**BURSOR & FISHER, P.A.**
Joel D. Smith (State Bar No. 244902)
Neal J. Deckant (State Bar No. 322946)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
jsmith@bursor.com
ndeckant@bursor.com

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
Rebecca A. Peterson (241858)
Kate M. Baxter-Kauf (pro hac vice)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
rapeterson@locklaw.com

**FOSTER YARBOROUGH PLLC**
Patrick Yarborough, Esq. (pro hac vice)
917 Franklin Street, Suite 220
Houston, TX 77002
Telephone: (713) 331-5254
patrick@fosteryarborough.com

**GEORGE FELDMAN MCDONALD, PLLC**
Lori G. Feldman (pro hac vice)
200 Park Avenue, Suite 1700
New York, New York 10166
Telephone: (646) 354-6534
lfeldman@4-justice.com

**THE HODA LAW FIRM, PLLC**
Marshal J. Hoda, Esq. (pro hac vice)
12333 Sowden Road, Suite B
Houston, TX 77080
Telephone: (832) 848-0036
marshal@thehodalawfirm.com

*Attorneys for Plaintiffs*
*Additional Attorneys on Signature Page*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE META PIXEL TAX FILING CASES | Master File No. 3:22-cv-07557 (SI) |
| This document relates to: | **CONSOLIDATED CLASS ACTION COMPLAINT** |
| All Actions | |
| | <u>JURY TRIAL DEMANDED</u> |

## NATURE OF THE ACTION

1.      This is a class action against Defendant Meta Platforms, Inc., formerly known as Facebook, Inc. ("Meta," "Facebook," or "Defendant"), arising from Meta's wiretapping of electronic communications on major online tax filing websites offered by H&R Block, TaxAct, and TaxSlayer, among other sites.  As a result of this wiretapping, U.S consumers have been transmitting their sensitive financial information to Meta – inadvertently and without consent – when they file their taxes online.  This information has included things like income, refund amounts, filing status, the names of dependents, and scholarship information.  When Meta receives this information, it matches it with Facebook users.

2.      The device that makes this wiretapping possible is Meta's ubiquitous tracking pixel, which is embedded in the JavaScript of online tax preparation websites, and which is part of a larger set of free "business tools" that Meta offers to website owners.  This pixel gathers information from website visitors even if they do not have a Meta account.  A separate but related technology, which Meta calls "Conversions API," also transmits web events and customer interactions directly from the website to Meta's servers.  Yet another tool, called the Facebook SDK, works similarly with mobile applications.

3.      Disclosing tax-return information without consent is a crime.  26 U.S. § 7216. Aiding and abetting the unlawful disclosure of tax-return information is a crime.  Inspecting unlawfully obtained tax-return information is a crime.  26 U.S. § 7213A(a)(2).

4.      This action is brought on behalf of Plaintiffs and a putative class of all people in the United States who used an online tax preparation provider subject to Meta's wiretap, including but not limited to H&R Block, TaxAct, or TaxSlayer, and who, as a result of using those services, had their tax-filing information transmitted to Meta via the pixel, Conversions API, or Facebook SDK. This action also seeks to certify subclasses of people from California, Illinois, New York, Washington, and Missouri who used these same websites.  Among other causes of action, Plaintiffs allege violations of state and federal wiretapping laws and consumer protection statutes.

1

## THE PARTIES

2     5.     Plaintiff Katrina Calderon is a citizen of California whose domicile is in California.

3  For the year 2021, Ms. Calderon used TaxAct's website to file her taxes online.   Since the tracking

4  pixel was on the site at that time, and it operates always and for everyone, Plaintiff Calderon's tax

5  return data would have been sent to Meta.  To the extent that TaxAct utilized Meta's Conversions

6  API, that business tool would have sent tax return information to Meta too.  Plaintiff provided the

7  same email to the online tax filing service and to Facebook.  Plaintiff recalls that shortly after using

8  the tax-filing website, Plaintiff saw advertisements for the same tax-filing service on her Facebook

9  feed.  Plaintiff typically uses online tax services to prepare and file her tax filings and would continue

10  to do so again in the future if the online service did not transmit tax filing information to Meta.

11  However, Plaintiff does not have the expertise to confirm whether any given tax filing site is

12  transmitting such information to Meta.  As a result, Plaintiff may either refrain from doing her taxes

13  online in the future, or may use the online tax filing service *incorrectly* assuming that it does not

14  transmit tax filing information to Meta.  Plaintiff Katrina Calderon may later be referred to in this

15  complaint as a "California Plaintiff."

16     6.     Plaintiff Crystal Craig is a citizen of Illinois whose domicile is in Illinois.  From 2016

17  forward, Plaintiff used the H&R Block website to file taxes online.   Since the tracking pixel was on

18  the site at that time, and it operates always and for everyone, Plaintiff's tax return data would have

19  been sent to Meta.  To the extent that H&R Block utilized Meta's Conversions API, that business

20  tool would have sent tax return information to Meta too.  Plaintiff provided the same email to the

21  online tax filing service that was provided to Facebook when Plaintiff set up a Facebook account.

22  Plaintiff typically uses online tax services to prepare and file her tax filings and would continue to

23  do so again in the future if the online service did not transmit tax filing information to Meta.

24  However, Plaintiff does not have the expertise to confirm whether any given tax filing site is

25  transmitting such information to Meta.  As a result, Plaintiff may either refrain from doing her taxes

26  online in the future, or may use the online tax filing service *incorrectly* assuming that it does not

27  transmit tax filing information to Meta.  Plaintiff Crystal Craig may later be referred to in this

28  complaint as an "Illinois Plaintiff."

7.      Plaintiff Tiffany Bryant is a citizen of Illinois whose domicile is in Illinois.  From 2019 forward, Plaintiff used the H&R Block website to file taxes online.   Since the tracking pixel was on the site at that time, and it operates always and for everyone, Plaintiff's tax return data would have been sent to Meta.  To the extent that H&R Block utilized Meta's Conversions API, that business tool would have sent tax return information to Meta too.  Plaintiff provided the same email to the online tax filing service that was provided to Facebook when Plaintiff set up a Facebook account.  Plaintiff typically uses online tax services to prepare and file her tax filings and would continue to do so again in the future if the online service did not transmit tax filing information to Meta.  However, Plaintiff does not have the expertise to confirm whether any given tax filing site is transmitting such information to Meta.  As a result, Plaintiff may either refrain from doing her taxes online in the future, or may use the online tax filing service *incorrectly* assuming that it does not transmit tax filing information to Meta.  Plaintiff Tiffany Bryant may later be referred to in this complaint as an "Illinois Plaintiff."

8.      Plaintiff Sait Kumargaliyev is a resident of New York whose domicile is in New York.  From 2019 forward, Plaintiff used the H&R Block website to file taxes online.   Since the tracking pixel was on the site at that time, and it operates always and for everyone, Plaintiff's tax return data would have been sent to Meta.  To the extent that H&R Block utilized Meta's Conversions API, that business tool would have sent tax return information to Meta too.  Plaintiff provided the same email to the online tax filing service that was provided to Facebook when Plaintiff set up a Facebook account.  Plaintiff recalls seeing advertisements for tax filing services on his Facebook feed. Plaintiff typically uses online tax services to prepare and file his tax filings and would continue to do so again in the future if the online service did not transmit tax filing information to Meta.  However, Plaintiff does not have the expertise to confirm whether any given tax filing site is transmitting such information to Meta.  As a result, Plaintiff may either refrain from doing his taxes online in the future, or may use the online tax filing service *incorrectly* assuming that it does not transmit tax filing information to Meta.  Plaintiff Sait Kumargaliyev may later be referred to in this complaint as a "New York Plaintiff."

9.      Plaintiff Chris Papadimitriou is a citizen of New York whose domicile is in New

York.  From 2001 forward, Plaintiff used the H&R Block, Tax Slayer, and TaxAct websites to file taxes online.   Since the tracking pixel was on the sites at that time, and it operates always and for everyone, Plaintiff's tax return data would have been sent to Meta.  To the extent that H&R Block, Tax Slayer, and TaxAct utilized Meta's Conversions API, that business tool would have sent tax return information to Meta too.  Plaintiff provided the same email to the online tax filing service that was provided to Facebook when Plaintiff set up a Facebook account.  Plaintiff recalls that shortly after using the tax filing website, Plaintiff saw advertisements for the same tax filing service on his Facebook feed.  Plaintiff typically uses online tax services to prepare and file his tax filings and would continue to do so again in the future if the online service did not transmit tax filing information to Meta.  However, Plaintiff does not have the expertise to confirm whether any given tax filing site is transmitting such information to Meta.  As a result, Plaintiff may either refrain from doing his taxes online in the future, or may use the online tax filing service *incorrectly* assuming that it does not transmit tax filing information to Meta.  Plaintiff Chris Papadimitriou may later be referred to in this complaint as a "New York Plaintiff."

