| | |
|---|---|
| **BURSOR & FISHER, P.A.**<br>Neal J. Deckant (State Bar No. 322946)<br>1990 North California Blvd., 9th Floor<br>Walnut Creek, CA 94596<br>Telephone: (925) 300-4455<br>ndeckant@bursor.com | **GEORGE FELDMAN MCDONALD, PLLC**<br>Lori G. Feldman (*pro hac vice*)<br>Michael Liskow (State Bar No. 243899)<br>200 Park Avenue, Suite 1700<br>New York, New York 10166<br>Telephone: (646) 354-6534<br>lfeldman@4-justice.com<br>mliskow@4-justice.com |

*Attorneys for Plaintiffs*
*Additional Attorneys on Signature Page*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE META PIXEL TAX FILING CASES<br><br>This document relates to:<br><br>All Actions | Master File No. 5:22-cv-07557-PCP (VKD)<br><br>**OPPOSITION TO DEFENDANT META PLATFORMS, INC.'S MOTION TO DISMISS SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Date: July 31, 2025<br>Time: 10:00 a.m.<br>Courtroom 8, 4th Floor<br><br>Date Action Filed: December 1, 2022<br>Honorable P. Casey Pitts |

**TABLE OF CONTENTS**

**PAGE(S)**

I.   INTRODUCTION ...................................................................................................................1

II.   ARGUMENT .........................................................................................................................2

      A.   Plaintiffs Sufficiently State Claims Under CIPA Section 638.51 ..............................2

           1.   Plaintiffs Sufficiently Allege Meta Used a Pen Register ...............................2

           2.   The Meta Pixel is a Pen Register Even if it Also Discloses the Contents of Communications ..........................................................................6

III.   CONCLUSION ...................................................................................................................10

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Aholelei v. Dept. of Public Safety*,
  488 F.3d 1144 (9th Cir. 2007) ................................................................................................... 8

*Brown v. Stored Value Cards, Inc.*,
  953 F.3d 567 (9th Cir. 2020) ..................................................................................................... 9

*Cleveland v. Policy Mgmt. Sys. Corp.*,
  526 U.S. 795 (1999) ................................................................................................................... 8

*Greenley v. Kochava, Inc.*,
  684 F. Supp. 3d 1024 (S.D. Cal. 2023) .............................................................................. 5, 6, 7

*In re Meta Pixel Tax Filing Cases*,
  724 F. Supp. 3d 987 (N.D. Cal. 2024) ....................................................................................... 4

*Molsbergen v. United States*,
  757 F.2d 1016 (9th Cir. 1985) ................................................................................................... 8

*Moody v. C2 Educ. Sys. Inc.*,
  742 F. Supp. 3d 1072 (C.D. Cal. 2024) ..................................................................................... 8

*Rowe v. Educ. Credit Mgmt. Corp.*,
  559 F.3d 1028 (9th Cir. 2009) ................................................................................................... 5

*SCAP 9, LLC v. Fin. Indus. Regul. Auth., Inc.*,
  2024 WL 1574348 (9th Cir. Apr. 11, 2024) .............................................................................. 8

*Segen v. Rickey*,
  2008 WL 5905054 (N.D. Cal. Feb. 29, 2008) ........................................................................... 9

*Shah v. Fandom, Inc.*,
  754 F. Supp. 3d 924 (N.D. Cal. 2024) .............................................................................. 2, 5, 7

*Wang v. Zymergen Inc.*,
  2024 WL 773603 (N.D. Cal. Feb. 26, 2024) ......................................................................... 9, 10

*Zarif v. Hwareh.com, Inc.*,
  2025 WL 486317 (S.D. Cal. Feb. 13, 2025) .............................................................................. 7

**RULES**

Fed. R. Civ. P. 8 ............................................................................................................................. 8

I.      INTRODUCTION

In its Motion to Dismiss ("Motion" or "Mot."), defendant Meta Platforms, Inc. ("Meta") seeks the dismissal of Count III of Plaintiffs' Second Consolidated Class Action Complaint ("SAC"). Count III alleges that Meta violated Section 638.51 of the California Invasion of Privacy Act ("CIPA") which prohibits the installation or use of a "pen register" without a court order. Plaintiffs allege that the Meta Pixel operates as an illicit pen register because, *inter alia*, it is a "device or process that records or decodes dialing, routing, addressing or signaling information from the electronic communications transmitted to or from subject tax filing websites." SAC, ¶ 129.

