**BURSOR & FISHER, P.A.**
Neal Deckant (State Bar No. 320783)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail:  ndeckant@bursor.com

**GEORGE FELDMAN MCDONALD, PLLC**
Lori G. Feldman (*pro hac vice*)
Michael Liskow (State Bar No. 243899)
102 Half Moon Bay Drive
Croton-on-Hudson, NY  10520
Telephone: (917) 983-9321
E-mail: lfeldman@4-justice.com
           mliskow@4-justice.com
           e-service@4-justice.com

*Attorneys for Plaintiffs*

*Additional Attorneys on Signature Page*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE META PIXEL TAX FILING CASES<br><br>This document relates to:<br><br>All actions | Master File No. 5:22-cv-07557-PCP<br><br>**DECLARATION OF NEAL DECKANT IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Date:               January 15, 2026<br>Time:               10:00 a.m.<br>Judge:             Hon. P. Casey Pitts<br>Date Action Filed: Dec. 1, 2022 |

**REDACTED VERSION**

I, Neal Deckant, declare as follows:

1.    I am an attorney at law licensed to practice in the State of California.  I am a member of the bar of this Court, and I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiffs in this matter.  I have personal knowledge of the matters set forth herein, and if called upon to do so, would and could testify competently thereto.  I offer this declaration in support of Plaintiffs' Motion for Class Certification.

2.    In some instances, relevant portions of the materials listed below have been marked in red boxes.

***Publicly Filed Documents***

3.    Attached hereto as __**Exhibit 1**__ is a true and correct copy of excerpts of Defendant Meta's responses to Plaintiffs' Requests for Admission.

4.    Attached hereto as __**Exhibit 2**__ is a true and correct copy of the public, redacted version of the Declaration of Tobias Wooldridge, filed by Meta on October 17, 2022 in the related matter *In re Meta Healthcare Litig.*, N.D. Cal. Case No. 3:22-cv-3580-WHO.

5.    Attached hereto as __**Exhibit 3**__ is a true and correct copy of excerpts of the public, redacted version of Meta's Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Class Certification in *McDaniel et al. v. Meta Platforms, Inc.*, Santa Clara Superior Court Case No. 21-cv-383231.

6.    Attached hereto as __**Exhibit 4**__ is a true and correct copy of a publicly available document that was marked as Deposition Exhibit No. 158 during the July 14, 2025 deposition of Meta's 30(b)(6) witness in this matter. My understanding is that the document has been publicly available since 2022, and as of the date of this declaration, the document is publicly available at https://www.documentcloud.org/documents/21716382-facebook-data-lineage-internal-document/

7.    Attached hereto as __**Exhibit 6**__ is a true and correct copy of the Declaration of Plaintiff Jane Doe.

8.    Attached hereto as __**Exhibit 7**__ is a true and correct copy of the Declaration of Plaintiff Katrina Calderon.

9. Attached hereto as **Exhibit 8** is a true and correct copy of the Declaration of Plaintiff Kayla Salas (formerly Kayla Housman).

10. Attached hereto as **Exhibit 9** is a true and correct copy of the Declaration of Plaintiff Tiffany Bryant.

11. Attached hereto as **Exhibit 10** is a true and correct copy of Bursor & Fisher's current firm resume.

12. Attached hereto as **Exhibit 11** is a true and correct copy of George Feldman McDonald's current firm resume.

13. Attached hereto as **Exhibit 12** is a true and correct copy of Meta's "About location targeting" webpage from the Meta Business Help Center at https://www.facebook.com/business/help/202297959811696?id=176276233019487

*Documents Filed Under Seal*

14. Meta and/or Plaintiffs designated portions of the document listed below as confidential pursuant to the protective order in this case, and therefore the documents are being filed under seal.

15. Attached hereto as **Exhibit 5** is a true and correct copy of Meta's Supplemental Responses and Objections to Plaintiffs' Interrogatory No. 6, served in this matter on April 11, 2025.

16. Attached hereto as **Exhibit 13** is a true and correct copy of excerpts of Meta's 30(b)(6) witness Amlesh Jayakumar, who was deposed in this matter on July 14, 2025.

17. Attached hereto as **Exhibit 14** is a true and correct copy of a document produced by Meta in this case, with Bates Number PIXEL_TAX000022472-73, and which was previously marked as Deposition Exhibit No. 150 during the July 14, 2025 deposition of Meta's 30(b)(6) witness in this matter.

18. Attached hereto as **Exhibit 15** is a true and correct copy correct copy of a document produced by Meta in this case, with Bates Number PIXEL_TAX000023123-25, and which was previously marked as Deposition Exhibit No. 156 during the July 14, 2025 deposition of Meta's 30(b)(6) witness in this matter.

19.    Attached hereto as **Exhibit 16** is a true and correct copy correct copy of a document which was previously marked as Deposition Exhibit No. 148 during the July 14, 2025 deposition of Meta's 30(b)(6) witness in this matter.  The exhibit is a printout of excerpts of a database file produced by Meta in this case, with Bates Number PIXEL_TAX000003585.

20.    Attached hereto as **Exhibit 17** is a true and correct copy correct copy of a printout of excerpts of a database file produced by Meta in this case, with Bates Number PIXEL_TAX000003585. The data shown was under a Tab marked "Katrina Calderon."

21.    Attached hereto as **Exhibit 18** is a true and correct copy correct copy of a printout of excerpts of a database file produced by Meta in this case, with Bates Number PIXEL_TAX0000023328, and a file name identified as "ads_pixel_traffic_2022-05-26_10.csv, showing rows 509, 14344, and 41578.  Meta produced this document with its production of sample Hive data.

22.    Attached hereto as **Exhibit 19** is a true and correct copy of excerpts of Meta's 30(b)(6) witness Amlesh Jayakumar in the related matter *In re Meta Healthcare Litig.*, N.D. Cal. Case No. 3:22-cv-3580-WHO, taken on May 21, 2025.

23.    Attached hereto as **Exhibit 20** is a true and correct copy correct copy of a document Meta produced in this case, with Bates Number PIXEL_TAX0000052702-704.

24.    Attached hereto as **Exhibit 21** is a true and correct copy correct copy of a document Meta produced in this case, with Bates Number PIXEL_TAX0000052648.

25.    Attached hereto as **Exhibit 22** is a true and correct copy correct copy of a document which was previously marked as Deposition Exhibit No. 146 during the July 14, 2025 deposition of Meta's 30(b)(6) witness in this matter.  The exhibit is a printout of excerpts of a database file produced by Meta in this case, with Bates Number PIXEL_TAX000036169.

26.    Attached hereto as **Exhibit 23** is a true and correct copy correct copy of a document produced by Meta in this case, with Bates Number PIXEL_TAX000023047, and which was previously marked as Deposition Exhibit No. 151 during the July 14, 2025 deposition of Meta's 30(b)(6) witness in this matter.

27.    Attached hereto as **Exhibit 24** is a true and correct copy correct copy of a document Meta produced in this case, with Bates Number PIXEL_TAX000023180-84.

28.    Attached hereto as **Exhibit 25** is a true and correct copy correct copy of a document Meta produced in this case, with Bates Number PIXEL_TAX000004297-98.

29.    Attached hereto as **Exhibit 26** is a true and correct copy correct copy of a document Meta produced in this case, with Bates Number PIXEL_TAX000058899-905.

30.    Attached hereto as **Exhibit 27** is a true and correct copy correct copy of the expert report of Colin Weir.

31.    Attached hereto as **Exhibit 28** is a true and correct copy correct copy of the expert report of Robert Zeidman.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.  Executed in Walnut Creek, California, on August 18, 2025.

_/s/ Neal J. Deckant_
Neal J. Deckant

**EXHIBIT 1**

GIBSON, DUNN & CRUTCHER LLP
LAUREN GOLDMAN (*pro hac vice*)
LGoldman@gibsondunn.com
DARCY C. HARRIS (*pro hac vice*)
DHarris@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:    (212) 351-4000
Facsimile:    (212) 351-4035

ELIZABETH MCCLOSKEY, SBN 268184
EMccloskey@gibsondunn.com
ABIGAIL A. BARRERA, SBN 301746
ABarrera@gibsondunn.com
One Embarcadero Center
San Francisco, CA 9411
Telephone:    (415) 393-8200
Facsimile:    (415) 393-8306

ANDREW M KASABIAN, SBN 313210
AKasabian@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:    (213) 229-7311
Facsimile:    (213 229-6311

*Attorneys for Defendant Meta Platforms, Inc.*

COOLEY LLP
MICHAEL G. RHODES, SBN 116127
Rhodesmg@cooley.com
KYLE C. WONG, SBN 224021
KWong@cooley.com
CAROLINE A. LEBEL, SBN 340067
CLebel@cooley.com
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| IN RE META PIXEL TAX FILING CASES<br><br>This document relates to: All Actions | Master File No. 5:22-cv-07557-PCP (VKD)<br><br>**DEFENDANT META PLATFORMS, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION** |

**PROPOUNDING PARTY:**    Plaintiffs

**RESPONDING PARTY:**    Meta Platforms, Inc.

**SET NO.:**    One (Requests No. 1-36)

Gibson, Dunn & Crutcher LLP

DEFENDANT META PLATFORMS, INC.'S RESPONSES AND OBJECTIONS TO
PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION
CASE NO. 5:22-CV-07557-PCP (VKD)

1  **RESPONSE TO REQUEST FOR ADMISSION NO. 12**

2      Meta incorporates by reference the Preliminary Statement and General Objections set forth

3  above.  Meta further objects to this Request as vague and ambiguous, including in the use of the

4  following undefined terms and phrases: "using" and "on its website."  Meta further objects that this

5  Request seeks an admission regarding the actions of a third party over whom Meta has no control and

6  information solely within the possession of a third party over whom Meta has no control.  Meta

7  further objects to this Request to the extent it calls for discovery that is better sought through another

8  mechanism, including the duplicative Plaintiffs' Interrogatory No. 6, dated July 11, 2023, that

9  plaintiffs also served.

10      Subject to and without waiving its objections, and based on a reasonable investigation of the

11  information available as of the date of these responses, including the Pixel ID that plaintiffs have

12  indicated is a Pixel ID associated with TaxAct, Meta responds as follows:  Meta denies this Request.

13  **REQUEST FOR ADMISSION NO. 13**

14      Admit that the Meta Pixel collected information from the TaxAct website that included "full

15  names, email, country, state, city, zip codes, phone numbers, gender, date of birth, first names of

16  dependents, buttons that were clicked, names of text-entry forms that the taxpayer navigated to (both

17  of which could indicate, for example, whether taxpayers were eligible for certain deductions or

18  exemptions), web browser used, year of the return, and website referral, if any." *See* THE REPORT,

19  at page 11.

20  **RESPONSE TO REQUEST FOR ADMISSION NO. 13**

21      Meta incorporates by reference the Preliminary Statement and General Objections set forth

22  above.  Meta further objects to this Request as vague and ambiguous, including in the use of the

23  following undefined terms and phrases: "collected," "information," "the TaxAct website," and

24  "website referral."   Meta further objects to this Request to the extent it quotes a statement in a

25  document that Meta did not prepare, and relays information allegedly provided by a third party over

26  whom Meta has no control.  Meta further objects to this Request because Meta cannot confirm that

27  the quotation in the Request accurately represents what the cited third party communicated to the

28  author(s) of THE REPORT.  *See* THE REPORT, at page 11 n.75.  Meta also objects to this Request

12

Gibson, Dunn &
Crutcher LLP

1    as vague, ambiguous, unduly burdensome, and disproportionate to the needs of this case to the extent

2    the Request fails to specify a particular period of time.  Meta further objects to this Request to the

3    extent it suggests the Pixel, rather than TaxAct, determined what information to send to Meta via the

4    Pixel.  Meta further objects to the Request to the extent it calls for information no longer within

5    Meta's possession, custody, or control.

6        Subject to and without waiving its objections, and based on a reasonable investigation of the

7    information available as of the date of these responses, Meta responds as follows:  Meta admits that it

8    received from the TaxAct website via the Pixel, among other things, "SubscribedButtonClick" event

9    data, and "PageView" event data with parameters, among others, bearing the labels "name,"

10   "raw_event_name," "event_name," "itemlist_product_name," "og:site_name," "cy_email,"

11   "ly_email," "email," "state_revenue," "zip," "phone," "age_range," "num_of_dependents,"

12   "numChildButtons," "button_text," "buttonFeatures," "buttonText," "return_year,"

13   "further_referred_document_link," "referred_document_link," "innerText," "tax_form,"

14   "formFeatures," and "client_user_agent."  Meta directs plaintiffs to its forthcoming production(s) of

15   event data for additional information that may be relevant to this Request.  Except as otherwise

16   admitted, the information Meta knows or can readily obtain is insufficient to enable it to admit or

17   deny this Request.  Meta continues to investigate information within its possession, custody, or

18   control that would enable it to admit or deny this Request, and Meta reserves the right to supplement

19   or amend its response.  Meta is willing to meet and confer to discuss the basis for its response.

20   **REQUEST FOR ADMISSION NO. 14**

21       Admit that Meta "collected indicators for whether a given taxpayer was head of household,

22   married filing jointly, had certain assets, investment income, charitable contributions, mortgage

23   interests, standard deductions, Schedule Cs, and student loan interest" from the TaxAct website

24   through another Meta "business tool that leverages Facebook's computing services." *See* THE

25   REPORT, at page 11.

26   **RESPONSE TO REQUEST FOR ADMISSION NO. 14**

27       Meta incorporates by reference the Preliminary Statement and General Objections set forth

28   above.  Meta further objects to this Request as vague and ambiguous, including in the use of the

Gibson, Dunn &
Crutcher LLP

DEFENDANT META PLATFORMS, INC.'S RESPONSES AND OBJECTIONS TO
PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION
CASE NO. 5:22-CV-07557-PCP (VDK)

following undefined terms and phrases: "collected," "indicators," "leverages," "computing services," "the TaxAct website," and "another Meta business tool," rendering this Request improper and unintelligible. Meta further objects to this Request to the extent it quotes a statement in a document that Meta did not prepare, and relays information allegedly provided by a third party over whom Meta has no control. Meta further objects to this Request to the extent Meta cannot confirm that the quotation in the Request accurately represents what the cited third party communicated to the author(s) of THE REPORT. Meta also objects to this Request as vague, ambiguous, unduly burdensome, and disproportionate to the needs of this case to the extent the Request fails to specify a particular period of time. Meta further objects to this Request to the extent it suggests the Meta, rather than TaxAct, determined what information to send to Meta via a "Meta business tool."

Subject to and without waiving its objections, and based on a reasonable investigation of the information available as of the date of these responses, Meta responds as follows: Meta can neither admit nor deny the matters set forth in this Request because the information Meta knows or can readily obtain is insufficient to enable it to admit or deny this Request.

**REQUEST FOR ADMISSION NO. 15**

Admit that TaxAct shared taxpayers' number of dependents, number of W2s, AGI (rounded to the nearest thousand), and federal tax owed, and refund amount (each one rounded to the nearest hundred)" with Meta. *See* THE REPORT, at page 11–12.

**RESPONSE TO REQUEST FOR ADMISSION NO. 15**

Meta incorporates by reference the Preliminary Statement and General Objections set forth above. Meta further objects to the Request as impermissibly vague and unintelligible to the extent it purports to quote from a source but omits an introductory quotation mark. Meta further objects to this Request as vague and ambiguous, including in the use of the following undefined terms and phrases: "shared," "taxpayers," "AGI," "number of dependents," "federal tax owed," and "refund amount." Meta further objects to this Request as unduly burdensome and disproportionate to the needs of this case to the extent the Request pertains to business tools other than the Meta Pixel, SDK, and CAPI. Meta further objects to this Request to the extent it quotes a statement in a document that Meta did not prepare, and relays information allegedly provided by a third party over whom Meta has

1   no control.  Meta further objects to this Request to the extent it cannot confirm that the quotation in

2   the Request accurately represents what the cited third party communicated to the author(s) of THE

3   REPORT.  Meta further objects to this Request as vague, ambiguous, unduly burdensome, and

4   disproportionate to the needs of this case to the extent the Request fails to specify a particular period

5   of time.

6        Subject to and without waiving its objections, and based on a reasonable investigation of the

7   information available as of the date of these responses, Meta responds as follows:  Meta admits that it

8   received from the TaxAct website via the Pixel, among other things, parameters bearing the labels

9   "num_of_dependents," "numChildButtons," "w2," "agi," "federal_owe_amount," and

10  "federal_refund_amount."  Meta directs plaintiffs to its forthcoming production(s) of event data for

11  additional information that may be relevant to this Request.  Except as otherwise admitted, the

12  information Meta knows or can readily obtain is insufficient to enable it to admit or deny this

13  Request.  Meta continues to investigate information within its possession, custody, or control that

14  would enable it to admit or deny this Request, and Meta reserves the right to supplement or amend its

15  response.  Meta is willing to meet and confer to discuss the basis for its response.

16  **REQUEST FOR ADMISSION NO. 16**

17        Admit that the Meta Pixel's default settings allowed it to collect page title information from

18  H&R Block's online tax filing service, including page titles that relayed information about the

19  customer and his or her tax situation, such as "the first name of the taxpayer and aggregate amounts

20  relating to HSA contributions, scholarships, and education expenses." *See* THE REPORT, at page 12.

21  **RESPONSE TO REQUEST FOR ADMISSION NO. 16**

22        Meta incorporates by reference the Preliminary Statement and General Objections set forth

23  above.  Meta further objects to this Request as vague and ambiguous, including in the use of the

24  following undefined terms and phrases: "allowed," "collect page title information," "H&R Block's

25  online tax filing service," "relayed information," "tax situation," and "aggregate amounts relating to

26  HSA contributions, scholarships, and education expenses."  Meta further objects to this Request to

27  the extent it quotes a statement in a document that Meta did not prepare, and relays information

28  allegedly provided by a third party over whom Meta has no control.  Meta further objects to this

Gibson, Dunn &
Crutcher LLP

15

DEFENDANT META PLATFORMS, INC.'S RESPONSES AND OBJECTIONS TO
PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION
CASE NO. 5:22-CV-07557-PCP (VDK)

information irrelevant to the claims or defenses in this case and as such Meta is not required to respond.

**REQUEST FOR ADMISSION NO. 36**

Admit that the document attached as Exhibit A is a true and correct copy of an original document generated by a Meta employee.

**RESPONSE TO REQUEST FOR ADMISSION NO. 36**

Meta incorporates by reference the Preliminary Statement and General Objections set forth above. Meta further objects to this Request as vague and ambiguous, including in the use of the following undefined terms and phrases: "an original document," and "generated."

Subject to and without waiving its objections, and based on a reasonable investigation of the information available as of the date of these responses, Meta responds as follows: Meta denies this Request.

Dated: February 23, 2024                    GIBSON, DUNN & CRUTCHER LLP


By:  _____*/s/ Lauren Goldman*_____

*Attorneys for Defendant Meta Platforms, Inc.*

Gibson, Dunn &
Crutcher LLP

**EXHIBIT 2**

GIBSON, DUNN & CRUTCHER LLP
LAUREN R. GOLDMAN (*pro hac vice*)
lgoldman@gibsondunn.com
200 Park Avenue
New York, NY 10166
Telephone:    (212) 351-4000
Facsimile:    (212) 351-4035

ELIZABETH K. MCCLOSKEY (SBN 268184)
emccloskey@gibsondunn.com
ABIGAIL A. BARRERA (SBN 301746)
abarrera@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105
Telephone:    (415) 393-8200
Facsimile:    (415) 393-8306

TRENTON J. VAN OSS (*pro hac vice*)
tvanoss@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:    (202) 955-8500
Facsimile:    (202) 467-0539

COOLEY LLP
MICHAEL G. RHODES (SBN 116127)
rhodesmg@cooley.com
KYLE C. WONG (SBN 224021)
kwong@cooley.com
CAMERON J. CLARK (SBN 313039)
cclark@cooley.com
CAROLINE A. LEBEL (SBN 340067)
clebel@cooley.com
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

*Attorneys for Defendant Meta Platforms, Inc.*
*(formerly known as Facebook, Inc.)*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE META PIXEL HEALTHCARE LITIGATION<br><br>————————————————<br><br>This Document Relates To:<br><br>Case No. 3:22-cv-3580-WHO (Doe) | Case No. 3:22-cv-3580-WHO<br><br>PUTATIVE CLASS ACTION<br><br>**DECLARATION OF TOBIAS WOOLDRIDGE IN SUPPORT OF DEFENDANT META PLATFORMS, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>*[Declaration of Abigail Barrera and [Proposed] Order filed concurrently herewith]*<br><br>Action Filed: June 17, 2022<br><br>Honorable Judge William H. Orrick |

Gibson, Dunn &
Crutcher LLP

DECLARATION OF TOBIAS WOOLDRIDGE IN SUPPORT OF DEFENDANT META PLATFORMS, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION – CASE NO. 3:22-CV-3580-WHO

DocuSign Envelope ID: 29C074F9-7BDC-41AA-8958-8701BA9D6E2

I, Tobias Wooldridge, hereby declare and state:

1.     I am a software engineer at Meta. I offer this declaration in support of Meta's Opposition to Plaintiff's Motion for Preliminary Injunction. The following facts are based on my own personal knowledge, unless otherwise indicated, and, if called and sworn as a witness, I could and would testify competently to them.

## My Background And Work At Meta

2.     I have worked at Meta as a software engineer since February 2015. I am a senior engineer on the Signals team, which bears primary responsibility for maintaining and updating the Meta Pixel code. My team is also responsible for maintaining and implementing Meta's systems that detect and filter potentially sensitive data being sent by third-party developers to Meta via the Meta Pixel, among other Business Tools. I have worked on the Signals team since April 2017.

## Meta Prohibits Developers From Sending Health Information Through Its Pixel Tool

3.     Meta's Pixel is a free, publicly available piece of code that third-party website developers can choose to install and use on their websites to measure certain actions taken on their own websites. Meta's Pixel is available to and used by website developers across industries. Other companies offer their own pixel tools.

4.     Specifically, when someone takes an action a developer chooses to track on their website (like subscribing to email updates), the Meta Pixel is triggered and sends Meta certain data, called an "Event." Meta attempts to match the Events it receives to Meta users (Meta cannot match non-Meta users). The developer can then create "Custom Audiences" based on Events and can target ads on Facebook, Instagram, and publishers within Meta's Audience Network to Meta users who have taken certain actions on their own website. Meta can also provide the developer with de-identified, aggregated reporting that helps the developer better understand the impact of its ads by measuring what happens when people see them. The identity of matched Meta users is never revealed to the developer or to any advertiser.

5.     Meta does not want or permit developers to transmit sensitive information, including health information, to it through the Pixel tool. Meta takes numerous measures to prevent the transmission and receipt of that information.

Gibson, Dunn & Crutcher LLP

1

DECLARATION OF TOBIAS WOOLDRIDGE IN SUPPORT OF DEFENDANT META PLATFORMS, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION – CASE NO. 3:22-CV-3580-WHO

6.      First, Meta requires all developers to agree to its Business Tools Terms before they can obtain a Pixel ID and utilize Meta Pixel code in a website. The Business Tools Terms expressly prohibit developers from sending Meta health or otherwise sensitive information (including any information defined as sensitive under applicable law) and require developers to warrant that they have the legal right to share any information they choose to share with Meta. Developers must also accept Meta's Commercial Terms before using Meta for a business purpose, which similarly prohibit sending Meta health or otherwise sensitive information.

7.      Second, during the Meta Pixel ID creation process—a necessary step to install and use the Meta Pixel—Meta reminds developers not to send Meta sensitive user data, linking to the Business Tools Terms and to Meta's Business Help Center content about restricted data ("About Restricted Meta Business Tools Data"). Attached as **Exhibit 1** is a true and correct copy of the article entitled "About Restricted Meta Business Tools Data," downloaded from the Meta Business Help Center on October 13, 2022. Meta has published several additional Business Help Center articles that explain and give examples of the kinds of information (including health information) that developers should not send to Meta, provide steps developers can take to avoid sending such information, and describe how to address instances in which sensitive information may have been sent.

8.      Third, in addition to requiring developers to agree not to send Meta any information they do not have the legal right to share, Meta developed and implemented a filtering mechanism to screen out potentially sensitive data it detects. Meta developed the filter to detect data sent through the Pixel (as well as other Business Tools) that it categorizes as potentially sensitive data, including health data, and the filter prevents that detected data from being ingested into Meta's ads ranking and optimization systems. ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

9.      When Meta's systems detect and filter out data they categorize as potentially sensitive, Meta sends notifications to the developer (1) via email and (2) in two locations in Meta's developer

DECLARATION OF TOBIAS WOOLDRIDGE IN SUPPORT OF DEFENDANT META PLATFORMS, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION – CASE NO. 3:22-CV-3580-WHO

dashboard, Events Manager. These notifications inform the developer that Meta detected and blocked data that may not comply with Meta's terms; confirm that the removal may affect ad performance; and provide details about the affected data, including the URL where the events occurred, the location (but not the contents) of the potentially violating information, steps the developer can take to address the issue, and an email address to contact with questions.

**Meta Users Consent To Meta's Use Of Pixel Data And Can Control And Disconnect Their Off-Facebook Activity**

10.     Meta discloses to users that it receives data from third parties, including data sent via the Pixel tool, and provides several ways for its users to review and control Meta's use of that data. The Data Policy, to which all users of Meta services must agree, explains that Meta may receive information about users' activities off the Meta services, including from developers that use the Meta Business Tools, including the Meta Pixel. The Data Policy also discloses how Meta uses such data, including by providing measurement, analytics, and other business services. Meta users also must agree to the Terms of Service and Cookies Policy, which disclose that their personal data can be used to provide targeted ads.

11.     Meta also enables its users to review a summary of information Meta has received about their activity from third parties, including through the Pixel, and to disconnect that data from their account. Specifically, using the Off-Facebook Activity tool, which is linked to in the Data Policy and accessible via other entry points, Meta users can control or disconnect the off-Facebook activity that has been associated with their Facebook account, subject to some exceptions for security and safety needs. Meta users can disconnect historical third-party activity data from their account using the "Clear previous history" option. They can also "turn off" storage of future connections between their Facebook account and their activities off Facebook using the "Disconnect Future Activity" option. Meta users can make this choice for all third-party websites or on a website-by-website basis.

12.     In addition, Meta provides other privacy tools and resources to users of the Meta services that allow them to control how data shared by third parties can be used to show them relevant ads. Specifically, the "Data About Your Activity From Partners" tool within Meta's "Ad Settings" allows users to opt out of receiving personalized advertisements based on their activity on third-party

Gibson, Dunn & Crutcher LLP

3

DECLARATION OF TOBIAS WOOLDRIDGE IN SUPPORT OF DEFENDANT META PLATFORMS, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION – CASE NO. 3:22-CV-3580-WHO

1  websites, apps, or offline, among other things.

2       13.    Additional tools Meta provides to its users, which enable them to control

3  advertisements they receive, include the following:

4       •  **Hide ad**:  Users can hide individual advertisements appearing in their News Feed.

5       •  **Report ad**:  Users can report advertisements in their News Feed if they consider them

6          to be inappropriate—for example, due to containing spam, false news, or being

7          misleading or sexually inappropriate.

8       •  **Hide advertiser**:  Users can hide all advertisements from a specific developer altogether

9          via their Ad Preferences.

10      •  **Limit ad topics**:  Users can limit advertisements about topics such as alcohol, parenting,

11         pets, social issues, and elections or politics, and advertisers cannot target the user based

12         on an interest in that topic.

13      I declare under penalty of perjury that the foregoing is true and correct, and that I executed this

14  Declaration on October $\underline{17}$, 2022, in $\underline{Adelaide, South Australia}$.

15

16                                          _Tobias Wooldridge_

17                                          Tobias Wooldridge

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

4

DECLARATION OF TOBIAS WOOLDRIDGE IN SUPPORT OF DEFENDANT META PLATFORMS, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION – CASE NO. 3:22-CV-3580-WHO

DocuSign Envelope ID: 29C074F9-7BDC-41AA-8059-67011BA9D6E2

# Exhibit 1

DocuSign Envelope ID: 29C074F2-7BB2-41AA-805B-6791BA9D6E0

**At Meta, we have policies around the kinds of information businesses can share with us. We don't want websites or apps sending us sensitive information about people.**

Business Tools Data is data sent from advertisers to Meta in connection with advertising, matching, measurement and analytics, including through the use of Business Tools, Social Plugins, Login, and certain APIs. Meta's Business Tools Terms outline the type of data that advertisers should not send to Meta via any of the Meta Business Tools.

Specifically, advertisers should not share Business Tools Data with Meta that they know or reasonably should know is either from or about children under the age of 13, or includes health or financial information, or other categories of sensitive information. This includes any information defined as sensitive under applicable laws, regulations and applicable industry guidelines.

Advertisers may use the Meta Business Tools to send to Meta information that personally identifies individuals (referred to as Contact Information), such as names, email addresses, and phone numbers, to help Meta match the data advertisers share with Meta user accounts. However, such Contact Information must be hashed in a manner specified by Meta before transmission, when using a Meta image Pixel or other Meta Business Tools. Visit Meta for Developers for hashing instructions.

Use the Learn More section below for further guidance on certain types of sensitive Business Tools Data prohibited under Meta's Business Tools Terms.

If you receive a notification that you're violating Meta's Business Tools data policies, learn how to troubleshoot the issue.

## Learn more

**EXHIBIT 3**

1
2
3
4
5

**GIBSON, DUNN & CRUTCHER LLP**
ELIZABETH K. MCCLOSKEY, SBN 268184
emccloskey@gibsondunn.com
ABIGAIL A. BARRERA, SBN 301746
abarrera@gibsondunn.com
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone:    (415) 393-8200
Facsimile:    (415) 393-8306

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 7/17/2024 11:47 PM
Reviewed By: C. Roman
Case #21CV383231
Envelope: 15983398**

6
7
8
9

**GIBSON, DUNN & CRUTCHER LLP**
LAUREN R. GOLDMAN (*pro hac vice*)
lgoldman@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:    (212) 351-4000
Facsimile:    (212) 351-4035

10
11
12
13

**COOLEY LLP**
MICHAEL G. RHODES, SBN 116127
rhodesmg@cooley.com
Three Embarcadero Center, 20th Floor
San Francisco, CA 94111
Telephone:    (415) 693-2000
Facsimile:    (415) 693-2222

14
15

*Attorneys for Defendant Meta Platforms, Inc.*
*(formerly known as Facebook, Inc.)*

16

SUPERIOR COURT OF THE STATE OF CALIFORNIA

17

COUNTY OF SANTA CLARA

18
19
20
21
22
23
24
25
26

ANGEL MCDANIEL, JEROME GAGE, and
CRAIG MILLER,

            Plaintiffs,

        v.

META PLATFORMS, INC.,
fka FACEBOOK, INC.,

            Defendant.

Case No. 21-CV-383231

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF META'S
OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION**

Action Filed:  June 18, 2021

Judge:  Hon. Charles F. Adams, Department 7

Date:  October 17, 2024

Time:  1:30 P.M.

27
28

**PUBLIC - REDACTS MATERIALS FROM CONDITIONALLY SEALED RECORD**

1  that class litigation cannot be superior.  Other courts have refused to certify classes for wiretapping

2  claims based on many of these exact issues.  Plaintiffs' motion and trial plan address none of them.

3        Plaintiffs cannot avoid these problems by simply pretending they do not exist.  "A class cannot

4  be certified on the premise that [the defendant] will not be entitled to litigate its . . . defenses to indi-

5  vidual claims."  (*Duran v. U.S. Bank Nat'l Ass'n* (2014) 59 Cal.4th 1, 35 (*Duran*), quotation marks and

6  citation omitted.)  Plaintiffs' motion for class certification should be denied.

7  **BACKGROUND**

8       **A.**    **Meta's Pixel**

9        The Meta Pixel is a free, publicly available internet tool that website developers can install on

10  their websites to measure the actions users take on their sites.  (Declaration of Elizabeth K. McCloskey

11  ("McCloskey Decl.") Ex. 1.)  Pixels are ubiquitous tools across the web.  Numerous companies (such

12  as Google and LinkedIn) offer them, and web developers across numerous industries use them.  (Report

13  of Dr. Georgios Zervas ("Zervas Report") ¶¶ 9(a), 10, 12.)

14        Web developers choose whether and how to install Meta's Pixel and decide which actions to

15  measure (called "events").  (McCloskey Decl. Ex. 2; Zervas Report ¶¶ 13–15.)  When a user of the

16  developer's website takes an action the developer has chosen to measure, the Pixel sends certain "Event

17  Data" about that action to Meta, which Meta can then compile and use to provide analytics to the

18  developer.  (*Ibid.*; McCloskey Decl. Ex. 1; *id.* Ex. 3; Zervas Report ¶ 12.)  This information helps

19  developers improve their online services, understand how people interact with their products and ser-

20  vices, and better communicate with people who may be interested in their products and services, in-

21  cluding by showing ads to them.  (McCloskey Decl. Ex. 1; *id.* Ex. 4; *id.* Ex. 5; Zervas Report ¶ 12.)

22        Pixel technology is no secret.  Meta's policies and online articles describe how pixels work,

23  and web developers (including HBO) disclose their use of pixels in their policies.  (E.g., McCloskey

24  Decl. Exs. 6–9.)  Meta also provides a tool, the "Off-Facebook Activity" tool, for users to see data

25  Meta receives about them from other websites.  (*Id.* Ex. 10; Declaration of Stephanie Tung ("Tung

26  Decl.") ¶¶ 2–3.)

27       **B.**    **Plaintiffs' Claims**

28        Plaintiffs Angel McDaniel, Jerome Gage, and Craig Miller are Facebook users who have HBO

6

1

2    Dated:  July 17, 2024                    **GIBSON, DUNN & CRUTCHER LLP**

3

4                                              By:    */s/ Elizabeth K. McCloskey*
                                                      Elizabeth K. McCloskey, SBN 268184
5                                                     Abigail A. Barrera, SBN 301746
                                                      One Embarcadero Center, Suite 2600
6                                                     San Francisco, CA 94111
                                                      Telephone:    (415) 393-8200
7                                                     Facsimile:    (415) 393-8306
                                                      emccloskey@gibsondunn.com
8                                                     abarrera@gibsondunn.com

9                                                     Lauren R. Goldman (*pro hac vice*)
10                                                    200 Park Avenue
                                                      New York, NY 10166-0193
11                                                    Telephone:    (212) 351-4000
                                                      Facsimile:    (212) 351-4035
12                                                    lgoldman@gibsondunn.com

13                                            **COOLEY LLP**

14

15                                            By:    */s/ Michael G. Rhodes*
                                                      Michael G. Rhodes, SBN 116127
16                                                    Three Embarcadero Center, 20th Floor
                                                      San Francisco, CA 94111
17                                                    Telephone:    (415) 693-2000
                                                      Facsimile:    (415) 693-2222
18                                                    rhodesmg@cooley.com

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF META'S OPPOSITION TO PLAIN-
TIFFS' MOTION FOR CLASS CERTIFICATION – CASE NO. 21-CV-383231

**EXHIBIT 4**

# ABP Privacy Infra, Long Range Investments [A/C Priv]

**Goals of this Review**

- This document was written to advise leadership on preparedness, investments and technology plans with respect to inbound regulations.
- ABP is seeking continuous, multi-year investment and support from Data Infrastructure, Core Data and Central Privacy for the plans laid out in this document.

  NOTE (1) This document is an abridged version of ABP Privacy Infra 2021 (2) the follow up reading of this document in ABP Privacy Infra: WWW [A/C priv] which expands on the base understanding provided here.