10.     Plaintiff Jane Doe is a citizen of California whose domicile is in California.  For the year 2020, Ms. Doe used H&R Block's website to file her taxes online.   Since the tracking pixel was on the site at that time, and it operates always and for everyone, Ms. Doe's tax return data would have been sent to Meta.  To the extent that H&R Block utilized Meta's Conversions API, that business tool would have sent tax return information to Meta too.  Plaintiff provided the same email to the online tax-filing service that was provided to Facebook when Plaintiff set up a Facebook account. Plaintiff typically uses online tax services to prepare and file her tax filings and would continue to do so again in the future if the online service did not transmit tax-filing information to Meta. However, Plaintiff does not have the expertise to confirm whether any given tax-filing site is transmitting such information to Meta. As a result, Plaintiff may either refrain from doing her taxes online in the future, or may use the online tax-filing service *incorrectly* assuming that it does not transmit tax-filing information to Meta.  Plaintiff Jane Doe may later be referred to in this complaint as a "California Plaintiff."

1      11.     Plaintiff Claire Bresee is a citizen of the State of Washington whose domicile is in

2   Washington.  For the year 2021, Plaintiff used the TaxAct website to file taxes online.   Since the

3   tracking pixel was on the site at that time, and it operates always and for everyone, Plaintiff's tax

4   return data would have been sent to Meta.  To the extent that TaxAct utilized Meta's Conversions

5   API, that business tool would have sent tax return information to Meta too. Plaintiff provided the

6   same email to the online tax filing service that was provided to Facebook when Plaintiff set up a

7   Facebook account.  Plaintiff recalls that shortly after using the tax filing website, Plaintiff saw

8   advertisements for the same tax filing service on her Facebook feed.  Plaintiff typically uses online

9   tax services to prepare and file her tax filings and would continue to do so again in the future if the

10  online service did not transmit tax filing information to Meta.  However, Plaintiff does not have the

11  expertise to confirm whether any given tax filing site is transmitting such information to Meta.  As

12  a result, Plaintiff may either refrain from doing her taxes online in the future, or may use the online

13  tax filing service *incorrectly* assuming that it does not transmit tax filing information to

14  Meta. Plaintiff Bresee may later be referred to in this complaint as a "Washington Plaintiff."

15      12.     Plaintiff Kayla Housman is a citizen of the State of Missouri whose domicile is in

16  Missouri. For the years 2021 and 2022, Plaintiff used H&R Block to file taxes online. Since the

17  tracking pixel was on the site at the time, and it operates always and for everyone, Plaintiff's tax-

18  return data would have been sent to Meta. To the extent that H&R Block utilized Meta's

19  conversions API, that business tool would have sent tax-return information to Meta too. Plaintiff

20  provided the same email to the online tax-filing service that was provided to Facebook when

21  Plaintiff set up a Facebook account. Plaintiff recalls that shortly after using the tax-filing website,

22  Plaintiff saw advertisements for the same tax-filing service on her Facebook feed. Plaintiff

23  typically uses online tax services to prepare and file her tax filings and would continue to do so

24  again in the future if the online service did not transmit tax filing information to Meta.  However,

25  Plaintiff does not have the expertise to confirm whether any given tax filing site is transmitting

26  such information to Meta.  As a result, Plaintiff may either refrain from doing her taxes online in

27  the future, or may use the online tax filing service incorrectly assuming that it does not transmit tax

28

filing information to Meta.  Plaintiff Housman may later be referred to in this complaint as a "Missouri Plaintiff."

13.     Meta is a California corporation with its headquarters in Menlo Park, California. Meta does business throughout California and the United States.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this class action.  This Court has personal jurisdiction over Meta because it is headquartered in this State.

15.     Venue is proper in this Court because Meta conducts business in this County and throughout the State of California and its principal place of business is in this County.

## STATEMENT OF FACTS

### The Evolution Of Meta's Business Model: From Social Media to Surveillance

16.     Meta operates Facebook.com.  It is the world's largest social media company.

17.     Within 10 months of Facebook.com's initial launch, the site reached 1 million active users, quickly swelling to 30 million less than three years later.  As its user base grew, so too did interest from investors.  By late 2007, interest turned to clamor, and after rejecting a steady flow of proposed investments and buyouts, Meta (then called "Facebook") settled on an offer from Microsoft, agreeing to a $240 million investment for a 1.6 percent stake, which extrapolated to an eye-popping valuation: $15 billion.

18.     Commentators scrutinized the deal, pointing to the gaping disparity between Facebook's valuation and its revenue.  "When a startup shows an estimated $150 million in revenue, isn't wildly profitable, and doesn't have a clear revenue model, no company in its right mind would give it a $15 billion valuation – except, it seems, if we're talking about Facebook."  In short order, Meta/Facebook set about crafting that revenue model.

19.     In 2007, Mark Zuckerberg announced Facebook's new revenue model: Facebook Ads.  The main selling point of social media advertising—as opposed to traditional mediums—was the ability to customize, micro-target, and monitor advertising campaigns.  Shortly before the launch of Facebook Ads, details about the soon-to-be launched advertising system began to leak,

with one clear takeaway: "***Facebook is going to be gunning hard to get lots and lots of third-party data about its users into its database.***"

20.     Ultimately, Facebook users were not customers in the ordinary sense, but instead *products* offered to advertisers.  Facebook planned to mine its platform and third-party websites for insights it could use to target and customize advertisements for businesses.  User activity served as the raw materials that Facebook analyzed and dissected for inferences answering its ultimate question: what advertisement, from which company, for which user, will have maximal impact?  The better Facebook could answer that question, the better it could "improve the effectiveness of the ads and recruit new advertisers who want to pitch their messages to refined slices of the online audiences."

21.     In 2021, Meta generated $117 billion in revenue.  Roughly 97% of that came from selling advertising space.

22.     Meta sells advertising space by highlighting its ability to target users.

23.     Important to its advertising revenue model, Meta describes itself as a "real identity platform," meaning users are allowed only one account and must share "the name they go by in everyday life."  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.

24.     Meta maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications that Meta associates with personal identifiers including IP addresses, cookies, and device identifiers.

25.     Meta can target users effectively because it surveils user activity both on and off its site.  This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."  Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.

### The Wiretapping Devices: Meta's Tracking Pixel and Similar Business Tools

26.     Meta offers a suite of so-called Business Tools that Meta claims "help website owners and publishers, app developers and business partners, including advertisers and others,

integrate with Facebook, understand and measure their products and services, and better reach and serve people who might be interested in their products and services."

27.     One of those tools is Meta's pixel, which is an invisible 1x1 web element –an invisible pixel—that website owners can install on their websites to measure certain actions taken by users on their own websites, such as online purchases.

28.     Meta describes its pixel as follows: "The Meta Pixel is a snippet of JavaScript code *that allows you to track visitor activity on your website. It works by loading a small library of functions which you can use whenever a site visitor takes an action (called an event) that you want to track (called a conversion)*. Tracked conversions appear in the Ads Manager where they can be used to measure the effectiveness of your ads, to define custom audiences for ad targeting, for Advantage+ catalog ads campaigns, and to analyze that effectiveness of your website's conversion funnels."

29.     The pixel has vast capabilities and can collect a large range of user data, including, HTTP headers, the pixel ID, actions taken on a page, button click data (including the names of the buttons and pages visited as a result of button clicks), and form field information.

30.     The website communications collected by the tracking pixel are transmitted in real time to Meta's servers in California, where the information is stored.  The information also is transmitted to Meta while it is being sent from or received within California.

31.     Meta explains "How the Facebook Pixel Works" in relevant part as follows: "When someone visits your website and takes an action (for example, buying something), *the Facebook pixel is triggered and reports this action*.  This way, you'll know when a customer took an action after seeing your Facebook ad."

32.     Meta has stated that "When someone takes an action that the [website] developer has chosen to measure on its website, *the Meta Pixel is triggered and sends Meta certain data,* called an 'Event.'  Meta attempts to match the Events it receives to Meta users.  The developer can then choose to show ads to users who have taken a certain action on their own website."

33.     Meta has stated that the tracking pixel "*log[s] when someone takes an action*" such as "adding an item to their shopping cart or making a purchase."