Meta moves to dismiss Plaintiffs' Section 638.51 claims under Rule 12(b)(6) based on two narrow arguments. First, Meta contends that Plaintiffs fail to allege that Meta either installed or used a pen register, as required by Section 638.51. But Plaintiffs expansively allege that Meta "used" the pen register at issue here, Meta's own Meta Pixel, in various ways in violation of the statute.

Meta otherwise argues that the Meta Pixel cannot be a pen register under Section 638.51 because Plaintiffs have also alleged that it intercepts the contents of communications. But Meta cites no authority that the two causes of action are mutually exclusive, or that a device or set of processes cannot serve both functions. The fact that the Meta Pixel hoovers up so-called "content" (such as communications) and "non-content" data (such as geolocation tracking) is the result of the wide-ranging surveillance performed by the Meta Pixel's library of functions, and is consistent with the allegation that Meta is "*gunning hard to get lots and lots of third-party data about its users into its database*." SAC, ¶ 18. Section 638.51 does not provide that a complex suite of programs like the Meta Pixel cannot be considered a pen register merely because it also conducts illegal wiretapping under CIPA Sections 631 and 632. Meta also provides no authority for its argument, while Plaintiffs herein identify multiple cases where both pen register and wiretapping claims have been upheld at the pleading stage. As Plaintiffs have sufficiently alleged their claims under Section 638.51, Meta's Motion should be denied.

**II.     ARGUMENT**

    **A.     Plaintiffs Sufficiently State Claims Under CIPA Section 638.51**

        **1.     Plaintiffs Sufficiently Allege Meta Used a Pen Register**

Section 638.51(a) provides in pertinent part that "a person may not install or use a pen register . . . without first obtaining a court order," subject to exceptions not at issue here. This "pen register statute is broadly written, and under California law, is to be interpreted broadly to protect privacy and to be applied to new techniques and technologies." *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 933 (N.D. Cal. 2024). The statute "reflects the Legislature's judgment that an individual's consent is required before others may track certain addressing information in their electronic communications for non-law enforcement purposes." *Id.*

Meta's contention that Plaintiffs fail to allege "facts showing that Meta installed or used the Pixel," Mot. at 4-5, is belied by Plaintiffs' extensive allegations that Meta "used" its own Meta Pixel, thereby satisfying Section 638.51(a). For example, Plaintiffs allege:

- In launching its "Facebook Ads" program, "Facebook planned to *mine its platform and third-party websites* for insights it could use to target and customize advertisements for businesses. *User activity served as the raw materials* that Facebook analyzed and dissected for inferences answering its ultimate question: what advertisement, from which company, for which user, will have maximal impact? The better Facebook could answer that question, the better it could 'improve the effectiveness of the ads and recruit new advertisers who want to pitch their messages to refined slices of the online audiences.'" SAC, ¶ 19 (emphasis added).

- "Meta can target users effectively because it surveils user activity both on and off its site." SAC, ¶ 24.

- Meta obtains information about users and other individuals through various means including via its use of the Meta Pixel. Data entered into third-party websites that have installed the Meta Pixel is "collected by the tracking pixel [and] transmitted in real time to Meta's servers in California, where the information is stored. The information also is transmitted to Meta while it is being sent from or received within California." SAC, ¶¶ 25-30.