**Executive Summary**

- We were surprised in 2021 with regulatory changes in the EU and India that will restrict 1P data use; setting the stage for a global regulatory push toward consent for 1P data use in Ads.
- Our past policy enforcement plans were already insufficient (on any timeframe) for handling 2PD concerns. The gap with success (scalably enforcing policy) is now an order of magnitude larger with the increased 1P governance.
- We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as "we will not use X data for Y purpose." And yet, this is exactly what regulators expect us to do, increasing our risk of mistakes and misrepresentation.
- Addressing these challenges will require additional multi-year investment in Ads and our infrastructure teams to gain control over how our systems ingest, process and egest data. This new investment is needed in addition to the ongoing Purpose Policy Framework investments.
- The remainder of this document is structured as follows

Motivations
- Regulatory Landscape
- Fundamental Problems
- Gaps in Purpose Policy Framework

Investments Needed
- Curated Data Sources


EXHIBIT
158

- 1PD Controls
- Timelines & Goals
- Resource Napkin and Funding Gaps

Nascent Investments
- Competition
- WWW Isolation and Control

**Motivations**

**Regulatory Landscape**

In 2021 regulatory restrictions will continue to expand around the globe as we shift toward consent. Under a consent regime, by default we are not allowed to use personal data for ads. We are anticipating impactful regulations from India, Thailand, South Korea, South Africa, Egypt, and many other jurisdictions (see image below). We also expect the US to make progress on federal privacy legislation, though the effective data will likely not be in 2021. Key point: historically regulations have been major thrashing changes for the company, but we've had the "luxury" of addressing one at a time (GDPR in 2018, FTC suit in 2019, CCPA in 2020). This is no longer the case. We face a tsunami of inbound regulations that all carry massive uncertainty.



**Fundamental Problems**

From an infrastructure point of view, the heart of our challenge is a lack of "closed form systems." In this context, "closed form" refers to the union of these desirable properties of a system: (1) All data types ingested, derived and egested by the system can be enumerated and controlled; (2) All data uses within the system can be enumerated and controlled; (3) All

data uses of egested data by consumers downstream, can be enumerated and controlled. These properties are what make a system tractable, and controllable. If we can't enumerate all the data we have - where it is; where it goes; how it's used - then how can we make commitments about it to the outside world?

We fundamentally lack closed-form properties in Facebook systems. For more than a decade, openness and empowering individual contributors has been part of our culture. We've built systems with open borders. The result of these open systems and open culture is well described with an analogy: Imagine you hold a bottle of ink in your hand. This bottle of ink is a mixture of all kinds of user data (3PD, 1PD, SCD, Europe, etc.) You pour that ink into a lake of water (our open data systems; our open culture) … and it flows … everywhere. How do you put that ink back in the bottle? How do you organize it again, such that it only flows to the allowed places in the lake?

To make this understanding a bit more concrete, consider this: There are 15K features used in ads models. The graph to the right shows the dependency chain of actual tables used to produce **just one single feature**. In total, ~6K tables (the red dots) were used to produce "user_home_city_moved"



**Gaps in Purpose Policy Framework**

In 2019 ABP accepted the vision from Central Privacy that in the longer term, most, if not all of our challenges would be solved by the Purpose Policy Framework (PPF). The basic idea

of PPF was that we could attach a policy, at a very granular level, to every piece of data as it gets ingested or created in Facebook. Then, as the data flowed from system to system, the policy would flow with it. Then, at every place the data was being processed or used, it would get properly handled, because every processor would have a declared purpose. If the declared purpose wasn't allowed, the data would get filtered out by the underlying infrastructure…And all this would happen magically and silently so that engineers wouldn't need to restructure all of its data flows to gain control over its data use.

**Key point:** The beauty of (Purpose Policy Framework) was that -in theory- ABP wouldn't need to restructure all of its data flows to gain control over its data use.

In late 2020 PPF was folded under the branding of Privacy Aware Infra (PAI), and while it carries forward many of the challenges characteristic of large infrastructure projects (delays technological gaps, misaligned cross-org investment levels), it is still one of our most necessary and promising investments. **ABP remains committed to PPF adoption. However we now see that the original version wasn't a full solution.**

**Key Gaps:**
1. **Investment gap** → Policy Annotation. There are not aggressive and proportionate investments among the Family of Apps for attaching policies to their tens-of-thousands of root data sources (e.g. APIs in WWW, Tables in Hive, etc.)
2. **Technological Gap** → Policy Propagation. Even after policies are attached, they need to be handled through complex operators (joins, unions, concatenations, transformations, etc.) This is a very technologically difficult to do for several classes of operators that are frequently used throughout ads pipelines. Contrary to the original vision, PPF won't be able to support major classes of Ads operators, on any timeframe.
3. **Technological Gap** → System Coverage. Policies need to be handed off from one data platform to another, passing all the way from root systems to target systems without getting dropped (e.g. www → thrift → scribe → hive → etc.) There are more than 140 data processing systems (Asset Classes), and even for some of the major ones like WWW, PPF won't be supported until 2023 or later.

   … summing these gaps: ABP has been getting ready to receive a pitch, but no one will be ready to throw the ball.

Key Point: In light of these gapos, and pressured by accelerated regulatory timelines, we can't wait for PPF to achieve the "closed form" system properties we need while holding our core ads infrastructure as invariant. We need to restructure our data flows so that they are closer to the goal by design.

**Investments Needed**

In this section we'll discuss (1) Curated Data Sources and (2) 1P Data Controls. These are the most major infrastructure investments needed, and they have the most developed plans.

**Curated Data Sources (CDS)**

There are tens-of-thousands of uncontrolled data ingestion points into Ads systems today. We will rewrite and migrate all of these onto a controlled 'choke point' where we can systematically annotate the data with PPF policy. All of the Ads subsystems will only consume data from [Curated Data Sources]. Thus we will know exactly what data is being consumed by Ads subsystems, where it comes from, how it's generated, and what policies apply. Furthermore, CDS will only use computational operators (joins, unions, etc.) that PPF can support. With CDS we will be able to make product commitments and comply with regulatory requirements.

The below diagram provides a 30K foot architecture. A more detailed architecture can be found here. [URL redacted]



**Why do we need Curated Data Sources if we have Purpose Policy Framework?**
Two reasons:

1. All data consumed by Ads must have an attached policy. The act of curation into CDS is the attachment of a PPF policy (by ads engineers). The alternative of waiting for FOA [Family of Apps] to decorate all their data with policy is **many** years away, at best.
2. PPF technology will never be capable of handling certain classes of operators and processors that are common among Ads pipelines. This, even if FOA were to properly decorate all their data with policies, Ads would still need to refactor most of its data flows to make them PPF compatible.

**Why do we need Purpose Policy Framework if we have Curated Data Sources?**
Two reasons:

1. Subsystems within Ads may or may not be allowed to consume certain data from CDS, subject to privacy policy. For example, we may allow certain opt-out data to be used in training, but not in ranking or targeting. To support these different levels of access among CDS consumers, we need a policy enforcement mechanism within the Ads boundary. Ads could build a new custom enforcement - why would we? - This is exactly what PPF is for, and Ads intends to take a low-risk dependency on PPF's basic capabilities.
2. PPF policies are the standard way to express a purpose policy today, and will generalize for other policy types as part of PAI going forward. Data arriving at and leaving Ads boundary will need to carry such a policy to remain compatible with the rest of the infra ecosystem.

**1P Data Controls**

There is a global regulatory trend pushing Facebook Ads toward legitimate interest or consent for 1P data use. In either legal construct (legitimate interest or consent) Ads must "immediately" halt processing of an opted-out user's data; including user data that was accumulated before the opt-out occurred.

**Long term**: A major part of our long term solution for halting processing in ads is CDS+PPF, as described above in this doc. However, even CDS+PPF will not be sufficient, because we will not be able to retroactively apply a user opt-out toi data that has already been consumed by Ads systems. There is strong consensus among Ads and Data Infrastructure TL circles that to fully stop processing (including data that has already entered ads systems) we'll need to efficiently filter opted-out users in the underlying Data Infrastructure.

Specifically, Data Infra will need to have some semantic awareness of its data assets (hive tables, scribe streams, etc.) such that it can know if the data it contains includes an

opted-out user information (a UserID) - in which case, the infra would be silently and efficiently filter that opted-out user from further processing. Building this will take multiple years, and will require DI investment. We are still in the early stages of joint scoping and estimations.

**Short Term**: Our short term response to these requirements is to build "Basic Ads." A new product initiative that needs to be launch-ready in Europe by January, 2022. When launched, Facebook users will be able to "opt-out" from having almost all of their 3P and 1P data used by Ads systems - page likes, posts, friends list, etc. To build this, Ads will still require efficient Data Infra filtration, however the work will be more narrowly scoped - we will only filter data at the boundary of Ads warehouse systems (Uhaul jobs, etc.) Data infra scoping and estimation work for this is underway.



**Resourcing Napkin**

Ads will require substantial investment for the next several years in order to deliver on our aggressive timeline. A detailed resourcing plan is here. In brief:
- Estimate: 450-750 eng years. For simplicity, yearly breakdowns assume the mid-point of 600 eng years.
- Assume: Execution timeline of 3 years.
- High-level execution plan and resourcing needs by year:

**2021**
- +150 HC (150 in total)
- Fully staff ingestion for CDS and 1P data controls
- Partially staff consumption of CDS and frontload key tech investments

- 150 eng years of work is completed.

**Fully Funded**
✓ 50 HC from PAI pool
✓ 40 HC from ABP pool
✓ 60 people from ABP reprí

**2022**
- +200 HC (350 total)
- Fully staff consumption of CDS - migrate Delivery systems to use only curated data
- Egin investments outside Ads Delivery (Business Integrity, Measurement, etc.)
- 500 eng years of work is completed.

**Funding Source Needed**

**2023**
- ~250 HC (100 total)
- Drop the investment for curated data sources since most work should be completed

**Funding Source Needed**

**Nascent Investments**

In this section we'll discuss (1) Competition and (2) WWW isolation. These are two relatively more nascent challenges that will drive additional investment needs over the next several years.

**Competition**

Our legal teams anticipate negative competition judgments from the European Commission within 2021. This will likely have contagion effects for other jurisdictions (United States) and other FB product areas (Shops).

To oversimplify, 'Privacy' is concerned with controlling data flowing *from our Family of Apps into Ads*; whereas 'Competition' is concerned with the reverse flow - i.e. competitively sensitive data flowing *from Ads into our Family of Apps*. But the fundamental challenge is exactly the same. That is, data isolation and control among FACEBOOK properties.

In 2020 Ads wrote a joint proposal with the Choice and Competition team that would stem risks associated with competitively sensitive data use. It called for accelerations of PPF adoption around the company and a massive surge in headcount split among Central

Privacy, Ads and FOA → see [Occam] Avoiding Competitive Data Use Mistakes [A/C priv].
The Occam proposal remains unfriended in this writing (April, 2021)

**WWW Isolation and Control**

From an infrastructure point of view, the aforementioned investments are about 'isolation and control' of data and processing. That is, we need to isolate Ads from the rest of the Family of Apps, and build well controlled interfaces at the boundaries between Ads and other Facebook properties. Creating this isolation in WWW wil be especially difficult due to its monolithic nature. There are hundreds of thousands of controllers and call sites, and there is no clear solution for defining an "ads boundary", short of doing the hard work of manually visiting each of them.

Our overall strategy for solving this problem is to migrate as many of the Ads data dependencies as possible out of WWW, in favor of Warehouse data sources, where boundary definitions, isolation and control systems are relatively more available. We will execute on this strategy (migrating to Warehouse) as part of our Curated Data Sources investments. But this will not be enough. There will remain substantial Ads code in WWW that is entangled with FACEBOOK organic processing. The legal constructs of legitimate interest and consent require us to also stop this WWW processing.

We will continue working with Privacy Infra to evaluate new WWW lineage tools, boundary annotations and enforcement technologies such as CIPP. However, there is no obvious solution yet, which doesn't involve dramatic investment by Ads engineers. At present, it appears we will need to manually visit tens-of-thousands of call sites and code paths to define and enforce an Ads boundary. And in many cases we will need to manually untangle and rebuild Ads scenarios.

**Key point**: Just like PPF isn't a sufficient solution without heavy Ads refactoring and adoption work in warehouse, WWW enforcement technologies such as CIPP will not magically solve these problems without enormous Ads and FOA side investments for adoption.

**Appendix-1: Point of view on readiness and uncertainty of solutions**

The below grid shows the dimensions of requirements we described above. For each of these, we are assigning one of 3 colors that represents our level of confidence in our proposed infrastructure solutions. This is obviously subjective, and it oversimplifies things. Nevertheless, we hope it can level set perspectives on uncertainty.

| High Confidence | Low Confidence | Very Low Confidence |
|---|---|---|

| | Necessary? | Sufficient? | |
|---|---|---|---|
| | How confident are we that our infra investments address long term fundamental problems and are necessary? | How confident are we that our infra solutions are sufficient for 2022? | **Explanation** |
| Jurisdiction | | | We have a reasonable handle on which jurisdictions are going to drive significant requirements and there is a Central Privacy team monitoring global changes. |
| Sensitive Categories | | | With inferences counting as SCDs, this problem space expands to ML. Our solutions in this area are immature, and have not been subjected to regulatory scrutiny. We will likely discover new work (e.g. Youth requirements). |
| Purpose Limitation & Legal Basis | | | The legal constructs in this area are well understood and similar around the world. We've had a lot of time to consider the problem space. However, we are making risk based decisions around legal basis, and we may be challenged by regulators. |
| ML/AI | | | This is a new area for regulation and we are very likely to see novel requirements for several years to come. We have very low confidence that our solutions are sufficient. |
| Data Provenance and Responsibilities | | | Similar to purpose limitations, we understand the legal constructs in this area, and they are patterned around the globe. And yet, we have risk based |

| | | | |
|---|---|---|---|
| | | | tradeoffs and there is room for regulatory surprise and novel requirements, particularly from the USA. |
| Transparency & Control | | | Transparency and Control over machine learning is likely to reveal new requirements. |
| Localization | | | Ads is largely in the dark here. We are not aware of any ads specific requirements, and are awaiting company wide solutions that will most likely be owned by core infra teams. |
| Minimization | | | This area is largely understood and similar around the world. The infra solutions for controlling retention policies are in place and continue to improve coverage through Central Privacy Waves. There is room for surprise here as ML regulations progress. |
| Timing | | | Our infra solutions have not, and most likely will not be ready before significant regulations take effect. Of most concern: India will likely mandate Consent within 2023. |

**Appendix-2: Collection of diagrams for potential Q/A**





**Appendix-3: Examples and Understanding of Ads WWW Footprint and Entanglement**

Question from [NAME REDACTED]: "One thing I'd like to understand better is how Ads uses www. If possible, it would be great if you could pull together some specific examples of each of the three categories you listed in the architecture diagram in the appendix (organic

processing, Entangled Ads processing and signal processing) along with where in www this code lives and what it depends on."

**Answer**: We don't have an organized understanding of all the Ads workloads and data flows in WWW. Even a specific and commonly used example -the AdRequest- has unboundedness and intractability in its dependency graph. As you read this, keep in mind this is probably our most well understood and controlled example, and that other ads workloads are similarly gnarly (measurement, targeting, business integrity etc... etc...)

**Macro view: Ads Footprint and Entanglement in WWW**

**APIs**
- There are about <u>350K</u> endpoints in the entire company. Of these, about a quarter (~80K) log to scribe channels that are owned by Ads OnCalls.
- According to OnCall associations, Ads only owns about 30K of the 80K endpoints that send data into Ads → Restated: 60% of the WWW APIs that Ads uses are not owned by Ads. Let's call these "entangled" APIs.
- Presumably most of the entangled APIs have alternate or original purposes that are 'organic' in nature.

**Files and Directories**
- There are 800K directories in WWW, containing 4.8 million files.
- Of these, at least 6% of the file structure (50K directories, containing 300K files) are in a directory that starts with "ads" in the name.
- Important note: We don't have a useful structure in WWW for determining what is ads vs what is not ads. Let alone a useful way to substructure the WWW workloads within Ads. This is, in part, the nature of our WWW entanglement problem. The heuristics described above, such as *'includes' "Ads" in the filename'*, or *'has an Ads oncall attached'* only give an approximation.

**Zoom in on a specific Ads workload: The AdRequest**
- Let's consider the "ad request"; one of our more "standard" interfaces between Ads & FOA.
- There are at least 60 different end points that generate 680 distinct code paths which eventually lead to an AdFinder call.
- In each ad request there are about 200 fields passed into AdFinder. These fields can be objects and complex structures. Each AdRequest is stuffed with *whatever* data placement teams and organic surfaces around FACEBOOK decided to compose in WWW. This would include unbounded and uncontrolled fetching of data from Ents and organic data stores from around the company (zippy, laser, ... or whatever).
- When calling AdFinder, the min—average—max call stack depth is 19—90—127. That is, on average there are 90 WWW files used before AdFinder is even called.

Again, this is organic WWW processing running arbitrary code, and eventually building an arbitrary AdRequest using %whatever% data from around the company that they want.

**EXHIBIT 5**

**FILED UNDER SEAL**

**EXHIBIT 6**

**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
ndeckant@bursor.com

**GEORGE FELDMAN MCDONALD, PLLC**
Lori G. Feldman (*pro hac vice*)
Michael Liskow (State Bar No. 243899)
200 Park Avenue, Suite 1700
New York, New York 10166
Telephone: (646) 354-6534
lfeldman@4-justice.com
mliskow@4-justice.com

*Attorneys for Plaintiffs*
*Additional Attorneys on Signature Page*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE META PIXEL TAX FILING CASES | Master File No. 5:22-cv-07557-PCP (VKD) |
| This document relates to: | **DECLARATION OF JANE DOE** |
| All Actions | Date Action Filed: December 1, 2022<br>Honorable P. Casey Pitts |

1    I, Jane Doe, declare as follows:

2    1.    I am over the age of 18 and I submit this declaration in support of my concurrently-

3    filed Motion for Class Certification.  I have personal knowledge of the facts set forth in this

4    declaration and, if called as a witness, I could and would testify competently thereto.

5    2.    I used H&R Block's online services to prepare my tax filings in 2022.  In the process

6    of using these online services I provided confidential tax information to H&R Block.

7    3.    I have a basic understanding of the complaint in this case. I was asked about this topic

8    when I was deposed by Meta in this matter. An example of some of my testimony on this topic is the

9    following:

10    Q.    Did you review this complaint before it was filed?

11    A.    Yes … They send me these things and tell me to review them, and I do.

12    Q.    Did you authorize the filing of the complaint?

13    A.    I believe so, yes.

14    . . . .

15    Q.    Did you review the facts in the complaint for accuracy?

16    A.    Yes … I try to take the reviewing of the documents very seriously.

17    June 24, 2025 Lindley Dep., 267:14-268:11.

18    4.    I have a basic understanding of the difference between an individual action and a class

19    action, and also understand that my role in this litigation is to protect the interests of other putative

20    class members.  I was asked about this topic when I was deposed by Meta in this matter.  An example

21    of some of my testimony on this topic is the following:

22    Q.    Do you understand what your duties and obligations would be as a class

23    representative in this case?

24    A.    I believe so, yeah … I think I understand my duties. We talked a lot about it,

25    had a very long conversation before I decided to go forward with it.

26    Q.    What class are you seeking to represent in this case?

27    A.    It's my understanding that I represent whoever this happened to in California.

28    June 24, 2025 Lindley Dep., 281:25, 282:1-16.

5.      I have dedicated a significant amount of time to this action.  I frequently communicate with my attorneys about this case.  I have done so to discuss discovery requests and other issues requiring my immediate attention, or to keep up to date on the case generally.  I have searched for and produced documents and responded to interrogatories.  I also spent several hours meeting with my attorneys to prepare for my deposition, and later travelled to San Francisco, California to attend my in-person deposition, which occurred on June 24, 2025 and lasted seven and a half hours.

6.      As a class representative, I will continue to work to the best of my abilities to prosecute this action on behalf of the class members.  I expect to assist further in the case as needed, including testifying at trial.

7.      I have no interest in this litigation that would conflict with the interests of class members.  I have no past or present financial, employment, familial or other relationship with any of the attorneys representing me that would cause me to put my economic interests above those of the class members I seek to represent.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on 8/5/2025 _____ in _____,. Turlock, California

JANE DOE

**EXHIBIT 7**

1

**BURSOR & FISHER, P.A.**           **GEORGE FELDMAN MCDONALD, PLLC**

2

Neal J. Deckant (State Bar No. 322946)    Lori G. Feldman (*pro hac vice*)

1990 North California Blvd., 9th Floor     Michael Liskow (State Bar No. 243899)

3

Walnut Creek, CA 94596               200 Park Avenue, Suite 1700

Telephone: (925) 300-4455            New York, New York 10166

4

ndeckant@bursor.com                 Telephone: (646) 354-6534

lfeldman@4-justice.com

5

mliskow@4-justice.com

6

*Attorneys for Plaintiffs*

7

*Additional Attorneys on Signature Page*

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

SAN JOSE DIVISION

11

12

IN RE META PIXEL TAX FILING CASES          Master File No. 5:22-cv-07557-PCP (VKD)

13

This document relates to:                  **DECLARATION OF KATRINA
                                           CALDERON**

14

All Actions                                Date Action Filed: December 1, 2022

15                                         Honorable P. Casey Pitts

16

17

18

19

20

21

22

23

24

25

26

27

28

I, Katrina Calderon, declare as follows:

1.     I am over the age of 18 and I submit this declaration in support of my concurrently-filed Motion for Class Certification.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would testify competently thereto.

2.     I used TaxAct's online services to prepare my tax filings in 2021.  In the process of using these online services I provided confidential tax information to TaxAct.

3.     I have a basic understanding of the complaint in this case. I was asked about this topic when I was deposed by Meta in this matter. An example of some of my testimony on this topic is the following:

> Q.     So Exhibit 2 is the Second Amended Consolidated Class Action Complaint in this case. Are you familiar with this document?
>
> A.     Yes.
>
> Q.     Did you review it before it was filed?
>
> A.     Yes.
>
> Q.     Did you confirm that all of the information in this Complaint was accurate?
>
> A.     Yes.

May 30, 2025 Calderon Dep., 40:2-10.

4.     I have a basic understanding of the difference between an individual action and a class action, and also understand that my role in this litigation is to protect the interests of other putative class members.  I was asked about this topic when I was deposed by Meta in this matter.  An example of some of my testimony on this topic is the following:

> Q.     Do you understand what your duties and obligations would be as a class representative in this case?
>
> A.     Yes.
>
> Q.     What are those obligations?
>
> A.     To make sure that everybody that has been a part of this is also compensated.
>
> Q.     What do you mean as -- "that has been a part of this"?
>
> A.     Like had their information -- their tax information shared with Meta.

May 30, 2025 Calderon Dep., 165:2-12.

5.    I have dedicated a significant amount of time to this action.  I frequently communicate with my attorneys about this case.  I have done so to discuss discovery requests and other issues requiring my immediate attention, or to keep up to date on the case generally.  I have searched for and produced documents and responded to interrogatories.  I also spent several hours meeting with my attorneys to prepare for my deposition, and later travelled to Palo Alto, California to attend my in-person deposition, which occurred on May 30, 2025 and lasted four and a half hours.

6.    As a class representative, I will continue to work to the best of my abilities to prosecute this action on behalf of the class members.  I expect to assist further in the case as needed, including testifying at trial.

7.    I have no interest in this litigation that would conflict with the interests of class members.  I have no past or present financial, employment, familial or other relationship with any of the attorneys representing me that would cause me to put my economic interests above those of the class members I seek to represent.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on
___Jul 22, 2025___ in Salinas, California.


Katrina Calderon (Jul 22, 2025 14:40 PDT)
_____
KATRINA CALDERON

**EXHIBIT 8**

1

**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)

2    1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596

3    Telephone: (925) 300-4455
ndeckant@bursor.com

4

5

**GEORGE FELDMAN MCDONALD, PLLC**
Lori G. Feldman (*pro hac vice*)
Michael Liskow (State Bar No. 243899)
200 Park Avenue, Suite 1700
New York, New York 10166
Telephone: (646) 354-6534
lfeldman@4-justice.com
mliskow@4-justice.com

6

7    *Attorneys for Plaintiffs*
*Additional Attorneys on Signature Page*

8

9                    UNITED STATES DISTRICT COURT

10                   NORTHERN DISTRICT OF CALIFORNIA

11                        SAN JOSE DIVISION

12   IN RE META PIXEL TAX FILING CASES          Master File No. 5:22-cv-07557-PCP (VKD)

13   This document relates to:                  **DECLARATION OF KAYLA SALAS**

14   All Actions                                Date Action Filed: December 1, 2022
                                                Honorable P. Casey Pitts
15

16

17

18

19

20

21

22

23

24

25

26

27

28

1      I, Kayla Salas, declare as follows:

2      1.      I am over the age of 18 and I submit this declaration in support of my concurrently-

3   filed Motion for Class Certification. I have personal knowledge of the facts set forth in this

4   declaration and, if called as a witness, I could and would testify competently thereto.

5      2.      From the time I initiated this lawsuit until June 2025, my name was Kayla Housman.

6   I was married in June 2025 and have now changed my name to Kayla Salas. I refer to the "Housman"

7   deposition transcript below because Housman was my surname at the time of my deposition.

8      3.      I used H&R Block's online services to prepare my tax filings in 2022 and 2023. In

9   the process of using these online services I provided confidential tax information to H&R Block.

10     4.      I have a basic understanding of the complaint in this case. I was asked about this topic

11  when I was deposed by Meta in this matter. An example of some of my testimony on this topic is the

12  following:

13          Q.      Did you review this complaint before it was filed?

14          A.      Yes.

15          Q.      Did you authorize the filing of the complaint?

16          A.      Yes.

17  June 11, 2025 Housman Dep., 190:17-22.

18     5.      I have a basic understanding of the difference between an individual action and a class

19  action, and also understand that my role in this litigation is to protect the interests of other putative

20  class members. I was asked about this topic when I was deposed by Meta in this matter. An example

21  of some of my testimony on this topic is the following:

22          Q.      Do you understand what your duties and obligations would be as a class

23                  representative in this case?

24          A.      Yes.

25          Q.      What are those responsibilities?

26          A.      My responsibility would be to represent all of the other people that may not

27                  be able to represent themselves or come forward and do all of this for themselves.

28                  And it's my job to be here on their behalf.

DECLARATION OF KAYLA SALAS
CASE NO. 5:22-CV-07557                                                                        1

1   June 11, 2025 Housman Dep., 204:16-25.

2       6.      I have dedicated a significant amount of time to this action. I frequently communicate

3   with my attorneys about this case. I have done so to discuss discovery requests and other issues

4   requiring my immediate attention, or to keep up to date on the case generally. I have searched for

5   and produced documents and responded to interrogatories. I also spent several hours meeting with

6   my attorneys to prepare for my deposition, and later travelled to Kansas City, Missouri to attend my

7   in-person deposition, which occurred on June 11, 2025 and lasted six and a half hours.

8       7.      As a class representative, I will continue to work to the best of my abilities to

9   prosecute this action on behalf of the class members. I expect to assist further in the case as needed,

10  including testifying at trial.

11      8.      I have no interest in this litigation that would conflict with the interests of class

12  members. I have no past or present financial, employment, familial or other relationship with any of

13  the attorneys representing me that would cause me to put my economic interests above those of the

14  class members I seek to represent.

15

16

17

        I declare under penalty of perjury that the foregoing is true and correct. Executed on
18  ___8/6/2025_____ in Kansas City, Missouri.

19

20  

21  KAYLA SALAS

22

23

24

25

26

27

28

**EXHIBIT 9**

**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
ndeckant@bursor.com

**GEORGE FELDMAN MCDONALD, PLLC**
Lori G. Feldman (*pro hac vice*)
Michael Liskow (State Bar No. 243899)
200 Park Avenue, Suite 1700
New York, New York 10166
Telephone: (646) 354-6534
lfeldman@4-justice.com
mliskow@4-justice.com

*Attorneys for Plaintiffs*
*Additional Attorneys on Signature Page*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| IN RE META PIXEL TAX FILING CASES | Master File No. 5:22-cv-07557-PCP (VKD) |
|---|---|
| This document relates to: | **DECLARATION OF TIFFANY BRYANT** |
| All Actions | Date Action Filed: December 1, 2022 |
| | Honorable P. Casey Pitts |

1    I, Tiffany Bryant, declare as follows:

2        1.    I am over the age of 18 and I submit this declaration in support of my concurrently-

3    filed Motion for Class Certification.  I have personal knowledge of the facts set forth in this

4    declaration and, if called as a witness, I could and would testify competently thereto.

5        2.    I used H&R Block's online services to prepare my tax filings between 2021and 2024.

6    In the process of using these online services I provided confidential tax information to H&R Block.

7        3.    I have a basic understanding of the complaint in this case.  I was asked about this

8    topic when I was deposed by Meta in this matter.  An example of some of my testimony on this topic

9    is the following:

10       Q.    What is your allegation of what Meta did wrong in this case?

11       A.    I would say just getting private tax information.

12   July 21, 2025 Bryant Dep., 225:17-20.

13       4.    I have a basic understanding of the difference between an individual action and a class

14   action, and also understand that my role in this litigation is to protect the interests of other putative

15   class members.  I was asked about this topic when I was deposed by Meta in this matter.  An example

16   of some of my testimony on this topic is the following:

17       Q.    Do you have any understanding as to what your duties and obligations would be as a

18       representative of a class in this case?

19       A.    Yes.

20       Q.    And what are those responsibilities?

21       A.    To tell the truth, and just be an advocate for myself and for others.

22   July 21, 2025 Bryant Dep., 232:25-233:1-6.

23       5.    I have dedicated a material amount of time to this action.  I frequently communicate

24   with my attorneys about this case.  I have done so to discuss discovery requests and other issues

25   requiring my immediate attention, or to keep up to date on the case generally.  I have searched for

26   and produced documents and responded to interrogatories.  I also spent two to three hours meeting

27   with my attorneys to prepare for my deposition which occurred on July 21, 2025 and lasted over five

28   hours.

6.     As a class representative, I will continue to work to the best of my abilities to prosecute this action on behalf of the class members. I expect to assist further in the case as needed, including testifying at trial.

7.     I have no interest in this litigation that would conflict with the interests of class members. I have no past or present financial, employment, familial or other relationship with any of the attorneys representing me that would cause me to put my economic interests above those of the class members I seek to represent.

I declare under penalty of perjury that the foregoing is true and correct. Executed on 08/06/2025 in Chicago, Illinois.

*Tiffany Bryant*
TIFFANY BRYANT

**EXHIBIT 10**

# BURSOR & FISHER
P.A.

www.bursor.com

701 BRICKELL AVENUE        1330 AVENUE OF THE AMERICAS        1990 NORTH CALIFORNIA BLVD.
MIAMI, FL 33131                NEW YORK, NY 10019                    WALNUT CREEK, CA 94596

## FIRM RESUME

With offices in Florida, New York, and California, BURSOR & FISHER lawyers have represented both plaintiffs and defendants in state and federal courts throughout the country.

The lawyers at our firm have an active civil trial practice, having won multi-million-dollar verdicts or recoveries in six of six class action jury trials since 2008. Our most recent class action trial victory came in May 2019 in *Perez v. Rash Curtis & Associates*, in which Mr. Bursor served as lead trial counsel and won a $267 million jury verdict against a debt collector found to have violated the Telephone Consumer Protection Act. During the pendency of the defendant's appeal, the case settled for $75.6 million, the largest settlement in the history of the Telephone Consumer Protection Act.

In August 2013 in *Ayyad v. Sprint Spectrum L.P.*, in which Mr. Bursor served as lead trial counsel, we won a jury verdict defeating Sprint's $1.06 billion counterclaim and securing the class's recovery of more than $275 million in cash and debt relief.

In *Thomas v. Global Vision Products, Inc. (II)*, we obtained a $50 million jury verdict in favor of a certified class of 150,000 purchasers of the Avacor Hair Regrowth System. The legal trade publication VerdictSearch reported that this was the second largest jury verdict in California in 2009, and the largest in any class action.

The lawyers at our firm have an active class action practice and have won numerous appointments as class counsel to represent millions of class members, including customers of Honda, Verizon Wireless, AT&T Wireless, Sprint, Haier America, and Michaels Stores as well as purchasers of Avacor™, Hydroxycut, and Sensa™ products. Bursor & Fisher lawyers have been court-appointed Class Counsel or Interim Class Counsel in:

1. *O'Brien v. LG Electronics USA, Inc.* (D.N.J. Dec. 16, 2010) to represent a certified nationwide class of purchasers of LG French-door refrigerators,

2. *Ramundo v. Michaels Stores, Inc.* (N.D. Ill. June 8, 2011) to represent a certified nationwide class of consumers who made in-store purchases at Michaels Stores using a debit or credit card and had their private financial information stolen as a result,

3. *In re Haier Freezer Consumer Litig.* (N.D. Cal. Aug. 17, 2011) to represent a certified class of purchasers of mislabeled freezers from Haier America Trading, LLC,

**BURSOR&FISHER**
P.A.

4. *Rodriguez v. CitiMortgage, Inc.* (S.D.N.Y. Nov. 14, 2011) to represent a certified nationwide class of military personnel against CitiMortgage for illegal foreclosures,

5. *Rossi v. The Procter & Gamble Co.* (D.N.J. Jan. 31, 2012) to represent a certified nationwide class of purchasers of Crest Sensitivity Treatment & Protection toothpaste,

6. *Dzielak v. Whirlpool Corp. et al.* (D.N.J. Feb. 21, 2012) to represent a proposed nationwide class of purchasers of mislabeled Maytag Centennial washing machines from Whirlpool Corp., Sears, and other retailers,

7. *In re Sensa Weight Loss Litig.* (N.D. Cal. Mar. 2, 2012) to represent a certified nationwide class of purchasers of Sensa weight loss products,

8. *In re Sinus Buster Products Consumer Litig.* (E.D.N.Y. Dec. 17, 2012) to represent a certified nationwide class of purchasers,

9. *Ebin v. Kangadis Food Inc.* (S.D.N.Y. Feb. 25, 2014) to represent a certified nationwide class of purchasers of Capatriti 100% Pure Olive Oil,

10. *Forcellati v. Hyland's, Inc.* (C.D. Cal. Apr. 9, 2014) to represent a certified nationwide class of purchasers of children's homeopathic cold and flu remedies,

11. *Ebin v. Kangadis Family Management LLC, et al.* (S.D.N.Y. Sept. 18, 2014) to represent a certified nationwide class of purchasers of Capatriti 100% Pure Olive Oil,

12. *In re Scotts EZ Seed Litig.* (S.D.N.Y. Jan. 26, 2015) to represent a certified class of purchasers of Scotts Turf Builder EZ Seed,

13. *Dei Rossi v. Whirlpool Corp., et al.* (E.D. Cal. Apr. 28, 2015) to represent a certified class of purchasers of mislabeled KitchenAid refrigerators from Whirlpool Corp., Best Buy, and other retailers,

14. *Hendricks v. StarKist Co.* (N.D. Cal. July 23, 2015) to represent a certified nationwide class of purchasers of StarKist tuna products,

15. *In re NVIDIA GTX 970 Graphics Card Litig.* (N.D. Cal. May 8, 2015) to represent a proposed nationwide class of purchasers of NVIDIA GTX 970 graphics cards,

16. *Melgar v. Zicam LLC, et al.* (E.D. Cal. March 30, 2016) to represent a certified ten-jurisdiction class of purchasers of Zicam Pre-Cold products,

17. *In re Trader Joe's Tuna Litigation* (C.D. Cal. December 21, 2016) to represent purchaser of allegedly underfilled Trader Joe's canned tuna.