34.     As soon as a website user takes any action on a webpage which includes the tracking pixel—such as clicking a button to register, login, or logout of a website, Meta's source code commands the user's device to re-direct the content of the communication to Meta while the exchange of the communication between the user and the website is still occurring.

35.     By design, Meta receives the content of website communications as the website user enters the information but before the website owner receives it.

36.     Through this technology, Meta intercepts each page a user visits, what buttons they click, as well as specific information they input into the website.  The Meta Pixel sends each of these pieces of information to Meta with PII, such as the user's IP address.

37.     The financial and tax-filing information at issue here is included among the "Event Data" that Meta captures and attempts to match with Facebook users.

38.     There are several ways that Meta matches data with an individual user's Facebook account.  For example, if the user is logged into their Facebook account when the user visits a website, Meta receives third party cookies allowing Meta to link the data collected by the pixel to the specific Facebook user.

39.     Meta can also link the data to a specific user through the Facebook Cookie, which is a workaround to recent cookie-blocking techniques.

40.     The tracking pixel also may utilize "Automatic Advanced Matching."  Automatic Advanced Matching enables the Meta pixel to "look for recognizable form field and other sources on your website that contain information such as first name, last name and email."  The tracking pixel then intercepts and transmits that information, "along with the event, or action, that took place."

41.     Meta intercepts and collects this information so it can better match visitors to their Facebook.com profiles, which in turn allows companies to better target their advertisements.

42.     Meta intercepts and collects information from its pixel regardless of whether a user is logged into Facebook.com or has ever registered for an account.

43.     Meta has claimed that it does not track non-Facebook user data, but that claim is false.  When a data-collection subject doesn't have an account on Meta's platforms, the data is collected in dossiers called "shadow profiles."

44.     Even if a user is not logged in, Meta can still associate the data with their IP address and all the websites that they have been to that contain the tracking pixel.

45.     After collecting and intercepting this information, Meta processes it, analyzes it, and assimilates it into datasets like Core Audiences.

46.     Meta's tracking pixel is not simply a "tool" utilized by website owners for their own purposes.  Meta offers these technologies to companies for free because Meta benefits too.  Meta uses the data it gleans from tools like the pixel to power its algorithms, providing it insight into the habits of users across the internet.  The data obtained allows Meta to amass huge amounts of data in a detailed dossier, or digital fingerprint, that it keeps on its users and other website visitors.

47.     Meta uses data obtained from the tracking pixel to target users with advertisements based on their interests.  For example, Meta admitted that "[w]e use the information we have (including your activity off our Products, such as the websites you visit and the ads you see) to help advertisers and other partners measure the effectiveness and distribution of their ads and services, and understand the types of people who use their services and how people interact with their websites, apps, and services."

48.     Meta uses the data that it collects from the pixel to increase its ad revenue.

49.     The pixel is widely deployed across many industries.

50.     The pixel has been available to website developers since at least October 14, 2015.

51.     Facebook's other Business Tools function the same.  For mobile applications, advertisers can utilize the Facebook SDK, which contains "component SDKs," like the App Events API, allowing advertisers to track events on their mobile apps so they can "measure ad performance and build audiences for ad targeting."[1]  For example, in 2019, the Wall Street Journal reported that Facebook was receiving sensitive user health data from at least 11 popular mobile

---

[1] FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/

apps.  The data being sent included information such as user's heart rates, blood pressure readings, menstrual cycles, and pregnancy statuses.

52.     Advertisers/website developers can also utilize the "Conversions API."  The Conversions API lets advertisers circumvent a user's choice to exercise privacy controls.[2]  More technically, the Conversions API is Facebook code that advertisers can implement server-side.[3]  Because it operates server-side, the Conversions API ignores users' decision to opt out of tracking, collecting the same data it would otherwise through "a connection between an advertiser's server and Facebook."[4]  When the Conversions API collects "[s]erver events," those data points are "linked to a Meta Pixel ID and are processed like web events sent via Pixel."[5]  As with the Facebook Tracking Pixel, the Conversions API intercepts these communications contemporaneously and surreptitiously.[6]  Facebook "recommend[s] that advertisers implement the Conversions API alongside their Meta Pixel and follow other best practices."[7]

### *Meta Secretly Hoovers Up Vast Amounts Of Private Tax Return Information*

53.     Thanks to Meta's pixel and business tools, online tax filing services such as H&R Block, TaxAct, and TaxSlayer have been quietly transmitting sensitive financial information to Meta when Americans file their taxes online.

54.     The information sent to Meta is used by Meta to power its advertising algorithms and is gathered regardless of whether the person using the tax filing service has an account on Meta or other platforms operated by its owner, Meta.

55.     H&R Block, TaxAct, and TaxSlayer are some of the most widely used e-filing

---

[2] FACEBOOK, CONVERSIONS API, https://developers.facebook.com/docs/marketing-api/conversions-api.  This refers to device specific privacy controls.

[3] *Id.*

[4] *Id*.

[5] *Id*.

[6] FACEBOOK, HANDLING DUPLICATE PIXEL AND CONVERSIONS API EVENTS, https://developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events/ ("Once your event fulfills both conditions, we keep the first one and remove the following one.  If a server and browser event arrive at approximately the same time (within 15 seconds of each other), we favor the browser event.").

[7] *Id.*

services that had the tracking pixel deployed on their websites.

56.     The type of data includes names and email addresses, data on users' income, filing status, refund amounts, and dependents' college scholarship amounts.

57.     For example, a recently published report found that the pixel on TaxAct's website sent users' filing status, adjusted gross income, and the amount of refund to Meta.  TaxAct has about three million users.

58.     H&R Block, which also has millions of users, reportedly transmitted information about tax filers' health savings account usage and dependents' college tuition grants and expenses.

59.     TaxSlayer reportedly used the Meta tracking pixel's "advanced matching" system described above to transmit phone numbers, filer names, and the names of any dependents added to the return.  TaxSlayer completed 10 million federal and state tax returns last year.

60.     The financial information that was transmitted to Meta from the tax filing websites included form field information and/or information affirmatively provided by the website user to the website.  Website users intended to convey information to the tax filing websites about their contact information, filing status, gross income, dependents, social security numbers, and other tax filing and financial information, and that information was surreptitiously shared with Meta in real-time as the information was provided.

61.     Meta's pixel and other business tools at issue here connect a particular user to particular tax-related information, which falls within the ambit of information protected against disclosure by federal law.

62.     Each of the Plaintiffs had their tax and financial information unlawfully transmitted from the websites of either H&R Block, TaxSlayer, or TaxAct, depending on which website they used to prepare and file their taxes.  When installed on a website, Meta's pixel operates all the time and the same way for all website visitors.  So, when each Plaintiff entered the information needed to prepare their tax filings, the pixel caused that information to be transmitted in real time to Meta, including confidential tax and financial information.  Meta's system then matched that information to Plaintiffs' Facebook accounts, per its standard operating procedures.  Meta used the information transmitted for purposes of marketing and to train its algorithms to more accurately identify and

target users, as described more fully in the section above describing Meta's business model.

***Meta Did Not Receive Consent To Receive Confidential Tax Information***

63.     Meta's position in this litigation is that it has consent from Facebook.com users to obtain any information whatsoever that users disclose on third-party websites—no matter how sensitive or confidential, and even if the information is illegal to disclose.

64.     Meta's position in this litigation is that consent from Facebook.com users is derived from disclosures made in its Terms of Service, Data Policy, and Cookies Policy, and regardless of whether users saw those policies.

65.     Meta's Terms of Service has never specifically indicated that Meta may acquire confidential tax information obtained from Facebook users' interactions on third-party online tax preparation sites, like those offered by H&R Block, TaxAct, and TaxSlayer, among others.

66.     Meta's Data Policy has never specifically indicated that Meta may acquire confidential tax information obtained from Facebook users' interactions on third-party online tax preparation sites, like those offered by H&R Block, TaxAct, and TaxSlayer, among others.

67.     Meta's Cookies Policy has never specifically indicated that Meta may acquire confidential tax information obtained from Facebook users' interactions on third-party online tax preparation sites, like those offered by H&R Block, TaxAct, and TaxSlayer, among others.

68.     None of the tax-filing websites offered by H&R Block, Tax Slayer, Tax Act, or other similar companies disclosed that they sent confidential tax-return information to Meta, or requested consent for such disclosure.

69.     Meta also makes several false representations and warranties that it does not collect sensitive financial information like the information at issue here.  Because of those false representations, Plaintiffs and class members could not have consented to Meta's collection of tax filing information.