- Meta has explained that "[w]hen someone takes an action that the [website] developer has chosen to measure on its website, the Meta Pixel is triggered and *sends Meta certain data*, called an 'Event.' Meta attempts to match the Events it receives to Meta users. The developer can then choose to show ads to users who have taken a certain action on their own website." SAC, ¶ 32 (emphasis and brackets in original).

- Meta has explained that its Meta Pixel "'log[s] when someone takes an action' such as 'adding an item to their shopping cart or making a purchase.'" SAC, ¶ 33.

- "As soon as a website user takes any action on a webpage which includes the [Meta Pixel]—such as clicking a button to register, login, or logout of a website, Meta's source code commands the user's device to re-direct the content of the communication to Meta while the exchange of the communication between the user and the website is still occurring. By design, Meta receives the content of website communications as the website user enters the information but before the website owner receives it." SAC, ¶¶ 34, 35.

- Through its use of the Meta Pixel, "*Meta intercepts* each page a user visits, what buttons they click, as well as specific information they input into the website. The Meta Pixel *sends each of these pieces of information to Meta with PII, such as the user's IP address*." SAC, ¶ 36 (emphasis added).

- Meta "intercepts and collects this information" through its use of the Meta Pixel "so it can better match visitors to their Facebook.com profiles, which in turn allows companies to better target their advertisements." SAC, ¶ 41.

- "After collecting and intercepting this information" using the Meta Pixel, "Meta processes it, analyzes it, and assimilates it into datasets like Core Audiences." SAC, ¶ 45.

- "Meta's tracking pixel is not simply a 'tool' utilized by website owners for their own purposes. Meta offers these technologies to companies for free because *Meta benefits too*. Meta *uses the data* it **gleans from tools like the pixel** to power its algorithms, providing it insight into the habits of users across the internet. The data obtained allows Meta to amass huge amounts of data in a detailed dossier, or digital fingerprint, that it keeps on its users and other website visitors." SAC, ¶ 46 (emphasis added).

- "Meta *uses* data *obtained from the tracking pixel* to target users with advertisements based on their interests" and to "increase its ad revenue." SAC, ¶¶ 47-48 (emphasis added).

- The data Meta collects through its use of the Meta Pixel is "curated" and then used for a wide range of purposes within Meta, including targeting, training, ranking, billing, analytics, and more:

*See* SAC, ¶ 51.

- The Meta Pixel on TaxAct's website was found to have "sent users' filing status, adjusted gross income, and the amount of refund to Meta." SAC, ¶ 58.

- "Meta received a wide array of information from Plaintiffs and class members" via its use of the Meta Pixel. SAC, ¶ 62; *see also* SAC, ¶ 63 (Meta admitted it "received from the TaxAct website via the Pixel" numerous types of user data); SAC, ¶¶ 64-65 (Meta obtained individuals' webpage URL data through the Meta Pixel).

- "[W]hen each Plaintiff entered the information needed to prepare their tax filings, the pixel caused that information to be transmitted in real time to Meta, including confidential tax and financial information. Meta's system then matched that information to Plaintiffs' Facebook accounts, per its standard operating procedures. Meta used the information transmitted for purposes of marketing and to train its algorithms to more accurately identify and target users, as described more fully in the section above describing Meta's business model." SAC, ¶ 67 (emphasis added).

- "Meta provides its pixel, Conversion API, and SDK technology to website owners with the knowledge and expectation that doing so *will result in data transmissions to Meta*, thereby supporting its business model and advertising revenue." SAC, ¶ 82.

In fact, Meta's *own Motion* concedes that "*plaintiffs assert* that 'Meta was not authorized by any court order *to use* a pen register to track Plaintiffs' and class members' location data and personal information.'" *Id.* at 2 (quoting SAC, ¶ 134) (emphasis added). Therefore, Plaintiffs' allegations are more than sufficient at the pleading stage. *See In re Meta Pixel Tax Filing Cases*, 724 F. Supp.