18. *In re Welspun Litigation* (S.D.N.Y. January 26, 2017) to represent a proposed nationwide class of purchasers of Welspun Egyptian cotton bedding products,

19. *Retta v. Millennium Products, Inc.* (C.D. Cal. January 31, 2017) to represent a certified nationwide class of Millennium kombucha beverages,

20. *Moeller v. American Media, Inc.*, (E.D. Mich. June 8, 2017) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

21. *Hart v. BHH, LLC* (S.D.N.Y. July 7, 2017) to represent a nationwide class of purchasers of Bell & Howell ultrasonic pest repellers,

22. *McMillion v. Rash Curtis & Associates* (N.D. Cal. September 6, 2017) to represent a certified nationwide class of individuals who received calls from Rash Curtis & Associates,

23. *Lucero v. Solarcity Corp.* (N.D. Cal. September 15, 2017) to represent a certified nationwide class of individuals who received telemarketing calls from Solarcity Corp.,

24. *Taylor v. Trusted Media Brands, Inc.* (S.D.N.Y. Oct. 17, 2017) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

25. *Gasser v. Kiss My Face, LLC* (N.D. Cal. Oct. 23, 2017) to represent a proposed nationwide class of purchasers of cosmetic products,

26. *Gastelum v. Frontier California Inc.* (S.F. Superior Court February 21, 2018) to represent a certified California class of Frontier landline telephone customers who were charged late fees,

27. *Williams v. Facebook, Inc.* (N.D. Cal. June 26, 2018) to represent a proposed nationwide class of Facebook users for alleged privacy violations,

28. *Ruppel v. Consumers Union of United States, Inc.* (S.D.N.Y. July 27, 2018) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

29. *Bayol v. Health-Ade* (N.D. Cal. August 23, 2018) to represent a proposed nationwide class of Health-Ade kombucha beverage purchasers,

30. *West v. California Service Bureau* (N.D. Cal. September 12, 2018) to represent a certified nationwide class of individuals who received calls from California Service Bureau,

31. *Gregorio v. Premier Nutrition Corporation* (S.D.N.Y. Sept. 14, 2018) to represent a nationwide class of purchasers of protein shake products,

32. *Moeller v. Advance Magazine Publishers, Inc. d/b/a Condé Nast* (S.D.N.Y. Oct. 24, 2018) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

33. *Bakov v. Consolidated World Travel Inc. d/b/a Holiday Cruise Line* (N.D. Ill. Mar. 21, 2019) to represent a certified class of individuals who received calls from Holiday Cruise Line,

34. *Martinelli v. Johnson & Johnson* (E.D. Cal. March 29, 2019) to represent a certified class of purchasers of Benecol spreads labeled with the representation "No Trans Fat,"

35. *Edwards v. Hearst Communications, Inc.* (S.D.N.Y. April 24, 2019) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

36. *Galvan v. Smashburger* (C.D. Cal. June 25, 2019) to represent a proposed class of purchasers of Smashburger's "Triple Double" burger,

37. *Kokoszki v. Playboy Enterprises, Inc.* (E.D. Mich. Feb. 7, 2020) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

38. *Russett v. The Northwestern Mutual Life Insurance Co.* (S.D.N.Y. May 28, 2020) to represent a class of insurance policyholders that were allegedly charged unlawful paper billing fees,

39. *In re:  Metformin Marketing and Sales Practices Litigation* (D.N.J. June 3, 2020) to represent a proposed nationwide class of purchasers of generic diabetes medications that were contaminated with a cancer-causing carcinogen,

40. *Hill v. Spirit Airlines, Inc.* (S.D. Fla. July 21, 2020) to represent a proposed nationwide class of passengers whose flights were cancelled by Spirit Airlines due to the novel coronavirus, COVID-19, and whose tickets were not refunded,

41. *Kramer v. Alterra Mountain Co.* (D. Colo. July 31, 2020) to represent a proposed nationwide class of purchasers to recoup the unused value of their Ikon ski passes after Alterra suspended operations at its ski resorts due to the novel coronavirus, COVID-19,

42. *Qureshi v. American University* (D.D.C. July 31, 2020) to represent a proposed nationwide class of students for tuition and fee refunds after their classes were moved online by American University due to the novel coronavirus, COVID-19,

43. *Hufford v. Maxim Inc.* (S.D.N.Y. Aug. 13, 2020) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

44. *Desai v. Carnegie Mellon University* (W.D. Pa. Aug. 26, 2020) to represent a proposed nationwide class of students for tuition and fee refunds after their classes were moved online by Carnegie Mellon University due to the novel coronavirus, COVID-19,

45. *Heigl v. Waste Management of New York, LLC* (E.D.N.Y. Aug. 27, 2020) to represent a class of waste collection customers that were allegedly charged unlawful paper billing fees,

46. *Stellato v. Hofstra University* (E.D.N.Y. Sept. 18, 2020) to represent a proposed nationwide class of students for tuition and fee refunds after their classes were moved online by Hofstra University due to the novel coronavirus, COVID-19,

47. *Kaupelis v. Harbor Freight Tools USA, Inc.* (C.D. Cal. Sept. 23, 2020), to represent consumers who purchased defective chainsaws,

48. *Soo v. Lorex Corporation* (N.D. Cal. Sept. 23, 2020), to represent consumers whose security cameras were intentionally rendered non-functional by manufacturer,

49. *Miranda v. Golden Entertainment (NV), Inc.* (D. Nev. Dec. 17, 2020), to represent consumers and employees whose personal information was exposed in a data breach,

50. *Benbow v. SmileDirectClub, Inc.* (Cir. Ct. Cook Cnty. Feb. 4, 2021), to represent a certified nationwide class of individuals who received text messages from SmileDirectClub, in alleged violation of the Telephone Consumer Protection Act,

51. *Suren v. DSV Solutions, LLC* (Cir. Ct. DuPage Cnty. Apr. 8, 2021), to represent a certified class of employees who used a fingerprint clock-in system, in alleged violation of the Illinois Biometric Information Privacy Act,

52. *De Lacour v. Colgate-Palmolive Co.* (S.D.N.Y. Apr. 23, 2021), to represent a certified class of consumers who purchased allegedly "natural" Tom's of Maine products,

53. *Wright v. Southern New Hampshire University* (D.N.H. Apr. 26, 2021), to represent a certified nationwide class of students for tuition and fee refunds after their classes were moved online by Southern New Hampshire University due to the novel coronavirus, COVID-19,

54. *Sahlin v. Hospital Housekeeping Systems, LLC* (Cir. Ct. Williamson Cnty. May 21, 2021), to represent a certified class of employees who used a fingerprint clock-in system, in alleged violation of the Illinois Biometric Information Privacy Act,

55. *Landreth v. Verano Holdings LLC, et al.* (Cir. Ct. Cook Cnty. June 2, 2021), to represent a certified class of employees who used a fingerprint clock-in system, in alleged violation of the Illinois Biometric Information Privacy Act.

56. *Rocchio v. Rutgers, The State University of New Jersey*, (Sup. Ct., Middlesex Cnty. October 27, 201), to represent a certified nationwide class of students for fee refunds after their classes were moved online by Rutgers due to the novel coronavirus, COVID-19,

57. *Malone v. Western Digital Corp.*, (N.D. Cal. Dec. 22, 2021), to represent a class of consumers who purchased hard drives that were allegedly deceptively advertised,

58. *Jenkins v. Charles Industries, LLC*, (Cir. Ct. DuPage Cnty. Dec. 21, 2021) to represent a certified class of employees who used a fingerprint clock-in system, in alleged violation of the Illinois Biometric Information Privacy Act,

59. *Frederick v. Examsoft Worldwide, Inc.*, (Cir. Ct. DuPage Cnty. Jan. 6, 2022) to represent a certified class of exam takers who used virtual exam proctoring software, in alleged violation of the Illinois Biometric Information Privacy Act,

60. *Isaacson v. Liqui-Box Flexibles, LLC, et al.*, (Cir. Ct. Will Cnty. Jan. 18, 2022) to represent a certified class of employees who used a fingerprint clock-in system, in alleged violation of the Illinois Biometric Information Privacy Act,

61. *Goldstein et al. v. Henkel Corp.*, (D. Conn. Mar. 3, 2022) to represent a proposed class of purchasers of Right Guard-brand antiperspirants that were allegedly contaminated with benzene,

62. *McCall v. Hercules Corp.*, (N.Y. Sup. Ct., Westchester Cnty. Mar. 14, 2022) to represent a certified class of who laundry card purchasers who were allegedly subjected to deceptive practices by being denied cash refunds,

63. *Lewis v. Trident Manufacturing, Inc.*, (Cir. Ct. Kane Cnty. Mar. 16, 2022) to represent a certified class of workers who used a fingerprint clock-in system, in alleged violation of the Illinois Biometric Information Privacy Act,

64. *Croft v. Spinx Games Limited, et al.*, (W.D. Wash. Mar. 31, 2022) to represent a certified class of Washington residents who lost money playing mobile applications games that allegedly constituted illegal gambling under Washington law,

65. *Fischer v. Instant Checkmate LLC*, (N.D. Ill. Mar. 31, 2022) to represent a certified class of Illinois residents whose identities were allegedly used without their consent in alleged violation of the Illinois Right of Publicity Act,

66. *Rivera v. Google LLC*, (Cir. Ct. Cook Cnty. Apr. 25, 2022) to represent a certified class of Illinois residents who appeared in a photograph in Google Photos, in alleged violation of the Illinois Biometric Information Privacy Act,

67. *Loftus v. Outside Integrated Media, LLC*, (E.D. Mich. May 5, 2022) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

68. *D'Amario v. The University of Tampa*, (S.D.N.Y. June 3, 2022) to represent a certified nationwide class of students for tuition and fee refunds after their classes were moved online by The University of Tampa due to the novel coronavirus, COVID-19,

69. *Fittipaldi v. Monmouth University*, (D.N.J. Sept. 22, 2022) to represent a certified nationwide class of students for tuition and fee refunds after their classes were moved online by Monmouth University due to the novel coronavirus, COVID-19,

70. *Armstead v. VGW Malta Ltd. et al.* (Cir. Ct. Henderson Cnty. Oct. 3, 2022) to present a certified class of Kentucky residents who lost money playing mobile applications games that allegedly constituted illegal gambling under Kentucky law,

71. *Cruz v. The Connor Group, A Real Estate Investment Firm, LLC*, (N.D. Ill. Oct. 26, 2022) to represent a certified class of workers who used a fingerprint clock-in system, in alleged violation of the Illinois Biometric Information Privacy Act,

72. *Delcid et al. v. TCP HOT Acquisitions LLC et al.* (S.D.N.Y. Oct. 28, 2022) to represent a certified nationwide class of purchasers of Sure and Brut-brand antiperspirants that were allegedly contaminated with benzene,

73. *Kain v. The Economist Newspaper NA, Inc.* (E.D. Mich. Dec. 15, 2022) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

74. *Strano v. Kiplinger Washington Editors, Inc.* (E.D. Mich. Jan. 6, 2023) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

75. *Moeller v. The Week Publications, Inc.* (E.D. Mich. Jan. 6, 2023) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

76. *Ambrose v. Boston Globe Media Partners, LLC* (D. Mass. May 25, 2023) to represent a nationwide class of newspaper subscribers who were also Facebook users under the Video Privacy Protection Act,

77. *In re: Apple Data Privacy Litigation*, (N.D. Cal. July 5, 2023) to represent a putative nationwide class of all persons who turned off permissions for data tracking and whose mobile app activity was still tracked on iPhone mobile devices,

78. *Young v. Military Advantage, Inc. d/b/a Military.com* (Cir. Ct. DuPage Cnty. July 26, 2023) to represent a nationwide class of website subscribers who were also Facebook users under the Video Privacy Protection Act,

79. *Whiting v. Yellow Social Interactive Ltd.* (Cir. Ct. Henderson Cnty. Aug. 15, 2023) to represent a certified class of Kentucky residents who lost money playing mobile applications games that allegedly constituted illegal gambling under Kentucky law,

80. *Kotila v. Charter Financial Publishing Network, Inc.* (W.D. Mich. Feb. 21, 2024) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

81. *Schreiber v. Mayo Foundation for Medical Education and Research* (W.D. Mich. Feb. 21, 2024) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

82. *Norcross v. Tishman Speyer Properties, et al.* (S.D.N.Y. May 17, 2024) to represent a class of online ticket purchasers under New York Arts & Cultural Affairs Law § 25.07(4).

## SCOTT A. BURSOR

Mr. Bursor has an active civil trial practice, having won multi-million verdicts or recoveries in six of six civil jury trials since 2008. Mr. Bursor's most recent victory came in May 2019 in *Perez v. Rash Curtis & Associates*, in which Mr. Bursor served as lead trial counsel and won a $267 million jury verdict against a debt collector for violations of the Telephone Consumer Protection Act (TCPA).

In *Ayyad v. Sprint Spectrum L.P.* (2013), where Mr. Bursor served as lead trial counsel, the jury returned a verdict defeating Sprint's $1.06 billion counterclaim and securing the class's recovery of more than $275 million in cash and debt relief.

In *Thomas v. Global Vision Products, Inc.* (2009), the jury returned a $50 million verdict in favor of the plaintiff and class represented by Mr. Bursor. The legal trade publication VerdictSearch reported that this was the second largest jury verdict in California in 2009.

Class actions are rarely tried to verdict. Other than Mr. Bursor and his partner Mr. Fisher, we know of no lawyer that has tried more than one class action to a jury. Mr. Bursor's perfect record of six wins in six class action jury trials, with recoveries ranging from $21 million to $299 million, is unmatched by any other lawyer. Each of these victories was hard-fought against top trial lawyers from the biggest law firms in the United States.

Mr. Bursor graduated from the University of Texas Law School in 1996. He served as Articles Editor of the Texas Law Review, and was a member of the Board of Advocates and Order of the Coif. Prior to starting his own practice, Mr. Bursor was a litigation associate at a large New York based law firm where he represented telecommunications, pharmaceutical, and technology companies in commercial litigation.

Mr. Bursor is a member of the state bars of New York, Florida, and California, as well as the bars of the United States Court of Appeals for the Second, Third, Fourth, Sixth, Ninth and Eleventh Circuits, and the bars of the United States District Courts for the Southern and Eastern Districts of New York, the Northern, Central, Southern and Eastern Districts of California, the Southern and Middle Districts of Florida, and the Eastern District of Michigan.

### *Representative Cases*

Mr. Bursor was appointed lead or co-lead class counsel to the largest, 2nd largest, and 3rd largest classes ever certified. Mr. Bursor has represented classes including more than 160 million class members, roughly 1 of every 2 Americans. Listed below are recent cases that are representative of Mr. Bursor's practice:

Mr. Bursor negotiated and obtained court-approval for two landmark settlements in *Nguyen v. Verizon Wireless* and *Zill v. Sprint Spectrum* (the largest and 2nd largest classes ever certified). These settlements required Verizon and Sprint to open their wireless networks to third-party devices and applications. These settlements are believed to be the most significant legal development affecting the telecommunications industry since 1968, when the FCC's Carterfone decision similarly opened up AT&T's wireline telephone network.

Mr. Bursor was the lead trial lawyer in *Ayyad v. Sprint Spectrum, L.P.* representing a class of approximately 2 million California consumers who were charged an early termination fee under a Sprint cellphone contract, asserting claims that such fees were unlawful liquidated damages under the California Civil Code, as well as other statutory and common law claims. After a five-week combined bench-and-jury trial, the jury returned a verdict in June 2008 and the Court issued a Statement of Decision in December 2008 awarding the plaintiffs $299 million in cash and debt cancellation. Mr. Bursor served as lead trial counsel for this class again in 2013 during a month-long jury trial in which Sprint asserted a $1.06 billion counterclaim against the class. Mr. Bursor secured a verdict awarding Sprint only $18.4 million, the exact amount calculated by the class's damages expert. This award was less than 2% of the damages Sprint sought, less than 6% of the amount of the illegal termination fees Sprint charged to class members. In December 2016, after more than 13 years of litigation, the case was settled for $304 million, including $79 million in cash payments plus $225 million in debt cancellation.

Mr. Bursor was the lead trial lawyer in *White v. Cellco Partnership d/b/a Verizon Wireless* representing a class of approximately 1.4 million California consumers who were charged an early termination fee under a Verizon cellphone contract, asserting claims that such fees were unlawful liquidated damages under the California Civil Code, as well as other statutory and common law claims. In July 2008, after Mr. Bursor presented plaintiffs' case-in-chief, rested, then cross-examined Verizon's principal trial witness, Verizon agreed to settle the case for a $21 million cash payment and an injunction restricting Verizon's ability to impose early termination fees in future subscriber agreements.

Mr. Bursor was the lead trial lawyer in *Thomas v. Global Visions Products Inc.* Mr. Bursor represented a class of approximately 150,000 California consumers who had purchased the Avacor® hair regrowth system. In January 2008, after a four-week combined bench-and-jury trial. Mr. Bursor obtained a $37 million verdict for the class, which the Court later increased to $40 million.

Mr. Bursor was appointed class counsel and was elected chair of the Official Creditors' Committee in *In re Nutraquest Inc.*, a Chapter 11 bankruptcy case before Chief Judge Garrett E. Brown, Jr. (D.N.J.) involving 390 ephedra-related personal injury and/or wrongful death claims, two consumer class actions, four enforcement actions by governmental agencies, and multiple adversary proceedings related to the Chapter 11 case. Working closely with counsel for all parties and with two mediators, Judge Nicholas Politan (Ret.) and Judge Marina Corodemus (Ret.), the committee chaired by Mr. Bursor was able to settle or otherwise resolve every claim and reach a fully consensual Chapter 11 plan of reorganization, which Chief Judge Brown approved in late 2006. This settlement included a $12.8 million recovery to a nationwide class of consumers who alleged they were defrauded in connection with the purchase of Xenadrine® dietary supplement products.

Mr. Bursor was the lead trial lawyer in *In re: Pacific Bell Late Fee Litigation*.  After filing the first class action challenging Pac Bell's late fees in April 2010, winning a contested motion to certify a statewide California class in January 2012, and defeating Pac Bell's motion for summary judgment in February 2013, Mr. Bursor obtained final approval of the $38 million class settlement.  The settlement, which Mr. Bursor negotiated the night before opening statements were scheduled to commence, included a $20 million cash payment to provide refunds to California customers who paid late fees on their Pac Bell wireline telephone accounts, and an injunction that reduced other late fee charges by $18.6 million.

## L. TIMOTHY FISHER

L. Timothy Fisher has an active practice in consumer class actions and complex business litigation and has also successfully handled a large number of civil appeals.

Mr. Fisher has been actively involved in numerous cases that resulted in multi-million dollar recoveries for consumers and investors. Mr. Fisher has handled cases involving a wide range of issues including nutritional labeling, health care, telecommunications, corporate governance, unfair business practices and consumer fraud. With his partner Scott A. Bursor, Mr. Fisher has tried five class action jury trials, all of which produced successful results. In *Thomas v. Global Vision Products*, Mr. Fisher obtained a jury award of $50,024,611 — the largest class action award in California in 2009 and the second-largest jury award of any kind. In 2019, Mr. Fisher served as trial counsel with Mr. Bursor in *Perez. v. Rash Curtis & Associates*, where the jury returned a verdict for $267 million in statutory damages under the Telephone Consumer Protection Act.

Mr. Fisher was admitted to the State Bar of California in 1997. He is also a member of the bars of the United States Court of Appeals for the Ninth Circuit, the United States District Courts for the Northern, Central, Southern and Eastern Districts of California, the Northern District of Illinois, the Eastern District of Michigan, and the Eastern District of Missouri. Mr. Fisher taught appellate advocacy at John F. Kennedy University School of Law in 2003 and 2004.  In 2010, he contributed jury instructions, a verdict form and comments to the consumer protection chapter of Justice Elizabeth A. Baron's *California Civil Jury Instruction Companion Handbook* (West 2010). In January 2014, Chief Judge Claudia Wilken of the United States District Court for the Northern District of California appointed Mr. Fisher to a four-year term as a member of the Court's Standing Committee on Professional Conduct.

Mr. Fisher received his Juris Doctor from Boalt Hall at the University of California at Berkeley in 1997. While in law school, he was an active member of the Moot Court Board and participated in moot court competitions throughout the United States. In 1994, Mr. Fisher received an award for Best Oral Argument in the first-year moot court competition.

In 1992, Mr. Fisher graduated with highest honors from the University of California at Berkeley and received a degree in political science.  Prior to graduation, he authored an honors thesis for Professor Bruce Cain entitled "The Role of Minorities on the Los Angeles City Council."  He is also a member of Phi Beta Kappa.

## Representative Cases

*Thomas v. Global Vision Products, Inc.* (Alameda County Superior Court). Mr. Fisher litigated claims against Global Vision Products, Inc. and other individuals in connection with the sale and marketing of a purported hair loss remedy known as Avacor. The case lasted more than seven years and involved two trials. The first trial resulted in a verdict for plaintiff and the class in the amount of $40,000,000. The second trial resulted in a jury verdict of $50,024,611, which led to a $30 million settlement for the class.

*In re Cellphone Termination Fee Cases* - Handset Locking Actions (Alameda County Superior Court). Mr. Fisher actively worked on five coordinated cases challenging the secret locking of cell phone handsets by major wireless carriers to prevent consumers from activating them on competitive carriers' systems. Settlements have been approved in all five cases on terms that require the cell phone carriers to disclose their handset locks to consumers and to provide unlocking codes nationwide on reasonable terms and conditions. The settlements fundamentally changed the landscape for cell phone consumers regarding the locking and unlocking of cell phone handsets.

*In re Cellphone Termination Fee Cases* - Early Termination Fee Cases (Alameda County Superior Court and Federal Communications Commission). In separate cases that are a part of the same coordinated litigation as the Handset Locking Actions, Mr. Fisher actively worked on claims challenging the validity under California law of early termination fees imposed by national cell phone carriers. In one of those cases, against Verizon Wireless, a nationwide settlement was reached after three weeks of trial in the amount of $21 million. In a second case, which was tried to verdict, the Court held after trial that the $73 million of flat early termination fees that Sprint had collected from California consumers over an eight-year period were void and unenforceable.

## Selected Published Decisions

*Melgar v. Zicam LLC*, 2016 WL 1267870 (E.D. Cal. Mar. 30, 2016) (certifying 10-jurisdiction class of purchasers of cold remedies, denying motion for summary judgment, and denying motions to exclude plaintiff's expert witnesses).

*Salazar v. Honest Tea, Inc.*, 2015 WL 7017050 (E.D. Cal. Nov. 12. 2015) (denying motion for summary judgment).

*Dei Rossi v. Whirlpool Corp.*, 2015 WL 1932484 (E.D. Cal. Apr. 27, 2015) (certifying California class of purchasers of refrigerators that were mislabeled as Energy Star qualified).

*Bayol v. Zipcar, Inc.*, 78 F.Supp.3d 1252 (N.D. Cal. 2015) (denying motion to dismiss claims alleging unlawful late fees under California Civil Code § 1671).

*Forcellati v. Hyland's, Inc.*, 2015 WL 9685557 (C.D. Cal. Jan. 12, 2015) (denying motion for summary judgment in case alleging false advertising of homeopathic cold and flu remedies for children).

*Bayol v. Zipcar, Inc.*, 2014 WL 4793935 (N.D. Cal. Sept. 25, 2014) (denying motion to transfer venue pursuant to a forum selection clause).

*Forcellati v. Hyland's Inc.*, 2014 WL 1410264 (C.D. Cal. Apr. 9, 2014) (certifying nationwide class of purchasers of homeopathic cold and flu remedies for children).

*Hendricks v. StarKist Co.*, 30 F.Supp.3d 917 (N.D. Cal. 2014) (denying motion to dismiss in case alleging underfilling of 5-ounce cans of tuna).

*Dei Rossi v. Whirlpool Corp.*, 2013 WL 5781673 (E.D. Cal. October 25, 2013) (denying motion to dismiss in case alleging that certain KitchenAid refrigerators were misrepresented as Energy Star qualified).

*Forcellati v. Hyland's Inc.*, 876 F.Supp.2d 1155 (C.D. Cal. 2012) (denying motion to dismiss complaint alleging false advertising regarding homeopathic cold and flu remedies for children).

*Clerkin v. MyLife.com*, 2011 WL 3809912 (N.D. Cal. August 29, 2011) (denying defendants' motion to dismiss in case alleging false and misleading advertising by a social networking company).

*In re Cellphone Termination Fee Cases*, 186 Cal.App.4th 1380 (2010) (affirming order approving $21 million class action settlement).

*Gatton v. T-Mobile USA, Inc.*, 152 Cal.App.4th 571 (2007) (affirming order denying motion to compel arbitration).

### *Selected Class Settlements*

*Melgar v. Zicam* (Eastern District of California) - $16 million class settlement of claims alleging cold medicine was ineffective.

*Gastelum v. Frontier California Inc.* (San Francisco Superior Court) - $10.9 million class action settlement of claims alleging that a residential landline service provider charged unlawful late fees.

*West v. California Service Bureau, Inc.* (Northern District of California) - $4.1 million class settlement of claims under the Telephone Consumer Protection Act.

*Gregorio v. Premier Nutrition Corp.* (Southern District of New York) - $9 million class settlement of false advertising claims against protein shake manufacturer.

*Morris v. SolarCity Corp.* (Northern District of California) - $15 million class settlement of claims under the Telephone Consumer Protection Act.

*Retta v. Millennium Products, Inc.* (Central District of California) - $8.25 million settlement to resolve claims of bottled tea purchasers for alleged false advertising.

*Forcellati v. Hyland's* (Central District of California) – nationwide class action settlement providing full refunds to purchasers of homeopathic cold and flu remedies for children.

*Dei Rossi v. Whirlpool* (Eastern District of California) – class action settlement providing $55 cash payments to purchasers of certain KitchenAid refrigerators that allegedly mislabeled as Energy Star qualified.

*In Re NVIDIA GTX 970 Graphics Chip Litigation* (Northern District of California) - $4.5 million class action settlement of claims alleging that a computer graphics card was sold with false and

misleading representations concerning its specifications and performance.

*Hendricks v. StarKist Co.* (Northern District of California) – $12 million class action settlement of claims alleging that 5-ounce cans of tuna were underfilled.

*In re Zakskorn v. American Honda Motor Co.* Honda (Eastern District of California) – nationwide settlement providing for brake pad replacement and reimbursement of out-of-pocket expenses in case alleging defective brake pads on Honda Civic vehicles manufactured between 2006 and 2011.

*Correa v. Sensa Products, LLC* (Los Angeles Superior Court) - $9 million settlement on behalf of purchasers of the Sensa weight loss product.

*In re Pacific Bell Late Fee Litigation* (Contra Costa County Superior Court) - $38.6 million settlement on behalf of Pac Bell customers who paid an allegedly unlawful late payment charge.

*In re Haier Freezer Consumer Litigation* (Northern District of California) - $4 million settlement, which provided for cash payments of between $50 and $325.80 to class members who purchased the Haier HNCM070E chest freezer.

*Thomas v. Global Vision Products, Inc.* (Alameda County Superior Court) - $30 million settlement on behalf of a class of purchasers of a hair loss remedy.

*Guyette v. Viacom, Inc.* (Alameda County Superior Court) - $13 million settlement for a class of cable television subscribers who alleged that the defendant had improperly failed to share certain tax refunds with its subscribers.

## JOSEPH I. MARCHESE

Joseph I. Marchese is a Partner with Bursor & Fisher, P.A. Joe focuses his practice on consumer class actions, employment law disputes, and commercial litigation. He has represented corporate and individual clients in a wide array of civil litigation, and has substantial trial and appellate experience.

Joe has diverse experience in litigating and resolving consumer class actions involving claims of mislabeling, false or misleading advertising, privacy violations, unlawful and junk fees, data breach claims, and violations of the Telephone Consumer Protection Act and Servicemembers Civil Relief Act.

Joe also has significant experience in multidistrict litigation proceedings. Recently, he served on the Plaintiffs' Executive Committee in *In Re: Blue Buffalo Company, Ltd. Marketing And Sales Practices Litigation*, MDL No. 2562, which resulted in a $32 million consumer class settlement. Currently, he serves on the Plaintiffs' Steering Committee for Economic Reimbursement in *In Re: Valsartan Products Liability Litigation*, MDL. No. 2875.

Joe is admitted to the State Bar of New York and is a member of the bars of the United States District Courts for the Southern District of New York, the Eastern District of New York,

and the Eastern District of Michigan, as well as the United States Courts of Appeals for the First, Second and Sixth Circuits.

Joe graduated from Boston University School of Law in 2002 where he was a member of The Public Interest Law Journal.  In 1998, Joe graduated with honors from Bucknell University.

### *<u>Selected Published Decisions:</u>*

*Farwell v. Google, LLC*, 595 F. Supp. 3d 702 (C.D. Ill. Mar. 31, 2022), denying defendant's motion to dismiss BIPA claims brought on behalf of Illinois students using Google's Workspace for Education platform.

*Boelter v. Hearst Communications, Inc.*, 269 F. Supp. 3d 172 (S.D.N.Y. Sept. 7, 2017), granting plaintiff's motion for partial summary judgment on state privacy law violations in putative class action.

*Boelter v. Hearst Communications, Inc.*, 192 F. Supp. 3d 427 (S.D.N.Y. June 17, 2016), denying publisher's motion to dismiss its subscriber's allegations of state privacy law violations in putative class action.

*In re Scotts EZ Seed Litigation*, 304 F.R.D. 397 (S.D.N.Y. 2015), granting class certification of false advertising and other claims brought by New York and California purchasers of grass seed product.

*Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014), granting nationwide class certification of false advertising and other claims brought by purchasers of purported "100% Pure Olive Oil" product.

*In re Michaels Stores Pin Pad Litigation*, 830 F. Supp. 2d 518 (N.D. Ill. 2011), denying retailer's motion to dismiss its customers' state law consumer protection and privacy claims in data breach putative class action.

### *<u>Selected Class Settlements:</u>*

*Schreiber v. Mayo Foundation*, Case No. 22-cv-0188-HYJ-RSK (W.D. Mich. 2024) – final approval granted for $52.5 million class settlement to resolve claims of periodical subscribers for alleged statutory privacy violations.

*Edwards v. Mid-Hudson Valley Federal Credit Union*, Case No. 22-cv-00562-TJM-CFH (N.D.N.Y. 2023) – final approval granted for $2.2 million class settlement to resolve claims alleging unlawfully charged overdraft fees on accounts with sufficient funds.

*Benbow v. SmileDirectClub, LLC*, Case No. 2020-CH-07269 (Cir. Ct. Cook Cnty. 2022) – final approval granted for $11.5 million class settlement to resolve claims for alleged TCPA violations.

*Marquez v. Google LLC*, Case No. 2021-CH-1460 (Cir. Ct. Cook Cnty. 2022) – final approval granted for $100 million class settlement to resolve alleged BIPA violations of Illinois residents appearing on the Google Photos platform.

*Edwards v. Hearst Communications, Inc.*, Case No. 15-cv-09279-AT (S.D.N.Y. 2019) – final approval granted for $50 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*Moeller v. Advance Magazine Publishers, Inc. d/b/a Condé Nast*, Case No. 15-cv-05671-NRB (S.D.N.Y. 2019) – final approval granted for $13.75 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

In re *Scotts EZ Seed Litigation*, Case No. 12-cv-4727-VB (S.D.N.Y. 2018) – final approval granted for $47 million class settlement to resolve false advertising claims of purchasers of combination grass seed product.

*In Re:  Blue Buffalo Marketing And Sales Practices Litigation*, Case No. 14-MD-2562-RWS (E.D. Mo. 2016) – final approval granted for $32 million class settlement to resolve claims of pet owners for alleged false advertising of pet foods.

*Rodriguez v. Citimortgage, Inc.*, Case No. 11-cv-4718-PGG (S.D.N.Y. 2015) – final approval granted for $38 million class settlement to resolve claims of military servicemembers for alleged foreclosure violations of the Servicemembers Civil Relief Act, where each class member was entitled to $116,785 plus lost equity in the foreclosed property and interest thereon.

*O'Brien v. LG Electronics USA, Inc., et al.*, Case No. 10-cv-3733-DMC (D.N.J. 2011) – final approval granted for $23 million class settlement to resolve claims of Energy Star refrigerator purchasers for alleged false advertising of the appliances' Energy Star qualification.

## SARAH N. WESTCOT

Sarah N. Westcot is the Managing Partner of Bursor & Fisher's Miami office. She focuses her practice on consumer class actions, complex business litigation, and mass torts.

She has represented clients in a wide array of civil litigation, and has substantial trial and appellate experience.  Sarah served as trial counsel in *Ayyad v. Sprint Spectrum L.P.*, where Bursor & Fisher won a jury verdict defeating Sprint's $1.06 billion counterclaim and securing the class's recovery of more than $275 million in cash and debt relief.

Sarah also has significant experience in high-profile, multi-district litigations.  She currently serves on the Plaintiffs' Steering Committee in *In re Zantac (Ranitidine) Products Liability Litigation,* MDL No. 2924 (S.D. Florida). She also serves on the Plaintiffs' Executive Committee in *In re Apple Inc. App Store Simulated Casino-Style Games Litigation,* MDL No. 2985 (N.D. Cal.) and *In Re: Google Play Store Simulated Casino-Style Games Litigation*, MDL No. 3001 (N.D. Cal.).

Sarah is admitted to the State Bars of California and Florida, and is a member of the bars of the United States District Courts for the Northern, Central, Southern, and Eastern Districts of California, the United States District Courts for the Southern and Middle Districts of Florida, and the bars of the United States Courts of Appeals for the Second, Eighth, and Ninth Circuits.

Sarah received her Juris Doctor from the University of Notre Dame Law School in 2009. During law school, she was a law clerk with the Cook County State's Attorney's Office in Chicago and the Santa Clara County District Attorney's Office in San Jose, CA, gaining early trial experience in both roles. She graduated with honors from the University of Florida in 2005.

Sarah is a member of The National Trial Lawyers Top 100 Civil Plaintiff Lawyers, and was selected to The National Trial Lawyers Top 40 Under 40 Civil Plaintiff Lawyers for 2022.

## **NEAL J. DECKANT**

Neal J. Deckant is a Partner with Bursor & Fisher, P.A., where he serves as the firm's Head of Information & e-Discovery. Neal focuses his practice on complex business litigation and consumer class actions. Prior to joining Bursor & Fisher, Neal counseled low-income homeowners facing foreclosure in East Boston.

Neal is admitted to the State Bars of California and New York, and is a member of the bars of the United States District Court for the Northern District of California, the United States District Court for the Eastern District of California, the United States District Court for the Central District of California, the United States District Court for the Southern District of California, the United States District Court for the Southern District of New York, the United States District Court for the Eastern District of New York, and the bars of the United States Courts of Appeals for the Second and Ninth Circuits.

Neal received his Juris Doctor from Boston University School of Law in 2011, graduating cum laude with two Dean's Awards. During law school, Neal served as a Senior Articles Editor for the Review of Banking and Financial Law, where he authored two published articles about securitization reforms, both of which were cited by the New York Court of Appeals, the highest court in the state. Neal was also awarded Best Oral Argument in his moot court section, and he served as a Research Assistant for his Securities Regulation professor. Neal has also been honored as a 2014, 2015, 2016, and 2017 Super Lawyers Rising Star. In 2007, Neal graduated with Honors from Brown University with a dual major in East Asian Studies and Philosophy.

### ***Selected Published Decisions:***

*Martinelli v. Johnson & Johnson*, 2019 WL 1429653 (N.D. Cal. Mar. 29, 2019), granting class certification of false advertising and other claims brought by purchasers of Benecol spreads labeled with the representation "No Trans Fats."