A.   Meta's Business Tool Terms expressly provide that website developers will not share data that they "know ore reasonably should know … includes health, ***financial*** or other categories of sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry

guidelines.)"

    B. In Meta's Advertising Policy, Meta states "[w]e do not use sensitive personal data for ad targeting."

    C. In a blog post titled "About Restricted Meta Business Tools Data," Meta states that it does not "want websites or apps sending us sensitive information about people," including "any information defined as sensitive under applicable laws, regulations and applicable industry guidelines."

    D. In an article titled, "How does Facebook receive information from other businesses and organizations," Meta reiterates its promise to "prohibit businesses or organizations from sharing sensitive information with us," and if Meta "determine[s] that a business or an organization is violating our terms, we'll take action against that business or organization."

    E. In another article, titled, "How does Meta work with data providers?" Meta states, "[b]usinesses that advertise on Facebook are required to have any necessary rights and permissions to use this information, as outlined in our Custom Audience Terms that businesses must agree to."

70.    Each of the above-quoted statements is false or misleading. Collecting financial information is consistent with Meta's business model of "gunning hard to get lots and lots of third-party data about its users into its database."

***Meta Intentionally Obtained Confidential Tax and Financial Information***

71.    As alleged above, Meta's business model depends on data collection for advertising purposes.

72.    Income and other related financial information are highly valuable demographic markers for advertising purposes.   Hence, the financial information at issue here was valuable to Meta.

73.    Meta knew that it was receiving tax filing and other financial information through the pixel, SDK, and Conversion API, and did not make a genuine effort to prevent it. Meta did not do so because it had an affirmative desire to intercept and utilize confidential communications

1   between class members and the tax-filing websites they used to prepare their taxes.

2        74.    Meta knew about the data transmissions from several sources.  First, Meta monitors

3   and analyzes all data that comes to it, because data collection is at the core of its business.  Second,

4   it is important for Meta to assist high-traffic websites that provide advertising revenue to Meta.

5   Therefore, Meta employs account managers to help website developers and owners use the Meta

6   pixel and other tools like the SDK and Conversion API.  H&R Block and other popular tax filing

7   websites provide substantial advertising revenue to Meta, especially during the runup to tax season.

8   Meta therefore knew that H&R Block and other popular tax filing websites used the pixel and

9   similar technology like the SDK and Conversion API, and that using those technologies would

10   result in confidential data being sent to Meta.

11        75.    Meta's policy of prohibiting the disclosure of confidential or sensitive information

12   to Meta is a sham because Meta usually does not take enforcement action against companies that it

13   knows are sharing potentially sensitive information with it.  A primary purpose of Meta's policy

14   against the disclosure of confidential or sensitive information is to provide plausible deniability

15   when Meta is sued for privacy violations.

16        76.     Meta's receipt of the tax filing and financial information at issue here was not the

17   result of accident, mistake, or inadvertence.  Meta provides its pixel, Conversion API, and SDK

18   technology to website owners with the knowledge and expectation that doing so will result in data

19   transmissions to Meta, thereby supporting its business model and advertising revenue.

20        77.    Meta's actions were done for the purpose of violating laws prohibiting the unlawful

21   review and use of tax and other confidential information.   Meta's intent to unlawfully utilize the

22   confidential information it obtained was separate and independent from its intent to violate the

23   Federal Wiretap Act.

24        78.    Alternatively, Meta was willfully blind to the fact that it was receiving and

25   processing the tax and financial information at issue here.  Given that Meta knew how its pixel

26   technology worked, and that many websites used that pixel (including H&R Block and other

27   popular tax filing websites), Meta subjectively believed that there was a high probability that it was

28   receiving tax filing information, but deliberately choose not to investigate that fact and take

appropriate remedial action.

79.     Meta turned a blind eye to the problem because it had a financial and business incentive to continue receiving confidential tax filing and other financial information.  This deliberate ignorance was equivalent to actual knowledge.

## CLASS ACTION ALLEGATIONS

80.     Plaintiffs seek to represent the following classes:

Nationwide Class:  All people in the United States whose tax filing information was obtained by Meta from an online tax preparation provider such as H&R Block, TaxAct, or TaxSlayer.

Plaintiffs also seek corresponding state subclasses that include the same people in the Nationwide class, but limited to residents of the following states:  California, Illinois, New York, Washington, and Missouri.

81.     Plaintiffs reserve the right to modify the class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

82.     Members of the class and subclass are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the class and subclass number in the millions.  The precise number of class and subclass members and their identities are unknown at this time but may be determined through discovery.  Class and subclass members may be notified of the pendency of this action by mail and/or publication through the distribution records of Meta.

83.     Common questions of law and fact exist as to all class and subclass members and predominate over questions affecting only individual class members.  Common legal and factual questions include, but are not limited to, whether Meta has violated wiretapping statutes at issue here; whether class members are entitled to statutory damages for the violations; whether Meta's omissions were material; whether Meta intentionally obtained confidential tax filing information; and whether Meta was unjustly enriched by the conduct alleged here.

84.     The claims of the named Plaintiffs are typical of the claims of the class and subclass because the named Plaintiffs, like all other class members, visited the websites of H&R Block, TaxAct, or TaxSlayer and had their electronic communications intercepted and disclosed to

Facebook using the tracking pixel and/or other business tools.

85.     Plaintiffs are adequate representatives of the class and subclass because their interests do not conflict with the interests of the class members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of class and subclass members will be fairly and adequately protected by Plaintiff and their counsel.

86.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of class and subclass members.  Each individual class and subclass member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Meta's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Meta's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

87.     Plaintiffs bring all claims in this action individually and on behalf of members of the class and subclass against Meta.

## TOLLING, CONCEALMENT, AND ESTOPPEL

88.     Any statute of limitation applicable to Plaintiffs' or class members claims are tolled as a result of Meta's knowing and active concealment of its conduct alleged here.

89.     Among other things, Meta affirmatively hid its true actions while misrepresenting that website owners were not permitted to transmit information that was unlawful to disclose to Meta.

90.     Plaintiffs and class members did not have the information essential to pursue their claims, without any fault or lack of diligence on their own part.

91.     Under the circumstances, Meta was under a duty to disclose the true character,

1    quality, and nature of its activities to Plaintiffs.  Meta therefore is estopped from relying on any

2    statute of limitations.

3            92.     All applicable statutes of limitations have been tolled by operation of the discovery

4    rule.  Plaintiffs and other class members could not have learned through the exercise of reasonable

5    diligence of Meta's conduct as alleged herein.

6            93.     Information about online tax filing services such as H&R Block transmitting tax

7    filing information did not become publicly known until approximately November 22, 2022, when

8    various news agencies began reporting on the subject.  The news was prompted by research and

9    data collected by The Markup, and required the expert analysis of computer scientists to uncover.

10           94.     Meta has claimed in litigation that the discovery rule does not apply because

11   "Facebook's Off-Facebook Activity tool allows users to view a summary of information Meta has

12   received about their activity from third parties."  This is a misleading statement and evidence of

13   Meta's intent to deceive its customers about its true business operations.  The truth is, Off-

14   Facebook Activity reports contain very little information at all, and do not disclose that on-line tax

15   websites like H&R Block and others transmitted confidential tax filing information.

16           95.     Meta further misled its customers by falsely representing that (a) Meta does not

17   want businesses to share confidential information with it; (b) Meta prohibits businesses from

18   sharing confidential information with it; and (c) Meta will act against a company that does so.

19   Accordingly, Meta's false assurances would reasonably lead a person to conclude that there was no

20   reason to investigate whether unlawful transmissions of confidential tax information were

21   occurring.

### COUNT I
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 631**

24           96.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set

25   forth herein.

26           97.     All Plaintiffs bring this claim individually and on behalf of the members of the

27   nationwide class against Meta.  Each Plaintiff also brings this claim on behalf of their respective

28   state subclass.

98.     To establish liability under section 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> Or
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> Or
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> Or
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

99.     Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc*., 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc*., 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. Apr. 9, 2020) (reversing dismissal of CIPA and common law privacy claims based on Meta's collection of consumers' Internet browsing history).

100.    The tracking pixel, Conversion API, SDK, related business tools, and corresponding backend and frontend code are "machine[s], instrument[s], contrivance[s], or … other manner[s]" used to engage in the prohibited conduct at issue here.

101.    At all relevant times, by using the Facebook Tracking Pixel, Meta intentionally

tapped, electrically or otherwise, the lines of internet communication between Plaintiff and class members and the owners of the websites at issue here.