3d 987, 1000-01 (N.D. Cal. 2024) ("The Court must 'accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party.'") (quoting *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029-30 (9th Cir. 2009)); *see also Shah*, 754 F. Supp. 3d at 930 ("[T]he California Supreme Court has instructed courts to interpret CIPA in the manner that fulfills the legislative purpose of CIPA by giving greater protection to privacy interests.") (internal quotations omitted).

Meta attempts to distinguish this case from three others where courts found violations of Section 638.51, contending that those cases "involved website developers that hosted tracking software, not entities like Meta that created the trackers in the first place." Mot. at 4 (emphasis omitted). But this artificial distinction is found nowhere in Section 638.51, which does not absolve the creators of pen registers from liability stemming from their subsequent unsanctioned use of the pen registers. And in any event, Plaintiffs do not merely allege that Meta "created tracking software for use by website operators," Mot. at 5, but also allege Meta "used" the Meta Pixel. *See supra.*

Meta also tries to preemptively wave away the on point case *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024 (S.D. Cal. 2023), on the ground that the defendant creator of the software developer kit ("SDK") at issue did not contest whether the plaintiff sufficiently alleged that the defendant installed or used the SDK. *See* Mot. at 5. But this is unsurprising: the plaintiff in *Greenley* made clear allegations, similar to Plaintiffs' claims against Meta here, that the defendant "used" the offending pen register by, *inter alia*, "surreptitiously intercept[ing] location data" from an app user . . . via its SDK" and then selling the resulting "customized data feeds to its clients." *Id.* at 1035 (internal quotations omitted). And even if *Greenley* merely involved a defendant that was only alleged to have *created* the pen register (which it does not), Plaintiffs nowhere proffer the "theory" that Meta purports to rebut, that "creating something could be the same as installing or using it." Mot. at 5 (emphasis omitted). Instead, Plaintiffs have "alleged each necessary element of this claim: Defendant [used] a pen register without a court order." *Greenley*, 684 F. Supp. 3d at 1050-51.

### 2. The Meta Pixel is a Pen Register Even if it Also Discloses the Contents of Communications

Meta next argues that the Meta Pixel cannot be a pen register if it also captures the contents of communications. *See* Mot. at 5-8. Put another way, Meta contends that Plaintiffs "cannot plead a content-centric set of facts to support their various privacy claims against Meta only to plead contradictory facts (denying the transmission of contents) to support their § 638.51 claim." Mot. at 7-8 (citations omitted). As an initial matter, Meta misstates Plaintiffs' SAC, which does not "deny[] the transmission of contents" of communications by the multifaceted Meta Pixel. However, this does not mean that Meta has not also violated Section 638.51 by separately using the Meta Pixel's processes that function as a pen register. Meta provides no authority that Section 638.51 excludes from its reach multifaceted devices and/or collections of processes like the Meta Pixel that intercept both "non-content" information and the contents of communications, and the plain language of the statute also fails to support this contention.

Section 638.50(b), which defines a pen register and upon which Meta's argument relies, refers to a "device *or process*." *Id.* (emphasis added). Plaintiffs have sufficiently alleged, and Meta does not contest Plaintiffs have alleged, that the Meta Pixel employs multiple, independent "processes," some of which "record[] or decode[] dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." *Id.*; *see also* SAC, ¶ 27 (Meta explained Meta Pixel "works by loading a *small library of functions* which you can use whenever a site visitor takes an action (called an event) that you want to track (called a conversion).") (emphasis added); SAC, ¶ 28 (listing Meta Pixel's "vast capabilities"). As explained in *Greenley*, which found that the defendant's SDK program violated *both* Section 638.51 and CIPA's wiretapping provision Section 631, a "process can *take many forms*," including "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" *Greenley*, 684 F. Supp. 3d at 1050 (emphasis added).