*Dzielak v. Whirlpool Corp.*, 2017 WL 6513347 (D.N.J. Dec. 20, 2017), granting class certification of consumer protection claims brought by purchasers of Maytag Centennial washing machines marked with the "Energy Star" logo.

*Duran v. Obesity Research Institute*, LLC, 204 Cal. Rptr. 3d 896 (Cal. Ct. App. 2016), reversing and remanding final approval of a class action settlement on appeal, regarding allegedly mislabeled dietary supplements, in connection with a meritorious objection.

*Marchuk v. Faruqi & Faruqi, LLP*, et al., 100 F. Supp. 3d 302 (S.D.N.Y. 2015), granting individual and law firm defendants' motion for judgment as a matter of law on plaintiff's claims for retaliation and defamation, as well as for all claims against law firm partners, Nadeem and Lubna Faruqi.

*Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014), granting nationwide class certification of false advertising and other claims brought by purchasers of purported "100% Pure Olive Oil" product.

*Ebin v. Kangadis Food Inc.*, 2014 WL 737878 (S.D.N.Y. Feb. 25, 2014), denying distributor's motion for summary judgment against nationwide class of purchasers of purported "100% Pure Olive Oil" product.

### *Selected Class Settlements:*

*In Re NVIDIA GTX 970 Graphics Chip Litigation*, Case No. 15-cv-00760-PJH (N.D. Cal. Dec. 7, 2016) – final approval granted for $4.5 million class action settlement to resolve claims that a computer graphics card was allegedly sold with false and misleading representations concerning its specifications and performance.

*Hendricks v. StarKist Co.*, 2016 WL 5462423 (N.D. Cal. Sept. 29, 2016) – final approval granted for $12 million class action settlement to resolve claims that 5-ounce cans of tuna were allegedly underfilled.

*In re: Kangadis Food Inc.*, Case No. 8-14-72649 (Bankr. E.D.N.Y. Dec. 17, 2014) – class action claims resolved for $2 million as part of a Chapter 11 plan of reorganization, after a corporate defendant filed for bankruptcy, following claims that its olive oil was allegedly sold with false and misleading representations.

### *Selected Publications:*

Neal Deckant, *X. Reforms of Collateralized Debt Obligations: Enforcement, Accounting and Regulatory Proposals*, 29 Rev. Banking & Fin. L. 79 (2009) (cited in *Quadrant Structured Products Co., Ltd. v. Vertin*, 16 N.E.3d 1165, 1169 n.8 (N.Y. 2014)).

Neal Deckant, *Criticisms of Collateralized Debt Obligations in the Wake of the Goldman Sachs Scandal*, 30 Rev. Banking & Fin. L. 407 (2010) (cited in *Quadrant Structured Products Co., Ltd. v. Vertin*, 16 N.E.3d 1165, 1169 n.8 (N.Y. 2014); *Lyon Village Venetia, LLC v. CSE Mortgage LLC*, 2016 WL 476694, at *1 n.1 (Md. Ct. Spec. App. Feb. 4, 2016); Ivan Ascher, Portfolio Society: On the Capitalist Mode of Prediction, at 141, 153, 175 (Zone Books / The MIT Press 2016); Devon J. Steinmeyer, *Does State National Bank of Big Spring v. Geithner Stand a Fighting Chance?*, 89 Chi.-Kent. L. Rev. 471, 473 n.13 (2014)).

## YITZCHAK KOPEL

Yitzchak Kopel is a Partner with Bursor & Fisher, P.A. Yitz focuses his practice on consumer class actions and complex business litigation. He has represented corporate and individual clients before federal and state courts, as well as in arbitration proceedings.

Yitz has substantial experience in successfully litigating and resolving consumer class actions involving claims of consumer fraud, data breaches, and violations of the telephone consumer protection act. Since 2014, Yitz has obtained class certification on behalf of his clients five times, three of which were certified as nationwide class actions. Bursor & Fisher was appointed as class counsel to represent the certified classes in each of the cases.

Yitz is admitted to the State Bars of New York and New Jersey, the bar of the United States Court of Appeals for the Second, Eleventh, and Ninth Circuits, and the bars of the United States District Courts for the Southern District of New York, Eastern District of New York, Eastern District of Missouri, Eastern District of Wisconsin, Northern District of Illinois, and District of New Jersey.

Yitz received his Juris Doctorate from Brooklyn Law School in 2012, graduating *cum laude* with two Dean's Awards. During law school, Yitz served as an Articles Editor for the Brooklyn Law Review and worked as a Law Clerk at Shearman & Sterling. In 2009, Yitz graduated *cum laude* from Queens College with a B.A. in Accounting.

### *Selected Published Decisions:*

*Bassaw v. United Industries Corp.,* 482 F.Supp.3d 80, 2020 WL 5117916 (S.D.N.Y. Aug. 31, 2020), denying motion to dismiss claims in putative class action concerning insect foggers.

*Poppiti v. United Industries Corp.*, 2020 WL 1433642 (E.D. Mo. Mar. 24, 2020), denying motion to dismiss claims in putative class action concerning citronella candles.

*Bakov v. Consolidated World Travel, Inc.*, 2019 WL 6699188 (N.D. Ill. Dec. 9, 2019), granting summary judgment on behalf of certified class in robocall class action.

*Krumm v. Kittrich Corp.*, 2019 WL 6876059 (E.D. Mo. Dec. 17, 2019), denying motion to dismiss claims in putative class action concerning mosquito repellent.

*Crespo v. S.C. Johnson & Son, Inc.*, 394 F. Supp. 3d 260 (S.D.N.Y. 2019), denying defendant's motion to dismiss fraud and consumer protection claims in putative class action regarding Raid insect fogger.

*Bakov v. Consolidated World Travel, Inc.*, 2019 WL 1294659 (N.D. Ill. Mar. 21, 2019), certifying a class of persons who received robocalls in the state of Illinois.

*Bourbia v. S.C. Johnson & Son, Inc.*, 375 F. Supp. 3d 454 (S.D.N.Y. 2019), denying defendant's motion to dismiss fraud and consumer protection claims in putative class action regarding mosquito repellent.

*Hart v. BHH, LLC*, 323 F. Supp. 3d 560 (S.D.N.Y. 2018), denying defendants' motion for summary judgment in certified class action involving the sale of ultrasonic pest repellers.

*Hart v. BHH, LLC*, 2018 WL 3471813 (S.D.N.Y. July 19, 2018), denying defendants' motion to exclude plaintiffs' expert in certified class action involving the sale of ultrasonic pest repellers.

*Penrose v. Buffalo Trace Distillery, Inc.*, 2018 WL 2334983 (E.D. Mo. Feb. 5, 2018), denying bourbon producers' motion to dismiss fraud and consumer protection claims in putative class action.

*West v. California Service Bureau, Inc.*, 323 F.R.D. 295 (N.D. Cal. 2017), certifying a nationwide class of "wrong-number" robocall recipients.

*Hart v. BHH, LLC*, 2017 WL 2912519 (S.D.N.Y. July 7, 2017), certifying nationwide class of purchasers of ultrasonic pest repellers.

*Browning v. Unilever United States, Inc.*, 2017 WL 7660643 (C.D. Cal. Apr. 26, 2017), denying motion to dismiss fraud and warranty claims in putative class action concerning facial scrub product.

*Brenner v. Procter & Gamble Co.*, 2016 WL 8192946 (C.D. Cal. Oct. 20, 2016), denying motion to dismiss warranty and consumer protection claims in putative class action concerning baby wipes.

*Hewlett v. Consolidated World Travel, Inc.*, 2016 WL 4466536 (E.D. Cal. Aug. 23, 2016), denying telemarketer's motion to dismiss TCPA claims in putative class action.

*Bailey v. KIND, LLC*, 2016 WL 3456981 (C.D. Cal. June 16, 2016), denying motion to dismiss fraud and warranty claims in putative class action concerning snack bars.

*Hart v. BHH, LLC*, 2016 WL 2642228 (S.D.N.Y. May 5, 2016) denying motion to dismiss warranty and consumer protection claims in putative class action concerning ultrasonic pest repellers.

*Marchuk v. Faruqi & Faruqi, LLP, et al.*, 100 F. Supp. 3d 302 (S.D.N.Y. 2015), granting clients' motion for judgment as a matter of law on claims for retaliation and defamation in employment action.

*In re Scotts EZ Seed Litigation*, 304 F.R.D. 397 (S.D.N.Y. 2015), granting class certification of false advertising and other claims brought by New York and California purchasers of grass seed product.

*Brady v. Basic Research, L.L.C.*, 101 F. Supp. 3d 217 (E.D.N.Y. 2015), denying diet pill manufacturers' motion to dismiss its purchasers' allegations for breach of express warranty in putative class action.

*Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151 (S.D.N.Y. 2014), denying online job board's motion to dismiss its subscribers' allegations of consumer protection law violations in putative class action.

*Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014), granting nationwide class certification of false advertising and other claims brought by purchasers of purported "100% Pure Olive Oil" product.

*Ebin v. Kangadis Food Inc.*, 2014 WL 737878 (S.D.N.Y. Feb. 25, 2014), denying distributor's motion for summary judgment against nationwide class of purchasers of purported "100% Pure Olive Oil" product.

### *Selected Class Settlements:*

*Hart v. BHH, LLC*, Case No. 1:15-cv-04804 (S.D.N.Y. Sept. 22, 2020), resolving class action claims regarding ultrasonic pest repellers.

*In re: Kangadis Food Inc.*, Case No. 8-14-72649 (Bankr. E.D.N.Y. Dec. 17, 2014), resolving class action claims for $2 million as part of a Chapter 11 plan of reorganization, after a corporate defendant filed for bankruptcy following the certification of nationwide claims alleging that its olive oil was sold with false and misleading representations.

*West v. California Service Bureau*, Case No. 4:16-cv-03124-YGR (N.D. Cal. Jan. 23, 2019), resolving class action claims against debt-collector for wrong-number robocalls for $4.1 million.

## PHILIP L. FRAIETTA

Philip L. Fraietta is a Partner with Bursor & Fisher, P.A. Phil focuses his practice on data privacy, complex business litigation, consumer class actions, and employment law disputes. Phil has been named a "Rising Star" in the New York Metro Area by Super Lawyers® every year since 2019.

Phil has significant experience in litigating consumer class actions, particularly those involving privacy claims under statutes such as the Michigan Preservation of Personal Privacy Act, the Illinois Biometric Information Privacy Act, and Right of Publicity statutes. Since 2016, Phil has recovered over $100 million for class members in privacy class action settlements. In addition to privacy claims, Phil has significant experience in litigating and settling class action claims involving false or misleading advertising.

Phil is admitted to the State Bars of New York, New Jersey, Illinois, Michigan, and California, the bars of the United States District Courts for the Southern District of New York, the Eastern District of New York, the Western District of New York, the Northern District of New York, the District of New Jersey, the Eastern District of Michigan, the Western District of Michigan, the Northern District of Illinois, the Central District of Illinois, and the United States Court of Appeals for the Second, Third, and Ninth Circuits. Phil was a Summer Associate with Bursor & Fisher prior to joining the firm.

**BURSOR&FISHER**
P.A.

Phil received his Juris Doctor from Fordham University School of Law in 2014, graduating cum laude. During law school, Phil served as an Articles & Notes Editor for the Fordham Law Review, and published two articles. In 2011, Phil graduated cum laude from Fordham University with a B.A. in Economics.

### *Selected Published Decisions:*

*Garner v. Me-TV National Limited Partnership*, 132 F.4th 1022 (7th Cir. Mar. 28, 2025), reversing grant of motion to dismiss under federal Video Privacy Protection Act and specifying standard for being a "consumer" under the Act.

*Jancik v. WebMD LLC*, 2025 WL 560705 (N.D. Ga. Feb 20, 2025), certifying the first ever contested class under the federal Video Privacy Protection Act.

*Fischer v. Instant Checkmate LLC*, 2022 WL 971479 (N.D. Ill. Mar. 31, 2022), certifying class of Illinois residents for alleged violations of Illinois' Right of Publicity Act by background reporting website.

*Kolebuck-Utz v. Whitepages, Inc.*, 2021 WL 157219 (W.D. Wash. Apr. 22, 2021), denying defendant's motion to dismiss for alleged violations of Ohio's Right to Publicity Law.

*Porter v. NBTY, Inc.*, 2019 WL 5694312 (N.D. Ill. Nov. 4, 2019), denying supplement manufacturer's motion for summary judgment on consumers' allegations of false advertising relating to whey protein content.

*Boelter v. Hearst Communications, Inc.*, 269 F. Supp. 3d 172 (S.D.N.Y. 2017), granting plaintiff's motion for partial summary judgment on state privacy law violations in putative class action.

### *Selected Class Settlements:*

*Ramos v. ZoomInfo Technologies, LLC*, Case No. 21-cv-02032-CPK (N.D. Ill. 2024) – final approval granted for $29.5 million class settlement to resolve claims for alleged statutory right of publicity violations.

*Awad v. AMC Entertainment Holdings, Inc.*, Index No. 607322/2024 (Sup. Ct. Nassau Cnty. 2024) – final approval granted for $12.3 million class settlement to resolve claims for alleged New York ticket fee claims.

*Schreiber v. Mayo Foundation for Medical Education and Research*, Case No. 22-cv-00188-HYJ (W.D. Mich. 2024) – final approval granted for $52.5 million class settlement to resolve claims of newsletter subscribers for alleged statutory privacy violations.

*Fischer v. Instant Checkmate LLC*, Case No. 19-cv-04892-MSS (N.D. Ill. 2024) – final approval granted for $10.1 million class settlement to resolve claims for alleged statutory right of publicity violations.

*Young v. Military Advantage, Inc.*, Case No. 2023LA000535 (Cir. Ct. DuPage Cnty. 2023) – final approval granted for $7.35 million class settlement to resolve claims of newsletter subscribers for alleged federal Video Privacy Protection Act claims.

*Rivera v. Google LLC*, Case No. 2021-CH-1460 (Cir. Ct. Cook Cnty. 2022) – final approval granted for $100 million class settlement to resolve alleged BIPA violations of Illinois residents appearing in photos on the Google Photos platform.

*Edwards v. Hearst Communications, Inc.*, Case No. 15-cv-09279-AT (S.D.N.Y. 2019) – final approval granted for $50 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*Ruppel v. Consumers Union of United States, Inc.*, Case No. 16-cv-02444-KMK (S.D.N.Y. 2018) – final approval granted for $16.375 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*Moeller v. Advance Magazine Publishers, Inc. d/b/a Condé Nast*, Case No. 15-cv-05671-NRB (S.D.N.Y. 2019) – final approval granted for $13.75 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*Benbow v. SmileDirectClub, LLC*, Case No. 2020-CH-07269 (Cir. Ct. Cook Cnty. 2021) – final approval granted for $11.5 million class settlement to resolve claims for alleged TCPA violations.

*Gregorio v. Premier Nutrition Corp.*, Case No. 17-cv-05987-AT (S.D.N.Y. 2019) – final approval granted for $9 million class settlement to resolve claims of protein shake purchasers for alleged false advertising.

## ALEC M. LESLIE

Alec Leslie is a Partner with Bursor & Fisher, P.A. He focuses his practice on consumer class actions, employment law disputes, and complex business litigation.

Alec is admitted to the State Bar of New York and is a member of the bar of the United States District Courts for the Southern and Eastern Districts of New York. Alec was a Summer Associate with Bursor & Fisher prior to joining the firm.

Alec received his Juris Doctor from Brooklyn Law School in 2016, graduating *cum laude*. During law school, Alec served as an Articles Editor for Brooklyn Law Review. In addition, Alec served as an intern to the Honorable James C. Francis for the Southern District of New York and the Honorable Vincent Del Giudice, Supreme Court, Kings County. Alec graduated from the University of Colorado with a B.A. in Philosophy in 2012.

### *Selected Class Settlements:*

*Gregorio v. Premier Nutrition Corp.*, Case No. 17-cv-05987-AT (S.D.N.Y. 2019) – final approval granted for class settlement to resolve claims of protein shake purchasers for alleged

false advertising.

*Wright v. Southern New Hampshire Univ.*, Case No. 1:20-cv-00609-LM (D.N.H. 2021) – final approval granted for class settlement to resolve claims over COVID-19 tuition and fee refunds to students.

*Mendoza et al. v. United Industries Corp.*, Case No. 21PH-CV00670 (Phelps Cnty. Mo. 2021) – final approval granted for class settlement to resolve false advertising claims on insect repellent products.

*Kaupelis v. Harbor Freight Tools USA, Inc.*, Case No. 8:19-cv-01203-JVS-DFM (C.D. Cal. 2021) – final approval granted for class settlement involving allegedly defective and dangerous chainsaws.

*Rocchio v. Rutgers Univ.*, Case No. MID-L-003039-20 (Middlesex Cnty. N.J. 2021) – final approval granted for class settlement to resolve claims over COVID-19 fee refunds to students.

*Malone v. Western Digital Corporation*, Case No. 5:20-cv-03584-NC (N.D. Cal.) – final approval granted for class settlement to resolve false advertising claims on hard drive products.

*Frederick et al. v. ExamSoft Worldwide, Inc.*, Case No. 2021L001116 (DuPage Cnty. Ill. 2021) – final approval granted for class settlement to resolve claims over alleged BIPA violations with respect to exam proctoring software.

*D'Amario et al. v. Univ. of Tampa*, Case No. 7:20-cv-07344 (S.D.N.Y. 2022) – final approval granted for class settlement to resolve claims over COVID-19 fee refunds to students.

*Olin et al. v. Meta Platforms, Inc.*, Case No. 3:18-cv-01881-RS (N.D. Cal. 2022) – final approval granted for class settlement involving invasion of privacy claims.

*Croft v. SpinX Games et al.*, Case No. 2:20-cv-01310-RSM (W.D. Wash. 2022) – final approval granted for class settlement involving allegedly deceptive and/or illegal gambling practices.

*Armstead v. VGW Malta Ltd. et al.*, Case No. 22-CI-00553 (Henderson Cnty. Ky. 2023) – final approval granted for class settlement involving allegedly deceptive and/or illegal gambling practices.

*Barbieri v. Tailored Brands, Inc.*, Index No. 616696/2022 (Nassau Cnty. N.Y.) – final approval granted for class settlement involving untimely wage payments to employees.

*Metzner et al. v. Quinnipiac Univ.*, Case No. 3:20-cv-00784 (D. Conn.) – final approval granted for class settlement to resolve claims over COVID-19 fee refunds to students.

*In re GE/Canon Data Breach,* Case No. 1:20-cv-02903 (S.D.N.Y.) – final approval granted for class settlement to resolve data breach claims.

*Davis v. Urban Outfitters, Inc.,* Index No. 612162/2022 (Nassau Cnty. N.Y.) – final approval granted for class settlement involving untimely wage payments to employees.

*Armstead v. VGW Malta LTD et al.,* Civil Action No. 22-CI-00553 (Henderson Cir. Ct. Ky.) – final approval granted for class settlement involving allegedly deceptive and/or illegal gambling practices.

*Casler et al. v. Mclane Company, Inc. et al.,* Index No. 616432/2022 (Nassau Cnty. N.Y.) – final approval granted for class settlement involving untimely wage payments to employees.

*Wyland v. Woopla, Inc.,* Civil Action No. 2023-CI-00356 (Henderson Cir. Ct. Ky.) – final approval granted for class settlement involving allegedly deceptive and/or illegal gambling practices.

*Graziano et al. v. Lego Systems, Inc.,* Index No. 611615/2022 (Nassau Cnty. N.Y.) – final approval granted for class settlement involving untimely wage payments to employees.

*Lipsky et al. v. American Behavioral Research Institute, LLC,* Case No. 50-2023-CA-011526-XXXX-MB (Palm Beach Cnty. Fl.) – final approval granted to resolve allegedly deceptive automatic renewal and product efficacy claims.

*Whiting v. Yellow Social Interactive Ltd.,* Civil Action No. 2023-CI-00358 (Henderson Cir. Ct. Ky.) – final approval granted for class settlement involving allegedly deceptive and/or illegal gambling practices.

## DANIEL GUERRA

Daniel Guerra is a Senior Associate with Bursor & Fisher, P.A.  Dan focuses his practice on complex civil litigation and consumer class actions.

Prior to working at Bursor & Fisher, Dan practiced at a national law firm in San Francisco.  He helped represent various companies during internal investigations and in complex civil litigation, including product liability litigation and commercial disputes.  He also advised clients on a range of matters including regulatory compliance, litigation risk assessment, and product counseling.

Dan is admitted to the State Bar of California, all California Federal District Courts, and the United States District Court for the Western District of Texas.

Dan received his Juris Doctor from the University of California Law, San Francisco (formerly U.C. Hastings College of the Law) in 2009.

## STEPHEN BECK

Stephen is an Associate with Bursor & Fisher, P.A. Stephen focuses his practice on complex civil litigation and class actions.

Stephen is admitted to the State Bar of Florida and is a member of the bars of the United States District Courts for the Southern and Middle Districts of Florida, the Eastern District of Missouri, and the Northern District of Illinois.

Stephen received his Juris Doctor from the University of Miami School of Law in 2018. During law school, Stephen received an Honors distinction in the Litigation Skills Program and was awarded the Honorable Theodore Klein Memorial Scholarship for excellence in written and oral advocacy. Stephen also received the CALI Award in Legislation for earning the highest grade on the final examination. Stephen graduated from the University of North Florida with a B.A. in Philosophy in 2015.

## STEFAN BOGDANOVICH

Stefan Bogdanovich is an Associate with Bursor & Fisher, P.A. Stefan litigates complex civil and class actions typically involving privacy, intellectual property, entertainment, and false advertising law.

Prior to working at Bursor & Fisher, Stefan practiced at two national law firms in Los Angeles.  He helped represent various companies in false advertising and IP infringement cases, media companies in defamation cases, and motion picture producers in royalty disputes.  He also advised corporations and public figures on complying with various privacy and advertising laws and regulations.

Stefan is admitted to the State Bar of California and all of the California Federal District Courts.  He is also a Certified Information Privacy Professional.

Stefan received his Juris Doctor from the University of Southern California Gould School of Law in 2018, where he was a member of the Hale Moot Court Honors Program and the Trial Team.  He received the highest grade in his class in three subjects, including First Amendment Law.

## MAX S. ROBERTS

Max Roberts is an Associate in Bursor & Fisher's New York office.  Max focuses his practice on class actions concerning data privacy and consumer protection.  Max was a Summer Associate with Bursor & Fisher prior to joining the firm and is now Co-Chair of the firm's Appellate Practice Group.

Since 2023, Max has been named "Rising Star" in the New York Metro Area by Super Lawyers®.

Max received his Juris Doctor from Fordham University School of Law in 2019, graduating *cum laude.*  During law school, Max was a member of Fordham's Moot Court Board, the Brennan Moore Trial Advocates, and the Fordham Urban Law Journal, for which he published a note entitled *Weaning Drug Manufacturers Off Their Painkiller: Creating an Exception to the Learned Intermediary Doctrine in Light of the Opioid Crisis*.  In addition, Max served as an intern to the Honorable Vincent L. Briccetti of the Southern District of New York and the Fordham Criminal

Defense Clinic.  Max graduated from Johns Hopkins University in 2015 with a B.A. in Political Science.

Outside of the law, Max is an avid triathlete.

### ***Selected Published Decisions:***

*Huertas v. Bayer US LLC*, 120 F.4th 1169 (3d Cir. 2024), reversing district court and holding plaintiffs had alleged an injury-in-fact sufficient for Article III standing.  Max personally argued the appeal before the Third Circuit, which can be listened to here.

*Jackson v. Amazon.com, Inc.*, 65 F.4th 1093 (9th Cir. 2023), affirming district court's denial of motion to compel arbitration.  Max personally argued the appeal before the Ninth Circuit, which can be viewed here.

*Javier v. Assurance IQ, LLC*, 2022 WL 1744107 (9th Cir. May 31, 2022), reversing district court and holding that Section 631 of the California Invasion of Privacy Act requires prior consent to wiretapping.  Max personally argued the appeal before the Ninth Circuit, which can be viewed here.

*Mora v. J&M Plating, Inc.*, 213 N.E.3d 942 (Ill. App. Ct. 2d Dist. 2022), reversing circuit court and holding that Section 15(a) of Illinois' Biometric Information Privacy Act requires an entity to establish a retention and deletion schedule for biometric data at the first moment of possession.  Max personally argued the appeal before the Second District, which can be listened to here.

*Newman v. Bayer Corp.*, --- F.R.D. ---, 2025 WL 856225 (S.D.N.Y. Mar. 19, 2025), certifying class of New York purchases of "One A Day" gummy multivitamins.

*Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924 (N.D. Cal. 2024), denying motion to dismiss alleged violations of California pen register statute.

*Yockey v. Salesforce, Inc.*, 745 F. Supp. 3d 945 (N.D. Cal. 2024), denying motion dismiss alleged violations of California and Pennsylvania wiretapping statutes.

*Gladstone v. Amazon Web Services, Inc.*, 739 F. Supp. 3d 846 (W.D. Wash. 2024), denying motion to dismiss alleged violations of California wiretapping statute.

*Rancourt v. Meredith Corp.*, 2024 WL 381344 (D. Mass. Jan. 11, 2024), denying motion to dismiss alleged violations of federal Video Privacy Protection Act, and finding personal jurisdiction over operator of mobile application.

*Saunders v. Hearst Television, Inc.*, 711 F. Supp. 3d 24 (D. Mass. 2024), denying motion to dismiss alleged violations of federal Video Privacy Protection Act.

*Cristostomo v. New Balance Athletics, Inc.*, 647 F. Supp. 3d 1 (D. Mass. 2022), denying motion to dismiss and motion to strike class allegations in case involving sneakers marketed as "Made in

the USA."

### *Selected Class Settlements:*

*Sholopa v. Turk Hava Yollari A.O. (d/b/a Turkish Airlines)*, Case No. 1:20-cv-3294-ALC (S.D.N.Y. 2023) – final approval granted for $14.1 million class settlement to resolve claims of passengers whose flights with Turkish Airlines were cancelled due to COVID-19 and who did not receive refunds.

*Payero v. Mattress Firm, Inc.*, Case No. 7:21-cv-3061-VB (S.D.N.Y. 2023) – final approval granted for $4.9 million class settlement to resolve claims of consumers who purchased allegedly defective bed frames.

*Miranda v. Golden Entertainment (NV), Inc.*, Case No. 2:20-cv-534-AT (D. Nev. 2021) – final approval granted for class settlement valued at over $4.5 million to resolve claims of customers and employees of casino company stemming from data breach.

*Malone v. Western Digital Corp.*, Case No. 5:20-cv-3584-NC (N.D. Cal. 2021) – final approval granted for class settlement valued at $5.7 million to resolve claims of hard drive purchasers for alleged false advertised.

*Frederick v. ExamSoft Worldwide, Inc.*, Case No. 2021-L-001116 (18th Judicial Circuit Court DuPage County, Illinois 2021) – final approval granted for $2.25 million class settlement to resolve claims of Illinois students for alleged violations of the Illinois Biometric Information Privacy Act.

### *Bar Admissions*

- New York State
- Southern District of New York
- Eastern District of New York
- Northern District of New York
- Northern District of Illinois
- Central District of Illinois
- Eastern District of Michigan
- District of Colorado
- First Circuit Court of Appeals
- Second Circuit Court of Appeals
- Third Circuit Court of Appeals
- Seventh Circuit Court of Appeals
- Ninth Circuit Court of Appeals

BURSOR&FISHER
P.A.

## JULIA K. VENDITTI

Julia K. Venditti is an Associate with Bursor & Fisher, P.A. Julia focuses her practice on complex civil litigation and class actions. Julia was a Summer Associate with Bursor & Fisher prior to joining the firm.

Julia is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern, Eastern, Central, and Southern Districts of California.

Julia received her Juris Doctor in 2020 from the University of California, Hastings College of the Law, where she graduated *cum laude* with two CALI Awards for the highest grade in her Evidence and California Community Property classes. During law school, Julia was a member of the UC Hastings Moot Court team and competed at the Evans Constitutional Law Moot Court Competition, where she finished as a national quarterfinalist and received a best brief award. Julia was also inducted into the UC Hastings Honors Society and was awarded Best Brief and an Honorable Mention for Best Oral Argument in her First-Year Moot Court section. In addition, Julia served as a Research Assistant for her Constitutional Law professor, as a Teaching Assistant for Legal Writing & Research, and as a Law Clerk at the San Francisco Public Defender's Office. In 2017, Julia graduated *magna cum laude* from Baruch College/CUNY, Weissman School of Arts and Sciences, with a B.A. in Political Science.

## JULIAN DIAMOND

Julian Diamond is an Associate with Bursor & Fisher, P.A. Julian focuses his practice on privacy law and class actions. Julian was a Summer Associate with Bursor & Fisher prior to joining the firm.

Julian received his Juris Doctor from Columbia Law School, where he was a Harlan Fiske Stone Scholar. During law school, Julian was Articles Editor for the Columbia Journal of Environmental Law. Prior to law school, Julian worked in education. Julian graduated from California State University, Fullerton with a B.A. in History and a single subject social science teaching credential.

## MATTHEW GIRARDI

Matt Girardi is an Associate with Bursor & Fisher, P.A. Matt focuses his practice on complex civil litigation and class actions, and has focused specifically on consumer class actions involving privacy violations, illegal gambling, financial misconduct, and false advertising. Matt was a Summer Associate with Bursor & Fisher prior to joining the firm.

Matt is admitted to the State Bar of New York, and is a member of the bars of the United States District Courts for the Southern District of New York, the Eastern District of New York, the Eastern District of Michigan, the Western District of Michigan, the First Circuit Court of Appeals, and the Ninth Circuit Court of Appeals.

Matt received his Juris Doctor from Columbia Law School in 2020, where he was a Harlan Fiske Stone Scholar. During law school, Matt was the Commentary Editor for the

Columbia Journal of Tax Law, and represented fledgling businesses for Columbia's
Entrepreneurship and Community Development Clinic.  In addition, Matt worked as an Honors
Intern in the Division of Enforcement at the U.S. Securities and Exchange Commission.  Matt
graduated from Brown University in 2016 with a B.A. in Economics, and worked as a Paralegal
Specialist at the U.S. Department of Justice in the Antitrust Division prior to law school.

### *Selected Class Settlements:*

*Armstead v. VGW Malta Ltd. et al.*, Case No. 22-CI-00553 (Henderson Cnty. Ky. 2023) – final
approval granted for $11.75 million class settlement involving allegedly deceptive and/or illegal
gambling practices.

*Edwards v. Mid-Hudson Valley Federal Credit Union, Case No. 22-cv-00562-TJM-CFH*
(N.D.N.Y. 2023) – final approval granted for $2.2 million class settlement to resolve claims that
an upstate New York credit union was unlawfully charging overdraft fees on accounts with
sufficient funds.

*Fischer, et al. v. Instant Checkmate LLC, et al.*, No. 19-cv-04892 (N.D. Ill. 2024) – final
approval granted for state-by-state non-reversionary cash settlements involving alleged
violations of right of publicity statutes totaling in excess of $10.1 million.

*Wyland v. Woopla, Inc.,* Civil Action No. 2023-CI-00356 (Henderson Cir. Ct. Ky. 2023) – final
approval granted for $835,000 class settlement involving allegedly deceptive and/or illegal
gambling practices.

*Whiting v. Yellow Social Interactive Ltd.,* Civil Action No. 2023-CI-00358 (Henderson Cir. Ct.
Ky. 2023) – final approval granted for $1.32 million class settlement involving allegedly
deceptive and/or illegal gambling practices.

## XAVIER JOHNSON

Xavier Johnson is a Staff Attorney at Bursor & Fisher, where they focus their practice on
complex civil litigation and consumer class actions.  They are admitted to the State Bar of
California.  Xavier is a former Director of Policy Practice at the Just Cities Institute where their
work focused on Fair Chance Housing policies, re-entry policy, as well as tenants' rights.
Previously, Xavier worked as a Tenants' Rights Attorney at Centro Legal de la Raza.  Their
work at Centro Legal de la Raza centered on representing tenants in hearings with the Oakland
Rent Adjustment Program.  Xavier provided assistance to tenants through all stages of the
petition process including providing representation on the day of the hearings.  Xavier
successfully advocated for more than one million dollars in rent reductions.  Xavier engaged
with the community through outreach and documented how tenants are being impacted by the
housing crisis and what steps we can take to ensure that our tenant communities are protected.
Xavier Johnson is also an elected official serving as a Commissioner on the Berkeley Rent
Stabilization Board.

Over their career, Xavier has worked with law firms, non-profits, and governmental
entities in the realms of policy advocacy, research and community organizing.  Xavier spent two

years as a Congressional Aide in Congresswoman Barbara Lee's District Office with a focus on housing and housing justice.

Xavier holds a Juris Doctorate from University of California Berkeley School of Law and a Bachelor of Arts in Sociology from University of Texas at San Antonio.

## JENNA GAVENMAN

Jenna Gavenman is an Associate with Bursor & Fisher, P.A. Jenna focuses her practice on complex civil litigation and consumer class actions. Jenna was a Summer Associate and a part-time intern with Bursor & Fisher prior to joining the firm as a full-time Associate in September 2022.

Jenna is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern, Eastern, Central, and Southern Districts of California.

Jenna received her Juris Doctor in 2022 from the University of California, Hastings College of the Law (now named UC Law SF). During law school, she was awarded an Honorable Mention for Best Oral Argument in her First-Year Moot Court section. Jenna also participated in both the Medical Legal Partnership for Seniors (MLPS) and the Lawyering for Children Practicum at Legal Services for Children—two of UC Hastings's nationally renowned clinical programs. Jenna was awarded the Clinic Award for Outstanding Performance in MLPS for her contributions to the clinic. In addition, Jenna volunteered with her law school's Legal Advice and Referral Clinic and as a LevelBar Mentor.

In 2018, Jenna graduated *cum laude* from Villanova University with a B.A. in Sociology and Spanish (double major). Jenna was a Division I athlete, competing on the Villanova Women's Water Polo varsity team for four consecutive years.

## IRA ROSENBERG

Ira Rosenberg is an Associate with Bursor & Fisher, P.A. Ira focuses his practice on complex civil litigation and class actions.

Ira received his Juris Doctor in 2022 from Columbia Law School. During law school, Ira served as a Student Honors Legal Intern with Division of Enforcement at the U.S. Securities and Exchange Commission. Ira also interned during law school in the Criminal Division at the United States Attorney's Office for the Southern District of New York and with the Investor Protection Bureau at the Office of the New York State Attorney General. Ira graduated in 2018 from Beth Medrash Govoha with a B.A. in Talmudic Studies.

## LUKE SIRONSKI-WHITE

Luke Sironski-White is an Associate with Bursor & Fisher, P.A., focusing on complex civil litigation and consumer class actions. Luke joined the firm as a full-time Associate in August 2022.

Luke is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern, Eastern, Central, and Southern Districts of California.

Luke received his Juris Doctor in 2022 from the University of California, Berkeley School of Law.   During law school, Luke was on the board of the Consumer Advocacy and Protection Society (CAPS), edited for the Berkeley Journal of Employment and Labor Law, and volunteered with the Prisoner Advocacy Network.

In 2017, Luke graduated from the University of Chicago with a B.A. in Anthropology.  Before entering the field of law Luke was a professional photographer and filmmaker.

## MUJGHAN AHMAD

Mujghan Ahmad is a Staff Attorney at Bursor & Fisher, where she focuses her practice on complex civil litigation and consumer class actions.  She is admitted to the State Bar of California.