102.    At all relevant times, by using the Facebook Tracking Pixel, Meta willfully and without the consent of all parties to the communication, or in any unauthorized manner, read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and class members, while the electronic communications were in transit or passing over any wire, line or cable or were being sent from or received at any place within California.

103.    Plaintiffs and class and subclass members did not consent to any of Meta's actions in implementing the wiretaps.  Plaintiffs and putative class and subclass members did not consent to Meta's access, interception, reading, learning, recording, and collection of Plaintiffs and class and subclass members' electronic communications.

104.    Plaintiffs and class and subclass members seek all relief available under Cal. Penal Code § 637.2, including injunctive relief and statutory damages of $5,000 per violation.

**COUNT II**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 632**

105.    Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

106.    All Plaintiffs bring this claim individually and on behalf of the members of the nationwide class against Meta.  Each Plaintiff also brings this claim on behalf of their respective state subclass.

107.    The California invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638.  The Act begins with its statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code § 630.

108.    California Penal code § 632(a) provides, in pertinent part:

A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500) per violation.

109.    A defendant must show it had the consent of <u>all</u> parties to a communication.

110.    The tracking pixel, Conversion API, SDK, related business tools, and corresponding backend and frontend code are "electronic amplifying or recording device(s)" under the CIPA.

111.    The tax filing and other financial data collected by Meta constitutes "confidential communications," as that term is used in Section 632, because class members had objectively reasonable expectations of privacy with respect to their tax filing information.  Plaintiffs and class members had an objectively reasonable expectation of privacy because tax filing information is protected by federal and state law.

112.    Pursuant to Cal. Penal Code § 637.2, Plaintiffs and class members have been injured by the violations of Cal. Penal Code § 635, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

## COUNT III
### Violation Of Illinois Eavesdropping Statute
### 720 ILCS 5/14

113.    Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

114.    The Illinois Plaintiffs Craig and Bryant bring this claim individually and on behalf of the members of the Illinois subclass against Meta.

115.    A person violates the Illinois Eavesdropping Statute when he or she knowingly and intentionally "[i]ntercepts, records, or transcribes, in a surreptitious manner any private electronic communication to which he or she is not a party unless he or she does so with the consent of all parties to the private electronic communication. . . ." 720 ILCS 5/14-2(a).

116.    The statute broadly defines "private electronic communication" to mean "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or part by a wire, radio, pager, computer, electromagnetic, photo electronic or photo optical

system, when the sending or receiving party intends the electronic communication to be private under circumstances reasonably justifying that expectation." 720 ILCS 5/14-1(e). 48.

117.    By designing and the Meta Pixel, Conversions API, and Facebook SDK to contemporaneously monitor, intercept, collect, record, transmit, and disclose the contents of private electronic communications on the tax filing website at issue here, Meta intentionally and knowingly monitored, intercepted, collected, recorded, transmitted, and disclosed "private electronic communications," in violation of 720 ILCS 5/14-2.

118.    The Illinois Plaintiffs and the Illinois Subclass members intended their communications to be private because they reveal confidential financial and tax information.

119.    Neither Illinois Plaintiffs nor the members of the Illinois Subclass ever consented to Meta's interception, collection, recording, use, or disclosure of their private electronic communications.

120.    As a result of Meta's unlawful conduct, the Illinois Plaintiffs and the members of the Illinois Subclass have been injured and seek all available relief under the Illinois Eavesdropping Statute.

**COUNT IV**
**Violation Of The Washington Privacy Act**
**Wash. Rev. Code § 9.73.030**

121.    Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

122.    The Washington Plaintiff Bresee brings this claim individually and on behalf of the members of the Washington Subclass against Meta.

123.    Washington's Privacy Act, RCW §§ 9.73, et seq. ("Privacy Act") prohibits companies from intercepting private communications without the consent of all parties involved. The Privacy Act is one of the most restrictive privacy statutes in the United States.

124.    Meta does not qualify as an entity exempted from liability under the Privacy Act as defined by RCW § 9.73.070. 60.

125.    Meta's conduct violated RCW § 9.73.030(a) because Meta intentionally intercepted and/or recorded, by device or otherwise, private communications as described more fully herein,

without first obtaining the consent of Plaintiff or the Class.

126.    The Washington Plaintiff and Washington Subclass members suffered harm as a result of Meta's violations of the Privacy Act, and therefore seek all available relief under the Washington Privacy Act.

**COUNT V**
**Violation Of The Missouri Wiretap Act**
**Mo. Ann. Stat. § 542.418, *et seq.***

127.    Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

128.    The Missouri Plaintiff Houseman brings this claim individually and on behalf of the Missouri Subclass against Meta.

129.    Missouri's Wiretap Act, Mo. Ann. Stat. § 542.418, *et seq.*, provides that "[a]ny person whose wire communication is intercepted, disclosed, or used in violation" of the statute shall "have a civil cause of action" against the person or entity who "intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications."  The statute prohibits companies from intercepting private communications without the consent of both parties to the communication where the communications is intercepted for the purpose of committing and criminal or tortious act.

130.    Meta's conduct violated the Missouri Wiretap Act because Meta intentionally intercepted and/or recorded, by device or otherwise, private communications as described more fully herein, without first obtaining the consent of the Plaintiff or the Class and did so for the purpose of committing a criminal or tortious act.

131.    The Missouri Plaintiff and the Missouri Subclass members suffered harm as a result of Meta's violations of the Wiretap Act, and therefore seek all available relief under that statute.

**COUNT VI**
**Violation Of The Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.***

132.    Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

133.    All Plaintiffs bring this claim individually and on behalf of the members of the nationwide class against Meta.  Each Plaintiff also brings this claim on behalf of their respective

state subclass.

134.    The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986, prohibits the intentional interception of the contents of any wire, oral, or electronic communications through the use of a device.  18 U.S.C. § 2511.

135.    The Wiretap Act protects both the sending and receiving of communications.

136.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral or electronic communication is intercepted.

137.    Meta's intentional interception of internet communications that Plaintiff and Class members were sending and receiving while navigating websites that integrated Facebook's Business Tools was done contemporaneously with the Plaintiffs' and Class members' sending and receipt of those communications.

138.    The communications intercepted by Meta included "contents" of electronic communications made from Plaintiffs.

139.    The transmission of data between Plaintiffs and Class members were "transfer[s] of signs, signals, writing, … data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetics, photoelectronic, or photooptical system that affects interstate commerce[,]" and were therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

140.    Meta's pixel and business tools are "devices" within the meaning of 18 U.S.C. 2510(5):

141.    Meta was not an authorized party to the communications because Plaintiffs and Class members were unaware of Meta's monitoring.  Class members did not consent to Meta's interception or continued gathering of the user's communications.

142.    The interception by Meta were unlawful and tortious, and were done in furtherance of one or more crimes baring disclosure or review of confidential tax information, and tortious invasion of privacy.

143.     After intercepting the communications, Meta used the contents of the communications knowing or having reason to know that such information was obtained through the interception of electronic communications in violation of 18 U.S.C. § 2511(a).

144.     Plaintiffs seek all available relief for the violations asserted here.

<u>COUNT VII</u>
**Unjust Enrichment**

145.     Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

146.     All Plaintiffs bring this claim against Meta under California law on behalf of themselves and the nationwide class.  Alternatively, each Plaintiff brings this claim on behalf of their respective state subclass.

147.     To the extent required by law, this count is alleged in the alternative to legal claims pursuant to F.R.C.P. 8.

148.     Meta has wrongfully and unlawfully received, used, and/or sold Plaintiffs' and Class members' confidential tax and financial information without their consent.  Meta benefited financially by doing so.

149.     Meta has been unjustly enriched at the expense of the Plaintiffs and Class members.

150.     Meta has unjustly retained the benefits of its unlawful and wrongful conduct.

151.     It would be inequitable and unjust for Meta to retain any of the unlawful proceeds resulting from its unlawful and wrongful conduct.

152.     Plaintiffs and class members have suffered an injury in fact and have lost money as a result of Meta's unjust conduct.  Plaintiffs and class members lack an adequate remedy at law with respect to this claim and are entitled to non-restitutionary disgorgement of the financial profits that Meta obtained as a result of its unjust conduct.

<u>COUNT VIII</u>
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 635**

153.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

154.     All Plaintiffs bring this claim individually and on behalf of the members of the

nationwide class against Meta.  Each Plaintiff also brings this claim on behalf of their respective

state subclass.