Section 638.50(b) also does not state, contrary to Meta's claims, that a "'pen register' does *not* include any 'device or process' that 'records or decodes . . . the *contents of a communication*.'"

Mot. at 6 (emphasis and ellipses in original).[1] The statute also does not provide that a device or process *cannot* be a pen register if it *also* records the "contents of a communication," like the Meta Pixel. This makes sense: CIPA is "broadly written" and, "under California law, . . . [must] be interpreted broadly to protect privacy and to be applied to new techniques and technologies." *Shah*, 754 F. Supp. 3d at 933. By contrast, Meta's novel misreading of the statute, if accepted by the Court, would allow ill-intentioned actors to avoid any liability under Section 638.51 simply by adding any functionality to the offending device or processes that *also* illicitly wiretaps the contents of communications. This Court should instead follow others noting that Section 638.51 is "vague and inclusive as to the form of the collection tool— 'a device or process[,]' . . . [which] indicates courts should focus less on the form of the data collector and more on the result." *Greenley*, 684 F. Supp. 3d at 1050; *see also id.* ("A process can take many forms.").

Meta offers no authority for its reading of Section 638.51, nor could it. Indeed, multiple courts have found that devices and processes like the Meta Pixel that intercept the contents of communications, *and even the Meta Pixel itself*, can also be pen registers. For example, in *Zarif v. Hwareh.com, Inc.*, No. 23-CV-0565-BAS-DEB, 2025 WL 486317 (S.D. Cal. Feb. 13, 2025), the court upheld the plaintiffs' claims under both Sections 631 and 638.51 of CIPA. In doing so the court found that the plaintiffs sufficiently alleged that the Meta Pixel intercepted the contents of communications, *see id.* at *7, while rejecting the defendant's argument that "*the Meta Pixel* and similar tracking software do not qualify as a pen register or trap and trace device as those terms are defined by the statute." *Id.* at *12 (emphasis added). *See also Greenley*, 684 F. Supp. 3d 1024 (plaintiff's claims concerning defendant's software development kit upheld under *both* Sections 631 and 638.51).

---

[1] Section 638.50(b) instead provides that "'Pen register' means a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication. 'Pen register' does not include a device or process used by a provider or customer of a wire or electronic communication service for billing, or recording as an incident to billing, for communications services provided by such provider, or a device or process used by a provider or customer of a wire communication service for cost accounting or other similar purposes in the ordinary course of its business."

1    Moreover, if the Court finds Plaintiffs have sufficiently alleged that the Meta Pixel collects
2    "non-content" data falling within the scope of Section 638.51, it makes no difference whether the
3    Meta Pixel's processes *also* act to wiretap the "contents of a communication." Section 638.50(b).
4    *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072 (C.D. Cal. 2024), is instructive. There, the court
5    rejected the defendant's contention that the plaintiff's Section 638.51 claim must be dismissed
6    because one of two categories of data alleged to have been intercepted by the software at issue
7    consisted of contents of communications. *See Moody*, 742 F. Supp. 3d at 1077. The court explained
8    that "even if the [second category of] data did constitute 'contents' beyond the scope of §§ 638.50
9    and 638.51, a defendant may not dismiss only a portion of a claim under Rule 12(b)(6)." *Moody*,
10   742 F. Supp. 3d at 1077 (citations omitted).