Mujghan earned her Juris Doctor from Golden Gate University, School of Law in 2022, with specializations in Intellectual Property and Public Interest.  During law school,  she received a CALI Award in Intellectual Property Law Survey, wrote for the Environmental Law Journal, and was a member of the Moot Court Board and the Pro Bono Honor Society.  She also served as a teaching assistant for Criminal Law Professor Thomas Schaaf.  In 2017, Mujghan received a Bachelor of Arts in Political Science from the University of California, Irvine.

Her prior legal experience includes internships with the Los Angeles County Counsel's Property Division, Homeless Advocacy Project, Bay Area Legal Aid's Economic Justice Unit, and California Lawyers for the Arts.  Before joining Bursor & Fisher, Mujghan served as a Foreclosure Prevention Attorney at Legal Assistance to the Elderly, where she litigated cases involving wrongful foreclosure and financial elder abuse, and provided pro bono estate planning services to low-income seniors in San Francisco.

## INES DIAZ

Ines Diaz is an Associate with Bursor & Fisher, P.A. Ines focuses her practice on complex civil litigation and class actions.

Ines is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern, Eastern, Central, and Southern Districts of California.

Ines received her Juris Doctor in 2023 from the University of California, Berkeley School of Law.  During law school, Ines served as an Executive Editor of the California Law Review. She also served as an intern with the East Bay Community Law Center's Immigration Clinic and as a Fellow of the Berkeley Law Academic Skills Program.  Additionally, Ines served as an instructor with the University of California, Berkeley Extension, Legal Studies Global Access Program where she taught legal writing to international law students.  In 2021, Ines was selected

for a summer externship at the California Supreme Court where she served as a judicial extern for the Honorable Mariano-Florentino Cuéllar.

### CAROLINE C. DONOVAN

Caroline C. Donovan is an Associate with Bursor & Fisher, P.A. Caroline focuses her practice on complex civil litigation, data protection, mass arbitration, and class actions. Caroline interned with Bursor & Fisher during her third year of law school before joining full time in Fall 2023.

Caroline is admitted to the State Bar of New York.

Caroline received her Juris Doctor in 2023 from Brooklyn Law School. During law school, Caroline was a member of the Moot Court Honor Society Trial Division, where she was chosen to serve as a National Team Member. Caroline competed and coached in numerous competitions across the country, and placed second at regionals in AAJ's national competition in both her second and third year of law school. Caroline was also the President of the Art Law Association, and the Treasurer of the Labor and Employment Law Association.

During law school, Caroline was a judicial intern for Judge Kenneth W. Chu of the National Labor Relations Board. She also interned at the United States Attorney's Office in the Eastern District of New York, as well as a securities class action firm.

### JOSHUA B. GLATT

Joshua Glatt is an Associate with Bursor & Fisher, P.A. Joshua focuses his practice on complex civil litigation and consumer class actions. Joshua was a Summer Associate with Bursor & Fisher prior to joining the firm as an Associate.

Joshua is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern, Eastern, Central, and Southern Districts of California.

Joshua earned his Juris Doctor from the University of California College of the Law, San Francisco (formerly U.C. Hastings). While there, he received a CALI Award for earning the highest grade in Constitutional Law II and served on the executive boards of the Jewish Law Students Association and the American Constitution Society. Prior to law school, Joshua graduated *summa cum laude* from the Walter Cronkite School of Journalism and Mass Communication at Arizona State University in 2016 and earned a master's degree from the University of Southern California in 2018.

### JOSHUA R. WILNER

Joshua Wilner is an Associate with Bursor & Fisher, P.A. Joshua focuses his practice on complex civil litigation, data privacy, consumer protection, and class actions. Joshua was a Summer Associate at Bursor & Fisher prior to joining the firm full time in Fall 2023.

Joshua is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern, Eastern, Central, and Southern Districts of California.

Joshua received his Juris Doctor in 2023 from Berkeley Law.  During law school, he received the American Jurisprudence Award for Constitutional Law.

During law school, Joshua served on the board of the Berkeley Journal of Employment and Labor Law.  Joshua also interned at Disability Rights California, Legal Aid at Work, and a private firm that worked closely with the ACLU of Northern California to enforce the California Racial Justice Act.  In 2022 and 2023, Joshua worked as a research assistant for Professor Abbye Atkinson.


### VICTORIA ZHOU

Victoria Zhou is an Associate in Bursor & Fisher's New York office.  Victoria focuses her practice on class actions concerning data privacy and consumer protection.

Victoria is admitted to the State Bar of New York.

Victoria received her Juris Doctor from Fordham Law School in 2023.  During law school, Victoria served as an Associate Editor of the Moot Court Board and competed in multiple mock trial competitions as a member of the Brendan Moore Trial Advocates.  In addition, Victoria served as a judicial extern to Chief Judge Mark A. Barnett of the United States Court of International Trade.  In 2019, Victoria graduated *magna cum laude* from Fei Tian College with a B.F.A. in Classical Dance.

### KYLE D. GORDON

Kyle Gordon is an Associate with Bursor & Fisher, P.A.  Kyle focuses his practice on class actions concerning data privacy and consumer protection.  Kyle was a Summer Associate with Bursor & Fisher prior to joining the firm.

Kyle is admitted to the State Bar of New York.

Kyle received his Juris Doctor from Columbia Law School in 2023, where he was a Harlan Fiske Stone Scholar.  During law school, Kyle was a Staff Editor for the Columbia Science and Technology Law Review.  In 2020, Kyle graduated *summa cum laude* from New York University with a B.A. in Politics and became a member of Phi Beta Kappa.  Prior to law school, Kyle interned in the Clerk's Office of the United States District Court for the District of Columbia.

### ELEANOR R. GRASSO

Eleanor Grasso is an Associate with Bursor & Fisher, P.A.  Eleanor focuses her practice on complex civil litigation, including data privacy and consumer protection class actions.

Eleanor is admitted to the State Bars of New York and Florida, and is a member of the bars of the United States District Courts for the Southern District of New York and Eastern District of New York.

Eleanor earned her Juris Doctor from Fordham University School of Law.  During law school, Eleanor was a member of the Fordham Journal of Intellectual Property, Media & Entertainment Law, serving as Symposium Editor for Volume XXXIV.  Eleanor was also a member of the Brendan Moore Trial Advocacy Team, served as a Research Assistant, and was a member of the Board of Student Advisors.

Throughout her time in law school, Eleanor interned for the Office of the Public Defender for the Sixth Judicial Circuit of Florida in the Misdemeanor Unit, the Office of the Federal Public Defender for the Middle District of Tennessee in the Capital Habeas Unit, the ACLU of Florida, and for the Honorable Kiyo A. Matsumoto in the United States District Court for the Eastern District of New York.  Eleanor was a Summer Associate with Bursor & Fisher and also interned part-time during her third year of law school.

Eleanor earned her Bachelors from the University of Florida, with a double-major in Criminology & Law and Political Science and a minor in French & Francophone studies.

### RYAN B. MARTIN

Ryan Martin is an Associate with Bursor & Fisher, P.A.  Ryan focuses his practice on complex civil litigation and consumer class actions.  He was a Summer Associate and part-time law clerk with Bursor & Fisher prior to joining the firm as a full time Associate in August 2024.

Ryan is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern, Eastern, Central, and Southern Districts of California.

He earned his Juris Doctor from the University of California College of the Law, San Francisco (formerly U.C. Hastings), graduating *Cum Laude* with a Concentration in Environmental Law and as a member of the Honors Society.  While there, he was a Senior Production Editor of the *U.C. Law Journal*, was President of the Hastings Environmental Law Association, and was a Torts Teaching Fellow.

Prior to law school, Ryan graduated from the W.A. Franke College of Business at Northern Arizona University with a Bachelors of Science in Hotel and Restaurant Management and a minor in Business.  Ryan also studied Sustainable Business and Hotel Management at the Internationale Hochschule of Applied Sciences in Bad Honnef Germany and is a certified yoga instructor.

### LOGAN HAGERTY

Logan Hagerty is an Associate with Bursor & Fisher, P.A.  Logan is admitted to the State Bar of New York.

Logan received his Juris Doctor from Boston College Law School in 2024, where he received a certificate in Land & Environmental Law.

During law school, Logan was President of the Environmental Law Society.  In addition, Logan worked for a class action firm, a general practice firm, and interned at a Massachusetts state agency.

Logan earned his Bachelors from St. Lawrence University, where he graduated magna cum laude with a double major in History and Environmental Studies and a minor in African Studies.  He is also a member of Phi Beta Kappa.

## KAREN VALENZUELA

Karen Valenzuela is an Associate with Bursor & Fisher, P.A.  Karen focuses her practice on complex civil litigation and class actions.  Karen was a Summer Associate and a part-time intern with Bursor & Fisher prior to joining the firm as a full-time Associate.

Karen is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern, Eastern, Central, and Southern Districts of California.

Karen received her Juris Doctor in 2024 from the University of California, Berkeley School of Law.  During law school, Karen was part of the Consumer Protection Public Policy Order, and interned for the Los Angeles County Public Defender's Office.  Karen also participated in the International Human Rights Law Clinic, La Alianza Workers' and Tenants' Rights Clinic, and the Death Penalty Clinic.

Prior to law school, Karen graduated from the University of California, Berkeley with a B.A. in Gender and Women's Studies and a minor in Global Poverty and Practice.

**EXHIBIT 11**



### Florida

9897 Lake Worth Rd

Suite 302

Lake Worth, FL 33467


### Virginia

5516 Falmouth St

Suite 108

Richmond, Virginia 23230


### New York

745 Fifth Ave

Suite 500

New York, New York 10151


### Minnesota

1650 W. 82nd Street

Suite 880

Bloomington, Minnesota 55431


www.4-Justice.com

George Feldman McDonald, PLLC

## The Firm

The mission of George Feldman McDonald, PLLC ("GFM" or "the Firm") is to provide the highest quality legal service to our clients, taking a heartfelt and genuine interest in their circumstances, while offering creative fee agreements in order to provide access to justice for everyone.

We are dedicated to these values:  We will work aggressively, relentlessly and with integrity to represent those who need us.  In addition to the variety of legal services we provide (consumer fraud class actions, data breach and privacy violation class actions, securities, EB-5 fraud litigation, business litigation, personal injury, consumer rights and victims' rights), our passion is helping victims of injustice.

We aim to serve those taken advantage of, wronged, or exploited with an exceptional level of service, excellence, encouragement, respect and strength, backed by nearly two centuries of collective legal experience, success and results.

We embrace and encourage diversity among our lawyers and staff and respect the differences among us and our communities.  We always have and always will conduct ourselves and our firm with an uncompromising dedication to the highest ethical standards, while maintaining a profitable business enterprise with an impeccable reputation.  Our firm endeavors to give back to our community in many ways, and we will pursue our belief that individuals with a sense of family and community, and with interests outside of the practice of law, are better for it.

George Feldman McDonald, PLLC

## Attorneys



**David J. George, Managing Member**

David J. George earned his Bachelor of Arts degree in Political Science from the University of Rhode Island, *summa cum laude*. David then graduated at the top of his class at the University of Richmond School of Law. At the University of Richmond, David was a member of the Law Review, was the President of the McNeill Law Society, and earned numerous academic awards, including Outstanding Academic Performance in each of his three years there and Outstanding Graduate.

Before founding and becoming the Managing Member of the Firm, David, who is AV rated by Martindale-Hubbell (the highest rating available), was a partner in one of the largest class action firms in the world. A zealous advocate of shareholder, consumer and EB-5 investor rights, David has been lead and/or co-lead counsel with respect to various securities class action matters throughout the United States, including: *In re Cryo Cell Int'l, Inc. Sec. Litig.* (M.D. Fla.) ($7 million settlement); *In re TECO Energy, Inc. Sec. Litig.* (M.D. Fla.) ($17.35 million settlement); *Baxter Int'l* (N.D. Ill.) ($42.5 million settlement); *In re Newpark Res., Inc. Sec. Litig.* (E.D. La.) ($9.24 million settlement); *In re Mannatech, Inc. Sec. Litig.* (N.D. Tex.) ($11.5 million settlement); *In re Gilead Sec. Litig.* (N.D. Cal.) ($8.25 million settlement); and *In re R.H. Donnelly* (D. Del.) ($25 million settlement). David has also acted as lead counsel in numerous consumer class actions nationwide, including *Lewis v. Labor Ready, Inc.* ($11 million settlement); *In re Webloyalty, Inc. Mktg. & Sales Practices Litig.* (D. Mass.) ($10 million settlement); and *In re Navisite Migration Litig.* (D. Md.) ($1.7 million settlement). Moreover, David was a member of the litigation team that secured a $925 million settlement in *In re UnitedHealth Grp. Inc. PSLRA Litig.* (D. Minn.). The UnitedHealth Group settlement was the largest stock options backdating case in history.

He is the Chair of the Firm's EB-5 Practice Group and a member of the Firm's Class Action and Commercial Litigation Practice Groups. David recently served as lead

George Feldman McDonald, PLLC

counsel in two of the Firm's EB-5 cases involving the Palm House Hotel at 160 Royal Palm Way in Palm Beach, Florida. The litigation is entitled *Lan Li, et al. v. Joseph Walsh, et al.*, 16-cv-81871-KAM (S.D. Fla). and *Lan Li, et al. v. PNC Bank, N.A. and Ruben Ramirez*, 9:19-cv-80332-KAM (S.D. Fla), and GFM served as Lead Counsel for the Palm House EB-5 Investors. The EB-5 program allows foreign nationals who invest at least $800,000 in a U.S. business and create 10 jobs for qualified U.S. workers to obtain green cards. Through the EB-5 program, Defendants collected $44 million from at least 88 foreign investors who sought to obtain green cards, promising to use the funds for the acquisition, development, and operation of the Palm Beach Hotel in Palm Beach, Florida. The Palm House EB-5 Investors alleged that foreign investors lost approximately $50 million in the Palm House Hotel EB-5 hotel scam after the defendants and their related entities used the funds meant for the Palm House Hotel Project to pay for lavish personal expenses. David consults with EB-5 investors from all over the world, including China, South America, India, and Vietnam, and lectures on EB-5 related topics during his travels. David's EB-5 practice includes projects in various cities across the U.S.

David also spent more than a decade as a commercial litigator with two of the largest corporate law firms in the United States. During that time, David aggressively prosecuted and defended a wide array of complex commercial litigation matters, including securities class action matters, non-compete litigation, fraud claims, and real estate-based litigation matters. He is a member of the National Association of Shareholder and Consumer Attorneys.

David was honored as a 2021 Plaintiffs' Lawyers Trailblazer by the National Law Journal. He was also named as one of Florida's Most Effective Corporate/Securities Lawyers and was the only plaintiffs' securities class action counsel recognized. He has a nationwide practice and successfully prosecutes commercial litigation and fraud cases throughout the U.S.

4

George Feldman McDonald, PLLC



**Lori G. Feldman**

Lori G. Feldman is a Member of George Feldman McDonald.  She is the Chair of the Firm's Class Action Practice Group, Managing Partner of the Firm's New York office, and a member of the Firm's EB-5 and Commercial Litigation Practice Groups.  She earned her Bachelor of Arts degree in Criminal Justice from the State University of New York at Albany, *magna cum laude*, where she was awarded the Signum Laudis graduate school honors scholarship.  Lori earned her Juris Doctor degree upon graduating from Albany Law School of Union University, where she served as a member of the Albany Law Review and was a winner of the school's first year law review student writing competition.

Prior to joining the Firm, Lori was a Partner in one of the largest class action firms in the country, a Partner in another prestigious securities and consumer class action firm, and Of Counsel to one of the most tenacious criminal and civil litigation boutiques in the United States.

Lori was honored as a 2021 Plaintiffs' Lawyers Trailblazer by the National Law Journal.  From 2011 to 2023, Lori was named a New York Metro Super Lawyer.  As a young lawyer, she was named a Rising Star in New York and Washington State.  She served as a member of the Federal Bar Council for the Western District of Washington when she managed an office for her prior law firm in Seattle, Washington.

Lori is a daughter of retired public employees and is a tireless advocate of public and private investors, shareholders and consumers.  Lori's grandparents immigrated through Ellis Island in New York City, where she was born and raised.

She takes great pride in representing EB-5 and other investors, consumers, and plaintiffs in cases involving corporate fraud and deceptive practices.  Lori has obtained class and individual recoveries in excess of $250 million.

George Feldman McDonald, PLLC

She has successfully litigated class actions against some of the largest and most well-funded corporate defendants in the nation, including but not limited to:

- Century Link, Inc. (D. Minn.) (consumer fraud class action)

- Swisher International, Inc. (Multnomah Cty. Cir. Ct., Oregon) (consumer fraud class action)

- Bernard L. Madoff LLC (S.D.N.Y.) (securities fraud)

- Equifax (D. Or.) (consumer fraud class action)

- Porsche Cars North America (N.D. Cal.) (consumer fraud class action)

- Washington Mutual (W.D. Wash.) (securities fraud class action)

- General Electric Co. (N.D.N.Y.) (pension fraud class action)

- State Street (D. Mass.) (securities fraud class action)

- Macy's (S.D. Ohio) (pension fraud class action)

- Morgan Stanley (S.D.N.Y) (data breach class action)

- Gilead Sciences (N.D. Cal.) (securities fraud class action)

- Amazon.com (W.D. Wash.) (consumer fraud class action)

- Citibank (S.D.N.Y) (consumer fraud)

- Oppenheimer Funds (D. Colo.) (securities fraud class action)

- ConAgra Foods (D. Neb.) (securities fraud class action)

- Boston Scientific, Inc. (D. Mass.) (pension fraud class action)

- Rhythms Net Connections (D. Mass.) (securities fraud class action)

- Textron, Inc. (D. Mass.) (securities fraud class action)

- AIG (S.D.N.Y.) (securities fraud class action)

Lori was appointed to serve as Co-Lead Counsel for Plaintiffs after heavily contested leadership motion practice in *In re Nurture Baby Food Litigation*, Case No. 1:21-cv-0127-MKV (S.D.N.Y.). She serves as Co-Chair of the Plaintiffs' Steering Committee in *In re Meta Tax Filing Cases*, No. 2-07557-(SI) (N.D. Cal.) and *Smith v. Google*, No.

6

George Feldman McDonald, PLLC

23-cv-03527 (N.D. Cal.) , and holds many other leadership positions in class actions, pending in federal and state court class actions across the country, including but not limited to: *In re Fidelity Investments Data Breach Litigation*, Civil No. 24-12601-LTS (D. Mass.) (Co-Lead Counsel in data breach case); *In re Shields Health Care Group, Inc.*, Case No.: 1:22-cv-10901-PBS (D. Mass.) (Co-Lead Counsel in data breach case); *Chandra Tate v. EyeMed Vision Care*, LLC, Case No. 1:21-cv-00036 (S.D. Ohio) (Co-Lead Counsel in data breach case); Wahab v. Boston Children's Health Physician, et al., Case No. 73692/2024 (Westchester Cty) (Liaison Counsel in data breach case); *Skurauskis v. NationsBenefits Holdings, LLC*, 23-cv-60830-RAR (S.D. Fla.) (Executive Committee Member in *Fortra Data Breach MDL*); *Doe v. Highmark*, Inc., Case No. 2:23-cv-00250 (W.D. Pa.) (Executive Committee Member in data breach case); *Morill v. Lakeview Loan Servicing, LLC*, Case No. 1:22-cv-20955-DPG (S.D. Fl.) (supporting lead counsel in data breach case); *In re MOVEit Customer Data Security Breach Litigation*, MDL No. 1:23-md-03083-ADB (representing named plaintiffs in Master Complaint); *Bowen v. Paxton Media Group, LLC*, Case No. 5:21-cv-00143-GNS-LLK (W.D. Ky) (Co-Lead Settlement Class Counsel in data breach case); *In re Morgan Stanley Data Security Litig.*, Case No. 1:20-cv-05014-MKV (S.D.N.Y.) (Executive Committee Member in settled data breach case); and *In re: Canon Data Breach Litig.*, Case No. 1:20-cv-06239-AMD-SJB (E.D.N.Y.) (Executive Committee Member in settled data breach case).

She is a member of the National Association of Shareholder and Consumer Attorneys, the New York State and Washington State Bar Associations, and is bi-coastally licensed in New York and Washington State. Lori is admitted to the Supreme Court of the United States, the U.S. Courts of Appeal for the Second, Ninth, and First Circuits, the Southern, Eastern and Northern Districts of New York, the Western District of Washington, and the Northern District of Illinois.

George Feldman McDonald, PLLC



**Christopher McDonald**

Christopher McDonald, a thirty-year trial lawyer, combines skills in business and accounting with insightful legal acumen to achieve outstanding results for his clients. He works closely with clients in structuring their business operations, acquisitions and handling the day-to-day matters that business owners customarily face.

Chris maintains an active litigation practice representing clients in civil matters including business and contract disputes, real estate litigation, and a full range of domestic relations issues including divorce, support, custody and visitation. Further, he represents clients in non-litigation matters such as incorporating or organizing new businesses, business acquisitions, commercial real estate transactions and estate planning including the preparation of wills, trusts and other related documents. Chris is the Managing Partner of GFM's Virginia Office, the Co-Chair of the Commercial Litigation Practice Group, and a member of GFM's EB-5, Class Action, and Transactional Practice Groups.

8

George Feldman McDonald, PLLC



**Elizabeth L. Parker**

Elizabeth L. Parker is the Chair of the Firm's Victims' Rights Practice Group. Elizabeth began her career as an Assistant State Attorney in the Palm Beach County State Attorney's Office in 1998. While working as a prosecutor, Elizabeth handled Misdemeanor, Domestic Violence, Felony and Traffic Homicide cases including DUI Manslaughter, Vehicular Homicide, and Manslaughter by Culpable Negligence. She served as the Deputy Chief of County Court from June 2003 until December 2006, and then as the Chief of the County Court Division and the Domestic Violence Division from January 2007 until December 2008. From January 2009 until August 2011, she held the position of Chief Assistant State Attorney.

As a Chief Assistant State Attorney her responsibilities specifically included: hiring of new attorneys, daily supervision of the Misdemeanor Division and Domestic Violence Unit, the Satellite offices, and the Appellate Unit, working closely with law enforcement on investigations, reviewing and assisting on search warrants and arrest warrants, constant case review for filing decisions, trial strategies, legal theories, ethical considerations, daily, weekly and monthly attorney training, caseload management, calendar coverage, liaison for statewide issues, complaint resolution relating to staff or charging decisions, and working closely with Judges to ensure efficiency in the courtrooms.

In addition to the administrative duties as Chief Assistant, Elizabeth personally litigated cases of great public importance involving new or novel issues of law, technical matters with expert witnesses, and high-profile cases requiring substantial trial and media relations experience.

Elizabeth created the Advocacy Institute at the State Attorney's Office and oversaw the training of each new lawyer and special prosecutor (private lawyers volunteering as prosecutors).

During her time as Chief Assistant, she trained hundreds of prosecutors in how to successfully try DUI cases both in Palm Beach County and around the state. Elizabeth was a member of the Florida Prosecuting Attorney's Association (FPAA) Education Committee. While she was an Assistant State Attorney, Elizabeth lectured for the FPAA and the Florida Traffic Safety Resource Prosecutor Program

9

George Feldman McDonald, PLLC

for prosecutors in the areas of opening statements, closing arguments, pre-trial motions, cross-examination of experts, and trial techniques.  She was a member of the Technical Advisory Committee for the Institute of Police Technology and Management (IPTM) from 2007-2011.

Prior to joining GFM, Elizabeth was in private practice in Palm Beach County Florida. Elizabeth advocates on behalf of all crime victims or their next of kin including child victims of sexual abuse, victims of domestic violence, sexual assault, cybercrimes, financial crimes, DUI Serious Bodily Injury, DUI Manslaughter and Homicide.  In her role as a crime victim advocate, she works closely with law enforcement and prosecutors to be a voice for the victim and assist them throughout the overwhelming criminal justice process, keeping them apprised every step of the way.  Elizabeth's knowledge of the criminal investigation and criminal justice process from her experience as a prosecutor ensures law enforcement and prosecutors have all of the evidence and information to build the strongest case possible.  If there is a civil cause of action for the criminal act, Elizabeth will aggressively pursue all legal avenues to ensure the criminal perpetrators are held accountable in every way possible.

From 2011 until 2018 Elizabeth, on behalf of the Florida Coalition Against Domestic Violence, taught law enforcement officers throughout the State of Florida how to investigate incidents of Domestic Violence and properly collect and preserve evidence to enable prosecutions even when the victim refuses to cooperate.

Elizabeth has appeared on the Nancy Grace show and In Session (Court TV) as a legal analyst on high profile cases such as Jerry Sandusky, George Zimmerman, John Goodman, Adam Kauffman, and Tammy Smith. She was a legal analyst for USA TODAY during the George Zimmerman trial. She has also made several appearances on Law and Crime as a Victim's Right Expert. She has also appeared on Dateline, 20/20, SNAPPED, Sins and Secrets, Nothing Personal, and American Greed.

Elizabeth has served as a board member for the Boys and Girls Club and the KIDSAFE Foundation.  She currently serves on the Board of Pet Haven Rescue.

George Feldman McDonald, PLLC



**Janine L. Pollack**

Janine L. Pollack is a Member of the Firm and the Class Action Practice Group.  She has been a class action litigator for over 34 years and has prosecuted cases that have resulted in the award of hundreds of millions of dollars to defrauded consumers and investors.  She has been appointed by courts to lead numerous class actions and has had much success in securing refunds and other remedies for class members.  She has prosecuted bench and jury trials as first chair, winning a jury verdict against R.J. Reynolds for wrongful death in a tobacco litigation.

Janine grew up in New Jersey and is a member of the New York and New Jersey bars.  After graduating from University of Pennsylvania Carey Law School, she worked in a general litigation firm for approximately eighteen months before joining a large plaintiffs' class action firm in 1991 and has devoted her practice primarily to class actions since then.

Janine is a Certified Health and Well-Being Coach and the Firm's Chief Wellness Officer.  Janine and the Firm are at the forefront of the focus on well-being in the legal profession.  Her and the Firm's philosophy is that well-being is ground zero for all endeavors we undertake in life, including being an effective attorney.  Since adolescence, her interests have revolved around her love for fitness, nutrition and the goal of uniting mind, body and soul and her enthusiasm for such interests has continued to grow over time.  She strives to share that philosophy with her colleagues at the Firm and in the Bar to support them in finding strength, motivation and empowerment for fulfillment in their personal and professional lives.

Janine graduated from University of Pennsylvania Carey Law School in 1989, where she was elected to the Journal of International Business Law.  Prior to that, she graduated in 1986 from Rutgers College at Rutgers University in New Brunswick, New Jersey with High Honors, Phi Beta Kappa, with a B.A., having double-majored in English and French.  Fluent in French, she spent a semester abroad in 1985 at New York University in France.

11

George Feldman McDonald, PLLC

Janine is Co-President of the National Association of Shareholder & Consumer Attorneys (NASCAT), a non-profit organization of attorneys that supports consumer and investor rights, including through the class action mechanism.  Janine is also the Chair of the Women's Initiative at NASCAT, which seeks to advance women in the class action bar.  She participated as a team leader in developing standards and best practices for increasing diversity in mass tort and class action litigation for the James F. Humphreys Complex Litigation Center at the George Washington Law School titled, "Inclusivity and Excellence: Guidelines and Best Practices for Judges Appointing Lawyers to Leadership Positions in MDL and Class-Action Litigation" (March 15, 2021).  Janine is also a member of the Women in the Legal Profession Committee of the Bar Association of the City of New York (City Bar), where she was a co-editor of the publication, *Street Smarts for Women Lawyers*.  Her committee activities include wellness projects and presentations, as well as the Women on the Walls initiative that commissions portraits of women jurists for display at the City Bar.  Janine participates as a volunteer for the Institute for Well-Being in Law (IWIL), a non-profit organization whose focus is well-being within the legal community.  To contribute as an alumnus, Janine participates in a program that allows prospective students who are applying to the University of Pennsylvania to converse with alumni.

Some of Janine's representative cases include:

- Lead litigator in consumer class actions against major banks for failure to pay interest on mortgage escrow monies; settlement achieved in one case

- One of lead litigators in consumer class action against lender for misrepresentations in financing documents to pay for energy-saving home improvements; settlement achieved

- Co-lead counsel in data breach against large clothing retailer for failure to exercise reasonable care in safeguarding personal information of its customers; settlement achieved

- Represented consumers nationwide in class actions against Skechers, Reebok and others for false claims regarding efficacy of "toning shoes"; worked with Federal Trade Commission in securing settlements

George Feldman McDonald, PLLC

- The lead litigator in oft-cited seminal consumer class action in D. Mass. (*Bezdek v. Vibram USA Inc.*, 79 F. Supp. 3d 324, 338 (D. Mass. 2015), *aff'd*, 809 F.3d 78 (1st Cir. 2015)), against the manufacturer of "Vibram FiveFingers footwear" for mispresenting the health benefits of the shoes; settlement achieved

- One of lead litigators in consumer class action against makers of boxed macaroni and cheese for failure to disclose presence or risk of dangerous phthalates

- Working with various co-counsel in consumer class actions against makers of infant formula for failure to disclose presence or risk of heavy metals

- Working with various co-counsel in consumer class actions against several makers of baby foods for failure to disclose presence or risk of heavy metals

- One of lead litigators in consumer class action against maker of chocolate confectionary products for failure to disclose presence or risk of PFAS "forever chemicals"

- Worked with various co-counsel in consumer class actions against makers of herbs and spices for failure to disclose presence or risk of heavy metals

- Working with various co-counsel on numerous data breach and privacy class actions, many of which have had successful settlements

Janine is honored to have been named as a Super Lawyer every year since 2012 and to Lawdragon's list of 500 Leading Plaintiff Financial Lawyers every year since 2019. She has also enjoyed being appointed numerous times to Law360's editorial boards. Janine's prior firm where she was a founding partner was awarded the National Law Journal's 2020 Trailblazer Award for an Elite Boutique Firm. In 2012, Janine was one of the attorneys featured on the front page of The National Law Journal's Plaintiffs' Hot List for her work on toning shoe cases, including against Reebok and Skechers, which resulted in settlements jointly with the Federal Trade Commission.

Janine is a frequent public speaker on well-being, women's and other issues, including:

13

George Feldman McDonald, PLLC

- Women Lawyers in Leadership, Practicing Law Institute (numerous years)

- Making Wellness Work for You, Class of Our Own Women's Summit, May 9, 2023

- Health and Wellness Panel, Class Action Law Forum, University of San Diego School of Law, March 18, 2022

- Taking Care of our Own: Lawyer Well-Being Programs, AON Virtual Law Firm Symposium, October 14, 2021

- Harris Martin Webinar Series: Baby Food Litigation, April 8, 2021

- Taking Control of Your Well-Being: How to Leverage Your Legal Organization's Wellness Program, Practicing Law Institute, December 10, 2020

- How to Wow Motivation and Wellness: Your Guide to Grit and Fit, University of Pennsylvania Carey Law School, October 21, 2020 (highlighted in *Penn Law Journal*, Summer 2021)

**EDUCATION**

- University of Pennsylvania Carey Law School, Philadelphia, Pennsylvania (J.D. 1989, Elected to Journal of International Business Law)
- Rutgers University, Rutgers College, New Brunswick, New Jersey (B.A. 1986 with High Honors, English and French double major (fluent in French), Phi Beta Kappa)
- New York University in France Semester Abroad, Paris, France, 1985

**BAR ADMISSIONS**
- New York
- New Jersey

**COURT ADMISSIONS**
- U.S. District Court Southern District of New York
- U.S. District Court Eastern District of New York
- U.S. District Court Northern District of New York
- U.S. District Court District of New Jersey

14

George Feldman McDonald, PLLC

- U.S. District Court Northern District of Illinois
- U.S. Court of Appeals for the First Circuit
- U.S. Court of Appeals for the Ninth Circuit
- U.S. Court of Appeals for the Tenth Circuit

George Feldman McDonald, PLLC



**Michael Liskow**

Michael Liskow is a Member of the Firm.  He has extensive experience litigating complex class actions on behalf of plaintiffs in data breach, consumer fraud, antitrust, securities, housing, and wage and hour matters, among others.  Michael has devoted his career to seeking justice for classes of individuals and businesses that have been taken advantage of by unscrupulous corporations.

Michael earned his Bachelor of Arts Degree in Psychology from the University of Kansas, and his Juris Doctor Degree from the University of Pennsylvania Carey Law School, where he was an Executive Board Member the Journal of Constitutional Law and received a Fulbright Award to the Slovak Republic.

Prior to joining the Firm, Michael was a clerk for the Honorable Steven H. Levinson of the Supreme Court of Hawai`i, an associate at Quinn Emanuel Urquhart & Sullivan, LLP, a Fulbright Teaching Assistant to the Slovak Republic, and a partner at three other law firms practicing plaintiff-side class action litigation.

Michael has been recognized as a "New York Super Lawyer" each year since 2019, and was named a "Rising Star" by New York Super Lawyers from 2013-2018.

Michael has acted as lead counsel in data breach class actions resulting in meaningful settlements, *Bokelman v. FCH Enters.*, No. 18-00209-RJB-RLP (D. Haw.) and *Mizrahi v. NBEO*, No. 16-cv-03146-JKB (D. Md.).  He has initiated and litigated numerous class actions to completion as the lead attorney through investigation, complaint, discovery, motion practice, appeal, and resolution, including, among others, *Thompson v. Bethpage Fed. Credit Union*, No. 2:17-cv-00921 (E.D.N.Y.), alleging violations of the Real Estate Settlement Procedures Act resulting in a settlement where every class member received a full recovery, and *Egleston v. Verizon*, No. 194784/2011 (N.Y. Sup. Ct.), on behalf of overbilled Verizon customers resulting in a $5 million settlement providing full refunds plus interest and fees to the class.  He also had a significant role in representing a class of overcharged tenants of Stuyvesant Town and Peter Cooper Village in New York City, resulting in a $173 million recovery, the largest recovery for tenants in United States history.

George Feldman McDonald, PLLC

Michael is a member of the National Association of Shareholder and Consumer Attorneys, and is licensed to practice in New York and California.

**EDUCATION**
- Pennsylvania Carey Law School, Philadelphia, Pennsylvania
- Undergraduate Degree, University of Kansas, Lawrence, Kansas

**BAR ADMISSIONS**
- California, 2006
- New York, 2010

**COURT ADMISSIONS**
- U.S. District Court for Northern District of California
- U.S. District Court for Central District of California
- U.S. District Court for Southern District of California
- U.S. District Court for Eastern District of California
- U.S. District Court for Southern District of New York
- U.S. District Court for Eastern District of New York
- U.S. District Court for Northern District of New York
- U.S. District Court for Northern District of Illinois
- U.S. District Court for District of Colorado
- U.S. Court of Appeals 1st Circuit
- U.S. Court of Appeals 2nd Circuit
- U.S. Court of Appeals 3rd Circuit
- U.S. Court of Appeals 4th Circuit
- U.S. Court of Appeals 7th Circuit
- U.S. Court of Appeals 9th Circuit

George Feldman McDonald, PLLC



**Brittany L. (Brown) Sackrin**

Brittany L. (Brown) Sackrin is an associate in George Feldman McDonald's Class Action Practice Group. Brittany earned her Bachelor of Science degree in Business Administration (Finance) at the University of Florida. Brittany then graduated near the top of her class with honors from the University of Miami School of Law, where she was an inaugural member of the school's Investor Rights Clinic through which she passionately represented investors in securities arbitration claims before FINRA.