155.    California Penal Code § 635 provides, in pertinent part:

> Every person who manufactures, assembles, sells, offers for sale,
> advertises for sale, possesses, transports, imports, or furnishes to
> another any device which is primarily or exclusively designed or
> intended for eavesdropping upon the communication of another, or
> any device which is primarily or exclusively designed or intended for
> the unauthorized interception or reception of communications
> between cellular radio telephones or between a cellular radio
> telephone and a landline telephone in violation of Section 632.5, or
> communications between cordless telephones or between a cordless
> telephone and a landline telephone in violation of Section 632.6 ,
> shall be punished by a fine not exceeding two thousand five hundred
> dollars ….

156.    At all relevant times, by implementing Meta's wiretaps, Meta intentionally

manufactured, assembled, sold, offered for sale, advertised for sale, possessed, transported,

imported, and/or furnished a wiretap device that is primarily or exclusively designed or intended

for eavesdropping upon the communication of another.

157.    The Facebook Tracking Pixel is a "device" that is "primarily or exclusively

designed" for eavesdropping.  That is, the Facebook Tracking Pixel is designed to gather

information about what URLs users visit and what they search for.

158.    Plaintiffs and class members did not consent to any of Meta's actions in

implementing Facebook's wiretaps.

159.    Pursuant to Cal. Penal Code § 637.2, Plaintiffs and class and members have been

injured by the violations of Cal. Penal Code § 635, and each seek damages for the greater of $5,000

or three times the amount of actual damages, as well as injunctive relief.

## COUNT IX
### Violation Of The Federal Wiretap Act, 18 U.S.C. § 2512

160.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set

forth herein.

161.    All Plaintiffs bring this claim individually and on behalf of the members of the

nationwide class against Meta.  Each Plaintiff also brings this claim on behalf of their respective

state subclass.

162.     18 U.S.C. § 2512, in pertinent part, holds "any person" liable who manufactures, assembles, or sells "any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications, and that such device or any component thereof has been or will be sent through the mail or transported in interstate or foreign commerce. 18 U.S.C. § 2512(1)(b).

163.     The technology at issue here is an "electronic, mechanical, or other device" as defined by 18 U.S.C. § 2510(5), and is primarily useful for the purpose of the surreptitious interception of electronic communications.

164.     Meta manufactured, marketed, and sold its technology with knowledge that it would primarily be used to illegally intercept electronic communications.

165.     Meta conduct violated 18 U.S.C. § 2512 and therefore gives rise to a claim under 18 U.S.C. § 2520.

166.     Pursuant to 18 U.S.C. § 2520, Plaintiffs and class members are entitled to the greater of actual damages or statutory damages or not less than $100 a day for each day of violation or $10,000, whichever is greater.

## COUNT X
### Violation Of The Illinois Consumer Fraud and Deceptive Business Practices Act
### 815 Ill. Comp. Stat. §§ 505, *et seq.*

167.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

168.     Illinois Plaintiffs Craig and Bryant bring this claim individually and on behalf of the members of the Illinois Subclass against Meta.

169.     Meta is a "person" as defined by 815 Ill. Comp. Stat. § 505/1(c).

170.     Illinois Plaintiffs and Illinois Subclass Members are "consumers" as defined by 815 Ill. Comp. Stat. § 505/1(e).

171.     Meta's conduct as described herein was in the conduct of "trade" or "commerce" as defined by 815 Ill. Comp. Stat. § 505/1(f).

172.     Meta's fraudulent business practices, in violation of 815 Ill. Comp. Stat. § 505/2, include the failure to disclose that the Facebook Pixel is being improperly used on tax preparation websites resulting in the wrongful, contemporaneous, redirection to Facebook of sensitive financial communications without the knowledge or authorization of Plaintiffs or Illinois Subclass Members.

173.     Meta also failed to disclose that it had no reasonable security measures that would have prevented online tax filing websites from sharing confidential tax filing information with Meta.

174.     Meta further knowingly deceived the Illinois Plaintiffs and Illinois Subclass Members by representing through its practices that it does not collect sensitive financial information from its users, when it, in fact, did collect such information through the Facebook Pixel.

175.     Illinois Plaintiffs and Illinois Subclass Members have suffered an injury in fact, including the loss of money and/or property, as a result of Meta's unfair, unlawful and/or deceptive practices, to wit, the disclosure of their personally identifiable data which has value as is demonstrated by the use and sale of it by Meta. While only an identifiable "trifle" of injury is needed to be shown, as set forth above Plaintiffs, the Illinois Subclass Members, and the public at large value their tax filing information at more than a trifle. And the sale of this confidential and valuable information has now diminished the value of such information to the Illinois Plaintiffs and the Illinois Subclass.

176.     Meta's actions caused damage to and loss of Illinois Plaintiffs', Illinois Subclass Members', and other taxpayers' property rights to control the dissemination and use of their tax filing information.

177.     Meta's misleading practices and related  omissions were intended to, were likely to, and did deceive reasonable consumers such as Plaintiffs and the Illinois Subclass. .

178.     The undisclosed information Meta concealed is material to reasonable consumers.

179.     Meta intended to mislead its customers, Illinois Plaintiffs, and Illinois Subclass Members, and induce them to rely on its omissions.

180.     The above unfair and deceptive practices and acts by Meta offend public policy.

These acts caused substantial injury that these consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

181.    Meta acted intentionally and knowingly to violate Illinois' Consumer Fraud Act, and recklessly disregarded Plaintiffs' and Illinois Subclass lass members' rights.

182.    As a direct and proximate result of Meta's conduct, Illinois Plaintiffs and Illinois Subclass Members have suffered and will suffer injury, including, but not limited to, nominal damages; general damages based on the fact that their confidential tax filing information that Illinois Plaintiffs and Illinois Subclass Members intended to remain private are no longer private; that Meta eroded the essential confidential nature of the filer-tax preparer relationship; that Meta took something of value from Illinois Plaintiffs and Class Members and derived benefits therefrom without Illinois Plaintiffs' and Illinois Subclass Members' knowledge or informed consent and without sharing the benefit of such value; and, the diminished value of Meta's goods and services Illinois Plaintiffs and Illinois Subclass Members received.

183.    Illinois Plaintiffs and Illinois Subclass Members seek all monetary and non–monetary relief allowed by law, including damages, restitution, nominal and punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT XI
### Violation Of The Illinois Uniform Deceptive Trade Practices Act
### 815 ILCS §§ 510/2, et seq.

184.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

185.    Illinois Plaintiffs Craig and Bryant bring this claim individually and on behalf of the members of the Illinois subclass against Meta.

186.    Meta is a "person" as defined by 815 Ill. Comp. Stat. §§ 510/1(5).

187.    Meta engaged in deceptive trade practices in the conduct of its business, in violation of 815 Ill. Comp. Stat. §§ 510/2(a), including the acts and practices alleged herein, namely, that Meta misrepresented that it does not collect sensitive financial information from its users, when it, in fact, did collect such information through the Facebook Pixel and failed to disclose that the Facebook Pixel is being improperly used on tax preparation websites resulting in the wrongful,

contemporaneous, redirection to Meta of sensitive financial communications without the knowledge or authorization of Plaintiffs or Illinois Subclass Members.

188.    This is a deceptive trade practice because it is a mechanism for: (a) Representing that goods or services have characteristics that they do not have (815 Ill. Comp. Stat. § 510/2(a)(5)); (b) Representing that goods or services are of a particular standard, quality, or grade if they are of another (815 Ill. Comp. Stat. § 510/2(a)(7)); (c) Advertising goods or services with intent not to sell them as advertised (815 Ill. Comp. Stat. § 510/2(a)(9)); and (d) Engaging in other conduct that creates a likelihood of confusion or misunderstanding (815 Ill. Comp. Stat. § 510/2(a)(12)).

189.    Meta's conduct and related omissions were material because they were likely to deceive reasonable consumers about the adequacy and capabilities of Meta's data security and ability to protect the confidentiality of Plaintiffs' and Illinois Subclass Members' tax filing information.

190.    Meta's conduct and related omissions were material because they were likely to deceive reasonable consumers, including Plaintiffs and Illinois Subclass Members.

191.    The above unfair and deceptive practices and acts by Meta offend and violate public policy. These acts caused substantial injury to Illinois Plaintiffs and Illinois Subclass Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

192.    As a direct and proximate result of Meta's conduct, Illinois Plaintiffs and Illinois Subclass Members have suffered and will suffer injury, including, but not limited to, nominal damages; general damages based on the fact that their sensitive and confidential tax filing information that Illinois Plaintiffs and Illinois Subclass Members intended to remain private are no longer private; that Meta eroded the essential confidential nature of the filer-tax preparer relationship; that Meta took something of value from Illinois Plaintiffs and Illinois Subclass Members and derived benefits therefrom without Illinois Plaintiffs' and Illinois Subclass Members' knowledge or informed consent and without sharing the benefit of such value; and, the diminished value of Meta's goods and services Illinois Plaintiffs and Illinois Subclass Members received.