11   Similarly, even if there were some inconsistency in Plaintiffs' claims (there is not), Fed. R.
12   Civ. P. 8(d)(3) allows Plaintiffs to "state as many separate claims or defenses as [they have],
13   regardless of consistency." *Id.* The Ninth Circuit has repeatedly held that "a pleading should not be
14   construed as an admission against another alternative or inconsistent pleading in the same case . . ."
15   *Molsbergen v. United States*, 757 F.2d 1016, 1019 (9th Cir. 1985). *See also, e.g.*, *SCAP 9, LLC v.*
16   *Fin. Indus. Regul. Auth., Inc.*, No. 23-15627, 2024 WL 1574348, at *1 (9th Cir. Apr. 11, 2024)
17   (reaffirming rule in *Molsbergen*); *Aholelei v. Dept. of Public Safety*, 488 F.3d 1144, 1149 (9th Cir.
18   2007) (same).[2]

19   Meta's cited cases for its claim that Plaintiffs plead "contradictory facts," which Plaintiffs
20   again do not, are inapposite. First, Meta incorrectly claims that *Cleveland v. Policy Mgmt. Sys.*
21   *Corp.*, 526 U.S. 795 (1999), "reject[ed the] plaintiff's theory that Federal Rule of Civil Procedure 8
22   permits plaintiffs to plead inconsistent facts and providing that courts 'should require an explanation
23   of any apparent inconsistency with the necessary elements of [the] claim.'" Mot. at 8. In fact,
24   *Cleveland* does not address Rule 8, or any FRCP Rule at all, nor did it involve a plaintiff at the
25   pleading stage. Instead, *Cleveland* held that, at the *summary judgment* stage of an ADA claim, courts

---

[2] Meta unintentionally illustrates the importance of permitting plaintiffs to plead in the alternative by arguing that the Meta Pixel in fact "does not read or learn the contents of any communications while in transit." Mot. at 6 n.1. In doing so Meta undermines the entire basis of its claim that the Meta Pixel cannot be a pen register if it *does* capture the contents of communications.

should require explanations where a plaintiff's "sworn assertion in an application for disability benefits that she is unable to work appears to negate the essential element of her ADA claim that she can perform the essential functions of her job." *Id.*, 526 U.S. at 796.

*Segen v. Rickey*, No. C07-02917 MJJ, 2008 WL 5905054 (N.D. Cal. Feb. 29, 2008), is also inapposite. There the court noted that the plaintiff appeared to plead "two different versions of the facts" concerning whether certain corporate entities approved the option grants at issue. *Id.* at *3. By contrast here, Plaintiffs do not allege any inconsistent facts despite Meta's attempts to manufacture an inconsistency. Instead, Plaintiffs allege that the Meta Pixel's processes violated Section 638.51 *and* Sections 631 and 632 of CIPA. *See supra*. As the Meta Pixel meets the definition of a pen register, Meta's Motion should be denied.

**B.      If Meta's Motion is Granted in Whole or In Part, it Should be Granted Without Prejudice and With Leave to Amend**

Meta finally argues that if the Court dismisses Count III (which it should not), it should do so with prejudice. *See* Mot. at 8-9. But any such dismissal would be the first for Count III, and Plaintiffs should be afforded the opportunity to address any concerns the Court may have through amendments to the SAC. *See, e.g.*, *Wang v. Zymergen Inc.*, No. 21-CV-06028-PCP, 2024 WL 773603, at *1 (N.D. Cal. Feb. 26, 2024) ("The Ninth Circuit has counseled that 'leave to amend should be granted with extreme liberality.'") (quoting *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020)). And granting leave to amend would not be futile, as Plaintiffs could, for example, further allege how Meta "uses" the Meta Pixel, including by citing to *Meta's own AI* which responded as follows to queries concerning whether Meta uses the Meta Pixel:[3]

> **Does Meta use the Meta Pixel?**
>
> Yes, Meta does use the Meta Pixel (previously known as the Facebook Pixel) across its platforms and services for various purposes, including analytics, advertising, and optimizing user experiences. The Meta Pixel is a tool that helps track user interactions and conversions on websites that have integrated the pixel, providing valuable data for advertisers and website owners. This data can be used to measure the effectiveness of ads, target specific audiences, and personalize content.

---

[3] The responses were obtained from meta.ai on May 29, 2025. A screenshot of the responses is attached as Exhibit A.