While in law school, Brittany also interned with the U.S. Securities and Exchange Commission's trial unit in its downtown Miami office. She was a decorated member of the University of Miami Trial Team, and was awarded a scholarship for her performance in the Litigation Skills Program. She also received a scholarship for her demonstrated academic achievement in the interrelationship between law and economics, as well as several Book awards for achieving the highest grade in law school courses.

Before joining the firm, Brittany was an associate at one of the largest securities defense litigation law firms in the country, where she focused her practice on complex securities litigation matters, specifically class and derivative actions with an emphasis on securities and regulatory matters.

Brittany's class action experience at GFM includes significant time spent working on data breach cases in a variety of industries, including *Geleng v. Independent Living Systems, LLC*, No. 23-cv-21060-KMW (S.D. Fla.), *In re Shields Health Care Grp., Inc.*, 1:22-cv-10901 (D. Mass.), *Fleet v. Southern Orthopedic Associates, P.S.C.*, 5:22-cv-00109 (W.D. Ky.), *Tate v. EyeMed Vision Care, LLC*, 1:21-cv-00036 (S.D. Ohio), *Hollandsworth v. Highmark Health*, 2:23-cv-00376 (W.D. Penn.), *Skurauskis v. NationsBenefits Holdings, LLC*, 0:23-cv-60830 (S.D. Fla.), *In re: Canon Data Breach Litig.*, 1:20-cv-06239 (E.D.N.Y.), *In re Waste Mgmt. Data Breach Litig.*, 1:21-cv-06199 (S.D.N.Y.), *Bowen v. Paxton Media Grp., LLC*, 5:21-cv-143 (W.D. Ky.), *In re Morgan Stanley Data Sec. Litig.*, 1:20-cv-05014 (S.D.N.Y.), and *In re Lakeview Loan Servicing Litig.*, Case No. 1:22-cv-20955 (S.D. Fla.), among others. Brittany is also working closely with lead counsel on a privacy case involving Meta Platforms, Inc.,

George Feldman McDonald, PLLC

*In Re Meta Pixel Tax Filing Cases*, 3:22-cv-07557 (N.D. Cal.), following a congressional report detailing the extensive sharing of taxpayers' sensitive personal and financial information by Meta and online tax preparation companies. She is also working on a similar privacy case against Google, LLC, *Smith v. Google, LLC*, 5:23-cv-03527 (N.D. Cal.). Through her work representing plaintiffs in data breach cases, Brittany has honed her skills in researching and drafting briefs, vetting and evaluating plaintiffs and class representatives, and guiding clients through the discovery process, as well as working collaboratively and in conjunction with all plaintiffs' counsel.

She was appointed to the Executive Committee in *Geleng v. Independent Living Systems, LLC*, 23-cv-21060-KMW (S.D. Fla.) through which she led the Defensive Discovery Subcommittee.

Brittany is a zealous advocate for those seeking justice and brings her attention to detail and expert legal research and writing skills to all her cases at GFM, where she represents class action plaintiffs.

**EDUCATION**
- University of Miami Law School, Coral Gables, Florida
- University of Florida, Gainesville, Florida (Bachelor of Science in Business Administration, Finance Major)

**BAR ADMISSIONS**
- Florida

**COURT ADMISSIONS**
- U.S. District Court for Southern District of Florida
- U.S. District Court for Middle District of Florida

19

George Feldman McDonald, PLLC



**Tiffany Wong**

Tiffany Wong is an Associate ----in GFM's Class Action Practice Group and is resident in GFM's New York office. Tiffany earned her Bachelor of Science degree in Business Administration at the Fashion Institute of Design and Merchandising in California. Tiffany then attended Brooklyn Law School where she was awarded a scholarship for her academic achievements and multiple CALI Excellence for the Future Awards for having the highest grade in her courses. Upon graduation, she also received the Robert A. Morse Memorial Prize for having the highest grade in a Criminal Procedure course.

Prior to joining the firm, Tiffany was an associate at an intellectual property litigation firm where her practice focused on copyright litigation, particularly in representing small businesses and individuals against large corporations. As a daughter of immigrants, Tiffany is also passionate and experienced in both corporate and humanitarian immigration law.

**EDUCATION**
- Undergraduate Degree, Fashion Institute of Design, Los Angeles, California
- Brooklyn Law School, Brooklyn, New York

**BAR ADMISSIONS**
- New York

George Feldman McDonald, PLLC



**Justin Alvarez-Herman**

Justin Alvarez-Herman is an Associate in GFM's Class Action Practice Group, resident in the New York Office. Justin earned his bachelor's degree in political science from the State University of New York at New Paltz, and his J.D. from Brooklyn Law School, where he was awarded multiple scholarships for his academic achievements.

Prior to joining the firm, Justin worked at a boutique litigation firm focused on class actions, consumer protection, civil rights, municipal representation, and commercial litigation. Justin's experience includes work on several wrongful death lawsuits concerning the Fisher-Price Rock 'n Play Sleeper; a class action brought against one of New York State's largest counties alleging discrimination in their tax assessment process; survivors of childhood sexual assault pursuing justice under New York's Child Victims Act; and a lawsuit brought against a University in New York State alleging the violations of Title IX and state law.

Outside of law, Justin's interests include political theory, astronomy, and sports.

**EDUCATION**

- Brooklyn Law School, Brooklyn, New York
- Bachelor of Science, University of New York, New Paltz, New York

**BAR ADMISSIONS**

- New York

George Feldman McDonald, PLLC



**Rebecca A. Peterson**

Rebecca Peterson is a Member of GFM's Class Action Practice Group and is the Managing Member of GFM's Minnesota Office. Ms. Peterson, a recognized expert in heavy metal litigation, focuses on consumer protection, product liability and pet food regulation cases and accompanying regulatory issues. Ms. Peterson has been part of the successful prosecution of actions on behalf of consumers in both state and federal courts. Ms. Peterson has been appointed lead counsel and, alongside a group of attorneys, was recognized as Attorney of the Year by Minnesota Lawyer for her work on behalf of U.S. farmers. Prior to joining the firm, Ms. Peterson practiced in California and had extensive experience in complex class actions, appeals and public relations.

Ms. Peterson is admitted to the state bar of the States of Minnesota and California. She received her law degree from the University of San Diego School Law and her B.A. from St. Olaf College. She is an Advisory Board Member of the Page Education Foundation.

**REPRESENTATIVE CASES**
- *In re Syngenta AG MIR162 Corn Litig., No. 14-md-2591-JWL-JPO (D. Kan.)*
- *In re Syngenta Litig. (Minn. Producers), No. 27-cv-15-3785 (Henn. Co. Dist. Ct., Minn.)*
- *Zarinebaf et al. v. Champion Petfoods USA, Inc. et    al.,  1:18-cv- 06951 (N.D. Ill.)*
- *In re Big Heart Pet Brands Litig., No. 4:18-cv-00861-JSW (N.D. Cal.) [Co-Lead Counsel]*
- *Zeiger et al. v. WellPet LLC et al.*, 3:17-cv-04056-WHO (N.D. Cal.)
- *Stuve et al. v. The Kraft Heinz Company,* No. 21-cv-1845 [N.D.  Ill.]
- *In re Plum Baby Food Litigation,* 4:21-cv-00913-YGR (N.D. Cal.) [Co- Lead Counsel]
- *In re Nurture Baby Food Litigation,* 1:21-cv-01217-MKV (S.D. NY) [Co- Lead Counsel]
- *Willoughby et al. v. Abbott Laboratories,* 1:22-cv-01322 [N.D. Ill.]

George Feldman McDonald, PLLC

- *In re Theo's Dark Chocolate Litigation*, 4:23-cv-02739 [N.D. Calif.] [Co-Lead Counsel]
- *In re Meta Piel Tax Filing Cases,* 3:22-cv-07557 [N.D. Calif.] [Co-Lead Counsel]
- *In re Trader Joe's Company Dark Chocolate Litig*, 3:23-cv-00061 [S.D. Calif.] [Executive Committee]
- *Mason v. WL Gore & Associates, 2:25-cv-00049 (E.D. of Wash.)*
- *Peterson et al. v. 3M Company et al., 0:24-cv-03497 (D. of Minn.)*
- *Lowry et al. v. Proctor & Gamble Co., 2:25-cv-00108 (W.D. Wash.)*
- *Amanda Seutter et al. V. Mead Johnson Nutrition Co., 0:24-cv-02179 (D. of Minn.)*
- *Author of Amicus Brief in Karsjens, et al. v. Harpstead, et al., 11-cv-02359 (8th Cir.)*


**EDUCATION**
- School of Law, University of San Diego 2005
- Undergraduate Degree St. Olaf College, 1998

**BAR ADMISSIONS**
- Minnesota
- California

**COURT ADMISSIONS**
- U.S. District Court, Northern District of California
- U.S. District Court, District of Minnesota
- U.S. District Court, District of North Dakota
- U.S. District Court, Central District of California
- U.S. District Court, Eastern District of California
- U.S. District Court, Southern District of California
- U.S. District Court, District of Colorado
- U.S. District Court, Central District of Illinois
- U.S. District Court, Eastern District of Wisconsin
- U.S. Court of Appeals, Second Circuit
- U.S. Court of Appeals, District of Appeals, Sixth Circuit
- U.S. Court of Appeals, Seventh Circuit
- U.S. District of Appeals, Eighth Circuit
- U.S. District of Appeals, Ninth Circuit
- U.S. District of Appeals, Tenth Circuit

George Feldman McDonald, PLLC

**PROFESSIONAL ASSOCIATIONS**
- The National Trial Lawyers Top 100 (2021 – 2024)
- Best Lawyers in Minnesota 2022 by Minnesota Monthly (2022)
- Attorney of the Year (Syngenta litigation team) by Minnesota Lawyer (2017)
- Minnesota Super Lawyers – Class Action and Mass Torts Attorney (2022 – 2024)

**COMMUNITY INVOLVEMENT**

- Food Law Advisory Board at Mitchell Hamline Law School
- Advisory Board Member, Page Education Foundation

**CURRENT EMPLOYMENT POSITION**

- Managing Member of GFM's Minnesota Office

**LANGUAGES**

- English

24

George Feldman McDonald, PLLC



**Catherine A. Peterson**

Catherine Peterson practices in GFM's Class Action Practice Group.  Catherine is an experienced class action lawyer and has represented victims in a wide variety of consumer class actions.  Prior to joining GFM, in addition to her experience as a class action lawyer, she practiced immigration law, representing clients before the Immigration Court, United States Citizenship and Immigration Services, and Federal Court. She also served on the staffs of U.S. Senator Byron Dorgan, U.S. Senator Kent Conrad, and U.S. Senator Heidi Heitkamp. She has experience on political campaigns and assisting with political compliance matters. Catherine has also served over 15 years in the Army National Guard.

**EDUCATION**

- University of North Dakota School of Law in Grand Forks, North Dakota
- Undergraduate Degree Texas A&M University in College Station, Texas

**BAR ADMISSIONS**

- 2024, Minnesota
-  2017, Virginia

**COURT ADMISSIONS**

- U.S. District Court, Eastern District of Viriginia
- U.S. District Court, District of North Dakota
- U.S. District Court, Eastern District of Michigan
- U.S. District Court, Northern District of Illinois
-
**PROFESSIONAL ASSOCIATIONS**

- American Legion
- American Legion Auxiliary
- Federal Bar Association – Minnesota Chapter

25

George Feldman McDonald, PLLC

**CURRENT EMPLOYMENT POSITION**
- Associate Attorney

**LANGUAGES**
- English

George Feldman McDonald, PLLC



**Krista K. Freier**

Krista Freier is an associate in GFM's Class Action Practice Group and is based in the Minnesota office. Krista's practice is concentrated on products liability and consumer protection cases. She is a 2009 graduate of Hamline University School of Law where she was a Student Attorney in Hamline's Child Advocacy Clinic and interned with the Honorable Gregory G. Galler in Minnesota State Court. While attending law school, Krista clerked with the Hennepin County Attorney's Office in the divisions of Juvenile Prosecution-Victim Witness and Child Support.

Prior to joining the firm, Krista was an associate at a law firm practicing in class action litigation and worked for the University of Minnesota and a local nonprofit organization.

**EDUCATION**
- Hamline University School of Law, St. Paul Minnesota, J.D.; Dean's List
- Concordia College, Moorhead, Minnesota, B.A. (History and Spanish major; Economics minor), *magna cum laude*

**BAR ADMISSIONS**
- 2009, Minnesota

**COURT ADMISSIONS**
- U.S. District Court, Minnesota
- U.S. District Court, Northern District of Illinois

**CURRENT EMPLOYMENT POSITION**
- Associate Attorney

**LANGUAGES**
- English

**EXHIBIT 12**

∞ Meta                    Get started    Build your...    Grow and...    Sell with...    Start Now

Business Help Center                                                                    ↗ Get support

# About location targeting

Location targeting allows you to reach people living in or recently in locations such as countries, regions or cities. You can use location targeting in Ads Manager each time you make a campaign or set account controls for your ad account.

Meta technologies use a variety of signals to show ads to people who are within your location targeting selections. Due to signal variations, complete accuracy cannot be guaranteed. You might see some ad impressions, or receive messages or leads from outside your location settings.

Sometimes people may also see an ad organically, leading to engagement such as likes, comments and shares on the ad outside the targeted location. We may also show preview ads to people connected to the business, even if they're outside the targeted location. You won't be charged for preview impressions.

If you use third-party tools like Google Analytics to compare results, keep in mind that their reporting may not match our campaign reporting because they may use different location targeting methods.

## Learn more

- Use location targeting
- Set account controls for your ad account
- About reaching new audiences
- About detailed targeting
- How to reach people interested in your selected cities and regions
- Create an ad with store location features in Meta Ads Manager

---

**Was this information helpful?** *

○ Yes

○ No

More in this section: Audiences

| Basics — |
|---|
| About detailed targeting |
| About location targeting |
| About shared audiences |

Set Up +

Create +

| Manage + |
|---|

| Specifications + |
|---|

| Troubleshoot + |
|---|

### Help chosen for you

**Some Messaging Metrics Unavailable**    →
Business Help Center

**Why is My Boost Unavailable?**    →
Business Help Center

**Troubleshoot a Disabled Ad Account**    →
Business Help Center

**How Ad Billing Works on Facebook**    →
Business Help Center

⊕

Feedback

---

# Get the latest updates from Meta for Business.

Provide your email address to receive the latest updates

Email

Enter a country name...

By submitting this form, you agree to receive marketing related electronic communications from Meta, including news, events, updates and promotional emails. You may withdraw your consent and unsubscribe from these at any time, for example, by clicking the unsubscribe link included on our emails. For more information about how Meta handles your data please read our Data Policy.

from Meta for Business, including news, events and product updates.

**Subscribe**

### Meta Technologies

Facebook

Instagram

Messenger

WhatsApp

Audience Network

Meta Quest

Workplace

Meta for Work

### Tools

Free Tools

Facebook Pages

Instagram Profiles

Stories

Shops

Meta Business Suite

Facebook Ads

Messenger Ads

Instagram Ads

Video Ads

Ads Manager

### Goals

Set Up a Facebook Page

Build Brand Awareness

Promote Your Local Business

Grow Online Sales

Promote Your App

Generate Leads

Measure and Optimize Ads

Retarget Existing Customers

View All Goals

### Business Types

Small Business

Large Business

Agency

Media and Publisher

Creator

Developer

Business Partner

### Industries

Automotive

Consumer Packaged Goods

Ecommerce

Entertainment and Media

Financial Services

Gaming

Real Estate

Restaurants

Retail

Technology and Telecom

Travel

### Inspiration

Campaign Guidance

Business News

Case Studies

Events

Creative Hub

### Skills and Training

Online Learning

Certification Programs

Webinars

### Guides and Resources

Ads Guide

Brand Safety and Suitability

Media Responsibility

Find a Business Partner

Sitemap

### Business Help Center

Create and Manage Accounts

Publish and Distribute Content

Advertise

Sell on Facebook and Instagram

Monetize Your Content or App

View All Articles



**Log in to Meta for Business**

Manage your ad accounts and get personalized support.

**Log in with Facebook**

**EXHIBIT 13**

HIGHLY CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF CALIFORNIA
3               SAN JOSE DIVISION
4                  ---oOo---
5
6
   IN RE META PIXEL TAX
7                              No. Master File No.
   FILING CASES                3:22-cv-07557-PCP
8
   This document relates
9   to:  All actions
   _____/
10
11
12
                   HIGHLY CONFIDENTIAL
13
       VIDEOTAPED DEPOSITION OF AMLESH JAYAKUMAR
14
           30(b)(6) Meta Platforms, Inc.
15
                  July 14, 2025
16
17
18
19
20
21
22
      Taken before EARLY K. LANGLEY, RMR, B.A. (PBK)
23
                  CSR No. 3537
24
               Job No. NE 7464368
25

HIGHLY CONFIDENTIAL

1        A.   In North America.

2        Q.   Okay.  Can you narrow it down a little

3   bit more?  Is he up in Bellevue, or is he down

4   here?

5        A.   I'm not certain, but my personal

6   ███████████████████████████████████████████████

7   but I'm not certain.

8        Q.   Did you review any documents to prepare

9   for this deposition?

10        A.   Yes.

11        Q.   Why did you review documents?

12        A.   To help me prepare for the case so that

13   I may be able to testify to the best of my

14   abilities.

15        Q.   Okay.  Did any of them refresh your

16   recollection about anything?

17        A.   No.

18        Q.   How long have you known Mr. Wooldridge?

19        A.   For about nine to ten years.

20        Q.   And in your assessment, is it your view

21   Mr. Wooldridge is generally an honest person?

22           MS. HAUSKNECHT:  Object to form.  Outside

23   the scope.

24           THE WITNESS:  Yes.

25   BY MR. SMITH:

HIGHLY CONFIDENTIAL

```
                                              Page 20

 1        Q.   Is it your assessment of him that he is

 2   a competent person?

 3             MS. HAUSKNECHT:   Object to form.   Outside

 4   the scope.

 5             THE WITNESS:   Yes.

 6             MR. SMITH:   Those outside scope

 7   objections are preserved and unnecessary.   If you

 8   would like to avoid the appearance of coaching

 9   the witness, we can stipulate that they're

10   preserved without the need to raise them on the

11   record here.

12             MS. HAUSKNECHT:   I think we can discuss

13   at the first break, but I will preserve them as

14   we go for now.

15             THE REPORTER:   141.

16             (Plaintiff's Exhibit 141 was marked for

17             identification.)

18   BY MR. SMITH:

19        Q.   So you have Exhibit 141 in front of you.

20   I want to direct your attention to page 1,

21   paragraph 4 and more specifically the first two

22   sentences of paragraph 4.

23             Mr. Wooldridge states specifically (as

24   read):

25                  "When someone takes an action, a
```

HIGHLY CONFIDENTIAL

Page 21

1            developer chooses to track on their
2            website, like subscribing to email
3            updates, the Meta Pixel is triggered and
4            sends -- Meta certain data called an
5            'event.'  Meta attempts to match the
6            events it receives to Meta users.  Meta
7            cannot that much non-Meta users."
8            Do you see that?
9       A.   Yes.
10      Q.   Is that a true or false statement?
11      A.   It's true.
12      Q.   Does it remain true as of today,
13   July 14, 2025?
14      A.   Yes.
15      Q.   Does the Pixel do anything else apart
16   from sending Meta certain data when an event is
17   triggered?
18           MS. HAUSKNECHT:  Object to form.  Vague.
19           THE WITNESS:  As described here in the
20   sentence we just went through, it is -- this
21   remains to be the primary use case for the use of
22   a business tool.  That's the Meta Pixel.
23   BY MR. SMITH:
24      Q.   "Primary use case," you mean primary
25   function?

HIGHLY CONFIDENTIAL

1       A.   Correct.   Yes.

2       Q.   Understood.   Okay.

3            How does Meta attempt to match events

4  with Meta users?   I should say Facebook users.

5       A.   Meta attempts to match the Event Data to

6  ██████████████████████████████████████████████

█  ██████████████████████████████████████████

8  information parameters that developers may choose

9  to send or configure, alongside the Event Data

10  through their Pixel.

11       Q.   You used the term "customer information

12  parameters."

13            What did you mean by that?

14       A.   These are parameters or key value pairs

15  that the developer can choose to configure in

16  their Meta Pixel code or setup to be transmitted

17  alongside Events Data for the purpose of Meta's

18  attempt to match the event to a user.

19       Q.   Can you give me an example?

20       A.   Yes, a hashed email ID is an example.

21       Q.   Would a name be -- a first name be

22  another example?

23       A.   Yes.   A hashed first name is or can be

24  an example of a customer information parameter.

25       Q.   Apart from customer information

HIGHLY CONFIDENTIAL

1    parameters, are there any other -- is there any

2    other information that is used to match events

3    with Facebook users?

4         A.   Yes.

5         Q.   What other information?

6         A.   This could also include cookie

7    information that may be transmitted alongside

8    Events Data to Meta.

9         Q.   Can you explain in general layperson's

10   term how cookie information may be used to match

11   Event Data with a Facebook user?

12        A.   Certain cookies, the information of

13   which is transmitted alongside the Event Data

14   from the Meta Pixel when an event fires to Meta,

15   if the Meta Pixels can be configured to be done

16   so, and there are not circumstances that may lead

17   to this data not being sent to Meta, and that

18   information is used alongside possibly customer

19   information parameters, if configured by the

20   developer, in an attempt to match the Event Data

21   holistically to a Meta user.

22        Q.   You said "certain cookies," are any of

23   those cookies developed by Meta?

24             MS. HAUSKNECHT:  Object to form.  Vague.

25             THE WITNESS:  These cookies are defined

HIGHLY CONFIDENTIAL

Page 24

1    by Meta, but in certain instance can be set or

2    configured in -- under different contacts such as

3    a first-party or third-party contacts on the

4    browser.

5    BY MR. SMITH:

6         Q.   When you say first-party, is that a

7    reference to Meta?

8         A.   No.

9         Q.   Here's the question I should have asked:

10   What is the distinction between a first-party and

11   a third-party cookie that you just mentioned?

12        A.   A first-party cookie generally refers to

13   cookies that are set within the context of the

14   domain or the browser, the website, where an

15   action may take place.  Whereas, a third-party

16   cookie is set within the context of the -- set

17   within the context of a domain other than the

18   domain that the user may have visited in the

19   third-party sense.

20        Q.   Do IP addresses play any role in

21   matching events with Facebook users?

22        A.   The user's, or the client's IP address,

23   is an example of a customer information parameter

24   that can be sent in the way that I described it

25   earlier.

HIGHLY CONFIDENTIAL

Page 25

1        Q.   Did you say can be sent?

2        A.   Correct.

3        Q.   If it is sent, can it also be used or --

4    in any way to match events with Meta users?

5        A.   Yes.  The IP address, as with other

6    customer information parameters, are used in or

7    can be used in Meta's attempt to match Event Data

8    to a user.

9        Q.   Do device ID numbers play any role in

10   the matching process?

11       A.   Certain device identifiers similarly to

12   IP addresses I described, if configured to be

13   sent, can be used by Meta -- or may be used by

14   Meta in its attempts to match the Event Data to a

15   user.

16       Q.   You said certain ID device, that

17   suggests that some ID device numbers can play a

18   role and some can't.

19            Am I understanding the situation

20   correctly?

21       A.   Correct.

22       Q.   What circumstances dictate whether or

23   not device ID numbers can play a role in the

24   matching process?

25       A.   There were only certain formats of

HIGHLY CONFIDENTIAL

Page 26

1   device identifiers, such as IDFA or for an

2   Android devices, that, as described in our public

3   documentation, relating to customer information

4   parameters, can be sent as a device ID to be used

5   in the manner that I described earlier in Meta's

6   attempt to match the Event Data to a user.

7       Q.   Why does Meta try to match events with

8   Facebook users?

9       A.   Meta's attempt to match Event Data to

10  Meta users is to help with enabling certain

11  functionality of the business tool, including

12  measurement and analytics relating to the

13  business tool information that's configured to be

14  sent.

15      Q.   Does matching events with Facebook users

16  have any connection to advertising?

17      A.   Could you clarify what you mean by "any

18  connection" in this context?

19      Q.   Is there any relationship between

20  matching events with Facebook users and

21  advertising?  Is the matching process used for

22  advertising purposes at all?

23          MS. HAUSKNECHT:  Object to form.

24  Compound.

25          THE WITNESS:  The attempt to match Event

HIGHLY CONFIDENTIAL

Page 27

1    Data to a Meta user can be beneficial for

2    measuring and other function -- to make other

3    functionalities of ad campaigns better.

4    BY MR. SMITH:

5        Q.   So when I asked you before whether Meta

6    tries to -- correction.

7            When I asked you why Meta tries to match

8    events with Facebook users, the answer you gave

9    was that it helps enabling certain functionality

10   of the business tool, including measurement and

11   analytics.

12           When you were referring to measurement

13   and analytics, is that measurement and analytics

14   related solely to advertisement or are there

15   other forms of measurement in analytics that have

16   nothing to do with advertising.

17       A.   It can include purposes outside of

18   advertising as well.

19       Q.   What purposes outside of advertising?

20       A.   To provide general analytics about

21   the -- to the user of the business tool about

22   their website and potential website visitors.

23       Q.   So would general analytics include just,

24   for example, demographics of the type of people

25   who are visiting the website?

HIGHLY CONFIDENTIAL

Page 28

1      A.   No.   It rather includes -- an example
2   would be the -- how giving operational and
3   debugging support on how well the Pixel is set up
4   and metrics include -- relating to it, as well as
5   general accounts and other analytics relating to
6   the event data that is transmitted.
7      Q.   Does Meta have any other reasons for
8   matching events with Facebook users that you have
9   not already covered today?
10         MS. HAUSKNECHT:   Object to form.   Vague.
11         THE WITNESS:   Not beyond as I described
12   earlier enabling the functionality for the
13   business tools, which include the use cases I
14   described.
15  BY MR. SMITH:
16      Q.   Do you know if Meta has a list of
17   Facebook users?
18         MS. HAUSKNECHT:   Object to form.   Vague.
19         THE WITNESS:   Can you clarify what you
20   mean by "has a list" in this context of the
21   users?
22  BY MR. SMITH:
23      Q.   If someone at Meta woke up this morning
24   and decided they wanted to -- access to every
25   individual on the planet who has a Facebook

HIGHLY CONFIDENTIAL

Page 35

1    the scope.

2            THE WITNESS:  Again, in my personal

3    capacity as I described earlier, there are

4    multiple teams that may be impacted by such an

5    outage or such an issue as you had described it.

6    BY MR. SMITH:

7        Q.  I understood that.  That was your answer

8    initially so my follow-up question is if you

9    could describe to me which teams come to mind

10   first.

11           MS. HAUSKNECHT:  Object to form.  Scope.

12           THE WITNESS:  Again, in my personal

13   capacity, the Signals and potentially targeting

14   teams are examples of teams that may be impacted.

15   Again, it would depend on the -- on several

16   factors, including the nature of such an issue

17   and its impact.

18   BY MR. SMITH:

19       Q.  You said Signals and the other one was

20   ads?

21       A.  Targeting.

22       Q.  Ads targeting?

23       A.  Yes.

24       Q.  Is there a third department that would

25   be likely to be involved in correcting any

HIGHLY CONFIDENTIAL

Page 36

1   problems with matching Event Data with Facebook

2   users?

3          MS. HAUSKNECHT:  Object to form.  Scope.

4          THE WITNESS:  Again, in my personal

5   capacity, not that I can think of.

6   BY MR. SMITH:

7       Q.  Meta allows advertisers to send

8   information that personally identifies

9   individuals; is that correct?

10      A.  As part of the Meta Pixel functionality

11  developers may configure parameters, as I

12  described, the customer information parameters,

13  that include PII or personally identifiable

14  information that can be used in Meta's attempt to

15  match this event data to a user.

16      Q.  So the short answer to my question

17  was -- would be "yes"?

18          MS. HAUSKNECHT:  Object to form.

19  Misstates testimony.  Argumentative.

20          THE WITNESS:  Could you repeat your

21  question as it was originally stated, please?

22  BY MR. SMITH:

23      Q.  "Meta allows advertisers to send

24  information that personally identifies

25  individuals; is that correct?"

HIGHLY CONFIDENTIAL

Page 37

1        A.   I would not frame it in the manner it's

2   been described.  Specifically, it's the

3   developer, the users of the business tools that

4   are permitted this functionality, and they may be

5   able to configure PII or personally identifiable

6   information.  Meta then attempts to use this

7   information to match the Event Data to a Meta

8   user.

9            MR. SMITH:  142.

10           (Plaintiff's Exhibit 142 was marked for

11           identification.)

12   BY MR. SMITH:

13       Q.   You have been handed a one-page document

14   that's been marked Exhibit 142.

15           Have you seen this document before?

16       A.   Not specifically, but it appears to be

17   an article or a page from Meta's externally

18   provided help center articles relating to PII.

19       Q.   So you'll note the second paragraph from

20   the top says, I'm quoting (as read):

21               "Meta allows advertisers to send

22           information that personally identifies

23           individuals," and then it has "(contact

24           information)".

25           Do you see that?

HIGHLY CONFIDENTIAL

Page 38

1      A.   Yes.

2      Q.   Is that a true or a false statement?

3      A.   As I testified earlier I would not frame

4  it in this manner, specifically it's not

5  pertain -- just to advertisers but rather the

6  users of our business tools.  And it's

7  particularly the information that's described as

8  personally identifying an individual is one that

9  can be configured to be sent by the business

10  tool.

11          But, generally, I -- it is truthful.

12      Q.   Do I understand correctly the

13  information like email, first name, last name is

14  supposed to be sent in a hashed format?

15      A.   Yes.

16      Q.   Is there a particular methodology for

17  hashing that should be used?

18      A.   Yes.

19      Q.   What methodology is that?

20      A.   The SHA256 is the hashing algorithm that

21  Meta recommends.

22      Q.   How, if at all, can Meta use the

23  information if it's hashed?

24      A.   The hashed, as described, contact

25  information are examples of email and first name.

HIGHLY CONFIDENTIAL

1    It is used to attempt to match the Event Data to

2    a user as I described as part of the

3    identity-matching process.

4         The information does not require to be

5    sent in a plain text format largely due to

6    privacy considerations as well, and the hash

7    value is sufficient in enabling Meta's attempt to

8    match the Event Data to -- to a Meta user.

9         Q.   Can the information be unhashed?

10        A.   The nature of such hashing algorithms,

11   particularly SHA256, is such that it is

12   prohibitively hard to reverse or unhash, as you

13   described it, the original information that was

14   hashed.

15        Q.   If you wanted to unhash something that

16   had been hashed with the SHA256 methodology what

17   would you do?

18        A.   It is not technically feasible within

19   reason, or within currently known reason limits

20   that exist with computation and other

21   infrastructure requirements to be able to do

22   that.

23        Q.   Do you know when Meta first started

24   trying to match events with Facebook?

25        A.   By "events," just to clarify, you mean

HIGHLY CONFIDENTIAL

Page 40

1    Event Data from the Meta Pixel?

2        Q.   Correct.   Thank you for the

3    clarification.

4        A.   Being a key part in enabling the

5    business tools functionality and in the use case

6    I have described earlier, it was part of the Meta

7    Pixel's functionality since its original launch.

8        Q.   And when was it originally launched, the

9    Pixel, I mean?

10       A.   The Meta Pixel was originally launched

11   publicly, as I recall, around 2016.

12       Q.   Meta provides the Pixel for free; is

13   that correct?

14       A.   Yes.

15       Q.   Why doesn't Meta charge for the Pixel?

16           MS. HAUSKNECHT:   Object to form.   Vague.

17   Outside the scope.

18           THE WITNESS:   Generally similar analytics

19   tools that are provided to website developers

20   aren't charged or -- in this manner.

21   BY MR. SMITH:

22       Q.   What does Meta have to gain by giving

23   away the Pixel for free?

24           MS. HAUSKNECHT:   Object to form.   Outside

25   the scope.

HIGHLY CONFIDENTIAL

Page 41

1          THE WITNESS:  Again, the Meta Pixel is

2    part of the -- or the business tools in general

3    are tools that are provided to developers to help

4    improve their products and provide analytics,

5    which can then be used optionally for running ads

6    or ad campaigns on Meta's business products, the

7    tool suite that we offer.

8    BY MR. SMITH:

9          Q.  I think that answers the question about

10   what the website developers stand to gain from

11   the Pixel.

12          But the real question is:  What does

13   Meta have to gain by it?

14          MS. HAUSKNECHT:  Objection to form.

15   Outside the scope.  Asked and answered.

16          THE WITNESS:  Again, as I described,

17   generally -- generally similar analytics tools

18   that are provided by companies are free to help

19   developers and businesses to, in a more informed

20   manner, build better website experiences.

21          Again in my personal capacity, I am not

22   certain, nor was privy to, decisions relating to

23   the business tools and ads products in general

24   that were launched during that time.

25   BY MR. SMITH:

HIGHLY CONFIDENTIAL

Page 42

1          Q.  So Meta provides Pixel for completely

2     altruistic reasons, has nothing to gain from the

3     Pixel?

4               MS. HAUSKNECHT:  Object to form.

5     Argumentative.  Outside the scope.

6               THE WITNESS:  Again, as I described, it's

7     similar to other analytics tools that are

8     provided outside of Meta as well.  These tools

9     can be used by developers and businesses to

10    improve their website experiences and better

11    reach out to users of their services or products

12    that may find it relevant.

13              It can also be used for advertising and

14    to run ad campaigns on Meta, but that is not a

15    necessary requirement for using the business

16    tools which is provided by Meta for free.

17              MS. HAUSKNECHT:  Joel, we have been going

18    for about an hour now.  I just wanted to flag for

19    you if you have a good place to stop for a break.

20              MR. SMITH:  Yeah.  Let me just finish up

21    with this line of questioning, and we'll take a

22    break.

23    BY MR. SMITH:

24         Q.  Does Event Data get used for billing

25    purposes?

HIGHLY CONFIDENTIAL

Page 43

```
 1        A.   Can you say that last word again?   I
 2   missed.
 3        Q.   "For billing purposes."
 4             MS. HAUSKNECHT:   Object to form.   Vague.
 5             THE WITNESS:   Can you clarify what you
 6   mean by "billing" in this instance, "for billing
 7   purposes"?
 8   BY MR. SMITH:
 9        Q.   For purposes of Meta billing website
10   developers for any services that Meta may be
11   providing.
12             MS. HAUSKNECHT:   Object to form.   Vague.
13             THE WITNESS:   No.   If the developers have
14   ad campaigns that they're running and as part of
15   that ad, an ad account, or other billing
16   information associated with the running of
17   campaigns, Meta may bill the -- the developer,
18   the advertiser in question, for the campaigns
19   that they run and set up.
20   BY MR. SMITH:
21        Q.   Does Event Data get used for either AI
22   or machine learning purposes?
23        ██   ██████████████████████████████████████
██   █████████████████████████████████████████████████
25   ████████████████████████████████████████████████████
```

HIGHLY CONFIDENTIAL

Page 44

1 ██████████████████████████████████

2 ████████████

3     Q.  Does Event Data get used in connection

4 with Meta's ad ranking system?

5     A.  ████████████████████████████

6 ████████████████

7     Q.  Is that system called "Meta Lattice,"

8 L-a-t-t-i-c-e?

9         MS. HAUSKNECHT:  Outside to form.

10 Outside scope.

11         THE WITNESS:  Not that I am aware of, no.

12 BY MR. SMITH:

13     Q.  Are you familiar with the term called

14 "advertising measurement," as that term is used

15 within Meta?

16     A.  I'm generally familiar with measurement

17 within the context of advertising as it may be

18 used, yes.

19     Q.  What does that terminology mean to you

20 in sort of layperson's terms?