1    193.    Illinois Plaintiffs and Illinois Subclass Members seek all monetary and non–

2  monetary relief allowed by law, including damages, restitution, nominal and punitive damages,

3  injunctive relief, and reasonable attorneys' fees and costs.

4                                       **COUNT XII**

   **Violation Of New York's Deceptive Practices Act, N.Y. Gen. Bus. Law, § 349 ("GBL")**

5    194.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set

6  forth herein.

7    195.    New York Plaintiffs Kumargaliyev and Papadimitriou bring this claim individually

8  and on behalf of the members of the New York Subclass against Meta.

9    196.    Section 349 of the New York GBL provides that "[d]eceptive acts or practices in the

10  conduct of any business, trade or commerce or in the furnishing of any service in this state are

11  hereby declared unlawful." N.Y. Gen. Bus. Law § 349(a).

12    197.    Meta, engaged in deceptive acts and practices in the conduct of business, trade and

13  commerce, and the furnishing of services, in violation of N.Y. Gen. Bus. Law § 349(a). This

14  includes but is not limited to the following: surreptitiously obtaining and disclosing New York

15  Plaintiffs' and New York Subclass Members' tax filing and other financial information; failing to

16  disclose that the Facebook Pixel is being improperly used on tax preparation websites resulting in

17  the wrongful, contemporaneous, redirection to Meta of sensitive financial communications without

18  the knowledge or authorization of New York Plaintiffs or New York Subclass.

19    198.    As a direct and proximate result of Meta's practices, New York Plaintiffs and other

20  New York Subclass Members suffered injury and/or damages, including but not limited to,

21  nominal damages; general damages based on the fact that their sensitive and confidential tax filing

22  information that New York Plaintiffs and New York Subclass Members intended to remain private

23  are no longer private; that Meta eroded the essential confidential nature of the filer-tax preparer

24  relationship; that Meta took something of value from New York Plaintiffs and Class Members and

25  derived benefits therefrom without New York Plaintiffs' and New York Subclass Members'

26  knowledge or informed consent and without sharing the benefit of such value; and, the diminished

27  value of Meta's goods and services New York Plaintiffs and New York Subclass Members

28

1    received.

2        199.    The above unfair and deceptive practices and acts by Meta were immoral, unethical,

3    oppressive, and unscrupulous. These acts caused substantial injury to New York Plaintiffs and

4    other New York Subclass Members that they could not reasonably avoid, and which outweighed

5    any benefits to consumers or to competition.

6        200.    New York Plaintiffs and New York Subclass Members seek relief under N.Y. Gen.

7    Bus. Law § 349(h), including but not limited to actual damages (to be proven at trial), treble

8    damages, statutory damages, injunctive relief, and/or attorney's fees and costs.

9        201.    New York Plaintiffs and New York Subclass Member will be irreparably harmed

10   unless the Court enjoins Meta's unlawful, deceptive actions, in that Meta will continue to engage in

11   the unlawful conduct outlined above unless enjoined from doing so.

12       202.    New York Plaintiffs and New York Subclass Members seek declaratory relief,

13   restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits,

14   statutory damages, injunctive relief prohibiting Meta from continuing to disseminate its false and

15   misleading statements, and other relief allowable under N.Y. Gen. Bus. Law § 349.

16   **COUNT XIII**
**Negligence/ Negligence Per Se**

17       203.    Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

18       204.    All Plaintiffs bring this claim under California law on behalf of themselves and the

19   nationwide class.  Alternatively, each Plaintiff brings this claim on behalf of their respective state

20   subclass.

21       205.    Meta owed a duty to Plaintiffs and Class members to exercise reasonable care in

22   protecting their confidential tax and financial information from unauthorized disclosure to Meta.

23       206.    Meta failed to comply with its own publicly-stated standards to prevent

24   unauthorized disclosure of confidential tax and financial information to Meta.  This is particularly

25   so given that Meta knew the nature of data that was being transmitted to it via the pixel, SDK, and

26   Conversion API technology, and yet took no action.

27       207.    The lack of reasonable care in the handling of the confidential information at issue

28

here can foreseeably harm the individuals providing the information.

208.    The tax and financial information at issue here was private, and Plaintiffs and Class members trusted Meta to employ appropriate measures to prevent disclosure of their confidential information.

209.    From a policy standpoint, to hold that Meta has no duty of care here would create perverse incentives for businesses who profit off the use of consumers' personal data to turn a blind eye and ignore known security risks.

210.    Meta breached its duties to Plaintiffs and Class members. Meta knew or should have known that it was collecting and using confidential information tax and financial information from tax filing websites like H&R Block and others.  Meta knew or should have known that its business practices did not safeguard against the disclosures at issue in this case.

211.    The doctrine of negligence per se also applies here.  At all times, Meta had an obligation to comply with all state and federal laws restricting the disclosure of confidential tax filing information, including but not limited to 26 U.S. § 7213A(a)(2) and § 7216.   Meta also had an obligation to comply with state and federal wiretap laws, and Section 5 of the FTC Act.  Meta's actions as described herein violated these laws.

212.    Plaintiffs and Class members are within the class of persons protected by state and federal laws governing the disclosure of tax filing information, and state and federal wiretapping laws.  Plaintiffs' and Class members' injuries are the type of harm that these same laws are intended to prevent.

213.    As a result of Meta's negligence, Plaintiffs and Class members suffered the following injuries, which were foreseeable to Meta: (1) the loss of privacy of Plaintiff's protected financial information; (2) time and resources expended to investigate and respond to Meta's violations; (3) diminution in value of their protected financial information; and (4) loss of the benefit of their bargain with Meta.  Plaintiffs' tax filing and financial information is a valuable commodity, as it is a key demographic marker for marketing purposes.

214.    Meta encouraged the transmission of financial information by providing tax-filing websites with technology that Meta knew would result in the transmission of confidential

information, and took no action against websites when Meta began obtaining and using that information.

215.    Meta's violations of the aforementioned statutes are negligence per se.

216.    Plaintiffs and class members seek all available relief for Meta's negligence, including damages, restitution, punitive damages, nominal damages, and any other relief the Court deems just.

## COUNT XIV
### Violation of California Consumer Legal Remedies Act, Cal. Civ. Code § 1780 et seq.

217.    Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

218.    All Plaintiffs bring this claim under California law on behalf of themselves and the nationwide class.  Alternatively, each Plaintiff brings this claim on behalf of their respective state subclass.

219.    Plaintiffs and Class Members are each a "consumer" as that term is defined in California Civil Code § 1761(d).

220.    Meta is a "person" as that term is defined in California Civil Code § 1761(e).

221.    Meta provides "services" to Plaintiffs and Class Members as that term is defined in California Civil Code § 1761(b).

222.    By  failing to disclose that Meta was secretly collecting and using tax filing and other financial data for its own advertising and other business purposes, Meta violated section 1770(2) of the CLRA by "[m]isrepresenting the source, sponsorship, approval, or certification of goods or services." Cal. Civ. Code § 1770(2).

223.    By making the same omissions, Meta violated section 1770(5) of the CLRA by "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

224.    By making the same omissions, Meta violated section 1770(14) of the CLRA by "[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law."

225.   Plaintiffs and the members of the Class have suffered an injury in fact resulting in the loss of money and/or property as a proximate result of the violations of law and wrongful conduct of Meta alleged herein, and they lack an adequate remedy at law to address the violations of the CLRA at issue here.  Legal remedies available to Plaintiffs and class members are inadequate because they are not equally prompt and certain and in other ways efficient as equitable relief.  Damages are not equally certain as restitution because the standard that governs restitution is different than the standard that governs damages.  Hence, the Court may award restitution even if it determines that Plaintiffs fail to sufficiently adduce evidence to support an award of damages. Damages and restitution are not the same amount.  Unlike damages, restitution is not limited to the amount of money defendant wrongfully acquired plus the legal rate of interest.  Equitable relief, including restitution, entitles the plaintiffs to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize.  In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law.

226.   As a direct and proximate result of these violations, Plaintiffs and Class Members have been harmed, and that harm will continue unless Meta is enjoined from continuing its conduct as described herein.

227.   Plaintiffs and Class Members seek all available relief under the CLRA, except for actual damages.  Plaintiffs reserve the right to amend the complaint to seek damages in connection with the CLRA at a later time.