**How does Meta use the Meta Pixel?**

Meta uses the Meta Pixel for several purposes:

1. **Analytics and measurement**: To track user interactions, such as page views, conversions, and other events on websites that have integrated the pixel. This helps Meta understand how users engage with content and ads across the web.

2. **Ad targeting and optimization**: To target specific audiences and optimize ad delivery based on user behavior, interests, and demographics.

3. **Conversion tracking**: To measure the effectiveness of ads by tracking conversions (e.g., purchases, sign-ups, or downloads) that occur on websites after users interact with Meta ads.

4. **Personalization**: To personalize content and ads for users based on their behavior and interests.

By using the Meta Pixel, Meta can collect valuable data that informs its advertising and analytics services, ultimately helping businesses and organizations reach their target audiences more effectively.

**How does Meta benefit from using the Meta Pixel?**

Meta benefits from using the Meta Pixel in several ways:

1. **Improved ad targeting**: By collecting data on user behavior, Meta can create more accurate and effective ad targeting options for advertisers.

2. **Enhanced analytics**: The pixel provides valuable insights into user interactions, helping Meta refine its advertising and analytics services.

3. **Increased ad revenue**: By offering more effective ad targeting and measurement capabilities, Meta can attract more advertisers and increase ad revenue.

4. **Better user experience**: Meta can use pixel data to personalize content and ads for users, potentially leading to a more engaging experience.

5. **Competitive advantage**: The Meta Pixel helps Meta maintain a competitive edge in the digital advertising market by providing unique insights and capabilities.

Overall, the Meta Pixel is a key tool for Meta's advertising business, enabling the company to deliver more effective and targeted ads, which in turn drives revenue and growth.

### III. CONCLUSION

For the reasons detailed herein, Defendant's Motion should be denied in its entirety. If the Court determines the SAC is deficient in any respect, Plaintiffs seek leave to amend to cure such deficiencies. *See Wang*, 2024 WL 773603, at *1.

| | | |
|---|---|---|
| 1 | Dated: June 2, 2025 | By:    */s/ Neal J. Deckant* |
| 2 | |         Neal J. Deckant |

**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ndeckant@bursor.com

**SMITH KRIVOSHEY, P.C.**
Joel D. Smith (State Bar No. 244902)
867 Boylston Street, 5th Floor, #1520
Boston, MA 02116
Telephone: (617) 377-7404
Email: joel@skclassactions.com

**GEORGE FELDMAN MCDONALD, PLLC**
Lori G. Feldman (*pro hac vice*)
Michael Liskow (State Bar No. 243899)
200 Park Avenue, Suite 1700
New York, New York 10166
Telephone: (646) 354-6534
Email: lfeldman@4-justice.com
mliskow@4-justice.com

**GEORGE FELDMAN MCDONALD, PLLC**
Rebecca A. Peterson (241858)
1650 West 82nd Street, Suite 880
Bloomington, MN 55431
Telephone: (612) 778-9595
Facsimile: (888) 421-4173
E-mail: rpeterson@4-Justice.com

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
Kate M. Baxter-Kauf (*pro hac vice*)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
Email: kmbaxter-kauf@locklaw.com

**THE HODA LAW FIRM, PLLC**
Marshal J. Hoda, Esq. (*pro hac vice*)
12333 Sowden Road, Suite B
Houston, TX 77080
Telephone: (832) 848-0036
Email: marshal@thehodalawfirm.com

**FOSTER YARBOROUGH PLLC**
Patrick Yarborough, Esq. (*pro hac vice*)
917 Franklin Street, Suite 220
Houston, TX 77002
Telephone: (713) 331-5254
Email: patrick@fosteryarborough.com

**EMERSON FIRM, PLLC**
John G. Emerson (*pro hac vice*)
2500 Wilcrest, Suite 300
Houston, TX 77042
Telephone: (800) 551-8649
Email: jemerson@emersonfirm.com

*Attorneys for Plaintiffs*