21     A.  Advertising measurement or measurement

22 within the advertising context could represent

23 the ability for Meta to be able to help measure

24 the efficacy or the effectiveness of on ad

25 campaign that marketers may have run on a product

HIGHLY CONFIDENTIAL

Page 45

1   suite.

2       Q.   Does Event Data get used for advertising

3   measurement?

4       A.   Yes.

5       Q.   How so?

6       A.   An ad campaign, if configured in a

7   manner to be connected with a Meta Pixel or

8   business tool, can report back the potential

9   number of certain actions or events that have --

10  that have been driven by the campaign in

11  question.

12          Again, this requires the developer, the

13  use of the business tool to configure the Meta

14  Pixel as well as the ad campaigns in a manner

15  that enables this.

16          MR. SMITH:   I'm happy to take a break

17  now.

18          MS. HAUSKNECHT:   Sounds good.

19          THE VIDEOGRAPHER:   This marks the end of

20  Media Number 1 in the deposition of Amlesh

21  Jayakumar.   The time is 11:12 a.m.   We are off

22  the record.

23              (Recess taken.)

24          THE VIDEOGRAPHER:   This marks the

25  beginning of Media Number 2 in the deposition of

HIGHLY CONFIDENTIAL

Page 46

1    Amlesh Jayakumar.  The time is 11:31 a.m.  We are
2    on the record.
3    BY MR. SMITH:
4        Q.  Does the term "restricted verticals"
5    mean anything to you?
6        A.  Depending on the context, it could refer
7    to some of the policies relating to Events Data
8    and restrictions that are in place to certain
9    sensitive or restricted verticals of businesses.
10       Q.  I've also seen the term "sensitive
11   verticals."  Is that synonymous with restricted
12   verticals or something different?
13       A.  Again, it would depend on the context.
14   The example I described in my previous response
15   whereby as it relates to the policies that can be
16   applied to Events Data, at times they are used
17   synonymously.
18       Q.  Is the term restricted verticals
19   sometimes used to describe a particular category
20   of advertiser?
21       A.  As it pertains to the business tools, it
22   largely is used to describe certain categories of
23   businesses or websites.
24       Q.  Okay.  Would H&R Block follow under the
25   category of a restricted vertical?

HIGHLY CONFIDENTIAL

1      A.   Again, as it pertains to the context of

2    the Meta Business Tools and policies that we have

3    ██████████████████    ████████████████████████

     ████████████████████████████████████████████████

     ██████████████████████████████████████████

6      Q.   Same for TaxAct and TaxSlayer?

7        ████  ██████  ████████████████████████████

     ████████████████████████████████████

9         MR. SMITH:   This will be 143.   This will

10   be 144.

11        MS. HAUSKNECHT:   Is this 143 that you

12   just handed me?

13        MR. SMITH:   143 is actually this one.

14   The big one is 144.

15        (Plaintiff's Exhibit 143 was marked for

16        identification.)

17        (Plaintiff's Exhibit 144 was marked for

18        identification.)

19   BY MR. SMITH:

20     Q.   Have you seen before today the documents

21   that have been marked as Exhibits 143 and 144?

22     A.   Yes.

23     Q.   All right.   I want to focus your

24   attention for the moment more on the smaller

25   document, 143, Exhibit 143, I mean.

HIGHLY CONFIDENTIAL

Page 48

1          And I want to direct your attention to
2    the third page, and there's a fairly lengthy
3    paragraph that starts on line 4 and ends on
4    line 17.
5          Do you see that?
6      A.   Yes.
7      Q.   Line 7 of page 3 of Exhibit 143
8    describes a list of Event Data and parameters.
9    And that list goes from roughly -- well, actually
10   line 6 through roughly line 12.
11         Do you see that?
12     A.   Yes.
13     Q.   How did Meta learn about the information
14   that's disclosed on page 3 of Exhibit 143?
15         MS. HAUSKNECHT:  Object to form.  Vague.
16         THE WITNESS:  Just to clarify, by how
17   does Meta -- how has Meta learned, are you
18   describing the admission as it's mentioned in
19   line 5 onwards with respect to the event and the
20   parameters listed here?
21   BY MR. SMITH:
22     Q.   Yeah.  How did it know what parameters
23   and events to list in its response there?
24     A.   In the ordinary course of business,
25   Event Data that is received or transmitted and

HIGHLY CONFIDENTIAL

Page 49

1   then subsequently received by Meta from Meta

2   Pixels are primarily stored in certain off line

3   persistent storage systems that can be used in

4   determining potential Event Data that may have

5   been sent and then subsequently received by Meta

6   for certain Pixels.

7       Q.   And when you say "offline persistent

8   storage system," are you referring to HIVE?

9       A.   Yes.

10      Q.   Was the data found on a particular HIVE

11  table?

12  ███ ██████████████████████████

    ████████████████████████████

    ████████████        ████████████

    ██████████████████████████

    ██████████████████████████

    ████████████████████████

    ███████████████████████████

    ████████████████████████████

    ██████████

21      Q.   What are the names of the HIVE tables

22  where the information disclosed on page 3 were

23  obtained?

24      A.   The HIVE tables could -- relating to the

25  ████████████████████████████

1 ███████████████████████████████████████

2 ██ ████████████████ .

3     Q.   Okay.   So your answer was "could

4 include."   I'm asking which did include.   I'm

5 asking you to definitively tell me which of the

6 HIVE tables that had this information.

7     ██  █████████████████████████████

8 ██ ███████████████████████████████████

9 ██ █████████████████████████████████████

10 ██ ████████████████████████████████

11 include events data associated with -- with this.

12     Q.   Now you say "in totality."   Is that

13 because some parameters and events were disclosed

14 ██████████████████████████████████████

15 ██ ███████████████████████████████

16 ██     ██  ████████████

17     Q.   Was there a particular column you had to

18 look at to find this information?

19     A.   Yes.

20     Q.   Which column?

21     A.   It would be the columns associated with

22 the events data or parameters in question,

23 ██████████████████████████████████████

24 ██ ██████████████████████████████████

25 to the relevant Pixel IDs, the date and time

1 █████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

████████████████████████████

6     Q. ██████████████████████████████

7 that actually disclosed specific parameters or

8 values for the parameters, for instance,

9 state_revenue?

10     A. ████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

    ███ █████████████████████████████████

███████████████████████████████████████

16 extent they're available for state_revenue?

17         MS. HAUSKNECHT: Object to form. Asked

18 and answered. Outside the scope.

19     ████████████████ ████ █████████████████

███████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████

██████████████████████████████████.

24 BY MR. SMITH:

25     Q. And you say it's the "primary column."

HIGHLY CONFIDENTIAL

Page 52

1  ███████████████████████████████

███████████████████████████████

███████████

4        MS. HAUSKNECHT:  Objection.  Outside the

5  scope.

6        ████████████    ████████████

██████████████████████████████████

████████████████████████████████████

██████████████████████████████████

███████  ██████████████████████

█████████████████████████████████

███████████████████████████████

███████████████████

      ███████████████████████████

██████████████████████████████████

███████████  ████████████████████

██████████████████████████████████

18  BY MR. SMITH:

19        ████  ████████████████████████

██████████████████████████████████████

███████████████████

22        A.  I can't recall specifically.

23        Q.  So turning your attention back to page 3

24  of Exhibit 143, would the parameter for

25  state_revenue have been sent in connection with a

HIGHLY CONFIDENTIAL

Page 53

1  custom event?

2          MS. HAUSKNECHT:  Outside the scope.

3          THE WITNESS:  I can't.  Just looking at

4  this information that would be speculative on my

5  part with respect to what event the parameter in

6  question may be transmitted.

7  BY MR. SMITH:

8      Q.  Are you aware of any information

9  suggesting that SubscribedButtonClick event may

10  have some relationship or connection with the

11  transmission of state_revenue?

12          MS. HAUSKNECHT:  Outside the scope.

13          THE WITNESS:  No, as I described earlier,

14  that would be speculative on my part.  But

15  generally, the onus is on the user of the

16  business tool or the developer that is

17  configuring the Meta Pixel code and the Event

18  Data to set up the parameters of the events that

19  are required in a manner adhering to our terms of

20  service.

21          Meta doesn't and cannot interpret

22  specific names of parameters as being tied to a

23  particular action or have any specific meaning

24  beyond that.

25  BY MR. SMITH:

HIGHLY CONFIDENTIAL

Page 54

1          Q.  Is the onus entirely on website

2     developers to avoid transmission of sensitive

3     information to Meta?

4              MS. HAUSKNECHT:  Object to form.  Outside

5     the scope.

6              THE WITNESS:  In accepting the terms of

7     service associated with the Meta Pixel and

8     business tools in general, the users of the

9     business tools have agreed to the terms including

10    what you described.  Not sending potentially

11    sensitive information, including other

12    requirements, per applicable local law and

13    regulation.

14    BY MR. SMITH:

15         Q.  Are you aware of any information

16    suggesting that the term state_revenue is

17    anything other than what it suggests?

18              MS. HAUSKNECHT:  Object to form.  Vague.

19              THE WITNESS:  Again, as I testified

20    earlier, Meta doesn't and cannot interpret

21    specific names of parameters, such as

22    state_revenue to mean anything in particular.

23    The onus is on the developer who is setting the

24    Event Data.  It would be speculative on my part.

25    BY MR. SMITH:

HIGHLY CONFIDENTIAL

Page 55

1          Q.   And I take it Meta has not made any

2     effort to determine what the term "state_revenue"

3     refers to?

4          A.   In addition -- sorry.   In addition to

5     the acceptance of the terms of service as I

6     described earlier, Meta does take other sort of

7     proactive measures to detect and filter out

8     potentially sensitive information that may be

9     sent.

10          But that does not include, and we cannot

11     ████████████████████████████████████████████

       ████████████████████████████████████████████

       ██████████████████████████████████████████

       ████████████████

15          Q.   Why not?

16          A.   I can't speak on the developers or user

17     business tools' behalf, but the Event Data that's

18     transmitted can mean multiple things, and it is

19     hard and Meta -- it is hard to do so.   Meta

20     cannot and doesn't interpret specific names of

21     parameters beyond certain publicly documented

22     Standard Events and parameters that we have

23     provided.

24          Q.   So the transmission of information

25     labeled state_revenue would raise no red flags

HIGHLY CONFIDENTIAL

Page 56

1    for Meta?

2            MS. HAUSKNECHT:  Object to form.

3    Misstates testimony.

4            THE WITNESS:  Again, Meta does take steps

5    beyond the onus that is on the user of the

6    business tools to adhere to our terms of service

7    to detect and filter out potentially sensitive

8    information.  Some of these steps may lead to the

9    Event Data not even being transmitted to Meta or

10   ████████████████████████████████████████████████

11   █  ████████████████████████████

12   BY MR. SMITH:

13       Q.  Did Meta ever ask TaxAct what the

14   term "state_revenue" signifies?

15       A.  Not that I am aware, no.

16       Q.  Has Meta asked TaxAct to explain what

17   any of the other terms that are listed on page 3

18   of Exhibit 143 mean?

19           MS. HAUSKNECHT:  Outside the scope.

20           THE WITNESS:  Some of the fields listed

21   in the document page sheet that we are looking at

22   are names of columns that related to standard

23   fields, such as Event Names or

24   referred_document_link that we have an

25   understanding of what that field represents by

HIGHLY CONFIDENTIAL

Page 57

1    virtue of how it's documented externally.

2            But this isn't the case for all fields as

3    you have described, for example, state_revenue,

4    whereby the onus is on the developer as they're

5    setting up the Event Data for their business

6    tool.

7    BY MR. SMITH:

8        Q.   So Meta has an understanding of what

9    terms like event name means but has no idea what

10   state_revenue, number of dependents, number of

11   child buttons, return year, tax form, has no idea

12   of what any of that stuff means?

13           MS. HAUSKNECHT:  Object to form.  Asked

14   and answered.  Outside the scope.

15   Mischaracterizes testimony.

16           THE WITNESS:  As I mentioned earlier,

17   some of the fields, such as Event Name, are --

18   represent the -- that -- Meta has an

19   understanding of what it should represent, such

20   as the name of the event that's configured to be

21   sent along the Event Data.  By definition, Meta

22   understands what those fields represent.

23           However, even in the case of fields such

24   as Event Name, Meta cannot and doesn't further

25   interpret what the name of that event, particular

HIGHLY CONFIDENTIAL

Page 65

1   discretion of the developer on how Event Data is

2   transmitted.

3           Once configured, there may be various

4   reasons that could lead to this data not even

5   being sent to Meta or even subsequently used in

6   our ad systems.

7   BY MR. SMITH:

8       Q.  Would your answer differ at all for the

9   years 2023, 2024, or 2025, or would it be

10  essentially the same answer you provided?

11          MS. HAUSKNECHT:  Objection.  Outside the

12  scope misstates prior testimony.  Calls for

13  speculation.

14          THE WITNESS:  My response would be --

15  would be the same.

16  BY MR. SMITH:

17      Q.  How did H&R Block customize the Meta

18  Pixel?

19          MS. HAUSKNECHT:  Object to form.  Calls

20  for speculation.

21          THE WITNESS:  I cannot speak on behalf of

22  the developers that have configured the explicit

23  Meta Pixel for H&R Block.  But I can speak to the

24  kind of general process of the setup of a Meta

25  Pixel and what the steps include.

HIGHLY CONFIDENTIAL

Page 66

1    BY MR. SMITH:

2        Q.    Has Meta at any time conducted any

3    investigation into how H&R Block customized its

4    Pixels specifically?

5            MS. HAUSKNECHT:    Object to form.    Vague.

6            THE WITNESS:    Generally, in the ordinary

7    course of business, there are processes in place

8    to help in responding to and helping debug issues

9    relating to the Meta Pixel for users that exist

10   that could lead to debugging or looking at

11   certain setups of Pixels with the goal of being

12   able to help resolve an issue that may have come

13   up.

14           Sitting here today, I'm not sure whether

15   specifically H&R Block was subject to such

16   debugging as I described it.

17   BY MR. SMITH:

18       Q.    Are you familiar with the website called

19   "MarkUp"?

20       A.    Yes.

21       Q.    You're aware at some point the Markup

22   published an article alleging that H&R Block,

23   among other tax websites, were transmitting

24   sensitive tax information to Meta.

25           Is that news to you, or have you heard

HIGHLY CONFIDENTIAL

Page 67

1    that before today?

2            MS. HAUSKNECHT:  I'm going to object on

3    privilege grounds.

4            You can answer to the extent it doesn't

5    reflect information that you received or involved

6    counsel.

7            THE WITNESS:  I am familiar with articles

8    that you speak of.

9    BY MR. SMITH:

10       Q.  When that article came out, did Meta

11   conduct any investigation into how H&R Block

12   configured its Pixel?

13           MS. HAUSKNECHT:  Object on privilege

14   grounds.

15           Again, you can answer to the extent it

16   doesn't reflect conversations you had with

17   counsel.

18           THE WITNESS:  I'm not familiar with such

19   investigations to which you speak, no.

20   BY MR. SMITH:

21       Q.  Same answers for TaxAct and TaxSlayer?

22           MS. HAUSKNECHT:  Objection on privilege

23   grounds.

24           Same instruction.

25           THE WITNESS:  Yes.

HIGHLY CONFIDENTIAL

Page 68

1    BY MR. SMITH:

2        Q.  So I take it no one from Meta ever

3    called up someone from H&R Block and asked them

4    if they had done anything with the Pixel that may

5    have resulted in the transmission of sensitive

6    information?

7        A.  Generally for certain advertisers or

8    businesses that use Meta Business Tools, they may

9    have some support from our sales functions whose

10   job descriptions include informing users of our

11   business tools, or other products, of their

12   responsibility and helping with any issues they

13   may face that can apply overall to all of the

14   users of our business tools.

15            The -- such conversations that you

16   described may have occurred with H&R Block and

17   TaxAct, possibly TaxSlayer, but I'm not --

18   sitting here today, I'm not aware of very

19   specific communications.

20       Q.  Are you aware there was a Senate

21   investigation into the subject of whether or not

22   various tax filing websites had been transmitting

23   tax filing information to Meta?

24            MS. HAUSKNECHT:  Objection.  Outside the

25   scope.

HIGHLY CONFIDENTIAL

Page 69

1           THE WITNESS:  No, not specifically.
2    BY MR. SMITH:
3       Q.  So you are unaware of any efforts Meta
4    may have taken to understand what may have caused
5    TaxAct to transmit tax filing information to
6    Meta --
7           MS. HAUSKNECHT:  Objection --
8    BY MR. SMITH:
9       Q.  -- in connection with the Senate
10   investigation?
11          MS. HAUSKNECHT:  Objection.  Outside the
12   scope.  Misstates prior testimony.  Lack of
13   foundation.
14          THE WITNESS:  I'm not familiar with the
15   Senate investigation to which you're referring
16   to.
17          Beyond what I described about certain
18   sales functions or sales counterparts reaching
19   out to businesses, which may have included TaxAct
20   or H&R Block, I'm not familiar with specific
21   investigations, no.
22   BY MR. SMITH:
23      Q.  And one may have occurred, one may not,
24   you just don't know either way?
25          MS. HAUSKNECHT:  Objection.  Misstates

HIGHLY CONFIDENTIAL

Page 70

 1   testimony.

 2          THE WITNESS:  As I described, these

 3   investigations generally, in the ordinary course

 4   of business -- in the ordinary course of business

 5   can occur on multiple fronts by sales or by the

 6   tech -- technical team in helping debug or

 7   helping resolve an issue that clients may face or

 8   users in the business tools may face, which may

 9   have included the TaxAct or H&R Block that you

10   mentioned.  But I'm not aware beyond this of any

11   specific instances of such, no.

12   BY MR. SMITH:

13      Q.  Did Meta determine whether TaxAct had

14   violated Meta's terms and policies by sending

15   sensitive information it was not supposed to have

16   sent?

17          MS. HAUSKNECHT:  Objection.  Outside the

18   scope.

19          Also, I'll give you a privilege

20   instruction again.

21          THE WITNESS:  No, not specifically.

22   Generally we'd expect the users of our business

23   tools, having accepted our terms of service, to

24   adhere to those terms which includes not sending

25   potentially sensitive information.

HIGHLY CONFIDENTIAL

Page 71

```
 1            And in addition to that, Meta does have
 2    systems, as I described earlier, to detect and
 3    filter the sensitive information from business
 4    tools.  But I'm not aware of specific
 5    communications that you had described.
 6    BY MR. SMITH:
 7        Q.  Did Meta ever tell TaxSlayer that it had
 8    violated Meta's terms and policies by sending
 9    sensitive tax filing information?
10            MS. HAUSKNECHT:  Object to form.  Asked
11    and answered.  Outside the scope.
12            THE WITNESS:  I have the same response
13    for TaxSlayer as I've had for TaxAct in the
14    previous question.
15    BY MR. SMITH:
16        Q.  Same for H&R Block as well?
17            MS. HAUSKNECHT:  Object to form.  Outside
18    the scope.
19            THE WITNESS:  Yes.
20    BY MR. SMITH:
21        Q.  You've worked for Meta for 11 years?
22        A.  Yes.
23        Q.  Are you aware of any website being
24    barred from using the Meta Pixel for sending
25    sensitive data to Meta?
```

HIGHLY CONFIDENTIAL

Page 72

1           MS. HAUSKNECHT:  Objection.  Outside the

2    scope.

3           THE WITNESS:  Meta has various security

4    and privacy policies that may prevent certain

5    types of websites, such as porn sites, from using

6    our Meta Business Tools altogether.

7    BY MR. SMITH:

8        Q.   Okay.  Are you aware of any company

9    being barred from using the Meta Pixel for

10   sending sensitive financial data to Meta?

11          MS. HAUSKNECHT:  Objection.  Outside the

12   scope.

13          THE WITNESS:  Again, as I described, we

14   have policies in place in addition to the terms

15   of service throughout the business tools that

16   describe and prevent and disallow the sending of

17   potentially sensitive information.

18          Whereas, Meta also takes steps in

19   identifying, detecting, and filtering out this

20   potentially sensitive information, which could

21   lead to the Event Data from certain business to

22   be filtered prior to being sent to Meta.  I'm not

23   aware of specific instances for particular

24   financial institutions being barred in the manner

25   as you have described.

HIGHLY CONFIDENTIAL

Page 73

1   BY MR. SMITH:

2        Q.   So the short answer to my last question

3   is no; is that correct?

4            MS. HAUSKNECHT:   Objection.   Misstates

5   the testimony.   Outside the scope.

6            THE WITNESS:   What I had described --

7   what I previously testified, there may be

8   circumstances that lead to Event Data being

9   completely filtered out for certain types of

10  businesses, but which may have a similar effect.

11  But I'm not aware of instances of particular

12  financial businesses or institutions in the

13  manner that you described as being barred.

14  BY MR. SMITH:

15       Q.   What is Automatic Advanced Matching?

16       A.   Firstly, advanced matching in general is

17  the ability for developers to transmit or send,

18  set up customer information parameters, as I

19  described earlier, along side Event Data for the

20  purposes of enabling -- for purposes of identity

21  matching.

22           Automatic Advanced Matching is a tool

23  whereby the developer can configure their Pixel

24  to -- if opted in, to automatically identify

25  potential customer information parameters that

HIGHLY CONFIDENTIAL

Page 74

1    they have described for the same purposes.

2        Q.   Does Automatic Advance Matching tell a

3    Pixel to send recognizable form fields to Meta?

4        A.   If -- if the Pixel is configured to be

5    by the developer to enable Automatic Advance

6    Matching for the specific fields that the

7    developer has enabled, yes, what you have

8    described is the functionality of Automatic

9    Advance Matching works.

10       Q.   Sending recognizable form fields to Meta

11   can potentially violate Meta's terms; is that

12   correct?

13           MS. HAUSKNECHT:   Object to form.

14   Misstates the testimony.

15           THE WITNESS:   To clarify my previous

16   answer, for the functionality of Automatic

17   Advance Matching, if opted in to be use for the

18   record specific fields that the developer has

19   selected, sets the Pixel up to transmit customer

20   information parameters that have been configured

21   by the developer to be transmitted in a hashed

22   format.  This is done via form fields as you have

23   described.

24           The -- generally transmission of Event

25   Data in a manner that's in violation of our terms

HIGHLY CONFIDENTIAL

Page 75

1    of service, such as not -- as an example being,

2    not sending a customer information parameter in a

3    hashed format, can violate our terms, yes.

4         Q.  Do you know a gentleman by the name of

5    Max Nelson?

6         A.  No.

7         Q.  How about Gunjan Paliwal, last name

8    spelled P-a-l-i-w-a-l?

9         A.  Yes.

10        Q.  Do you work with this individual?

11        A.  I have worked with Gunjan in the past,

12   yes.

13        Q.  Regularly or only occasionally?

14        A.  Occasionally as it pertains to her --

15   her job function and certain specific areas, yes.

16        Q.  Any concerns about this person's

17   competence that you have?

18             MS. HAUSKNECHT:  Object to form.  Outside

19   the scope.

20             THE WITNESS:  I can't speak to her

21   competence overall in general.  But from my

22   interactions with her, no.

23   BY MR. SMITH:

24        Q.  Based on your interactions with her, do

25   you have any concerns about her honesty?

HIGHLY CONFIDENTIAL

Page 91

1          MS. HAUSKNECHT:  Yes.  This is an
2     objection to your representation that this
3     accurately reflects the data that was produced in
4     this matter.
5     BY MR. SMITH:
6          Q.  Now, I think earlier in your testimony
7     ███████████████████████████████████████████████.
8          Do you recall that?
9          A.  Yes.
10         Q.  So I want to direct your attention to
11    Exhibit 146, page 2.  You will see the third
12    column from the left has a notation,
13    ████████████████████████
14         Do you see that?
15         A.  Yes.
16         Q.  And is the data that's shown below in
17    the rows below that column, does that contain
18    custom data sent by the Pixel?
19         MS. HAUSKNECHT:  Object to form.  Vague.
20         THE WITNESS:  The values represented in
21    ████████████████████████████████████████████████
22    key value pairs that's transmitted as Event Data
23    from the Pixel in a JSON -- stored in a JSON
24    format.
25    BY MR. SMITH:

HIGHLY CONFIDENTIAL

1    ████████████████████████████████████

2        Q.  So does that mean there may be

3    circumstances where you're trying to match an

4    event with a Meta -- with a Facebook user, but

5    Meta, for whatever reason, may not be certain of

6    what the match is so you may have more than one

7    person who is a potential match?

8            Is that another way of putting it, or am

9    I off base there?

10           MS. HAUSKNECHT:  Object to form.

11   Incomplete hypothetical.

12           THE WITNESS:  The identity-matching

13   process as you described is an attempt on Meta's

14   behalf, as we can never be certain of the actual

15   user associated with the Event Data that was

16   ███████████████    ██████████████████████████

██   ████████████████████████████████████████████

██   ███████████████████████████████████████████

██   ██████████████████

20   BY MR. SMITH:

21       Q.  I see.  And why is the information

22   ████████████

23       A.  You're referring to the

24   ███████████████████████████████

25       Q.  Yeah.  Thank you for the clarification.

HIGHLY CONFIDENTIAL

Page 101

1        A.    ████████████████████████████

    ████████████████████████████████████

    ███████████████████████████████

    ████████████████████████████████

    ███████████████

6        Q.    Okay.  And so the data that may appear

7    in connection or in the

8    ██████████████████████████████████

9    used for advertising?

10            MS. HAUSKNECHT:  Object to form.  Vague.

11    █████████████████    ██████████████████

    ████████████████████████████████████████

    █████████████████████████████████████

    ████████████████████████████████████

    ███████████████████████████████

    ████████████████████.

17    BY MR. SMITH:

18        Q.    Is the data generated for the

19    ████████████████████████████████████

20    research purposes?

21            MS. HAUSKNECHT:  Object to form.  Vague.

22            THE WITNESS:  Could you clarify what you

23    mean by "research purposes?"  I just want to make

24    sure I understand the question.

25    BY MR. SMITH:

HIGHLY CONFIDENTIAL

Page 102

1        Q.   Just construe it as broadly as you like

2   in terms of any research that Meta does.

3             MS. HAUSKNECHT:   Object to form.   Vague.

4             THE WITNESS:   Generally this information

5   ████████████████████████████████████████████

█   ████████████████████████████████████

█   █████████████████████████████████████████████

█   ██████████████████████████████████    ████

█   █████████████████████████████████████████████

██  ████████████████████████████████

11  BY MR. SMITH:

12       Q.   Not used for AI research?

13       A.        ███████████████████████████████████

█   █████████████████████████████████████

█   █████████████████████████████████████████████

█   ██████████████████████████████████████

█   ████████████████████████████████    ██████

█   ████████████████████████████████████

█   █████████████████████████████████████████████

██  ████

21       Q.   Sticking a little bit longer with

22   Exhibit 146, I wanted to draw your attention to

23   page 10.   And there's a field called -- first one

24  ████████████████████████████████    ████████

██  ██████████████████    ████████████████████

1  ████████████████

2          What's that used for?

3          MS. HAUSKNECHT:  Objection.  Outside the

4  scope.

5              ████████████    ██████████████████

   █████████████████████████████████████

   ██████████████████████████████████████████

   █████████████████████████████████████

9  BY MR. SMITH:

10      Q.  What's a custom conversion?

11          MS. HAUSKNECHT:  Objection.  Outside the

12  scope.

13          THE WITNESS:  A custom conversion is a

14  rule-based event or conversion that can be

15  defined by the developer or the marketer on

16  Meta's Business Tools in association with Event

17  Data from the Meta Pixel.

18  BY MR. SMITH:

19      Q.  Same page, page 10, Exhibit 146.  The

20  second column from the right has the

21  ██████████████████████

22          Do you see that?

23      A.  Yes.

24      Q.  What is that?

25          MS. HAUSKNECHT:  Objection.  Outside the

HIGHLY CONFIDENTIAL

**Page 104**

1    scope.

2            THE WITNESS:  I'm not specifically

3    familiar with this column, but generally the

4    ███████████████████████████████████████

▮    ███████████████████████████████████████

▮    ████████████████████████████████████

▮    ████████████████████████

8    BY MR. SMITH:

9        Q.    ████████████████████████████

10   generated by the Pixel or from some other source?

11           MS. HAUSKNECHT:  Objection.  Outside the

12   scope.

13           THE WITNESS:  Again, I'm not too familiar

14   ███████████████████████████████████████

▮    █████████████████████████████████

▮    ██████████████████████████████████████

▮    ████████████████████████.

18           THE REPORTER:  147.

19           MR. SMITH:  Wait.  I gave you the wrong

20   copy.  Here's the correct one.

21           (Plaintiff's Exhibit 147 was marked for

22           identification.)

23           MS. HAUSKNECHT:  Do you have one for us?

24           MR. SMITH:  One moment.  Here's 148.

25           (Plaintiff's Exhibit 148 was marked for

HIGHLY CONFIDENTIAL

Page 105

1              identification.)

2              MS. HAUSKNECHT:  I'm going to make the

3     same standing objection to both of these

4     exhibits, 147 and 148, that they do not

5     accurately represent what was produced in this

6     matter.

7              Just to make sure I don't have to say it

8     every time, do you agree to honor the standing

9     objection to these?

10             MR. SMITH:  Yes.

11             MS. HAUSKNECHT:  Thanks.

12             MR. SMITH:  Not that I agree with it, but

13    I understand the objection.

14    BY MR. SMITH:

15        Q.  Mr. Jayakumar, did you review the

16    documents identified in Topic Number 1 to your

17    deposition notice?

18        A.  To clarify you're referring to the

19    plaintiff HIVE documents and the general

20    explanations of the columns referred to in Topic

21    1?

22        Q.  Correct.

23        A.  Yes.

24        Q.  And focusing on Exhibit 147, having

25    briefly reviewed it, do you have any reason to

HIGHLY CONFIDENTIAL

Page 106

1    doubt that this is HIVE data that's been produced

2    with the Bates number ending in 3583?

3            MS. HAUSKNECHT:  I'll just note the

4    objection especially as to columns primarily

5    ███████████████████████████████████████

6            THE WITNESS:  This appears to be similar

7    to the data that was produced to which you've

8    described.  There are certain fields that appear

9    to be different, such as being truncated, and

10   this appears to be an excerpt of the data that

11   was produced.  The columns look similar, yes.

12   BY MR. SMITH:

13       Q.  ██████████████████████████████████

██   ████████████████████████████████████████████

██   ████  ████  ████████████████████████████████

██   ██████████████  ██████████████████

██   ████  ████████████

██   ████  ██████  ████████████████

██   ████  ████████████████████████████████████

20   ████████████████████████████████████████████

██   ██████████████████████

22           Do you see that?

23       A.  I█████████████████████████████████

██   ████████████████████████████████████████████

25   differently across both exhibits.

HIGHLY CONFIDENTIAL

Page 107

1        Q.  I see.  Okay.

2        A.  ████████████████████████████████████

3   column on the first page.

4        Q.  Generally speaking, recognizing there

5   ██████████████████████████████████████████████

██  ████████████████████████████████████████

██  ████████████████████████? 

8            MS. HAUSKNECHT:  I'll just object and

9   note that you haven't told him what PIXEL_TAX3583

10  is an excerpt of, which table it comes from.

11           MR. SMITH:  It's referenced in the depo

12  notice.

13           THE WITNESS:  Given that some of the data

14  is truncated and cut off in both exhibits, I

15  can't say with certainty.  But given -- but the

16  ███████████████████████████████████████

██  ███████████████████████████████████████

██  █████████████████████████

19  BY MR. SMITH:

20       Q.  Focus on Exhibit 148.  Let me know when

21  you're ready.

22       A.  Yes.  I'm ready.

23       Q.  Okay.  So just focusing for the moment

24  on Exhibit 148, there's a lot of data in

25  Exhibit 148.  Why generally does Meta keep all

HIGHLY CONFIDENTIAL

Page 108

1    this data?

2           MS. HAUSKNECHT:  Object to form.

3    Misstates the record.

4           THE WITNESS:  I think, generally, when it

5    comes to the logging in offline persistent

6    storage systems, such as HIVE, that is related to

7    ██████████████████████████    ██████████████

8    ████████████████████████████████████████

█    ████████████████████████████████████

█    ██████████████████████████████████████████████

█    ███████████████████████████████

█        ████████████████████████████████████████

█    █████████████████████████████████    ████████████

█    ████████████████████████████████████████████████

█    ████████████████████████████████████████

█    ██████████████████

17           Q.  Are there any other reasons you can

18   think of that are not already stated in your last

19   answer?

20           A.  No.

21           Q.  How was Meta able to match HIVE data

22   with the specific named plaintiffs in this case?

23           A.  It is my understanding generally to --

24   ██████████████████████████████████████████████

█    ███████████████████████████████████████████

HIGHLY CONFIDENTIAL

**Page 109**

1 ██████████████████████████

██████████████████████████████

████████    ████████████████████

██████████████████████████

████████████████████████

██████████████████████████

██████████████████████████

    ████████████████████████

██████████████████████████████

██████████████████████████

██████████████████████████████

12        Q.  Are there any columns with fields --

13    strike that.

14            Do any of the column headers in

15    Exhibit 148 include information that would allow

16    Me██████████████████████████████

17            MS. HAUSKNECHT:  Object to form.  Vague.

18            THE WITNESS:  The column on page 15

19    headed with the header

20    ████████████████████████

    ████████    ████████████████

██████████████████████████████

██████████████████████████████

    ████████████████████

25    BY MR. SMITH:

1      Q.   Are there any other headers in

2      ███████████████████████████████████████

███   ██████████████████████████████

4           MS. HAUSKNECHT:  Object to form.  Vague.

5           THE WITNESS:  As I described earlier,

6      ████████████████████████████████████████

███   ████████████████████████████████████████

███   ████████████████████████████████████████

███   ████████████████████████████████████████

███   ███████████████████████████████████

███   █████████████

12    BY MR. SMITH:

13         Q.   ██████████████████████████████

14    first one on the left of page 1 of Exhibit 148?

15         A.   Yes.

16         Q.   ██████████████████████████████

███   ████████████████████████████████████

18    particular plaintiff?

19           MS. HAUSKNECHT:  Object to form.  Vague.

20           THE WITNESS:  Just to clarify my earlier

21    response, what I meant to describe was the fields

22    ████████████████████████████████████████

███   ████████████████████████████████████████

███   ████████████████████████████████████████

███   ████████████████████████████████

HIGHLY CONFIDENTIAL

**Page 111**

1 ██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████

5 BY MR. SMITH:

6     Q.  There are a number of columns or column

7 ███████████████████████████████████████

████████████████████

9     Two examples are on page 6.

10     Are you able to provide a general

11 explanation about what type of data those fields

12 represent?

13     MS. HAUSKNECHT:  Object to form.  Asked

14 and answered.  Vague.

15     THE WITNESS:  I can speak to the columns

16 on page 6 specifically and generally what the

17 ██████████████████████████████

█████████████████  ██████████████

███████████████████████████

██████████████████████████████

███████████████████████████████████

██████████████████

    ████████████████████████

██████████████████████████

25 BY MR. SMITH:

HIGHLY CONFIDENTIAL

**Page 112**

1      ▆    ████████████████████████

▆   ████████████████    █████████████

3   that?

4      ▆    ████████████████████████

▆   ██████████████████████████████████████

▆   ██████████████████████████████████████

▆   ██████████████████

8      Q.   You mean producing the data in

9   litigation?

10      A.   In this instance, yes.

11      Q.   █████████████████████

▆   ████████████████████████████████████████

13   does that disclose?