## COUNT XV
### Violation of California Penal Code § 496

228.   Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

229.   All Plaintiffs bring this claim under California law on behalf of themselves and the nationwide class.  Alternatively, each Plaintiff brings this claim on behalf of their respective state subclass.

230.   California Penal Code section 496(a) prohibits the obtaining of property "in any manner constituting theft."

231.   Section 484 defines "theft" to include stealing or taking personal property of another or by obtaining property by false pretense.

232.   Meta's conduct alleged here was theft and/or false pretense within the meaning of Section 484.

233.   Meta stole, took, and fraudulently appropriated Plaintiffs' and Class members' individually identifiable tax and other financial information without their consent.

234.   Meta concealed, aided in the concealing, sold and/or utilized the information at issue here for Meta's commercial purposes and financial benefit.

235.   Meta knew that Plaintiffs' and Class members' individually identifiable information was unlawfully obtained because Meta designed the code that redirected Plaintiffs' and Class members' information from tax filing websites to Meta and operated it in a manner that was concealed or withheld from Plaintiffs and Class members.

236.   The reasonable and fair market value of the unlawfully obtained information can be determined in the marketplace and by examining the unjust enrichment Meta received by using the unlawfully collected information for marketing purposes.

237.   As a direct result of Meta's conduct alleged here, Plaintiffs and Class members suffered injuries, and seek triple the value of their stolen financial and tax information, attorneys' fees and costs, and injunctive relief.

## COUNT XVI
### Violation Of California's Unfair Competition Law
### (Cal. Bus. & Prof. Code §§ 17200, *et seq.*)

238.   Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

239.   All Plaintiffs bring this claim under California law on behalf of themselves and the nationwide class.

240.   California Business and Professions Code section 17200 ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . .."

241.   Facebook has engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

242.    Meta has engaged in unlawful acts or practices under section 17200 by its violations of sections 496, 631, 632, and 635 of the California Penal Code, sections 2510 and 2512 of the Federal Wiretap Act, and all other statutory and common law claims asserted in this complaint.

243.    Meta has engaged in fraudulent business acts or practices under section 17200 by failing to disclose that it was surreptitiously collecting and using tax filing and financial information for its own business purposes, and this omission was intended to, were likely to, and did deceive reasonable consumers such as Plaintiffs and the Class.

244.    The undisclosed information Meta concealed would be, and is, material to reasonable consumers.

245.    Meta has engaged in unfair acts and practices under section 17200 by surreptitiously collecting and using tax filing and financial information for its own business purposes, and failing to disclose its conduct to Plaintiffs and class members.

246.    Facebook's actions offend public policy.

247.    Facebook's unfair and/or unlawful conduct and its omissions have also impaired competition within the tax-preparation and financial services market in that those actions have prevented Plaintiffs and Class Members from making fully informed decisions about whether to communicate online with their financial services providers and to use their providers' websites in the first instance.

248.    Plaintiffs and Class Members have suffered an injury in fact, including the loss of money and/or property, as a result of Meta's unfair, unlawful and/or deceptive practices, to wit, the disclosure of their tax filing data which has value as is demonstrated by the use and sale of it by Meta. While only an identifiable "trifle" of injury is needed to be shown, as set forth above, Plaintiffs, the Class Members, and the public at large value their tax filing information at more than a trifle. And sale of this confidential and valuable information has now diminished the value of such information to Plaintiffs and the Class.

249.    Meta's actions caused damage to and loss of Plaintiffs', Class Members' and other taxpayers' property right to control the dissemination and use of their personally identifiable financial and tax data and communications.

250.     Each Plaintiff also suffered economic injury by the loss of their personal tax filing information to Meta with no consent or disclosure.

251.     Meta's actions caused damage to and loss of Plaintiffs', Class Members' and other taxpayers' property rights to control the dissemination and use of the personally identifiable communications.

252.     Plaintiffs and the members of the Class have suffered an injury in fact resulting in the loss of money and/or property as a proximate result of the violations of law and wrongful conduct of Meta alleged herein, and they lack an adequate remedy at law to address the unfair conduct at issue here.  Legal remedies available to Plaintiffs and class members are inadequate because they are not equally prompt and certain and in other ways efficient as equitable relief. Damages are not equally certain as restitution because the standard that governs restitution is different than the standard that governs damages.  Hence, the Court may award restitution even if it determines that Plaintiffs fail to sufficiently adduce evidence to support an award of damages. Damages and restitution are not the same amount.  Unlike damages, restitution is not limited to the amount of money defendant wrongfully acquired plus the legal rate of interest.  Equitable relief, including restitution, entitles the plaintiffs to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Legal claims for damages are not equally certain as restitution because claims under the UCL entail few elements.  In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law.

253.     The wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Facebook's business.  Meta's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, in the State of California.

254.     Plaintiffs and the Class request that this Court enjoin Meta from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the Class, in the form of restitution, any money Meta acquired through its unfair competition.

1

## **PRAYER FOR RELIEF**

2      WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek

3  judgment against Meta, as follows:

4      a.    For an order certifying the class and subclass and naming Plaintiffs as the

5            representatives of the class and subclasses and Plaintiffs' attorneys as Class Counsel

6            to represent the  class and subclass members;

7      b.    For an order declaring that the Meta's conduct violates the statutes referenced

8            herein;

9      c.    For an order finding in favor of Plaintiffs and the class and subclass on all counts

10           asserted herein;

11     d.    For an order granting restitution and injunctive relief that bars Meta from engaging

12           in the unfair business practices alleged herein;

13     e.    For statutory damages, actual damages, nominal damages, and/or punitive damages

14           in amounts to be determined by the Court and/or jury;

15     f.    For prejudgment interest on all amounts awarded;

16     g.    For injunctive relief as pleaded or as the Court may deem proper; and

17     h.    For an order awarding Plaintiffs and the class and subclass their reasonable

18           attorneys' fees and expenses and costs of suit.

19

## **JURY TRIAL DEMANDED**

20      Plaintiffs demand a trial by jury on all claims so triable.

21

22  Dated:  May 15, 2023                    Respectfully submitted,

23                                          By:  ___*/s/ Joel D. Smith*___
                                                   Joel D. Smith
24

25                                          **BURSOR & FISHER, P.A**.
                                            Joel D. Smith (State Bar No. 244902)
26                                          Neal J. Deckant (State Bar No. 322946)
                                            1990 North California Blvd., Suite 940
27                                          Walnut Creek, CA 94596
                                            Telephone: (925) 300-4455
28                                          Facsimile:  (925) 407-2700

E-mail: jsmith@bursor.com
        ndeckant@bursor.com

**GEORGE FELDMAN MCDONALD, PLLC**
Lori G. Feldman (pro hac vice)
200 Park Avenue, Suite 1700
New York, New York 10166
Telephone: (646) 354-6534
lfeldman@4-justice.com

**GEORGE FELDMAN MCDONALD, PLLC**
David J. George*
Brittany Brown*
9897 Lake Worth Road, Suite 302
Lake Worth, FL 33467
Telephone: (561) 232-6002
dgeorge@4-justice.com
bbrown@4-justice.com

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
Robert K. Shelquist*
Rebecca A. Peterson (241858)
Kate M. Baxter-Kauf (pro hac vice)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
rkshelquist@locklaw.com
rapeterson@locklaw.com
kmbaxter-kauf@locklaw.com

**THE HODA LAW FIRM, PLLC**
Marshal J. Hoda, Esq. (pro hac vice)
12333 Sowden Road, Suite B
Houston, TX 77080
Telephone: (832) 848-0036
marshal@thehodalawfirm.com

**FOSTER YARBOROUGH PLLC**
Patrick Yarborough, Esq. (pro hac vice)
917 Franklin Street, Suite 220
Houston, TX 77002
Telephone: (713) 331-5254
patrick@fosteryarborough.com

**EMERSON FIRM, PLLC**
John G. Emerson*

2500 Wilcrest, Suite 300
Houston, TX 77042
Telephone: (800) 551-8649
jemerson@emersonfirm.com

**Attorneys for Plaintiffs**

*motion for admission *pro hac vice* forthcoming

**<u>CLRA Venue Affidavit Pursuant to California Civil Code Section 1780(d)</u>**

I, Joel D. Smith, declare as follows:

1.     I am an attorney at law licensed to practice in the State of California, and I am a member of the bar of this Court.  I am a Partner at Bursor & Fisher, P.A., counsel of record for Plaintiffs in this action.

2.     The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) because Meta's principal place of business is in this District.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.  This declaration was executed in Danielson, Connecticut, on May 15, 2023.

_____*/s/ Joel D. Smith*_____
Joel D. Smith