14        MS. HAUSKNECHT:   Object to form.   Vague.

15        THE WITNESS:   Generally, as I described

16   ████████████████████████████████

▆   ██████████████████████████████████████

▆   ████████████████████████████████████

▆   █████████████████████████████████

▆      ████████████████████████████████

▆   █████████████████    ███████████████████

▆   ██████████████████████████████████

▆   ███████████████████████████████

▆   ███████████████

25   BY MR. SMITH:

HIGHLY CONFIDENTIAL

Page 113

1       Q.   What's the word "deprecated" mean?

2       A.   By deprecated, I mean are no longer

3    ████████████████████    ████████████████████

     ████████████████████████████████

     ████████████████████████████████

     ██████████████

7       Q.  ████████████████████████████

8    identify a Facebook user?

9       A.  ████████████████████████

     █████████████████████████████████

     ███████████████████████████████

     ███████████████████████

     ███████████████████

14      Q.   What does it signify to you if a field

15   ███████████

     ███  █████████████████████████

     ███████████████████████████████

     ████████████████████████████████

     ██████████████████████████████████

     ████████████████████████████████

     ████████████████████████████████

     █████████

     ███  ████████████████████████

     ████████████████████████████████

     ███████████████

HIGHLY CONFIDENTIAL

**Page 114**



1

2

3

4

5

6

7

8          MS. HAUSKNECHT:   Object to form.   Asked

9      and answered.

10

11

12

13      BY MR. SMITH:

14

15

16

17

18          MS. HAUSKNECHT:   Object to form.   Asked

19      and answered.

20

HIGHLY CONFIDENTIAL



**Page 115**

10    BY MR. SMITH:

11        Q.   So on page 15

12    ███████████████████████████████

13    separated; is that correct?

14        A.   That is my understanding, yes.

15

HIGHLY CONFIDENTIAL

Page 116

1    the production?

2            MS. HAUSKNECHT:  Object to form.

3    Misstates testimony.

4    ████████████  ████  ██████████

█ ████████████████████████████████

█ ██████████████████████████████

█ ████████████████████████████████

█ ██████████████████

9    BY MR. SMITH:

10       Q.  Has any category or type of Pixel Event

11   Data been excluded from Exhibit 148?

12           MS. HAUSKNECHT:  Object to form.

13   Plaintiffs represented this was excerpted.  I

14   don't know how to say that word apparently.

15   Mischaracterizes the record.

16           THE WITNESS:  Can you -- sorry.  Can you

17   repeat the first part of your question?  You

18   mentioned there are Pixel categories of data

19   that's removed?

20   BY MR. SMITH:

21       Q.  Yeah.  And just to clarify I'm not

22   asking about any information in a particular

23   field.  I'm really focused on headers.

24           MS. HAUSKNECHT:  Object to form.

25   Mischaracterizes the record.

HIGHLY CONFIDENTIAL

**Page 117**



7    BY MR. SMITH:

8        Q.   I want to direct your attention to

9    paragraph -- I'm sorry -- Exhibit 148, page 13.

11            Do you see that?

12       A.   Yes.

13       Q.

14       A.

18       A.   Generally, as with other fields, this --

HIGHLY CONFIDENTIAL

**Page 118**

1          Q.   You used the term "operational

2     purposes."   Could you elaborate what you actually

3     mean by that?

4          A.   Yes.   By "operational purposes," it

5     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮     ▮▮▮▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮     ▮▮▮▮▮▮▮▮▮▮▮

▮          ▮▮▮▮▮▮▮▮▮▮▮▮

▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮          ▮▮   ▮▮▮▮▮▮▮▮▮▮▮▮

15    help you determine if a Pixel was set up

16    properly?

17          ▮▮   ▮▮▮▮▮▮▮▮▮▮▮

▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮   ▮▮▮▮

▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮     ▮▮▮▮▮

24          Q.   If you wanted to know how long a

25    particular session lasted, is there anywhere in

HIGHLY CONFIDENTIAL

Page 119

1   Exhibit 148 you could look to get that

2   information?

3           MS. HAUSKNECHT:  Object to form.  Lacks

4   foundation.

5   ███████████████    ████████████████████████

6   BY MR. SMITH:

7       Q. ███████████████████████████████████████

█   ███████████████

9       A.  Not that I can tell, no.

10      Q.  The first column on page 1 of

11  ███████████████████████████████████████████

12  time stamp?

13      A.  Yes.

14      ███    ████████████████████████

15  signify?

16      ███    ███████████████████████████████

█   ████████████████████████████████████████████

█   ████████████████    ████████████████████████

█   ████████    ████████████████████████████████

█   ██████████████

21          MS. HAUSKNECHT:  We have been going about

22  an hour.

23          MR. SMITH:  Yeah.  Let me just finish up.

24  Just a couple of more minutes.

25  BY MR. SMITH:

HIGHLY CONFIDENTIAL

**Page 127**

1      A.    ███████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

█████████████████████

6      Q.    Meaning the website user?

7            MS. HAUSKNECHT:  Object to form.  Vague.

8            THE WITNESS:  It is associated -- or the

9      ████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████.

14    BY MR. SMITH:

15          Q.  But you have no idea how H&R Block

16    configured the Pixel, at least to the extent it

17    ████████████████████████████████████████

18    correct?

19            MS. HAUSKNECHT:  Object to form.

20    Misstates the testimony.  Misstates the record.

21            THE WITNESS:  H&R Block's Pixel

22    instrumentation may have included customer

23    ████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

HIGHLY CONFIDENTIAL

Page 128

1  ████████████████████████████████████████

2  ███████████████████████████  ██████████

3  mentioned earlier, I'm not quite certain how that

4  information is derived.

5  BY MR. SMITH:

6  ████  ███████████████████████████████

7      A.  As it pertains to the Pixel, the Meta

8  ████████████████████████████████████

9  ████████████████████████  █████████████

10 ██████████████████████████████

11 ████████████████████████████████████████

12 ██████████████████████████████████████

13 ██████████████████████████████████████

14      Q.  So if you wanted a campaign, for

15 instance, to focus on people who lived in

16 Turlock, could an advertiser do that?

17          MS. HAUSKNECHT:  Object to form.

18 Misstates the testimony.

19          THE WITNESS:  Marketers can run campaigns

20 using various -- targeting various audiences

21 using various options that Meta provides, which

22 can include geographic location.  And other

23 possible -- other possible information.

24          However, this is not necessarily always

25 related to the business tools or the Meta Pixel.

HIGHLY CONFIDENTIAL

Page 129

1   It could be other forms of information, such as

2   profile information that the user has provided

3   during the creation of their Facebook account.

4   BY MR. SMITH:

5

7   advertising by location if someone wanted to?

8          MS. HAUSKNECHT:  Object to form.  Calls

9   for speculation.

10        THE WITNESS:  Event Data that's

11  transmitted from the business tools can be used

12

22  BY MR. SMITH:

23      Q.  Page 3 of Exhibit 148 has a header

24

25        What does that information refer to?

HIGHLY CONFIDENTIAL



Page 130

1    █    ████████████████████████

█    █████████████████████████

█    ███████████████████████

█    ████████████████

5    Q.   Why does Meta keep that information?

6    █    ████████████████████████████

█    █████████████████████

█    ████████████████████████████

█    █████████████████████████████

█    ██████████████████████████

█    ███████████████████████

12   Q.   There are two headers on page 1 of

13   ███████████████████████

█    ████████████

15   What is that a reference to?

16   █    ████████████████████████

█    ██████████████████████

█    █████████████████████████████

█    ██████████████████████

20   Q.   On pages 1 and 2, there are headers that

21   ████████████████████████

█    ████████████████████████

23   Do you see that?

24   A.   Yes.

25   Q.   Generally speaking, what do these

HIGHLY CONFIDENTIAL

Page 131

1   headers refer to?

2           MS. HAUSKNECHT:  Object to form.  Vague.

3   ██████████████    ████████████████████████████

    █  ████████████████████████████████████████████████

    █  ██████████████████████████████    ████████████

    █  ██████████████████████████████████████████

7   BY MR. SMITH:

8       Q.  I want to go to page 10.  Right about

9   the middle you will see a field that says

10  ██████████████████████    ██████████████████████

11  there, which I left out, but you see it; correct?

12      A.  Yes.

13      Q.  What does it signify if the field

14  ████████████████

15          MS. HAUSKNECHT:  Objection.  Outside the

16  scope.

17  ██████████████████    ████████████████████████

    █  ████████████████████████████████████████████████

    █  ████████████████████████████████████████████

    █  ██████████████████████████████████████████████████

    █  ████████████

22  BY MR. SMITH:

23      Q.  ██████████████████████████████████████

24          MS. HAUSKNECHT:  Objection.  Scope.

25          THE WITNESS:  Yes.

HIGHLY CONFIDENTIAL

Page 132

1    BY MR. SMITH:

2         Q.   Why does Meta keep track of that

3    ███████████████████████████████████████

4              MS. HAUSKNECHT:  Objection.  Scope.

5              THE WITNESS:  I'm not sure specifically

6    as it relates to this column, but I think, as I

7    ██████████████████████████████████████████

█    ████████████████████████████████████████

█    ████████████████████████████████████████

10   BY MR. SMITH:

11        Q.   Page 14, still on Exhibit 148.  Has a

12   ████████████████████████████████████████

13   that a reference to?

14        ███   ████████████████████████████████

█    ████████████████████████████████████████████

█    ████████████████████████████████████████████

█    ████████████████████████████

18        Q.   How does Meta system determine whether

19   █████████████████████████████████████████████

20   show up in the fields there?

21        A.   To clarify, you're referring to the

22   ████████████████████████████████

23        Q.   Yes.  Thank you.

24        ███   ██████████████████████████████████

█    ████████████████████████████████████████████

HIGHLY CONFIDENTIAL

Page 147

1      Q.   Do you know roughly how many people have
2   Facebook accounts?
3           MS. HAUSKNECHT:  Objection.  Scope.
4           THE WITNESS:  Sitting here today, I
5   wouldn't know that.
6   BY MR. SMITH:
7      Q.   Is it likely to be in the millions?
8           MS. HAUSKNECHT:  Objection.  Scope.
9   Calls for speculation.
10          THE WITNESS:  Similar to the question
11  about Pixel, I cannot say that for certain.
12  BY MR. SMITH:
13     Q.   Have you heard or seen any information
14  about Facebook currently experiencing a decline
15  in active users?
16          MS. HAUSKNECHT:  Objection.  Scope.
17  Vague.
18          THE WITNESS:  Not that I recall, no.
19  BY MR. SMITH:
20     Q.   Have you been in any discussions about
21  whether Meta should just shut down operation of
22  Pixel?
23          MS. HAUSKNECHT:  Objection.  Scope.
24          THE WITNESS:  Not that I recall, no.
25  BY MR. SMITH:

HIGHLY CONFIDENTIAL

Page 148

1      Q.   Has Meta implemented any measures to
2   block IP address information?
3           MS. HAUSKNECHT:   Objection.   Scope.
4           THE WITNESS:   Could you clarify when you
5   refer to "block IP information," from what?
6   BY MR. SMITH:
7      Q.   Prevent transmission of IP information
8   from users to Meta.
9           MS. HAUSKNECHT:   Objection.   Scope.
10          THE WITNESS:   Actually, I'm not sure.   I
11  do not know.
12  BY MR. SMITH:
13     Q.   Same question, but zip code information.
14     A.   Same answer.   I do not -- do not know.
15     Q.   Any -- has Meta implemented any measures
16  to block transmission of first or last names?
17          MS. HAUSKNECHT:   Objection.   Scope.
18  Vague.
19          THE WITNESS:   Again, just to clarify, I
20  want to make sure I'm able to represent it
21  accurately.   When you refer to blocking first
22  name and last name, within what context are you
23  referring to?   You said it's from users, like on
24  an account profile, for example, that when they
25  share that information, we created on their

HIGHLY CONFIDENTIAL

Page 149

1    Facebook account or?

2    BY MR. SMITH:

3         Q.   I'm referring to data transmitted by the

4    Meta Pixel.

5         A.   Meta's filtration system, as I described

6    earlier, does attempt to detect and filter out

7    PII, including first name and last name that may

8    be transmitted in a manner that's not in line

9    with our terms of service.

10        Q.   When did it start doing that?

11        A.   And just wanted to clarify within the

12   context of you mentioning Meta Business Tool, the

13   same answer applies for other PII, like zip and

14   IP address as well.

15             Meta has systems that detect and filter

16   out potentially identifiable information that may

17   be transmitted from the Pixel in a manner that's

18   not in line with the terms of service.  The

19   systems were in place -- these filtering systems,

20   ███████████████████████████████████████████████

21   as I recall.

22        Q.   What's the difference between a "Pixel

23   ███████████████████████████████████

██  ██  ████████████████████████████████████

██  ████████████████████████████████████

HIGHLY CONFIDENTIAL

Page 150

1 ███████████████████████████████████████

2 to a project in Workstreams relating to, or is an

3 internal name given to projects that help with

4 making the setup of the Pixel easier.  So there's

5 ███████████████████████████████████████

6 ██ ████████

7          MR. SMITH:  149, I think.

8          THE REPORTER:  Yes.

9          (Plaintiff's Exhibit 149 was marked for

10          identification.)

11 BY MR. SMITH:

12      Q.  So you have in front of you an exhibit

13 that's been marked 149, and I want to draw your

14 attention to page 2.  On the second half -- the

15 bottom half of page 2, in the third column, if

16 you search for it, you'll see a sentence that

17 says (as read):

18                    ██████████████████████████

19 ██    ████████

20          Do you see that?

21      A.  Yes.

22      Q.  So earlier you had testified that

23 there's no specific event that you would call a

24 ███████████████████    ██████████████

25 ██ ████████████████████████████

HIGHLY CONFIDENTIAL

Page 151

1 ███████████████████████████████████████

2 ██████████████████

3        Can you help clarify what that means and

4 how that is in sync with what you testified a

5 moment ago?

6        A.  Yes.  I wouldn't reference -- I wouldn't

7 ████████████████████████████████████████

8 ██████████████████████████████████████

9 ████████████████████████████████

10 projects generally, and is likely a shorthand to

11 indicate those particular events.

12        Q.  Okay.  The line just above the one I

13 asked about said (as read):

14               ████████████████████████████

15      ████████████████████

16        What does that mean to you?

17        A.  I'm not certain within the context of

18 this specific table's description.  But generally

19 the terms "staging" is used to represent any

20 post-processing of data or transformations to

21 data that occurs for certain purposes, like

22 showing up specific metrics in a dashboard, or

23 what have you.

24        And it's to make the data easier to

25 consume via dashboard for monitoring, but I

HIGHLY CONFIDENTIAL

Page 152

1    cannot say for certain for this specific table.

2         Q.  Since you first began working at Meta,

3    when is the earliest time you can recall ever

4    communicating with anyone else in Meta about

5    whether the Pixel may have been transmitting

6    sensitive information that it should not be

7    transmitting?

8              MS. HAUSKNECHT:  Objection.  Scope.

9              THE WITNESS:  I think, firstly, to

10   clarify generally, any discussions I might have

11   had relating to the topic of potentially

12   sensitive information from our business tools, I

13   would qualify that as being potentially

14   sensitive, partly given Meta aren't arbiters of

15   what is truly sensitive and a lot of our

16   filtering represents, albeit proactively, an

17   attempt to detect and filter potentially

18   sensitive information.

19             But I don't quite recall when the

20   earliest such instance of a discussion I may have

21   had with someone I work with relating to the

22   topic would be.

23        Q.  Best estimate would be first time you --

24   well, strike that.

25             Is it your sense you have at some point

HIGHLY CONFIDENTIAL

Page 153

1    in time, during your tenure at Meta, spoken with

2    someone about the potential for the Meta Pixel to

3    transmit potentially sensitive data?

4            MS. HAUSKNECHT:  Objection.  Scope.

5            THE WITNESS:  No.  But given that I have

6    worked in the Signals Integrity team that I

7    described, that maintains --

8            (Clarification requested by Reporter.)

9            THE WITNESS:  Sorry.  I can restart.  I

10   will say no.

11           However, given that I have worked on the

12   Signals Integrity space that maintains and builds

13   our filtration systems for detecting and

14   filtering out potentially sensitive information,

15   I have had discussions, as part of my job

16   function, relating to those systems, but I do not

17   recall the earliest instance of such discussions.

18   BY MR. SMITH:

19       Q.  Okay.  Have you ever discussed with

20   another engineer or non-attorney the subject of

21   the Pixel potentially transmitting sensitive

22   financial information?

23           MS. HAUSKNECHT:  Objection.  Scope.

24           THE WITNESS:  Not that I recall, no.

25   BY MR. SMITH:

HIGHLY CONFIDENTIAL

Page 154

1      Q.   How about any other specific categories

2    of potentially sensitive information, like video

3    viewing history or health information?

4           MS. HAUSKNECHT:   Objection.   Scope.

5    Asked and answered.

6           THE WITNESS:   Not that I recall

7    specifically to those topics.   But as I mentioned

8    earlier, by virtue of the team I have worked on

9    at my job function, I have had discussions

10   relating to the systems that Meta has to detect

11   and filter out potentially sensitive information

12   generally.

13   BY MR. SMITH:

14      Q.   Did you work with the Signals Integrity

15   team in 2018?

16      A.   No.

17      Q.   No interactions with them whatsoever in

18   a professional capacity during that year?

19           MS. HAUSKNECHT:   Objection.   Scope.

20   Asked and answered.

21           THE WITNESS:   Not that I can recall

22   sitting here today.

23   BY MR. SMITH:

24      Q.   In 2018, what department were you

25   working for?

HIGHLY CONFIDENTIAL

Page 155

```
 1        A.  As I recall, I worked within the Signals
 2    department more broadly.
 3        Q.  Okay.  But not Signals Integrity?
 4        A.  That is right.
 5        Q.  I see.  Okay.
 6            THE REPORTER:  150.
 7            (Plaintiff's Exhibit 150 was marked for
 8            identification.)
 9            MS. HAUSKNECHT:  We are at an hour.  Do
10    you want to stop now or...
11            MR. SMITH:  This won't take long.
12    BY MR. SMITH:
13        Q.  Do you recall ever hearing in 2018 of an
14    ██████████████████████████████████████████████
      ████████████████████████
16            MS. HAUSKNECHT:  Objection.  Scope.
17            THE WITNESS:  Sorry, just looking at the
18    exhibit for a second.
19    BY MR. SMITH:
20        Q.  Yeah.  Of course.
21        A.  No, not that I recall.
22        Q.  Okay.  Do you know if Meta ever
23    ████████████████████████████████████████████████
      ██████████████████████████████
25            MS. HAUSKNECHT:  Objection.  Scope.
```

HIGHLY CONFIDENTIAL

Page 156

1           THE WITNESS:  I do not know.

2   BY MR. SMITH:

3       Q.  I want to direct your attention to

4   Exhibit 150, first page.  Near the bottom about

5   25 percent up from the bottom -- actually, strike

6   that.

7           The -- there's a section in the middle

8   ██████████████████████████████████████████

9   █  ██████████████████  █████████████████████████

10  to be that to you as well?

11          MS. HAUSKNECHT:  Objection.  Scope.

12  Calls for speculation.

13          THE WITNESS:  I see the section that

14  ███████████████████████████  ███████████████████

    █  ████████████████████████████████████████████

    █  ██████████████████████

17  █  ██  █████████████████████████████████████████

    █  ████████████████████████████████████████████

    █  ██████████████████████████████████████

    █  ████████████████████████████████████████

21          MS. HAUSKNECHT:  Objection.  Scope.

22  Calls for speculation.

23          THE WITNESS:  I do not know.

24  BY MR. SMITH:

25      Q.  Okay.  So back to what I was originally

HIGHLY CONFIDENTIAL

Page 157

1    going to ask you a moment ago.  About 20 or

2    25 percent up from the bottom, you will see a

3    sentence that reads (as read):

4    ████████████████████████████

     ████████████████████████████████████

     ████████████████████████████████

     █████████████████████████████

     █████████████████████

9        A.  Yes.

10       Q.  ████████████████████████████████

     ████████████████████████████████████████

     ████████████████████████████████████████████

     ████████████████

14           MS. HAUSKNECHT:  Objection.  Scope.

15   Calls for speculation.

16           THE WITNESS:  I do not know specifically

17   as it relates to the context of the email.  But

18   █████████████████████████████████████████

     ████████████████████████████████████████████

     ████████████████████████████████████████

     ████████████████████

22   BY MR. SMITH:

23       Q.  And does that remain a true statement

24   today, in 2025?

25       ████  ████

HIGHLY CONFIDENTIAL

Page 158

1        Q.   And that's been the standard practice
2   during the whole seven-year period between 2018
3   and 2025; correct?
4        ██   ████
5        Q.   Now skipping ahead in time to midyear
6   ████████████████████████████████████████████
7   date, did Meta have some kind of system in place
8   to filter financial data that may have been
9   transmitted from the Pixel?
10       ██████████████████████████████████████████
11   detect and filter potentially sensitive
12   information in general, such as PII or health or
13   ████████████████████████████████████████████
██  ████████████████████████████████████
██  ████████████████████████████████████
██  ████████████████████████████████████
██  ████████████████████████
18       Q.   Did it have that same system back in
19   ██████
20            MS. HAUSKNECHT:  Objection.  Vague.
21            THE WITNESS:  Meta had a filtration
22   system that detected and filtered out potentially
23   sensitive information that applied to all Event
24   Data that included financial information.
25   Generally, Meta makes, in the ordinary course of

HIGHLY CONFIDENTIAL

Page 159

1    business, like progressive improvements to

2    systems that we maintain.

3    ███████████████████

█    ███████████████████████████

█    ██████████████████████████████

█    ████████████

7    BY MR. SMITH:

8        Q.   Can you tell me a little bit about how

9    the filter -- filter systems worked as of

10   █████████

11       A.   Yes.

12       Q.   Please do.

13       A.   The filtration system consists of

14   ███████████████████████

█    █████████████████████████

█    ████████████████████

█    ██████████████████████████████

█    ████████████████████████████

█    ██████████████████████████████

█    ███████████████

21       Q.   How would the filter know or identify

22   the category of information being transmitted as

23   ██████████

█    ████  ████████████████████

█    ████████████████████

HIGHLY CONFIDENTIAL



**Page 160**

9    A.   The -- in the description I had

17    Q.   In that scenario you just described,

20    A.   I don't recall specifically, but

HIGHLY CONFIDENTIAL

Page 172

1    Event Data is stored typically retains the data

2    for about 90 days.

3    BY MR. SMITH:

4         Q.   Okay.  And other HIVE tables, do they

5    retain the data, or at least some of the data,

6    for a longer period or a shorter period or a

7    combination of both?

8              MS. HAUSKNECHT:  Objection.  Scope.

9    Vague.

10             THE WITNESS:  And to clarify, by other

11   "HIVE tables," are you referring to tables other

12   than what I described as being the primary

13   tables --

14   BY MR. SMITH:

15        Q.   Uh-huh.

16        A.   -- that were in the scope of this?

17             MS. HAUSKNECHT:  Objection.  Scope.

18   Vague.

19             THE WITNESS:  Event Data that may be

20   stored in tables, other than the primary tables,

21   would be duplicative of the data that is in the

22   primary tables.

23             So that the data would not be stored for

24   a longer period of time or novel -- different

25   data would not be stored elsewhere from the

HIGHLY CONFIDENTIAL

Page 173

1    ██████████████████████████████████████

2    ████████████████████████

3    BY MR. SMITH:

4        Q.   ████████████████████████████

     ████████████████████████████████████████

     ████████████████████

         ██   ████████████████████████████████

     ████████████████████████████████████

     ████████████████████████████████.

10       Q.   Why doesn't Meta keep the Event Data for

11   longer periods of time?

12           MS. HAUSKNECHT:  Objection.  Scope.

13   Calls for speculation.

14           THE WITNESS:  I can't say specifically as

15   it retains -- as it pertains to Event Data, but

16   generally, Meta has retention policies associated

17   with different kinds of data and how long those

18   data can be stored for that we respect and we

19   uphold.

20   BY MR. SMITH:

21       Q.   Have you seen or heard any

22   communications within Meta discussing whether

23   Meta should extend its retention period to avoid

24   any destruction of evidence?

25       A.   Could you repeat the last part?

HIGHLY CONFIDENTIAL

Page 174

1          MS. HAUSKNECHT:  Object --

2          THE WITNESS:  Sorry.  Can you repeat the

3   last part of your question.

4   BY MR. SMITH:

5      Q.  Are you aware of anyone -- well, strike

6   that.

7          Have you seen or heard any

8   communications within Meta discussing whether

9   Meta should extend its retention period to avoid

10  any destruction of evidence?

11         MS. HAUSKNECHT:  Objection.  Outside the

12  scope.

13         And I would also instruct you not to

14  discuss any privileged communications with

15  counsel.

16         THE WITNESS:  Not that I am aware, no.

17         THE REPORTER:  153.

18         (Plaintiff's Exhibit 153 was marked for

19         identification.)

20  BY MR. SMITH:

21     Q.  So you have in front of you a document

22  that's been marked Exhibit 153.  It apparently is

23  ████████████████████████████████████████

   ████████████████████████████████████████

25  have received from TaxSlayer's use of the Meta

HIGHLY CONFIDENTIAL

**Page 175**

1    Pixel.

2    ████████████████████████████

     ███████████████████

4          MS. HAUSKNECHT:  Object to scope.

5    ██████████████    ███████████████

     ███████████████████████████████

     ████████████

8    BY MR. SMITH:

9          Q.  I take it then by the same token you

10   ██████████████████████████████

     ██████████████████████████████

12         MS. HAUSKNECHT:  Objection.  Scope.

13         THE WITNESS:  No, I do not know if there

14   █████████████████████████████

15   BY MR. SMITH:

16         Q.  Do you understand the difference between

17   Automatic Event, Standard Events, and Custom

18   Events?

19         A.  Yes.

20         Q.  Is it correct to say that automatic and

21   Standard Events are events that are defined by

22   Meta and that can be used to track user

23   activities on websites?

24         A.  I would describe them slightly

25   differently, largely that automatic and Standard

HIGHLY CONFIDENTIAL

Page 201

1    article was released.

2    BY MR. SMITH:

3        Q.   When you saw it, did someone at Meta

4    suggest that you read it?

5            MS. HAUSKNECHT:  Objection.  Scope.

6            Also, give a privilege instruction.

7            THE WITNESS:  Not that I recall, no.

8    BY MR. SMITH:

9        Q.   Do you recall reading anything in the

10   article that you disagreed with?

11           MS. HAUSKNECHT:  Objection.  Scope.

12           THE WITNESS:  Again, as I mentioned, I

13   don't recall reading the article generally, so I

14   do not -- I do not remember.

15   BY MR. SMITH:

16       Q.   Okay.  Has anyone at Meta told you that

17   the information contained in The Markup article

18   is false?

19           MS. HAUSKNECHT:  Objection.  Scope.

20           Also, continue to give you a privilege

21   instruction in terms of any discussions with

22   counsel.

23           THE WITNESS:  I do not recall having

24   discussions relating to this article in general,

25   no.

HIGHLY CONFIDENTIAL

Page 202

1    BY MR. SMITH:

2        Q.   Do you know if anyone at Meta ever tried

3    to determine whether anything said in The Markup

4    article was correct?

5             MS. HAUSKNECHT:  Objection.  Scope.

6             THE WITNESS:  I do not know specifically,

7    no.

8    BY MR. SMITH:

9        Q.   If such an effort had been made, would

10   you anticipate someone from the Signals

11   department would have been involved with that

12   effort?

13            MS. HAUSKNECHT:  Objection.  Scope.

14   Misstates testimony.  Calls for speculation.

15            THE WITNESS:  It would depend on the

16   nature of what's -- of what's being investigated

17   and how it's conducted, so I can't say for sure.

18   BY MR. SMITH:

19       Q.   Can you think of any other departments,

20   apart from Signals, that would be a logical

21   choice to investigate whether or not anything in

22   the Markup article was accurate?

23            MS. HAUSKNECHT:  Objection.  Scope.

24   ██████████████     ████████████████████

██  ████████████████████████████████████████

HIGHLY CONFIDENTIAL

Page 203

1 ███████████████████████████████████

███████████████████████████████████

███████████████████████████████

██████████  ███████████████████████

██████████████████████████████

██████████

7            THE REPORTER:  158.

8            (Plaintiff's Exhibit 158 was marked for

9            identification.)

10            MS. HAUSKNECHT:  Counsel, I don't see a

11    Bates stamp on this document.

12            MR. SMITH:  Yeah, it's just pulled from

13    the Internet.

14            MS. HAUSKNECHT:  Do you have a url?

15            MR. SMITH:  No.  I think Meta knows about

16    this document.

17    BY MR. SMITH:

18        Q.  Have you seen the document that's been

19    marked Exhibit 158 before?

20            MS. HAUSKNECHT:  Objection.  Scope.

21            THE WITNESS:  No.

22    BY MR. SMITH:

23        Q.  Have you heard anything within Meta

24    discussing a leaked memo describing privacy

25    issues at Meta?

HIGHLY CONFIDENTIAL

1            MS. HAUSKNECHT:  Objection.  Scope.  I'll

2    also give a privilege instruction.

3            THE WITNESS:  I do not recall, no.

4    BY MR. SMITH:

5       Q.  Is it common at Meta to use brackets

6    with "A/C Priv" on documents that are intended to

7    be privileged?

8            MS. HAUSKNECHT:  Objection.  Scope.

9    ████████████████    ██████████████████████████

██  ████████████████████████████████████████████

██  ████████████████████████████████████████████

██  ████████████████████████████████████████████████

██  ██████████████████████████████████████

14   BY MR. SMITH:

15      Q.  Have you --

16      A.  Excuse me.

17      Q.  Have you ever used that notation on an

18   email?

19            MS. HAUSKNECHT:  Objection.  Scope.

20            THE WITNESS:  On an email, you asked?

21   BY MR. SMITH:

22      Q.  Uh-huh.

23      A.  ████████████████████████████████

24      Q.  How about a memo or other type of

25   written document?

1        MS. HAUSKNECHT:  Objection.  Scope.

2        THE WITNESS:  ███████████████████.

3   BY MR. SMITH:

4        Q.  ████████████████████████████

█   █████████████████████████████████████████

6        MS. HAUSKNECHT:  Objection.  Scope.

7   Asked and answered.  Argumentative.  Harassing.

8        ██████████████  ████  ██████████████

█   ████████████████████████████████████████

█   ██████████████████████████████████████

█   ██████████████████████████

12  BY MR. SMITH:

13       Q.  Have you ever received an email

14  internally from Meta that used the notation "A/C

15  Priv," but there was no lawyer on the email?

16       MS. HAUSKNECHT:  Objection.  Scope.

17       ██████████████████  ████████████████

18  BY MR. SMITH:

19       Q.  Is it common in Meta to use the word

20  "privilege" as a verb as in privileging an email?

21       MS. HAUSKNECHT:  Objection.  Scope.  Lack

22  of foundation.  Asked and answered.

23       ██████████████████  ████████████████████

█   ██████████████

25  BY MR. SMITH:

HIGHLY CONFIDENTIAL

Page 206

```
 1        Q.  I want to direct your attention to
 2   page 1 of Exhibit 158.  Underneath the executive
 3   summary you will see four bullet points -- no,
 4   I'm sorry, five, and I just want to direct your
 5   attention to the third one.
 6             It says (as read):
 7                  "We do not have an adequate level
 8             of control and explainability over how
 9             our systems use data, and thus, we can't
10             confidently make controlled policy
11             changes or external commitments such as,
12             we will not use X data for Y purpose."
13             Do you see that?
14        A.  Yes.
15        Q.  Do you agree or disagree with that
16   statement?
17             MS. HAUSKNECHT:  Objection.  Scope.
18
23   BY MR. SMITH:
24        Q.
```

HIGHLY CONFIDENTIAL

**Page 208**

1   Data, we receive as it's set up by the developer,

2   in addition to the admission -- or the acceptance

3   of the user of the business tool to not send

4   potentially sensitive information or information

5   that's not in compliance with the terms of

6   ███████████████████████████████████████████

    ████████████████████████████████████████████████

    ███████████████████████████████████████████

    ███████████████████████████████████████████████████

    ████████████████████████████████████████

    ███████████████████████████████████████████████

    █████████████████████████████████  ██████████████

    ████████████████████████████████████████

    ███████████████████████████████████████████████

15        Q.  Do you believe in -- as of 2020 Meta

16   systems to ensure that information that is not in

17   compliance with the terms of service is -- was

18   detected and filtered out, was adequate?

19        MS. HAUSKNECHT:  Objection.  Vague.

20   Scope.  Misstates testimony.

21        █████████████████  ████████████████████████

    ████████████████████████████████████████████

    ██████████████████████████████████████████████████████

    ██████████████████████████████████████████

    ██████████████████████████████████████████

HIGHLY CONFIDENTIAL

Page 209

1    ████████████████████████████████████

█    ████████████████████████████████████████

█    ██████████████████████████

4    BY MR. SMITH:

5        Q.   Were those systems you just described

6    adequate in 2021?

7            MS. HAUSKNECHT:   Objection.   Scope.

8    Vague.

9            THE WITNESS:   And just to clarify by when

10   you use the term "adequate," you mean functioning

11   as expected of the system -- the system is

12   functioning as it was intended to?

13   BY MR. SMITH:

14       Q.   No.   By "adequate," sufficient to

15   reliably block the transmission of sensitive

16   information that violated Meta's tools?

17       A.   Okay.   Thank you for clarifying.

18           MS. HAUSKNECHT:   Objection.   Scope.

19           THE WITNESS:   As I mentioned earlier, the

20   reason I have described our systems in the

21   context of what it detects and filters as

22   potentially sensitive or being potentially

23   sensitive is, we can never say with certainty,

24   whether certain information is sensitive or not,

25   as we do not and can't interpret the contents of

HIGHLY CONFIDENTIAL

Page 217

1  STATE OF CALIFORNIA

2

3  REPORTER'S CERTIFICATE

4

5      I, EARLY LANGLEY, a Shorthand Reporter,

6  State of California, do hereby certify:

7      That AMLESH JAYAKUMAR, in the foregoing

8  deposition named, was present and by me sworn as

9  a witness in the above-entitled action at the

10  time and place therein specified;

11      That said deposition was taken before me

12  at said time and place, and was taken down in

13  shorthand by me, a Certified Shorthand Reporter

14  of the State of California, and was thereafter

15  transcribed into typewriting, and that the

16  foregoing transcript constitutes a full, true and

17  correct report of said deposition and of the

18  proceedings that took place;

19      That before completion of the

20  proceedings, review of the transcript was not

21  requested.

22      IN WITNESS WHEREOF, I have hereunder

   subscribed my hand this July 17, 2025.

23

24

      EARLY LANGLEY, CSR NO. 3537

25      State of California

**EXHIBIT 14**

**FILED UNDER SEAL**

**EXHIBIT 15**

**FILED UNDER SEAL**

**EXHIBIT 16**

**FILED UNDER SEAL**

**EXHIBIT 17**

**FILED UNDER SEAL**

**EXHIBIT 18**

**FILED UNDER SEAL**

**EXHIBIT 19**

**FILED UNDER SEAL**

**EXHIBIT 20**

**FILED UNDER SEAL**

**EXHIBIT 21**

**FILED UNDER SEAL**

**EXHIBIT 22**

**FILED UNDER SEAL**

**EXHIBIT 23**

**FILED UNDER SEAL**

**EXHIBIT 24**

**FILED UNDER SEAL**

**EXHIBIT 25**

**FILED UNDER SEAL**

**EXHIBIT 26**

**FILED UNDER SEAL**

**EXHIBIT 27**

**FILED UNDER SEAL**

**EXHIBIT 28**

**FILED UNDER SEAL**