# Proposed Redacted Version of the Declaration of Neal Deckant (Dkt. No. 218-1)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BURSOR & FISHER, P.A.**
Neal Deckant (State Bar No. 320783)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail:  ndeckant@bursor.com

**GEORGE FELDMAN MCDONALD, PLLC**
Lori G. Feldman (*pro hac vice*)
Michael Liskow (State Bar No. 243899)
102 Half Moon Bay Drive
Croton-on-Hudson, NY  10520
Telephone: (917) 983-9321
E-mail: lfeldman@4-justice.com
          mliskow@4-justice.com
          e-service@4-justice.com

*Attorneys for Plaintiffs*

*Additional Attorneys on Signature Page*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE META PIXEL TAX FILING CASES | Master File No. 5:22-cv-07557-PCP |
| This document relates to: | **DECLARATION OF NEAL DECKANT IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** |
| All actions | |
| | Date:                January 15, 2026<br>Time:                10:00 a.m.<br>Judge:               Hon. P. Casey Pitts<br>Date Action Filed:  Dec. 1, 2022 |

## FILED UNDER SEAL

I, Neal Deckant, declare as follows:

1.     I am an attorney at law licensed to practice in the State of California.  I am a member of the bar of this Court, and I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiffs in this matter.  I have personal knowledge of the matters set forth herein, and if called upon to do so, would and could testify competently thereto.  I offer this declaration in support of Plaintiffs' Motion for Class Certification.

2.     In some instances, relevant portions of the materials listed below have been marked in red boxes.

### *Publicly Filed Documents*

3.     Attached hereto as **Exhibit 1** is a true and correct copy of excerpts of Defendant Meta's responses to Plaintiffs' Requests for Admission.

4.     Attached hereto as **Exhibit 2** is a true and correct copy of the public, redacted version of the Declaration of Tobias Wooldridge, filed by Meta on October 17, 2022 in the related matter *In re Meta Healthcare Litig.*, N.D. Cal. Case No. 3:22-cv-3580-WHO.

5.     Attached hereto as **Exhibit 3** is a true and correct copy of excerpts of the public, redacted version of Meta's Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Class Certification in *McDaniel et al. v. Meta Platforms, Inc.*, Santa Clara Superior Court Case No. 21-cv-383231.

6.     Attached hereto as **Exhibit 4** is a true and correct copy of a publicly available document that was marked as Deposition Exhibit No. 158 during the July 14, 2025 deposition of Meta's 30(b)(6) witness in this matter. My understanding is that the document has been publicly available since 2022, and as of the date of this declaration, the document is publicly available at https://www.documentcloud.org/documents/21716382-facebook-data-lineage-internal-document/

7.     Attached hereto as **Exhibit 5** is a true and correct copy of Meta's Supplemental Responses and Objections to Plaintiffs' Interrogatory No. 6, served in this matter on April 11, 2025.

8.     Attached hereto as **Exhibit 6** is a true and correct copy of the Declaration of Plaintiff Jane Doe.

9.      Attached hereto as **Exhibit 7** is a true and correct copy of the Declaration of Plaintiff Katrina Calderon.

10.      Attached hereto as **Exhibit 8** is a true and correct copy of the Declaration of Plaintiff Kayla Salas (formerly Kayla Housman).

11.      Attached hereto as **Exhibit 9** is a true and correct copy of the Declaration of Plaintiff Tiffany Bryant.

12.      Attached hereto as **Exhibit 10** is a true and correct copy of Bursor & Fisher's current firm resume.

13.      Attached hereto as **Exhibit 11** is a true and correct copy of George Feldman McDonald's current firm resume.

14.      Attached hereto as **Exhibit 12** is a true and correct copy of Meta's "About location targeting" webpage from the Meta Business Help Center at https://www.facebook.com/business/help/202297959811696?id=176276233019487

*Documents Filed Under Seal*

15.      Meta and/or Plaintiffs designated portions of the document listed below as confidential pursuant to the protective order in this case, and therefore the documents are being filed under seal.

16.      Attached hereto as **Exhibit 13** is a true and correct copy of excerpts of Meta's 30(b)(6) witness Amlesh Jayakumar, who was deposed in this matter on July 14, 2025.

17.      Attached hereto as **Exhibit 14** is a true and correct copy of a document produced by Meta in this case, with Bates Number PIXEL_TAX000022472-73, and which was previously marked as Deposition Exhibit No. 150 during the July 14, 2025 deposition of Meta's 30(b)(6) witness in this matter.

18.      Attached hereto as **Exhibit 15** is a true and correct copy correct copy of a document produced by Meta in this case, with Bates Number PIXEL_TAX000023123-25, and which was previously marked as Deposition Exhibit No. 156 during the July 14, 2025 deposition of Meta's 30(b)(6) witness in this matter.

19.     Attached hereto as **Exhibit 16** is a true and correct copy correct copy of a document which was previously marked as Deposition Exhibit No. 148 during the July 14, 2025 deposition of Meta's 30(b)(6) witness in this matter.  The exhibit is a printout of excerpts of a database file produced by Meta in this case, with Bates Number PIXEL_TAX000003585.

20.     Attached hereto as **Exhibit 17** is a true and correct copy correct copy of a printout of excerpts of a database file produced by Meta in this case, with Bates Number PIXEL_TAX000003585. The data shown was under a Tab marked "Katrina Calderon."

21.     Attached hereto as **Exhibit 18** is a true and correct copy correct copy of a printout of excerpts of a database file produced by Meta in this case, with Bates Number PIXEL_TAX0000023328, and a file name identified as ███████████_2022-05-26_10.csv, showing rows 509, 14344, and 41578.  Meta produced this document with its production of sample Hive data.

22.     Attached hereto as **Exhibit 19** is a true and correct copy of excerpts of Meta's 30(b)(6) witness Amlesh Jayakumar in the related matter *In re Meta Healthcare Litig.*, N.D. Cal. Case No. 3:22-cv-3580-WHO, taken on May 21, 2025.

23.     Attached hereto as **Exhibit 20** is a true and correct copy correct copy of a document Meta produced in this case, with Bates Number PIXEL_TAX0000052702-704.

24.     Attached hereto as **Exhibit 21** is a true and correct copy correct copy of a document Meta produced in this case, with Bates Number PIXEL_TAX0000052648.

25.     Attached hereto as **Exhibit 22** is a true and correct copy correct copy of a document which was previously marked as Deposition Exhibit No. 146 during the July 14, 2025 deposition of Meta's 30(b)(6) witness in this matter.  The exhibit is a printout of excerpts of a database file produced by Meta in this case, with Bates Number PIXEL_TAX000036169.

26.     Attached hereto as **Exhibit 23** is a true and correct copy correct copy of a document produced by Meta in this case, with Bates Number PIXEL_TAX000023047, and which was previously marked as Deposition Exhibit No. 151 during the July 14, 2025 deposition of Meta's 30(b)(6) witness in this matter.

27.     Attached hereto as **Exhibit 24** is a true and correct copy correct copy of a document Meta produced in this case, with Bates Number PIXEL_TAX000023180-84.

28.     Attached hereto as **Exhibit 25** is a true and correct copy correct copy of a document Meta produced in this case, with Bates Number PIXEL_TAX000004297-98.

29.     Attached hereto as **Exhibit 26** is a true and correct copy correct copy of a document Meta produced in this case, with Bates Number PIXEL_TAX000058899-905.

30.     Attached hereto as **Exhibit 27** is a true and correct copy correct copy of the expert report of Colin Weir.

31.     Attached hereto as **Exhibit 28** is a true and correct copy correct copy of the expert report of Robert Zeidman.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.  Executed in Walnut Creek, California, on August 18, 2025.

_/s/ Neal J. Deckant_
Neal J. Deckant

**EXHIBIT 1**

1    GIBSON, DUNN & CRUTCHER LLP                COOLEY LLP
     LAUREN GOLDMAN (*pro hac vice*)           MICHAEL G. RHODES, SBN 116127
2    LGoldman@gibsondunn.com                    Rhodesmg@cooley.com
     DARCY C. HARRIS (*pro hac vice*)           KYLE C. WONG, SBN 224021
3    DHarris@gibsondunn.com                     KWong@cooley.com
     200 Park Avenue                            CAROLINE A. LEBEL, SBN 340067
4    New York, NY 10166-0193                    CLebel@cooley.com
     Telephone:    (212) 351-4000               3 Embarcadero Center, 20th Floor
5    Facsimile:    (212) 351-4035               San Francisco, CA 94111-4004
                                                Telephone: (415) 693-2000
6    ELIZABETH MCCLOSKEY, SBN 268184            Facsimile: (415) 693-2222
     EMccloskey@gibsondunn.com
7    ABIGAIL A. BARRERA, SBN 301746
     ABarrera@gibsondunn.com
8    One Embarcadero Center
     San Francisco, CA 9411
9    Telephone:    (415) 393-8200
     Facsimile:    (415) 393-8306
10
11   ANDREW M KASABIAN, SBN 313210
     AKasabian@gibsondunn.com
12   333 South Grand Avenue
     Los Angeles, CA 90071
13   Telephone:    (213) 229-7311
     Facsimile:    (213 229-6311
14
     *Attorneys for Defendant Meta Platforms, Inc.*
15

16                    UNITED STATES DISTRICT COURT

17                   NORTHERN DISTRICT OF CALIFORNIA

18                          SAN JOSE DIVISION

19

20   IN RE META PIXEL TAX FILING CASES          Master File No. 5:22-cv-07557-PCP (VKD)

21   This document relates to: All Actions      **DEFENDANT META PLATFORMS, INC.'S**
                                                 **RESPONSES AND OBJECTIONS TO**
22                                               **PLAINTIFFS' FIRST SET OF REQUESTS**
                                                 **FOR ADMISSION**

23

24   **PROPOUNDING PARTY:**    Plaintiffs

25   **RESPONDING PARTY:**    Meta Platforms, Inc.

26   **SET NO.:**    One (Requests No. 1-36)

27

28

**RESPONSE TO REQUEST FOR ADMISSION NO. 12**

Meta incorporates by reference the Preliminary Statement and General Objections set forth above.  Meta further objects to this Request as vague and ambiguous, including in the use of the following undefined terms and phrases: "using" and "on its website."  Meta further objects that this Request seeks an admission regarding the actions of a third party over whom Meta has no control and information solely within the possession of a third party over whom Meta has no control.  Meta further objects to this Request to the extent it calls for discovery that is better sought through another mechanism, including the duplicative Plaintiffs' Interrogatory No. 6, dated July 11, 2023, that plaintiffs also served.

Subject to and without waiving its objections, and based on a reasonable investigation of the information available as of the date of these responses, including the Pixel ID that plaintiffs have indicated is a Pixel ID associated with TaxAct, Meta responds as follows:  Meta denies this Request.

**REQUEST FOR ADMISSION NO. 13**

Admit that the Meta Pixel collected information from the TaxAct website that included "full names, email, country, state, city, zip codes, phone numbers, gender, date of birth, first names of dependents, buttons that were clicked, names of text-entry forms that the taxpayer navigated to (both of which could indicate, for example, whether taxpayers were eligible for certain deductions or exemptions), web browser used, year of the return, and website referral, if any." *See* THE REPORT, at page 11.

**RESPONSE TO REQUEST FOR ADMISSION NO. 13**

Meta incorporates by reference the Preliminary Statement and General Objections set forth above.  Meta further objects to this Request as vague and ambiguous, including in the use of the following undefined terms and phrases: "collected," "information," "the TaxAct website," and "website referral."   Meta further objects to this Request to the extent it quotes a statement in a document that Meta did not prepare, and relays information allegedly provided by a third party over whom Meta has no control.  Meta further objects to this Request because Meta cannot confirm that the quotation in the Request accurately represents what the cited third party communicated to the author(s) of THE REPORT.  *See* THE REPORT, at page 11 n.75.  Meta also objects to this Request

12

Gibson, Dunn &
Crutcher LLP

1  as vague, ambiguous, unduly burdensome, and disproportionate to the needs of this case to the extent

2  the Request fails to specify a particular period of time.  Meta further objects to this Request to the

3  extent it suggests the Pixel, rather than TaxAct, determined what information to send to Meta via the

4  Pixel.  Meta further objects to the Request to the extent it calls for information no longer within

5  Meta's possession, custody, or control.

6         Subject to and without waiving its objections, and based on a reasonable investigation of the

7  information available as of the date of these responses, Meta responds as follows:  Meta admits that it

8  received from the TaxAct website via the Pixel, among other things, "SubscribedButtonClick" event

9  data, and "PageView" event data with parameters, among others, bearing the labels "name,"

10  "raw_event_name," "event_name," "itemlist_product_name," "og:site_name," "cy_email,"

11  "ly_email," "email," "state_revenue," "zip," "phone," "age_range," "num_of_dependents,"

12  "numChildButtons," "button_text," "buttonFeatures," "buttonText," "return_year,"

13  "further_referred_document_link," "referred_document_link," "innerText," "tax_form,"

14  "formFeatures," and "client_user_agent."  Meta directs plaintiffs to its forthcoming production(s) of

15  event data for additional information that may be relevant to this Request.  Except as otherwise

16  admitted, the information Meta knows or can readily obtain is insufficient to enable it to admit or

17  deny this Request.  Meta continues to investigate information within its possession, custody, or

18  control that would enable it to admit or deny this Request, and Meta reserves the right to supplement

19  or amend its response.  Meta is willing to meet and confer to discuss the basis for its response.

20  **REQUEST FOR ADMISSION NO. 14**

21         Admit that Meta "collected indicators for whether a given taxpayer was head of household,

22  married filing jointly, had certain assets, investment income, charitable contributions, mortgage

23  interests, standard deductions, Schedule Cs, and student loan interest" from the TaxAct website

24  through another Meta "business tool that leverages Facebook's computing services." *See* THE

25  REPORT, at page 11.

26  **RESPONSE TO REQUEST FOR ADMISSION NO. 14**

27         Meta incorporates by reference the Preliminary Statement and General Objections set forth

28  above.  Meta further objects to this Request as vague and ambiguous, including in the use of the

Gibson, Dunn &
Crutcher LLP

DEFENDANT META PLATFORMS, INC.'S RESPONSES AND OBJECTIONS TO
PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION
CASE NO. 5:22-CV-07557-PCP (VDK)

following undefined terms and phrases: "collected," "indicators," "leverages," "computing services,"
"the TaxAct website," and "another Meta business tool," rendering this Request improper and
unintelligible.  Meta further objects to this Request to the extent it quotes a statement in a document
that Meta did not prepare, and relays information allegedly provided by a third party over whom
Meta has no control.  Meta further objects to this Request to the extent Meta cannot confirm that the
quotation in the Request accurately represents what the cited third party communicated to the
author(s) of THE REPORT.  Meta also objects to this Request as vague, ambiguous, unduly
burdensome, and disproportionate to the needs of this case to the extent the Request fails to specify a
particular period of time.  Meta further objects to this Request to the extent it suggests the Meta,
rather than TaxAct, determined what information to send Meta via a "Meta business tool."

Subject to and without waiving its objections, and based on a reasonable investigation of the
information available as of the date of these responses, Meta responds as follows:  Meta can neither
admit nor deny the matters set forth in this Request because the information Meta knows or can
readily obtain is insufficient to enable it to admit or deny this Request.

**REQUEST FOR ADMISSION NO. 15**

Admit that TaxAct shared taxpayers' number of dependents, number of W2s, AGI (rounded
to the nearest thousand), and federal tax owed, and refund amount (each one rounded to the nearest
hundred)" with Meta. *See* THE REPORT, at page 11–12.

**RESPONSE TO REQUEST FOR ADMISSION NO. 15**

Meta incorporates by reference the Preliminary Statement and General Objections set forth
above.  Meta further objects to the Request as impermissibly vague and unintelligible to the extent it
purports to quote from a source but omits an introductory quotation mark.  Meta further objects to
this Request as vague and ambiguous, including in the use of the following undefined terms and
phrases: "shared," "taxpayers," "AGI," "number of dependents," "federal tax owed," and "refund
amount."  Meta further objects to this Request as unduly burdensome and disproportionate to the
needs of this case to the extent the Request pertains to business tools other than the Meta Pixel, SDK,
and CAPI.  Meta further objects to this Request to the extent it quotes a statement in a document that
Meta did not prepare, and relays information allegedly provided by a third party over whom Meta has

14

Gibson, Dunn &
Crutcher LLP

no control.  Meta further objects to this Request to the extent it cannot confirm that the quotation in the Request accurately represents what the cited third party communicated to the author(s) of THE REPORT.  Meta further objects to this Request as vague, ambiguous, unduly burdensome, and disproportionate to the needs of this case to the extent the Request fails to specify a particular period of time.

Subject to and without waiving its objections, and based on a reasonable investigation of the information available as of the date of these responses, Meta responds as follows:  Meta admits that it received from the TaxAct website via the Pixel, among other things, parameters bearing the labels "num_of_dependents," "numChildButtons," "w2," "agi," "federal_owe_amount," and "federal_refund_amount."  Meta directs plaintiffs to its forthcoming production(s) of event data for additional information that may be relevant to this Request.  Except as otherwise admitted, the information Meta knows or can readily obtain is insufficient to enable it to admit or deny this Request.  Meta continues to investigate information within its possession, custody, or control that would enable it to admit or deny this Request, and Meta reserves the right to supplement or amend its response.  Meta is willing to meet and confer to discuss the basis for its response.

**REQUEST FOR ADMISSION NO. 16**

Admit that the Meta Pixel's default settings allowed it to collect page title information from H&R Block's online tax filing service, including page titles that relayed information about the customer and his or her tax situation, such as "the first name of the taxpayer and aggregate amounts relating to HSA contributions, scholarships, and education expenses." *See* THE REPORT, at page 12.

**RESPONSE TO REQUEST FOR ADMISSION NO. 16**

Meta incorporates by reference the Preliminary Statement and General Objections set forth above.  Meta further objects to this Request as vague and ambiguous, including in the use of the following undefined terms and phrases: "allowed," "collect page title information," "H&R Block's online tax filing service," "relayed information," "tax situation," and "aggregate amounts relating to HSA contributions, scholarships, and education expenses."  Meta further objects to this Request to the extent it quotes a statement in a document that Meta did not prepare, and relays information allegedly provided by a third party over whom Meta has no control.  Meta further objects to this

Gibson, Dunn &
Crutcher LLP

DEFENDANT META PLATFORMS, INC.'S RESPONSES AND OBJECTIONS TO
PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION
CASE NO. 5:22-CV-07557-PCP (VDK)

information irrelevant to the claims or defenses in this case and as such Meta is not required to respond.

**REQUEST FOR ADMISSION NO. 36**

Admit that the document attached as Exhibit A is a true and correct copy of an original document generated by a Meta employee.

**RESPONSE TO REQUEST FOR ADMISSION NO. 36**

Meta incorporates by reference the Preliminary Statement and General Objections set forth above. Meta further objects to this Request as vague and ambiguous, including in the use of the following undefined terms and phrases: "an original document," and "generated."

Subject to and without waiving its objections, and based on a reasonable investigation of the information available as of the date of these responses, Meta responds as follows: Meta denies this Request.

Dated: February 23, 2024                    GIBSON, DUNN & CRUTCHER LLP


By:  _____*/s/ Lauren Goldman*_____

*Attorneys for Defendant Meta Platforms, Inc.*

DEFENDANT META PLATFORMS, INC.'S RESPONSES AND OBJECTIONS TO
PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION
CASE NO. 5:22-CV-07557-PCP (VDK)

**EXHIBIT 2**

GIBSON, DUNN & CRUTCHER LLP
LAUREN R. GOLDMAN (*pro hac vice*)
lgoldman@gibsondunn.com
200 Park Avenue
New York, NY 10166
Telephone:    (212) 351-4000
Facsimile:    (212) 351-4035

ELIZABETH K. MCCLOSKEY (SBN 268184)
emccloskey@gibsondunn.com
ABIGAIL A. BARRERA (SBN 301746)
abarrera@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105
Telephone:    (415) 393-8200
Facsimile:    (415) 393-8306

TRENTON J. VAN OSS (*pro hac vice*)
tvanoss@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:    (202) 955-8500
Facsimile:    (202) 467-0539

COOLEY LLP
MICHAEL G. RHODES (SBN 116127)
rhodesmg@cooley.com
KYLE C. WONG (SBN 224021)
kwong@cooley.com
CAMERON J. CLARK (SBN 313039)
cclark@cooley.com
CAROLINE A. LEBEL (SBN 340067)
clebel@cooley.com
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

*Attorneys for Defendant Meta Platforms, Inc.*
*(formerly known as Facebook, Inc.)*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE META PIXEL HEALTHCARE LITIGATION<br><br>_____<br><br>This Document Relates To:<br><br>Case No. 3:22-cv-3580-WHO (Doe) | Case No. 3:22-cv-3580-WHO<br><br>PUTATIVE CLASS ACTION<br><br>**DECLARATION OF TOBIAS WOOLDRIDGE IN SUPPORT OF DEFENDANT META PLATFORMS, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>*[Declaration of Abigail Barrera and [Proposed] Order filed concurrently herewith]*<br><br>Action Filed: June 17, 2022<br><br>Honorable Judge William H. Orrick |

Gibson, Dunn &
Crutcher LLP

DECLARATION OF TOBIAS WOOLDRIDGE IN SUPPORT OF DEFENDANT META PLATFORMS, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION – CASE NO. 3:22-CV-3580-WHO

I, Tobias Wooldridge, hereby declare and state:

1.  I am a software engineer at Meta. I offer this declaration in support of Meta's Opposition to Plaintiff's Motion for Preliminary Injunction. The following facts are based on my own personal knowledge, unless otherwise indicated, and, if called and sworn as a witness, I could and would testify competently to them.

## My Background And Work At Meta

2.  I have worked at Meta as a software engineer since February 2015. I am a senior engineer on the Signals team, which bears primary responsibility for maintaining and updating the Meta Pixel code. My team is also responsible for maintaining and implementing Meta's systems that detect and filter potentially sensitive data being sent by third-party developers to Meta via the Meta Pixel, among other Business Tools. I have worked on the Signals team since April 2017.

## Meta Prohibits Developers From Sending Health Information Through Its Pixel Tool

3.  Meta's Pixel is a free, publicly available piece of code that third-party website developers can choose to install and use on their websites to measure certain actions taken on their own websites. Meta's Pixel is available to and used by website developers across industries. Other companies offer their own pixel tools.

4.  Specifically, when someone takes an action a developer chooses to track on their website (like subscribing to email updates), the Meta Pixel is triggered and sends Meta certain data, called an "Event." Meta attempts to match the Events it receives to Meta users (Meta cannot match non-Meta users). The developer can then create "Custom Audiences" based on Events and can target ads on Facebook, Instagram, and publishers within Meta's Audience Network to Meta users who have taken certain actions on their own website. Meta can also provide the developer with de-identified, aggregated reporting that helps the developer better understand the impact of its ads by measuring what happens when people see them. The identity of matched Meta users is never revealed to the developer or to any advertiser.

5.  Meta does not want or permit developers to transmit sensitive information, including health information, to it through the Pixel tool. Meta takes numerous measures to prevent the transmission and receipt of that information.

Gibson, Dunn &
Crutcher LLP

1

DECLARATION OF TOBIAS WOOLDRIDGE IN SUPPORT OF DEFENDANT META PLATFORMS, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION – CASE NO. 3:22-CV-3580-WHO

1      6.      First, Meta requires all developers to agree to its Business Tools Terms before they

2  can obtain a Pixel ID and utilize Meta Pixel code in a website.  The Business Tools Terms expressly

3  prohibit developers from sending Meta health or otherwise sensitive information (including any

4  information defined as sensitive under applicable law) and require developers to warrant that they have

5  the legal right to share any information they choose to share with Meta.  Developers must also accept

6  Meta's Commercial Terms before using Meta for a business purpose, which similarly prohibit sending

7  Meta health or otherwise sensitive information.

8      7.      Second, during the Meta Pixel ID creation process—a necessary step to install and use

9  the Meta Pixel—Meta reminds developers not to send Meta sensitive user data, linking to the Business

10  Tools Terms and to Meta's Business Help Center content about restricted data ("About Restricted Meta

11  Business Tools Data").  Attached as **Exhibit 1** is a true and correct copy of the article entitled "About

12  Restricted Meta Business Tools Data," downloaded from the Meta Business Help Center on October

13  13, 2022.  Meta has published several additional Business Help Center articles that explain and give

14  examples of the kinds of information (including health information) that developers should not send to

15  Meta, provide steps developers can take to avoid sending such information, and describe how to address

16  instances in which sensitive information may have been sent.

17      8.      Third, in addition to requiring developers to agree not to send Meta any information

18  they do not have the legal right to share, Meta developed and implemented a filtering mechanism to

19  screen out potentially sensitive data it detects.  Meta developed the filter to detect data sent through the

20  Pixel (as well as other Business Tools) that it categorizes as potentially sensitive data, including health

21  data, and the filter prevents that detected data from being ingested into Meta's ads ranking and

22  optimization systems.  ████████████████████████████████████

23  ████████████████████████████████████████████████

24  ████████████████████████████████████████████████

25  ████████████████████████████████████████████████

26  ████████████████████████████████████████████

27      9.      When Meta's systems detect and filter out data they categorize as potentially sensitive,

28  Meta sends notifications to the developer (1) via email and (2) in two locations in Meta's developer

Gibson, Dunn &
Crutcher LLP

2

DECLARATION OF TOBIAS WOOLDRIDGE IN SUPPORT OF DEFENDANT META PLATFORMS, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION – CASE NO. 3:22-CV-3580-WHO

dashboard, Events Manager. These notifications inform the developer that Meta detected and blocked data that may not comply with Meta's terms; confirm that the removal may affect ad performance; and provide details about the affected data, including the URL where the events occurred, the location (but not the contents) of the potentially violating information, steps the developer can take to address the issue, and an email address to contact with questions.

**Meta Users Consent To Meta's Use Of Pixel Data And Can Control And Disconnect Their Off-Facebook Activity**

10. Meta discloses to users that it receives data from third parties, including data sent via the Pixel tool, and provides several ways for its users to review and control Meta's use of that data. The Data Policy, to which all users of Meta services must agree, explains that Meta may receive information about users' activities off the Meta services, including from developers that use the Meta Business Tools, including the Meta Pixel. The Data Policy also discloses how Meta uses such data, including by providing measurement, analytics, and other business services. Meta users also must agree to the Terms of Service and Cookies Policy, which disclose that their personal data can be used to provide targeted ads.

11. Meta also enables its users to review a summary of information Meta has received about their activity from third parties, including through the Pixel, and to disconnect that data from their account. Specifically, using the Off-Facebook Activity tool, which is linked to in the Data Policy and accessible via other entry points, Meta users can control or disconnect the off-Facebook activity that has been associated with their Facebook account, subject to some exceptions for security and safety needs. Meta users can disconnect historical third-party activity data from their account using the "Clear previous history" option. They can also "turn off" storage of future connections between their Facebook account and their activities off Facebook using the "Disconnect Future Activity" option. Meta users can make this choice for all third-party websites or on a website-by-website basis.

12. In addition, Meta provides other privacy tools and resources to users of the Meta services that allow them to control how data shared by third parties can be used to show them relevant ads. Specifically, the "Data About Your Activity From Partners" tool within Meta's "Ad Settings" allows users to opt out of receiving personalized advertisements based on their activity on third-party

Gibson, Dunn & Crutcher LLP

3

DECLARATION OF TOBIAS WOOLDRIDGE IN SUPPORT OF DEFENDANT META PLATFORMS, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION – CASE NO. 3:22-CV-3580-WHO

1  websites, apps, or offline, among other things.

2      13.    Additional tools Meta provides to its users, which enable them to control

3  advertisements they receive, include the following:

4          • **Hide ad**:  Users can hide individual advertisements appearing in their News Feed.

5          • **Report ad**:  Users can report advertisements in their News Feed if they consider them

6            to be inappropriate—for example, due to containing spam, false news, or being

7            misleading or sexually inappropriate.

8          • **Hide advertiser**:  Users can hide all advertisements from a specific developer altogether

9            via their Ad Preferences.

10         • **Limit ad topics**:  Users can limit advertisements about topics such as alcohol, parenting,

11           pets, social issues, and elections or politics, and advertisers cannot target the user based

12           on an interest in that topic.

13     I declare under penalty of perjury that the foregoing is true and correct, and that I executed this

14  Declaration on October  17  , 2022, in  Adelaide, South Australia  .

15

16                                                    Tobias Wooldridge

17                                                    Tobias Wooldridge

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

4

DECLARATION OF TOBIAS WOOLDRIDGE IN SUPPORT OF DEFENDANT META PLATFORMS, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION – CASE NO. 3:22-CV-3580-WHO

# Exhibit 1

DocuSign Envelope ID: 29C07AF3-7BB2-41AA-895B-6701EBA9D6E5

**At Meta, we have policies around the kinds of information businesses can share with us. We don't want websites or apps sending us sensitive information about people.**

Business Tools Data is data sent from advertisers to Meta in connection with advertising, matching, measurement and analytics, including through the use of Business Tools, Social Plugins, Login, and certain APIs. Meta's Business Tools Terms outline the type of data that advertisers should not send to Meta via any of the Meta Business Tools.

Specifically, advertisers should not share Business Tools Data with Meta that they know or reasonably should know is either from or about children under the age of 13, or includes health or financial information, or other categories of sensitive information. This includes any information defined as sensitive under applicable laws, regulations and applicable industry guidelines.

Advertisers may use the Meta Business Tools to send to Meta information that personally identifies individuals (referred to as Contact Information), such as names, email addresses, and phone numbers, to help Meta match the data advertisers share with Meta user accounts. However, such Contact Information must be hashed in a manner specified by Meta before transmission, when using a Meta image Pixel or other Meta Business Tools. Visit Meta for Developers for hashing instructions.

Use the Learn More section below for further guidance on certain types of sensitive Business Tools Data prohibited under Meta's Business Tools Terms.

If you receive a notification that you're violating Meta's Business Tools data policies, learn how to troubleshoot the issue.

## Learn more

**EXHIBIT 3**

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 7/17/2024 11:47 PM
Reviewed By: C. Roman
Case #21CV383231
Envelope: 15983398**

**GIBSON, DUNN & CRUTCHER LLP**
ELIZABETH K. MCCLOSKEY, SBN 268184
emccloskey@gibsondunn.com
ABIGAIL A. BARRERA, SBN 301746
abarrera@gibsondunn.com
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone:    (415) 393-8200
Facsimile:    (415) 393-8306

**GIBSON, DUNN & CRUTCHER LLP**
LAUREN R. GOLDMAN (*pro hac vice*)
lgoldman@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:    (212) 351-4000
Facsimile:    (212) 351-4035

**COOLEY LLP**
MICHAEL G. RHODES, SBN 116127
rhodesmg@cooley.com
Three Embarcadero Center, 20th Floor
San Francisco, CA 94111
Telephone:    (415) 693-2000
Facsimile:    (415) 693-2222

*Attorneys for Defendant Meta Platforms, Inc.
(formerly known as Facebook, Inc.)*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA CLARA

| | |
|---|---|
| ANGEL MCDANIEL, JEROME GAGE, and CRAIG MILLER,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC., fka FACEBOOK, INC.,<br><br>Defendant. | Case No. 21-CV-383231<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF META'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Action Filed:  June 18, 2021<br><br>Judge:  Hon. Charles F. Adams, Department 7<br><br>Date:  October 17, 2024<br><br>Time:  1:30 P.M. |

**PUBLIC - REDACTS MATERIALS FROM CONDITIONALLY SEALED RECORD**

1    that class litigation cannot be superior.  Other courts have refused to certify classes for wiretapping

2    claims based on many of these exact issues.  Plaintiffs' motion and trial plan address none of them.

3         Plaintiffs cannot avoid these problems by simply pretending they do not exist.  "A class cannot

4    be certified on the premise that [the defendant] will not be entitled to litigate its . . . defenses to indi-

5    vidual claims."  (*Duran v. U.S. Bank Nat'l Ass'n* (2014) 59 Cal.4th 1, 35 (*Duran*), quotation marks and

6    citation omitted.)  Plaintiffs' motion for class certification should be denied.

7                                    **BACKGROUND**

8         **A.    Meta's Pixel**

9         The Meta Pixel is a free, publicly available internet tool that website developers can install on

10   their websites to measure the actions users take on their sites.  (Declaration of Elizabeth K. McCloskey

11   ("McCloskey Decl.") Ex. 1.)  Pixels are ubiquitous tools across the web.  Numerous companies (such

12   as Google and LinkedIn) offer them, and web developers across numerous industries use them.  (Report

13   of Dr. Georgios Zervas ("Zervas Report") ¶¶ 9(a), 10, 12.)

14        Web developers choose whether and how to install Meta's Pixel and decide which actions to

15   measure (called "events").  (McCloskey Decl. Ex. 2; Zervas Report ¶¶ 13–15.)  When a user of the

16   developer's website takes an action the developer has chosen to measure, the Pixel sends certain "Event

17   Data" about that action to Meta, which Meta can then compile and use to provide analytics to the

18   developer.  (*Ibid.*; McCloskey Decl. Ex. 1; *id.* Ex. 3; Zervas Report ¶ 12.)  This information helps

19   developers improve their online services, understand how people interact with their products and ser-

20   vices, and better communicate with people who may be interested in their products and services, in-

21   cluding by showing ads to them.  (McCloskey Decl. Ex. 1; *id.* Ex. 4; *id.* Ex. 5; Zervas Report ¶ 12.)

22        Pixel technology is no secret.  Meta's policies and online articles describe how pixels work,

23   and web developers (including HBO) disclose their use of pixels in their policies.  (E.g., McCloskey

24   Decl. Exs. 6–9.)  Meta also provides a tool, the "Off-Facebook Activity" tool, for users to see data

25   Meta receives about them from other websites.  (*Id.* Ex. 10; Declaration of Stephanie Tung ("Tung

26   Decl.") ¶¶ 2–3.)

27        **B.    Plaintiffs' Claims**

28        Plaintiffs Angel McDaniel, Jerome Gage, and Craig Miller are Facebook users who have HBO

                                          6

1

2 Dated: July 17, 2024

3

**GIBSON, DUNN & CRUTCHER LLP**

4 By:     */s/ Elizabeth K. McCloskey*
         Elizabeth K. McCloskey, SBN 268184
5        Abigail A. Barrera, SBN 301746
         One Embarcadero Center, Suite 2600
6        San Francisco, CA 94111
         Telephone:     (415) 393-8200
7        Facsimile:      (415) 393-8306
         emccloskey@gibsondunn.com
8        abarrera@gibsondunn.com

9        Lauren R. Goldman (*pro hac vice*)
         200 Park Avenue
10       New York, NY 10166-0193
         Telephone:     (212) 351-4000
11       Facsimile:      (212) 351-4035
         lgoldman@gibsondunn.com
12

13   **COOLEY LLP**

14

15   By:     */s/ Michael G. Rhodes*
         Michael G. Rhodes, SBN 116127
16       Three Embarcadero Center, 20th Floor
         San Francisco, CA 94111
17       Telephone:     (415) 693-2000
         Facsimile:      (415) 693-2222
18       rhodesmg@cooley.com

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF META'S OPPOSITION TO PLAIN-
TIFFS' MOTION FOR CLASS CERTIFICATION – CASE NO. 21-CV-383231

**EXHIBIT 4**

# ABP Privacy Infra, Long Range Investments [A/C Priv]

**Goals of this Review**

- This document was written to advise leadership on preparedness, investments and technology plans with respect to inbound regulations.
- ABP is seeking continuous, multi-year investment and support from Data Infrastructure, Core Data and Central Privacy for the plans laid out in this document.

  NOTE (1) This document is an abridged version of ABP Privacy Infra 2021 (2) the follow up reading of this document in ABP Privacy Infra: WWW [A/C priv] which expands on the base understanding provided here.

**Executive Summary**

- We were surprised in 2021 with regulatory changes in the EU and India that will restrict 1P data use; setting the stage for a global regulatory push toward consent for 1P data use in Ads.
- Our past policy enforcement plans were already insufficient (on any timeframe) for handling 2PD concerns. The gap with success (scalably enforcing policy) is now an order of magnitude larger with the increased 1P governance.
- We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as "we will not use X data for Y purpose." And yet, this is exactly what regulators expect us to do, increasing our risk of mistakes and misrepresentation.
- Addressing these challenges will require additional multi-year investment in Ads and our infrastructure teams to gain control over how our systems ingest, process and egest data. This new investment is needed in addition to the ongoing Purpose Policy Framework investments.
- The remainder of this document is structured as follows

Motivations
- Regulatory Landscape
- Fundamental Problems
- Gaps in Purpose Policy Framework

Investments Needed
- Curated Data Sources


EXHIBIT
158

- 1PD Controls
- Timelines & Goals
- Resource Napkin and Funding Gaps

Nascent Investments
- Competition
- WWW Isolation and Control

**Motivations**

**Regulatory Landscape**

In 2021 regulatory restrictions will continue to expand around the globe as we shift toward consent. Under a consent regime, by default we are not allowed to use personal data for ads. We are anticipating impactful regulations from India, Thailand, South Korea, South Africa, Egypt, and many other jurisdictions (see image below). We also expect the US to make progress on federal privacy legislation, though the effective data will likely not be in 2021. Key point: historically regulations have been major thrashing changes for the company, but we've had the "luxury" of addressing one at a time (GDPR in 2018, FTC suit in 2019, CCPA in 2020). This is no longer the case. We face a tsunami of inbound regulations that all carry massive uncertainty.



**Fundamental Problems**

From an infrastructure point of view, the heart of our challenge is a lack of "closed form systems." In this context, "closed form" refers to the union of these desirable properties of a system: (1) All data types ingested, derived and egested by the system can be enumerated and controlled; (2) All data uses within the system can be enumerated and controlled; (3) All

data uses of egested data by consumers downstream, can be enumerated and controlled. These properties are what make a system tractable, and controllable. If we can't enumerate all the data we have - where it is; where it goes; how it's used - then how can we make commitments about it to the outside world?

We fundamentally lack closed-form properties in Facebook systems. For more than a decade, openness and empowering individual contributors has been part of our culture. We've built systems with open borders. The result of these open systems and open culture is well described with an analogy: Imagine you hold a bottle of ink in your hand. This bottle of ink is a mixture of all kinds of user data (3PD, 1PD, SCD, Europe, etc.) You pour that ink into a lake of water (our open data systems; our open culture) … and it flows … everywhere. How do you put that ink back in the bottle? How do you organize it again, such that it only flows to the allowed places in the lake?

To make this understanding a bit more concrete, consider this: There are 15K features used in ads models. The graph to the right shows the dependency chain of actual tables used to produce **just one single feature**. In total, ~6K tables (the red dots) were used to produce "user_home_city_moved"



**Gaps in Purpose Policy Framework**

In 2019 ABP accepted the vision from Central Privacy that in the longer term, most, if not all of our challenges would be solved by the Purpose Policy Framework (PPF). The basic idea

of PPF was that we could attach a policy, at a very granular level, to every piece of data as it gets ingested or created in Facebook. Then, as the data flowed from system to system, the policy would flow with it. Then, at every place the data was being processed or used, it would get properly handled, because every processor would have a declared purpose. If the declared purpose wasn't allowed, the data would get filtered out by the underlying infrastructure…And all this would happen magically and silently so that engineers wouldn't need to restructure all of its data flows to gain control over its data use.

**Key point:** The beauty of (Purpose Policy Framework) was that -in theory- ABP wouldn't need to restructure all of its data flows to gain control over its data use.

In late 2020 PPF was folded under the branding of Privacy Aware Infra (PAI), and while it carries forward many of the challenges characteristic of large infrastructure projects (delays technological gaps, misaligned cross-org investment levels), it is still one of our most necessary and promising investments. **ABP remains committed to PPF adoption. However we now see that the original version wasn't a full solution.**

**Key Gaps:**

1. **Investment gap** → Policy Annotation. There are not aggressive and proportionate investments among the Family of Apps for attaching policies to their tens-of-thousands of root data sources (e.g. APIs in WWW, Tables in Hive, etc.)
2. **Technological Gap** → Policy Propagation. Even after policies are attached, they need to be handled through complex operators (joins, unions, concatenations, transformations, etc.) This is a very technologically difficult to do for several classes of operators that are frequently used throughout ads pipelines. Contrary to the original vision, PPF won't be able to support major classes of Ads operators, on any timeframe.
3. **Technological Gap** → System Coverage. Policies need to be handed off from one data platform to another, passing all the way from root systems to target systems without getting dropped (e.g. www → thrift → scribe → hive → etc.) There are more than 140 data processing systems (Asset Classes), and even for some of the major ones like WWW, PPF won't be supported until 2023 or later.

   … summing these gaps: ABP has been getting ready to receive a pitch, but no one will be ready to throw the ball.

Key Point: In light of these gapos, and pressured by accelerated regulatory timelines, we can't wait for PPF to achieve the "closed form" system properties we need while holding our core ads infrastructure as invariant. We need to restructure our data flows so that they are closer to the goal by design.

**Investments Needed**

In this section we'll discuss (1) Curated Data Sources and (2) 1P Data Controls. These are the most major infrastructure investments needed, and they have the most developed plans.

**Curated Data Sources (CDS)**

There are tens-of-thousands of uncontrolled data ingestion points into Ads systems today. We will rewrite and migrate all of these onto a controlled 'choke point' where we can systematically annotate the data with PPF policy. All of the Ads subsystems will only consume data from [Curated Data Sources]. Thus we will know exactly what data is being consumed by Ads subsystems, where it comes from, how it's generated, and what policies apply. Furthermore, CDS will only use computational operators (joins, unions, etc.) that PPF can support. With CDS we will be able to make product commitments and comply with regulatory requirements.

The below diagram provides a 30K foot architecture. A more detailed architecture can be found here. [URL redacted]



**Why do we need Curated Data Sources if we have Purpose Policy Framework?**
Two reasons:

1. All data consumed by Ads must have an attached policy. The act of curation into CDS is the attachment of a PPF policy (by ads engineers). The alternative of waiting for FOA [Family of Apps] to decorate all their data with policy is **many** years away, at best.
2. PPF technology will never be capable of handling certain classes of operators and processors that are common among Ads pipelines. This, even if FOA were to properly decorate all their data with policies, Ads would still need to refactor most of its data flows to make them PPF compatible.

**Why do we need Purpose Policy Framework if we have Curated Data Sources?**
Two reasons:

1. Subsystems within Ads may or may not be allowed to consume certain data from CDS, subject to privacy policy. For example, we may allow certain opt-out data to be used in training, but not in ranking or targeting. To support these different levels of access among CDS consumers, we need a policy enforcement mechanism within the Ads boundary. Ads could build a new custom enforcement - why would we? - This is exactly what PPF is for, and Ads intends to take a low-risk dependency on PPF's basic capabilities.
2. PPF policies are the standard way to express a purpose policy today, and will generalize for other policy types as part of PAI going forward. Data arriving at and leaving Ads boundary will need to carry such a policy to remain compatible with the rest of the infra ecosystem.

**1P Data Controls**

There is a global regulatory trend pushing Facebook Ads toward legitimate interest or consent for 1P data use. In either legal construct (legitimate interest or consent) Ads must "immediately" halt processing of an opted-out user's data; including user data that was accumulated before the opt-out occurred.

**Long term**: A major part of our long term solution for halting processing in ads is CDS+PPF, as described above in this doc. However, even CDS+PPF will not be sufficient, because we will not be able to retroactively apply a user opt-out toi data that has already been consumed by Ads systems. There is strong consensus among Ads and Data Infrastructure TL circles that to fully stop processing (including data that has already entered ads systems) we'll need to efficiently filter opted-out users in the underlying Data Infrastructure.

Specifically, Data Infra will need to have some semantic awareness of its data assets (hive tables, scribe streams, etc.) such that it can know if the data it contains includes an

opted-out user information (a UserID) - in which case, the infra would be silently and efficiently filter that opted-out user from further processing. Building this will take multiple years, and will require DI investment. We are still in the early stages of joint scoping and estimations.

**Short Term**: Our short term response to these requirements is to build "Basic Ads." A new product initiative that needs to be launch-ready in Europe by January, 2022. When launched, Facebook users will be able to "opt-out" from having almost all of their 3P and 1P data used by Ads systems - page likes, posts, friends list, etc. To build this, Ads will still require efficient Data Infra filtration, however the work will be more narrowly scoped - we will only filter data at the boundary of Ads warehouse systems (Uhaul jobs, etc.) Data infra scoping and estimation work for this is underway.



**Resourcing Napkin**

Ads will require substantial investment for the next several years in order to deliver on our aggressive timeline. A detailed resourcing plan is here. In brief:
- Estimate: 450-750 eng years. For simplicity, yearly breakdowns assume the mid-point of 600 eng years.
- Assume: Execution timeline of 3 years.
- High-level execution plan and resourcing needs by year:

**2021**
- +150 HC (150 in total)
- Fully staff ingestion for CDS and 1P data controls
- Partially staff consumption of CDS and frontload key tech investments

- 150 eng years of work is completed.

  **Fully Funded**
  ✓ 50 HC from PAI pool
  ✓ 40 HC from ABP pool
  ✓ 60 people from ABP repri

**2022**
- +200 HC (350 total)
- Fully staff consumption of CDS - migrate Delivery systems to use only curated data
- Egin investments outside Ads Delivery (Business Integrity, Measurement, etc.)
- 500 eng years of work is completed.

  **Funding Source Needed**

**2023**
- ~250 HC (100 total)
- Drop the investment for curated data sources since most work should be completed

  **Funding Source Needed**

**Nascent Investments**

In this section we'll discuss (1) Competition and (2) WWW isolation. These are two relatively more nascent challenges that will drive additional investment needs over the next several years.

**Competition**

Our legal teams anticipate negative competition judgments from the European Commission within 2021. This will likely have contagion effects for other jurisdictions (United States) and other FB product areas (Shops).

To oversimplify, 'Privacy' is concerned with controlling data flowing *from our Family of Apps into Ads*; whereas 'Competition' is concerned with the reverse flow - i.e. competitively sensitive data flowing *from Ads into our Family of Apps*. But the fundamental challenge is exactly the same. That is, data isolation and control among FACEBOOK properties.

In 2020 Ads wrote a joint proposal with the Choice and Competition team that would stem risks associated with competitively sensitive data use. It called for accelerations of PPF adoption around the company and a massive surge in headcount split among Central

Privacy, Ads and FOA → see [Occam] Avoiding Competitive Data Use Mistakes [A/C priv]. The Occam proposal remains unfriended in this writing (April, 2021)

**WWW Isolation and Control**

From an infrastructure point of view, the aforementioned investments are about 'isolation and control' of data and processing. That is, we need to isolate Ads from the rest of the Family of Apps, and build well controlled interfaces at the boundaries between Ads and other Facebook properties. Creating this isolation in WWW wil be especially difficult due to its monolithic nature. There are hundreds of thousands of controllers and call sites, and there is no clear solution for defining an "ads boundary", short of doing the hard work of manually visiting each of them.

Our overall strategy for solving this problem is to migrate as many of the Ads data dependencies as possible out of WWW, in favor of Warehouse data sources, where boundary definitions, isolation and control systems are relatively more available. We will execute on this strategy (migrating to Warehouse) as part of our Curated Data Sources investments. But this will not be enough. There will remain substantial Ads code in WWW that is entangled with FACEBOOK organic processing. The legal constructs of legitimate interest and consent require us to also stop this WWW processing.

We will continue working with Privacy Infra to evaluate new WWW lineage tools, boundary annotations and enforcement technologies such as CIPP. However, there is no obvious solution yet, which doesn't involve dramatic investment by Ads engineers. At present, it appears we will need to manually visit tens-of-thousands of call sites and code paths to define and enforce an Ads boundary. And in many cases we will need to manually untangle and rebuild Ads scenarios.

**Key point**: Just like PPF isn't a sufficient solution without heavy Ads refactoring and adoption work in warehouse, WWW enforcement technologies such as CIPP will not magically solve these problems without enormous Ads and FOA side investments for adoption.

**Appendix-1: Point of view on readiness and uncertainty of solutions**

The below grid shows the dimensions of requirements we described above. For each of these, we are assigning one of 3 colors that represents our level of confidence in our proposed infrastructure solutions. This is obviously subjective, and it oversimplifies things. Nevertheless, we hope it can level set perspectives on uncertainty.

| High Confidence | Low Confidence | Very Low Confidence |
|---|---|---|

|  | Necessary? | Sufficient? |  |
|---|---|---|---|
|  | How confident are we that our infra investments address long term fundamental problems and are necessary? | How confident are we that our infra solutions are sufficient for 2022? | **Explanation** |
| Jurisdiction |  |  | We have a reasonable handle on which jurisdictions are going to drive significant requirements and there is a Central Privacy team monitoring global changes. |
| Sensitive Categories |  |  | With inferences counting as SCDs, this problem space expands to ML. Our solutions in this area are immature, and have not been subjected to regulatory scrutiny. We will likely discover new work (e.g. Youth requirements). |
| Purpose Limitation & Legal Basis |  |  | The legal constructs in this area are well understood and similar around the world. We've had a lot of time to consider the problem space. However, we are making risk based decisions around legal basis, and we may be challenged by regulators. |
| ML/AI |  |  | This is a new area for regulation and we are very likely to see novel requirements for several years to come. We have very low confidence that our solutions are sufficient. |
| Data Provenance and Responsibilities |  |  | Similar to purpose limitations, we understand the legal constructs in this area, and they are patterned around the globe. And yet, we have risk based |

| | | | tradeoffs and there is room for regulatory surprise and novel requirements, particularly from the USA. |
|---|---|---|---|
| Transparency & Control | | | Transparency and Control over machine learning is likely to reveal new requirements. |
| Localization | | | Ads is largely in the dark here. We are not aware of any ads specific requirements, and are awaiting company wide solutions that will most likely be owned by core infra teams. |
| Minimization | | | This area is largely understood and similar around the world. The infra solutions for controlling retention policies are in place and continue to improve coverage through Central Privacy Waves. There is room for surprise here as ML regulations progress. |
| Timing | | | Our infra solutions have not, and most likely will not be ready before significant regulations take effect. Of most concern: India will likely mandate Consent within 2023. |

**Appendix-2: Collection of diagrams for potential Q/A**





**Appendix-3: Examples and Understanding of Ads WWW Footprint and Entanglement**

Question from [NAME REDACTED]: "One thing I'd like to understand better is how Ads uses www. If possible, it would be great if you could pull together some specific examples of each of the three categories you listed in the architecture diagram in the appendix (organic

processing, Entangled Ads processing and signal processing) along with where in www this code lives and what it depends on."

**Answer**: We don't have an organized understanding of all the Ads workloads and data flows in WWW. Even a specific and commonly used example -the AdRequest- has unboundedness and intractability in its dependency graph. As you read this, keep in mind this is probably our most well understood and controlled example, and that other ads workloads are similarly gnarly (measurement, targeting, business integrity etc… etc…)

**Macro view: Ads Footprint and Entanglement in WWW**

**APIs**
- There are about <u>350K</u> endpoints in the entire company. Of these, about a quarter (~80K) log to scribe channels that are owned by Ads OnCalls.
- According to OnCall associations, Ads only owns about 30K of the 80K endpoints that send data into Ads → Restated: 60% of the WWW APIs that Ads uses are not owned by Ads. Let's call these "entangled" APIs.
- Presumably most of the entangled APIs have alternate or original purposes that are 'organic' in nature.

**Files and Directories**
- There are 800K directories in WWW, containing 4.8 million files.
- Of these, at least 6% of the file structure (50K directories, containing 300K files) are in a directory that starts with "ads" in the name.
- Important note: We don't have a useful structure in WWW for determining what is ads vs what is not ads. Let alone a useful way to substructure the WWW workloads within Ads. This is, in part, the nature of our WWW entanglement problem. The heuristics described above, such as *'includes' "Ads" in the filename'*, or *'has an Ads oncall attached'* only give an approximation.

**Zoom in on a specific Ads workload: The AdRequest**
- Let's consider the "ad request"; one of our more "standard" interfaces between Ads & FOA.
- There are at least 60 different end points that generate 680 distinct code paths which eventually lead to an AdFinder call.
- In each ad request there are about 200 fields passed into AdFinder. These fields can be objects and complex structures. Each AdRequest is stuffed with *whatever* data placement teams and organic surfaces around FACEBOOK decided to compose in WWW. This would include unbounded and uncontrolled fetching of data from Ents and organic data stores from around the company (zippy, laser, … or whatever).
- When calling AdFinder, the min—average—max call stack depth is 19—90—127. That is, on average there are 90 WWW files used before AdFinder is even called.

Again, this is organic WWW processing running arbitrary code, and eventually building an arbitrary AdRequest using %whatever% data from around the company that they want.

**EXHIBIT 5**

GIBSON, DUNN & CRUTCHER LLP
LAUREN R. GOLDMAN (admitted *pro hac vice*)
lgoldman@gibsondunn.com
DARCY C. HARRIS (admitted *pro hac vice*)
dharris@gibsondunn.com
200 Park Avenue
New York, NY 10166
Telephone:    (212) 351-4000
Facsimile:    (212) 351-4035

ELIZABETH K. MCCLOSKEY, SBN 268184
emccloskey@gibsondunn.com
ABIGAIL A. BARRERA, SBN 301746
abarrera@gibsondunn.com
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone:    (415) 393-8200
Facsimile:    (415) 393-8306

*Attorneys for Defendant Meta Platforms, Inc.*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE META PIXEL TAX FILING CASES | MASTER FILE NO. 3:22-cv-07557-PCP |
| | **DEFENDANT META PLATFORMS, INC.'S FIRST SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES** |
| This Document Relates To: | |
| All Actions | |

**PROPOUNDING PARTY:  PLAINTIFFS**

**RESPONDING PARTY:    META PLATFORMS, INC.**

**SET NUMBER:      ONE**

Gibson, Dunn &
Crutcher LLP

DEFENDANT META PLATFORMS, INC.'S FIRST SUPPLEMENTAL RESPONSES AND OBJECTIONS
TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
CASE NO. 3:22-CV-07557-SI

Defendant Meta Platforms, Inc. ("Meta"), by and through its undersigned attorneys, and pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure ("Federal Rules"), and the Civil Local Rules of the U.S. District Court for the Northern District of California ("Local Rules"), hereby provides the following supplemental responses and objections to Interrogatory No. 6 from plaintiffs' First Set of Interrogatories to Defendant Meta Platforms, Inc. (each, an "Interrogatory," and, together, the "Interrogatories"), dated July 11, 2023.  Meta provides these supplemental responses subject to and without waiving the responses and objections contained in its initial response dated August 10, 2023.  Meta likewise provides these supplemental responses subject to the Preliminary Statement, General Objections, Objections to Definitions, Objections to Instructions, and Objections to Time Period set forth in its initial response dated August 10, 2023, and incorporates them by reference as if asserted herein.

## INTERROGATORIES

**INTERROGATORY NO. 6:**

State the period(s) of time when each SUBJECT WEBSITE transmitted event data or other data to Meta via the Meta Pixel, Conversions API, and SDK.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:**

**(CONFIDENTIAL):**

Meta restates and incorporates its Preliminary Statement, General Objections, Objections to Definitions, and Objections to Time Period, as though fully set forth in this Response.  Meta further objects to this Interrogatory on the following additional grounds:

(A)     Meta objects to this Interrogatory as being overbroad and unduly burdensome, including because it is unlimited as to time.

(B)     Meta objects to this Interrogatory as overbroad and unduly burdensome, including because it seeks information that is irrelevant to the claims in, or defenses to, this action and is disproportionate to the needs of the case.  For example, the Interrogatory seeks information related to any transmission by a "SUBJECT WEBSITE" of "event data or other data to Meta via the Meta Pixel, Conversions API, and SDK," irrespective of whether such data is relevant to the subject matter of this

1

Gibson, Dunn &
Crutcher LLP

1    litigation.

2        Subject to and without waiving the foregoing objections, and subject to the ongoing nature of

3    discovery in this action, Meta responds as follows:  The first and last dates on which Meta received a

4    transmission of data via the Meta Pixel or the Conversions API from each of the corresponding

5    SUBJECT WEBSITES based on the Pixel IDs plaintiffs have provided to Meta is as follows as of

6    March 30, 2025:

|  | Meta Pixel First Fired Date | Meta Pixel Last Fired Date | Conversions API First Fired Date | Conversions API Last Fired Date |
|---|---|---|---|---|
| **TaxAct** (Pixel ID: 1445099202415763) | August 25, 2015 | March 30, 2025 | November 10, 2020 | November 28, 2022 |
| **TaxSlayer** (Pixel ID: 535920746746256) | December 12, 2017 | March 30, 2025 | March 5, 2021 | March 30, 2025 |
| **H&R Block** (Pixel ID: 288696891835309) | January 15, 2019 | March 30, 2025 | June 16, 2021 | March 30, 2025 |

20        Meta reserves its right to supplement its objections and responses to this Interrogatory.

22    DATED:  April 11, 2025                        **GIBSON, DUNN & CRUTCHER LLP**

24                                          By:  _____
                                                  */s/ Lauren Goldman*
                                                  Lauren Goldman

25                                          *Attorneys for Defendant Meta Platforms, Inc.*

2

DEFENDANT META PLATFORMS, INC.'S FIRST SUPPLEMENTAL RESPONSES AND OBJECTIONS
TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
CASE NO. 3:22-CV-07557-PCP

Gibson, Dunn &
Crutcher LLP

**VERIFICATION**

I, Carrol Xia, a data scientist at Meta Platforms, Inc. ("Meta"), am authorized to make this Verification on behalf of Meta. I have read Meta's foregoing First Set of Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories. The responses were prepared by Meta's counsel with assistance from Meta's employees. My understanding is that these responses and information are based on records and information currently available. To the extent I do not have personal knowledge, I have relied on others to gather the information. Subject to the foregoing, in accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the factual information provided in the foregoing First Set of Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories are true and correct based upon a reasonable inquiry at this time made by Meta.

Executed on April 11, 2025

Signed by:

*Carrol Xia*

A705EDF159D44F1...

3

DEFENDANT META PLATFORMS, INC.'S FIRST SUPPLEMENTAL RESPONSES AND OBJECTIONS
TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
CASE NO. 3:22-CV-07557-PCP

**EXHIBIT 6**

1

**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)

2

1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596

3

Telephone: (925) 300-4455

4

ndeckant@bursor.com

5

6

*Attorneys for Plaintiffs*

7

*Additional Attorneys on Signature Page*

8

**GEORGE FELDMAN MCDONALD, PLLC**
Lori G. Feldman (*pro hac vice*)
Michael Liskow (State Bar No. 243899)
200 Park Avenue, Suite 1700
New York, New York 10166
Telephone: (646) 354-6534
lfeldman@4-justice.com
mliskow@4-justice.com

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

SAN JOSE DIVISION

11

12

IN RE META PIXEL TAX FILING CASES

13

This document relates to:

14

All Actions

15

16

17

18

Master File No. 5:22-cv-07557-PCP (VKD)

**DECLARATION OF JANE DOE**

Date Action Filed: December 1, 2022
Honorable P. Casey Pitts

19

20

21

22

23

24

25

26

27

28

1       I, Jane Doe, declare as follows:

2       1.    I am over the age of 18 and I submit this declaration in support of my concurrently-

3 filed Motion for Class Certification. I have personal knowledge of the facts set forth in this

4 declaration and, if called as a witness, I could and would testify competently thereto.

5       2.    I used H&R Block's online services to prepare my tax filings in 2022. In the process

6 of using these online services I provided confidential tax information to H&R Block.

7       3.    I have a basic understanding of the complaint in this case. I was asked about this topic

8 when I was deposed by Meta in this matter. An example of some of my testimony on this topic is the

9 following:

10           Q.    Did you review this complaint before it was filed?

11           A.    Yes … They send me these things and tell me to review them, and I do.

12           Q.    Did you authorize the filing of the complaint?

13           A.    I believe so, yes.

14           . . . .

15           Q.    Did you review the facts in the complaint for accuracy?

16           A.    Yes … I try to take the reviewing of the documents very seriously.

17 June 24, 2025 Lindley Dep., 267:14-268:11.

18       4.    I have a basic understanding of the difference between an individual action and a class

19 action, and also understand that my role in this litigation is to protect the interests of other putative

20 class members. I was asked about this topic when I was deposed by Meta in this matter. An example

21 of some of my testimony on this topic is the following:

22           Q.    Do you understand what your duties and obligations would be as a class

23           representative in this case?

24           A.    I believe so, yeah … I think I understand my duties. We talked a lot about it,

25           had a very long conversation before I decided to go forward with it.

26           Q.    What class are you seeking to represent in this case?

27           A.    It's my understanding that I represent whoever this happened to in California.

28 June 24, 2025 Lindley Dep., 281:25, 282:1-16.

5.    I have dedicated a significant amount of time to this action.  I frequently communicate with my attorneys about this case.  I have done so to discuss discovery requests and other issues requiring my immediate attention, or to keep up to date on the case generally.  I have searched for and produced documents and responded to interrogatories.  I also spent several hours meeting with my attorneys to prepare for my deposition, and later travelled to San Francisco, California to attend my in-person deposition, which occurred on June 24, 2025 and lasted seven and a half hours.

6.    As a class representative, I will continue to work to the best of my abilities to prosecute this action on behalf of the class members.  I expect to assist further in the case as needed, including testifying at trial.

7.    I have no interest in this litigation that would conflict with the interests of class members.  I have no past or present financial, employment, familial or other relationship with any of the attorneys representing me that would cause me to put my economic interests above those of the class members I seek to represent.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on ___8/5/2025___ in ___Turlock, California___,.

Signed by:

*Jeri Lindley*

JANE DOE

**EXHIBIT 7**

1

**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
ndeckant@bursor.com

**GEORGE FELDMAN MCDONALD, PLLC**
Lori G. Feldman (*pro hac vice*)
Michael Liskow (State Bar No. 243899)
200 Park Avenue, Suite 1700
New York, New York 10166
Telephone: (646) 354-6534
lfeldman@4-justice.com
mliskow@4-justice.com

*Attorneys for Plaintiffs*
*Additional Attorneys on Signature Page*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE META PIXEL TAX FILING CASES<br><br>This document relates to:<br><br>All Actions | Master File No. 5:22-cv-07557-PCP (VKD)<br><br>**DECLARATION OF KATRINA CALDERON**<br><br>Date Action Filed: December 1, 2022<br>Honorable P. Casey Pitts |

I, Katrina Calderon, declare as follows:

1.    I am over the age of 18 and I submit this declaration in support of my concurrently-filed Motion for Class Certification.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would testify competently thereto.

2.    I used TaxAct's online services to prepare my tax filings in 2021.  In the process of using these online services I provided confidential tax information to TaxAct.

3.    I have a basic understanding of the complaint in this case. I was asked about this topic when I was deposed by Meta in this matter. An example of some of my testimony on this topic is the following:

> Q.    So Exhibit 2 is the Second Amended Consolidated Class Action Complaint in this case. Are you familiar with this document?
>
> A.    Yes.
>
> Q.    Did you review it before it was filed?
>
> A.    Yes.
>
> Q.    Did you confirm that all of the information in this Complaint was accurate?
>
> A.    Yes.

May 30, 2025 Calderon Dep., 40:2-10.

4.    I have a basic understanding of the difference between an individual action and a class action, and also understand that my role in this litigation is to protect the interests of other putative class members.  I was asked about this topic when I was deposed by Meta in this matter.  An example of some of my testimony on this topic is the following:

> Q.    Do you understand what your duties and obligations would be as a class representative in this case?
>
> A.    Yes.
>
> Q.    What are those obligations?
>
> A.    To make sure that everybody that has been a part of this is also compensated.
>
> Q.    What do you mean as -- "that has been a part of this"?
>
> A.    Like had their information -- their tax information shared with Meta.

1    May 30, 2025 Calderon Dep., 165:2-12.

2         5.    I have dedicated a significant amount of time to this action. I frequently communicate

3    with my attorneys about this case. I have done so to discuss discovery requests and other issues

4    requiring my immediate attention, or to keep up to date on the case generally. I have searched for

5    and produced documents and responded to interrogatories. I also spent several hours meeting with

6    my attorneys to prepare for my deposition, and later travelled to Palo Alto, California to attend my

7    in-person deposition, which occurred on May 30, 2025 and lasted four and a half hours.

8         6.    As a class representative, I will continue to work to the best of my abilities to

9    prosecute this action on behalf of the class members. I expect to assist further in the case as needed,

10   including testifying at trial.

11        7.    I have no interest in this litigation that would conflict with the interests of class

12   members. I have no past or present financial, employment, familial or other relationship with any of

13   the attorneys representing me that would cause me to put my economic interests above those of the

14   class members I seek to represent.

15        I declare under penalty of perjury that the foregoing is true and correct. Executed on

16   ___Jul 22, 2025_____ in Salinas, California.

17

18   
     _____

19   KATRINA CALDERON

20

21

22

23

24

25

26

27

28

**EXHIBIT 8**

1

**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
ndeckant@bursor.com

**GEORGE FELDMAN MCDONALD, PLLC**
Lori G. Feldman (*pro hac vice*)
Michael Liskow (State Bar No. 243899)
200 Park Avenue, Suite 1700
New York, New York 10166
Telephone: (646) 354-6534
lfeldman@4-justice.com
mliskow@4-justice.com

2

3

4

5

6

7

*Attorneys for Plaintiffs*
*Additional Attorneys on Signature Page*

8

9

UNITED STATES DISTRICT COURT

10

NORTHERN DISTRICT OF CALIFORNIA

11

SAN JOSE DIVISION

12

IN RE META PIXEL TAX FILING CASES

Master File No. 5:22-cv-07557-PCP (VKD)

13

This document relates to:

**DECLARATION OF KAYLA SALAS**

14

All Actions

Date Action Filed: December 1, 2022
Honorable P. Casey Pitts

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I, Kayla Salas, declare as follows:

1. I am over the age of 18 and I submit this declaration in support of my concurrently-filed Motion for Class Certification. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would testify competently thereto.

2. From the time I initiated this lawsuit until June 2025, my name was Kayla Housman. I was married in June 2025 and have now changed my name to Kayla Salas. I refer to the "Housman" deposition transcript below because Housman was my surname at the time of my deposition.

3. I used H&R Block's online services to prepare my tax filings in 2022 and 2023. In the process of using these online services I provided confidential tax information to H&R Block.

4. I have a basic understanding of the complaint in this case. I was asked about this topic when I was deposed by Meta in this matter. An example of some of my testimony on this topic is the following:

> Q.  Did you review this complaint before it was filed?
>
> A.  Yes.
>
> Q.  Did you authorize the filing of the complaint?
>
> A.  Yes.

June 11, 2025 Housman Dep., 190:17-22.

5. I have a basic understanding of the difference between an individual action and a class action, and also understand that my role in this litigation is to protect the interests of other putative class members. I was asked about this topic when I was deposed by Meta in this matter. An example of some of my testimony on this topic is the following:

> Q.  Do you understand what your duties and obligations would be as a class representative in this case?
>
> A.  Yes.
>
> Q.  What are those responsibilities?
>
> A.  My responsibility would be to represent all of the other people that may not be able to represent themselves or come forward and do all of this for themselves. And it's my job to be here on their behalf.

DECLARATION OF KAYLA SALAS
CASE NO. 5:22-CV-07557
1

June 11, 2025 Housman Dep., 204:16-25.

6.      I have dedicated a significant amount of time to this action.  I frequently communicate with my attorneys about this case.  I have done so to discuss discovery requests and other issues requiring my immediate attention, or to keep up to date on the case generally.  I have searched for and produced documents and responded to interrogatories.  I also spent several hours meeting with my attorneys to prepare for my deposition, and later travelled to Kansas City, Missouri to attend my in-person deposition, which occurred on June 11, 2025 and lasted six and a half hours.

7.      As a class representative, I will continue to work to the best of my abilities to prosecute this action on behalf of the class members.  I expect to assist further in the case as needed, including testifying at trial.

8.      I have no interest in this litigation that would conflict with the interests of class members.  I have no past or present financial, employment, familial or other relationship with any of the attorneys representing me that would cause me to put my economic interests above those of the class members I seek to represent.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on 8/6/2025 _____ in Kansas City, Missouri.



KAYLA SALAS

**EXHIBIT 9**

**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
ndeckant@bursor.com

**GEORGE FELDMAN MCDONALD, PLLC**
Lori G. Feldman (*pro hac vice*)
Michael Liskow (State Bar No. 243899)
200 Park Avenue, Suite 1700
New York, New York 10166
Telephone: (646) 354-6534
lfeldman@4-justice.com
mliskow@4-justice.com

*Attorneys for Plaintiffs*
*Additional Attorneys on Signature Page*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE META PIXEL TAX FILING CASES | Master File No. 5:22-cv-07557-PCP (VKD) |
| This document relates to: | **DECLARATION OF TIFFANY BRYANT** |
| All Actions | Date Action Filed: December 1, 2022 |
| | Honorable P. Casey Pitts |

1    I, Tiffany Bryant, declare as follows:

2    1.    I am over the age of 18 and I submit this declaration in support of my concurrently-

3    filed Motion for Class Certification.  I have personal knowledge of the facts set forth in this

4    declaration and, if called as a witness, I could and would testify competently thereto.

5    2.    I used H&R Block's online services to prepare my tax filings between 2021and 2024.

6    In the process of using these online services I provided confidential tax information to H&R Block.

7    3.    I have a basic understanding of the complaint in this case.  I was asked about this

8    topic when I was deposed by Meta in this matter.  An example of some of my testimony on this topic

9    is the following:

10    Q.    What is your allegation of what Meta did wrong in this case?

11    A.    I would say just getting private tax information.

12    July 21, 2025 Bryant Dep., 225:17-20.

13    4.    I have a basic understanding of the difference between an individual action and a class

14    action, and also understand that my role in this litigation is to protect the interests of other putative

15    class members.  I was asked about this topic when I was deposed by Meta in this matter.  An example

16    of some of my testimony on this topic is the following:

17    Q.    Do you have any understanding as to what your duties and obligations would be as a

18    representative of a class in this case?

19    A.    Yes.

20    Q.    And what are those responsibilities?

21    A.    To tell the truth, and just be an advocate for myself and for others.

22    July 21, 2025 Bryant Dep., 232:25-233:1-6.

23    5.    I have dedicated a material amount of time to this action.  I frequently communicate

24    with my attorneys about this case.  I have done so to discuss discovery requests and other issues

25    requiring my immediate attention, or to keep up to date on the case generally.  I have searched for

26    and produced documents and responded to interrogatories.  I also spent two to three hours meeting

27    with my attorneys to prepare for my deposition which occurred on July 21, 2025 and lasted over five

28    hours.

---

DECLARATION OF TIFFANY BRYANT;
CASE NO. 5:22-CV-07557                                                                                  1

6.     As a class representative, I will continue to work to the best of my abilities to prosecute this action on behalf of the class members. I expect to assist further in the case as needed, including testifying at trial.

7.     I have no interest in this litigation that would conflict with the interests of class members. I have no past or present financial, employment, familial or other relationship with any of the attorneys representing me that would cause me to put my economic interests above those of the class members I seek to represent.

I declare under penalty of perjury that the foregoing is true and correct. Executed on 08/06/2025 in Chicago, Illinois.

*Tiffany Bryant*
TIFFANY BRYANT

**EXHIBIT 10**

# BURSOR & FISHER

P.A.

www.bursor.com

701 BRICKELL AVENUE       1330 AVENUE OF THE AMERICAS       1990 NORTH CALIFORNIA BLVD.
   MIAMI, FL 33131              NEW YORK, NY 10019              WALNUT CREEK, CA 94596

## FIRM RESUME

With offices in Florida, New York, and California, BURSOR & FISHER lawyers have represented both plaintiffs and defendants in state and federal courts throughout the country.

The lawyers at our firm have an active civil trial practice, having won multi-million-dollar verdicts or recoveries in six of six class action jury trials since 2008. Our most recent class action trial victory came in May 2019 in *Perez v. Rash Curtis & Associates*, in which Mr. Bursor served as lead trial counsel and won a $267 million jury verdict against a debt collector found to have violated the Telephone Consumer Protection Act. During the pendency of the defendant's appeal, the case settled for $75.6 million, the largest settlement in the history of the Telephone Consumer Protection Act.

In August 2013 in *Ayyad v. Sprint Spectrum L.P.*, in which Mr. Bursor served as lead trial counsel, we won a jury verdict defeating Sprint's $1.06 billion counterclaim and securing the class's recovery of more than $275 million in cash and debt relief.

In *Thomas v. Global Vision Products, Inc. (II)*, we obtained a $50 million jury verdict in favor of a certified class of 150,000 purchasers of the Avacor Hair Regrowth System. The legal trade publication VerdictSearch reported that this was the second largest jury verdict in California in 2009, and the largest in any class action.

The lawyers at our firm have an active class action practice and have won numerous appointments as class counsel to represent millions of class members, including customers of Honda, Verizon Wireless, AT&T Wireless, Sprint, Haier America, and Michaels Stores as well as purchasers of Avacor™, Hydroxycut, and Sensa™ products. Bursor & Fisher lawyers have been court-appointed Class Counsel or Interim Class Counsel in:

1. *O'Brien v. LG Electronics USA, Inc.* (D.N.J. Dec. 16, 2010) to represent a certified nationwide class of purchasers of LG French-door refrigerators,

2. *Ramundo v. Michaels Stores, Inc.* (N.D. Ill. June 8, 2011) to represent a certified nationwide class of consumers who made in-store purchases at Michaels Stores using a debit or credit card and had their private financial information stolen as a result,

3. *In re Haier Freezer Consumer Litig.* (N.D. Cal. Aug. 17, 2011) to represent a certified class of purchasers of mislabeled freezers from Haier America Trading, LLC,

4. *Rodriguez v. CitiMortgage, Inc.* (S.D.N.Y. Nov. 14, 2011) to represent a certified nationwide class of military personnel against CitiMortgage for illegal foreclosures,

5. *Rossi v. The Procter & Gamble Co.* (D.N.J. Jan. 31, 2012) to represent a certified nationwide class of purchasers of Crest Sensitivity Treatment & Protection toothpaste,

6. *Dzielak v. Whirlpool Corp. et al.* (D.N.J. Feb. 21, 2012) to represent a proposed nationwide class of purchasers of mislabeled Maytag Centennial washing machines from Whirlpool Corp., Sears, and other retailers,

7. *In re Sensa Weight Loss Litig.* (N.D. Cal. Mar. 2, 2012) to represent a certified nationwide class of purchasers of Sensa weight loss products,

8. *In re Sinus Buster Products Consumer Litig.* (E.D.N.Y. Dec. 17, 2012) to represent a certified nationwide class of purchasers,

9. *Ebin v. Kangadis Food Inc.* (S.D.N.Y. Feb. 25, 2014) to represent a certified nationwide class of purchasers of Capatriti 100% Pure Olive Oil,

10. *Forcellati v. Hyland's, Inc.* (C.D. Cal. Apr. 9, 2014) to represent a certified nationwide class of purchasers of children's homeopathic cold and flu remedies,

11. *Ebin v. Kangadis Family Management LLC, et al.* (S.D.N.Y. Sept. 18, 2014) to represent a certified nationwide class of purchasers of Capatriti 100% Pure Olive Oil,

12. *In re Scotts EZ Seed Litig.* (S.D.N.Y. Jan. 26, 2015) to represent a certified class of purchasers of Scotts Turf Builder EZ Seed,

13. *Dei Rossi v. Whirlpool Corp., et al.* (E.D. Cal. Apr. 28, 2015) to represent a certified class of purchasers of mislabeled KitchenAid refrigerators from Whirlpool Corp., Best Buy, and other retailers,

14. *Hendricks v. StarKist Co.* (N.D. Cal. July 23, 2015) to represent a certified nationwide class of purchasers of StarKist tuna products,

15. *In re NVIDIA GTX 970 Graphics Card Litig.* (N.D. Cal. May 8, 2015) to represent a proposed nationwide class of purchasers of NVIDIA GTX 970 graphics cards,

16. *Melgar v. Zicam LLC, et al.* (E.D. Cal. March 30, 2016) to represent a certified ten-jurisdiction class of purchasers of Zicam Pre-Cold products,

17. *In re Trader Joe's Tuna Litigation* (C.D. Cal. December 21, 2016) to represent purchaser of allegedly underfilled Trader Joe's canned tuna.

18. *In re Welspun Litigation* (S.D.N.Y. January 26, 2017) to represent a proposed nationwide class of purchasers of Welspun Egyptian cotton bedding products,

19. *Retta v. Millennium Products, Inc.* (C.D. Cal. January 31, 2017) to represent a certified nationwide class of Millennium kombucha beverages,

20. *Moeller v. American Media, Inc.*, (E.D. Mich. June 8, 2017) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

21. *Hart v. BHH, LLC* (S.D.N.Y. July 7, 2017) to represent a nationwide class of purchasers of Bell & Howell ultrasonic pest repellers,

22. *McMillion v. Rash Curtis & Associates* (N.D. Cal. September 6, 2017) to represent a certified nationwide class of individuals who received calls from Rash Curtis & Associates,

23. *Lucero v. Solarcity Corp.* (N.D. Cal. September 15, 2017) to represent a certified nationwide class of individuals who received telemarketing calls from Solarcity Corp.,

24. *Taylor v. Trusted Media Brands, Inc.* (S.D.N.Y. Oct. 17, 2017) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

25. *Gasser v. Kiss My Face, LLC* (N.D. Cal. Oct. 23, 2017) to represent a proposed nationwide class of purchasers of cosmetic products,

26. *Gastelum v. Frontier California Inc.* (S.F. Superior Court February 21, 2018) to represent a certified California class of Frontier landline telephone customers who were charged late fees,

27. *Williams v. Facebook, Inc.* (N.D. Cal. June 26, 2018) to represent a proposed nationwide class of Facebook users for alleged privacy violations,

28. *Ruppel v. Consumers Union of United States, Inc.* (S.D.N.Y. July 27, 2018) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

29. *Bayol v. Health-Ade* (N.D. Cal. August 23, 2018) to represent a proposed nationwide class of Health-Ade kombucha beverage purchasers,

30. *West v. California Service Bureau* (N.D. Cal. September 12, 2018) to represent a certified nationwide class of individuals who received calls from California Service Bureau,

31. *Gregorio v. Premier Nutrition Corporation* (S.D.N.Y. Sept. 14, 2018) to represent a nationwide class of purchasers of protein shake products,

32. *Moeller v. Advance Magazine Publishers, Inc. d/b/a Condé Nast* (S.D.N.Y. Oct. 24, 2018) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

33. *Bakov v. Consolidated World Travel Inc. d/b/a Holiday Cruise Line* (N.D. Ill. Mar. 21, 2019) to represent a certified class of individuals who received calls from Holiday Cruise Line,

34. *Martinelli v. Johnson & Johnson* (E.D. Cal. March 29, 2019) to represent a certified class of purchasers of Benecol spreads labeled with the representation "No Trans Fat,"

35. *Edwards v. Hearst Communications, Inc.* (S.D.N.Y. April 24, 2019) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

36. *Galvan v. Smashburger* (C.D. Cal. June 25, 2019) to represent a proposed class of purchasers of Smashburger's "Triple Double" burger,

37. *Kokoszki v. Playboy Enterprises, Inc.* (E.D. Mich. Feb. 7, 2020) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

38. *Russett v. The Northwestern Mutual Life Insurance Co.* (S.D.N.Y. May 28, 2020) to represent a class of insurance policyholders that were allegedly charged unlawful paper billing fees,

BURSOR & FISHER
P.A.

39. *In re:  Metformin Marketing and Sales Practices Litigation* (D.N.J. June 3, 2020) to represent a proposed nationwide class of purchasers of generic diabetes medications that were contaminated with a cancer-causing carcinogen,

40. *Hill v. Spirit Airlines, Inc.* (S.D. Fla. July 21, 2020) to represent a proposed nationwide class of passengers whose flights were cancelled by Spirit Airlines due to the novel coronavirus, COVID-19, and whose tickets were not refunded,

41. *Kramer v. Alterra Mountain Co.* (D. Colo. July 31, 2020) to represent a proposed nationwide class of purchasers to recoup the unused value of their Ikon ski passes after Alterra suspended operations at its ski resorts due to the novel coronavirus, COVID-19,

42. *Qureshi v. American University* (D.D.C. July 31, 2020) to represent a proposed nationwide class of students for tuition and fee refunds after their classes were moved online by American University due to the novel coronavirus, COVID-19,

43. *Hufford v. Maxim Inc.* (S.D.N.Y. Aug. 13, 2020) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

44. *Desai v. Carnegie Mellon University* (W.D. Pa. Aug. 26, 2020) to represent a proposed nationwide class of students for tuition and fee refunds after their classes were moved online by Carnegie Mellon University due to the novel coronavirus, COVID-19,

45. *Heigl v. Waste Management of New York, LLC* (E.D.N.Y. Aug. 27, 2020) to represent a class of waste collection customers that were allegedly charged unlawful paper billing fees,

46. *Stellato v. Hofstra University* (E.D.N.Y. Sept. 18, 2020) to represent a proposed nationwide class of students for tuition and fee refunds after their classes were moved online by Hofstra University due to the novel coronavirus, COVID-19,

47. *Kaupelis v. Harbor Freight Tools USA, Inc.* (C.D. Cal. Sept. 23, 2020), to represent consumers who purchased defective chainsaws,

48. *Soo v. Lorex Corporation* (N.D. Cal. Sept. 23, 2020), to represent consumers whose security cameras were intentionally rendered non-functional by manufacturer,

49. *Miranda v. Golden Entertainment (NV), Inc.* (D. Nev. Dec. 17, 2020), to represent consumers and employees whose personal information was exposed in a data breach,

50. *Benbow v. SmileDirectClub, Inc.* (Cir. Ct. Cook Cnty. Feb. 4, 2021), to represent a certified nationwide class of individuals who received text messages from SmileDirectClub, in alleged violation of the Telephone Consumer Protection Act,

51. *Suren v. DSV Solutions, LLC* (Cir. Ct. DuPage Cnty. Apr. 8, 2021), to represent a certified class of employees who used a fingerprint clock-in system, in alleged violation of the Illinois Biometric Information Privacy Act,

52. *De Lacour v. Colgate-Palmolive Co.* (S.D.N.Y. Apr. 23, 2021), to represent a certified class of consumers who purchased allegedly "natural" Tom's of Maine products,

BURSOR&FISHER
P.A.

53. *Wright v. Southern New Hampshire University* (D.N.H. Apr. 26, 2021), to represent a certified nationwide class of students for tuition and fee refunds after their classes were moved online by Southern New Hampshire University due to the novel coronavirus, COVID-19,

54. *Sahlin v. Hospital Housekeeping Systems, LLC* (Cir. Ct. Williamson Cnty. May 21, 2021), to represent a certified class of employees who used a fingerprint clock-in system, in alleged violation of the Illinois Biometric Information Privacy Act,

55. *Landreth v. Verano Holdings LLC, et al.* (Cir. Ct. Cook Cnty. June 2, 2021), to represent a certified class of employees who used a fingerprint clock-in system, in alleged violation of the Illinois Biometric Information Privacy Act.

56. *Rocchio v. Rutgers, The State University of New Jersey*, (Sup. Ct., Middlesex Cnty. October 27, 201), to represent a certified nationwide class of students for fee refunds after their classes were moved online by Rutgers due to the novel coronavirus, COVID-19,

57. *Malone v. Western Digital Corp.*, (N.D. Cal. Dec. 22, 2021), to represent a class of consumers who purchased hard drives that were allegedly deceptively advertised,

58. *Jenkins v. Charles Industries, LLC*, (Cir. Ct. DuPage Cnty. Dec. 21, 2021) to represent a certified class of employees who used a fingerprint clock-in system, in alleged violation of the Illinois Biometric Information Privacy Act,

59. *Frederick v. Examsoft Worldwide, Inc.*, (Cir. Ct. DuPage Cnty. Jan. 6, 2022) to represent a certified class of exam takers who used virtual exam proctoring software, in alleged violation of the Illinois Biometric Information Privacy Act,

60. *Isaacson v. Liqui-Box Flexibles, LLC, et al.*, (Cir. Ct. Will Cnty. Jan. 18, 2022) to represent a certified class of employees who used a fingerprint clock-in system, in alleged violation of the Illinois Biometric Information Privacy Act,

61. *Goldstein et al. v. Henkel Corp.*, (D. Conn. Mar. 3, 2022) to represent a proposed class of purchasers of Right Guard-brand antiperspirants that were allegedly contaminated with benzene,

62. *McCall v. Hercules Corp.*, (N.Y. Sup. Ct., Westchester Cnty. Mar. 14, 2022) to represent a certified class of who laundry card purchasers who were allegedly subjected to deceptive practices by being denied cash refunds,

63. *Lewis v. Trident Manufacturing, Inc.*, (Cir. Ct. Kane Cnty. Mar. 16, 2022) to represent a certified class of workers who used a fingerprint clock-in system, in alleged violation of the Illinois Biometric Information Privacy Act,

64. *Croft v. Spinx Games Limited, et al.*, (W.D. Wash. Mar. 31, 2022) to represent a certified class of Washington residents who lost money playing mobile applications games that allegedly constituted illegal gambling under Washington law,

65. *Fischer v. Instant Checkmate LLC*, (N.D. Ill. Mar. 31, 2022) to represent a certified class of Illinois residents whose identities were allegedly used without their consent in alleged violation of the Illinois Right of Publicity Act,

66. *Rivera v. Google LLC*, (Cir. Ct. Cook Cnty. Apr. 25, 2022) to represent a certified class of Illinois residents who appeared in a photograph in Google Photos, in alleged violation of the Illinois Biometric Information Privacy Act,

67. *Loftus v. Outside Integrated Media, LLC*, (E.D. Mich. May 5, 2022) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

68. *D'Amario v. The University of Tampa*, (S.D.N.Y. June 3, 2022) to represent a certified nationwide class of students for tuition and fee refunds after their classes were moved online by The University of Tampa due to the novel coronavirus, COVID-19,

69. *Fittipaldi v. Monmouth University*, (D.N.J. Sept. 22, 2022) to represent a certified nationwide class of students for tuition and fee refunds after their classes were moved online by Monmouth University due to the novel coronavirus, COVID-19,

70. *Armstead v. VGW Malta Ltd. et al.* (Cir. Ct. Henderson Cnty. Oct. 3, 2022) to present a certified class of Kentucky residents who lost money playing mobile applications games that allegedly constituted illegal gambling under Kentucky law,

71. *Cruz v. The Connor Group, A Real Estate Investment Firm, LLC*, (N.D. Ill. Oct. 26, 2022) to represent a certified class of workers who used a fingerprint clock-in system, in alleged violation of the Illinois Biometric Information Privacy Act,

72. *Delcid et al. v. TCP HOT Acquisitions LLC et al.* (S.D.N.Y. Oct. 28, 2022) to represent a certified nationwide class of purchasers of Sure and Brut-brand antiperspirants that were allegedly contaminated with benzene,

73. *Kain v. The Economist Newspaper NA, Inc.* (E.D. Mich. Dec. 15, 2022) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

74. *Strano v. Kiplinger Washington Editors, Inc.* (E.D. Mich. Jan. 6, 2023) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

75. *Moeller v. The Week Publications, Inc.* (E.D. Mich. Jan. 6, 2023) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

76. *Ambrose v. Boston Globe Media Partners, LLC* (D. Mass. May 25, 2023) to represent a nationwide class of newspaper subscribers who were also Facebook users under the Video Privacy Protection Act,

77. *In re: Apple Data Privacy Litigation*, (N.D. Cal. July 5, 2023) to represent a putative nationwide class of all persons who turned off permissions for data tracking and whose mobile app activity was still tracked on iPhone mobile devices,

78. *Young v. Military Advantage, Inc. d/b/a Military.com* (Cir. Ct. DuPage Cnty. July 26, 2023) to represent a nationwide class of website subscribers who were also Facebook users under the Video Privacy Protection Act,

79. *Whiting v. Yellow Social Interactive Ltd.* (Cir. Ct. Henderson Cnty. Aug. 15, 2023) to represent a certified class of Kentucky residents who lost money playing mobile applications games that allegedly constituted illegal gambling under Kentucky law,

80. *Kotila v. Charter Financial Publishing Network, Inc.* (W.D. Mich. Feb. 21, 2024) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

81. *Schreiber v. Mayo Foundation for Medical Education and Research* (W.D. Mich. Feb. 21, 2024) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

82. *Norcross v. Tishman Speyer Properties, et al.* (S.D.N.Y. May 17, 2024) to represent a class of online ticket purchasers under New York Arts & Cultural Affairs Law § 25.07(4).

## SCOTT A. BURSOR

Mr. Bursor has an active civil trial practice, having won multi-million verdicts or recoveries in six of six civil jury trials since 2008. Mr. Bursor's most recent victory came in May 2019 in *Perez v. Rash Curtis & Associates*, in which Mr. Bursor served as lead trial counsel and won a $267 million jury verdict against a debt collector for violations of the Telephone Consumer Protection Act (TCPA).

In *Ayyad v. Sprint Spectrum L.P.* (2013), where Mr. Bursor served as lead trial counsel, the jury returned a verdict defeating Sprint's $1.06 billion counterclaim and securing the class's recovery of more than $275 million in cash and debt relief.

In *Thomas v. Global Vision Products, Inc.* (2009), the jury returned a $50 million verdict in favor of the plaintiff and class represented by Mr. Bursor. The legal trade publication VerdictSearch reported that this was the second largest jury verdict in California in 2009.

Class actions are rarely tried to verdict. Other than Mr. Bursor and his partner Mr. Fisher, we know of no lawyer that has tried more than one class action to a jury. Mr. Bursor's perfect record of six wins in six class action jury trials, with recoveries ranging from $21 million to $299 million, is unmatched by any other lawyer. Each of these victories was hard-fought against top trial lawyers from the biggest law firms in the United States.

Mr. Bursor graduated from the University of Texas Law School in 1996. He served as Articles Editor of the Texas Law Review, and was a member of the Board of Advocates and Order of the Coif. Prior to starting his own practice, Mr. Bursor was a litigation associate at a large New York based law firm where he represented telecommunications, pharmaceutical, and technology companies in commercial litigation.

Mr. Bursor is a member of the state bars of New York, Florida, and California, as well as the bars of the United States Court of Appeals for the Second, Third, Fourth, Sixth, Ninth and Eleventh Circuits, and the bars of the United States District Courts for the Southern and Eastern Districts of New York, the Northern, Central, Southern and Eastern Districts of California, the Southern and Middle Districts of Florida, and the Eastern District of Michigan.

## *Representative Cases*

Mr. Bursor was appointed lead or co-lead class counsel to the largest, 2nd largest, and 3rd largest classes ever certified. Mr. Bursor has represented classes including more than 160 million class members, roughly 1 of every 2 Americans. Listed below are recent cases that are representative of Mr. Bursor's practice:

BURSOR&FISHER
P.A.

Mr. Bursor negotiated and obtained court-approval for two landmark settlements in *Nguyen v. Verizon Wireless* and *Zill v. Sprint Spectrum* (the largest and 2nd largest classes ever certified). These settlements required Verizon and Sprint to open their wireless networks to third-party devices and applications. These settlements are believed to be the most significant legal development affecting the telecommunications industry since 1968, when the FCC's Carterfone decision similarly opened up AT&T's wireline telephone network.

Mr. Bursor was the lead trial lawyer in *Ayyad v. Sprint Spectrum, L.P.* representing a class of approximately 2 million California consumers who were charged an early termination fee under a Sprint cellphone contract, asserting claims that such fees were unlawful liquidated damages under the California Civil Code, as well as other statutory and common law claims. After a five-week combined bench-and-jury trial, the jury returned a verdict in June 2008 and the Court issued a Statement of Decision in December 2008 awarding the plaintiffs $299 million in cash and debt cancellation. Mr. Bursor served as lead trial counsel for this class again in 2013 during a month-long jury trial in which Sprint asserted a $1.06 billion counterclaim against the class. Mr. Bursor secured a verdict awarding Sprint only $18.4 million, the exact amount calculated by the class's damages expert. This award was less than 2% of the damages Sprint sought, less than 6% of the amount of the illegal termination fees Sprint charged to class members. In December 2016, after more than 13 years of litigation, the case was settled for $304 million, including $79 million in cash payments plus $225 million in debt cancellation.

Mr. Bursor was the lead trial lawyer in *White v. Cellco Partnership d/b/a Verizon Wireless* representing a class of approximately 1.4 million California consumers who were charged an early termination fee under a Verizon cellphone contract, asserting claims that such fees were unlawful liquidated damages under the California Civil Code, as well as other statutory and common law claims. In July 2008, after Mr. Bursor presented plaintiffs' case-in-chief, rested, then cross-examined Verizon's principal trial witness, Verizon agreed to settle the case for a $21 million cash payment and an injunction restricting Verizon's ability to impose early termination fees in future subscriber agreements.

Mr. Bursor was the lead trial lawyer in *Thomas v. Global Visions Products Inc.* Mr. Bursor represented a class of approximately 150,000 California consumers who had purchased the Avacor® hair regrowth system. In January 2008, after a four-week combined bench-and-jury trial. Mr. Bursor obtained a $37 million verdict for the class, which the Court later increased to $40 million.

Mr. Bursor was appointed class counsel and was elected chair of the Official Creditors' Committee in *In re Nutraquest Inc.*, a Chapter 11 bankruptcy case before Chief Judge Garrett E. Brown, Jr. (D.N.J.) involving 390 ephedra-related personal injury and/or wrongful death claims, two consumer class actions, four enforcement actions by governmental agencies, and multiple adversary proceedings related to the Chapter 11 case. Working closely with counsel for all parties and with two mediators, Judge Nicholas Politan (Ret.) and Judge Marina Corodemus (Ret.), the committee chaired by Mr. Bursor was able to settle or otherwise resolve every claim and reach a fully consensual Chapter 11 plan of reorganization, which Chief Judge Brown approved in late 2006. This settlement included a $12.8 million recovery to a nationwide class of consumers who alleged they were defrauded in connection with the purchase of Xenadrine® dietary supplement products.

Mr. Bursor was the lead trial lawyer in *In re: Pacific Bell Late Fee Litigation*.  After filing the first class action challenging Pac Bell's late fees in April 2010, winning a contested motion to certify a statewide California class in January 2012, and defeating Pac Bell's motion for summary judgment in February 2013, Mr. Bursor obtained final approval of the $38 million class settlement.  The settlement, which Mr. Bursor negotiated the night before opening statements were scheduled to commence, included a $20 million cash payment to provide refunds to California customers who paid late fees on their Pac Bell wireline telephone accounts, and an injunction that reduced other late fee charges by $18.6 million.

## L. TIMOTHY FISHER

L. Timothy Fisher has an active practice in consumer class actions and complex business litigation and has also successfully handled a large number of civil appeals.

Mr. Fisher has been actively involved in numerous cases that resulted in multi-million dollar recoveries for consumers and investors. Mr. Fisher has handled cases involving a wide range of issues including nutritional labeling, health care, telecommunications, corporate governance, unfair business practices and consumer fraud. With his partner Scott A. Bursor, Mr. Fisher has tried five class action jury trials, all of which produced successful results. In *Thomas v. Global Vision Products*, Mr. Fisher obtained a jury award of $50,024,611 — the largest class action award in California in 2009 and the second-largest jury award of any kind. In 2019, Mr. Fisher served as trial counsel with Mr. Bursor in *Perez. v. Rash Curtis & Associates*, where the jury returned a verdict for $267 million in statutory damages under the Telephone Consumer Protection Act.

Mr. Fisher was admitted to the State Bar of California in 1997. He is also a member of the bars of the United States Court of Appeals for the Ninth Circuit, the United States District Courts for the Northern, Central, Southern and Eastern Districts of California, the Northern District of Illinois, the Eastern District of Michigan, and the Eastern District of Missouri. Mr. Fisher taught appellate advocacy at John F. Kennedy University School of Law in 2003 and 2004.  In 2010, he contributed jury instructions, a verdict form and comments to the consumer protection chapter of Justice Elizabeth A. Baron's *California Civil Jury Instruction Companion Handbook* (West 2010). In January 2014, Chief Judge Claudia Wilken of the United States District Court for the Northern District of California appointed Mr. Fisher to a four-year term as a member of the Court's Standing Committee on Professional Conduct.

Mr. Fisher received his Juris Doctor from Boalt Hall at the University of California at Berkeley in 1997. While in law school, he was an active member of the Moot Court Board and participated in moot court competitions throughout the United States. In 1994, Mr. Fisher received an award for Best Oral Argument in the first-year moot court competition.

In 1992, Mr. Fisher graduated with highest honors from the University of California at Berkeley and received a degree in political science.  Prior to graduation, he authored an honors thesis for Professor Bruce Cain entitled "The Role of Minorities on the Los Angeles City Council."  He is also a member of Phi Beta Kappa.

### Representative Cases

*Thomas v. Global Vision Products, Inc.* (Alameda County Superior Court). Mr. Fisher litigated claims against Global Vision Products, Inc. and other individuals in connection with the sale and marketing of a purported hair loss remedy known as Avacor. The case lasted more than seven years and involved two trials. The first trial resulted in a verdict for plaintiff and the class in the amount of $40,000,000. The second trial resulted in a jury verdict of $50,024,611, which led to a $30 million settlement for the class.

*In re Cellphone Termination Fee Cases* - Handset Locking Actions (Alameda County Superior Court). Mr. Fisher actively worked on five coordinated cases challenging the secret locking of cell phone handsets by major wireless carriers to prevent consumers from activating them on competitive carriers' systems. Settlements have been approved in all five cases on terms that require the cell phone carriers to disclose their handset locks to consumers and to provide unlocking codes nationwide on reasonable terms and conditions. The settlements fundamentally changed the landscape for cell phone consumers regarding the locking and unlocking of cell phone handsets.

*In re Cellphone Termination Fee Cases* - Early Termination Fee Cases (Alameda County Superior Court and Federal Communications Commission). In separate cases that are a part of the same coordinated litigation as the Handset Locking Actions, Mr. Fisher actively worked on claims challenging the validity under California law of early termination fees imposed by national cell phone carriers. In one of those cases, against Verizon Wireless, a nationwide settlement was reached after three weeks of trial in the amount of $21 million. In a second case, which was tried to verdict, the Court held after trial that the $73 million of flat early termination fees that Sprint had collected from California consumers over an eight-year period were void and unenforceable.

### Selected Published Decisions

*Melgar v. Zicam LLC*, 2016 WL 1267870 (E.D. Cal. Mar. 30, 2016) (certifying 10-jurisdiction class of purchasers of cold remedies, denying motion for summary judgment, and denying motions to exclude plaintiff's expert witnesses).

*Salazar v. Honest Tea, Inc.*, 2015 WL 7017050 (E.D. Cal. Nov. 12. 2015) (denying motion for summary judgment).

*Dei Rossi v. Whirlpool Corp.*, 2015 WL 1932484 (E.D. Cal. Apr. 27, 2015) (certifying California class of purchasers of refrigerators that were mislabeled as Energy Star qualified).

*Bayol v. Zipcar, Inc.*, 78 F.Supp.3d 1252 (N.D. Cal. 2015) (denying motion to dismiss claims alleging unlawful late fees under California Civil Code § 1671).

*Forcellati v. Hyland's, Inc.*, 2015 WL 9685557 (C.D. Cal. Jan. 12, 2015) (denying motion for summary judgment in case alleging false advertising of homeopathic cold and flu remedies for children).

*Bayol v. Zipcar, Inc.*, 2014 WL 4793935 (N.D. Cal. Sept. 25, 2014) (denying motion to transfer venue pursuant to a forum selection clause).

*Forcellati v. Hyland's Inc.*, 2014 WL 1410264 (C.D. Cal. Apr. 9, 2014) (certifying nationwide class of purchasers of homeopathic cold and flu remedies for children).

*Hendricks v. StarKist Co.*, 30 F.Supp.3d 917 (N.D. Cal. 2014) (denying motion to dismiss in case alleging underfilling of 5-ounce cans of tuna).

*Dei Rossi v. Whirlpool Corp.*, 2013 WL 5781673 (E.D. Cal. October 25, 2013) (denying motion to dismiss in case alleging that certain KitchenAid refrigerators were misrepresented as Energy Star qualified).

*Forcellati v. Hyland's Inc.*, 876 F.Supp.2d 1155 (C.D. Cal. 2012) (denying motion to dismiss complaint alleging false advertising regarding homeopathic cold and flu remedies for children).

*Clerkin v. MyLife.com*, 2011 WL 3809912 (N.D. Cal. August 29, 2011) (denying defendants' motion to dismiss in case alleging false and misleading advertising by a social networking company).

*In re Cellphone Termination Fee Cases*, 186 Cal.App.4th 1380 (2010) (affirming order approving $21 million class action settlement).

*Gatton v. T-Mobile USA, Inc.*, 152 Cal.App.4th 571 (2007) (affirming order denying motion to compel arbitration).

### *Selected Class Settlements*

*Melgar v. Zicam* (Eastern District of California) - $16 million class settlement of claims alleging cold medicine was ineffective.

*Gastelum v. Frontier California Inc.* (San Francisco Superior Court) - $10.9 million class action settlement of claims alleging that a residential landline service provider charged unlawful late fees.

*West v. California Service Bureau, Inc.* (Northern District of California) - $4.1 million class settlement of claims under the Telephone Consumer Protection Act.

*Gregorio v. Premier Nutrition Corp.* (Southern District of New York) - $9 million class settlement of false advertising claims against protein shake manufacturer.

*Morris v. SolarCity Corp.* (Northern District of California) - $15 million class settlement of claims under the Telephone Consumer Protection Act.

*Retta v. Millennium Products, Inc.* (Central District of California) - $8.25 million settlement to resolve claims of bottled tea purchasers for alleged false advertising.

*Forcellati v. Hyland's* (Central District of California) – nationwide class action settlement providing full refunds to purchasers of homeopathic cold and flu remedies for children.

*Dei Rossi v. Whirlpool* (Eastern District of California) – class action settlement providing $55 cash payments to purchasers of certain KitchenAid refrigerators that allegedly mislabeled as Energy Star qualified.

*In Re NVIDIA GTX 970 Graphics Chip Litigation* (Northern District of California) - $4.5 million class action settlement of claims alleging that a computer graphics card was sold with false and

misleading representations concerning its specifications and performance.

*Hendricks v. StarKist Co.* (Northern District of California) – $12 million class action settlement of claims alleging that 5-ounce cans of tuna were underfilled.

*In re Zakskorn v. American Honda Motor Co.* Honda (Eastern District of California) – nationwide settlement providing for brake pad replacement and reimbursement of out-of-pocket expenses in case alleging defective brake pads on Honda Civic vehicles manufactured between 2006 and 2011.

*Correa v. Sensa Products, LLC* (Los Angeles Superior Court) - $9 million settlement on behalf of purchasers of the Sensa weight loss product.

*In re Pacific Bell Late Fee Litigation* (Contra Costa County Superior Court) - $38.6 million settlement on behalf of Pac Bell customers who paid an allegedly unlawful late payment charge.

*In re Haier Freezer Consumer Litigation* (Northern District of California) - $4 million settlement, which provided for cash payments of between $50 and $325.80 to class members who purchased the Haier HNCM070E chest freezer.

*Thomas v. Global Vision Products, Inc.* (Alameda County Superior Court) - $30 million settlement on behalf of a class of purchasers of a hair loss remedy.

*Guyette v. Viacom, Inc.* (Alameda County Superior Court) - $13 million settlement for a class of cable television subscribers who alleged that the defendant had improperly failed to share certain tax refunds with its subscribers.

## JOSEPH I. MARCHESE

Joseph I. Marchese is a Partner with Bursor & Fisher, P.A. Joe focuses his practice on consumer class actions, employment law disputes, and commercial litigation. He has represented corporate and individual clients in a wide array of civil litigation, and has substantial trial and appellate experience.

Joe has diverse experience in litigating and resolving consumer class actions involving claims of mislabeling, false or misleading advertising, privacy violations, unlawful and junk fees, data breach claims, and violations of the Telephone Consumer Protection Act and Servicemembers Civil Relief Act.

Joe also has significant experience in multidistrict litigation proceedings. Recently, he served on the Plaintiffs' Executive Committee in *In Re: Blue Buffalo Company, Ltd. Marketing And Sales Practices Litigation*, MDL No. 2562, which resulted in a $32 million consumer class settlement. Currently, he serves on the Plaintiffs' Steering Committee for Economic Reimbursement in *In Re: Valsartan Products Liability Litigation*, MDL. No. 2875.

Joe is admitted to the State Bar of New York and is a member of the bars of the United States District Courts for the Southern District of New York, the Eastern District of New York,

and the Eastern District of Michigan, as well as the United States Courts of Appeals for the First, Second and Sixth Circuits.

Joe graduated from Boston University School of Law in 2002 where he was a member of The Public Interest Law Journal. In 1998, Joe graduated with honors from Bucknell University.

### *Selected Published Decisions:*

*Farwell v. Google, LLC*, 595 F. Supp. 3d 702 (C.D. Ill. Mar. 31, 2022), denying defendant's motion to dismiss BIPA claims brought on behalf of Illinois students using Google's Workspace for Education platform.

*Boelter v. Hearst Communications, Inc.*, 269 F. Supp. 3d 172 (S.D.N.Y. Sept. 7, 2017), granting plaintiff's motion for partial summary judgment on state privacy law violations in putative class action.

*Boelter v. Hearst Communications, Inc.*, 192 F. Supp. 3d 427 (S.D.N.Y. June 17, 2016), denying publisher's motion to dismiss its subscriber's allegations of state privacy law violations in putative class action.

*In re Scotts EZ Seed Litigation*, 304 F.R.D. 397 (S.D.N.Y. 2015), granting class certification of false advertising and other claims brought by New York and California purchasers of grass seed product.

*Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014), granting nationwide class certification of false advertising and other claims brought by purchasers of purported "100% Pure Olive Oil" product.

*In re Michaels Stores Pin Pad Litigation*, 830 F. Supp. 2d 518 (N.D. Ill. 2011), denying retailer's motion to dismiss its customers' state law consumer protection and privacy claims in data breach putative class action.

### *Selected Class Settlements:*

*Schreiber v. Mayo Foundation*, Case No. 22-cv-0188-HYJ-RSK (W.D. Mich. 2024) – final approval granted for $52.5 million class settlement to resolve claims of periodical subscribers for alleged statutory privacy violations.

*Edwards v. Mid-Hudson Valley Federal Credit Union*, Case No. 22-cv-00562-TJM-CFH (N.D.N.Y. 2023) – final approval granted for $2.2 million class settlement to resolve claims alleging unlawfully charged overdraft fees on accounts with sufficient funds.

*Benbow v. SmileDirectClub, LLC*, Case No. 2020-CH-07269 (Cir. Ct. Cook Cnty. 2022) – final approval granted for $11.5 million class settlement to resolve claims for alleged TCPA violations.

*Marquez v. Google LLC*, Case No. 2021-CH-1460 (Cir. Ct. Cook Cnty. 2022) – final approval granted for $100 million class settlement to resolve alleged BIPA violations of Illinois residents appearing on the Google Photos platform.

*Edwards v. Hearst Communications, Inc.*, Case No. 15-cv-09279-AT (S.D.N.Y. 2019) – final approval granted for $50 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*Moeller v. Advance Magazine Publishers, Inc. d/b/a Condé Nast*, Case No. 15-cv-05671-NRB (S.D.N.Y. 2019) – final approval granted for $13.75 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

In re *Scotts EZ Seed Litigation*, Case No. 12-cv-4727-VB (S.D.N.Y. 2018) – final approval granted for $47 million class settlement to resolve false advertising claims of purchasers of combination grass seed product.

*In Re: Blue Buffalo Marketing And Sales Practices Litigation*, Case No. 14-MD-2562-RWS (E.D. Mo. 2016) – final approval granted for $32 million class settlement to resolve claims of pet owners for alleged false advertising of pet foods.

*Rodriguez v. Citimortgage, Inc.*, Case No. 11-cv-4718-PGG (S.D.N.Y. 2015) – final approval granted for $38 million class settlement to resolve claims of military servicemembers for alleged foreclosure violations of the Servicemembers Civil Relief Act, where each class member was entitled to $116,785 plus lost equity in the foreclosed property and interest thereon.

*O'Brien v. LG Electronics USA, Inc., et al.*, Case No. 10-cv-3733-DMC (D.N.J. 2011) – final approval granted for $23 million class settlement to resolve claims of Energy Star refrigerator purchasers for alleged false advertising of the appliances' Energy Star qualification.

## **SARAH N. WESTCOT**

Sarah N. Westcot is the Managing Partner of Bursor & Fisher's Miami office. She focuses her practice on consumer class actions, complex business litigation, and mass torts.

She has represented clients in a wide array of civil litigation, and has substantial trial and appellate experience. Sarah served as trial counsel in *Ayyad v. Sprint Spectrum L.P.*, where Bursor & Fisher won a jury verdict defeating Sprint's $1.06 billion counterclaim and securing the class's recovery of more than $275 million in cash and debt relief.

Sarah also has significant experience in high-profile, multi-district litigations. She currently serves on the Plaintiffs' Steering Committee in *In re Zantac (Ranitidine) Products Liability Litigation,* MDL No. 2924 (S.D. Florida). She also serves on the Plaintiffs' Executive Committee in *In re Apple Inc. App Store Simulated Casino-Style Games Litigation,* MDL No. 2985 (N.D. Cal.) and *In Re: Google Play Store Simulated Casino-Style Games Litigation*, MDL No. 3001 (N.D. Cal.).

Sarah is admitted to the State Bars of California and Florida, and is a member of the bars of the United States District Courts for the Northern, Central, Southern, and Eastern Districts of California, the United States District Courts for the Southern and Middle Districts of Florida, and the bars of the United States Courts of Appeals for the Second, Eighth, and Ninth Circuits.

Sarah received her Juris Doctor from the University of Notre Dame Law School in 2009. During law school, she was a law clerk with the Cook County State's Attorney's Office in Chicago and the Santa Clara County District Attorney's Office in San Jose, CA, gaining early trial experience in both roles. She graduated with honors from the University of Florida in 2005.

Sarah is a member of The National Trial Lawyers Top 100 Civil Plaintiff Lawyers, and was selected to The National Trial Lawyers Top 40 Under 40 Civil Plaintiff Lawyers for 2022.

## **NEAL J. DECKANT**

Neal J. Deckant is a Partner with Bursor & Fisher, P.A., where he serves as the firm's Head of Information & e-Discovery.  Neal focuses his practice on complex business litigation and consumer class actions.  Prior to joining Bursor & Fisher, Neal counseled low-income homeowners facing foreclosure in East Boston.

Neal is admitted to the State Bars of California and New York, and is a member of the bars of the United States District Court for the Northern District of California, the United States District Court for the Eastern District of California, the United States District Court for the Central District of California, the United States District Court for the Southern District of California, the United States District Court for the Southern District of New York, the United States District Court for the Eastern District of New York, and the bars of the United States Courts of Appeals for the Second and Ninth Circuits.

Neal received his Juris Doctor from Boston University School of Law in 2011, graduating cum laude with two Dean's Awards.  During law school, Neal served as a Senior Articles Editor for the Review of Banking and Financial Law, where he authored two published articles about securitization reforms, both of which were cited by the New York Court of Appeals, the highest court in the state.  Neal was also awarded Best Oral Argument in his moot court section, and he served as a Research Assistant for his Securities Regulation professor. Neal has also been honored as a 2014, 2015, 2016, and 2017 Super Lawyers Rising Star.  In 2007, Neal graduated with Honors from Brown University with a dual major in East Asian Studies and Philosophy.

### *Selected Published Decisions:*

*Martinelli v. Johnson & Johnson*, 2019 WL 1429653 (N.D. Cal. Mar. 29, 2019), granting class certification of false advertising and other claims brought by purchasers of Benecol spreads labeled with the representation "No Trans Fats."

*Dzielak v. Whirlpool Corp.*, 2017 WL 6513347 (D.N.J. Dec. 20, 2017), granting class certification of consumer protection claims brought by purchasers of Maytag Centennial washing machines marked with the "Energy Star" logo.

*Duran v. Obesity Research Institute*, LLC, 204 Cal. Rptr. 3d 896 (Cal. Ct. App. 2016), reversing and remanding final approval of a class action settlement on appeal, regarding allegedly mislabeled dietary supplements, in connection with a meritorious objection.

*Marchuk v. Faruqi & Faruqi, LLP*, et al., 100 F. Supp. 3d 302 (S.D.N.Y. 2015), granting individual and law firm defendants' motion for judgment as a matter of law on plaintiff's claims for retaliation and defamation, as well as for all claims against law firm partners, Nadeem and Lubna Faruqi.

*Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014), granting nationwide class certification of false advertising and other claims brought by purchasers of purported "100% Pure Olive Oil" product.

*Ebin v. Kangadis Food Inc.*, 2014 WL 737878 (S.D.N.Y. Feb. 25, 2014), denying distributor's motion for summary judgment against nationwide class of purchasers of purported "100% Pure Olive Oil" product.

### *Selected Class Settlements:*

*In Re NVIDIA GTX 970 Graphics Chip Litigation*, Case No. 15-cv-00760-PJH (N.D. Cal. Dec. 7, 2016) – final approval granted for $4.5 million class action settlement to resolve claims that a computer graphics card was allegedly sold with false and misleading representations concerning its specifications and performance.

*Hendricks v. StarKist Co.*, 2016 WL 5462423 (N.D. Cal. Sept. 29, 2016) – final approval granted for $12 million class action settlement to resolve claims that 5-ounce cans of tuna were allegedly underfilled.

*In re: Kangadis Food Inc.*, Case No. 8-14-72649 (Bankr. E.D.N.Y. Dec. 17, 2014) – class action claims resolved for $2 million as part of a Chapter 11 plan of reorganization, after a corporate defendant filed for bankruptcy, following claims that its olive oil was allegedly sold with false and misleading representations.

### *Selected Publications:*

Neal Deckant, *X. Reforms of Collateralized Debt Obligations: Enforcement, Accounting and Regulatory Proposals*, 29 Rev. Banking & Fin. L. 79 (2009) (cited in *Quadrant Structured Products Co., Ltd. v. Vertin*, 16 N.E.3d 1165, 1169 n.8 (N.Y. 2014)).

Neal Deckant, *Criticisms of Collateralized Debt Obligations in the Wake of the Goldman Sachs Scandal*, 30 Rev. Banking & Fin. L. 407 (2010) (cited in *Quadrant Structured Products Co., Ltd. v. Vertin*, 16 N.E.3d 1165, 1169 n.8 (N.Y. 2014); *Lyon Village Venetia, LLC v. CSE Mortgage LLC*, 2016 WL 476694, at *1 n.1 (Md. Ct. Spec. App. Feb. 4, 2016); Ivan Ascher, Portfolio Society: On the Capitalist Mode of Prediction, at 141, 153, 175 (Zone Books / The MIT Press 2016); Devon J. Steinmeyer, *Does State National Bank of Big Spring v. Geithner Stand a Fighting Chance?*, 89 Chi.-Kent. L. Rev. 471, 473 n.13 (2014)).

### **YITZCHAK KOPEL**

Yitzchak Kopel is a Partner with Bursor & Fisher, P.A. Yitz focuses his practice on consumer class actions and complex business litigation.  He has represented corporate and individual clients before federal and state courts, as well as in arbitration proceedings.

Yitz has substantial experience in successfully litigating and resolving consumer class actions involving claims of consumer fraud, data breaches, and violations of the telephone consumer protection act.  Since 2014, Yitz has obtained class certification on behalf of his clients five times, three of which were certified as nationwide class actions.  Bursor & Fisher was appointed as class counsel to represent the certified classes in each of the cases.

Yitz is admitted to the State Bars of New York and New Jersey, the bar of the United States Court of Appeals for the Second, Eleventh, and Ninth Circuits, and the bars of the United States District Courts for the Southern District of New York, Eastern District of New York, Eastern District of Missouri, Eastern District of Wisconsin, Northern District of Illinois, and District of New Jersey.

Yitz received his Juris Doctorate from Brooklyn Law School in 2012, graduating *cum laude* with two Dean's Awards. During law school, Yitz served as an Articles Editor for the Brooklyn Law Review and worked as a Law Clerk at Shearman & Sterling. In 2009, Yitz graduated *cum laude* from Queens College with a B.A. in Accounting.

### ***Selected Published Decisions:***

*Bassaw v. United Industries Corp.,* 482 F.Supp.3d 80, 2020 WL 5117916 (S.D.N.Y. Aug. 31, 2020), denying motion to dismiss claims in putative class action concerning insect foggers.

*Poppiti v. United Industries Corp.*, 2020 WL 1433642 (E.D. Mo. Mar. 24, 2020), denying motion to dismiss claims in putative class action concerning citronella candles.

*Bakov v. Consolidated World Travel, Inc.*, 2019 WL 6699188 (N.D. Ill. Dec. 9, 2019), granting summary judgment on behalf of certified class in robocall class action.

*Krumm v. Kittrich Corp.*, 2019 WL 6876059 (E.D. Mo. Dec. 17, 2019), denying motion to dismiss claims in putative class action concerning mosquito repellent.

*Crespo v. S.C. Johnson & Son, Inc.*, 394 F. Supp. 3d 260 (S.D.N.Y. 2019), denying defendant's motion to dismiss fraud and consumer protection claims in putative class action regarding Raid insect fogger.

*Bakov v. Consolidated World Travel, Inc.*, 2019 WL 1294659 (N.D. Ill. Mar. 21, 2019), certifying a class of persons who received robocalls in the state of Illinois.

*Bourbia v. S.C. Johnson & Son, Inc.*, 375 F. Supp. 3d 454 (S.D.N.Y. 2019), denying defendant's motion to dismiss fraud and consumer protection claims in putative class action regarding mosquito repellent.

*Hart v. BHH, LLC*, 323 F. Supp. 3d 560 (S.D.N.Y. 2018), denying defendants' motion for summary judgment in certified class action involving the sale of ultrasonic pest repellers.

*Hart v. BHH, LLC*, 2018 WL 3471813 (S.D.N.Y. July 19, 2018), denying defendants' motion to exclude plaintiffs' expert in certified class action involving the sale of ultrasonic pest repellers.

*Penrose v. Buffalo Trace Distillery, Inc.*, 2018 WL 2334983 (E.D. Mo. Feb. 5, 2018), denying bourbon producers' motion to dismiss fraud and consumer protection claims in putative class action.

*West v. California Service Bureau, Inc.*, 323 F.R.D. 295 (N.D. Cal. 2017), certifying a nationwide class of "wrong-number" robocall recipients.

*Hart v. BHH, LLC*, 2017 WL 2912519 (S.D.N.Y. July 7, 2017), certifying nationwide class of purchasers of ultrasonic pest repellers.

*Browning v. Unilever United States, Inc.*, 2017 WL 7660643 (C.D. Cal. Apr. 26, 2017), denying motion to dismiss fraud and warranty claims in putative class action concerning facial scrub product.

*Brenner v. Procter & Gamble Co.*, 2016 WL 8192946 (C.D. Cal. Oct. 20, 2016), denying motion to dismiss warranty and consumer protection claims in putative class action concerning baby wipes.

*Hewlett v. Consolidated World Travel, Inc.*, 2016 WL 4466536 (E.D. Cal. Aug. 23, 2016), denying telemarketer's motion to dismiss TCPA claims in putative class action.

*Bailey v. KIND, LLC*, 2016 WL 3456981 (C.D. Cal. June 16, 2016), denying motion to dismiss fraud and warranty claims in putative class action concerning snack bars.

*Hart v. BHH, LLC*, 2016 WL 2642228 (S.D.N.Y. May 5, 2016) denying motion to dismiss warranty and consumer protection claims in putative class action concerning ultrasonic pest repellers.

*Marchuk v. Faruqi & Faruqi, LLP, et al.*, 100 F. Supp. 3d 302 (S.D.N.Y. 2015), granting clients' motion for judgment as a matter of law on claims for retaliation and defamation in employment action.

*In re Scotts EZ Seed Litigation*, 304 F.R.D. 397 (S.D.N.Y. 2015), granting class certification of false advertising and other claims brought by New York and California purchasers of grass seed product.

*Brady v. Basic Research, L.L.C.*, 101 F. Supp. 3d 217 (E.D.N.Y. 2015), denying diet pill manufacturers' motion to dismiss its purchasers' allegations for breach of express warranty in putative class action.

*Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151 (S.D.N.Y. 2014), denying online job board's motion to dismiss its subscribers' allegations of consumer protection law violations in putative class action.

*Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014), granting nationwide class certification of false advertising and other claims brought by purchasers of purported "100% Pure Olive Oil" product.

*Ebin v. Kangadis Food Inc.*, 2014 WL 737878 (S.D.N.Y. Feb. 25, 2014), denying distributor's motion for summary judgment against nationwide class of purchasers of purported "100% Pure Olive Oil" product.

### *Selected Class Settlements:*

*Hart v. BHH, LLC*, Case No. 1:15-cv-04804 (S.D.N.Y. Sept. 22, 2020), resolving class action claims regarding ultrasonic pest repellers.

*In re: Kangadis Food Inc.*, Case No. 8-14-72649 (Bankr. E.D.N.Y. Dec. 17, 2014), resolving class action claims for $2 million as part of a Chapter 11 plan of reorganization, after a corporate defendant filed for bankruptcy following the certification of nationwide claims alleging that its olive oil was sold with false and misleading representations.

*West v. California Service Bureau*, Case No. 4:16-cv-03124-YGR (N.D. Cal. Jan. 23, 2019), resolving class action claims against debt-collector for wrong-number robocalls for $4.1 million.

## PHILIP L. FRAIETTA

Philip L. Fraietta is a Partner with Bursor & Fisher, P.A. Phil focuses his practice on data privacy, complex business litigation, consumer class actions, and employment law disputes. Phil has been named a "Rising Star" in the New York Metro Area by Super Lawyers® every year since 2019.

Phil has significant experience in litigating consumer class actions, particularly those involving privacy claims under statutes such as the Michigan Preservation of Personal Privacy Act, the Illinois Biometric Information Privacy Act, and Right of Publicity statutes. Since 2016, Phil has recovered over $100 million for class members in privacy class action settlements. In addition to privacy claims, Phil has significant experience in litigating and settling class action claims involving false or misleading advertising.

Phil is admitted to the State Bars of New York, New Jersey, Illinois, Michigan, and California, the bars of the United States District Courts for the Southern District of New York, the Eastern District of New York, the Western District of New York, the Northern District of New York, the District of New Jersey, the Eastern District of Michigan, the Western District of Michigan, the Northern District of Illinois, the Central District of Illinois, and the United States Court of Appeals for the Second, Third, and Ninth Circuits. Phil was a Summer Associate with Bursor & Fisher prior to joining the firm.

BURSOR&FISHER
P.A.

Phil received his Juris Doctor from Fordham University School of Law in 2014, graduating cum laude. During law school, Phil served as an Articles & Notes Editor for the Fordham Law Review, and published two articles. In 2011, Phil graduated cum laude from Fordham University with a B.A. in Economics.

### ***Selected Published Decisions:***

*Garner v. Me-TV National Limited Partnership*, 132 F.4th 1022 (7th Cir. Mar. 28, 2025), reversing grant of motion to dismiss under federal Video Privacy Protection Act and specifying standard for being a "consumer" under the Act.

*Jancik v. WebMD LLC*, 2025 WL 560705 (N.D. Ga. Feb 20, 2025), certifying the first ever contested class under the federal Video Privacy Protection Act.

*Fischer v. Instant Checkmate LLC*, 2022 WL 971479 (N.D. Ill. Mar. 31, 2022), certifying class of Illinois residents for alleged violations of Illinois' Right of Publicity Act by background reporting website.

*Kolebuck-Utz v. Whitepages, Inc.*, 2021 WL 157219 (W.D. Wash. Apr. 22, 2021), denying defendant's motion to dismiss for alleged violations of Ohio's Right to Publicity Law.

*Porter v. NBTY, Inc.*, 2019 WL 5694312 (N.D. Ill. Nov. 4, 2019), denying supplement manufacturer's motion for summary judgment on consumers' allegations of false advertising relating to whey protein content.

*Boelter v. Hearst Communications, Inc.*, 269 F. Supp. 3d 172 (S.D.N.Y. 2017), granting plaintiff's motion for partial summary judgment on state privacy law violations in putative class action.

### ***Selected Class Settlements:***

*Ramos v. ZoomInfo Technologies, LLC*, Case No. 21-cv-02032-CPK (N.D. Ill. 2024) – final approval granted for $29.5 million class settlement to resolve claims for alleged statutory right of publicity violations.

*Awad v. AMC Entertainment Holdings, Inc.*, Index No. 607322/2024 (Sup. Ct. Nassau Cnty. 2024) – final approval granted for $12.3 million class settlement to resolve claims for alleged New York ticket fee claims.

*Schreiber v. Mayo Foundation for Medical Education and Research*, Case No. 22-cv-00188-HYJ (W.D. Mich. 2024) – final approval granted for $52.5 million class settlement to resolve claims of newsletter subscribers for alleged statutory privacy violations.

*Fischer v. Instant Checkmate LLC*, Case No. 19-cv-04892-MSS (N.D. Ill. 2024) – final approval granted for $10.1 million class settlement to resolve claims for alleged statutory right of publicity violations.

*Young v. Military Advantage, Inc.*, Case No. 2023LA000535 (Cir. Ct. DuPage Cnty. 2023) – final approval granted for $7.35 million class settlement to resolve claims of newsletter subscribers for alleged federal Video Privacy Protection Act claims.

*Rivera v. Google LLC*, Case No. 2021-CH-1460 (Cir. Ct. Cook Cnty. 2022) – final approval granted for $100 million class settlement to resolve alleged BIPA violations of Illinois residents appearing in photos on the Google Photos platform.

*Edwards v. Hearst Communications, Inc.*, Case No. 15-cv-09279-AT (S.D.N.Y. 2019) – final approval granted for $50 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*Ruppel v. Consumers Union of United States, Inc.*, Case No. 16-cv-02444-KMK (S.D.N.Y. 2018) – final approval granted for $16.375 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*Moeller v. Advance Magazine Publishers, Inc. d/b/a Condé Nast*, Case No. 15-cv-05671-NRB (S.D.N.Y. 2019) – final approval granted for $13.75 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*Benbow v. SmileDirectClub, LLC*, Case No. 2020-CH-07269 (Cir. Ct. Cook Cnty. 2021) – final approval granted for $11.5 million class settlement to resolve claims for alleged TCPA violations.

*Gregorio v. Premier Nutrition Corp.*, Case No. 17-cv-05987-AT (S.D.N.Y. 2019) – final approval granted for $9 million class settlement to resolve claims of protein shake purchasers for alleged false advertising.

## ALEC M. LESLIE

Alec Leslie is a Partner with Bursor & Fisher, P.A. He focuses his practice on consumer class actions, employment law disputes, and complex business litigation.

Alec is admitted to the State Bar of New York and is a member of the bar of the United States District Courts for the Southern and Eastern Districts of New York. Alec was a Summer Associate with Bursor & Fisher prior to joining the firm.

Alec received his Juris Doctor from Brooklyn Law School in 2016, graduating *cum laude*. During law school, Alec served as an Articles Editor for Brooklyn Law Review. In addition, Alec served as an intern to the Honorable James C. Francis for the Southern District of New York and the Honorable Vincent Del Giudice, Supreme Court, Kings County. Alec graduated from the University of Colorado with a B.A. in Philosophy in 2012.

### *Selected Class Settlements:*

*Gregorio v. Premier Nutrition Corp.*, Case No. 17-cv-05987-AT (S.D.N.Y. 2019) – final approval granted for class settlement to resolve claims of protein shake purchasers for alleged

false advertising.

*Wright v. Southern New Hampshire Univ.*, Case No. 1:20-cv-00609-LM (D.N.H. 2021) – final approval granted for class settlement to resolve claims over COVID-19 tuition and fee refunds to students.

*Mendoza et al. v. United Industries Corp.*, Case No. 21PH-CV00670 (Phelps Cnty. Mo. 2021) – final approval granted for class settlement to resolve false advertising claims on insect repellent products.

*Kaupelis v. Harbor Freight Tools USA, Inc.*, Case No. 8:19-cv-01203-JVS-DFM (C.D. Cal. 2021) – final approval granted for class settlement involving allegedly defective and dangerous chainsaws.

*Rocchio v. Rutgers Univ.*, Case No. MID-L-003039-20 (Middlesex Cnty. N.J. 2021) – final approval granted for class settlement to resolve claims over COVID-19 fee refunds to students.

*Malone v. Western Digital Corporation*, Case No. 5:20-cv-03584-NC (N.D. Cal.) – final approval granted for class settlement to resolve false advertising claims on hard drive products.

*Frederick et al. v. ExamSoft Worldwide, Inc.*, Case No. 2021L001116 (DuPage Cnty. Ill. 2021) – final approval granted for class settlement to resolve claims over alleged BIPA violations with respect to exam proctoring software.

*D'Amario et al. v. Univ. of Tampa*, Case No. 7:20-cv-07344 (S.D.N.Y. 2022) – final approval granted for class settlement to resolve claims over COVID-19 fee refunds to students.

*Olin et al. v. Meta Platforms, Inc.*, Case No. 3:18-cv-01881-RS (N.D. Cal. 2022) – final approval granted for class settlement involving invasion of privacy claims.

*Croft v. SpinX Games et al.*, Case No. 2:20-cv-01310-RSM (W.D. Wash. 2022) – final approval granted for class settlement involving allegedly deceptive and/or illegal gambling practices.

*Armstead v. VGW Malta Ltd. et al.*, Case No. 22-CI-00553 (Henderson Cnty. Ky. 2023) – final approval granted for class settlement involving allegedly deceptive and/or illegal gambling practices.

*Barbieri v. Tailored Brands, Inc.*, Index No. 616696/2022 (Nassau Cnty. N.Y.) – final approval granted for class settlement involving untimely wage payments to employees.

*Metzner et al. v. Quinnipiac Univ.*, Case No. 3:20-cv-00784 (D. Conn.) – final approval granted for class settlement to resolve claims over COVID-19 fee refunds to students.

*In re GE/Canon Data Breach,* Case No. 1:20-cv-02903 (S.D.N.Y.) – final approval granted for class settlement to resolve data breach claims.

*Davis v. Urban Outfitters, Inc.,* Index No. 612162/2022 (Nassau Cnty. N.Y.) – final approval granted for class settlement involving untimely wage payments to employees.

*Armstead v. VGW Malta LTD et al.,* Civil Action No. 22-CI-00553 (Henderson Cir. Ct. Ky.) – final approval granted for class settlement involving allegedly deceptive and/or illegal gambling practices.

*Casler et al. v. Mclane Company, Inc. et al.,* Index No. 616432/2022 (Nassau Cnty. N.Y.) – final approval granted for class settlement involving untimely wage payments to employees.

*Wyland v. Woopla, Inc.,* Civil Action No. 2023-CI-00356 (Henderson Cir. Ct. Ky.) – final approval granted for class settlement involving allegedly deceptive and/or illegal gambling practices.

*Graziano et al. v. Lego Systems, Inc.,* Index No. 611615/2022 (Nassau Cnty. N.Y.) – final approval granted for class settlement involving untimely wage payments to employees.

*Lipsky et al. v. American Behavioral Research Institute, LLC,* Case No. 50-2023-CA-011526-XXXX-MB (Palm Beach Cnty. Fl.) – final approval granted to resolve allegedly deceptive automatic renewal and product efficacy claims.

*Whiting v. Yellow Social Interactive Ltd.,* Civil Action No. 2023-CI-00358 (Henderson Cir. Ct. Ky.) – final approval granted for class settlement involving allegedly deceptive and/or illegal gambling practices.

## **DANIEL GUERRA**

Daniel Guerra is a Senior Associate with Bursor & Fisher, P.A. Dan focuses his practice on complex civil litigation and consumer class actions.

Prior to working at Bursor & Fisher, Dan practiced at a national law firm in San Francisco. He helped represent various companies during internal investigations and in complex civil litigation, including product liability litigation and commercial disputes. He also advised clients on a range of matters including regulatory compliance, litigation risk assessment, and product counseling.

Dan is admitted to the State Bar of California, all California Federal District Courts, and the United States District Court for the Western District of Texas.

Dan received his Juris Doctor from the University of California Law, San Francisco (formerly U.C. Hastings College of the Law) in 2009.

## **STEPHEN BECK**

Stephen is an Associate with Bursor & Fisher, P.A. Stephen focuses his practice on complex civil litigation and class actions.

BURSOR&FISHER
P.A.

Stephen is admitted to the State Bar of Florida and is a member of the bars of the United States District Courts for the Southern and Middle Districts of Florida, the Eastern District of Missouri, and the Northern District of Illinois.

Stephen received his Juris Doctor from the University of Miami School of Law in 2018. During law school, Stephen received an Honors distinction in the Litigation Skills Program and was awarded the Honorable Theodore Klein Memorial Scholarship for excellence in written and oral advocacy. Stephen also received the CALI Award in Legislation for earning the highest grade on the final examination. Stephen graduated from the University of North Florida with a B.A. in Philosophy in 2015.

## STEFAN BOGDANOVICH

Stefan Bogdanovich is an Associate with Bursor & Fisher, P.A. Stefan litigates complex civil and class actions typically involving privacy, intellectual property, entertainment, and false advertising law.

Prior to working at Bursor & Fisher, Stefan practiced at two national law firms in Los Angeles. He helped represent various companies in false advertising and IP infringement cases, media companies in defamation cases, and motion picture producers in royalty disputes. He also advised corporations and public figures on complying with various privacy and advertising laws and regulations.

Stefan is admitted to the State Bar of California and all of the California Federal District Courts. He is also a Certified Information Privacy Professional.

Stefan received his Juris Doctor from the University of Southern California Gould School of Law in 2018, where he was a member of the Hale Moot Court Honors Program and the Trial Team. He received the highest grade in his class in three subjects, including First Amendment Law.

## MAX S. ROBERTS

Max Roberts is an Associate in Bursor & Fisher's New York office. Max focuses his practice on class actions concerning data privacy and consumer protection. Max was a Summer Associate with Bursor & Fisher prior to joining the firm and is now Co-Chair of the firm's Appellate Practice Group.

Since 2023, Max has been named "Rising Star" in the New York Metro Area by Super Lawyers®.

Max received his Juris Doctor from Fordham University School of Law in 2019, graduating *cum laude.* During law school, Max was a member of Fordham's Moot Court Board, the Brennan Moore Trial Advocates, and the Fordham Urban Law Journal, for which he published a note entitled *Weaning Drug Manufacturers Off Their Painkiller: Creating an Exception to the Learned Intermediary Doctrine in Light of the Opioid Crisis.* In addition, Max served as an intern to the Honorable Vincent L. Briccetti of the Southern District of New York and the Fordham Criminal

BURSOR&FISHER
P.A.

Defense Clinic.  Max graduated from Johns Hopkins University in 2015 with a B.A. in Political Science.

Outside of the law, Max is an avid triathlete.

### *Selected Published Decisions:*

*Huertas v. Bayer US LLC*, 120 F.4th 1169 (3d Cir. 2024), reversing district court and holding plaintiffs had alleged an injury-in-fact sufficient for Article III standing.  Max personally argued the appeal before the Third Circuit, which can be listened to here.

*Jackson v. Amazon.com, Inc.*, 65 F.4th 1093 (9th Cir. 2023), affirming district court's denial of motion to compel arbitration.  Max personally argued the appeal before the Ninth Circuit, which can be viewed here.

*Javier v. Assurance IQ, LLC*, 2022 WL 1744107 (9th Cir. May 31, 2022), reversing district court and holding that Section 631 of the California Invasion of Privacy Act requires prior consent to wiretapping.  Max personally argued the appeal before the Ninth Circuit, which can be viewed here.

*Mora v. J&M Plating, Inc.*, 213 N.E.3d 942 (Ill. App. Ct. 2d Dist. 2022), reversing circuit court and holding that Section 15(a) of Illinois' Biometric Information Privacy Act requires an entity to establish a retention and deletion schedule for biometric data at the first moment of possession.  Max personally argued the appeal before the Second District, which can be listened to here.

*Newman v. Bayer Corp.*, --- F.R.D. ---, 2025 WL 856225 (S.D.N.Y. Mar. 19, 2025), certifying class of New York purchases of "One A Day" gummy multivitamins.

*Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924 (N.D. Cal. 2024), denying motion to dismiss alleged violations of California pen register statute.

*Yockey v. Salesforce, Inc.*, 745 F. Supp. 3d 945 (N.D. Cal. 2024), denying motion dismiss alleged violations of California and Pennsylvania wiretapping statutes.

*Gladstone v. Amazon Web Services, Inc.,* 739 F. Supp. 3d 846 (W.D. Wash. 2024), denying motion to dismiss alleged violations of California wiretapping statute.

*Rancourt v. Meredith Corp.,* 2024 WL 381344 (D. Mass. Jan. 11, 2024), denying motion to dismiss alleged violations of federal Video Privacy Protection Act, and finding personal jurisdiction over operator of mobile application.

*Saunders v. Hearst Television, Inc.*, 711 F. Supp. 3d 24 (D. Mass. 2024), denying motion to dismiss alleged violations of federal Video Privacy Protection Act.

*Cristostomo v. New Balance Athletics, Inc.*, 647 F. Supp. 3d 1 (D. Mass. 2022), denying motion to dismiss and motion to strike class allegations in case involving sneakers marketed as "Made in

the USA."

### *Selected Class Settlements:*

*Sholopa v. Turk Hava Yollari A.O. (d/b/a Turkish Airlines)*, Case No. 1:20-cv-3294-ALC (S.D.N.Y. 2023) – final approval granted for $14.1 million class settlement to resolve claims of passengers whose flights with Turkish Airlines were cancelled due to COVID-19 and who did not receive refunds.

*Payero v. Mattress Firm, Inc.*, Case No. 7:21-cv-3061-VB (S.D.N.Y. 2023) – final approval granted for $4.9 million class settlement to resolve claims of consumers who purchased allegedly defective bed frames.

*Miranda v. Golden Entertainment (NV), Inc.*, Case No. 2:20-cv-534-AT (D. Nev. 2021) – final approval granted for class settlement valued at over $4.5 million to resolve claims of customers and employees of casino company stemming from data breach.

*Malone v. Western Digital Corp.*, Case No. 5:20-cv-3584-NC (N.D. Cal. 2021) – final approval granted for class settlement valued at $5.7 million to resolve claims of hard drive purchasers for alleged false advertised.

*Frederick v. ExamSoft Worldwide, Inc.*, Case No. 2021-L-001116 (18th Judicial Circuit Court DuPage County, Illinois 2021) – final approval granted for $2.25 million class settlement to resolve claims of Illinois students for alleged violations of the Illinois Biometric Information Privacy Act.

### *Bar Admissions*

- New York State
- Southern District of New York
- Eastern District of New York
- Northern District of New York
- Northern District of Illinois
- Central District of Illinois
- Eastern District of Michigan
- District of Colorado
- First Circuit Court of Appeals
- Second Circuit Court of Appeals
- Third Circuit Court of Appeals
- Seventh Circuit Court of Appeals
- Ninth Circuit Court of Appeals

## JULIA K. VENDITTI

Julia K. Venditti is an Associate with Bursor & Fisher, P.A. Julia focuses her practice on complex civil litigation and class actions. Julia was a Summer Associate with Bursor & Fisher prior to joining the firm.

Julia is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern, Eastern, Central, and Southern Districts of California.

Julia received her Juris Doctor in 2020 from the University of California, Hastings College of the Law, where she graduated *cum laude* with two CALI Awards for the highest grade in her Evidence and California Community Property classes. During law school, Julia was a member of the UC Hastings Moot Court team and competed at the Evans Constitutional Law Moot Court Competition, where she finished as a national quarterfinalist and received a best brief award. Julia was also inducted into the UC Hastings Honors Society and was awarded Best Brief and an Honorable Mention for Best Oral Argument in her First-Year Moot Court section. In addition, Julia served as a Research Assistant for her Constitutional Law professor, as a Teaching Assistant for Legal Writing & Research, and as a Law Clerk at the San Francisco Public Defender's Office. In 2017, Julia graduated *magna cum laude* from Baruch College/CUNY, Weissman School of Arts and Sciences, with a B.A. in Political Science.

## JULIAN DIAMOND

Julian Diamond is an Associate with Bursor & Fisher, P.A. Julian focuses his practice on privacy law and class actions. Julian was a Summer Associate with Bursor & Fisher prior to joining the firm.

Julian received his Juris Doctor from Columbia Law School, where he was a Harlan Fiske Stone Scholar. During law school, Julian was Articles Editor for the Columbia Journal of Environmental Law. Prior to law school, Julian worked in education. Julian graduated from California State University, Fullerton with a B.A. in History and a single subject social science teaching credential.

## MATTHEW GIRARDI

Matt Girardi is an Associate with Bursor & Fisher, P.A. Matt focuses his practice on complex civil litigation and class actions, and has focused specifically on consumer class actions involving privacy violations, illegal gambling, financial misconduct, and false advertising. Matt was a Summer Associate with Bursor & Fisher prior to joining the firm.

Matt is admitted to the State Bar of New York, and is a member of the bars of the United States District Courts for the Southern District of New York, the Eastern District of New York, the Eastern District of Michigan, the Western District of Michigan, the First Circuit Court of Appeals, and the Ninth Circuit Court of Appeals.

Matt received his Juris Doctor from Columbia Law School in 2020, where he was a Harlan Fiske Stone Scholar. During law school, Matt was the Commentary Editor for the

Columbia Journal of Tax Law, and represented fledgling businesses for Columbia's Entrepreneurship and Community Development Clinic.  In addition, Matt worked as an Honors Intern in the Division of Enforcement at the U.S. Securities and Exchange Commission.  Matt graduated from Brown University in 2016 with a B.A. in Economics, and worked as a Paralegal Specialist at the U.S. Department of Justice in the Antitrust Division prior to law school.

### *Selected Class Settlements:*

*Armstead v. VGW Malta Ltd. et al.*, Case No. 22-CI-00553 (Henderson Cnty. Ky. 2023) – final approval granted for $11.75 million class settlement involving allegedly deceptive and/or illegal gambling practices.

*Edwards v. Mid-Hudson Valley Federal Credit Union, Case No. 22-cv-00562-TJM-CFH* (N.D.N.Y. 2023) – final approval granted for $2.2 million class settlement to resolve claims that an upstate New York credit union was unlawfully charging overdraft fees on accounts with sufficient funds.

*Fischer, et al. v. Instant Checkmate LLC, et al.*, No. 19-cv-04892 (N.D. Ill. 2024) – final approval granted for state-by-state non-reversionary cash settlements involving alleged violations of right of publicity statutes totaling in excess of $10.1 million.

*Wyland v. Woopla, Inc.,* Civil Action No. 2023-CI-00356 (Henderson Cir. Ct. Ky. 2023) – final approval granted for $835,000 class settlement involving allegedly deceptive and/or illegal gambling practices.

*Whiting v. Yellow Social Interactive Ltd.,* Civil Action No. 2023-CI-00358 (Henderson Cir. Ct. Ky. 2023) – final approval granted for $1.32 million class settlement involving allegedly deceptive and/or illegal gambling practices.

## XAVIER JOHNSON

Xavier Johnson is a Staff Attorney at Bursor & Fisher, where they focus their practice on complex civil litigation and consumer class actions.  They are admitted to the State Bar of California.  Xavier is a former Director of Policy Institute at the Just Cities Institute where their work focused on Fair Chance Housing policies, re-entry policy, as well as tenants' rights. Previously, Xavier worked as a Tenants' Rights Attorney at Centro Legal de la Raza.  Their work at Centro Legal de la Raza centered on representing tenants in hearings with the Oakland Rent Adjustment Program.  Xavier provided assistance to tenants through all stages of the petition process including providing representation on the day of the hearings.  Xavier successfully advocated for more than one million dollars in rent reductions.  Xavier engaged with the community through outreach and documented how tenants are being impacted by the housing crisis and what steps we can take to ensure that our tenant communities are protected. Xavier Johnson is also an elected official serving as a Commissioner on the Berkeley Rent Stabilization Board.

Over their career, Xavier has worked with law firms, non-profits, and governmental entities in the realms of policy advocacy, research and community organizing.  Xavier spent two

years as a Congressional Aide in Congresswoman Barbara Lee's District Office with a focus on housing and housing justice.

Xavier holds a Juris Doctorate from University of California Berkeley School of Law and a Bachelor of Arts in Sociology from University of Texas at San Antonio.

## JENNA GAVENMAN

Jenna Gavenman is an Associate with Bursor & Fisher, P.A. Jenna focuses her practice on complex civil litigation and consumer class actions. Jenna was a Summer Associate and a part-time intern with Bursor & Fisher prior to joining the firm as a full-time Associate in September 2022.

Jenna is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern, Eastern, Central, and Southern Districts of California.

Jenna received her Juris Doctor in 2022 from the University of California, Hastings College of the Law (now named UC Law SF). During law school, she was awarded an Honorable Mention for Best Oral Argument in her First-Year Moot Court section. Jenna also participated in both the Medical Legal Partnership for Seniors (MLPS) and the Lawyering for Children Practicum at Legal Services for Children—two of UC Hastings's nationally renowned clinical programs. Jenna was awarded the Clinic Award for Outstanding Performance in MLPS for her contributions to the clinic. In addition, Jenna volunteered with her law school's Legal Advice and Referral Clinic and as a LevelBar Mentor.

In 2018, Jenna graduated *cum laude* from Villanova University with a B.A. in Sociology and Spanish (double major). Jenna was a Division I athlete, competing on the Villanova Women's Water Polo varsity team for four consecutive years.

## IRA ROSENBERG

Ira Rosenberg is an Associate with Bursor & Fisher, P.A. Ira focuses his practice on complex civil litigation and class actions.

Ira received his Juris Doctor in 2022 from Columbia Law School. During law school, Ira served as a Student Honors Legal Intern with Division of Enforcement at the U.S. Securities and Exchange Commission. Ira also interned during law school in the Criminal Division at the United States Attorney's Office for the Southern District of New York and with the Investor Protection Bureau at the Office of the New York State Attorney General. Ira graduated in 2018 from Beth Medrash Govoha with a B.A. in Talmudic Studies.

## LUKE SIRONSKI-WHITE

Luke Sironski-White is an Associate with Bursor & Fisher, P.A., focusing on complex civil litigation and consumer class actions. Luke joined the firm as a full-time Associate in August 2022.

Luke is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern, Eastern, Central, and Southern Districts of California.

Luke received his Juris Doctor in 2022 from the University of California, Berkeley School of Law.   During law school, Luke was on the board of the Consumer Advocacy and Protection Society (CAPS), edited for the Berkeley Journal of Employment and Labor Law, and volunteered with the Prisoner Advocacy Network.

In 2017, Luke graduated from the University of Chicago with a B.A. in Anthropology.  Before entering the field of law Luke was a professional photographer and filmmaker.

## MUJGHAN AHMAD

Mujghan Ahmad is a Staff Attorney at Bursor & Fisher, where she focuses her practice on complex civil litigation and consumer class actions.  She is admitted to the State Bar of California.

Mujghan earned her Juris Doctor from Golden Gate University, School of Law in 2022, with specializations in Intellectual Property and Public Interest.  During law school,  she received a CALI Award in Intellectual Property Law Survey, wrote for the Environmental Law Journal, and was a member of the Moot Court Board and the Pro Bono Honor Society.  She also served as a teaching assistant for Criminal Law Professor Thomas Schaaf.  In 2017, Mujghan received a Bachelor of Arts in Political Science from the University of California, Irvine.

Her prior legal experience includes internships with the Los Angeles County Counsel's Property Division, Homeless Advocacy Project, Bay Area Legal Aid's Economic Justice Unit, and California Lawyers for the Arts.  Before joining Bursor & Fisher, Mujghan served as a Foreclosure Prevention Attorney at Legal Assistance to the Elderly, where she litigated cases involving wrongful foreclosure and financial elder abuse, and provided pro bono estate planning services to low-income seniors in San Francisco.

## INES DIAZ

Ines Diaz is an Associate with Bursor & Fisher, P.A. Ines focuses her practice on complex civil litigation and class actions.

Ines is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern, Eastern, Central, and Southern Districts of California.

Ines received her Juris Doctor in 2023 from the University of California, Berkeley School of Law.  During law school, Ines served as an Executive Editor of the California Law Review. She also served as an intern with the East Bay Community Law Center's Immigration Clinic and as a Fellow of the Berkeley Law Academic Skills Program.  Additionally, Ines served as an instructor with the University of California, Berkeley Extension, Legal Studies Global Access Program where she taught legal writing to international law students.  In 2021, Ines was selected

for a summer externship at the California Supreme Court where she served as a judicial extern for the Honorable Mariano-Florentino Cuéllar.

## CAROLINE C. DONOVAN

Caroline C. Donovan is an Associate with Bursor & Fisher, P.A. Caroline focuses her practice on complex civil litigation, data protection, mass arbitration, and class actions. Caroline interned with Bursor & Fisher during her third year of law school before joining full time in Fall 2023.

Caroline is admitted to the State Bar of New York.

Caroline received her Juris Doctor in 2023 from Brooklyn Law School. During law school, Caroline was a member of the Moot Court Honor Society Trial Division, where she was chosen to serve as a National Team Member. Caroline competed and coached in numerous competitions across the country, and placed second at regionals in AAJ's national competition in both her second and third year of law school. Caroline was also the President of the Art Law Association, and the Treasurer of the Labor and Employment Law Association.

During law school, Caroline was a judicial intern for Judge Kenneth W. Chu of the National Labor Relations Board. She also interned at the United States Attorney's Office in the Eastern District of New York, as well as a securities class action firm.

## JOSHUA B. GLATT

Joshua Glatt is an Associate with Bursor & Fisher, P.A. Joshua focuses his practice on complex civil litigation and consumer class actions. Joshua was a Summer Associate with Bursor & Fisher prior to joining the firm as an Associate.

Joshua is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern, Eastern, Central, and Southern Districts of California.

Joshua earned his Juris Doctor from the University of California College of the Law, San Francisco (formerly U.C. Hastings). While there, he received a CALI Award for earning the highest grade in Constitutional Law II and served on the executive boards of the Jewish Law Students Association and the American Constitution Society. Prior to law school, Joshua graduated *summa cum laude* from the Walter Cronkite School of Journalism and Mass Communication at Arizona State University in 2016 and earned a master's degree from the University of Southern California in 2018.

## JOSHUA R. WILNER

Joshua Wilner is an Associate with Bursor & Fisher, P.A. Joshua focuses his practice on complex civil litigation, data privacy, consumer protection, and class actions. Joshua was a Summer Associate at Bursor & Fisher prior to joining the firm full time in Fall 2023.

Joshua is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern, Eastern, Central, and Southern Districts of California.

Joshua received his Juris Doctor in 2023 from Berkeley Law.  During law school, he received the American Jurisprudence Award for Constitutional Law.

During law school, Joshua served on the board of the Berkeley Journal of Employment and Labor Law.  Joshua also interned at Disability Rights California, Legal Aid at Work, and a private firm that worked closely with the ACLU of Northern California to enforce the California Racial Justice Act.  In 2022 and 2023, Joshua worked as a research assistant for Professor Abbye Atkinson.

## VICTORIA ZHOU

Victoria Zhou is an Associate in Bursor & Fisher's New York office.  Victoria focuses her practice on class actions concerning data privacy and consumer protection.

Victoria is admitted to the State Bar of New York.

Victoria received her Juris Doctor from Fordham Law School in 2023.  During law school, Victoria served as an Associate Editor of the Moot Court Board and competed in multiple mock trial competitions as a member of the Brendan Moore Trial Advocates.  In addition, Victoria served as a judicial extern to Chief Judge Mark A. Barnett of the United States Court of International Trade.  In 2019, Victoria graduated *magna cum laude* from Fei Tian College with a B.F.A. in Classical Dance.

## KYLE D. GORDON

Kyle Gordon is an Associate with Bursor & Fisher, P.A.  Kyle focuses his practice on class actions concerning data privacy and consumer protection.  Kyle was a Summer Associate with Bursor & Fisher prior to joining the firm.

Kyle is admitted to the State Bar of New York.

Kyle received his Juris Doctor from Columbia Law School in 2023, where he was a Harlan Fiske Stone Scholar.  During law school, Kyle was a Staff Editor for the Columbia Science and Technology Law Review.  In 2020, Kyle graduated *summa cum laude* from New York University with a B.A. in Politics and became a member of Phi Beta Kappa.  Prior to law school, Kyle interned in the Clerk's Office of the United States District Court for the District of Columbia.

## ELEANOR R. GRASSO

Eleanor Grasso is an Associate with Bursor & Fisher, P.A.  Eleanor focuses her practice on complex civil litigation, including data privacy and consumer protection class actions.

BURSOR&FISHER
P.A.

Eleanor is admitted to the State Bars of New York and Florida, and is a member of the bars of the United States District Courts for the Southern District of New York and Eastern District of New York.

Eleanor earned her Juris Doctor from Fordham University School of Law.  During law school, Eleanor was a member of the Fordham Journal of Intellectual Property, Media & Entertainment Law, serving as Symposium Editor for Volume XXXIV.  Eleanor was also a member of the Brendan Moore Trial Advocacy Team, served as a Research Assistant, and was a member of the Board of Student Advisors.

Throughout her time in law school, Eleanor interned for the Office of the Public Defender for the Sixth Judicial Circuit of Florida in the Misdemeanor Unit, the Office of the Federal Public Defender for the Middle District of Tennessee in the Capital Habeas Unit, the ACLU of Florida, and for the Honorable Kiyo A. Matsumoto in the United States District Court for the Eastern District of New York.  Eleanor was a Summer Associate with Bursor & Fisher and also interned part-time during her third year of law school.

Eleanor earned her Bachelors from the University of Florida, with a double-major in Criminology & Law and Political Science and a minor in French & Francophone studies.

## RYAN B. MARTIN

Ryan Martin is an Associate with Bursor & Fisher, P.A.  Ryan focuses his practice on complex civil litigation and consumer class actions.  He was a Summer Associate and part-time law clerk with Bursor & Fisher prior to joining the firm as a full time Associate in August 2024.

Ryan is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern, Eastern, Central, and Southern Districts of California.

He earned his Juris Doctor from the University of California College of the Law, San Francisco (formerly U.C. Hastings), graduating *Cum Laude* with a Concentration in Environmental Law and as a member of the Honors Society.  While there, he was a Senior Production Editor of the *U.C. Law Journal*, was President of the Hastings Environmental Law Association, and was a Torts Teaching Fellow.

Prior to law school, Ryan graduated from the W.A. Franke College of Business at Northern Arizona University with a Bachelors of Science in Hotel and Restaurant Management and a minor in Business.  Ryan also studied Sustainable Business and Hotel Management at the Internationale Hochschule of Applied Sciences in Bad Honnef Germany and is a certified yoga instructor.

## LOGAN HAGERTY

Logan Hagerty is an Associate with Bursor & Fisher, P.A.  Logan is admitted to the State Bar of New York.

Logan received his Juris Doctor from Boston College Law School in 2024, where he received a certificate in Land & Environmental Law.

During law school, Logan was President of the Environmental Law Society.  In addition, Logan worked for a class action firm, a general practice firm, and interned at a Massachusetts state agency.

Logan earned his Bachelors from St. Lawrence University, where he graduated magna cum laude with a double major in History and Environmental Studies and a minor in African Studies.  He is also a member of Phi Beta Kappa.


## KAREN VALENZUELA

Karen Valenzuela is an Associate with Bursor & Fisher, P.A.  Karen focuses her practice on complex civil litigation and class actions.  Karen was a Summer Associate and a part-time intern with Bursor & Fisher prior to joining the firm as a full-time Associate.

Karen is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern, Eastern, Central, and Southern Districts of California.

Karen received her Juris Doctor in 2024 from the University of California, Berkeley School of Law.  During law school, Karen was part of the Consumer Protection Public Policy Order, and interned for the Los Angeles County Public Defender's Office.  Karen also participated in the International Human Rights Law Clinic, La Alianza Workers' and Tenants' Rights Clinic, and the Death Penalty Clinic.

Prior to law school, Karen graduated from the University of California, Berkeley with a B.A. in Gender and Women's Studies and a minor in Global Poverty and Practice.

**EXHIBIT 11**



### Florida

9897 Lake Worth Rd

Suite 302

Lake Worth, FL 33467


### Virginia

5516 Falmouth St

Suite 108

Richmond, Virginia 23230


### New York

745 Fifth Ave

Suite 500

New York, New York 10151


### Minnesota

1650 W. 82nd Street

Suite 880

Bloomington, Minnesota 55431


www.4-Justice.com

George Feldman McDonald, PLLC

## The Firm

The mission of George Feldman McDonald, PLLC ("GFM" or "the Firm") is to provide the highest quality legal service to our clients, taking a heartfelt and genuine interest in their circumstances, while offering creative fee agreements in order to provide access to justice for everyone.

We are dedicated to these values: We will work aggressively, relentlessly and with integrity to represent those who need us. In addition to the variety of legal services we provide (consumer fraud class actions, data breach and privacy violation class actions, securities, EB-5 fraud litigation, business litigation, personal injury, consumer rights and victims' rights), our passion is helping victims of injustice.

We aim to serve those taken advantage of, wronged, or exploited with an exceptional level of service, excellence, encouragement, respect and strength, backed by nearly two centuries of collective legal experience, success and results.

We embrace and encourage diversity among our lawyers and staff and respect the differences among us and our communities. We always have and always will conduct ourselves and our firm with an uncompromising dedication to the highest ethical standards, while maintaining a profitable business enterprise with an impeccable reputation. Our firm endeavors to give back to our community in many ways, and we will pursue our belief that individuals with a sense of family and community, and with interests outside of the practice of law, are better for it.

2

George Feldman McDonald, PLLC

# Attorneys



**David J. George, Managing Member**

David J. George earned his Bachelor of Arts degree in Political Science from the University of Rhode Island, *summa cum laude*.  David then graduated at the top of his class at the University of Richmond School of Law.  At the University of Richmond, David was a member of the Law Review, was the President of the McNeill Law Society, and earned numerous academic awards, including Outstanding Academic Performance in each of his three years there and Outstanding Graduate.

Before founding and becoming the Managing Member of the Firm, David, who is AV rated by Martindale-Hubbell (the highest rating available), was a partner in one of the largest class action firms in the world.  A zealous advocate of shareholder, consumer and EB-5 investor rights, David has been lead and/or co-lead counsel with respect to various securities class action matters throughout the United States, including:  *In re Cryo Cell Int'l, Inc. Sec. Litig.* (M.D. Fla.) ($7 million settlement); *In re TECO Energy, Inc. Sec. Litig.* (M.D. Fla.) ($17.35 million settlement); *Baxter Int'l* (N.D. Ill.) ($42.5 million settlement); *In re Newpark Res., Inc. Sec. Litig.* (E.D. La.) ($9.24 million settlement); *In re Mannatech, Inc. Sec. Litig.* (N.D. Tex.) ($11.5 million settlement); *In re Gilead Sec. Litig.* (N.D. Cal.) ($8.25 million settlement); and *In re R.H. Donnelly* (D. Del.) ($25 million settlement).  David has also acted as lead counsel in numerous consumer class actions nationwide, including *Lewis v. Labor Ready, Inc.* ($11 million settlement); *In re Webloyalty, Inc. Mktg. & Sales Practices Litig.* (D. Mass.) ($10 million settlement); and *In re Navisite Migration Litig.* (D. Md.) ($1.7 million settlement).  Moreover, David was a member of the litigation team that secured a $925 million settlement in *In re UnitedHealth Grp. Inc. PSLRA Litig.* (D. Minn.).  The UnitedHealth Group settlement was the largest stock options backdating case in history.

He is the Chair of the Firm's EB-5 Practice Group and a member of the Firm's Class Action and Commercial Litigation Practice Groups.  David recently served as lead

George Feldman McDonald, PLLC

counsel in two of the Firm's EB-5 cases involving the Palm House Hotel at 160 Royal Palm Way in Palm Beach, Florida.  The litigation is entitled *Lan Li, et al. v. Joseph Walsh, et al.*, 16-cv-81871-KAM (S.D. Fla). and *Lan Li, et al. v. PNC Bank, N.A. and Ruben Ramirez*, 9:19-cv-80332-KAM (S.D. Fla), and GFM served as Lead Counsel for the Palm House EB-5 Investors.  The EB-5 program allows foreign nationals who invest at least $800,000 in a U.S. business and create 10 jobs for qualified U.S. workers to obtain green cards.  Through the EB-5 program, Defendants collected $44 million from at least 88 foreign investors who sought to obtain green cards, promising to use the funds for the acquisition, development, and operation of the Palm Beach Hotel in Palm Beach, Florida.  The Palm House EB-5 Investors alleged that foreign investors lost approximately $50 million in the Palm House Hotel EB-5 hotel scam after the defendants and their related entities used the funds meant for the Palm House Hotel Project to pay for lavish personal expenses.  David consults with EB-5 investors from all over the world, including China, South America, India, and Vietnam, and lectures on EB-5 related topics during his travels.  David's EB-5 practice includes projects in various cities across the U.S.

David also spent more than a decade as a commercial litigator with two of the largest corporate law firms in the United States.  During that time, David aggressively prosecuted and defended a wide array of complex commercial litigation matters, including securities class action matters, non-compete litigation, fraud claims, and real estate-based litigation matters.  He is a member of the National Association of Shareholder and Consumer Attorneys.

David was honored as a 2021 Plaintiffs' Lawyers Trailblazer by the National Law Journal.  He was also named as one of Florida's Most Effective Corporate/Securities Lawyers and was the only plaintiffs' securities class action counsel recognized.  He has a nationwide practice and successfully prosecutes commercial litigation and fraud cases throughout the U.S.

4

George Feldman McDonald, PLLC



### Lori G. Feldman

Lori G. Feldman is a Member of George Feldman McDonald.  She is the Chair of the Firm's Class Action Practice Group, Managing Partner of the Firm's New York office, and a member of the Firm's EB-5 and Commercial Litigation Practice Groups.  She earned her Bachelor of Arts degree in Criminal Justice from the State University of New York at Albany, *magna cum laude*, where she was awarded the Signum Laudis graduate school honors scholarship.  Lori earned her Juris Doctor degree upon graduating from Albany Law School of Union University, where she served as a member of the Albany Law Review and was a winner of the school's first year law review student writing competition.

Prior to joining the Firm, Lori was a Partner in one of the largest class action firms in the country, a Partner in another prestigious securities and consumer class action firm, and Of Counsel to one of the most tenacious criminal and civil litigation boutiques in the United States.

Lori was honored as a 2021 Plaintiffs' Lawyers Trailblazer by the National Law Journal.  From 2011 to 2023, Lori was named a New York Metro Super Lawyer.  As a young lawyer, she was named a Rising Star in New York and Washington State.  She served as a member of the Federal Bar Council for the Western District of Washington when she managed an office for her prior law firm in Seattle, Washington.

Lori is a daughter of retired public employees and is a tireless advocate of public and private investors, shareholders and consumers.  Lori's grandparents immigrated through Ellis Island in New York City, where she was born and raised.

She takes great pride in representing EB-5 and other investors, consumers, and plaintiffs in cases involving corporate fraud and deceptive practices.  Lori has obtained class and individual recoveries in excess of $250 million.

5

George Feldman McDonald, PLLC

She has successfully litigated class actions against some of the largest and most well-funded corporate defendants in the nation, including but not limited to:

- Century Link, Inc. (D. Minn.) (consumer fraud class action)

- Swisher International, Inc. (Multnomah Cty. Cir. Ct., Oregon) (consumer fraud class action)

- Bernard L. Madoff LLC (S.D.N.Y.) (securities fraud)

- Equifax (D. Or.) (consumer fraud class action)

- Porsche Cars North America (N.D. Cal.) (consumer fraud class action)

- Washington Mutual (W.D. Wash.) (securities fraud class action)

- General Electric Co. (N.D.N.Y.) (pension fraud class action)

- State Street (D. Mass.) (securities fraud class action)

- Macy's (S.D. Ohio) (pension fraud class action)

- Morgan Stanley (S.D.N.Y) (data breach class action)

- Gilead Sciences (N.D. Cal.) (securities fraud class action)

- Amazon.com (W.D. Wash.) (consumer fraud class action)

- Citibank (S.D.N.Y) (consumer fraud)

- Oppenheimer Funds (D. Colo.) (securities fraud class action)

- ConAgra Foods (D. Neb.) (securities fraud class action)

- Boston Scientific, Inc. (D. Mass.) (pension fraud class action)

- Rhythms Net Connections (D. Mass.) (securities fraud class action)

- Textron, Inc. (D. Mass.) (securities fraud class action)

- AIG (S.D.N.Y.) (securities fraud class action)

Lori was appointed to serve as Co-Lead Counsel for Plaintiffs after heavily contested leadership motion practice in *In re Nurture Baby Food Litigation*, Case No. 1:21-cv-0127-MKV (S.D.N.Y.).  She serves as Co-Chair of the Plaintiffs' Steering Committee in *In re Meta Tax Filing Cases*, No. 2-07557-(SI) (N.D. Cal.) and *Smith v. Google*, No.

6

23-cv-03527 (N.D. Cal.) , and holds many other leadership positions in class actions, pending in federal and state court class actions across the country, including but not limited to: *In re Fidelity Investments Data Breach Litigation*, Civil No. 24-12601-LTS (D. Mass.) (Co-Lead Counsel in data breach case); *In re Shields Health Care Group, Inc.*, Case No.: 1:22-cv-10901-PBS (D. Mass.) (Co-Lead Counsel in data breach case); *Chandra Tate v. EyeMed Vision Care*, LLC, Case No. 1:21-cv-00036 (S.D. Ohio) (Co-Lead Counsel in data breach case); Wahab v. Boston Children's Health Physician, et al., Case No. 73692/2024 (Westchester Cty) (Liaison Counsel in data breach case); *Skurauskis v. NationsBenefits Holdings, LLC*, 23-cv-60830-RAR (S.D. Fla.) (Executive Committee Member in *Fortra Data Breach MDL*); *Doe v. Highmark*, Inc., Case No. 2:23-cv-00250 (W.D. Pa.) (Executive Committee Member in data breach case);  *Morill v. Lakeview Loan Servicing, LLC*, Case No. 1:22-cv-20955-DPG (S.D. Fl.) (supporting lead counsel in data breach case); *In re MOVEit Customer Data Security Breach Litigation*, MDL No. 1:23-md-03083-ADB (representing named plaintiffs in Master Complaint); *Bowen v. Paxton Media Group, LLC*, Case No. 5:21-cv-00143-GNS-LLK (W.D. Ky) (Co-Lead Settlement Class Counsel in data breach case); *In re Morgan Stanley Data Security Litig.*, Case No. 1:20-cv-05014-MKV (S.D.N.Y.) (Executive Committee Member in settled data breach case); and *In re: Canon Data Breach Litig.*, Case No. 1:20-cv-06239-AMD-SJB (E.D.N.Y.) (Executive Committee Member in settled data breach case).

She is a member of the National Association of Shareholder and Consumer Attorneys, the New York State and Washington State Bar Associations, and is bi-coastally licensed in New York and Washington State.  Lori is admitted to the Supreme Court of the United States, the U.S. Courts of Appeal for the Second, Ninth, and First Circuits, the Southern, Eastern and Northern Districts of New York, the Western District of Washington, and the Northern District of Illinois.

George Feldman McDonald, PLLC



### Christopher McDonald

Christopher McDonald, a thirty-year trial lawyer, combines skills in business and accounting with insightful legal acumen to achieve outstanding results for his clients.  He works closely with clients in structuring their business operations, acquisitions and handling the day-to-day matters that business owners customarily face.

Chris maintains an active litigation practice representing clients in civil matters including business and contract disputes, real estate litigation, and a full range of domestic relations issues including divorce, support, custody and visitation.  Further, he represents clients in non-litigation matters such as incorporating or organizing new businesses, business acquisitions, commercial real estate transactions and estate planning including the preparation of wills, trusts and other related documents.  Chris is the Managing Partner of GFM's Virginia Office, the Co-Chair of the Commercial Litigation Practice Group, and a member of GFM's EB-5, Class Action, and Transactional Practice Groups.

8

George Feldman McDonald, PLLC



**Elizabeth L. Parker**

Elizabeth L. Parker is the Chair of the Firm's Victims' Rights Practice Group. Elizabeth began her career as an Assistant State Attorney in the Palm Beach County State Attorney's Office in 1998. While working as a prosecutor, Elizabeth handled Misdemeanor, Domestic Violence, Felony and Traffic Homicide cases including DUI Manslaughter, Vehicular Homicide, and Manslaughter by Culpable Negligence. She served as the Deputy Chief of County Court from June 2003 until December 2006, and then as the Chief of the County Court Division and the Domestic Violence Division from January 2007 until December 2008. From January 2009 until August 2011, she held the position of Chief Assistant State Attorney.

As a Chief Assistant State Attorney her responsibilities specifically included: hiring of new attorneys, daily supervision of the Misdemeanor Division and Domestic Violence Unit, the Satellite offices, and the Appellate Unit, working closely with law enforcement on investigations, reviewing and assisting on search warrants and arrest warrants, constant case review for filing decisions, trial strategies, legal theories, ethical considerations, daily, weekly and monthly attorney training, caseload management, calendar coverage, liaison for statewide issues, complaint resolution relating to staff or charging decisions, and working closely with Judges to ensure efficiency in the courtrooms.

In addition to the administrative duties as Chief Assistant, Elizabeth personally litigated cases of great public importance involving new or novel issues of law, technical matters with expert witnesses, and high-profile cases requiring substantial trial and media relations experience.

Elizabeth created the Advocacy Institute at the State Attorney's Office and oversaw the training of each new lawyer and special prosecutor (private lawyers volunteering as prosecutors).

During her time as Chief Assistant, she trained hundreds of prosecutors in how to successfully try DUI cases both in Palm Beach County and around the state. Elizabeth was a member of the Florida Prosecuting Attorney's Association (FPAA) Education Committee. While she was an Assistant State Attorney, Elizabeth lectured for the FPAA and the Florida Traffic Safety Resource Prosecutor Program

9

George Feldman McDonald, PLLC

for prosecutors in the areas of opening statements, closing arguments, pre-trial motions, cross-examination of experts, and trial techniques. She was a member of the Technical Advisory Committee for the Institute of Police Technology and Management (IPTM) from 2007-2011.

Prior to joining GFM, Elizabeth was in private practice in Palm Beach County Florida. Elizabeth advocates on behalf of all crime victims or their next of kin including child victims of sexual abuse, victims of domestic violence, sexual assault, cybercrimes, financial crimes, DUI Serious Bodily Injury, DUI Manslaughter and Homicide. In her role as a crime victim advocate, she works closely with law enforcement and prosecutors to be a voice for the victim and assist them throughout the overwhelming criminal justice process, keeping them apprised every step of the way. Elizabeth's knowledge of the criminal investigation and criminal justice process from her experience as a prosecutor ensures law enforcement and prosecutors have all of the evidence and information to build the strongest case possible. If there is a civil cause of action for the criminal act, Elizabeth will aggressively pursue all legal avenues to ensure the criminal perpetrators are held accountable in every way possible.

From 2011 until 2018 Elizabeth, on behalf of the Florida Coalition Against Domestic Violence, taught law enforcement officers throughout the State of Florida how to investigate incidents of Domestic Violence and properly collect and preserve evidence to enable prosecutions even when the victim refuses to cooperate.

Elizabeth has appeared on the Nancy Grace show and In Session (Court TV) as a legal analyst on high profile cases such as Jerry Sandusky, George Zimmerman, John Goodman, Adam Kauffman, and Tammy Smith. She was a legal analyst for USA TODAY during the George Zimmerman trial. She has also made several appearances on Law and Crime as a Victim's Right Expert. She has also appeared on Dateline, 20/20, SNAPPED, Sins and Secrets, Nothing Personal, and American Greed.

Elizabeth has served as a board member for the Boys and Girls Club and the KIDSAFE Foundation. She currently serves on the Board of Pet Haven Rescue.

George Feldman McDonald, PLLC



**Janine L. Pollack**

Janine L. Pollack is a Member of the Firm and the Class Action Practice Group.  She has been a class action litigator for over 34 years and has prosecuted cases that have resulted in the award of hundreds of millions of dollars to defrauded consumers and investors.  She has been appointed by courts to lead numerous class actions and has had much success in securing refunds and other remedies for class members.  She has prosecuted bench and jury trials as first chair, winning a jury verdict against R.J. Reynolds for wrongful death in a tobacco litigation.

Janine grew up in New Jersey and is a member of the New York and New Jersey bars.  After graduating from University of Pennsylvania Carey Law School, she worked in a general litigation firm for approximately eighteen months before joining a large plaintiffs' class action firm in 1991 and has devoted her practice primarily to class actions since then.

Janine is a Certified Health and Well-Being Coach and the Firm's Chief Wellness Officer.  Janine and the Firm are at the forefront of the focus on well-being in the legal profession.  Her and the Firm's philosophy is that well-being is ground zero for all endeavors we undertake in life, including being an effective attorney.  Since adolescence, her interests have revolved around her love for fitness, nutrition and the goal of uniting mind, body and soul and her enthusiasm for such interests has continued to grow over time.  She strives to share that philosophy with her colleagues at the Firm and in the Bar to support them in finding strength, motivation and empowerment for fulfillment in their personal and professional lives.

Janine graduated from University of Pennsylvania Carey Law School in 1989, where she was elected to the Journal of International Business Law.  Prior to that, she graduated in 1986 from Rutgers College at Rutgers University in New Brunswick, New Jersey with High Honors, Phi Beta Kappa, with a B.A., having double-majored in English and French.  Fluent in French, she spent a semester abroad in 1985 at New York University in France.

11

George Feldman McDonald, PLLC

Janine is Co-President of the National Association of Shareholder & Consumer Attorneys (NASCAT), a non-profit organization of attorneys that supports consumer and investor rights, including through the class action mechanism.  Janine is also the Chair of the Women's Initiative at NASCAT, which seeks to advance women in the class action bar.  She participated as a team leader in developing standards and best practices for increasing diversity in mass tort and class action litigation for the James F. Humphreys Complex Litigation Center at the George Washington Law School titled, "Inclusivity and Excellence: Guidelines and Best Practices for Judges Appointing Lawyers to Leadership Positions in MDL and Class-Action Litigation" (March 15, 2021).  Janine is also a member of the Women in the Legal Profession Committee of the Bar Association of the City of New York (City Bar), where she was a co-editor of the publication, *Street Smarts for Women Lawyers*.  Her committee activities include wellness projects and presentations, as well as the Women on the Walls initiative that commissions portraits of women jurists for display at the City Bar.  Janine participates as a volunteer for the Institute for Well-Being in Law (IWIL), a non-profit organization whose focus is well-being within the legal community.  To contribute as an alumnus, Janine participates in a program that allows prospective students who are applying to the University of Pennsylvania to converse with alumni.

Some of Janine's representative cases include:

- Lead litigator in consumer class actions against major banks for failure to pay interest on mortgage escrow monies; settlement achieved in one case

- One of lead litigators in consumer class action against lender for misrepresentations in financing documents to pay for energy-saving home improvements; settlement achieved

- Co-lead counsel in data breach against large clothing retailer for failure to exercise reasonable care in safeguarding personal information of its customers; settlement achieved

- Represented consumers nationwide in class actions against Skechers, Reebok and others for false claims regarding efficacy of "toning shoes"; worked with Federal Trade Commission in securing settlements

12

George Feldman McDonald, PLLC

- The lead litigator in oft-cited seminal consumer class action in D. Mass. (*Bezdek v. Vibram USA Inc.*, 79 F. Supp. 3d 324, 338 (D. Mass. 2015), *aff'd*, 809 F.3d 78 (1st Cir. 2015)), against the manufacturer of "Vibram FiveFingers footwear" for mispresenting the health benefits of the shoes; settlement achieved

- One of lead litigators in consumer class action against makers of boxed macaroni and cheese for failure to disclose presence or risk of dangerous phthalates

- Working with various co-counsel in consumer class actions against makers of infant formula for failure to disclose presence or risk of heavy metals

- Working with various co-counsel in consumer class actions against several makers of baby foods for failure to disclose presence or risk of heavy metals

- One of lead litigators in consumer class action against maker of chocolate confectionary products for failure to disclose presence or risk of PFAS "forever chemicals"

- Worked with various co-counsel in consumer class actions against makers of herbs and spices for failure to disclose presence or risk of heavy metals

- Working with various co-counsel on numerous data breach and privacy class actions, many of which have had successful settlements

Janine is honored to have been named as a Super Lawyer every year since 2012 and to Lawdragon's list of 500 Leading Plaintiff Financial Lawyers every year since 2019.  She has also enjoyed being appointed numerous times to Law360's editorial boards.  Janine's prior firm where she was a founding partner was awarded the National Law Journal's 2020 Trailblazer Award for an Elite Boutique Firm.  In 2012, Janine was one of the attorneys featured on the front page of The National Law Journal's Plaintiffs' Hot List for her work on toning shoe cases, including against Reebok and Skechers, which resulted in settlements jointly with the Federal Trade Commission.

Janine is a frequent public speaker on well-being, women's and other issues, including:

13

George Feldman McDonald, PLLC

- Women Lawyers in Leadership, Practicing Law Institute (numerous years)

- Making Wellness Work for You, Class of Our Own Women's Summit, May 9, 2023

- Health and Wellness Panel, Class Action Law Forum, University of San Diego School of Law, March 18, 2022

- Taking Care of our Own: Lawyer Well-Being Programs, AON Virtual Law Firm Symposium, October 14, 2021

- Harris Martin Webinar Series: Baby Food Litigation, April 8, 2021

- Taking Control of Your Well-Being: How to Leverage Your Legal Organization's Wellness Program, Practicing Law Institute, December 10, 2020

- How to Wow Motivation and Wellness: Your Guide to Grit and Fit, University of Pennsylvania Carey Law School, October 21, 2020 (highlighted in *Penn Law Journal*, Summer 2021)

**EDUCATION**

- University of Pennsylvania Carey Law School, Philadelphia, Pennsylvania
  (J.D. 1989, Elected to Journal of International Business Law)
- Rutgers University, Rutgers College, New Brunswick, New Jersey
  (B.A. 1986 with High Honors, English and French double major (fluent in French), Phi Beta Kappa)
- New York University in France Semester Abroad, Paris, France, 1985

**BAR ADMISSIONS**
- New York
- New Jersey

**COURT ADMISSIONS**
- U.S. District Court Southern District of New York
- U.S. District Court Eastern District of New York
- U.S. District Court Northern District of New York
- U.S. District Court District of New Jersey

14

George Feldman McDonald, PLLC

- U.S. District Court Northern District of Illinois
- U.S. Court of Appeals for the First Circuit
- U.S. Court of Appeals for the Ninth Circuit
- U.S. Court of Appeals for the Tenth Circuit

George Feldman McDonald, PLLC



**Michael Liskow**

Michael Liskow is a Member of the Firm. He has extensive experience litigating complex class actions on behalf of plaintiffs in data breach, consumer fraud, antitrust, securities, housing, and wage and hour matters, among others. Michael has devoted his career to seeking justice for classes of individuals and businesses that have been taken advantage of by unscrupulous corporations.

Michael earned his Bachelor of Arts Degree in Psychology from the University of Kansas, and his Juris Doctor Degree from the University of Pennsylvania Carey Law School, where he was an Executive Board Member the Journal of Constitutional Law and received a Fulbright Award to the Slovak Republic.

Prior to joining the Firm, Michael was a clerk for the Honorable Steven H. Levinson of the Supreme Court of Hawai`i, an associate at Quinn Emanuel Urquhart & Sullivan, LLP, a Fulbright Teaching Assistant to the Slovak Republic, and a partner at three other law firms practicing plaintiff-side class action litigation.

Michael has been recognized as a "New York Super Lawyer" each year since 2019, and was named a "Rising Star" by New York Super Lawyers from 2013-2018.

Michael has acted as lead counsel in data breach class actions resulting in meaningful settlements, *Bokelman v. FCH Enters.*, No. 18-00209-RJB-RLP (D. Haw.) and *Mizrahi v. NBEO*, No. 16-cv-03146-JKB (D. Md.). He has initiated and litigated numerous class actions to completion as the lead attorney through investigation, complaint, discovery, motion practice, appeal, and resolution, including, among others, *Thompson v. Bethpage Fed. Credit Union*, No. 2:17-cv-00921 (E.D.N.Y.), alleging violations of the Real Estate Settlement Procedures Act resulting in a settlement where every class member received a full recovery, and *Egleston v. Verizon*, No. 194784/2011 (N.Y. Sup. Ct.), on behalf of overbilled Verizon customers resulting in a $5 million settlement providing full refunds plus interest and fees to the class. He also had a significant role in representing a class of overcharged tenants of Stuyvesant Town and Peter Cooper Village in New York City, resulting in a $173 million recovery, the largest recovery for tenants in United States history.

16

George Feldman McDonald, PLLC

Michael is a member of the National Association of Shareholder and Consumer Attorneys, and is licensed to practice in New York and California.

**EDUCATION**
- Pennsylvania Carey Law School, Philadelphia, Pennsylvania
- Undergraduate Degree, University of Kansas, Lawrence, Kansas

**BAR ADMISSIONS**
- California, 2006
- New York, 2010

**COURT ADMISSIONS**
- U.S. District Court for Northern District of California
- U.S. District Court for Central District of California
- U.S. District Court for Southern District of California
- U.S. District Court for Eastern District of California
- U.S. District Court for Southern District of New York
- U.S. District Court for Eastern District of New York
- U.S. District Court for Northern District of New York
- U.S. District Court for Northern District of Illinois
- U.S. District Court for District of Colorado
- U.S. Court of Appeals 1st Circuit
- U.S. Court of Appeals 2nd Circuit
- U.S. Court of Appeals 3rd Circuit
- U.S. Court of Appeals 4th Circuit
- U.S. Court of Appeals 7th Circuit
- U.S. Court of Appeals 9th Circuit

George Feldman McDonald, PLLC



**Brittany L. (Brown) Sackrin**

Brittany L. (Brown) Sackrin is an associate in George Feldman McDonald's Class Action Practice Group. Brittany earned her Bachelor of Science degree in Business Administration (Finance) at the University of Florida. Brittany then graduated near the top of her class with honors from the University of Miami School of Law, where she was an inaugural member of the school's Investor Rights Clinic through which she passionately represented investors in securities arbitration claims before FINRA.

While in law school, Brittany also interned with the U.S. Securities and Exchange Commission's trial unit in its downtown Miami office. She was a decorated member of the University of Miami Trial Team, and was awarded a scholarship for her performance in the Litigation Skills Program. She also received a scholarship for her demonstrated academic achievement in the interrelationship between law and economics, as well as several Book awards for achieving the highest grade in law school courses.

Before joining the firm, Brittany was an associate at one of the largest securities defense litigation law firms in the country, where she focused her practice on complex securities litigation matters, specifically class and derivative actions with an emphasis on securities and regulatory matters.

Brittany's class action experience at GFM includes significant time spent working on data breach cases in a variety of industries, including *Geleng v. Independent Living Systems, LLC*, No. 23-cv-21060-KMW (S.D. Fla.), *In re Shields Health Care Grp., Inc.*, 1:22-cv-10901 (D. Mass.), *Fleet v. Southern Orthopedic Associates, P.S.C.*, 5:22-cv-00109 (W.D. Ky.), *Tate v. EyeMed Vision Care, LLC*, 1:21-cv-00036 (S.D. Ohio), *Hollandsworth v. Highmark Health*, 2:23-cv-00376 (W.D. Penn.), *Skurauskis v. NationsBenefits Holdings, LLC*, 0:23-cv-60830 (S.D. Fla.), *In re: Canon Data Breach Litig.*, 1:20-cv-06239 (E.D.N.Y.), *In re Waste Mgmt. Data Breach Litig.*, 1:21-cv-06199 (S.D.N.Y.), *Bowen v. Paxton Media Grp., LLC*, 5:21-cv-143 (W.D. Ky.), *In re Morgan Stanley Data Sec. Litig.*, 1:20-cv-05014 (S.D.N.Y.), and *In re Lakeview Loan Servicing Litig.*, Case No. 1:22-cv-20955 (S.D. Fla.), among others. Brittany is also working closely with lead counsel on a privacy case involving Meta Platforms, Inc.,

18

George Feldman McDonald, PLLC

*In Re Meta Pixel Tax Filing Cases*, 3:22-cv-07557 (N.D. Cal.), following a congressional report detailing the extensive sharing of taxpayers' sensitive personal and financial information by Meta and online tax preparation companies. She is also working on a similar privacy case against Google, LLC, *Smith v. Google, LLC*, 5:23-cv-03527 (N.D. Cal.). Through her work representing plaintiffs in data breach cases, Brittany has honed her skills in researching and drafting briefs, vetting and evaluating plaintiffs and class representatives, and guiding clients through the discovery process, as well as working collaboratively and in conjunction with all plaintiffs' counsel.

She was appointed to the Executive Committee in *Geleng v. Independent Living Systems, LLC*, 23-cv-21060-KMW (S.D. Fla.) through which she led the Defensive Discovery Subcommittee.

Brittany is a zealous advocate for those seeking justice and brings her attention to detail and expert legal research and writing skills to all her cases at GFM, where she represents class action plaintiffs.

**EDUCATION**
- University of Miami Law School, Coral Gables, Florida
- University of Florida, Gainesville, Florida (Bachelor of Science in Business Administration, Finance Major)

**BAR ADMISSIONS**
- Florida

**COURT ADMISSIONS**
- U.S. District Court for Southern District of Florida
- U.S. District Court for Middle District of Florida

19

George Feldman McDonald, PLLC



**Tiffany Wong**

Tiffany Wong is an Associate ----in GFM's Class Action Practice Group and is resident in GFM's New York office. Tiffany earned her Bachelor of Science degree in Business Administration at the Fashion Institute of Design and Merchandising in California. Tiffany then attended Brooklyn Law School where she was awarded a scholarship for her academic achievements and multiple CALI Excellence for the Future Awards for having the highest grade in her courses. Upon graduation, she also received the Robert A. Morse Memorial Prize for having the highest grade in a Criminal Procedure course.

Prior to joining the firm, Tiffany was an associate at an intellectual property litigation firm where her practice focused on copyright litigation, particularly in representing small businesses and individuals against large corporations. As a daughter of immigrants, Tiffany is also passionate and experienced in both corporate and humanitarian immigration law.

**EDUCATION**
- Undergraduate Degree, Fashion Institute of Design, Los Angeles, California
- Brooklyn Law School, Brooklyn, New York

**BAR ADMISSIONS**
- New York

George Feldman McDonald, PLLC



**Justin Alvarez-Herman**

Justin Alvarez-Herman is an Associate in GFM's Class Action Practice Group, resident in the New York Office. Justin earned his bachelor's degree in political science from the State University of New York at New Paltz, and his J.D. from Brooklyn Law School, where he was awarded multiple scholarships for his academic achievements.

Prior to joining the firm, Justin worked at a boutique litigation firm focused on class actions, consumer protection, civil rights, municipal representation, and commercial litigation. Justin's experience includes work on several wrongful death lawsuits concerning the Fisher-Price Rock 'n Play Sleeper; a class action brought against one of New York State's largest counties alleging discrimination in their tax assessment process; survivors of childhood sexual assault pursuing justice under New York's Child Victims Act; and a lawsuit brought against a University in New York State alleging the violations of Title IX and state law.

Outside of law, Justin's interests include political theory, astronomy, and sports.

**EDUCATION**

- Brooklyn Law School, Brooklyn, New York
- Bachelor of Science, University of New York, New Paltz, New York

**BAR ADMISSIONS**

- New York

George Feldman McDonald, PLLC



**Rebecca A. Peterson**

Rebecca Peterson is a Member of GFM's Class Action Practice Group and is the Managing Member of GFM's Minnesota Office. Ms. Peterson, a recognized expert in heavy metal litigation, focuses on consumer protection, product liability and pet food regulation cases and accompanying regulatory issues. Ms. Peterson has been part of the successful prosecution of actions on behalf of consumers in both state and federal courts. Ms. Peterson has been appointed lead counsel and, alongside a group of attorneys, was recognized as Attorney of the Year by Minnesota Lawyer for her work on behalf of U.S. farmers. Prior to joining the firm, Ms. Peterson practiced in California and had extensive experience in complex class actions, appeals and public relations.

Ms. Peterson is admitted to the state bar of the States of Minnesota and California. She received her law degree from the University of San Diego School Law and her B.A. from St. Olaf College. She is an Advisory Board Member of the Page Education Foundation.

**REPRESENTATIVE CASES**
- *In re Syngenta AG MIR162 Corn Litig., No. 14-md-2591-JWL-JPO (D. Kan.)*
- *In re Syngenta Litig. (Minn. Producers), No. 27-cv-15-3785 (Henn. Co. Dist. Ct., Minn.)*
- *Zarinebaf et al. v. Champion Petfoods USA, Inc. et    al.,  1:18-cv- 06951 (N.D. Ill.)*
- *In re Big Heart Pet Brands Litig., No. 4:18-cv-00861-JSW (N.D. Cal.) [Co-Lead Counsel]*
- *Zeiger et al. v. WellPet LLC et al.*, 3:17-cv-04056-WHO (N.D. Cal.)
- *Stuve et al. v. The Kraft Heinz Company,* No. 21-cv-1845 [N.D.  Ill.]
- *In re Plum Baby Food Litigation,* 4:21-cv-00913-YGR (N.D. Cal.) [Co- Lead Counsel]
- *In re Nurture Baby Food Litigation,* 1:21-cv-01217-MKV (S.D. NY) [Co- Lead Counsel]
- *Willoughby et al. v. Abbott Laboratories,* 1:22-cv-01322 [N.D. Ill.]

George Feldman McDonald, PLLC

- *In re Theo's Dark Chocolate Litigation*, 4:23-cv-02739 [N.D. Calif.] [Co-Lead Counsel]
- *In re Meta Piel Tax Filing Cases,* 3:22-cv-07557 [N.D. Calif.] [Co-Lead Counsel]
- *In re Trader Joe᾽s Company Dark Chocolate Litig*, 3:23-cv-00061 [S.D. Calif.] [Executive Committee]
- *Mason v. WL Gore & Associates, 2:25-cv-00049 (E.D. of Wash.)*
- *Peterson et al. v. 3M Company et al., 0:24-cv-03497 (D. of Minn.)*
- *Lowry et al. v. Proctor & Gamble Co., 2:25-cv-00108 (W.D. Wash.)*
- *Amanda Seutter et al. V. Mead Johnson Nutrition Co., 0:24-cv-02179 (D. of Minn.)*
- *Author of Amicus Brief in Karsjens, et al. v. Harpstead, et al., 11-cv-02359 (8th Cir.)*


**EDUCATION**
- School of Law, University of San Diego 2005
- Undergraduate Degree St. Olaf College, 1998


**BAR ADMISSIONS**
- Minnesota
- California


**COURT ADMISSIONS**
- U.S. District Court, Northern District of California
- U.S. District Court, District of Minnesota
- U.S. District Court, District of North Dakota
- U.S. District Court, Central District of California
- U.S. District Court, Eastern District of California
- U.S. District Court, Southern District of California
- U.S. District Court, District of Colorado
- U.S. District Court, Central District of Illinois
- U.S. District Court, Eastern District of Wisconsin
- U.S. Court of Appeals, Second Circuit
- U.S. Court of Appeals, District of Appeals, Sixth Circuit
- U.S. Court of Appeals, Seventh Circuit
- U.S. District of Appeals, Eighth Circuit
- U.S. District of Appeals, Ninth Circuit
- U.S. District of Appeals, Tenth Circuit

George Feldman McDonald, PLLC

**PROFESSIONAL ASSOCIATIONS**
- The National Trial Lawyers Top 100 (2021 – 2024)
- Best Lawyers in Minnesota 2022 by Minnesota Monthly (2022)
- Attorney of the Year (Syngenta litigation team) by Minnesota Lawyer (2017)
- Minnesota Super Lawyers – Class Action and Mass Torts Attorney (2022 – 2024)

**COMMUNITY INVOLVEMENT**

- Food Law Advisory Board at Mitchell Hamline Law School
- Advisory Board Member, Page Education Foundation

**CURRENT EMPLOYMENT POSITION**

- Managing Member of GFM's Minnesota Office

**LANGUAGES**

- English

George Feldman McDonald, PLLC



**Catherine A. Peterson**

Catherine Peterson practices in GFM's Class Action Practice Group.  Catherine is an experienced class action lawyer and has represented victims in a wide variety of consumer class actions.  Prior to joining GFM, in addition to her experience as a class action lawyer, she practiced immigration law, representing clients before the Immigration Court, United States Citizenship and Immigration Services, and Federal Court. She also served on the staffs of U.S. Senator Byron Dorgan, U.S. Senator Kent Conrad, and U.S. Senator Heidi Heitkamp. She has experience on political campaigns and assisting with political compliance matters. Catherine has also served over 15 years in the Army National Guard.

**EDUCATION**

- University of North Dakota School of Law in Grand Forks, North Dakota
- Undergraduate Degree Texas A&M University in College Station, Texas

**BAR ADMISSIONS**

- 2024, Minnesota
-  2017, Virginia

**COURT ADMISSIONS**

- U.S. District Court, Eastern District of Viriginia
- U.S. District Court, District of North Dakota
- U.S. District Court, Eastern District of Michigan
- U.S. District Court, Northern District of Illinois
-

**PROFESSIONAL ASSOCIATIONS**

- American Legion
- American Legion Auxiliary
- Federal Bar Association – Minnesota Chapter

George Feldman McDonald, PLLC

**CURRENT EMPLOYMENT POSITION**
- Associate Attorney

**LANGUAGES**
- English

George Feldman McDonald, PLLC



**Krista K. Freier**

Krista Freier is an associate in GFM's Class Action Practice Group and is based in the Minnesota office. Krista's practice is concentrated on products liability and consumer protection cases. She is a 2009 graduate of Hamline University School of Law where she was a Student Attorney in Hamline's Child Advocacy Clinic and interned with the Honorable Gregory G. Galler in Minnesota State Court. While attending law school, Krista clerked with the Hennepin County Attorney's Office in the divisions of Juvenile Prosecution-Victim Witness and Child Support.

Prior to joining the firm, Krista was an associate at a law firm practicing in class action litigation and worked for the University of Minnesota and a local nonprofit organization.

**EDUCATION**
- Hamline University School of Law, St. Paul Minnesota, J.D.; Dean's List
- Concordia College, Moorhead, Minnesota, B.A. (History and Spanish major; Economics minor), *magna cum laude*

**BAR ADMISSIONS**
- 2009, Minnesota

**COURT ADMISSIONS**
- U.S. District Court, Minnesota
- U.S. District Court, Northern District of Illinois

**CURRENT EMPLOYMENT POSITION**
- Associate Attorney

**LANGUAGES**
- English

27

**EXHIBIT 12**

∞ Meta    Get started    Build a Presence    Advertise    Sell online    Start Now

Business Help Center    → Get support

# About location targeting

Location targeting allows you to reach people living in or recently in locations such as countries, regions or cities. You can use location targeting in Ads Manager each time you make a campaign or set account controls for your ad account.

Meta technologies use a variety of signals to show ads to people who are within your location targeting selections. Due to signal variations, complete accuracy cannot be guaranteed. You might see some ad impressions, or receive messages or leads from outside your location settings.

Sometimes people may also see an ad organically, leading to engagement such as likes, comments and shares on the ad outside the targeted location. We may also show preview ads to people connected to the business, even if they're outside the targeted location. You won't be charged for preview impressions.

If you use third-party tools like Google Analytics to compare results, keep in mind that their reporting may not match our campaign reporting because they may use different location targeting methods.

## Learn more

- Use location targeting
- Set account controls for your ad account
- About reaching new audiences
- About detailed targeting
- How to reach people interested in your selected cities and regions
- Create an ad with store location features in Meta Ads Manager

---

Was this information helpful? *

○ Yes

○ No

More in this section: Audiences

| Basics — | Manage + |
|---|---|
| About detailed targeting | Specifications + |
| About location targeting | |
| About shared audiences | Troubleshoot + |

| Set Up + |
|---|
| Create + |

⌕ Help chosen for you

**Some Messaging Metrics Unavailable** →
Business Help Center

**Why is My Boost Unavailable?** →
Business Help Center

**Troubleshoot a Disabled Ad Account** →
Business Help Center

**How Ad Billing Works on Facebook** →
Business Help Center

⊕

# Get the latest updates from Meta for Business.

Provide your email address to receive the latest updates

Email

Enter a country name...

By submitting this form, you agree to receive marketing related electronic communications from Meta, including news, events, updates and promotional emails. You may withdraw your consent and unsubscribe from these at any time, for example, by clicking the unsubscribe link included on our emails. For more information about how Meta handles your data please read our Data Policy.

Feedback

from Meta for Business, including news, events and product updates.

**Subscribe**

**Meta Technologies**

Facebook

Instagram

Messenger

WhatsApp

Audience Network

Meta Quest

Workplace

Meta for Work

**Tools**

Free Tools

Facebook Pages

Instagram Profiles

Stories

Shops

Meta Business Suite

Facebook Ads

Messenger Ads

Instagram Ads

Video Ads

Ads Manager

**Goals**

Set Up a Facebook Page

Build Brand Awareness

Promote Your Local Business

Grow Online Sales

Promote Your App

Generate Leads

Measure and Optimize Ads

Retarget Existing Customers

View All Goals

**Business Types**

Small Business

Large Business

Agency

Media and Publisher

Creator

Developer

Business Partner

**Industries**

Automotive

Consumer Packaged Goods

Ecommerce

Entertainment and Media

Financial Services

Gaming

Real Estate

Restaurants

Retail

Technology and Telecom

Travel

**Inspiration**

Campaign Guidance

Business News

Case Studies

Events

Creative Hub

**Skills and Training**

Online Learning

Certification Programs

Webinars

**Guides and Resources**

Ads Guide

Brand Safety and Suitability

Media Responsibility

Find a Business Partner

Sitemap

**Business Help Center**

Create and Manage Accounts

Publish and Distribute Content

Advertise

Sell on Facebook and Instagram

Monetize Your Content or App

View All Articles



**Log in to Meta for Business**

Manage your ad accounts and get personalized support.

**Log in with Facebook**

# FILED UNDER SEAL

**EXHIBIT 13**

HIGHLY CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF CALIFORNIA
3               SAN JOSE DIVISION
4                  ---oOo---
5
6
     IN RE META PIXEL TAX
7                                    No. Master File No.
     FILING CASES                    3:22-cv-07557-PCP
8
     This document relates
9    to:  All actions
     _____/
10
11
12
                    HIGHLY CONFIDENTIAL
13
        VIDEOTAPED DEPOSITION OF AMLESH JAYAKUMAR
14
             30(b)(6) Meta Platforms, Inc.
15
                  July 14, 2025
16
17
18
19
20
21
22
        Taken before EARLY K. LANGLEY, RMR, B.A. (PBK)
23
                  CSR No. 3537
24
                Job No. NE 7464368
25

HIGHLY CONFIDENTIAL

Page 19

1          A.   In North America.

2          Q.   Okay.  Can you narrow it down a little

3     bit more?  Is he up in Bellevue, or is he down

4     here?

5          A.   I'm not certain, but my personal

6     capacity, I believe he may be in the West Coast,

7     but I'm not certain.

8          Q.   Did you review any documents to prepare

9     for this deposition?

10         A.   Yes.

11         Q.   Why did you review documents?

12         A.   To help me prepare for the case so that

13    I may be able to testify to the best of my

14    abilities.

15         Q.   Okay.  Did any of them refresh your

16    recollection about anything?

17         A.   No.

18         Q.   How long have you known Mr. Wooldridge?

19         A.   For about nine to ten years.

20         Q.   And in your assessment, is it your view

21    Mr. Wooldridge is generally an honest person?

22              MS. HAUSKNECHT:  Object to form.  Outside

23    the scope.

24              THE WITNESS:  Yes.

25    BY MR. SMITH:

HIGHLY CONFIDENTIAL

Page 20

```
 1      Q.  Is it your assessment of him that he is

 2  a competent person?

 3          MS. HAUSKNECHT:  Object to form.  Outside

 4  the scope.

 5          THE WITNESS:  Yes.

 6          MR. SMITH:  Those outside scope

 7  objections are preserved and unnecessary.  If you

 8  would like to avoid the appearance of coaching

 9  the witness, we can stipulate that they're

10  preserved without the need to raise them on the

11  record here.

12          MS. HAUSKNECHT:  I think we can discuss

13  at the first break, but I will preserve them as

14  we go for now.

15          THE REPORTER:  141.

16          (Plaintiff's Exhibit 141 was marked for

17          identification.)

18  BY MR. SMITH:

19      Q.  So you have Exhibit 141 in front of you.

20  I want to direct your attention to page 1,

21  paragraph 4 and more specifically the first two

22  sentences of paragraph 4.

23          Mr. Wooldridge states specifically (as

24  read):

25              "When someone takes an action, a
```

HIGHLY CONFIDENTIAL

                                             Page 21

1          developer chooses to track on their
2          website, like subscribing to email
3          updates, the Meta Pixel is triggered and
4          sends -- Meta certain data called an
5          'event.'  Meta attempts to match the
6          events it receives to Meta users.  Meta
7          cannot that much non-Meta users."
8          Do you see that?
9     A.   Yes.
10    Q.   Is that a true or false statement?
11    A.   It's true.
12    Q.   Does it remain true as of today,
13  July 14, 2025?
14    A.   Yes.
15    Q.   Does the Pixel do anything else apart
16  from sending Meta certain data when an event is
17  triggered?
18          MS. HAUSKNECHT:  Object to form.  Vague.
19          THE WITNESS:  As described here in the
20  sentence we just went through, it is -- this
21  remains to be the primary use case for the use of
22  a business tool.  That's the Meta Pixel.
23  BY MR. SMITH:
24    Q.   "Primary use case," you mean primary
25  function?

HIGHLY CONFIDENTIAL

Page 22

1        A.   Correct.  Yes.

2        Q.   Understood.   Okay.

3             How does Meta attempt to match events

4    with Meta users?  I should say Facebook users.

5        A.   Meta attempts to match the Event Data to

6    users by a process known as "identity-matching

7    process," whereby we use, including customer

8    information parameters that developers may choose

9    to send or configure, alongside the Event Data

10   through their Pixel.

11       Q.   You used the term "customer information

12   parameters."

13            What did you mean by that?

14       A.   These are parameters or key value pairs

15   that the developer can choose to configure in

16   their Meta Pixel code or setup to be transmitted

17   alongside Events Data for the purpose of Meta's

18   attempt to match the event to a user.

19       Q.   Can you give me an example?

20       A.   Yes, a hashed email ID is an example.

21       Q.   Would a name be -- a first name be

22   another example?

23       A.   Yes.  A hashed first name is or can be

24   an example of a customer information parameter.

25       Q.   Apart from customer information

HIGHLY CONFIDENTIAL

Page 23

1    parameters, are there any other -- is there any

2    other information that is used to match events

3    with Facebook users?

4        A.   Yes.

5        Q.   What other information?

6        A.   This could also include cookie

7    information that may be transmitted alongside

8    Events Data to Meta.

9        Q.   Can you explain in general layperson's

10   term how cookie information may be used to match

11   Event Data with a Facebook user?

12       A.   Certain cookies, the information of

13   which is transmitted alongside the Event Data

14   from the Meta Pixel when an event fires to Meta,

15   if the Meta Pixels can be configured to be done

16   so, and there are not circumstances that may lead

17   to this data not being sent to Meta, and that

18   information is used alongside possibly customer

19   information parameters, if configured by the

20   developer, in an attempt to match the Event Data

21   holistically to a Meta user.

22       Q.   You said "certain cookies," are any of

23   those cookies developed by Meta?

24            MS. HAUSKNECHT:   Object to form.  Vague.

25            THE WITNESS:   These cookies are defined

HIGHLY CONFIDENTIAL

Page 24

1   by Meta, but in certain instance can be set or

2   configured in -- under different contacts such as

3   a first-party or third-party contacts on the

4   browser.

5   BY MR. SMITH:

6        Q.   When you say first-party, is that a

7   reference to Meta?

8        A.   No.

9        Q.   Here's the question I should have asked:

10  What is the distinction between a first-party and

11  a third-party cookie that you just mentioned?

12       A.   A first-party cookie generally refers to

13  cookies that are set within the context of the

14  domain or the browser, the website, where an

15  action may take place.  Whereas, a third-party

16  cookie is set within the context of the -- set

17  within the context of a domain other than the

18  domain that the user may have visited in the

19  third-party sense.

20       Q.   Do IP addresses play any role in

21  matching events with Facebook users?

22       A.   The user's, or the client's IP address,

23  is an example of a customer information parameter

24  that can be sent in the way that I described it

25  earlier.

HIGHLY CONFIDENTIAL

Page 25

1      Q.   Did you say can be sent?

2      A.   Correct.

3      Q.   If it is sent, can it also be used or --

4    in any way to match events with Meta users?

5      A.   Yes.   The IP address, as with other

6    customer information parameters, are used in or

7    can be used in Meta's attempt to match Event Data

8    to a user.

9      Q.   Do device ID numbers play any role in

10   the matching process?

11     A.   Certain device identifiers similarly to

12   IP addresses I described, if configured to be

13   sent, can be used by Meta -- or may be used by

14   Meta in its attempts to match the Event Data to a

15   user.

16     Q.   You said certain ID device, that

17   suggests that some ID device numbers can play a

18   role and some can't.

19          Am I understanding the situation

20   correctly?

21     A.   Correct.

22     Q.   What circumstances dictate whether or

23   not device ID numbers can play a role in the

24   matching process?

25     A.   There were only certain formats of

HIGHLY CONFIDENTIAL

Page 26

1   device identifiers, such as IDFA or for an

2   Android devices, that, as described in our public

3   documentation, relating to customer information

4   parameters, can be sent as a device ID to be used

5   in the manner that I described earlier in Meta's

6   attempt to match the Event Data to a user.

7        Q.   Why does Meta try to match events with

8   Facebook users?

9        A.   Meta's attempt to match Event Data to

10  Meta users is to help with enabling certain

11  functionality of the business tool, including

12  measurement and analytics relating to the

13  business tool information that's configured to be

14  sent.

15       Q.   Does matching events with Facebook users

16  have any connection to advertising?

17       A.   Could you clarify what you mean by "any

18  connection" in this context?

19       Q.   Is there any relationship between

20  matching events with Facebook users and

21  advertising?  Is the matching process used for

22  advertising purposes at all?

23            MS. HAUSKNECHT:  Object to form.

24  Compound.

25            THE WITNESS:  The attempt to match Event

HIGHLY CONFIDENTIAL

Page 27

```
 1   Data to a Meta user can be beneficial for
 2   measuring and other function -- to make other
 3   functionalities of ad campaigns better.
 4   BY MR. SMITH:
 5       Q.  So when I asked you before whether Meta
 6   tries to -- correction.
 7           When I asked you why Meta tries to match
 8   events with Facebook users, the answer you gave
 9   was that it helps enabling certain functionality
10   of the business tool, including measurement and
11   analytics.
12           When you were referring to measurement
13   and analytics, is that measurement and analytics
14   related solely to advertisement or are there
15   other forms of measurement in analytics that have
16   nothing to do with advertising.
17       A.  It can include purposes outside of
18   advertising as well.
19       Q.  What purposes outside of advertising?
20       A.  To provide general analytics about
21   the -- to the user of the business tool about
22   their website and potential website visitors.
23       Q.  So would general analytics include just,
24   for example, demographics of the type of people
25   who are visiting the website?
```

Page 28

1    A.   No.   It rather includes -- an example
2    would be the -- ███████████████████████

      ████████████████████████████████████████

      ███████████████████████ -- relating to it, as well as
5    general accounts and other analytics relating to
6    the event data that is transmitted.
7         Q.   Does Meta have any other reasons for
8    matching events with Facebook users that you have
9    not already covered today?
10             MS. HAUSKNECHT:  Object to form.  Vague.
11             THE WITNESS:  Not beyond as I described
12   earlier enabling the functionality for the
13   business tools, which include the use cases I
14   described.
15   BY MR. SMITH:
16        Q.   Do you know if Meta has a list of
17   Facebook users?
18             MS. HAUSKNECHT:  Object to form.  Vague.
19             THE WITNESS:  Can you clarify what you
20   mean by "has a list" in this context of the
21   users?
22   BY MR. SMITH:
23        Q.   If someone at Meta woke up this morning
24   and decided they wanted to -- access to every
25   individual on the planet who has a Facebook

Page 35

1  the scope.

2        THE WITNESS:  Again, in my personal

3  capacity as I described earlier, there are

4  multiple teams that may be impacted by such an

5  outage or such an issue as you had described it.

6  BY MR. SMITH:

7      Q.  I understood that.  That was your answer

8  initially so my follow-up question is if you

9  could describe to me which teams come to mind

10  first.

11        MS. HAUSKNECHT:  Object to form.  Scope.

12        THE WITNESS:  Again, in my personal

13  capacity, the Signals and potentially targeting

14  teams are examples of teams that may be impacted.

15  Again, it would depend on the -- on several

16  factors, including the nature of such an issue

17  and its impact.

18  BY MR. SMITH:

19      Q.  You said Signals and the other one was

20  ads?

21      A.  Targeting.

22      Q.  Ads targeting?

23      A.  Yes.

24      Q.  Is there a third department that would

25  be likely to be involved in correcting any

HIGHLY CONFIDENTIAL

Page 36

1    problems with matching Event Data with Facebook

2    users?

3            MS. HAUSKNECHT:  Object to form.  Scope.

4            THE WITNESS:  Again, in my personal

5    capacity, not that I can think of.

6    BY MR. SMITH:

7        Q.  Meta allows advertisers to send

8    information that personally identifies

9    individuals; is that correct?

10       A.  As part of the Meta Pixel functionality

11   developers may configure parameters, as I

12   described, the customer information parameters,

13   that include PII or personally identifiable

14   information that can be used in Meta's attempt to

15   match this event data to a user.

16       Q.  So the short answer to my question

17   was -- would be "yes"?

18           MS. HAUSKNECHT:  Object to form.

19   Misstates testimony.  Argumentative.

20           THE WITNESS:  Could you repeat your

21   question as it was originally stated, please?

22   BY MR. SMITH:

23       Q.  "Meta allows advertisers to send

24   information that personally identifies

25   individuals; is that correct?"

HIGHLY CONFIDENTIAL

                                                    Page 37

1        A.   I would not frame it in the manner it's

2   been described.   Specifically, it's the

3   developer, the users of the business tools that

4   are permitted this functionality, and they may be

5   able to configure PII or personally identifiable

6   information.   Meta then attempts to use this

7   information to match the Event Data to a Meta

8   user.

9             MR. SMITH:   142.

10            (Plaintiff's Exhibit 142 was marked for

11            identification.)

12  BY MR. SMITH:

13       Q.   You have been handed a one-page document

14  that's been marked Exhibit 142.

15            Have you seen this document before?

16       A.   Not specifically, but it appears to be

17  an article or a page from Meta's externally

18  provided help center articles relating to PII.

19       Q.   So you'll note the second paragraph from

20  the top says, I'm quoting (as read):

21                 "Meta allows advertisers to send

22            information that personally identifies

23            individuals," and then it has "(contact

24            information)".

25            Do you see that?

HIGHLY CONFIDENTIAL

Page 38

```
 1        A.   Yes.
 2        Q.   Is that a true or a false statement?
 3        A.   As I testified earlier I would not frame
 4   it in this manner, specifically it's not
 5   pertain -- just to advertisers but rather the
 6   users of our business tools.  And it's
 7   particularly the information that's described as
 8   personally identifying an individual is one that
 9   can be configured to be sent by the business
10   tool.
11            But, generally, I -- it is truthful.
12        Q.   Do I understand correctly the
13   information like email, first name, last name is
14   supposed to be sent in a hashed format?
15        A.   Yes.
16        Q.   Is there a particular methodology for
17   hashing that should be used?
18        A.   Yes.
19        Q.   What methodology is that?
20        A.   The SHA256 is the hashing algorithm that
21   Meta recommends.
22        Q.   How, if at all, can Meta use the
23   information if it's hashed?
24        A.   The hashed, as described, contact
25   information are examples of email and first name.
```

HIGHLY CONFIDENTIAL

Page 39

1    It is used to attempt to match the Event Data to

2    a user as I described as part of the

3    identity-matching process.

4            The information does not require to be

5    sent in a plain text format largely due to

6    privacy considerations as well, and the hash

7    value is sufficient in enabling Meta's attempt to

8    match the Event Data to -- to a Meta user.

9        Q.   Can the information be unhashed?

10       A.   The nature of such hashing algorithms,

11   particularly SHA256, is such that it is

12   prohibitively hard to reverse or unhash, as you

13   described it, the original information that was

14   hashed.

15       Q.   If you wanted to unhash something that

16   had been hashed with the SHA256 methodology what

17   would you do?

18       A.   It is not technically feasible within

19   reason, or within currently known reason limits

20   that exist with computation and other

21   infrastructure requirements to be able to do

22   that.

23       Q.   Do you know when Meta first started

24   trying to match events with Facebook?

25       A.   By "events," just to clarify, you mean

HIGHLY CONFIDENTIAL

Page 40

1    Event Data from the Meta Pixel?

2        Q.   Correct.   Thank you for the

3    clarification.

4        A.   Being a key part in enabling the

5    business tools functionality and in the use case

6    I have described earlier, it was part of the Meta

7    Pixel's functionality since its original launch.

8        Q.   And when was it originally launched, the

9    Pixel, I mean?

10       A.   The Meta Pixel was originally launched

11   publicly, as I recall, around 2016.

12       Q.   Meta provides the Pixel for free; is

13   that correct?

14       A.   Yes.

15       Q.   Why doesn't Meta charge for the Pixel?

16           MS. HAUSKNECHT:   Object to form.   Vague.

17   Outside the scope.

18           THE WITNESS:   Generally similar analytics

19   tools that are provided to website developers

20   aren't charged or -- in this manner.

21   BY MR. SMITH:

22       Q.   What does Meta have to gain by giving

23   away the Pixel for free?

24           MS. HAUSKNECHT:   Object to form.   Outside

25   the scope.

HIGHLY CONFIDENTIAL

Page 41

1        THE WITNESS:  Again, the Meta Pixel is

2    part of the -- or the business tools in general

3    are tools that are provided to developers to help

4    improve their products and provide analytics,

5    which can then be used optionally for running ads

6    or ad campaigns on Meta's business products, the

7    tool suite that we offer.

8    BY MR. SMITH:

9        Q.  I think that answers the question about

10   what the website developers stand to gain from

11   the Pixel.

12        But the real question is:  What does

13   Meta have to gain by it?

14        MS. HAUSKNECHT:  Objection to form.

15   Outside the scope.  Asked and answered.

16        THE WITNESS:  Again, as I described,

17   generally -- generally similar analytics tools

18   that are provided by companies are free to help

19   developers and businesses to, in a more informed

20   manner, build better website experiences.

21        Again in my personal capacity, I am not

22   certain, nor was privy to, decisions relating to

23   the business tools and ads products in general

24   that were launched during that time.

25   BY MR. SMITH:

HIGHLY CONFIDENTIAL

Page 42

1        Q.   So Meta provides Pixel for completely
2    altruistic reasons, has nothing to gain from the
3    Pixel?
4            MS. HAUSKNECHT:  Object to form.
5    Argumentative.  Outside the scope.
6            THE WITNESS:  Again, as I described, it's
7    similar to other analytics tools that are
8    provided outside of Meta as well.  These tools
9    can be used by developers and businesses to
10   improve their website experiences and better
11   reach out to users of their services or products
12   that may find it relevant.
13           It can also be used for advertising and
14   to run ad campaigns on Meta, but that is not a
15   necessary requirement for using the business
16   tools which is provided by Meta for free.
17           MS. HAUSKNECHT:  Joel, we have been going
18   for about an hour now.  I just wanted to flag for
19   you if you have a good place to stop for a break.
20           MR. SMITH:  Yeah.  Let me just finish up
21   with this line of questioning, and we'll take a
22   break.
23   BY MR. SMITH:
24       Q.  Does Event Data get used for billing
25   purposes?

HIGHLY CONFIDENTIAL

Page 43

1      A.   Can you say that last word again?   I
2  missed.
3      Q.   "For billing purposes."
4           MS. HAUSKNECHT:   Object to form.  Vague.
5           THE WITNESS:   Can you clarify what you
6  mean by "billing" in this instance, "for billing
7  purposes"?
8  BY MR. SMITH:
9      Q.   For purposes of Meta billing website
10 developers for any services that Meta may be
11 providing.
12          MS. HAUSKNECHT:   Object to form.  Vague.
13          THE WITNESS:   No.  If the developers have
14 ad campaigns that they're running and as part of
15 that ad, an ad account, or other billing
16 information associated with the running of
17 campaigns, Meta may bill the -- the developer,
18 the advertiser in question, for the campaigns
19 that they run and set up.
20 BY MR. SMITH:
21     Q.   Does Event Data get used for either AI
22 or machine learning purposes?
23     A.   Meta employs machine learning as a
24 technique for offering various functionality,
25 some of which may be related or can be related to

HIGHLY CONFIDENTIAL

Page 44

1    the Meta Pixel Event Data and business tools in

2    general, yes.

3        Q.    Does Event Data get used in connection

4    with Meta's ad ranking system?

5        A.    Event Data may be used within our ads

6    ranking system, yes.

7        Q.    Is that system called "Meta Lattice,"

8    L-a-t-t-i-c-e?

9            MS. HAUSKNECHT:    Outside to form.

10   Outside scope.

11           THE WITNESS:    Not that I am aware of, no.

12   BY MR. SMITH:

13       Q.    Are you familiar with the term called

14   "advertising measurement," as that term is used

15   within Meta?

16       A.    I'm generally familiar with measurement

17   within the context of advertising as it may be

18   used, yes.

19       Q.    What does that terminology mean to you

20   in sort of layperson's terms?

21       A.    Advertising measurement or measurement

22   within the advertising context could represent

23   the ability for Meta to be able to help measure

24   the efficacy or the effectiveness of on ad

25   campaign that marketers may have run on a product

HIGHLY CONFIDENTIAL

Page 45

1   suite.

2       Q.   Does Event Data get used for advertising

3   measurement?

4       A.   Yes.

5       Q.   How so?

6       A.   An ad campaign, if configured in a

7   manner to be connected with a Meta Pixel or

8   business tool, can report back the potential

9   number of certain actions or events that have --

10  that have been driven by the campaign in

11  question.

12           Again, this requires the developer, the

13  use of the business tool to configure the Meta

14  Pixel as well as the ad campaigns in a manner

15  that enables this.

16           MR. SMITH:  I'm happy to take a break

17  now.

18           MS. HAUSKNECHT:  Sounds good.

19           THE VIDEOGRAPHER:  This marks the end of

20  Media Number 1 in the deposition of Amlesh

21  Jayakumar.  The time is 11:12 a.m.  We are off

22  the record.

23               (Recess taken.)

24           THE VIDEOGRAPHER:  This marks the

25  beginning of Media Number 2 in the deposition of

HIGHLY CONFIDENTIAL

Page 46

1    Amlesh Jayakumar.  The time is 11:31 a.m.  We are
2    on the record.
3    BY MR. SMITH:
4        Q.  Does the term ███████████████████████
5    mean anything to you?
6        A.  Depending on the context, it could refer
7    to ████████████████████████████████████████████
     ███████████████████████████████████████████████
     █████████████████████████████████████████████████.
10       Q.  I've also seen the term ████████████████
     ██████████████     Is that synonymous with ██████████████
     ██████████████   or something different?
13       A.  Again, it would depend on the context.
14   The example I described in my previous response
15   whereby as it relates to the ███████████████████████
     ██████████████████████████████, at times they are used
17   synonymously.
18       Q.  Is the term ███████████████████████
19   sometimes used to describe a particular category
20   of advertiser?
21       A.  As it pertains to the business tools, it
22   largely is used to describe certain categories of
23   businesses or websites.
24       Q.  Okay.  Would H&R Block follow under the
25   category of a ████████████████████████

HIGHLY CONFIDENTIAL

Page 47

```
 1        A.   Again, as it pertains to the context of
 2   the Meta Business Tools and policies that we have
 3   in place, yes.  H&R Block would fall within a
 4   category that is -- can be described as -- would
 5   be associated as ███████████████████████.
 6        Q.   Same for TaxAct and TaxSlayer?
 7        A.   Yes.  My response would be the same for
 8   the other two that you had mentioned.
 9             MR. SMITH:  This will be 143.  This will
10   be 144.
11             MS. HAUSKNECHT:  Is this 143 that you
12   just handed me?
13             MR. SMITH:  143 is actually this one.
14   The big one is 144.
15             (Plaintiff's Exhibit 143 was marked for
16             identification.)
17             (Plaintiff's Exhibit 144 was marked for
18             identification.)
19   BY MR. SMITH:
20        Q.   Have you seen before today the documents
21   that have been marked as Exhibits 143 and 144?
22        A.   Yes.
23        Q.   All right.  I want to focus your
24   attention for the moment more on the smaller
25   document, 143, Exhibit 143, I mean.
```

HIGHLY CONFIDENTIAL

Page 48

1          And I want to direct your attention to
2    the third page, and there's a fairly lengthy
3    paragraph that starts on line 4 and ends on
4    line 17.
5          Do you see that?
6      A.   Yes.
7      Q.   Line 7 of page 3 of Exhibit 143
8    describes a list of Event Data and parameters.
9    And that list goes from roughly -- well, actually
10   line 6 through roughly line 12.
11         Do you see that?
12     A.   Yes.
13     Q.   How did Meta learn about the information
14   that's disclosed on page 3 of Exhibit 143?
15         MS. HAUSKNECHT:  Object to form.  Vague.
16         THE WITNESS:  Just to clarify, by how
17   does Meta -- how has Meta learned, are you
18   describing the admission as it's mentioned in
19   line 5 onwards with respect to the event and the
20   parameters listed here?
21   BY MR. SMITH:
22     Q.   Yeah.  How did it know what parameters
23   and events to list in its response there?
24     A.   In the ordinary course of business,
25   Event Data that is received or transmitted and

HIGHLY CONFIDENTIAL

Page 49

1    then subsequently received by Meta from Meta

2    Pixels are primarily stored in certain off line

3    persistent storage systems that can be used in

4    determining potential Event Data that may have

5    been sent and then subsequently received by Meta

6    for certain Pixels.

7         Q.  And when you say "offline persistent

8    storage system," are you referring to HIVE?

9         A.  Yes.

10        Q.  Was the data found on a particular HIVE

11   table?

12        A.  There are multiple HIVE tables,

13   depending on the events data that could store

14   Pixel-related information.  But generally, as I

15   understand, Meta ███████████████████████████████████

     ██████████████████████████████████████████████████

     ██████████████████████████████████████████

     ██████████████████████████████████████████████████

     ██████████████████████████████████████████████████

20   were provided.

21        Q.  What are the names of the HIVE tables

22   where the information disclosed on page 3 were

23   obtained?

24        A.  The HIVE tables could -- relating to the

25   parameters here can include the ███████████████████

HIGHLY CONFIDENTIAL

Page 50

1  ██████████████████████████ as well as ████████

   █  █████████████

3      Q.  Okay.  So your answer was "could

4  include."  I'm asking which did include.  I'm

5  asking you to definitively tell me which of the

6  HIVE tables that had this information.

7      A.  For the events in question, page view,

8  as well as a try button clicks, it would be the

9  tables that I described, as well as the ████████

   █  ███████████████, tables, that in totality would

11  include events data associated with -- with this.

12      Q.  Now you say "in totality."  Is that

13  because ███████████████████████████████████████

   █  ████████████████████████████████████████████

   █  █████████████████████████████████?

16      A.  Correct.

17      Q.  Was there a particular column you had to

18  look at to find this information?

19      A.  Yes.

20      Q.  Which column?

21      A.  It would be the columns ████████████████

   █  ████████████████████████████████

   █  ██████████████████████████████████████████

   █  ██████████████████████████████████████████

   █  █████████████████████████████████

HIGHLY CONFIDENTIAL

Page 51

1　███████████████████████████████████

　　███████████████████████████████████████

　　██████████████████████████████████████

　　█████████████████████████████████████

　　████████████████████████████████.

6　　　　Q.　Is the ██████████████ field the only one

7　that actually ██████████████████████████

　　████████████████████████ for instance,

9　state_revenue?

10　　　　A.　████████████████████████████████████

　　████████████████████ where event parameters in

12　the example you provided would be included, if

13　received by Meta.

14　　　　Q.　Is the ███████████████ field the only

15　one that would have ████████████████ to the

16　extent they're available for state_revenue?

17　　　　　MS. HAUSKNECHT:　Object to form.　Asked

18　and answered.　Outside the scope.

19　　　　　THE WITNESS:　Yes.　███████████████████

20　would be the primary ███████████████████████████

　　████████████████████████████████████ent --

22　that is sent and received by Meta is -- is

23　relating as it relates to Pixel data.

24　BY MR. SMITH:

25　　　　Q.　And you say it's the "primary column."

HIGHLY CONFIDENTIAL

1    Does that mean to say the only column, or is

2    there another column where that data would be

3    available?

4            MS. HAUSKNECHT:  Objection.  Outside the

5    scope.

6            THE WITNESS:  As I understand, in the

7    ordinary course of business, the Event Data can

8    be and is logged in several tables as it pertains

9    to the upkeep and functionality of the business

10   tools.  But that data is duplicative of the

11   information that is in the tables that I

12   described earlier, including specifically for

13   Event Data or parameters.

14           In a similar fashion, custom data would

15   be -- would include information relating to the

16   event parameters.  If it is elsewhere, it would

17   be duplicative of what would be in that column.

18   BY MR. SMITH:

19       Q.  Can you think of the names of any other

20   fields that would contain duplicative data of the

21   nature you just described?

22       A.  I can't recall specifically.

23       Q.  So turning your attention back to page 3

24   of Exhibit 143, would the parameter for

25   state_revenue have been sent in connection with a

HIGHLY CONFIDENTIAL

Page 53

1    custom event?

2            MS. HAUSKNECHT:  Outside the scope.

3            THE WITNESS:  I can't.  Just looking at

4    this information that would be speculative on my

5    part with respect to what event the parameter in

6    question may be transmitted.

7    BY MR. SMITH:

8        Q.  Are you aware of any information

9    suggesting that SubscribedButtonClick event may

10   have some relationship or connection with the

11   transmission of state_revenue?

12           MS. HAUSKNECHT:  Outside the scope.

13           THE WITNESS:  No, as I described earlier,

14   that would be speculative on my part.  But

15   generally, the onus is on the user of the

16   business tool or the developer that is

17   configuring the Meta Pixel code and the Event

18   Data to set up the parameters of the events that

19   are required in a manner adhering to our terms of

20   service.

21           Meta doesn't and cannot interpret

22   specific names of parameters as being tied to a

23   particular action or have any specific meaning

24   beyond that.

25   BY MR. SMITH:

HIGHLY CONFIDENTIAL

Page 54

```
 1        Q.  Is the onus entirely on website
 2   developers to avoid transmission of sensitive
 3   information to Meta?
 4             MS. HAUSKNECHT:  Object to form.  Outside
 5   the scope.
 6             THE WITNESS:  In accepting the terms of
 7   service associated with the Meta Pixel and
 8   business tools in general, the users of the
 9   business tools have agreed to the terms including
10   what you described.  Not sending potentially
11   sensitive information, including other
12   requirements, per applicable local law and
13   regulation.
14   BY MR. SMITH:
15        Q.  Are you aware of any information
16   suggesting that the term state_revenue is
17   anything other than what it suggests?
18             MS. HAUSKNECHT:  Object to form.  Vague.
19             THE WITNESS:  Again, as I testified
20   earlier, Meta doesn't and cannot interpret
21   specific names of parameters, such as
22   state_revenue to mean anything in particular.
23   The onus is on the developer who is setting the
24   Event Data.  It would be speculative on my part.
25   BY MR. SMITH:
```

HIGHLY CONFIDENTIAL

1      Q.   And I take it Meta has not made any
2   effort to determine what the term "state_revenue"
3   refers to?
4      A.   In addition -- sorry.  In addition to
5   the acceptance of the terms of service as I
6   described earlier, Meta does take other sort of
7   proactive measures to detect and filter out
8   potentially sensitive information that may be
9   sent.
10          But that does not include, and we cannot
11   look -- include looking at specific parameter
12   names and be able to understand what they mean
13   beyond what -- how the developer may have
14   intended it.
15      Q.   Why not?
16      A.   I can't speak on the developers or user
17   business tools' behalf, but the Event Data that's
18   transmitted can mean multiple things, and it is
19   hard and Meta -- it is hard to do so.  Meta
20   cannot and doesn't interpret specific names of
21   parameters beyond certain publicly documented
22   Standard Events and parameters that we have
23   provided.
24      Q.   So the transmission of information
25   labeled state_revenue would raise no red flags

HIGHLY CONFIDENTIAL

Page 56

1    for Meta?

2          MS. HAUSKNECHT:  Object to form.

3    Misstates testimony.

4          THE WITNESS:  Again, Meta does take steps

5    beyond the onus that is on the user of the

6    business tools to adhere to our terms of service

7    to detect and filter out potentially sensitive

8    information.  Some of these steps may lead to the

9    Event Data not even being transmitted to Meta or

10   filtered by Meta, which could include parameters

11   in the Meta names.

12   BY MR. SMITH:

13       Q.  Did Meta ever ask TaxAct what the

14   term "state_revenue" signifies?

15       A.  Not that I am aware, no.

16       Q.  Has Meta asked TaxAct to explain what

17   any of the other terms that are listed on page 3

18   of Exhibit 143 mean?

19          MS. HAUSKNECHT:  Outside the scope.

20          THE WITNESS:  Some of the fields listed

21   in the document page sheet that we are looking at

22   are names of columns that related to standard

23   fields, such as Event Names or

24   ████████████████████████████  that we have an

25   understanding of what that field represents by

1    virtue of how it's documented externally.

2              But this isn't the case for all fields as

3    you have described, for example, state_revenue,

4    whereby the onus is on the developer as they're

5    setting up the Event Data for their business

6    tool.

7    BY MR. SMITH:

8         Q.   So Meta has an understanding of what

9    terms like event name means but has no idea what

10   state_revenue, number of dependents, number of

11   child buttons, return year, tax form, has no idea

12   of what any of that stuff means?

13             MS. HAUSKNECHT:  Object to form.  Asked

14   and answered.  Outside the scope.

15   Mischaracterizes testimony.

16             THE WITNESS:  As I mentioned earlier,

17   some of the fields, such as Event Name, are --

18   represent the -- that -- Meta has an

19   understanding of what it should represent, such

20   as the name of the event that's configured to be

21   sent along the Event Data.  By definition, Meta

22   understands what those fields represent.

23             However, even in the case of fields such

24   as Event Name, Meta cannot and doesn't further

25   interpret what the name of that event, particular

HIGHLY CONFIDENTIAL

Page 65

1    discretion of the developer on how Event Data is
2    transmitted.
3            Once configured, there may be various
4    reasons that could lead to this data not even
5    being sent to Meta or even subsequently used in
6    our ad systems.
7    BY MR. SMITH:
8        Q.   Would your answer differ at all for the
9    years 2023, 2024, or 2025, or would it be
10   essentially the same answer you provided?
11           MS. HAUSKNECHT:  Objection.  Outside the
12   scope misstates prior testimony.  Calls for
13   speculation.
14           THE WITNESS:  My response would be --
15   would be the same.
16   BY MR. SMITH:
17       Q.   How did H&R Block customize the Meta
18   Pixel?
19           MS. HAUSKNECHT:  Object to form.  Calls
20   for speculation.
21           THE WITNESS:  I cannot speak on behalf of
22   the developers that have configured the explicit
23   Meta Pixel for H&R Block.  But I can speak to the
24   kind of general process of the setup of a Meta
25   Pixel and what the steps include.

HIGHLY CONFIDENTIAL

Page 66

1    BY MR. SMITH:

2        Q.   Has Meta at any time conducted any

3    investigation into how H&R Block customized its

4    Pixels specifically?

5            MS. HAUSKNECHT:   Object to form.   Vague.

6            THE WITNESS:   Generally, in the ordinary

7    course of business, there are processes in place

8    to ████████████████████████████████████████████

    ████████████████████████████████████████████

    ███████████████████████████████████████

    █████████████████████████████████████████████

    ██████████████████████████████████████████████

    ███████

14           Sitting here today, I'm not sure whether

15   specifically H&R Block was subject to such

16   ████████████  as I described it.

17   BY MR. SMITH:

18       Q.   Are you familiar with the website called

19   "MarkUp"?

20       A.   Yes.

21       Q.   You're aware at some point the Markup

22   published an article alleging that H&R Block,

23   among other tax websites, were transmitting

24   sensitive tax information to Meta.

25           Is that news to you, or have you heard

HIGHLY CONFIDENTIAL

Page 67

1    that before today?

2            MS. HAUSKNECHT:  I'm going to object on

3    privilege grounds.

4            You can answer to the extent it doesn't

5    reflect information that you received or involved

6    counsel.

7            THE WITNESS:  I am familiar with articles

8    that you speak of.

9    BY MR. SMITH:

10        Q.  When that article came out, did Meta

11   conduct any investigation into how H&R Block

12   configured its Pixel?

13           MS. HAUSKNECHT:  Object on privilege

14   grounds.

15           Again, you can answer to the extent it

16   doesn't reflect conversations you had with

17   counsel.

18           THE WITNESS:  I'm not familiar with such

19   investigations to which you speak, no.

20   BY MR. SMITH:

21        Q.  Same answers for TaxAct and TaxSlayer?

22           MS. HAUSKNECHT:  Objection on privilege

23   grounds.

24           Same instruction.

25           THE WITNESS:  Yes.

HIGHLY CONFIDENTIAL

Page 68

1   BY MR. SMITH:

2       Q.   So I take it no one from Meta ever

3   called up someone from H&R Block and asked them

4   if they had done anything with the Pixel that may

5   have resulted in the transmission of sensitive

6   information?

7       A.   Generally for certain advertisers or

8   businesses that use Meta Business Tools, they may

9   have some support from our sales functions whose

10  job descriptions include informing users of our

11  business tools, or other products, of their

12  responsibility and helping with any issues they

13  may face that can apply overall to all of the

14  users of our business tools.

15          The -- such conversations that you

16  described may have occurred with H&R Block and

17  TaxAct, possibly TaxSlayer, but I'm not --

18  sitting here today, I'm not aware of very

19  specific communications.

20      Q.   Are you aware there was a Senate

21  investigation into the subject of whether or not

22  various tax filing websites had been transmitting

23  tax filing information to Meta?

24          MS. HAUSKNECHT:  Objection.  Outside the

25  scope.

HIGHLY CONFIDENTIAL

1         THE WITNESS:  No, not specifically.

2    BY MR. SMITH:

3         Q.  So you are unaware of any efforts Meta

4    may have taken to understand what may have caused

5    TaxAct to transmit tax filing information to

6    Meta --

7         MS. HAUSKNECHT:  Objection --

8    BY MR. SMITH:

9         Q.  -- in connection with the Senate

10   investigation?

11        MS. HAUSKNECHT:  Objection.  Outside the

12   scope.  Misstates prior testimony.  Lack of

13   foundation.

14        THE WITNESS:  I'm not familiar with the

15   Senate investigation to which you're referring

16   to.

17        Beyond what I described about certain

18   sales functions or sales counterparts reaching

19   out to businesses, which may have included TaxAct

20   or H&R Block, I'm not familiar with specific

21   investigations, no.

22   BY MR. SMITH:

23        Q.  And one may have occurred, one may not,

24   you just don't know either way?

25        MS. HAUSKNECHT:  Objection.  Misstates

HIGHLY CONFIDENTIAL

1    testimony.

2            THE WITNESS:  As I described, these

3    investigations generally, in the ordinary course

4    of business -- in the ordinary course of business

5    can occur on multiple fronts by ███████████████

     ██████████████████████████████████████

     ████████████████████████████████████████████

     ████████████████████████████████████████

     ████████████████████████████████████████

██   ███████████.  But I'm not aware beyond this of any

11   specific instances of such, no.

12   BY MR. SMITH:

13       Q.  Did Meta determine whether TaxAct had

14   violated Meta's terms and policies by sending

15   sensitive information it was not supposed to have

16   sent?

17           MS. HAUSKNECHT:  Objection.  Outside the

18   scope.

19           Also, I'll give you a privilege

20   instruction again.

21           THE WITNESS:  No, not specifically.

22   Generally we'd expect the users of our business

23   tools, having accepted our terms of service, to

24   adhere to those terms which includes not sending

25   potentially sensitive information.

HIGHLY CONFIDENTIAL

Page 71

1            And in addition to that, Meta does have

2    systems, as I described earlier, to detect and

3    filter the sensitive information from business

4    tools.  But I'm not aware of specific

5    communications that you had described.

6    BY MR. SMITH:

7        Q.  Did Meta ever tell TaxSlayer that it had

8    violated Meta's terms and policies by sending

9    sensitive tax filing information?

10            MS. HAUSKNECHT:  Object to form.  Asked

11    and answered.  Outside the scope.

12            THE WITNESS:  I have the same response

13    for TaxSlayer as I've had for TaxAct in the

14    previous question.

15    BY MR. SMITH:

16        Q.  Same for H&R Block as well?

17            MS. HAUSKNECHT:  Object to form.  Outside

18    the scope.

19            THE WITNESS:  Yes.

20    BY MR. SMITH:

21        Q.  You've worked for Meta for 11 years?

22        A.  Yes.

23        Q.  Are you aware of any website being

24    barred from using the Meta Pixel for sending

25    sensitive data to Meta?

HIGHLY CONFIDENTIAL

Page 72

1          MS. HAUSKNECHT:  Objection.  Outside the

2     scope.

3          THE WITNESS:  Meta has various security

4     and privacy policies that may prevent certain

5     types of websites, such as porn sites, from using

6     our Meta Business Tools altogether.

7     BY MR. SMITH:

8        Q.   Okay.  Are you aware of any company

9     being barred from using the Meta Pixel for

10    sending sensitive financial data to Meta?

11         MS. HAUSKNECHT:  Objection.  Outside the

12    scope.

13         THE WITNESS:  Again, as I described, we

14    have policies in place in addition to the terms

15    of service throughout the business tools that

16    describe and prevent and disallow the sending of

17    potentially sensitive information.

18         Whereas, Meta also takes steps in

19    identifying, detecting, and filtering out this

20    potentially sensitive information, which could

21    lead to the Event Data from certain business to

22    be filtered prior to being sent to Meta.  I'm not

23    aware of specific instances for particular

24    financial institutions being barred in the manner

25    as you have described.

HIGHLY CONFIDENTIAL

Page 73

1  BY MR. SMITH:

2      Q.  So the short answer to my last question

3  is no; is that correct?

4          MS. HAUSKNECHT:  Objection.  Misstates

5  the testimony.  Outside the scope.

6          THE WITNESS:  What I had described --

7  what I previously testified, there may be

8  circumstances that lead to Event Data being

9  completely filtered out for certain types of

10 businesses, but which may have a similar effect.

11 But I'm not aware of instances of particular

12 financial businesses or institutions in the

13 manner that you described as being barred.

14 BY MR. SMITH:

15     Q.  What is Automatic Advanced Matching?

16     A.  Firstly, advanced matching in general is

17 the ability for developers to transmit or send,

18 set up customer information parameters, as I

19 described earlier, along side Event Data for the

20 purposes of enabling -- for purposes of identity

21 matching.

22         Automatic Advanced Matching is a tool

23 whereby the developer can configure their Pixel

24 to -- if opted in, to automatically identify

25 potential customer information parameters that

HIGHLY CONFIDENTIAL

Page 74

1    they have described for the same purposes.

2        Q.   Does Automatic Advance Matching tell a

3    Pixel to send recognizable form fields to Meta?

4        A.   If -- if the Pixel is configured to be

5    by the developer to enable Automatic Advance

6    Matching for the specific fields that the

7    developer has enabled, yes, what you have

8    described is the functionality of Automatic

9    Advance Matching works.

10       Q.   Sending recognizable form fields to Meta

11   can potentially violate Meta's terms; is that

12   correct?

13           MS. HAUSKNECHT:   Object to form.

14   Misstates the testimony.

15           THE WITNESS:   To clarify my previous

16   answer, for the functionality of Automatic

17   Advance Matching, if opted in to be use for the

18   record specific fields that the developer has

19   selected, sets the Pixel up to transmit customer

20   information parameters that have been configured

21   by the developer to be transmitted in a hashed

22   format.   This is done via form fields as you have

23   described.

24           The -- generally transmission of Event

25   Data in a manner that's in violation of our terms

HIGHLY CONFIDENTIAL

Page 75

```
 1    of service, such as not -- as an example being,
 2    not sending a customer information parameter in a
 3    hashed format, can violate our terms, yes.
 4         Q.   Do you know a gentleman by the name of
 5    Max Nelson?
 6         A.   No.
 7         Q.   How about Gunjan Paliwal, last name
 8    spelled P-a-l-i-w-a-l?
 9         A.   Yes.
10         Q.   Do you work with this individual?
11         A.   I have worked with Gunjan in the past,
12    yes.
13         Q.   Regularly or only occasionally?
14         A.   Occasionally as it pertains to her --
15    her job function and certain specific areas, yes.
16         Q.   Any concerns about this person's
17    competence that you have?
18              MS. HAUSKNECHT:  Object to form.  Outside
19    the scope.
20              THE WITNESS:  I can't speak to her
21    competence overall in general.  But from my
22    interactions with her, no.
23    BY MR. SMITH:
24         Q.   Based on your interactions with her, do
25    you have any concerns about her honesty?
```

HIGHLY CONFIDENTIAL

Page 91

```
 1          MS. HAUSKNECHT:  Yes.  This is an
 2    objection to your representation that this
 3    accurately reflects the data that was produced in
 4    this matter.
 5    BY MR. SMITH:
 6          Q.  Now, I think earlier in your testimony
 7    today the subject of ███████████████  came up.
 8          Do you recall that?
 9          A.  Yes.
10          Q.  So I want to direct your attention to
11    Exhibit 146, page 2.  You will see the third
12    column from the left has a notation,
13    ██████████████.
14          Do you see that?
15          A.  Yes.
16          Q.  And is the data that's shown below in
17    the rows below that column, does that contain
18    custom data sent by the Pixel?
19          MS. HAUSKNECHT:  Object to form.  Vague.
20          THE WITNESS:  The values represented in
21    the ████████████  column does represent the
22    ████████████  that's transmitted as Event Data
23    from the Pixel in a █████ -- stored in a █████
24    format.
25    BY MR. SMITH:
```

HIGHLY CONFIDENTIAL

1   Event Data that's sent by a Meta Pixel.

2        Q.  So does that mean there may be

3   circumstances where you're trying to match an

4   event with a Meta -- with a Facebook user, but

5   Meta, for whatever reason, may not be certain of

6   what the match is so you may have more than one

7   person who is a potential match?

8            Is that another way of putting it, or am

9   I off base there?

10           MS. HAUSKNECHT:  Object to form.

11  Incomplete hypothetical.

12           THE WITNESS:  The identity-matching

13  process as you described is █████████████████████

    ████████████████████████████████████████████████

    ████████████████████████████████████████

    ███████████████████    █████████████████████████

    █████████████████████████████████████████████████

    ███████████████████████████████████████████████

    ██████████████

20  BY MR. SMITH:

21       Q.  I see.  And why is the information

22  hashed?

23       A.  You're referring to the

24  ████████████████████████████ column?

25       Q.  Yeah.  Thank you for the clarification.

HIGHLY CONFIDENTIAL

Page 101

1      A.  It's my understanding, typically for

2   privacy considerations, several columns that may

3   have potentially sensitive or personal

4   information is hashed prior to the data being

5   produced by Meta.

6      Q.  Okay.  And so the data that may appear

7   in connection or in the

8   ███████████████████████████████ field could be

9   used for advertising?

10         MS. HAUSKNECHT:  Object to form.  Vague.

11         THE WITNESS:  The value in this column,

12   or in this field ████████████████████████████████

███  ██████████████████████████████████████████

███  ███████████████████████████████████████████

███  █████████████████████████████████████

███  ███████████████████████

17   BY MR. SMITH:

18      Q.  Is the data generated for the

19   ██████████████████████████████ column used for

20   research purposes?

21         MS. HAUSKNECHT:  Object to form.  Vague.

22         THE WITNESS:  Could you clarify what you

23   mean by "research purposes?"  I just want to make

24   sure I understand the question.

25   BY MR. SMITH:

HIGHLY CONFIDENTIAL

Page 102

1      Q.   Just construe it as broadly as you like

2  in terms of any research that Meta does.

3           MS. HAUSKNECHT:   Object to form.   Vague.

4           THE WITNESS:   Generally this information

5  in this column, and this applies to other field

6  as well, ███████████████████████████████████████

   ████████████████████████████████████████████████

   ██████████████████████████████████████      ████

   ████████████████████████████████████████████████

   ██████████████████████████████████████████

11  BY MR. SMITH:

12      Q.   Not used for AI research?

13      A.   To machine learning or even the use of

14  AI are techniques that are employed in our

15  products and infrastructure, and Event Data may

16  be used in some of those -- in some of those

17  products or infrastructure specifically.   But I'm

18  not familiar with this field being used for

19  research, AI in particular, as you described it,

20  no.

21      Q.   Sticking a little bit longer with

22  Exhibit 146, I wanted to draw your attention to

23  page 10.   And there's a field called -- first one

24  on the left ██████████████████████      ██████████

   █████████████████████      █████████████████████████

HIGHLY CONFIDENTIAL

Page 103

1    ████████████████

2         What's that used for?

3         MS. HAUSKNECHT:  Objection.  Outside the

4    scope.

5         THE WITNESS:  This field, or values in

6    this column represents ███████████████

█    ████████████████████████████████████████

█    ██████████████████████████.

9    BY MR. SMITH:

10       Q.  What's a custom conversion?

11       MS. HAUSKNECHT:  Objection.  Outside the

12   scope.

13       THE WITNESS:  A custom conversion is a

14   rule-based event or conversion that can be

15   defined by the developer or the marketer on

16   Meta's Business Tools in association with Event

17   Data from the Meta Pixel.

18   BY MR. SMITH:

19       Q.  Same page, page 10, Exhibit 146.  The

20   second column from the right has the

21   word ████████████████

22       Do you see that?

23       A.  Yes.

24       Q.  What is that?

25       MS. HAUSKNECHT:  Objection.  Outside the

HIGHLY CONFIDENTIAL

Page 104

1    scope.

2           THE WITNESS:  I'm not specifically

3    familiar with this column, but generally the

4    ██████████████████████████████████████████████

     ██████████████████████████████████████████████

     ██████████████████████████████████████████████

     ████████████████████████████████.

8    BY MR. SMITH:

9        Q.   Does ████████████████████████████████

     ██████████████████████████████████████████████████

11          MS. HAUSKNECHT:  Objection.  Outside the

12   scope.

13          THE WITNESS:  Again, I'm not too familiar

14   for this column in this table, but generally it's

15   associated with ████████████████████████████████

     ██████████████████████████████████████████████████

     ████████████████████████████████████

18          THE REPORTER:  147.

19          MR. SMITH:  Wait.  I gave you the wrong

20   copy.  Here's the correct one.

21          (Plaintiff's Exhibit 147 was marked for

22          identification.)

23          MS. HAUSKNECHT:  Do you have one for us?

24          MR. SMITH:  One moment.  Here's 148.

25          (Plaintiff's Exhibit 148 was marked for

HIGHLY CONFIDENTIAL

```
 1              identification.)
 2              MS. HAUSKNECHT:  I'm going to make the
 3     same standing objection to both of these
 4     exhibits, 147 and 148, that they do not
 5     accurately represent what was produced in this
 6     matter.
 7              Just to make sure I don't have to say it
 8     every time, do you agree to honor the standing
 9     objection to these?
10              MR. SMITH:  Yes.
11              MS. HAUSKNECHT:  Thanks.
12              MR. SMITH:  Not that I agree with it, but
13     I understand the objection.
14     BY MR. SMITH:
15          Q.  Mr. Jayakumar, did you review the
16     documents identified in Topic Number 1 to your
17     deposition notice?
18          A.  To clarify you're referring to the
19     plaintiff HIVE documents and the general
20     explanations of the columns referred to in Topic
21     1?
22          Q.  Correct.
23          A.  Yes.
24          Q.  And focusing on Exhibit 147, having
25     briefly reviewed it, do you have any reason to
```

HIGHLY CONFIDENTIAL

Page 106

```
 1   doubt that this is HIVE data that's been produced
 2   with the Bates number ending in 3583?
 3              MS. HAUSKNECHT:  I'll just note the
 4   objection especially as to columns primarily
 5   ███████████ and other ones as an example.
 6              THE WITNESS:  This appears to be similar
 7   to the data that was produced to which you've
 8   described.  There are certain fields that appear
 9   to be different, such as being truncated, and
10   this appears to be an excerpt of the data that
11   was produced.  The columns look similar, yes.
12   BY MR. SMITH:
13       Q.  When you say appears to be excerpted,
14   were you referring to Exhibit 148 or 147 or both?
15       A.  I haven't had a chance to look at
16   Exhibit 148.  I apologize.
17       Q.  Oh, okay.
18       A.  Yes.  To both.
19       Q.  Exhibit 147 and Exhibit 148 have a lot
20   of header names in common like, let's see, ███████
     ███████████████████████████████████
22              Do you see that?
23       A.  I do see ███████████ as a common field.
24   ███████████, I see it being represented slightly
25   differently across both exhibits.
```

HIGHLY CONFIDENTIAL

1          Q.  I see.  Okay.

2          A.  Actually, now I do see the ████████

3     column on the first page.

4          Q.  Generally speaking, recognizing there

5     may or may not be exceptions, but do header names

6     generally have the same meaning across both

7     Exhibit 147 and 148?

8               MS. HAUSKNECHT:  I'll just object and

9     note that you haven't told him what PIXEL_TAX3583

10    is an excerpt of, which table it comes from.

11              MR. SMITH:  It's referenced in the depo

12    notice.

13              THE WITNESS:  Given that some of the data

14    is truncated and cut off in both exhibits, I

15    can't say with certainty.  But given -- but the

16    columns that have the same names appear to be

17    from the same table, in which case they would

18    mean the same thing.

19    BY MR. SMITH:

20         Q.  Focus on Exhibit 148.  Let me know when

21    you're ready.

22         A.  Yes.  I'm ready.

23         Q.  Okay.  So just focusing for the moment

24    on Exhibit 148, there's a lot of data in

25    Exhibit 148.  Why generally does Meta keep all

HIGHLY CONFIDENTIAL

Page 108

1    this data?

2              MS. HAUSKNECHT:  Object to form.

3    Misstates the record.

4              THE WITNESS:  I think, generally, when it

5    comes to the logging in offline persistent

6    storage systems, such as HIVE, that is related to

7    products like the business tools.  Each column

8    represents a ███████████████████████████

   ████████████████████████████████████████

   ██████████████████████████████████████████████

   ██████████████████████████████

12             The number of columns as such could be

13   large when you include these factors.  And that's

14   no different for the -- what I understand is the

15   primary tables where Meta Pixel related Event

16   Data is stored.

17        Q.  Are there any other reasons you can

18   think of that are not already stated in your last

19   answer?

20        A.  No.

21        Q.  How was Meta able to match HIVE data

22   with the specific named plaintiffs in this case?

23        A.  It is my understanding generally to --

24   in similar data productions for named plaintiffs

25   in association with their business tools, Meta

HIGHLY CONFIDENTIAL

**Page 109**

1   █████████████████████████████████.

    ███████████████████████████████████

    ████████████   ██████████████████████

    █████████████████████████████████

    █████████████████████████████████

    ████████████████████████████████

    ████████████████████████████████

        █████████████████████████████████

    ████████████████████████████████████

    ████████████████████████████████████

    ███████████████████████████████████.

12      Q.  Are there any columns with fields --

13  strike that.

14          Do any of the column headers in

15  Exhibit 148 include information that would allow

16  Meta to match the data with the named plaintiffs?

17          MS. HAUSKNECHT:  Object to form.  Vague.

18          THE WITNESS:  The column on page 15

19  headed with the header

20  ██████████████████████████████

    ████████████   ██████████████████████

    ████████████████████████████████████

    ████████████████████████████████████

    ██████████████████████████.

25  BY MR. SMITH:

HIGHLY CONFIDENTIAL

Page 110

1      Q.   Are there any other headers in

2   Exhibit 148 that would facilitate matching data

3   with a particular plaintiff?

4           MS. HAUSKNECHT:  Object to form.  Vague.

5           THE WITNESS:  As I described earlier,

6   ████████████████████████████████████████████████

    ████████████████████████████████████████████████

    ████████████████████████████████████████████████

    ████████████████████████████████████████████████

    ████████████████████████████████████████████

    ████████████.

12  BY MR. SMITH:

13      Q.   Is "Time Stamp" the header that's the

14  first one on the left of page 1 of Exhibit 148?

15      A.   Yes.

16      Q.   How does the time -- how can the time

17  stamp information help you link data with a

18  particular plaintiff?

19           MS. HAUSKNECHT:  Object to form.  Vague.

20           THE WITNESS:  Just to clarify my earlier

21  response, what I meant to describe was ████████████

    ████████████████████████████████████████████████

    ████████████████████████████████████████████████

    ████████████████████████████████████████████████

    ████████████████████████████████████████████

HIGHLY CONFIDENTIAL

**Page 111**

1  ██████████████████████████████

2  ████████████████████████████████████

3  ███████████████████████████████ is a

4  factor that's taken into account.

5  BY MR. SMITH:

6       Q.  There are a number of columns or column

7  headers that start with the word ████████ and end

8  with the word ██████

9            Two examples are on page 6.

10            Are you able to provide a general

11  explanation about what type of data those fields

12  represent?

13            MS. HAUSKNECHT:  Object to form.  Asked

14  and answered.  Vague.

15            THE WITNESS:  I can speak to the columns

16  on page 6 specifically and generally what the

17  prefix ████████may represent, but it depends on

18  the column generally.  For the columns in

19  question that end in ████████ and start with

20  ██████████████████████████████

21  ████████████████████████████████████

22  ████████████████████.

23            The other values, depending on the

24  column, they could have different meanings.

25  BY MR. SMITH:

HIGHLY CONFIDENTIAL

Page 112

1          Q.   So you said Meta ███████████████████
█          █████████████████.   What did you mean by
3     that?

4          A.   By that, I mean Meta ████████████████
█     ███████████████████████████████████████████████
█     ███████████████████████████████████████████████
7     when producing this data.

8          Q.   You mean producing the data in
9     litigation?

10         A.   In this instance, yes.

11         Q.   So how is ████████████████████████
█     █████████████████████████████, what information
13    does that disclose?

14             MS. HAUSKNECHT:  Object to form.  Vague.

15             THE WITNESS:  Generally, as I described
16    earlier -- in this instance the ███████████████████
█     ███████████████████████████████████████████████
█     ███████████████████████████████████████████████
█     ███████████████████████████████████████
█     ████████████████████████████████████
█     █████████████████████   █████████████████████
█     ███████████████████████████████████████████
█     ███████████████████████████████████
█     █████████████████.

25    BY MR. SMITH:

HIGHLY CONFIDENTIAL

Page 113

1      Q.   What's the word "deprecated" mean?

2      A.   By deprecated, I mean are no longer

3   supported or valid.  As we currently █████████

█   ████████████████████████████████████████████████

█   ████████████████████████████████████████████████

█   ██████████████ .

7      Q.   Can the last login user ID be used to

8   identify a Facebook user?

9      A.   The last logged in user is an -- is a

10  piece of information that may be transmitted via

11  cookies, alongside the Event Data with a Pixel

12  fired to Meta and can be used for

13  identity-matching process.

14     Q.   What does it signify to you if a field

15  is blank?

16     A.   █████████████████████████████████████

█   ████████████████████████████████████████████████

█   ████████████████████████████████████████████████

█   ████████████████████████████████████████████████

█   ████████████████████████████████████████████████

█   ████████████████████████████████████████████████

█   ████████████

23     Q.   If the information had ████████████████

24  before being produced, would there be some data

25  in the columns?

HIGHLY CONFIDENTIAL

**Page 114**

1      A.  ███    ████████████████████████
██ ████████████████████████████████
██ ████████████████████████████████████
██ ███████████████████.
5      Q.  So if a field says -- so if a field
6  under ████████████████████████████
██ ██████████████████?
8         MS. HAUSKNECHT:  Object to form.  Asked
9  and answered.
10        THE WITNESS:  ████   ███████████████.
██ █████████████████████████████
██ ████████
13  BY MR. SMITH:
14     Q.  ████████████████████████
██ ████████████████████████████
██ ██████████████████████████████
██ ██████████
18        MS. HAUSKNECHT:  Object to form.  Asked
19  and answered.
20        THE WITNESS:  In this particular instance
21  and in these columns generally, if the
22  ████████████████████████████
██ ████████████████████████
██ ██████████████████████████████
██ ████████████

HIGHLY CONFIDENTIAL

Page 115

1          To clarify, as I described earlier,

2     however, ████████████████████████████████████

      ████████████████████████████████  ███████████

      ███████████████████████████████████

      ████████████████████████████████████████████

      ████████████████████████████████████████████

      █████████████████████████████████████

      ██████████████████████████████████████

      █████████████████████████

10    BY MR. SMITH:

11         Q.  So on page 15

12    █████████████████████████████████████████

      ████████████████  is that correct?

14         A.  That is my understanding, yes.

15         Q.  And do you know why there's  █████████

      ████████████████████████

17         A.  It would be for the similar reason as I

18    described with the other columns.  In this

19    instance, ████████████████████████████████████

      ████████████████████████████████████████████

      ███████████████████████████████████████████████

      █████████████████████████████████████████

      ████████████████████████████████████████████

      ███████████████████████████████████

25         Q.  Was this information just withheld from

HIGHLY CONFIDENTIAL

Page 116

1    the production?

2            MS. HAUSKNECHT:  Object to form.

3    Misstates testimony.

4            THE WITNESS:  No.  As I testified

5    earlier, as with the other columns, the -- other,

6    I mean, █████████████████████████████████████

     ███████████████████████████████████████████████

     ███████████████████████████████████████

9    BY MR. SMITH:

10       Q.  Has any category or type of Pixel Event

11   Data been excluded from Exhibit 148?

12           MS. HAUSKNECHT:  Object to form.

13   Plaintiffs represented this was excerpted.  I

14   don't know how to say that word apparently.

15   Mischaracterizes the record.

16           THE WITNESS:  Can you -- sorry.  Can you

17   repeat the first part of your question?  You

18   mentioned there are Pixel categories of data

19   that's removed?

20   BY MR. SMITH:

21       Q.  Yeah.  And just to clarify I'm not

22   asking about any information in a particular

23   field.  I'm really focused on headers.

24           MS. HAUSKNECHT:  Object to form.

25   Mischaracterizes the record.

HIGHLY CONFIDENTIAL

```
 1          THE WITNESS:  Again, as I mentioned
 2    earlier, I can't tell for certain, given some of
 3    the data is truncated and not -- and cut off.
 4    But the columns appear to be consistent with the
 5    primary tables where an event data from the Meta
 6    Pixel start.
 7    BY MR. SMITH:
 8        Q.   I want to direct your attention to
 9    paragraph -- I'm sorry -- Exhibit 148, page 13.
10    First column on the left titled ███████████
11          Do you see that?
12        A.   Yes.
13        Q.   What does ████████████    mean?
14        A.   ████████████████████████
      ███████████████████████████████████████████
      █████████████████████████████████
17        Q.   Why is ███████████ information recorded?
18        A.   Generally, as with other fields, this --
19    █████████████████████████████████████████
      ████████████████████████████████████████
      ███████████████████████████████████████
      ███████████████████████████████████
      █████████████████████████████████████████
      █████████████████████████████████████████
      ███████████
```

HIGHLY CONFIDENTIAL

Page 118

1      Q.  You used the term █████████

       █████████  Could you elaborate what you actually

3    mean by that?

4      A.  Yes.  ████████████████████

     ██████████████████████████

     ████████████████████████████████

     ███████████  ██████████████████████

     ███████████████████

9          For example, if certain fields were

10   █████████████████████████████

     ██████████████████████████████████

     ████████████████████████████

     █████████████████████████

14     Q.  How, if at all, does a ██████████ data

15   help you determine if a Pixel was set up

16   properly?

17     A.  ███████████████████████

     █████████████████████████████████

     █████████████████████████████

     ████████████████  ██████████

     ██████████████████████████████

     ███████████████████████████████

     ██████████

24     Q.  If you wanted to know how long a

25   particular session lasted, is there anywhere in

HIGHLY CONFIDENTIAL

Page 119

```
 1   Exhibit 148 you could look to get that
 2   information?
 3              MS. HAUSKNECHT:  Object to form.  Lacks
 4   foundation.
 5              THE WITNESS:  ████████████████████████
 6   BY MR. SMITH:
 7       Q.  Is there a column that tracks start time
 8   of a session?
 9       A.  ███████████████████████████
10       Q.  The first column on page 1 of
11   Exhibit 148 has ██████ is that a reference for
12   ███████████
13       A.  Yes.
14       Q.  And what specifically does that number
15   signify?
16       A.  It represents the ███████████████████
█    ████████████████████████████████████████████████
█    ██████████████████  ██████████████████████████████
█    ████████████  ████████████████████████████████
█    █████████████
21              MS. HAUSKNECHT:  We have been going about
22   an hour.
23              MR. SMITH:  Yeah.  Let me just finish up.
24   Just a couple of more minutes.
25   BY MR. SMITH:
```

HIGHLY CONFIDENTIAL

**Page 127**

1      A.    ███████████████████████████

       ████████████████████████████████████

       ████████████████████████████████████

       ██████████████████████████████████

       ███████████████████████

6      Q.    Meaning the website user?

7            MS. HAUSKNECHT:  Object to form.  Vague.

8            THE WITNESS:  It is associated -- or the

9      ████████████████████████████████████

       ██████████████████████████████████

       ████████████████████████████████████

       ████████████████████████████████████

       ████████it may indicate something else.

14     BY MR. SMITH:

15           Q.   But you have no idea how H&R Block

16     configured the Pixel, at least to the extent it

17     relates to city and country information; is that

18     correct?

19           MS. HAUSKNECHT:  Object to form.

20     Misstates the testimony.  Misstates the record.

21           THE WITNESS:  H&R Block's Pixel

22     instrumentation may have included customer

23     information parameters, such as city or other

24     information to be transmitted to Meta.

25           But this represents the ████████████████

HIGHLY CONFIDENTIAL

Page 128

1    ███████████████████████ as I understand it, as

2    ████████████████████████.  And as I

3    mentioned earlier, I'm not quite certain how that

4    information is derived.

5    BY MR. SMITH:

6        Q.  Why does Meta track city information?

7        A.  As it pertains to the Pixel, the Meta

8    Pixel, city is one of the customer information

9    parameters that can be used.  Meta's attempt to

10   match Event Data to Meta user, which as I

11   testified earlier, can be useful for various --

12   various functionalities, including running of

13   campaigns but also analytics and measurement.

14       Q.  So if you wanted a campaign, for

15   instance, to focus on people who lived in

16   Turlock, could an advertiser do that?

17           MS. HAUSKNECHT:  Object to form.

18   Misstates the testimony.

19           THE WITNESS:  Marketers can run campaigns

20   using various -- targeting various audiences

21   using various options that Meta provides, which

22   can include geographic location.  And other

23   possible -- other possible information.

24           However, this is not necessarily always

25   related to the business tools or the Meta Pixel.

HIGHLY CONFIDENTIAL

Page 129

1    It could be other forms of information, such as

2    profile information that the user has provided

3    during the creation of their Facebook account.

4    BY MR. SMITH:

5         Q.   Could the ███ information, disclosed on

6    page 6 of Exhibit 148, be used to do targeted

7    advertising by location if someone wanted to?

8              MS. HAUSKNECHT:   Object to form.   Calls

9    for speculation.

10             THE WITNESS:   Event Data that's

11   transmitted from the business tools can be used

12   for various purposes up to and including for

13   advertising and targeting.   Largely, the customer

14   information parameters or values like ███ and --

15   such information is only used for the purposes of

16   identity -- for the identity-matching process.

17             As I described, there are other

18   functionality that Meta provides when creating

19   campaigns and defining audiences that does not

20   necessarily relate to business tool or Meta Pixel

21   information.

22   BY MR. SMITH:

23        Q.   Page 3 of Exhibit 148 has a header

24   called ██████████████

25             What does that information refer to?

HIGHLY CONFIDENTIAL

**Page 130**

1    A. ████████████████████████████

    ████████████████████████████████

    ████████████████████████████████

    ████████████████████

5    Q.  Why does Meta keep that information?

6    A.  Similar to other Event Data, ██████████

    ████████████████████████████████

    ████████████████████████████████

    ████████████████████████████████

    ████████████████████████████

    ███████████████████ I described earlier.

12    Q.  There are two headers on page 1 of

13  Exhibit 148 that refer to ███████████ and

14  ████████████████

15    What is that a reference to?

16    A. ████████████████████████████

    ████████████████████████████

    ████████████████████████████████

    ████████████████████████████

20    Q.  On pages 1 and 2, there are headers that

21  refer to ██████████████████████████████

    ██████████████ and one more, ████████████

23    Do you see that?

24    A.  Yes.

25    Q.  Generally speaking, what do these

Page 131

1    headers refer to?

2                MS. HAUSKNECHT:  Object to form.  Vague.

3                THE WITNESS:  The ███████████, as you

4    describe, contain information relating to the

5    ████████████████████████████████████   ██████████

6    ████████████████████████████████████.

7    BY MR. SMITH:

8         Q.  I want to go to page 10.  Right about

9    the middle you will see a field that says

10   █████████████████████████  There are underscores

11   there, which I left out, but you see it; correct?

12        A.  Yes.

13        Q.  What does it signify if the field

14   says ██████?

15                MS. HAUSKNECHT:  Objection.  Outside the

16   scope.

17                THE WITNESS:  ████████████████████

18   ████████████████████████████████████████████████

19   ████████████████████████████████████████████

20   ████████████████████████████████████████████████

21   ████████████

22   BY MR. SMITH:

23        Q.  And ██████████ is the opposite?

24                MS. HAUSKNECHT:  Objection.  Scope.

25                THE WITNESS:  Yes.

HIGHLY CONFIDENTIAL

Page 132

```
1    BY MR. SMITH:
2         Q.   Why does Meta keep track of that
3    information in that column ████████████████?
4              MS. HAUSKNECHT:  Objection.  Scope.
5              THE WITNESS:  I'm not sure specifically
6    as it relates to this column, but I think, as I
7    testified earlier, generally ████████████████
     ████████████████████████████████████████████
     ████████████████████████████████████████.
10   BY MR. SMITH:
11        Q.   Page 14, still on Exhibit 148.  Has a
12   field called ████████████████████████ what's
13   that a reference to?
14        A.   This references ██████████████████████
     ██████████████████████████████████████████████
     ██████████████████████████████████████████
     ████████████████████████████
18        Q.   How does Meta system determine whether
19   or not the word ████████ or the word ████████ should
20   show up in the fields there?
21        A.   To clarify, you're referring to the
22   ██████████████████████████████ column?
23        Q.   Yes.  Thank you.
24        A.   ████████████████████████████████████
     ██████████████████████████████████████████████
```

HIGHLY CONFIDENTIAL

Page 147

1        Q.  Do you know roughly how many people have

2    Facebook accounts?

3              MS. HAUSKNECHT:  Objection.  Scope.

4              THE WITNESS:  Sitting here today, I

5    wouldn't know that.

6    BY MR. SMITH:

7        Q.  Is it likely to be in the millions?

8              MS. HAUSKNECHT:  Objection.  Scope.

9    Calls for speculation.

10              THE WITNESS:  Similar to the question

11    about Pixel, I cannot say that for certain.

12    BY MR. SMITH:

13        Q.  Have you heard or seen any information

14    about Facebook currently experiencing a decline

15    in active users?

16              MS. HAUSKNECHT:  Objection.  Scope.

17    Vague.

18              THE WITNESS:  Not that I recall, no.

19    BY MR. SMITH:

20        Q.  Have you been in any discussions about

21    whether Meta should just shut down operation of

22    Pixel?

23              MS. HAUSKNECHT:  Objection.  Scope.

24              THE WITNESS:  Not that I recall, no.

25    BY MR. SMITH:

HIGHLY CONFIDENTIAL

Page 148

1      Q.   Has Meta implemented any measures to

2   block IP address information?

3           MS. HAUSKNECHT:  Objection.  Scope.

4           THE WITNESS:  Could you clarify when you

5   refer to "block IP information," from what?

6   BY MR. SMITH:

7      Q.   Prevent transmission of IP information

8   from users to Meta.

9           MS. HAUSKNECHT:  Objection.  Scope.

10          THE WITNESS:  Actually, I'm not sure.  I

11   do not know.

12   BY MR. SMITH:

13     Q.   Same question, but zip code information.

14     A.   Same answer.  I do not -- do not know.

15     Q.   Any -- has Meta implemented any measures

16   to block transmission of first or last names?

17          MS. HAUSKNECHT:  Objection.  Scope.

18   Vague.

19          THE WITNESS:  Again, just to clarify, I

20   want to make sure I'm able to represent it

21   accurately.  When you refer to blocking first

22   name and last name, within what context are you

23   referring to?  You said it's from users, like on

24   an account profile, for example, that when they

25   share that information, we created on their

HIGHLY CONFIDENTIAL

Page 149

1    Facebook account or?

2    BY MR. SMITH:

3         Q.   I'm referring to data transmitted by the

4    Meta Pixel.

5         A.   Meta's filtration system, as I described

6    earlier, does attempt to detect and filter out

7    PII, including first name and last name that may

8    be transmitted in a manner that's not in line

9    with our terms of service.

10        Q.   When did it start doing that?

11        A.   And just wanted to clarify within the

12   context of you mentioning Meta Business Tool, the

13   same answer applies for other PII, like zip and

14   IP address as well.

15             Meta has systems that detect and filter

16   out potentially identifiable information that may

17   be transmitted from the Pixel in a manner that's

18   not in line with the terms of service.  The

19   systems were in place -- these filtering systems,

20   as I described it, were in place from ███████████

21   as I recall.

22        Q.   What's the difference between a "Pixel

23   event" and a ███████████████

24        A.   There isn't really a concept that I

25   would frame as being a ████████████████

HIGHLY CONFIDENTIAL

Page 150

1    ████████████████████ is a name, an internal name,

2    to a████████████████████████████████████████████

     ████████████████████████████████████████████

     ████████████████████████████ So there's

5    no event specific that I would call a ████████████

     ████████

7           MR. SMITH:  149, I think.

8           THE REPORTER:  Yes.

9           (Plaintiff's Exhibit 149 was marked for

10          identification.)

11   BY MR. SMITH:

12       Q.  So you have in front of you an exhibit

13   that's been marked 149, and I want to draw your

14   attention to page 2.  On the second half -- the

15   bottom half of page 2, in the third column, if

16   you search for it, you'll see a sentence that

17   says (as read):

18              "A merge of Pixel and ████████████

     ████████████

20          Do you see that?

21       A.  Yes.

22       Q.  So earlier you had testified that

23   there's no specific event that you would call a

24   ████████████████████████.  So I'm trying to

25   reconcile what you said there with the sentence

HIGHLY CONFIDENTIAL

Page 151

1    there referring to "A merge of Pixel and █████

█    ████████████████ "

3         Can you help clarify what that means and

4    how that is in sync with what you testified a

5    moment ago?

6         A.  Yes.  I wouldn't reference -- I wouldn't

7    reference the term as ████████████████ myself.

8    This could be referring to events or Event Data

9    associated with the ████████████ project or

10   projects generally, and is likely a shorthand to

11   indicate those particular events.

12        Q.  Okay.  The line just above the one I

13   asked about said (as read):

14                    ██████████████████████████████

█    ████████████████

16        What does that mean to you?

17        A.  I'm not certain within the context of

18   this specific table's description.  But generally

19   the terms ████████████ is used to represent ████

█    ████████████████████████████████████████

█    ████████████████████████████████████

█    ████████████████████████████████████████

23   what have you.

24        And it's ███████████████████████████████

█    ████████████████████████████████████ but I

HIGHLY CONFIDENTIAL

Page 152

1    cannot say for certain for this specific table.

2        Q.  Since you first began working at Meta,

3    when is the earliest time you can recall ever

4    communicating with anyone else in Meta about

5    whether the Pixel may have been transmitting

6    sensitive information that it should not be

7    transmitting?

8            MS. HAUSKNECHT:  Objection.  Scope.

9            THE WITNESS:  I think, firstly, to

10   clarify generally, any discussions I might have

11   had relating to the topic of potentially

12   sensitive information from our business tools, I

13   would qualify that as being potentially

14   sensitive, partly given Meta aren't arbiters of

15   what is truly sensitive and a lot of our

16   filtering represents, albeit proactively, an

17   attempt to detect and filter potentially

18   sensitive information.

19           But I don't quite recall when the

20   earliest such instance of a discussion I may have

21   had with someone I work with relating to the

22   topic would be.

23       Q.  Best estimate would be first time you --

24   well, strike that.

25           Is it your sense you have at some point

HIGHLY CONFIDENTIAL

Page 153

1    in time, during your tenure at Meta, spoken with

2    someone about the potential for the Meta Pixel to

3    transmit potentially sensitive data?

4            MS. HAUSKNECHT:  Objection.  Scope.

5            THE WITNESS:  No.  But given that I have

6    worked in the Signals Integrity team that I

7    described, that maintains --

8            (Clarification requested by Reporter.)

9            THE WITNESS:  Sorry.  I can restart.  I

10   will say no.

11           However, given that I have worked on the

12   Signals Integrity space that maintains and builds

13   our filtration systems for detecting and

14   filtering out potentially sensitive information,

15   I have had discussions, as part of my job

16   function, relating to those systems, but I do not

17   recall the earliest instance of such discussions.

18   BY MR. SMITH:

19       Q.  Okay.  Have you ever discussed with

20   another engineer or non-attorney the subject of

21   the Pixel potentially transmitting sensitive

22   financial information?

23           MS. HAUSKNECHT:  Objection.  Scope.

24           THE WITNESS:  Not that I recall, no.

25   BY MR. SMITH:

HIGHLY CONFIDENTIAL

Page 154

1    Q.  How about any other specific categories
2    of potentially sensitive information, like video
3    viewing history or health information?
4         MS. HAUSKNECHT:  Objection.  Scope.
5    Asked and answered.
6         THE WITNESS:  Not that I recall
7    specifically to those topics.  But as I mentioned
8    earlier, by virtue of the team I have worked on
9    at my job function, I have had discussions
10   relating to the systems that Meta has to detect
11   and filter out potentially sensitive information
12   generally.
13   BY MR. SMITH:
14   Q.  Did you work with the Signals Integrity
15   team in 2018?
16   A.  No.
17   Q.  No interactions with them whatsoever in
18   a professional capacity during that year?
19        MS. HAUSKNECHT:  Objection.  Scope.
20   Asked and answered.
21        THE WITNESS:  Not that I can recall
22   sitting here today.
23   BY MR. SMITH:
24   Q.  In 2018, what department were you
25   working for?

HIGHLY CONFIDENTIAL

Page 155

1        A.  As I recall, I worked within the Signals

2    department more broadly.

3        Q.  Okay.  But not Signals Integrity?

4        A.  That is right.

5        Q.  I see.  Okay.

6            THE REPORTER:  150.

7            (Plaintiff's Exhibit 150 was marked for

8            identification.)

9            MS. HAUSKNECHT:  We are at an hour.  Do

10    you want to stop now or...

11            MR. SMITH:  This won't take long.

12    BY MR. SMITH:

13        Q.  Do you recall ever hearing in 2018 of an

14    incident where Intuit may have sent sensitive

15    data to Meta?

16            MS. HAUSKNECHT:  Objection.  Scope.

17            THE WITNESS:  Sorry, just looking at the

18    exhibit for a second.

19    BY MR. SMITH:

20        Q.  Yeah.  Of course.

21        A.  No, not that I recall.

22        Q.  Okay.  Do you know if Meta ever

23    prevented Intuit ever prevented Intuit from using

24    the Pixel after 2018?

25            MS. HAUSKNECHT:  Objection.  Scope.

HIGHLY CONFIDENTIAL

Page 156

1           THE WITNESS:  I do not know.

2     BY MR. SMITH:

3           Q.  I want to direct your attention to

4     Exhibit 150, first page.  Near the bottom about

5     25 percent up from the bottom -- actually, strike

6     that.

7                 The -- there's a section in the middle

8     of 150 that appears to be some form of stock

9     notification.  Is that what seems -- does it seem

10    to be that to you as well?

11                MS. HAUSKNECHT:  Objection.  Scope.

12    Calls for speculation.

13                THE WITNESS:  I see the section that

14    begins with "client email."  And "subject

15    important notice from Facebook Pixel team," yes.

16    BY MR. SMITH:

17          Q.  And do you recall whether or not in 2018

18    Meta had sort of a stock notification to send to

19    clients if there was concern about the

20    information that they were transmitting?

21                MS. HAUSKNECHT:  Objection.  Scope.

22    Calls for speculation.

23                THE WITNESS:  I do not know.

24    BY MR. SMITH:

25          Q.  Okay.  So back to what I was originally

HIGHLY CONFIDENTIAL

Page 157

1  going to ask you a moment ago.  About 20 or

2  25 percent up from the bottom, you will see a

3  sentence that reads (as read):

4  ████████████████████████████

▋  ██████████████████████████████████████

▋  ██████████████████████████████████

▋  ██████████████████████████

8            Do you see that?

9       A.  Yes.

10      Q.  Now the first part of that sentence ████

▋  ██████████████████████████████████████

▋  ████████████████████████████████████████████

▋  ████████████

14           MS. HAUSKNECHT:  Objection.  Scope.

15  Calls for speculation.

16           THE WITNESS:  I do not know specifically

17  as it relates to the context of the email.  But

18  generally, the process being described of

19  monitoring the implementation of our technologies

20  is standard practice in the ordinary course of

21  business for Meta.

22  BY MR. SMITH:

23      Q.  And does that remain a true statement

24  today, in 2025?

25      A.  Yes.

HIGHLY CONFIDENTIAL

Page 158

1      Q.   And that's been the standard practice
2   during the whole seven-year period between 2018
3   and 2025; correct?
4      A.   Yes.
5      Q.   Now skipping ahead in time to midyear
6   2022, say June 2022 approximately, as of that
7   date, did Meta have some kind of system in place
8   to ████████████████████████████████████████
█   ████████████████████████████████
10     A.   Meta ████████████████████████████████████
█   ████████████████████████████████████
█   ██████████████████████████████████████████████
█   ██████████████████████████████████████████████
█   ██████████████████████████████████████████
█   ████████████████████████████████████████
█   ██████████████████████████████████████████████
█   ████████████████████████████
18     Q.   Did it have that same system back in
19   2018?
20          MS. HAUSKNECHT:   Objection.   Vague.
21          THE WITNESS:   Meta ████████████████████
█   ██████████████████████████████████████████████
█   ████████████████████████████████████████████
█   ██████████████████████████████████████
25   Generally, Meta makes, in the ordinary course of

HIGHLY CONFIDENTIAL

Page 159

1  business, like progressive improvements to

2  systems that we maintain.

3          And this included an ▆▆▆▆▆▆

▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆  ▆▆▆▆▆▆▆▆▆▆

7  BY MR. SMITH:

8          Q.  Can you tell me a little bit about how

9  the filter -- filter systems worked as of

10  ▆▆▆▆▆▆

11         A.  Yes.

12         Q.  Please do.

13         A.  The filtration system ▆▆▆▆▆▆▆

▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

21         Q.  How would the filter ▆▆▆▆▆▆▆

▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆  ▆▆▆▆▆▆▆▆▆▆

24         A.  Meta -- one of the techniques Meta

25  employs in this filtering is we class using

HIGHLY CONFIDENTIAL

Page 160

1  machine learning techniques, the specific

2  domains -- and generally domains and apps into

3  various categories, which is used as an input to

4  help enhance the filtering that is applied to the

5  Event Data.

6      Q.  So in that circumstance, the machine

7  learning would analyze the data coming in and

8  make a decision about whether to filter or not?

9      A.  The -- in the description I had

10  provided, machine learning is applied to the

11  contents of the domain or the website that is

12  separately crawled to help with determining the

13  categories of topics on the website, on the

14  domain, which is then used to inform the

15  filtering that is applied to Event Data from that

16  domain in the future, from our business tools.

17      Q.  In that scenario you just described,

18  what kind of contents of the domain or website is

19  the machine learning looking at?

20      A.  I don't recall specifically, but

21  generally, as I understand, the -- the machine

22  learning model looks at contents from the domain

23  or landing page of the domain and the website in

24  general, and uses that to build features that is

25  then used to train the model, evaluate its

HIGHLY CONFIDENTIAL

Page 172

1  Event Data is stored typically retains the data

2  for about 90 days.

3  BY MR. SMITH:

4      Q.  Okay.  And other HIVE tables, do they

5  retain the data, or at least some of the data,

6  for a longer period or a shorter period or a

7  combination of both?

8          MS. HAUSKNECHT:  Objection.  Scope.

9  Vague.

10          THE WITNESS:  And to clarify, by other

11  "HIVE tables," are you referring to tables other

12  than what I described as being the primary

13  tables --

14  BY MR. SMITH:

15      Q.  Uh-huh.

16      A.  -- that were in the scope of this?

17          MS. HAUSKNECHT:  Objection.  Scope.

18  Vague.

19          THE WITNESS:  Event Data that may be

20  stored in tables, other than the primary tables,

21  would be ████████████████████████████████████

   ████████████████████████.

23          So that the data would not be stored for

24  a longer period of time or novel -- different

25  data would not be stored elsewhere from the

Page 173

1    Events Data that we receive outside of what's in
2    the primary tables.
3    BY MR. SMITH:
4        Q.  So is 90 days generally the longest
5    period of time that Event Data is retained in the
6    ordinary course?
7        A.  In the ordinary course of business, yes.
8    There may be circumstances where Event Data can
9    be retained for a longer period of time.
10       Q.  Why doesn't Meta keep the Event Data for
11   longer periods of time?
12           MS. HAUSKNECHT:  Objection.  Scope.
13   Calls for speculation.
14           THE WITNESS:  I can't say specifically as
15   it retains -- as it pertains to Event Data, but
16   generally, Meta has retention policies associated
17   with different kinds of data and how long those
18   data can be stored for that we respect and we
19   uphold.
20   BY MR. SMITH:
21       Q.  Have you seen or heard any
22   communications within Meta discussing whether
23   Meta should extend its retention period to avoid
24   any destruction of evidence?
25       A.  Could you repeat the last part?

HIGHLY CONFIDENTIAL

Page 174

1              MS. HAUSKNECHT:   Object --

2              THE WITNESS:   Sorry.  Can you repeat the

3     last part of your question.

4     BY MR. SMITH:

5         Q.  Are you aware of anyone -- well, strike

6     that.

7              Have you seen or heard any

8     communications within Meta discussing whether

9     Meta should extend its retention period to avoid

10    any destruction of evidence?

11             MS. HAUSKNECHT:   Objection.  Outside the

12    scope.

13             And I would also instruct you not to

14    discuss any privileged communications with

15    counsel.

16             THE WITNESS:   Not that I am aware, no.

17             THE REPORTER:   153.

18             (Plaintiff's Exhibit 153 was marked for

19             identification.)

20    BY MR. SMITH:

21        Q.  So you have in front of you a document

22    that's been marked Exhibit 153.  It apparently is

23    a letter from ███████████████████████████

      ████████████████████████████████████████████

      ████████████████████████████████████████

HIGHLY CONFIDENTIAL

                                              Page 175

1    Pixel.

2              Did Meta comply with the request in the

3    letter that's been marked Exhibit 153?

4              MS. HAUSKNECHT:  Object to scope.

5              THE WITNESS:  I'm not certain about what

6    and whether there were follow-ups associated with

7    this email.

8    BY MR. SMITH:

9        Q.  I take it then by the same token you

10   don't know whether Meta ever ███████████████

     █    ████████████████████████████████████████

12             MS. HAUSKNECHT:  Objection.  Scope.

13             THE WITNESS:  No, I do not know if there

14   were any such responses to -- to this email.

15   BY MR. SMITH:

16       Q.  Do you understand the difference between

17   Automatic Event, Standard Events, and Custom

18   Events?

19       A.  Yes.

20       Q.  Is it correct to say that automatic and

21   Standard Events are events that are defined by

22   Meta and that can be used to track user

23   activities on websites?

24       A.  I would describe them slightly

25   differently, largely that automatic and Standard

HIGHLY CONFIDENTIAL

Page 201

1    article was released.
2    BY MR. SMITH:
3        Q.   When you saw it, did someone at Meta
4    suggest that you read it?
5            MS. HAUSKNECHT:  Objection.  Scope.
6            Also, give a privilege instruction.
7            THE WITNESS:  Not that I recall, no.
8    BY MR. SMITH:
9        Q.   Do you recall reading anything in the
10   article that you disagreed with?
11           MS. HAUSKNECHT:  Objection.  Scope.
12           THE WITNESS:  Again, as I mentioned, I
13   don't recall reading the article generally, so I
14   do not -- I do not remember.
15   BY MR. SMITH:
16       Q.   Okay.  Has anyone at Meta told you that
17   the information contained in The Markup article
18   is false?
19           MS. HAUSKNECHT:  Objection.  Scope.
20           Also, continue to give you a privilege
21   instruction in terms of any discussions with
22   counsel.
23           THE WITNESS:  I do not recall having
24   discussions relating to this article in general,
25   no.

HIGHLY CONFIDENTIAL

Page 202

1    BY MR. SMITH:

2        Q.   Do you know if anyone at Meta ever tried

3    to determine whether anything said in The Markup

4    article was correct?

5            MS. HAUSKNECHT:  Objection.  Scope.

6            THE WITNESS:  I do not know specifically,

7    no.

8    BY MR. SMITH:

9        Q.   If such an effort had been made, would

10   you anticipate someone from the Signals

11   department would have been involved with that

12   effort?

13           MS. HAUSKNECHT:  Objection.  Scope.

14   Misstates testimony.  Calls for speculation.

15           THE WITNESS:  It would depend on the

16   nature of what's -- of what's being investigated

17   and how it's conducted, so I can't say for sure.

18   BY MR. SMITH:

19       Q.   Can you think of any other departments,

20   apart from Signals, that would be a logical

21   choice to investigate whether or not anything in

22   the Markup article was accurate?

23           MS. HAUSKNECHT:  Objection.  Scope.

24           THE WITNESS:  There are multiple

25   different functions of job titles and teams at

Page 203

```
 1    Meta that I -- I would imagine would be involved
 2    in generally answering questions and looking at
 3    doing similar investigations, which I have
 4    described.  So I wouldn't be able to guess on
 5    specific teams or functions that would be
 6    involved.
 7              THE REPORTER:  158.
 8              (Plaintiff's Exhibit 158 was marked for
 9              identification.)
10              MS. HAUSKNECHT:  Counsel, I don't see a
11    Bates stamp on this document.
12              MR. SMITH:  Yeah, it's just pulled from
13    the Internet.
14              MS. HAUSKNECHT:  Do you have a url?
15              MR. SMITH:  No.  I think Meta knows about
16    this document.
17    BY MR. SMITH:
18         Q.  Have you seen the document that's been
19    marked Exhibit 158 before?
20              MS. HAUSKNECHT:  Objection.  Scope.
21              THE WITNESS:  No.
22    BY MR. SMITH:
23         Q.  Have you heard anything within Meta
24    discussing a leaked memo describing privacy
25    issues at Meta?
```

HIGHLY CONFIDENTIAL

Page 204

```
 1            MS. HAUSKNECHT:  Objection.  Scope.  I'll
 2    also give a privilege instruction.
 3            THE WITNESS:  I do not recall, no.
 4    BY MR. SMITH:
 5       Q.  Is it common at Meta to use brackets
 6    with "A/C Priv" on documents that are intended to
 7    be privileged?
 8            MS. HAUSKNECHT:  Objection.  Scope.
 9            THE WITNESS:  I would not refer to that
10    as being a common practice, but when, under the
11    advisement of counsel, if the topics relate to
12    discussions that require legal advice or input,
13    documents may be marked in this fashion.
14    BY MR. SMITH:
15       Q.  Have you --
16       A.  Excuse me.
17       Q.  Have you ever used that notation on an
18    email?
19            MS. HAUSKNECHT:  Objection.  Scope.
20            THE WITNESS:  On an email, you asked?
21    BY MR. SMITH:
22       Q.  Uh-huh.
23       A.  I do not recall, no.
24       Q.  How about a memo or other type of
25    written document?
```

HIGHLY CONFIDENTIAL

1          MS. HAUSKNECHT:  Objection.  Scope.

2          THE WITNESS:  I believe I have, yes.

3   BY MR. SMITH:

4      Q.  Have you ever done that for a document

5   that was not intended to be reviewed by a lawyer?

6          MS. HAUSKNECHT:  Objection.  Scope.

7   Asked and answered.  Argumentative.  Harassing.

8          THE WITNESS:  No.  As I described

9   earlier, it is generally used to mark documents

10  or forms where the topics are intended -- are

11  seeking input from counsel.

12  BY MR. SMITH:

13     Q.  Have you ever received an email

14  internally from Meta that used the notation "A/C

15  Priv," but there was no lawyer on the email?

16         MS. HAUSKNECHT:  Objection.  Scope.

17         THE WITNESS:  I can't recall.

18  BY MR. SMITH:

19     Q.  Is it common in Meta to use the word

20  "privilege" as a verb as in privileging an email?

21         MS. HAUSKNECHT:  Objection.  Scope.  Lack

22  of foundation.  Asked and answered.

23         THE WITNESS:  I do not know, and haven't

24  heard that.

25  BY MR. SMITH:

HIGHLY CONFIDENTIAL

Page 206

1       Q.   I want to direct your attention to

2   page 1 of Exhibit 158.  Underneath the executive

3   summary you will see four bullet points -- no,

4   I'm sorry, five, and I just want to direct your

5   attention to the third one.

6            It says (as read):

7   ████████████████████████████████████████

    ████████████████████████████████████████

    ████████████████████████████████████████

    ████████████████████████████████████████

    ████████████████████████████████████████

    ████████████████████████████████████████

13           Do you see that?

14      A.   Yes.

15      Q.   Do you agree or disagree with that

16   statement?

17           MS. HAUSKNECHT:  Objection.  Scope.

18           THE WITNESS:  I do not know the context

19   with which the terms such as ████████████████

    ████████████████████████████████████████

    █████████████████████████████" are being used for this

22   document, as I haven't seen this document before.

23   BY MR. SMITH:

24      Q.   So you're unable today to express any

25   opinion about that statement that I read to you?

HIGHLY CONFIDENTIAL

Page 208

1    Data, we receive as it's set up by the developer,

2    in addition to the admission -- or the acceptance

3    of the user of the business tool to not send

4    potentially sensitive information or information

5    that's not in compliance with the terms of

6    service, Meta does have systems in place to

7    ensure that, proactively, information that's not

8    in compliance with the terms of services is

9    detected and subsequently filtered out and has --

10   has control over those systems generally.

11           Again, I do not understand to which

12   specific data are you referring to.  I'm happy to

13   answer if you have like -- if you can help

14   clarify what particularly you're describing.

15       Q.  Do you believe in -- as of 2020 Meta

16   systems to ensure that information that is not in

17   compliance with the terms of service is -- was

18   detected and filtered out, was adequate?

19           MS. HAUSKNECHT:  Objection.  Vague.

20   Scope.  Misstates testimony.

21           THE WITNESS:  Generally the systems,

22   including the filtering systems to which you

23   describe in your question, that detect and filter

24   out potentially sensitive information that Meta

25   has, again, proactively built on top of what is

HIGHLY CONFIDENTIAL

1    ultimately the developer's responsibility, did

2    continue to operate or function as expected even

3    during the -- during 2020.

4    BY MR. SMITH:

5        Q.   Were those systems you just described

6    adequate in 2021?

7            MS. HAUSKNECHT:  Objection.  Scope.

8    Vague.

9            THE WITNESS:  And just to clarify by when

10   you use the term "adequate," you mean functioning

11   as expected of the system -- the system is

12   functioning as it was intended to?

13   BY MR. SMITH:

14       Q.   No.  By "adequate," sufficient to

15   reliably block the transmission of sensitive

16   information that violated Meta's tools?

17       A.   Okay.  Thank you for clarifying.

18           MS. HAUSKNECHT:  Objection.  Scope.

19           THE WITNESS:  As I mentioned earlier, the

20   reason I have described our systems in the

21   context of what it detects and filters as

22   potentially sensitive or being potentially

23   sensitive is, ███████████████████████████████

     ███████████████████████████████████████████████

     ███████████████████████████████████████████████

HIGHLY CONFIDENTIAL

Page 217

1  STATE OF CALIFORNIA

2

3  REPORTER'S CERTIFICATE

4

5       I, EARLY LANGLEY, a Shorthand Reporter,

6  State of California, do hereby certify:

7       That AMLESH JAYAKUMAR, in the foregoing

8  deposition named, was present and by me sworn as

9  a witness in the above-entitled action at the

10 time and place therein specified;

11      That said deposition was taken before me

12 at said time and place, and was taken down in

13 shorthand by me, a Certified Shorthand Reporter

14 of the State of California, and was thereafter

15 transcribed into typewriting, and that the

16 foregoing transcript constitutes a full, true and

17 correct report of said deposition and of the

18 proceedings that took place;

19       That before completion of the

20 proceedings, review of the transcript was not

21 requested.

22       IN WITNESS WHEREOF, I have hereunder

   subscribed my hand this July 17, 2025.

23

24

       EARLY LANGLEY, CSR NO. 3537

25       State of California

# FILED UNDER SEAL

**EXHIBIT 14**



Message

| | |
|---|---|
| **From:** | Rachana Mansinghka ▮▮▮▮▮▮ |
| **Sent:** | 5/18/2018 4:52:28 PM |
| **To:** | Lisa Willett ▮▮▮▮▮▮ Jennifer D. Stalley ▮▮▮▮▮▮ |
| **BCC:** | Gowri Rao Krishnamurthy ▮▮▮▮▮▮ |
| **Subject:** | Notification about your client's Pixel implementation – action required |
| **Attachments:** | image001.png |

**Importance:** High

Hello Lisa & Jennifer,

This is a note from the Facebook Signals Integrity team. You're receiving this because your client's Pixel has been identified as sending us data that violates our <u>Terms of Service</u>. Could you please reach out to your client Intuit Inc., with the below email. This is about the following Pixels ID: 1987284848179970 associated with the following Ad Account: ▮▮▮▮▮▮

If you have any questions, please read the **FAQ** below.

=== Client Email====

### Subject: Important notice from Facebook Pixel team

Hi [Client],

Our aim is to help advertisers efficiently achieve their business goals while also maintaining a good consumer experience for people on Facebook. Therefore we have <u>Terms of Service</u> which you accept by using our tools such as Pixel, SDK & APIs.

Your business has been identified as sending us data that violates our terms of service. As a reminder, our Terms prohibit sharing:
*"information that you know or reasonably should know is from or about children under the age of 13 or that includes health, financial, or other categories of sensitive information (including any information defined as sensitive under applicable law)."*

Examples of such data include certain government identifiers such as social security numbers, home addresses, first name, last name, date of birth, email addresses, and passwords. Accordingly, we advise you to check your Pixel implementation and make sure you are only sending us data that complies with our Terms. Any data that is sent to us in violation of our Terms is removed from our system.

We continuously monitor the implementation of our technologies and thank you for your quick response in addressing this matter.

Facebook Ads team

## == Internal Sales FAQS ==

### Q: How will this impact my client?
At this stage this does not impact your client's campaign setup or performance as such. Our systems are setup to flag any "sensitive" data and delete it. So, this is just to notify your clients that their pixel setup needs



review so they can stop sending us this data.

**Q: Does this impact my client's campaigns?**
No. This does not impact any campaign performance as Facebook does not store or use this data. We delete it as it violates our terms.

**Q: What exactly is the "sensitive" data that my client is sending? Can you share more so I can ask them to fix it?**
Our machine learning algorithms identify data that is in violation of our terms and flag the accounts to us. At this stage we're unable to provide the exact data being sent by each client. However some examples of "sensitive" data include certain government identifiers such as social security numbers, home addresses, first name, last name, date of birth, email addresses, and passwords. Please request your client to review their entire Pixel implementation and ensure they stop sending any sensitive data.

**Q: Who is the Signals Integrity team? And what do they do?**
Signals Integrity is a newly formed team within the Measurement Org. Their mission is to ensure usage of all our signal sources (Pixel, Events SDK & Offline Conversions API) is compliant with our Terms of Service. This is ongoing stream of work to ensure we can help advertisers efficiently achieve their business goals while also maintaining a good consumer experience for people on Facebook.

=============

For any further questions feel free to reply to this email.

Thanks

--
**Rachana Mansinghka** | MPMM
p
c
f

# FILED UNDER SEAL

**EXHIBIT 15**

Message

From:        Victoria Chen Norland [/O=THEFACEBOOK/OU=EXTERNAL
             (FYDIBOHF25SPDLT)/CN=RECIPIENTS/CN=C82A141FC9DD45ECA82CFFE8231D7A90]
Sent:        11/15/2022 3:56:18 PM
To:          Max Nelson                        Victoria Chen Norland
Subject:     Message summary [{"otherUserFbId":100077404158439,"threadFbId":null}]


Victoria Chen Norland (11/15/2022 09:54:16 PST):
>Hey Max - know Dale added both of us to the  pixel chats. Will try to catch up but feel like we can
probably repurpose a lot of the same language we've used before re: pixel -
https:/█████████████████████████████████████████████████████

Max Nelson (11/15/2022 09:55:08 PST):
>sounds good - I just did a quick read through the chat. Sounds like they are still kind of in the
discovery phase right now, but good to have that on hand if we need to pull together a client statement

Max Nelson (11/15/2022 09:55:33 PST):
████████████████████████████████████████████ ██████████ d kind of be: ████████████████
██████████████████████████████████████████████████        █████████████████████████

Max Nelson (11/15/2022 09:55:49 PST):
>so we may not need to pull anything together for a while

Victoria Chen Norland (11/15/2022 09:59:17 PST):
>yup, pretty much, although I think we can lean on the existing Pixel messaging I shared for a client
████████████████████████████████████████████████████████████████████████████████

Victoria Chen Norland (11/15/2022 14:53:46 PST):
>Hey there - have you been syncing with Dale re: ████████████████████████████████████
been following along, but feels like that's something that we wown?

Max Nelson (11/15/2022 14:57:10 PST):
>i've been following along too, but haven't really had many side chats with him on this

Max Nelson (11/15/2022 14:57:27 PST):
>was basically just thinking I would attend the 9am PT meeting tomorrow for a deeper download

Max Nelson (11/15/2022 14:57:45 PST):
>but yeah - ██████████████████████████████████████████████████████████████████
█████████████████████

Max Nelson (11/15/2022 15:05:43 PST):
>I'm happy to lead on this from our team and I'll work with Dale and Growth. Curious to see what we've
said to clients in situations like this in the past. but I'm sure we have that somewhere. Sort of a fine
████████████████████████████████████████████████████████████████████████████████

Victoria Chen Norland (11/15/2022 15:06:24 PST):
>Thanks - ideally wouldn't wait until 9am. I would probably reach out to Dale now to see his thoughts on
what we can get started now. i think we have a ██████████████████████████████████ me
chase this down for you, but most important is ██████████████████████████████████████

Max Nelson (11/15/2022 15:10:54 PST):
>hey - got the recent client comms

Max Nelson (11/15/2022 15:11:38 PST):
██████████████████████████████████████ and we included an example of what we sent to a client

Victoria Chen Norland (11/15/2022 15:18:32 PST):
>Great let me see if we have anything else

Max Nelson (11/15/2022 15:25:57 PST):
>cool - Dale just called me. This is a tough one. I guess the core issue is that when someone uses
████████████████████████████████████████████████████████████████████████████████

EXHIBIT

156

CONFIDENTIAL                                                            PIXEL_TAX000023123

Victoria Chen Norland (11/15/2022 15:29:34 PST):

Victoria Chen Norland (11/15/2022 15:31:39 PST):

Victoria Chen Norland (11/15/2022 15:43:01 PST):
>FYI - here's some old language we used for proactive client outreach re: sending us potentially
sensitive data: https://

Victoria Chen Norland (11/15/2022 15:43:23 PST):
                                                    nd could be useful to lean on (although
likely will need to be updated given age)

Max Nelson (11/15/2022 15:44:00 PST):
>haha - yeah, could tell it was a little old when I saw Quip

Victoria Chen Norland (11/15/2022 15:44:01 PST):
>but some of the more recent language re

Max Nelson (11/15/2022 15:44:03 PST):
>but helpful for sure

Max Nelson (11/15/2022 15:44:20 PST):
>do you know if there is a way for us to

Max Nelson (11/15/2022 15:44:31 PST):

Victoria Chen Norland (11/15/2022 15:44:46 PST):

Max Nelson (11/15/2022 15:44:47 PST):

Victoria Chen Norland (11/15/2022 15:45:05 PST):
>so we do put the onus on advertisers to check - esp. since it's in our Business Tools Terms

Max Nelson (11/15/2022 15:45:15 PST):
>yeah - I know overall it's on them

Max Nelson (11/15/2022 15:45:24 PST):
>but just wondering if there is

Victoria Chen Norland (11/15/2022 15:45:28 PST):

Victoria Chen Norland (11/15/2022 15:45:39 PST):

Max Nelson (11/15/2022 15:45:59 PST):

Max Nelson (11/15/2022 15:46:21 PST):
>"could a reporter say" I mean

Max Nelson (11/15/2022 15:46:35 PST):

Max Nelson (11/15/2022 15:46:47 PST):

CONFIDENTIAL

Max Nelson (11/15/2022 15:47:00 PST):

Victoria Chen Norland (11/15/2022 15:47:01 PST):
>that's why i think we need to frame it as part of a story –

Victoria Chen Norland (11/15/2022 15:47:13 PST):

Victoria Chen Norland (11/15/2022 15:48:28 PST):
>I think we can lean into existing messaging: "In certain cases, you may see that your custom data was
not displayed and has been removed by our signal filtering mechanism. If Meta's signals filtering
mechanism detects Business Tool data that it categorizes as potentially sensitive health-related data,
the filtering mechanism is designed to prevent that data from being ingested into our ads ranking and
optimization systems."
>
>(but in this case don't think it was filtered

Max Nelson (11/15/2022 15:53:37 PST):
>yeah – at the most basic level, the opening sentence of the doc you shared ("your app is still sharing
potentially sensitive data", protects us a little bit

Victoria Chen Norland (11/15/2022 15:56:18 PST):
>Yup. That language was crafted to not demonstrate full knowledge on our side one way or another because
the onus sits on the advertiser to know the data

CONFIDENTIAL

# FILED UNDER SEAL

**EXHIBIT 16**

# FILED UNDER SEAL

**EXHIBIT 17**

# FILED UNDER SEAL

**EXHIBIT 18**

# FILED UNDER SEAL

**EXHIBIT 19**

CONFIDENTIAL

Page 1

1                    UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                      SAN FRANCISCO DIVISION

4    IN RE META PIXEL HEALTHCARE    ) Case No.   3:22-cv-3580-WHO (VKD)

     LITIGATION                     )

5                                   )

     _____    )

6                                   )

     This Document Relates to:      )

7    All Actions.                   )

     _____    )

8

9             CONFIDENTIAL VIDEOTAPED VOLUME I

10              DEPOSITION OF AMLESH JAYAKUMAR

11                San Francisco, California

12                Wednesday, May 21, 2025

13

14

15             REPORTED BY: Derek L. Hoagland

16                  CSR No. 13445

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 7

1    A.        It's Amlesh Jayakumar.

2    Q.        In what state and city do you reside?

3    A.        I currently stay in San Francisco, California.

4    Q.        Is that where you expect to reside for the next

5    six months or so?

6    A.        To the best of my knowledge, yes.

7    Q.        Okay.  Have you been deposed before?

8    A.        Yes.

9    Q.        How many times?

10   A.        About four times.

11   Q.        Were those four times for cases involving Meta?

12   A.        Yes.

13   Q.        All four?

14   A.        Yes.

15   Q.        When you testified in those cases, did you ever

16   testify on behalf of Meta?

17   A.        Yes.

18   Q.        How many of those times were on behalf of Meta?

19   A.        All four.

20   Q.        And I don't care to know the details of those

21   cases, but just so I can know which ones they are, can

22   you just tell me a little bit about each of them?

23   A.        I can tell you general details about this.

24   There's specifics if you would like to know.

25   Q.        Just names of the cases or names of the

CONFIDENTIAL

Page 8

1   plaintiffs or what the issue was.

2           MS. ROGERS:  Object to form.

3           THE DEPONENT:  I don't recall specifically,

4   sitting here today, but they were generally related to

5   video privacy-related matters where Meta was a third

6   party.

7   BY MR. TACK-HOOPER:

8   Q.      I'm sorry.  What was the word that came before

9   "privacy"?

10  A.      Video.

11  Q.      Video privacy.

12          Do you understand you have been designated to

13  testify on behalf of Meta today?

14  A.      Yes.

15  Q.      Very generally, what is core setup?

16  A.      Core setup is a set of restrictions that may

17  apply to event data from a Meta business tool that can

18  be applied by the developer or by Meta wherein specific

19  event data fields, unstructured or freeform data, may be

20  filtered prior to the transmission of the event data to

21  Meta.

22  Q.      Great.  So situate us in time.  When did

23  development on core setup begin?

24          MS. ROGERS:  Object to form.

25          THE DEPONENT:  The initial development and

CONFIDENTIAL

Page 9

1    launch of core setup occurred around July 2023 and the

2    months leading up to it.

3    BY MR. TACK-HOOPER:

4    Q.    I think I understand from your answer, but I

5    want to clarify, and so correct me if I'm wrong, that

6    the development happened close in time to the launch.

7    Is that correct?

8          MS. ROGERS:  Object to form.

9          THE DEPONENT:  Yes.  The development occurred in

10   the months leading up to the initial launch, which

11   occurred in July, around July 2023.

12   BY MR. TACK-HOOPER:

13   Q.    You described in that answer the initial launch,

14   and I understand that some Meta products are sort of

15   rolled out in such a way that there's a little bit of

16   safeguard in case something goes wrong.  In terms of the

17   initial intended scope of the launch, what -- when was

18   the 100 percent launch?

19         MS. ROGERS:  Object to form.

20         THE DEPONENT:  Generally in the ordinary course

21   of business, as Meta launches products or systems, we go

22   through multiple phases, including testing the launch

23   and continuous improvement of this product.  Core setup

24   as initially was launched around July 2023, and the

25   initial launch was concluded around July 2023 as well,

CONFIDENTIAL

Page 10

1    as was initially scoped.

2    BY MR. TACK-HOOPER:

3    Q.      How did Meta identify health-related websites to

4    place into core setup prior to its launch?

5          MS. ROGERS:  Object to form.

6          THE DEPONENT:  The initial launch of core setup

7    ████████████████████████████████████████████

     ████████████████████████████████████████

     ████████████████████████████

10   BY MR. TACK-HOOPER:

11   Q.      Which ████████████████was used for the

12   purpose of identifying the ████████████████?

13         MS. ROGERS:  Object to form.

14         THE DEPONENT: ████████████████████

     ████████████████████.

16   BY MR. TACK-HOOPER:

17   Q.      And so what I mean by my question is, it's my

18   understanding that there are many different sales

19   verticals and subverticals.  Was there a particular set

20   of verticals or subverticals that was used for the

21   identification of health-related websites to place into

22   core setup prior to its launch?

23         MS. ROGERS:  Object to form.

24         THE DEPONENT: ████████████████████

     ████████████████████████████████████████

Page 17

1    which is whether Meta has ever required them to say

2    whether they are a healthcare provider at the time of

3    installing the pixel.

4            MS. ROGERS:  Object to form.

5            THE DEPONENT:  In addition to accepting our

6    business tool terms, I do not believe that developers

7    are required to categorize their -- themselves or their

8    tools in a manner that associates it with categories

9    such -- including health.

10   BY MR. TACK-HOOPER:

11   Q.      Has that ever been something that's been

12   considered by signals integrity given the challenges

13   involved in Meta classifying it on your end?

14           MS. ROGERS:  Object to form, and I'll instruct

15   the witness not to answer as to any discussions with

16   counsel that may have occurred.

17           THE DEPONENT:  Not that I'm aware.

18   BY MR. TACK-HOOPER:

19   Q.      So I want to ask about some types of data and

20   whether core setup blocks transmission of them to Meta.

21   So when I ask, does core setup block something, what I

22   mean is, does it prevent it from being sent from client

23   side to Meta's server side.

24           Does that make sense?

25           MS. ROGERS:  Object to form.

CONFIDENTIAL

Page 18

1          THE DEPONENT:  Yes.

2     BY MR. TACK-HOOPER:

3     Q.     Okay.  Does core setup block the domain where an

4     event fires from?

5          MS. ROGERS:  Object to form.

6          THE DEPONENT:  As part of the restrictions that

7     comprise core setup, any URLs that is configured to be

8     transmitted via the business tool that's within scope of

9     core setup will see its URLs truncated or parts after

10    the domain be filtered or dropped prior to the

11    transmission of this event data.

12    BY MR. TACK-HOOPER:

13    Q.     And so I just want to make sure I understand

14    your answer.  While core setup truncates the information

15    after the domain, the domain itself is still transmitted

16    for an entity in core setup.  Is that right?

17         MS. ROGERS:  Object to form.

18         THE DEPONENT:  The core setup restrictions does

19    not prevent the domain from being transmitted and

20    filters out parts after the domain.  Whether the domain

21    is indeed transmitted or not, I can't speak on behalf of

22    the developer.  It depends on various factors, which

23    largely surround the configuration of the business tool.

24    BY MR. TACK-HOOPER:

25    Q.     I understand.  So if the domain's not

Page 19

1  transmitted, it's not core setup that's blocking it.  Is

2  that fair?

3          MS. ROGERS:  Object to form.

4          THE DEPONENT:  As I described earlier, core

5  setup as it pertains to URLs that may be configured to

6  be sent filtered out aspects, parts of the URL after the

7  domain, yes.

8  BY MR. TACK-HOOPER:

9  Q.    Does core setup block the transmission of

10  standard events?

11         MS. ROGERS:  Object to form.

12         THE DEPONENT:  The blocking or filtering of

13  standard events is not part of the restrictions that

14  comprise of core setup.

15  BY MR. TACK-HOOPER:

16  Q.    Does core setup block the values of standard

17  parameters in events?

18         MS. ROGERS:  Object to form.

19         THE DEPONENT:  Filtering of values or parameters

20  associated with standard parameters is not part of the

21  restrictions that is core setup.

22  BY MR. TACK-HOOPER:

23  Q.    Does core setup block custom event names if the

24  names otherwise meet Meta's requirements?

25         MS. ROGERS:  Object to form.

CONFIDENTIAL

Page 49

1                    REPORTER'S CERTIFICATE

2

3    STATE OF CALIFORNIA              )    ss.

4    I, DEREK L. HOAGLAND, CSR #13445, State of California,

5    do hereby certify:

6    That prior to being examined, the witness named in the

7    foregoing proceeding was by me sworn to testify to the

8    truth, the whole truth and nothing but the truth;

9    That said proceeding was taken down by me by stenotype

10   at the time and place therein stated and thereafter

11   transcribed under my direction into computerized

12   transcription.

13   I further certify that I am not of counsel nor attorney

14   for nor related to the parties hereto, nor am I in any

15   way interested in the outcome of this action.

16   In compliance with section 8016 of the Business and

17   Professions Code, I certify under penalty of perjury

18   that I am a certified shorthand reporter with license

19   number 13445 in full force and effect.

20   Witness my hand this 10th of June, 2025.

21

22

     _____

23                    DEREK L. HOAGLAND, CSR #13445

24

25

# FILED UNDER SEAL

**EXHIBIT 20**

# FILED UNDER SEAL

**EXHIBIT 21**

# About core setup

Computer Help   Mobile Help ▾

➜ Share Article

At Meta, we have restrictions around the kinds of information businesses can share with us through our Meta Business Tools. We don't want or permit advertisers to use the Meta Business Tools to share information about people that is not allowed under our Meta Business Tools Terms. This includes information that may be considered sensitive (including any information defined as sensitive under applicable laws, regulations and regulations and applicable industry guidelines), or information that is otherwise not allowed under our terms.

Core setup is a set of data restrictions that can be applied to a Meta Business Tool by you or by Meta. There is an option in Meta Events manager that you can use to turn on data restrictions for the Meta Business Tool you are using.

Core setup restricts the transmission of custom parameters and anything in a URL following the domain.

While not a substitute for your own compliance mechanisms, core setup's data restrictions can help prevent the sharing of information that may not be allowed under our Meta Business Tools Terms.

## Types of data that are restricted for Meta Business Tools with core setup's data restrictions

The kinds of data that are restricted for Meta Business Tools with core setup applied are:

- **Custom parameters**: Standard parameters are fields that we have predefined for advertisers to include with their events. For example, value and currency parameters for a purchase event, or the content_id parameter for a view content event. If your parameter is not on the list of standard parameters, it's considered a custom parameter. Learn about standard and custom parameters.

- **Anything in a URL after the domain**: For example, the URL https://jaspersmarket.com/clothes/summer/dresses?item=10 would be shortened to "https://jaspersmarket.com/".

## What core setup's data restrictions mean for you

If you're using a Meta Business Tool that has core setup's data restrictions applied, you may see limitations to the following advertiser experiences:

### Custom audiences may not work as expected

Custom audiences may not work as expected if they rely on custom parameters or anything in a URL after the domain:

- Custom audiences that rely on custom parameters or URLs in their rules can't be prefilled and may take longer to populate or not be available.
- Custom audiences can't be created and won't update if they contain device rules, or aggregation values along with custom parameters or URLs.

Go to Audiences to review and update custom audiences.

### Ads may be affected

Your ad sets may be effected if a custom audience decreases, or can no longer be updated because your Meta Business Tool is in a core setup. You can either update your custom audience or create a new one for your ad sets. Go to Audiences to review and update custom audiences.

### Events Manager information may change

Information may be unavailable in Meta Events Manager and other surfaces. For example, custom parameters and anything in a URL after the domain. This includes Sampled activities and the test events tool. Go to Meta Events Manager to learn more.

### Automatic advanced matching may be unavailable

Automatic advanced matching may not be available if your Meta Business Tool is in a core setup. If automatic advanced matching is unavailable, you can set up advanced matching manually instead. Learn how to set up advanced matching manually on Meta for Developers.

### Meta Pixel catalog updates

Adding items to your catalog via Meta Pixel may no longer work. You can add items to your catalog manually instead. Learn about ways to add items to a catalog.

### Custom events need to be reviewed

Review custom web, app, and offline events that are sent through the Meta Business Tools. During your review, you choose which events to confirm and which events to block. You should only confirm custom events if the event data follows the Meta Business Tools Terms, you intend to send the custom event to Meta, and the event data is formatted correctly. You may use custom events that you confirm for advertising purposes such as in ad campaigns, custom conversions, and custom audiences. Learn how to review custom events in Meta Events Manager.

## Reasons why core setup's data restrictions may be turned on for a Meta Business Tool

Core set up data restrictions may be turned on for the Meta Business Tool for one of the following reasons:

1. Meta has determined that the data source falls under a data source category that requires core setup's data restrictions. Learn more About data source categories in Meta Events Manager.
2. You received multiple notifications that data you're sharing potentially goes against the Meta Business Tools Terms. Learn how to review blocked parameters in Meta Events Manager.
3. You have turned on core setup's data restrictions in Meta Events Manager. Learn how to turn data restrictions on and off in Meta Events Manager.

# FILED UNDER SEAL

**EXHIBIT 22**

# FILED UNDER SEAL

**EXHIBIT 23**

Message
_____

**From:**      Tobias Wooldridge ███████████████
**Sent:**      12/19/2022 12:27:31 PM
**To:**        Tobias Wooldridge ██████████ Mayur Pate ██████████
**Subject:**   Message summary [{"otherUserFbId":100013092369987, threadFbId :null}]


Mayur Patel (12/19/2022 08:37:26 PST):
>" Meta's filtering system is designed to detect, among other things, forms of potential personal
financial data,"

Mayur Patel (12/19/2022 08:37:44 PST):
>Our signals integrity does financial filtering too?

Tobias Wooldridge (12/19/2022 08:47:17 PST):
>It depends on which thing you're filterint

Tobias Wooldridge (12/19/2022 08:47:19 PST):
>filtering*

Mayur Patel (12/19/2022 08:48:41 PST):
>I mean do we filter on financial data?

Mayur Patel (12/19/2022 08:48:51 PST):
>it's pretty straight forward yes/no :)

Mayur Patel (12/19/2022 08:51:17 PST):
>Shall I tag you in the doc/response? or do you wanna chat live about this

Tobias Wooldridge (12/19/2022 09:01:28 PST):
>I can vc quickly

Tobias Wooldridge (12/19/2022 09:01:30 PST):
>Tagging is fine

Mayur Patel (12/19/2022 09:14:14 PST):
>Let me setup time later

Mayur Patel (12/19/2022 09:14:28 PST):
>Started getting my son ready

Mayur Patel (12/19/2022 12:19:09 PST):
>free now?

Tobias Wooldridge (12/19/2022 12:19:25 PST):
>yeah

Tobias Wooldridge (12/19/2022 12:19:27 PST):
>#fileazoom

Mayur Patel (12/19/2022 12:20:16 PST):
>#portalme

Tobias Wooldridge (12/19/2022 12:25:03 PST):
>https ███████████████████████████████

Mayur Patel (12/19/2022 12:25:16 PST):
>https:/ ████████████████████████████

Tobias Wooldridge (12/19/2022 12:27:31 PST):
>https:// █████████████████████████████

**EXHIBIT**

tabbies®   _151_

PIXEL_TAX000023047

# FILED UNDER SEAL

**EXHIBIT 24**

Message

**From:** Tobias Wooldridge [/O=THEFACEBOOK/OU=EXTERNAL (FYDIBOHF25SPDLT)/CN=RECIPIENTS/CN=EC801801655D4BC89FC36B17F4B08C14]
**Sent:** 1/15/2020 6:13:35 PM
**To:** Tobias Wooldridge ███████████████ ; Yu Pang ████████████ ; Tal Davidi ████████████████ ; Jason Han (Ads) ████████████ ]
**Subject:** Message summary [████████
**Attachments:** █████████████████████████████████

Jiaxin Han (1/15/2020 16:04:50 PST): ███ ████ █████ ███ ████ █ █ ██

Jiaxin Han (1/15/2020 16:17:59 PST): ██████████████████████ ██████████████████

Jiaxin Han (1/15/2020 16:18:12 PST): ███ ██ █ ███

Tal Davidi (1/15/2020 17:11:25 PST): ████ ██ ████ ████ ████ ███ ████ ██ ███ ███ ████ ███ ██ ████ ██ ██

Tal Davidi (1/15/2020 17:14:39 PST): ████ ███ ██████ ████

Jiaxin Han (1/15/2020 17:20:25 PST): ██████ █ ███ ███

Tobias Henry Wooldridge (1/15/2020 17:20:51 PST): ██ ██ ████ █ ██ ███?

Tobias Henry Wooldridge (1/15/2020 17:21:03 PST): ██ ████████████ ████ ███ ███ ████ █ █
█

Tobias Henry Wooldridge (1/15/2020 17:21:17 PST): >████

Yu Pang (1/15/2020 17:22:18 PST): ██ ████ ████ ███ ███ ████ █ █

Jiaxin Han (1/15/2020 17:22:40 PST): ████ ████ ███ ███ ██ ███ ██ ███ ██ ████ ███ ████ ██

Tobias Henry Wooldridge (1/15/2020 17:23:09 PST): ████ ███ █ ███ █ ── ██ ███ ██ ███ ███ ██ ██

Jiaxin Han (1/15/2020 17:23:48 PST): ██ ███ ██ ███ ██ ███ ███ ███ ██ ██

Jiaxin Han (1/15/2020 17:24:03 PST):
>that is my understanding

Yu Pang (1/15/2020 17:24:13 PST): ██ ████ ██ ███ ███ ███ ██ ██ ██ ██

Yu Pang (1/15/2020 17:24:57 PST):

PIXEL_TAX000023180



Jiaxin Han (1/15/2020 17:26:35 PST):

Tobias Henry Wooldridge (1/15/2020 17:27:01 PST):

Tobias Henry Wooldridge (1/15/2020 17:27:39 PST):

Jiaxin Han (1/15/2020 17:32:01 PST):
>https://developers.facebook.com/docs/marketing-api/audiences-api/

Jiaxin Han (1/15/2020 17:32:36 PST):

Tobias Henry Wooldridge (1/15/2020 17:32:49 PST):

Tobias Henry Wooldridge (1/15/2020 17:32:51 PST):
>https://

Jiaxin Han (1/15/2020 17:33:03 PST):

Tobias Henry Wooldridge (1/15/2020 17:33:27 PST):

Jiaxin Han (1/15/2020 17:36:05 PST):

Jiaxin Han (1/15/2020 17:37:40 PST):

Jiaxin Han (1/15/2020 17:38:00 PST):

Tobias Henry Wooldridge (1/15/2020 17:38:15 PST):
>yeah absolutely

Tobias Henry Wooldridge (1/15/2020 17:38:38 PST):

Jiaxin Han (1/15/2020 17:38:47 PST):
?

Tobias Henry Wooldridge (1/15/2020 17:38:48 PST):

Tobias Henry Wooldridge (1/15/2020 17:38:58 PST):

Tobias Henry Wooldridge (1/15/2020 17:39:09 PST):
>

Jiaxin Han (1/15/2020 17:39:20 PST):

Jiaxin Han (1/15/2020 17:40:03 PST):

Jiaxin Han (1/15/2020 17:40:49 PST):

Yu Pang (1/15/2020 17:43:33 PST):

PIXEL_TAX000023181



Tobias Henry Wooldridge (1/15/2020 17:43:47 PST):
>yeah, advertisers can poop any data they want into it :(

Tobias Henry Wooldridge (1/15/2020 17:43:49 PST):
>which they dop

Tobias Henry Wooldridge (1/15/2020 17:44:02 PST):

Tobias Henry Wooldridge (1/15/2020 17:44:15 PST):

Tobias Henry Wooldridge (1/15/2020 17:44:49 PST):
>We only use the values for identity matching; after which we drop them - so they're not valuable to

Yu Pang (1/15/2020 17:45:31 PST):
https:/

Jiaxin Han (1/15/2020 17:45:33 PST):

Yu Pang (1/15/2020 17:46:01 PST):

Jiaxin Han (1/15/2020 17:46:14 PST):

Tobias Henry Wooldridge (1/15/2020 17:46:51 PST):

Jiaxin Han (1/15/2020 17:46:53 PST):

Tobias Henry Wooldridge (1/15/2020 17:47:05 PST):

Tobias Henry Wooldridge (1/15/2020 17:47:25 PST):

Tobias Henry Wooldridge (1/15/2020 17:47:40 PST):

Jiaxin Han (1/15/2020 17:48:30 PST):

Jiaxin Han (1/15/2020 17:48:59 PST):

Jiaxin Han (1/15/2020 17:50:04 PST):

Jiaxin Han (1/15/2020 17:50:19 PST):

Yu Pang (1/15/2020 17:50:57 PST):
>

Jiaxin Han (1/15/2020 17:51:12 PST):
>https://developers.facebook.com/docs/marketing-api/audiences-api/ covers all the keys we support today
for PII



Tobias Henry Wooldridge (1/15/2020 17:51:22 PST):
>htt█

Tobias Henry Wooldridge (1/15/2020 17:51:28 PST):

Jiaxin Han (1/15/2020 17:52:12 PST):

█2020 17:53:06 PST):
>htt

Jiaxin Han (1/15/2020 17:53:09 PST):

Yu Pang (1/15/2020 17:53:18 PST):

Jiaxin Han (1/15/2020 17:53:33 PST):
>we have that part

Tobias Henry Wooldridge (1/15/2020 17:53:43 PST):
>█

Tobias Henry Wooldridge (1/15/2020 17:53:50 PST):

Tobias Henry Wooldridge (1/15/2020 17:53:51 PST):
>then we're done

Tobias Henry Wooldridge (1/15/2020 17:54:01 PST):

Jiaxin Han (1/15/2020 17:54:18 PST):
>got it, thanks!!

Jiaxin Han (1/15/2020 17:55:24 PST):

Yu Pang (1/15/2020 17:56:17 PST):

Tobias Henry Wooldridge (1/15/2020 17:56:40 PST):

Tobias Henry Wooldridge (1/15/2020 17:56:51 PST):

Tal Davidi (1/15/2020 17:58:52 PST):

(https://ou█

Tal Davidi (1/15/2020 17:59:37 PST):
>█

Tal Davidi (1/15/2020 18:00:26 PST):

Jiaxin Han (1/15/2020 18:00:36 PST):

Tal Davidi (1/15/2020 18:01:38 PST):

CONFIDENTIAL

>https:/ ██████████████████████████████████████████████

Jiaxin Han (1/15/2020 18:01:40 PST):
██ ██ ██ ████ ██ ██████ ██ ███ ██ ██ ██ █████ ██ ████ ███ █████

Jiaxin Han (1/15/2020 18:07:53 PST):
████████████ ██████ ██████ ██ ██████

Jiaxin Han (1/15/2020 18:08:19 PST):
██████ ██ ████████ ███ ██ ███ █████ █████

Jiaxin Han (1/15/2020 18:10:01 PST):
███ ███ ██ ████ ██ ████ ███ █████ ██ █████

Jiaxin Han (1/15/2020 18:10:10 PST):
███ ███ ft

Yu Pang (1/15/2020 18:11:09 PST):
██ ██ █████ █ █████ █████ ██ █ https:/ █████████████

Yu Pang (1/15/2020 18:11:30 PST):
███████ ███ ████ ████ █ ██████ ██ ██ █████ ██ ██ ████ ██████

Yu Pang (1/15/2020 18:12:19 PST):
████████ ██ ██ ████ ████████ ██ ██ █████ ██ ████ ██ █████ █

Jiaxin Han (1/15/2020 18:13:20 PST):
██████ █████ █████ ████ ██ ███ ██

Jiaxin Han (1/15/2020 18:13:35 PST):
████ ██ █████████ ██ ██ ███ █████

CONFIDENTIAL

# FILED UNDER SEAL

**EXHIBIT 25**

Message

**From**: Abhinav Anand [REDACTED]
**Sent**: 3/1/2023 5:27:54 PM
**To**: Charity Hemphill-Frierson [REDACTED]; Abhinav Anand [REDACTED] Samson Bekele

**Subject**: Message summary [{"otherUserFbId":null,"threadFbId":5927457537333113}]

Samson Bekele (3/01/2023 15:14:49 PST):
>Hi team - I need your help to make sure we popoulate our H1 goals in this sheet

Samson Bekele (3/01/2023 15:14:53 PST):
>https:/ [REDACTED]

Samson Bekele (3/01/2023 15:15:33 PST):
[REDACTED]

Charity Hemphill-Frierson (3/01/2023 15:17:51 PST):
>Okay. Let me get the [REDACTED] out and then turn to this before I sign off

Samson Bekele (3/01/2023 15:17:59 PST):
[REDACTED]

Samson Bekele (3/01/2023 15:19:04 PST):
[REDACTED]

Abhinav Anand (3/01/2023 15:35:19 PST):
>I still don't have invite for tomorrow's meeting

Abhinav Anand (3/01/2023 15:36:32 PST):
[REDACTED]

Charity Hemphill-Frierson (3/01/2023 15:38:30 PST):
[REDACTED]

Charity Hemphill-Frierson (3/01/2023 15:48:03 PST):
>Question - Should we include unplanned work here like we did in the version used for the [REDACTED]
(which we need to update for tomorrow 😥😥)
https: [REDACTED]

Charity Hemphill-Frierson (3/01/2023 15:50:38 PST):
[REDACTED]

Charity Hemphill-Frierson (3/01/2023 16:08:02 PST):
>I added in some comments on various cells. [REDACTED]

Charity Hemphill-Frierson (3/01/2023 16:08:23 PST):
>I think 20/80 is fair for phase 2; we're still getting data science input there

Charity Hemphill-Frierson (3/01/2023 16:09:07 PST):
[REDACTED]

Charity Hemphill-Frierson (3/01/2023 16:09:26 PST):
>I only ask bc it looks like this is missing [REDACTED]

Charity Hemphill-Frierson (3/01/2023 16:09:40 PST):
>I also wonder if we want to detail our injects a bit more

Samson Bekele (3/01/2023 16:12:54 PST):
>Just talked to Jinyi and he confirmed that my orginal doc is the right template for team review

Samson Bekele (3/01/2023 16:13:21 PST):
>We still have to populate the goals sheet but for tomorrow's review, we will be using this doc:

Abhinav Anand (3/01/2023 16:13:23 PST):

Samson Bekele (3/01/2023 16:13:26 PST):
>https:/

Abhinav Anand (3/01/2023 16:13:41 PST):
>in confidence column what does 80/20 mean ?

Samson Bekele (3/01/2023 16:14:09 PST):
>Pinged Jinyi to add you. sorry for the delay on this one.

Samson Bekele (3/01/2023 16:14:56 PST):

Charity Hemphill-Frierson (3/01/2023 16:15:41 PST):
>Got it. Taking a closer read at this one now

Samson Bekele (3/01/2023 16:29:51 PST):
>@Abhinav Anand  regarding your comment -

Abhinav Anand (3/01/2023 16:38:49 PST):

>
>https://docs.google.

Charity Hemphill-Frierson (3/01/2023 16:39:23 PST):
>Left some suggested text (most of which I think you've already reviewed). The biggest thing I see in
this version is

Samson Bekele (3/01/2023 17:23:02 PST):
>@Abhinav Anand  you have been added to the meeting

Abhinav Anand (3/01/2023 17:27:54 PST):
>Ack, got the invite now

# FILED UNDER SEAL

**EXHIBIT 26**

# FILED UNDER SEAL

**EXHIBIT 27**

UNITED STATES DISTRICT COURT
NORTHER DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| |
|---|
| IN RE META PIXEL TAX FILING CASES |

Master File No. 5:22-cv-07557-PCP

Declaration

of

**COLIN B. WEIR**

August 18, 2025

REFERENCES MATERIALS DESIGNATED "CONFIDENTIAL" AND "HIGHLY

CONFIDENTIAL ATTORNEYS' EYES ONLY" UNDER PROTECTIVE ORDER

I, Colin B. Weir, declare as follows:

I am President at Economics and Technology, Inc. ("ETI"), 100 Franklin Street, 6th Floor, Boston, Massachusetts 02110.  ETI is a research and consulting firm specializing in economics, statistics, regulation and public policy.

## I. QUALIFICATIONS, BACKGROUND, AND EXPERIENCE

1.    I hold a Masters of Business Administration, with honors, from the High Technology program at Northeastern University, Boston, Massachusetts.  I hold a Bachelor of Arts degree cum laude in Business Economics from The College of Wooster, Wooster, Ohio.  I have provided expert testimony before federal and state courts, the Federal Communications Commission, and state regulatory commissions, and have contributed research and analysis to numerous ETI publications and expert testimony at the state, federal, and international levels.  I have consulted on a variety of consumer and wholesale products cases, calculating damages relating to telecom products, food products, household appliances, herbal remedies, health/beauty care products, electronics, and computers; and performing data analytics on various transactional records, including billing records, retail sales records, and call detail records.  My Statement of Qualifications, which outlines my professional experience, publications, and record of expert testimony, is attached hereto as Exhibit 1.  This includes a list of all cases in which, during the previous four years, I have testified as an expert at trial or by deposition.  Prior to joining ETI, I worked at Stop and Shop Supermarkets for a period of seven years, working as a cash department head, grocery/receiving clerk, and price-file maintenance head.



Declaration of Colin B. Weir
August 18, 2025
Page 2 of 6

## II. ENGAGEMENT

2.    I provide this declaration in connection with the cases filed by Plaintiffs Katrina

Calderon, Tiffany Bryant, Sait Kumargaliyev, Chris Papadimitriou, Kayla Housman, and Jane

Doe ("Plaintiffs") in the above-captioned action against Defendant Meta Platforms, Inc.,

("Defendant," "Meta," or "Facebook").  I understand that this case relates to allegations

surrounding Defendant's practice of wiretapping of electronic communications on major online

tax filing websites offered by H&R Block, TaxAct, and TaxSlayer, among other sites.[1]

3.    As discussed in greater detail below, I have been asked whether it would be possible

to process data obtained from Defendant Meta.  Specifically, I have been asked to determine

whether it would be possible to determine the counts of records contained in Meta's databases

that meet certain criteria (I discuss the specifics in greater detail below).  I am not offering

opinions as to whether liability should or should not be established in this matter.

4.    ETI is being compensated at the rate of $950 per hour for my work on this case.  The

opinions expressed in this declaration are my own, and my compensation is not dependent upon

the substance of these opinions or the outcome of the litigation.

5.    The documents, data, and other materials that I relied upon in forming my opinions

are identified throughout my report, and in Exhibit 2, attached hereto.  In addition, I have relied

upon my educational background, and more than 21 years of experience.

## III. DATA SOURCES

6.    I have been provided with several exemplar databases/datasets that Counsel for

Plaintiff has represented to me to be samples of Defendant's web activities including records that

Plaintiffs allege would evince illegal wiretapping activity[2] (hereinafter, "Meta Web Data").[3]  I am

---

[1] *See*, Second Amended Complaint, dated May 9, 2025 (the "Complaint"), at para 1 *et seq.*

[2] I understand the proposed class periods to be from January 15, 2019 to June 30, 2023 for the classes of visitors to the H&R Block website; and from August 25, 2015 to June 30, 2023 for the classes of visitors to the TaxAct website ("Class Period").



Declaration of Colin B. Weir
August 18, 2025
Page 3 of 6

not offering any opinions as to whether the records do or do not provide evidence of wiretapping.

This data was provided in comma delimited text format and contains Meta web records. In

particular, I have been asked to focus my analysis at this time on a database table known as the

██████████ table. The schema for this table is too voluminous to document in its entirety

here, but includes such fields as:

- ██████████
- ██████████
- ██████████
- ██

7.    I have been asked to assume the following:

- that the ██████ field is a ████████████████████████ ████████████████████████ ████████████████

- that the ████████████████████ ████████████████████ ████████████████████ ████████████████

- that the ████████████████████████ ██████ and where
  - the code ██████████ represents Tax Act;
  - the code ██████████ represents H&R Block; and
- that the ████████████████

---

[3] *E.g.*, PIXEL_TAX000036169_HIGHLY CONFIDENTIAL.



Declaration of Colin B. Weir
August 18, 2025
Page 4 of 6

## IV.  DETAILED ASSIGNMENT

8.    As above, I have been asked to determine whether it would be possible to determine

the counts of records contained in Meta's databases that meet certain criteria.

**Criteria 1**

9.    I was asked if it would be possible to query the data to find records in the data

where:

- The ███████████ is ████████████████ ; and
- The ███████████ field is either ███████ or ██████ ; and
- The ███████████ and
- The ██████████████████████████

10.  I was also asked if it would be possible to report such data as the number of ██████
████████████

**Criteria 2**

11.  I was asked if it would be possible to query the data to find records in the data

where:

- The ██████████ field is ██████████████████ and
- The ████████████ is either ███████ or ██████ and
- The ███████████ and
- The ██████████████████████████

12.  I was also asked if it would be possible to report such data as the number of ██████
████████████

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Colin B. Weir
August 18, 2025
Page 5 of 6

## V.  STEPS TO ANALYZE THE DATA

13.  I used the data analytics program STATA to perform my analysis of the preliminary data production.  STATA is a commercially available software that is regularly relied upon by data analysts in academia and industry.[4]

**Data import and review**

14.  My first step was to import the raw data into the STATA program.  I ensured that the data was imported properly, and was formatted in such a manner as to facilitate further analysis.

15.  I also ran several descriptive tabulations of the data, such as to determine the data contained in certain fields.  For example, I confirmed that I was able to parse the  I confirmed that I could ▮▮▮▮▮ field to identify the numeric flags identified by counsel.  I also confirmed that I could read and parse the text contained in the ▮▮▮ field.  I also confirmed that I could read and parse the date information in the ▮ field.

**Preliminary test on sample data**

16.  Using STATA and the available sample data, I was able to parse the data pursuant to the two criteria above, and was able to tabulate the data in a manner requested by counsel.

**Future analysis of complete data production**

17.  If the sample data is representative of the totality of the data to be produced, in terms of its form and presentation, I would be able to run the queries requested by counsel and to ▮▮▮ ▮▮▮▮▮▮ in the format requested.

---

[4] www.stata.com (last accessed January 11, 2025).



Declaration of Colin B. Weir
August 18, 2025
Page 6 of 6

18.  Such an analysis could be accomplished using STATA, which might be preferable if the production is produced in batches that can be separately processed, or using SQL, which would likely be preferable if the data production is produced as a single database, or if a batch production would need to be cross-compared in order to ensure that the ████ are unique across batches.

## VI.  RESERVATION OF RIGHTS

19.  My testimony is based upon the information and data presently available to me.  I understand that discovery is ongoing.  Additional, different and/or updated data may be obtained in advance of trial.  I therefore reserve the right to amend or modify my testimony, and anticipate supplementing this testimony when such data becomes available.

## VII.  VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, and that this declaration was executed at Harpers Ferry, WV, this 18th day of August 2025.

Colin B. Weir

ECONOMICS AND TECHNOLOGY, INC.

# Exhibit 1

# Statement of Qualifications
# of

# COLIN B. WEIR

## Statement of Qualifications

## COLIN B. WEIR

Colin B. Weir is President at Economics and Technology, Inc. Mr. Weir conducts economic, statistical, and regulatory research and analysis, and testifies as an expert witness. Mr. Weir's work involves econometric and statistical analysis, multiple regression, surveys, statistical sampling, micro- and macroeconomic modeling, accounting and other economic analysis. Such analysis often involves analysis of databases, call detail records, and other voluminous business records. Mr. Weir is familiar with common statistical and econometric software packages such as STATA and Sawtooth Software. Mr. Weir assists with analysis of economic, statistical and other evidence; and preparation for depositions, trial and oral examinations. Mr. Weir has provided expert testimony before federal and state courts, the FCC, and state regulatory commissions, and has contributed research and analysis to numerous ETI publications and testimony at the state, federal, and international levels. Prior to joining ETI, Mr. Weir worked at Stop and Shop Supermarkets as a cash department head, grocery/receiving clerk, and price-file maintenance head.

Mr. Weir's experience includes work on a variety of issues, including: economic harm and damage calculation; liquidated damages provisions; lost profits; false claims; diminution in value; merger/antitrust analysis; Early Termination Fees (ETFs); Late Fees; determination of Federal Excise Tax burden; and development of macroeconomic analyses quantifying the economic impact of corporate actions upon the US economy and job markets.

Mr. Weir has conducted research and analysis in numerous litigation and regulatory matters on behalf of corporate, government and individual clients, including AT&T, MTS Allstream (Canada), The US Department of Justice, Office of the Attorney General of Illinois, Pennsylvania Department of Revenue, Thomas v. Global Vision, (class action litigation, Superior Court, County of Alameda), Ayyad v. Sprint (class action litigation, Superior Court, County of Alameda), Forcellati v. Hylands (class action, U.S. District Court, Central District of California), and Ebin v. Kangadis Foods (class action, U.S. District Court, Southern District of New York).

Mr. Weir holds an MBA with honors from Northeastern University. He also holds a Bachelor of Arts degree *cum laude* in Business Economics from The College of Wooster.

Mr. Weir is a member of the Boston Economic Club, and a business member of the Boston Bar Association. Mr. Weir has served on the Board of Trustees of the Waring School, and served as the comptroller for the Sybaris Investment Partnership.

ECONOMICS AND
TECHNOLOGY, INC.

*Statement of Qualifications – Colin B. Weir*

**Publications and Testimony of Colin B. Weir**

Mr. Weir has co-authored the following:

*Interoperability and Spectrum Efficiency: Achieving a Competitive Outcome in the US Wireless Market* (with Lee L. Selwyn) Economics and Technology, Inc., prepared on behalf of United States Cellular Corporation, July 2012.

*The Price Cap LECs' "Broadband Connectivity Plan": Protecting Their Past, Hijacking the Nation's Future* (with Lee L. Selwyn and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of United States Cellular Corporation, September 2011.

*Regulation, Investment and Jobs: How Regulation of Wholesale Markets Can Stimulate Private Sector Broadband Investment and Create Jobs* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of Cbeyond, Inc., Covad Communications Company, Integra Telecom, Inc., PAETEC Holding Corp, and tw telecom inc., February 2010.

*Revisiting Us Broadband Policy: How Re-regulation of Wholesale Services Will Encourage Investment and Stimulate Competition and Innovation in Enterprise Broadband Markets*, (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, February 2010.

*Longstanding Regulatory Tools Confirm BOC Market Power: A Defense of ARMIS* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of the AdHoc Telecommunications Users Committee, January 2010.

*Choosing Broadband Competition over Unconstrained Incumbent Market Power: A Response to Bell and TELUS* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, April 2009.

*The Role of Regulation in a Competitive Telecom Environment: How Smart Regulation of Essential Wholesale Facilities Stimulates Investment and Promotes Competition* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, March 2009.

*Special Access Overpricing and the US Economy: How Unchecked RBOC Market Power is Costing US Jobs and Impairing US Competitiveness* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of the AdHoc Telecommunications Users Committee, August 2007.

*The AWS Spectrum Auction: A One-Time Opportunity to Introduce Real Competition for Wireless Services in Canada* (with Lee L. Selwyn and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, June 2007.

*Comparison of Wireless Service Price Levels in the US and Canada* (with Lee L. Selwyn) Economics and Technology, Inc., prepared on behalf of MTS Allstream, May 2007.

2



*Statement of Qualifications – Colin B. Weir*

*Hold the Phone! Debunking the Myth of Intermodal Alternatives for Business Telecom Users In New York* (with Susan M. Gately and Lee L. Selwyn) Economics and Technology, Inc., prepared for the UNE-L CLEC Coalition, August 2005.

Mr. Weir has submitted the following testimony during the last four years:

**United States District Court, Northern District of California,** *In re: Nestle Boost Nutritional Drink Litigation*, Case No.: 3:21-cv-09812-PJH, on behalf of Milberg Coleman Bryson Phillips Grossman, LLC, Declaration submitted on July 25, 2025; Deposition on August 15, 2025.

**United States District Court, Northern District of California,** *Sandra Jeruchim and Melissa Varga, individually and on behalf of all others similarly situated, v. The J.M. Smucker Company and Post Consumer Brands, LLC*, Case No.: 3:22-Cv-06913-WHO, on behalf of Bursor & Fisher, P.A., declaration submitted on July 8, 2025.

**United States District Court, Central District of California,** *Emily Chebul, individually and on behalf of all others similarly situated, v. Tuft & Needle, LLC*, Case No. 2:24-cv-02707-JLS-MAR, on behalf of Dovel & Luner, LLP, Declaration submitted on July 7, 2025.

**In the Circuit Court of the City of St. Louis, State of Missouri,** *State of Missouri ex rel. Attorney General Andrew Bailey, and Missouri Department of Agriculture, v. Dolgencorp, LLC, d/b/a Dollar General*, Case No. 2322-CC096910, on behalf of the Missouri Office of the Attorney General, Deposition on June 6, 2025.

**United States District Court, Northern District of California,** *Mikhail Gershzon, Kristin Della, and Jill Lienhard, on behalf of themselves and those similarly situated v. Colgate-Palmolive Company*, Case No.: 23-cv-04086-JCS, on behalf of Gutride Safier, LLP, Declaration submitted on May 22, 2025; Deposition on June 27, 2025.

**United States District Court, Northern District of California,** *Samuel Garcia, individually and on behalf of all others similarly situated, v. TC Heartland, LLC*, Case No.: 5:23-cv-04192-NW, on behalf of Clarkson Law Firm, Declaration submitted on April 21, 2025; Deposition on June 11, 2025.

**United States District Court, Northern District of California,** *Rick Chen and Mindy Aiello, individually and on behalf of all others similarly situated, v. Vesync Corporation*, Case No. 3:23-cv-04458-TLT, on behalf of Bursor & Fisher, P.A., Declaration submitted on April 17, 2025; Deposition on June 9, 2025; Reply Declaration submitted on July 25, 2025; Deposition on August 5, 2025.



*Statement of Qualifications – Colin B. Weir*

**United States District Court, Southern District of California,** *Albert Renn, on behalf of himself, all others similarly situated, and the general public, v. Otay Lakes Brewery, LLC*, Case No: 23-cv-1139-GPC-BLM, on behalf of Fitzgerald Monroe Flynn, PC, Declaration submitted on March 3, 2025.

**United States District Court, Northern District of California,** *Sharon Crowder, Joel Lumian, Robert Smith, Amanda Goldwasser, and Mark Elkins, each individually and on behalf of all others similarly situated, v. The Shade Store LLC*, Case No. 5:23-cv-2331, United States District Court, Western District of Washington At Seattle, *Lee Fitzgerald and Katherine Adler, individually and on behalf of all others similarly situated, v. The Shade Store LLC*, Case No. 2:23-cv-01435-RSM, on behalf of Dovel & Luner, LLP, Declaration submitted on January 23, 2025; Deposition on March 11, 2025.

**United States District Court, Northern District of California,** *Condalisa LeGrand, on behalf of herself, all others similarly situated, and the general public, v. Abbott Laboratories*, Case No. 3:22-cv-5815-TSH, on behalf of Fitzgerald Monroe Flynn, PC, Declaration submitted on January 23, 2025.

**Superior Court of the State of California, County of Santa Clara,** *Makenzie Smith, individually and on behalf of all others similarly situated, v. LinkedIn Corporation*, Case No. 22CV404069, on behalf of Bursor & Fisher, P.A., Declaration submitted on January 13, 2025; Deposition on March 4, 2025.

**United States District Court, Eastern District of Virginia, Richmond Division,** *James Dolan and James Morris, individually and on behalf of all others similarly situated, v. Ford Motor Company*, Case No. 1:19-cv-05045-REP, on behalf of Consumer Litigation Associates, PC, Declaration submitted on January 3, 2025; Reply Declaration submitted on February 12, 2025; Deposition on February 25, 2025.

**United States District Court, Northern District of California,** *Nea Vizcarra, individually and on behalf of all others similarly situated, v. Michaels Stores, Inc.*, Case No. 5:23-cv-468-PCP, on behalf of Dovel & Luner, LLP, Declaration submitted on November 15, 2024; Deposition on January 8, 2025.

**Superior Court of the State of California, for the County of Alameda,** *David Livingston, individually and on behalf of all other persons similarly situated, v. Mercedes-Benz USA, LLC,* Case No. RG21109711, on behalf of Bursor & Fisher, P.A., Declaration submitted on November 14, 2024; Deposition on December 16, 2024; Reply Declaration submitted on February 27, 2025.

**United States District Court, for the Northern District of California,** *Melissa Sanchez, Beverly Cassel, as individuals, on behalf of themselves, the general public and those similarly situated, v. Nurture, Inc.*, Case No. 5:21-cv-08566-EJD, on behalf of Gutride Safier, LLP, Declaration submitted on October 25, 2024; Deposition on December 12, 2024.



*Statement of Qualifications – Colin B. Weir*

**United States District Court, Northern District of California,** *Colby Tunick, individually and on behalf of all others similarly situated, v. Takara Sake USA Inc.*, Case No. 3:23-cv-00572-TSH, on behalf of Clarkson Law Firm, Declaration submitted on October 17, 2024; Deposition on November 22, 2024; Reply Declaration submitted on January 28, 2025.

**United State District Court, Northern District of California,** *Venus Yamasaki, on behalf of herself and all others similarly situated, v. Natrol, LLC*, Case No. 3:23-cv-00182-JD, on behalf of Spangenberg Shibley & Liber LLP, Declaration submitted on October 11, 2024; Deposition on December 2, 2024.

**United States District Court, Northern District of California,** *Jennifer Vlacich, Brenda Robert, Elena Nacarino, Ana Krstic, Christina Vink, Lora Grodnick, Lisa Malara, and Teena Stambaugh, individually and on behalf of all others similarly situated, v. Del Monte Foods, Inc.*, Case No. 4:22-cv-00892-JST, on behalf of Dovel & Luner, LLP, Declaration submitted on August 30, 2024; Deposition on October 8, 2024.

**United States District Court, Northern District of Georgia, Atlanta Division,** *Kellie Carder et al., on behalf of themselves and all others similarly situated, v. Graco Children's Products, Inc.*, Case No. 2:20-cv-00137-LMM, on behalf of Milberg Coleman Bryson Phillips Grossman, LLC, Declaration submitted on August 16, 2024; Supplemental Declaration submitted on January 17, 2025.

**United States District Court, Northern District of California,** *Krystal Lopez and Damany Browne, individually and on behalf of all others similarly situated, v. Zarbee's Inc.*, Case No. 3:22-04465-CRB, on behalf of Dovel & Luner, LLP, Declaration submitted on August 2, 2024; Deposition on August 27, 2024.

**United States District Court, Southern District of New York,** *Tanysha Newman, individually and on behalf of all others similarly situated, v. Bayer Corporation and Bayer Healthcare, LLC*, Case No. 7:22-cv-07087-KMK-AEK, on behalf of Bursor & Fisher, P.A., Declaration submitted on July 18, 2024; Deposition on September 9, 2024.

**In the United States District Court, for the Northern District of Oklahoma,** *In re: Genentech, Inc. Herceptin (Trastuzumab) Marketing and Sales Practices Litigation*, MDL Docket No. 16-MD-2700, on behalf of GableGotwals, Declaration submitted on July 15, 2024; Deposition on September 4, 2024.

**United States District Court, Southern District of New York,** *Casey E. Hall-Landers, individually and on behalf of all others similarly situated, v. New York University*, Case No. 1:20-cv-03250, on behalf of Bursor & Fisher, P.A., Declaration submitted on June 21, 2024; Reply Declaration submitted on October 30, 2024.



*Statement of Qualifications – Colin B. Weir*

**United States District Court for the Central District of California, Eastern Division,** *Steven Hernandez, individually and on behalf of all others similarly situated, v. Radio Systems Corporation*, Case No.: 22-cv-01861-JGB-KK, on behalf of Schubert Jonckheer & Kolbe, Declaration submitted on June 17, 2024; Declaration submitted on July 31, 2024; Deposition on November 1, 2024.

**United States District Court for the Southern District of California,** *Linda Sunderland and Benjamin Binder, individually and on behalf of all others similarly situated, v. Pharmacare U.S., Inc., a Delaware Corporation*, Case No.: 3:23-cv-01318-JES-BGS, on behalf of Milberg Coleman Bryson Phillips Grossman, LLC, Declaration submitted on June 3, 2024.

**United States District Court for the Northern District Of California,** *Martha Valentine, Ruby Cornejo, and Tiffany Avino, each an individual, on behalf of themselves, the general public, and those similarly situated, v. Crocs, Inc.*, Case No. 3:22-cv-07463-TLT, on behalf of Gutride Safier, LLP, Declaration submitted on May 31, 2024; Reply Declaration submitted on August 21, 2024.

**In the United States District Court for the Northern District of California,** *David Wallenstein, Montgomery Summa, individually and on behalf of all others similarly situated, v. Mondelez International, Inc., a Virginia corporation, Mondelez Global, LLC, a Delaware limited liability company, and Nabisco, Inc., a New Jersey corporation*, Case No. 3:22-cv-6033, on behalf of Fox Law APC, Declaration submitted on May 24, 2024; Deposition on June 27, 2024; Reply Declaration submitted on July 12, 2024; Reply Declaration submitted on August 9, 2024.

**United States District Court, Western District of Wisconsin,** *John Bankhurst, Pamela Anderson, Jonathan Zang, and Jesse Karp, individually and on behalf of all others similarly situated, v. Sub-Zero Group, Inc. and Wolf Appliance, Inc.*, Case No. 3:23-cv-253, on behalf of Dovel & Luner, LLP, Declaration submitted on May 17, 2024; Deposition on June 18, 2024.

**United States District Court, Eastern District of New York,** *Claudia Newton and Brandy Leandro, on behalf of themselves and all others similarly situated, v. R.C. Bigelow, Inc., and Does 1 through 10*, Case No.: 2:22-cv-05660-LDH-SIL, on behalf of The Wand Law Firm, Declaration submitted May 16, 2024; Rebuttal Declaration submitted on August 8, 2024.

**United States District Court, Northern District of Illinois, Eastern Division,** *Charlotte Willoughby, Lakendrea Camille Mcnealy, Shaylynn Doxie, Brittney Gray, Kataleena Helmick, Lani Johnston, Ashley Popa And Deniege Revord, individually and on behalf of a class of similarly situated individuals, v. Abbott Laboratories*, Case No. 1:22-cv-01322, on behalf of Lockridge Grindal Nauen P.L.L.P., Declaration submitted on April 12, 2024; Deposition on May 15, 2024; Reply Declaration submitted July 31, 2024.



*Statement of Qualifications – Colin B. Weir*

**In the United States District Court, Northern District of California**, *Aaron Brand, John Flodin, individually and on behalf of all others similarly situated, v. Central Garden & Pet Company, a Delaware corporation, Breeder's Choice Pet Foods, Inc., and Does 1-50, inclusive*, Case No.: 4:21-cv-01631-JST, on behalf of Fox Law APC, Declaration submitted on March 15, 2024; Deposition on June 11, 2024; Reply Declaration submitted on August 20, 2024.

**United States District Court, Central District of California**, *Tristan Hurd and Ken Dimicco, individually and on behalf of all others similarly situated, v. G.Skill International Enterprise Co., LTD., G.Skill USA, Inc., Racerspeed, Inc., and Neuteck, Inc.*, Case No. 2:22-cv-00685-SSS-MAR, on behalf of Dovel & Luner, LLP, Declaration submitted on March 15, 2024.

**In the United States District Court for the Western District of Virginia**, *Wendy Prince, individually and on behalf of all others similarly situated, v. Johnson Health Tech Trading, Johnson Health Tech Retail, Inc., and Johnson Health Tech, Inc.*, Civil Action No. 5:22-cv-00035, on behalf of Milberg Coleman Bryson Phillips Grossman, LLC, Declaration submitted on February 29, 2024; Deposition on June 7, 2024.

**In the United States District Court, for the Southern District of Ohio, Eastern Division,** *Judy Kirkbride and Beeta Lewis, individually and on behalf of all others similarly situated, v. The Kroger Co.*, Case No. 2:21-cv-00022-ALM-EPD, on behalf of Bursor & Fisher, P.A., Declaration submitted on February 23, 2024; Deposition on May 2, 2024; Reply Declaration submitted on July 25, 2024; Oral Testimony and Cross Examination on March 19 - 20, 2025.

**United States District Court, for the Southern District of New York,** *Joseph Wolf, Carmen Wolf, on behalf of themselves and those similarly situated, v. Dolgen New York LLC*, Case No.: 7:23-cv-00558-PMH, Milberg Coleman Bryson Phillips Grossman, LLC, Declaration submitted on February 9, 2024; Supplemental Declaration filed March 20, 2024; Deposition on March 25, 2024.

**United States District Court, Southern District of California,** *Heather Turrey, Oliver Fiaty, Jordan Hernandez, and Jeffrey Sazon, individually, and on behalf of all others similarly situated, v. Vervent, Inc. fka First Associates Loan Servicing, LLC; Activate Financial, LLC; David Johnson; and Laurence Chiavaro*, Case No. 3:20-cv-00697-DMS-AHG, on behalf of Blood, Hurst, & O'Reardon, LLP, Declaration submitted on February 2, 2024.

**United States District Court, Southern District of California,** *William Lessin and Carol Smalley et al, on behalf of themselves and all others similarly situated, v. Ford Motor Company*, Case No. 19-cv-1082-AJB-WVG , on behalf of McCune Law Group, Declaration submitted on December 1, 2023; Deposition on January 19, 2024; Reply Declaration submitted on April 12, 2024.

**United States District Court, Northern District of California,** *Thomas Iglesias, David Salazar, Olivia Thurman, and Bethany Torbert, individually and on behalf of all others similarly situated, v. For Life Products, LLC*, Case No. 3:21-cv-01147-TSH, on behalf of Clarkson Law Firm, Declaration submitted on November 29, 2023; Deposition on January 4, 2024.

7



*Statement of Qualifications – Colin B. Weir*

**United States District Court, Northern District of California,** *Matthew Sinatro and Shane Winkelbauer, individually and on behalf of all others similarly situated, v. Welch Foods Inc., A Cooperative and Promotion in Motion, Inc.*, Case No. 22-cv-07028-JD, on behalf of Clarkson Law Firm, Declaration submitted on November 20, 2023; Reply Declaration submitted on December 14, 2023; Deposition on December 20, 2023; Supplemental Declaration filed March 5, 2024.

**United States District Court, Northern District of California,** *David Swartz, as an individual, on behalf of himself, the general public and those similarly situated, v. Dave's Killer Bread, Inc., and Flowers Foods, Inc.*, Case No.: 4:21-cv-10053-YGR, on behalf of Gutride Safier, LLP, Declaration submitted on November 17, 2023; Deposition on January 23, 2024; Reply Declaration submitted on March 22, 2024; Declaration submitted on February 14; Amended Declaration submitted on February 17, 2024; Deposition on March 24, 2025.

**United States District Court, Northern District of California,** *Steven C. Johnson, an individual, on behalf of himself and all others similarly situated, v. GLOCK, INC., a Georgia Corporation; Glock Ges.m.b.H, an Austrian entity; John and Jane Does I through V; ABC Corporations I-X, XYZ Partnerships, Sole Proprietorships and/or Joint Ventures I-X, Gun Component Manufacturers I-V*, CASE NO.: 3:20-cv-08807-WHO, on behalf of Lewis and Lewis Trial Lawyers, PLC, Declaration submitted October 12, 2023; Reply Declaration submitted on April 11, 2024.

**United States District Court, Northern District of California,** *Kenneth Glassman, individually and on behalf of all others similarly situated, v. Edgewell Personal Care, LLC*, Case No. 3:21-cv-07669-RS, on behalf of Bursor & Fisher, P.A., Declaration submitted on September 14, 2023; Deposition on November 8, 2023; Reply Declaration submitted on February 12, 2024.

**United States District Court, for the Northern District of California, San Francisco,** *Tracy Howard, Adina Ringler, and Trecee Artis on behalf of themselves and those similarly situated, v. Hain Celestial Group, Inc., d/b/a Earth's Best*, Case No. 3:22-cv-00527-VC, on behalf of Gutride Safier LLP, Declaration submitted on September 5, 2023; Deposition on October 12, 2023; Reply Declaration submitted on December 13, 2023.

**Superior Court of the State of California, for the County of Alameda, Northern Division,** *Patricia Bland and Edward White, individually and on behalf of all others similarly situated, v. Premier Nutrition Corporation; and DOES 1-25, inclusive*, Case No. RG19002714, on behalf of Blood, Hurst, & O'Reardon, LLP, Deposition on September 1, 2023.

**United States District Court, Northern District of California,** *Antonio Mckinney, Clint Sundeen, and Joseph Alcantara, each individually and on behalf of all others similarly situated, v. Corsair Gaming, Inc.*, Case No. 3:22-cv-00312-CRB, on behalf of Dovel & Luner, LLP, Declaration submitted on September 1, 2023; Deposition on January 9, 2024; Declaration submitted on May 20, 2025.



**United States District Court, Northern District of California,** *Matthew Sinatro, and Jessica Prost, individually and on behalf of all others similarly situated, v. Barilla America, Inc*., Case No: 4:22-cv-03460, on behalf of Clarkson Law Firm, Declaration submitted on August 30, 2023; Reply Declaration submitted on February 7, 2024; Declaration submitted on February 7, 2025; Deposition on April 30, 2025.

**United States District Court, for the Central District of California,** *Kathleen Cadena, et al., v. American Honda Motor Company, Inc.*, Case No. 2:18-cv-04007-MWF-MAA, on behalf of Gibbs Law Group, LLP, Declaration submitted on August 11, 2023; Deposition on September 27, 2023; Declaration submitted on December 23, 2024; Reply Declaration submitted on May 23, 2025; Deposition on June 4, 2025.

**United States District Court, for the Eastern District of Michigan,** *Edward Pistorio, Paul Murdock, Daniel Przekop, Hasan Aktulga, Sandra and Thomas Kloszewski, Randall Courtney, Corey Gerritsen, Sara Elice, Justin Bagley and Elizabeth Bagley, and Marcus Swindle on behalf of themselves and all others similarly situated, v. FCA US LLC*, Case No.: 2:20-cv-11838-SFC-RSW, on behalf of Capstone Law APC, Declaration submitted on July 31, 2023; Deposition on September 13, 2023.

**United States District Court, District of Minnesota,** *Teeda Barclay, Jay Ovsak, and Nicole Nordick, individually, and on behalf of others similarly situated, v. iFIT Health & Fitness, Inc. f/k/a Icon Health & Fitness, Inc., and Nordictrack, Inc.*, Case No. 0:19-cv-02970-ECT-DTS, on behalf of Markovits, Stock & DeMarco, LLC, Declaration submitted on July 14, 2023; Deposition on August 9, 2023; Declaration submitted on January 2, 2024.

**United States District Court, Eastern District of Michigan, Southern Division,** *Bobby Roe, et al., individually and on behalf of all others similarly situated, v. Ford Motor Company*, Case No. 2:18-cv-12528-LGM-APP, on behalf of Kessler Topaz Meltzer & Check LLP, Declaration submitted on June 28, 2023.

**United States District Court, for the Central District of California, Eastern Division**, *Sarah McCracken, Individually and on behalf of all others similarly situated, v. KSF Acquisition Corporation*, Case No. 5:22-cv-01666, on behalf of Schubert Jonckheer & Kolbe, Declaration submitted on May 24, 2023.

**United States District Court, Northern District of California, Oakland Division,** *Jonathan Rusoff and Joseph Gambino, on behalf of themselves and all others similarly situated, v. The Happy Group, Inc., a corporation; and DOES 1 through 10, inclusive*, Case No.: 4: 21-cv-08084-YGR, on behalf of The Wand Law Firm, Declaration submitted on April 11, 2023; Deposition on May 10, 2023; Reply Declaration submitted on July 18, 2023.



*Statement of Qualifications – Colin B. Weir*

**United States District Court, Northern District of Illinois,** *Justin O'Connor, Stanislaw Zielinski, Daniel Fair, Bryan Smith, Jason Steen, William Fiedler, Michael Barcelona, Robert Marino, Brian Dougherty, Susan Heller, Victor M. Orndorff, and Michael McDonald on behalf of themselves and all others similarly situated, v. Ford Motor Company*, Case No. 1:19-cv-05045, on behalf of Milberg Coleman Bryson Phillips Grossman, LLC, Declaration submitted on March 30, 2023; Reply Declaration submitted on June 1, 2023; Deposition on June 15, 2023.

**United States District Court, Northern District of California, Oakland Division,** *In re: Plum Baby Food Litigation*, Case No. 21-cv-00913-YGR, on behalf of Lockridge Grindal Nauen P.L.L.P., Declaration submitted on December 20, 2022; Deposition on February 27, 2023; Declaration submitted on September 29, 2023.

**United States District Court, Northern District of California,** *Lisa M. Moore, individually and on behalf of all others similarly situated, v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC; Pfizer Inc.*, Case No. : 4:20-cv-09077-JSW, on behalf of Clarkson Law Firm and Moon Law APC, Declaration submitted on December 7, 2022; Deposition on April 13, 2023.

**United States District Court, Southern District of California,** *Montiqueno Corbett, Damaris Luciano, and Rob Dobbs, individually and on behalf of all others similarly situated, v. Pharmacare U.S., Inc.*, Case No.: 3:21-cv-00137-GPC-AG, on behalf of Milberg LLC, Declaration submitted on September 30, 2022; Declaration submitted on March 22, 2023; Deposition on April 10, 2023; Supplemental Declaration submitted on April 24, 2023; Declaration submitted on October 30, 2024.

**In the United States District Court, for the Eastern District of Texas, Sherman Division,** *William Squires, Jesse Badke, Ahmed Khalil, Michelle Nidever, John Murphy, Kevin Neuer, Nicholas Williams and Donna Sue Scott, on behalf of themselves and all others similarly situated, v. Toyota Motor Corp, Toyota Motor North America, Inc. and Toyota Motor Sales, U.S.A., Inc.*, Case No.: 4:18-cv-00138, on behalf of Berger Montague, P.C., Declaration submitted September 29, 2022; Deposition on October 27, 2022; Reply Declaration submitted December 21, 2022.

**United States District Court, Northern District of California,** *Anthony Bush, individually and on behalf of all others similarly situated, v. Rust-Oleum Corporation* Case No.: 3:20-cv-03268-LB, on behalf of Clarkson Law Firm and Moon Law, Declaration submitted on September 27, 2022; Deposition on February 8, 2023.

**United States District Court, Southern District of California,** *William D. Petterson, individually and on behalf of all others similarly situated, v. Circle K Stores Inc.*, Case No. 3:21-cv-00237-RBM-BGS, on behalf of Bursor & Fisher, P.A., Declaration submitted on September 22, 2022; Deposition on October 11, 2022.



*Statement of Qualifications – Colin B. Weir*

**Superior Court of the State of California, For the County Of Santa Clara,** *Elizabeth J. VanCleave,  and Katherine Hassan, individually and on behalf of a class of similarly situated individuals, v. Abbott Laboratories*, Case No.  19CV345045, on behalf of Goldstein, Borgen, Dardarian & Ho, Declaration submitted on September 19, 2022; Reply Declaration submitted on January 10, 2023; Deposition on February 1, 2023; Declaration submitted on August 29, 2024; Deposition on October 22, 2024; Supplemental Declaration submitted on October 31, 2024; Oral Testimony and Cross Examination on February 7, 2025.

**United States District Court, Southern District of New York,** *Asher Haft, Robert Fisher, and Cheryl Jones, individually and on behalf of all others similarly situated, v. Haier US Appliance Solutions, Inc. d/b/a GE Appliances*, Case No.: 1:21-cv-00506-GHW, on behalf of Milberg LLC, Declaration submitted on August 12, 2022.

**United States District Court for the District of Delaware,** *Michael Ninivaggi, Jake Mickey and Cailin Nigrelli, individually and on behalf of all others similarly situated, v. University of Delaware,* Case No. 20-cv-1478-SB, and *Hannah Russo, individually and on behalf of all others similarly situated, v. University of Delaware*, Case No. 20-cv-1693-SB, on behalf of Bursor & Fisher, P.A., Declaration submitted on July 1, 2022; Declaration submitted on August 1, 2022; Deposition on August 19, 2022; Reply Declaration submitted September 30, 2022.

**United States District Court, Central District of California,** *Kimberly Banks and Carol Cantwell, on behalf of themselves and all others similarly situated, v. R.C. Bigelow, Inc., a corporation; and DOES 1 through 10, inclusive,* Case No.: 20-cv-06208-DDP (RAOx), on behalf of The Wand Law Firm, Declaration submitted on June 17, 2022; Rebuttal Declaration submitted October 3, 2022; Declaration submitted on March 6, 2024; Deposition on May 30, 2024; Oral Testimony and Cross Examination on April 4, 2025.

**United States District Court, Central District of California,** *Mocha Gunaratna and Renee Camenforte, individually and on behalf of all others similarly situated, v. Dr. Dennis Gross Skincare, LLC, a New York Limited Liability Company*, Case No. 2:20-cv-02311-MWF-GJS, on behalf of Clarkson Law Firm, P.C.; Declaration submitted on March 30, 2022; Deposition on May 20, 2022; Reply Declaration submitted on September 22, 2022.

**Superior Court of the State of California, County of Santa Clara,** *Lance Dutcher, individually and on behalf of all others similarly situated, v. Google LLC, d/b/a YouTube, and YouTube LLC,* Case No. 20CV366905, on behalf of Bursor & Fisher, P.A., Declaration submitted on March 2, 2022; Deposition on May 17, 2022; Reply Declaration submitted on August 2, 2022; Declaration submitted on May 2, 2023.

**United States District Court, Middle District of Tennessee, Nashville Division,** *In re Nissan North America, Inc. Litigation; Lakeita Kemp, individually and on, behalf of all others similarly situated v. Nissan North America, Inc., and Nissan Motor Co., Ltd.*, Cases Nos. 3:19-cv-00843, Case No. 3:19-cv-00854, on behalf of DiCello Levitt Gutzler, Declaration submitted February 28, 2022; Deposition on August 25, 2022; Reply Declaration submitted on November 15, 2022.

11



**In the Court of Claims, for the State of Ohio,** *Autumn Adams, individually and on behalf of all others similarly situated v. University of Cincinnati,* Case No. 2021-00458JD, on behalf of Bursor & Fisher, P.A., Declaration submitted February 11, 2022; Deposition on August 10, 2022; Reply Declaration submitted on November 16, 2022.

**United States District Court, Northern District of California, San Francisco Division,** *Eric Fishon, individually and on behalf, of all others similarly situated, v. Premier Nutrition Corporation f/k/a Joint Juice, Inc.,* Case No. 3:16-cv-06980-RS, on behalf of Blood, Hurst, & O'Reardon, LLP, Expert Report submitted January 24, 2022; Deposition on March 11, 2022; Oral Testimony and Cross Examination on May 31, 2022.

**Superior Court for the State of California, for the County of Alameda,** *Michelle Moran, an individual on behalf of herself and all others similarly situated, v. S.C. Johnson & Son, Inc.,* Case No.: RG20067897, on behalf of Clarkson Law Firm, P.C.; Declaration submitted on November 12, 2021.

**United States District Court, Eastern District of Michigan,** *Chapman, et al., v. General Motors, LLC,* Case No. 2:19-cv-12333-TGB-DRG, on behalf of Hagens Berman Sobol Shapiro LLP, Declaration submitted on November 10, 2021; Declaration submitted on March 1, 2022; Deposition on April 13, 2022; Reply Declaration submitted on June 16, 2022.

**United States District Court, Central District of California,** *Terry Sonneveldt, Esther Wright Schneider, Michael Bibbo, Alan Meshberg, Brian Hume, Amie Levasseur, Jean Levasseur, Christopher Lacasse, Beth Pickerd, Dan Pickerd, Tim Halwas, Erin Matheny, Lewis Delvecchio, Jon Sowards, Lawrence Bohana, Monika Bohana, David Dennis, Jacqueline S. Aslan, Michael Gilreath, and Renatta Gilreath, individually and on behalf of all others similarly situated, v. Mazda Motor of America, Inc. D/B/A Mazda North American Operations and Mazda Motor Corporation,* Case No.: 8:19-cv-01298-JLS-KES, on behalf of Kessler Topaz Meltzer & Check, LLP, Declaration submitted on November 3, 2021; Declaration submitted on March 11, 2022; Deposition on April 4, 2022; Declaration submitted July 26, 2022.

**United States District Court, Southern District of Texas, Corpus Christi Division,** *Tyler Allen Click, Troy Bowen, Bailey Henderson, Ethan Galan, Luis G. Ochoa Cabrera, Homero Medina, Michael Guidroz, Scott A. Hines, Bryan J. Tomlin, Quentin Alexander, and Jacqueline Bargstedt, individually and on behalf of all others similarly situated, v. General Motors LLC,* Case No. 2:18-cv-00455-NGR, on behalf of Hagens Berman Sobol Shapiro LLP, Declaration submitted on October 12, 2021.

**In the Court of Claims, for the State of Ohio,** *Mackenzie Weiman and Sarah Baumgartner, on behalf of themselves and all others similarly situated v. Miami University,* Case Nos. 2020-00614JD and 2020-00644JD, on behalf of Bursor & Fisher, P.A., Declaration submitted September 29, 2021; Reply Declaration submitted on November 10, 2021.



*Statement of Qualifications – Colin B. Weir*

**United States District Court, Southern District of New York,** *Eric Fishon and Alicia Pearlman, individually and on behalf of all others similarly situated, v. Peloton Interactive, Inc.*, Case No. 1:19-cv-11711-LJL, on behalf of DiCello Levitt Gutzler and Keller Lenkner, Declaration submitted September 15, 2021; Deposition on October 12, 2021; Reply Declaration submitted on November 1, 2021; Declaration submitted on October 17, 2022; Reply Declaration submitted on November 30, 2022.

**In the Court of Claims, for the State of Ohio,** *Caitlyn Waitt and Jordan Worrell v. Kent State University*, Case No. 2020-00392JD, on behalf of Bursor & Fisher, P.A., Declaration submitted September 15, 2021; Reply Declaration submitted on November 11, 2021.

**United States District Court, Northern District of California,** *Christopher Julian, Mark Pacana, Paul Fiskratti, and Wayne Lewald, on behalf of themselves and all others similarly situated, v. TTE Technology, Inc., dba TCL North America*, Case No. 3:20-cv-02857-EMC, on behalf of Milberg LLC, Declaration submitted on August 27, 2021; Deposition on October 2, 2021.

**United States District Court for the Northern District of California,** *Sherris Minor, as an individual, on behalf of herself, the general public and those similarly situated, v. Baker Mills, Inc.; and Kodiak Cakes, LLC*, Case No. 20-cv-02901-RS, on behalf of Gutride Safier, LLP, Deposition on September 2, 2021; Reply Declaration submitted on October 18, 2021.

**In the Court of Claims, for the State of Ohio,** *Lily Zahn v. Ohio University*, Case No. 2020-00371JD, and *Gila Duke, individually and on behalf of all others similarly situated, v. Ohio University*, Case No. 2021-00036JD, on behalf of Bursor & Fisher, P.A., Deposition on October 6, 2021; Reply Declaration submitted on December 2, 2021; Oral Testimony and Cross Examination on January 18, 2022.

**In the Court of Claims, for the State of Ohio,** *Brooke Smith, individually and on behalf of all others similarly situated, v. The Ohio State University*, Case No. 2020-00321JD, on behalf of Bursor & Fisher, P.A., Deposition on August 26, 2021; Reply Declaration submitted on September 29, 2021.

**United States District Court, Southern District of California,** *Michael Testone, Collin Shanks, and Lamartine Pierre, on behalf of themselves, all others similarly situated, and the general public,v. Barlean's Organic Oils, LLC,* Case No. 3:19-cv-00169-JLS-BGS, on behalf of Law Offices of Jack Fitzgerald, Deposition on March 25, 2022.

**In The United States District Court, For the District of New Hampshire,** *Derick Ortiz, individually and on behalf of all others similarly situated, v. Sig Sauer, Inc.*, Case No.: 1:19-cv-01025-JL, on behalf of Bursor & Fisher, P.A., Supplemental Declaration submitted on August 6, 2021; Declaration submitted on August 13, 2021; Oral Testimony and Cross Examination on May 4, 2022.



*Statement of Qualifications – Colin B. Weir*

**United States District Court, Western District of New York,** *In re: Rock 'N Play Sleeper Marketing, Sales Practices, and Products Liability Litigation*, Case MDL No. 1:19-md-2903, on behalf of Beasley Allen Law Firm, Brief Reply Declaration submitted on September 24, 2021; Oral Testimony and Cross Examination on September 27, 2021; Reply Declaration submitted on October 13, 2021.

**In the United States Court of Federal Claims,** *Bryndon Fisher, individually and on behalf of all others similarly situated, v. The United States of America,* Case No. 15-1575C, on behalf of Schubert Jonckheer & Kolbe, Reply Declaration submitted on October 29, 2021.

**United States District Court, Southern District of Florida,** *Javier Cardenas, Rodney and Pamela Baker, Michelle Monge, and Kurt Kirton, individually and on behalf of all others similarly situated, v. Toyota Motor Corporation, Toyota Motor Sales, U.S.A., Inc., Toyota Motor Engineering & Manufacturing North America, Inc., and Southeast Toyota Distributors, LLC*, Case No.: 18-cv-22798-CIV-FAM, on behalf of Kessler Topaz Meltzer & Check, LLP, Supplemental Declaration submitted on February 17, 2023; Oral Testimony and Cross Examination on March 7, 2023.

**Superior Court of the State of California, County of Los Angeles,** *Jeffrey Koenig, on behalf of himself and all others similarly situated, v. Vizio, Inc*., Case No. BC 702266, on behalf of Greg Coleman Law, Declaration submitted on August 31, 2021; Deposition on October 15, 2021; Supplemental Declaration submitted on May 2, 2022; Deposition on May 12, 2022; Supplemental Declaration submitted January 16, 2023; Deposition on February 13, 2023.

**United States District Court, for the Central District of California, Western Division,** *Toya Edwards, on behalf of herself and all others similarly situated, v. Walmart Inc*., Case No. 1:18-cv-9655, on behalf of Simmons Hanly Conroy LLC, Reply Declaration submitted on June 28, 2021.

**United States District Court, Southern District of California,** *Patrick McMorrow, Marco Ohlin and Melody DiGregorio, on behalf of themselves, all others similarly situated and the general public, v. Mondelez International, Inc*., Case No. 3:17-cv-02327-BAS-JLB, on behalf of Law Offices of Jack Fitzgerald, Rebuttal Declaration submitted on July 2, 2021.

**United States District Court, Southern District of New York,** *Anne De Lacour, Andrea Wright, and Loree Moran individually and on behalf of all others similarly situated, v. Colgate-Palmolive Co., and Tom's of Maine Inc.*, Case No. 1:16-cv-08364-RA, on behalf of Bursor & Fisher, P.A., Declaration submitted on July 22, 2022; Deposition on September 9, 2022.

**United States District Court, Eastern District Of New York, Brooklyn Division,** *Reply All Corp., v. Gimlet Media, Inc.,* Case No. 15-cv-04950-WFK-PK, on behalf of Wolf, Greenfield & Sacks, P.C., Deposition on October 16, 2019.

Mr. Weir has provided expert testimony since 2007, served as a consultative expert in numerous proceedings that did not result in testimony, and has contributed research and analysis to numerous additional projects, publications and testimony at the state, federal, and international levels.

14



**Exhibit 2**

**Documents Reviewed**

- Second Amended Complaint, dated May 9, 2025

- PIXEL_TAX000036069-PIXEL_TAX000036268

- PIXEL_TAX000051219-PIXEL_TAX000052849

- PIXEL_TAX000058834-PIXEL_TAX000059047

- ███████████_2022-05-26_1.csv

███████████████_2022-05-26_10.csv

- ███████████_2022-05-26_2.csv

- ███████████_2022-05-26_3.csv

- ███████████_2022-05-26_4.csv

- ███████████_2022-05-26_5.csv

- ███████████_2022-05-26_6.csv

- ███████████_2022-05-26_7.csv

- ███████████_2022-05-26_8.csv

- ███████████_2022-05-26_9.csv

- ███████████_2022-06-26_1.csv

███████████████_2022-06-26_10.csv

- ███████████_2022-06-26_2.csv

- ███████████_2022-06-26_3.csv

- ███████████_2022-06-26_4.csv

███████████████_2022-06-26_5.csv

- ███████████_2022-06-26_6.csv

- ███████████_2022-06-26_7.csv

- ███████████_2022-06-26_8.csv

- ███████████_2022-06-26_9.csv

- ███████████████_2023-03-26.csv

- ███████████████_2023-04-26.csv

- ███████████████_2022-11-26_1.csv

- ██████████_2022-11-26_10.csv
- ██████████_2022-11-26_2.csv
- ██████████_2022-11-26_3.csv
- ████████████_2022-11-26_4.csv
- ██████████_2022-11-26_5.csv
- ██████████_2022-11-26_6.csv
- ██████████_2022-11-26_7.csv
- ██████████_2022-11-26_8.csv
- ██████████_2022-11-26_9.csv
- ██████████_2022-12-26_1.csv
- ██████████_2022-12-26_10.csv
- ██████████_2022-12-26_2.csv
- ██████████_2022-12-26_3.csv
- ██████████_2022-12-26_4.csv
- ██████████_2022-12-26_5.csv
- ██████████_2022-12-26_6.csv
- ██████████_2022-12-26_7.csv
- ██████████_2022-12-26_8.csv
- ██████████_2022-12-26_9.csv
- ██████████_2023-01-26_1.csv
- ██████████_2023-01-26_10.csv
- ██████████_2023-01-26_2.csv
- ██████████_2023-01-26_3.csv
- ██████████_2023-01-26_4.csv
- ██████████_2023-01-26_5.csv
- ██████████_2023-01-26_6.csv
- ██████████_2023-01-26_7.csv

- ██████████████_2023-01-26_8.csv
- ██████████████_2023-01-26_9.csv
- ██████████████_2023-02-26_1.csv
- ██████████████_2023-02-26_10.csv
- ██████████████_2023-02-26_2.csv
- ██████████████_2023-02-26_3.csv
- ██████████████_2023-02-26_4.csv
- ██████████████_2023-02-26_5.csv
- ██████████████_2023-02-26_6.csv
- ██████████████_2023-02-26_7.csv
- ██████████████_2023-02-26_8.csv
- ██████████████_2023-02-26_9.csv
- ██████████████_2023-03-26_1.csv
- ██████████████_2023-03-26_10.csv
- ██████████████_2023-03-26_2.csv
- ██████████████_2023-03-26_3.csv
- ██████████████_2023-03-26_4.csv
- ██████████████_2023-03-26_5.csv
- ██████████████_2023-03-26_6.csv
- ██████████████_2023-03-26_7.csv
- ██████████████_2023-03-26_8.csv
- ██████████████_2023-03-26_9.csv

- stata.com

# FILED UNDER SEAL

**EXHIBIT 28**

**THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| IN RE META PIXEL TAX FILING CASES | Master File No. 5:22-cv-07557-PCP (VKD) |
| This document relates to: | **EXPERT REPORT OF ROBERT ZEIDMAN** |
| All Actions | |

CONFIDENTIAL

**EXPERT REPORT OF ROBERT ZEIDMAN**

# Contents

I.    Introduction ............................................................................................................ 1

II.   Scope of Report ..................................................................................................... 1

III.  Personal Experience and Background ................................................................... 2

IV.  Background Facts for Report ................................................................................. 4

   A.  Putative Class Definitions .................................................................................. 4

   B.  Statutes Relevant to Report ................................................................................ 5

   C.  Descriptions of Key Technologies and Concepts Relevant to Report ............... 5

      i.   Software Source Code .................................................................................... 5

     ii.  JavaScript .....................................................................................................6

    iii.  Clients and Servers .......................................................................................6

    iv.  Tags...............................................................................................................7

     v.   The Meta Pixel ..............................................................................................7

    vi.  Meta Conversions API ..................................................................................7

V.    Analysis ................................................................................................................. 7

   A.  Description of Event Data Produced by Meta ..................................................... 8

   B.  How and When the Meta Pixel Collected and Transmitted Data to Meta .......... 9

      i.   When the Meta Pixel Began Operating on the Tax Preparers' Websites .........10

     ii.  How the Meta Pixel Operates on the Tax Preparers' Websites .....................10

    iii.  How the Meta Pixel was Employed on the Tax Preparers' Websites...............11

   C.  Analysis of the Specific Visitor Data Produced by Meta from the Tax Preparers' Websites that the Meta Pixel Collected and Transmitted to Meta .................... 12

   D.  Calculating Visits to the Tax Preparer Websites ............................................... 14

VI.  Conclusions ........................................................................................................ 16

Index of Exhibits................................................................................................................ 18

I, Robert Zeidman, provide the following expert disclosures.

## I.    INTRODUCTION

1.    Based on my background and experience, I have been asked by counsel for the Plaintiffs in this action to provide my opinions and conclusions related to Meta's collection and transmission of visitor data from the websites of H&R Block and TaxAct (collectively the "Tax Preparers") through Meta's use of the Meta Pixel.

2.    For my work on this matter Zeidman Consulting is being compensated at a rate of $1,000.00 per hour.

3.    In reaching the opinions and conclusions discussed herein, I relied upon the materials listed in **Exhibit A**.

## II.    SCOPE OF REPORT

4.    This report seeks to address the following issues:

a.    **How and When the Meta Pixel Collected and Transmitted Data to Meta**: This report details how the Meta Pixel and related technologies operate, and how and when the Meta Pixel collected and transmitted various types of data to Meta from the proposed class representatives ("Representatives")[1] and members of the proposed classes ("Classes," described further below) during the relevant class periods.

b.    **Analysis of the Specific Visitor Data Produced by Meta that the Meta Pixel Collected from the Tax Preparers' Websites and Transmitted to Meta**: This report will identify and analyze the specific samples of visitor data from the Tax Preparers' websites that Meta produced to Plaintiffs from its repository of "Hive" data, including the extent to which this data reflects the

---

[1] Plaintiffs' Counsel has informed me that Plaintiffs intend to seek the appointment of the following plaintiffs as Class Representatives: Kayla Housman, Tiffany Bryant, Katrina Calderon, and Jane Doe (the "Representatives").

transmission of sensitive data, including "pen register" data,[2] from the Meta Pixel to Meta. The report will also explain the limitations of the data Meta produced during discovery while demonstrating that even the sample provided by Meta shows the Meta Pixel transmitting an enormous amount of tax information and other data to Meta from the Tax Preparers' websites. Moreover, the report will also propose ways in which the types of data produced by Meta could be used to determine the number of visits made to the Tax Preparers' websites during the relevant class periods.

## III.    PERSONAL EXPERIENCE AND BACKGROUND

5.      I am an engineer and the founder and president of Zeidman Consulting, which provides engineering consulting to high-tech companies. Among the types of services I provide are hardware and software design. My clients have included Fortune 500 computer and technology companies as well as smaller companies and startups. A copy of my resume is attached hereto as **Exhibit B**.

6.      I hold a master's degree from Stanford University in Electrical Engineering and two bachelor's degrees from Cornell University, one in Electrical Engineering and one in Physics. I have more than 40 years of experience in electrical engineering and more than 50 years of experience in software development.

7.      The software products I have developed include Internet-based training courses and web-based course administration software, an operating system synthesis tool, a source code comparison tool, a network emulation software bridge, a remote backup system, and an online gaming site. The hardware products I have developed include semiconductor integrated circuits and printed circuit boards for bus controllers, memory interfaces, network interfaces, a video

---

[2] Cal. Penal Code § 638.50 defines a "pen register" as a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." *See* **Exhibit C**.

attribute controller, a data cache and register logic for a supercomputer, a processor for a telecom parallel processor system, a neural network memory, and various controllers incorporating RISC processors and DSPs.

8.    I have founded several companies including (a) Zeidman Consulting, a hardware and software development firm; (b) eVault, a remote backup company; (c) the Chalkboard Network, an e-learning company; (d) Zeidman Technologies, which develops software tools for enabling and improving hardware and software development; (e) Software Analysis and Forensic Engineering Corporation; which develops software forensic analysis tools; and (f) Good Beat Games, an online poker gaming site.

9.    I have written a variety of papers, books, and presentations on computer hardware and software and other engineering subjects. I am the developer of the Universal Design Methodology, a process for efficiently developing reliable systems, about which I have written extensively. A list of my publications is included in my resume attached as **Exhibit B**.

10.    I hold 29 patents in the areas of software analysis, software comparison, software synthesis, hardware emulation, hardware synthesis, hardware simulation, media broadcast and advertising, and online gaming. I wrote a textbook on software forensics entitled *The Software IP Detective's Handbook, Measurement, Comparison, and Infringement Detection*, which is recognized as the seminal book in the field. I have created a tool called CodeSuite® for assisting in the determination of whether one computer program has been copied from another computer program.

11.    I have consulted on 291 matters involving intellectual property disputes including instances of alleged software copying, trade secret misappropriation, and patent infringement. My work in this capacity has included, among other things, reviewing and analyzing software source code, reviewing and analyzing patents, reverse engineering hardware and software, writing expert reports, and testifying in court. I have testified at deposition and at trial in a number of these cases. The specific cases can be found in my resume, attached as **Exhibit B**.

IV.    **BACKGROUND FACTS FOR REPORT**

A.    **Putative Class Definitions**

12.    Plaintiffs' counsel has informed me that Plaintiffs intend to seek to certify the following classes and class periods:

**<u>The Nationwide Pen Register Classes (Cal. Penal Code § 638.51)</u>**:

<u>H&R Block.com</u>: All individuals in the United States who visited the website H&R Block.com when Meta's Tracking Pixel was deployed on the website, from January 15, 2019 to June 30, 2023. This class seeks certification of claims under California Penal Code § 638.51. All Representatives seek to be the class representatives for this class.

<u>TaxAct.com</u>: All individuals in the United States who visited the website TaxAct.com from August 25, 2015 to June 30, 2023. This class seeks certification of claims under California Penal Code §§ 638.51. Plaintiff Katrina Calderon seeks to be the class representative for this class.

**<u>The Nationwide Eavesdropping Classes (Cal. Penal Code §§ 632 and 635)</u>**:

<u>H&R Block.com</u>: All individuals in the United States who visited the website H&R Block.com from January 15, 2019 to June 30, 2023. This class seeks certification of claims under California Penal Code §§ 632 and 635. All Representatives seek to be the class representatives for this class.

<u>TaxAct.com</u>: All individuals in the United States who visited the website TaxAct.com from August 25, 2015 to June 30, 2023. This class seeks certification of claims under California Penal Code §§ 632, and 635. Plaintiff Katrina Calderon seeks to be the class representative for this class.

**<u>The California Wiretapping Classes (Cal. Penal Code § 631(a) and 635)</u>**:

<u>H&R Block.com</u>: All individuals in California who visited the website H&R Block.com from January 15, 2019 to June 30, 2023. This class seeks certification of claims under California Penal Code §§ 631(a) and 635. Plaintiffs Jane Doe and Katrina Calderon seek to be the class representative for this class.

<u>TaxAct.com</u>: All individuals in California who visited the website TaxAct.com from August 25, 2015 to June 30, 2023. This class seeks certification of claims under California Penal Code §§ 631(a) and 635. Plaintiff Katrina Calderon seeks to be the class representative for this class.

**The Nationwide UCL Public Injunctive Relief Classes (Cal. Bus. & Prof. Code § 17200)**:

H&R Block.com: All individuals in the United States who visited the website H&R Block.com from January 15, 2019 to June 30, 2023. This class seeks certification of claims under Cal. Bus. & Prof. Code § 17200. All Representatives seek to be the class representatives for this class.

TaxAct.com: All individuals in the United States who visited the website TaxAct.com from August 25, 2015 to June 30, 2023. This class seeks certification of claims under Cal. Bus. & Prof. Code § 17200. Plaintiff Katrina Calderon seeks to be the class representative for this class.

**B.    Statutes Relevant to Report**

13.    Plaintiffs' counsel has informed me that the Plaintiffs intend to seek the certification of class claims alleging violations of the statutes enumerated in **Exhibit C**.

**C.    Descriptions of Key Technologies and Concepts Relevant to Report**

14.    This section describes the key technologies and concepts relevant to this report.

**i.    *Software Source Code***

15.    Computer programs can be written using complex instructions that look like English. For example, the instruction `if revenue > expenses then profit = revenue-expenses` tells the computer that if revenue is greater than expenses then calculate profit by subtracting expenses from revenue. Similarly, the statement `printf("Hello world!")` tells the computer to print the words "Hello world!" to the computer screen. These high-level, English-like instructions are called "source code." Computer programs are made up of many lines of source code, and the process of writing these lines of code is called programming. Eventually these lines of source code are turned into instructions that a computer understands, consisting of sequences of electronic ones and zeroes. The process of turning human-readable source code into a file containing computer instructions is called "compiling" and is performed by a special computer program called a "compiler."

### ii.   *JavaScript*

16.     JavaScript is a scripting language that is executed most commonly on the client-side in modern web browsers. Typically, the purpose of JavaScript is to enhance the user interfaces of websites and make web page content dynamic, so that displayed web content varies based on user interaction and other input. JavaScript shares syntax similarities with Java, but they are two distinct programming languages and differ in both syntax and standard libraries. Java and JavaScript are also used for significantly different purposes and in significantly different environments. JavaScript needs to run inside another application, such as an Internet Browser, and is not well suited for building large, complex, fast applications.

### iii.   *Clients and Servers*

17.     The Internet is a global network of millions of interconnected computers throughout the world. An intranet is an internal network of interconnected computers within an organization that is isolated from the Internet and only accessible by members of the organization. A "browser" is a computer program used for displaying text, images, and sound over the Internet or an intranet. Much of the information on the Internet and on an intranet is stored in, and accessed through, "web pages" which can be accessed through a computer connected to a network. "Websites" are locations on the Internet and/or on an intranet that contain collections of web pages.

18.     A "server" is a computer on a network (such as an intranet or the Internet) that is dedicated to a particular purpose, stores information, and serves that information to one or more client computers over the network. For example, a "web server" performs all work necessary for hosting the website, stores all files related to the website, and serves the web pages to client computers on the network. Server software refers to software running on the server computer that "serves up" information to a client computer. When someone uses their browser to access Facebook, for example, the Facebook computer is the server.

19.     A "client" is a computer that makes an information request to a server, which fulfills the request. Client software refers to software running on the client computer that makes requests

for information from a server computer. When someone uses their Microsoft Edge browser to access Facebook, for example, the visitor's computer is the client and the browser is the client software.

### iv.    *Tags*

20.    A tag is JavaScript code that captures visitor interactions on a website and transmits that information to third party servers. In this way, tags "track" visitors. The scripts can be managed directly on the website or they can be managed by a tag manager on a third-party website such as Google Tag Manager. The advantage of using a third-party tag manager is that the website administrator does not need to modify the tag code on the website each time the company decides to track new information about its customers, which may require a code change to every webpage on the site. Instead the website administrator needs to simply supply new tags to the tag manager, effectively updating the entire website and all of its pages to track new information about visitors.

### v.    *The Meta Pixel*

21.    As explained in greater detail below, in Section V.B, the Meta Pixel is a specific type of tag used by Meta to transmit visitor information to Meta.

### vi.    *Meta Conversions API*

22.    The Meta Conversions API is a tracking tool developed by Meta to supplement its ability to collect visitor data from websites in addition to visitor data collected by the Meta Pixel. *See* **Exhibit D** (PIXEL_TAX000000230-32) at 1. Meta's Conversions API allows Meta to collect visitor data "that the [Meta Pixel] may fail to capture due to network connectivity issues or page loading errors." *See* **Exhibit D** at 1.

## V.    ANALYSIS

23.    In this section I describe the analysis that leads to my conclusions. First, I describe some of the key data I relied upon in forming my opinions.

A.    **Description of Event Data Produced by Meta**

24.    In this litigation, Meta produced a sample of event data from what it calls its "Hive" database (the "Event Data Sample"), which I have reviewed. The Event Data Sample consists of five tables of data, with data from the ████████████████████████████ depending on the table) between April 2022 and April 2023.

25.    For the purposes of this report, I focused mainly on the ███████████████ table, which includes data from the ██████████████ between July 26, 2022 and April 26, 2023. Internal Meta documents have described Meta's ████████████ database as "the source of truth for event [data] analysis." **Exhibit E** (PIXEL_TAX000000131-7) at 3.

26.    Meta also produced event data for three of the four Representatives, Tiffany Bryant, Katrina Calderon, and Jane Doe ("Representative Data," collectively with the Event Data Sample, the "Data").

27.    The Data produced by Meta includes tables with over ██ distinct data fields related to events from websites, including from H&R Block's and TaxAct's. Many of these fields originate from data collected and transmitted via the Meta Pixel.

28.    This Data includes "pen-register" information about the webpages members of the classes visited, the date and time they were on the website, their operating system information, browser information, device type information, IP address, and geolocation data.

29.    The Data includes fields clearly marked as ██████████████████████ *see* **Exhibit F** at 6, 21 (Ex. 148 to 30(b)(6) deposition), which, like other "pen register" data, is transmitted to Meta each time a person visits a website employing the Meta Pixel.[3] *See* **Exhibit G** at 1 (current version of https://developers.facebook.com/docs/meta-pixel explaining the Meta Pixel can collect, among other things, "[a]nything that is generally present in HTTP headers, a standard web protocol sent between any browser request and any server on the internet. This

---

[3] As described above, the relevant class period for classes related to visitors to the H&R Block website is from January 15, 2019 to June 30, 2023. The relevant class period for classes of visitors to the TaxAct website is from August 25, 2015 to June 30, 2023.

information may include data like IP addresses, information about the web browser, page location, document, referrer and person using the website."). Meta also produced a data dictionary which provides that the fields  and ▉▉▉▉▉ represent the ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉ **Exhibit H** (PIXEL_TAX000058898-905) at 1-2.

30.    My understanding is that neither the Event Data Sample nor the Representative Data is  ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. As explained by Meta's 30(b)(6) deponent, "the primary tables where the Event Data is stored typically retains the data for about 90 days." **Exhibit I** (excerpts of transcript of 30(b)(6) deposition) at 171:23-172:2.

**B.    How and When the Meta Pixel Collected and Transmitted Data to Meta**

31.    The Meta Pixel is a JavaScript tracking tool that Meta offers website operators so they can embed it in their webpages to measure visitor interactions and transmit those interactions to Meta for its use in its advertising and analytics systems. *See* **Exhibit G** at 1. When a webpage containing the Meta Pixel is loaded in a visitor's browser, or when a trigger event occurs (such as clicking a button, submitting a form, or completing a purchase), the Meta Pixel sends data about the event to Meta's servers. *See* **Exhibit J** (Declaration of Tobias Wooldridge in Support of Defendant Meta Platforms, Inc.'s Opposition to Plaintiffs' Motion for Preliminary Injunction in Case No. 3:22-cv-3580-WHO) at ¶ 4. This data can include standard data (such as the event name, page URL, and timestamp), optional custom data configured by the site operator, and data that can be used for matching the site visitor to a Meta user based on the user's Meta profiles (on Facebook, Instagram, and others). *See* **Exhibit J** at ¶ 4.

32.    The Meta Pixel can operate in conjunction with Meta's Conversions API, which sends similar event data directly from the website operator's servers to Meta's servers rather than from the visitor's browser. For both the Meta Pixel and Meta's Conversions API, data is transmitted over the Internet to Meta-controlled endpoints.

### i.    *When the Meta Pixel Began Operating on the Tax Preparers' Websites*

33.    According to Meta's Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories ("Supplemental Interrogatory Responses"), Meta received its first transmission of data from the Meta Pixel operating on the TaxAct website on August 15, 2015, and from the H&R Block Website on January 15, 2019. *See* **Exhibit K** at 2. Meta's Supplemental Interrogatory Responses further state that the Meta Pixel was still operating on the websites on March 30, 2025 when the responses were drafted. *See* **Exhibit K** at 2.

34.    I have used the Meta Pixel Helper, *see* **Exhibit L** (https://chromewebstore.google.com/detail/meta-pixel-helper/fdgfkebogiimcoedlicjlajpkdmockpc?pli=1), a third-party browser extension, to determine whether the Meta Pixel was still operating on the Tax Preparers' websites as of August 15, 2025. The Meta Pixel Helper detects and reports active Meta Pixel IDs and fired events in real time when a site is loaded. Using this tool, I confirmed that the Meta Pixel was still active and firing on www.hrblock.com and www.taxact.com as of that date.

### ii.    *How the Meta Pixel Operates on the Tax Preparers' Websites*

35.    The Meta Pixel is a tracking tag created and maintained by Meta that is embedded in the Tax Preparers' websites. It records visitor interactions and transmits event data to Meta's servers for advertising, analytics, and measurement purpose.

36.    The Meta Pixel is used by Meta to cause information about website visitors' "events" to be sent to Meta, which also allows the website operators to track customer information and interactions with the websites. There are three types of "events" that the Meta Pixel can collect and transmit to Meta:

- **Standard events** are website visitor actions that Meta has defined with specific functions and that website developers can track by employing one of several predefined Meta Pixel functions that are provided by Meta. Standard events are predefined visitor actions that correspond to common visitor activities, such as searching for, viewing or purchasing a product. Standard events that can be tracked include `AddToCart`, `Purchase`, and `CompleteRegistration`.

- **Custom events** are visitor actions that website operators define and can track by calling the Meta Pixel's built-in custom event method (`fbq('trackCustom', ...)`), which is part of the Pixel library provided by Meta. Custom events allow tracking of actions or details not covered by Meta's predefined standard events. For example, a website may want to track which customers used specific coupons during a purchase or identify a specific product purchased. In the context of the Tax Preparers' websites, examples of custom events include `EFile-Print`, `Download`, and `FormSubmission`.

- **Automatic Events** are visitor actions that are tracked automatically without needing the tags to call any specific functions. For example, each time the Meta Pixel loads, it automatically tracks a "PageView" standard event that records the URL of the page visited. No specific code is needed on the webpage to record these events. Automatic events include `PageView`, `ScrollDepth`, `Microdata`, and `SubscribeButtonclick`.

37.    The Meta Pixel captures and transmits:

- The **event type** (e.g., `Purchase`, `InitiateCheckout`).

- **Metadata** about the event (e.g., transaction value, page URL, financial interactions).

- **Device & browser details** (e.g., IP address, user agent, referrer URL).

- **App-specific data** (e.g. screen views, in-app purchases, app version).

- **Visitor identifiers** for cross-platform tracking (e.g., email, phone number, Meta ID).

- **Custom data** parameters defined by the website operator (e.g., tax return status, coupon codes, selected product type).

### iii.    *How the Meta Pixel was Employed on the Tax Preparers' Websites*

38.    Both TaxAct and H&R Block implemented the Meta Pixel on their websites, enabling immediate client-side tracking of visitor interactions as the visitor navigated the site. TaxAct deployed the Meta Pixel through Google Tag Manager, while H&R Block deployed the Meta Pixel through Adobe Dynamic Tag Manager/Adobe Launch and Magic Pixel.

39.    Tag management systems give website operators greater flexibility and control over tracking by allowing them to add, modify, or remove scripts without altering the site's underlying code. Because the tracking code is injected dynamically when the page loads, it is less visible in the website's static source code, reducing the likelihood of detection by casual visitors. Common tag management systems include the ones used by the Tax Preparers.

CONFIDENTIAL                                                                                      11

40.     During the relevant class periods the Meta Pixel operated in a largely uniform manner on the Tax Preparers' websites with respect to the basic mechanics of collecting and transmitting visitor data to Meta.

**C.     Analysis of the Specific Visitor Data Produced by Meta from the Tax Preparers' Websites that the Meta Pixel Collected and Transmitted to Meta**

41.     I reviewed the Data produced by Meta for the purpose of analyzing what event data was transmitted to and received by Meta from the Tax Preparers' websites.

42.     As an initial matter, and as discussed above, the Data produced by Meta was limited because it only included a small sample of possible event data from the relevant class periods. Meta also regularly deleted event data within 90 days. *See* **Exhibit I** at 171:23-172:2. Despite all of this I was able to review a considerable sample of event data for members of the classes and the Representatives.

43.     I have reviewed the Event Data Sample, particularly from the ███████████ spreadsheet. By reviewing the number of ████████████████ and associated ███████, I have determined that there are numerous (and more than 40) people who visited the HRB and TaxAct websites, both nationally and in California, during the relevant class periods. For H&R Block, the period was from January 15, 2019 to June 30, 2023. For TaxAct, the period was from August 25, 2015 to June 30, 2023.

44.     For example, the Representative Data produced by Meta reflects that the Meta Pixel transmitted to Meta the facts that Plaintiff Jane Doe, on April 2, 2022, visited H&R Block's website using a Chrome desktop browser with device operating system Windows NT, while she was in Turlock, California, and searched for information about claiming boyfriends on taxes. *See* **Exhibit F** at 1-3, 5-6, 21 (bottom row of each page).

45.     In another example, the Representative Data produced by Meta reflects that the Meta Pixel transmitted to Meta the facts that Plaintiff Katrina Calderon, on November 14, 2021, visited H&R Block's website using a mobile phone with an iOS operating system (i.e., an Apple iPhone), when she was in Salinas, California, and visited H&R Block's home page.

46.    As Meta confirmed in this litigation, in response to a request for admission that the Meta Pixel collected information from the TaxAct website that included numerous types of data, Meta:

> admit[ted] that it received from the TaxAct website via the Pixel, among other things, "SubscribedButtonClick" event data, "PageView" event data, and other event data with parameters, among others, bearing the labels "name," "raw_event_name," "event_name," "itemlist_product_names," "og:site_name," "cy_email," "ly_email," "email," "state_revenue," "zip," "phone," "age_range," "num_of_dependents," "numChildButtons," "button_text," "buttonFeatures," "buttonText," "return_year," "further_referred_document_link," "referred_document_link," "innerText," "tax_form," "formFeatures," and "client_user_agent."

**Exhibit M** at 3 (Meta's Amended Responses and Objections to Plaintiffs' First Set of Request for Admission).

47.    Meta further admitted that it "received from the TaxAct website via the Pixel, among other things, parameters bearing the labels 'num_of_dependents,' 'numChildButtons,' 'w2,' 'agi,' 'federal_owe_amount,' and 'federal_refund_amount." **Exhibit N** at 15 (Meta's Responses and Objections to Plaintiffs' First Set of Request for Admission).

48.    The Event Data Sample produced by Meta also reveals specific tax concerns that members of the classes researched when visiting both Tax Preparers' website. For example, the Event Data Sample table ███████████████ table for data from ███████████ reflects that the following URLs were visited:

- https://www.hrblock.com/taxcenter/income/investments/how-to-figure-capital-gains-tax/
- https://blog.taxact.com/debt-you-cant-lose-in-bankruptcy/

49.    The Event Data Sample from ███████████, similarly shows, among other things, a specific class member's age range (35-44), return year (2020), agi ($55,000), federal revenue ($0), federal amount owed ($0), federal refund amount ($7,400), number of dependents (2),

standard deductions (1), state revenue ($0), and tax form used (1040):

("age_range":"35-
44","f1099misc":"0","ad_tracking":"0","promo":"taspcl4usmilitary,","so
urce_code":"1901200000","start_vintage":"yr3","customer_type":"cons
umer","return_year":"2020","start_edition":"deluxe","current_edition":
"deluxe","start_product_id":"20CRDLXFEDFEDOL","current_product_id":
"20CRDLXFEDFEDOL","start_actual_price":"24.95","start_default_price"
:"24.95","agi":"55000","app_step":"iv_uspaper_printfedreturn","audit_r
evenue":"0.00","charitable_contribution":"0","complete_vintage":"new"
,"federal_revenue":"0.00","federal_owe_amount":"0","federal_refund_
amount":"7400","filing_status":"married_filing_jointly","investments":"
1","modules_submitted":"fed","num_of_dependents":"2","payment_typ
e":"ccard","rpt_revenue":"0.00","schedule_c":"0","schedule_c_ez":"und
efined","software_revenue":"0.00","standard_deduction":"1","state_rev
enue":"0.00","svc_revenue":"undefined","tax_form":"1040","total_reve
nue":"0.00","w2":"1","_filteredParams":"{\"unwantedParams\":[\"mort
gage_interest\",\"student_loan_interest\"],\"sensitiveParams\":[];"}

**Exhibit O** (Exhibit 146 to 30(b)(6) deposition) at 3, 16.

50.    There are thousands of rows of data like this for other members of the classes in the limited Event Data Sample produced by Meta.

**D.**    ███████████████████████████████

51.    The types of data produced by Meta could be used ███████████████

███████████████████████████████    I have been asked how to calculate these numbers using Meta's Hive data. In my view, a reasonable measure of a "visit" to a website (including the Tax Preparers' websites) would be each time someone (a) goes to the website and either simply remains for a time on the initial web page or performs some operations such as entering information into the website, and then (b) leaves the website by navigating to a different website, closing the browsing session or timing out. If this visitor comes back to the website again at a later time, that would be considered a second visit. I call the count of these visits

█████████████████

52.    In providing the following method for deriving the ████████████ from the Data, I am using the following proxies that should be accurate based on my knowledge of the fields in the Data and on the information disclosed by Meta.

53.    In the below Table 1, I identify the definitions that Meta provided for relevant fields in the Event Data Sample from the ████████████ database. *See* **Exhibit P** (PIXEL_TAX000034479-506) at 1-2. I am relying on these definitions and also my observations of the data in the fields.



**Table 1. Meta Hive field definitions provided by Meta**

54.    With the relevant fields of the Data identified, in order to ████████████ ████████████████████████████████████████ ███████████████████████████████ ██████████████ ██████ ██████████████████████████. *See* **Exhibit K** at 2 (TaxAct Pixel ID is 1445099202415763; H&R Block Pixel ID is 288696891835309). ████████ ████████████████████████████████████ ██████████████████████████

55.    Next, the field ████████████████ ██████████████████████ ██████████████████████████████ Meta Pixel or Meta Conversions API. *See* **Exhibit P** at 1; *see also* **Exhibit Q** (PIXEL_ TAX000059048-53) at 3.

56.    Finally, the field ████████████ ██████████████████████████ **Exhibit P** at 2. Put another way, ██████████████████████████████████ ████████████████████████████████████████████████

CONFIDENTIAL

███████████████████████████████ ████████ ██████████████████

███████████ for each website.

## VI.    CONCLUSIONS

57.    In this report, I describe how I reviewed the data supplied by Meta in its "Hive." I conclude the following about the data that Meta collected and how it collected it.

1) **How and When the Meta Pixel Collected and Transmitted Data to Meta**: This report details how the Meta Pixel and related technologies operate. As described in this report, I determined that the Meta Pixel collected and transmitted various types of data to Meta from the Representatives and other members of the Classes during the relevant class periods from the Tax Preparers' websites, and did so in a largely uniform matter on each website during the relevant class periods.

2) **Analysis of the Specific Visitor Data Produced by Meta from the Tax Preparers' Websites that the Meta Pixel Collected and Transmitted to Meta**: In this report, I analyzed samples of visitor data from the Tax Preparers' websites that Meta produced to Plaintiffs from its repository of "Hive" data. I determined that the data included "pen register" data that was transmitted from each visitor to the Tax Preparers' website to Meta, as well as other data reflecting visitors' tax information and other financial concerns. While Meta only produced a limited data sample, I nonetheless found there was an enormous amount of tax information and other data transmitted to Meta from the Tax Preparers' websites. In addition, I proposed how the types of data produced by Meta can be used to ████████████████████████ ████████████████████████████████████.

58.    It is my understanding that discovery in this case is ongoing. Accordingly, I reserve the right to supplement or amend my opinions in light of any additional evidence, testimony, or information that may be provided to me after the date of this report. I also reserve the right to

supplement or amend my opinions in response to any expert reports served by any other party in the lawsuit.

Dated: August 18, 2025

Robert Zeidman

## Index of Exhibits

Exhibit A – Materials Relied Upon

Exhibit B – Robert Zeidman Resume

Exhibit C – Relevant Legal Statutes

Exhibit D – Best practices for Meta Pixel setup PIXEL_TAX000000230-32

Exhibit E – How the Meta Pixel works PIXEL_TAX000000131-7

Exhibit F – Ex. 148 to 30(b)(6) deposition

Exhibit G – Meta Pixel Developers Website, Current version of
https://developers.facebook.com/docs/meta-pixel

Exhibit H – ██████████████████ PIXEL_TAX000058898-905

Exhibit I – Excerpts of transcript of 30(b)(6) deposition

Exhibit J – Declaration of Tobias Wooldridge in Support of Defendant Meta Platforms, Inc.'s Opposition to Plaintiffs' Motion for Preliminary Injunction in Case No. 3:22-cv-3580-WHO

Exhibit K – Meta's Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories

Exhibit L – Meta Pixel Helper overview, https://chromewebstore.google.com/detail/meta-pixel-helper/fdgfkebogiimcoedlicjlajpkdmockpc?pli=1

Exhibit M – Meta's Amended Responses and Objections to Plaintiffs' First Set of Request for Admission

Exhibit N – Meta's Responses and Objections to Plaintiffs' First Set of Request for Admission

Exhibit O – Exhibit 146 to 30(b)(6) deposition

Exhibit P – ██████████████████ PIXEL_TAX000034479-506

Exhibit Q –  Introducing ██████████ table PIXEL_TAX000059048-53

Exhibit R – About Automatic Events _ Meta Business Help Center,
https://www.facebook.com/business/help/1292598407460746?id=1205376682832142

Exhibit S – About Standard and Custom Website Events _ Meta Business Help Center,
https://www.facebook.com/business/help/964258670337005?id=1205376682832142

# EXHIBIT A

# Exhibit A – Materials Relied Upon

1. Data Produced by Meta to Plaintiffs including "Event Data Sample" and "Representative Data"
2. PIXELTAX000000230-32
3. PIXELTAX000000131-7
4. Ex. 148 to 30(b)(6) deposition
5. Meta Pixel description, https://developers.facebook.com/docs/meta-pixel
6. PIXELTAX000058898-905
7. Excerpts of transcript of 30(b)(6) deposition
8. Declaration of Tobias Wooldridge in Support of Defendant Meta Platforms, Inc.'s
9. Opposition To Plaintiffs' Motion for Preliminary Injunction in Case No. 3:22-cv-3580-WHO
10. Meta's Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories
11. Meta Pixel Helper Overview https://chromewebstore.google.com/detail/meta-pixel-helper/fdgfkebogiimcoedlicjlajpkdmockpc?pli=1
12. Meta's Amended Responses and Objections to Plaintiffs' First Set of Request for Admission
13. Meta's Responses and Objections to Plaintiffs' First Set of Request for Admission
14. Exhibit 146 to 30(b)(6) deposition
15. PIXELTAX000034479-506
16. PIXELTAX000059048-53
17. About Automatic Events, https://www.facebook.com/business/help/1292598407460746?id=1205376682832142
18. About Standard and Custom Website Events, https://www.facebook.com/business/help/964258670337005?id=1205376682832142

# EXHIBIT B

# *Robert Zeidman*



10981 Willow Valley Ct
Las Vegas, NV 89135
Tel (650) 741-5809
Email Bob@ZeidmanConsulting.com
Website www.ZeidmanConsulting.com

**PROFESSIONAL SUMMARY**

Bob Zeidman has management experience in the founding and daily operation of various high-tech companies as well as hands-on experience designing, analyzing, and reverse-engineering hardware and software. Mr. Zeidman is considered a pioneer in the fields of analyzing and synthesizing software source code and the creator of the field of Software Forensics. He is also considered one of the leading experts in the Verilog hardware description language as well as ASIC and FPGA design. He has written several engineering texts and regularly teaches courses in these areas at conferences throughout the world. Mr. Zeidman is also an experienced and well-regarded expert in intellectual property disputes. He is certified in the use of CodeSuite®. He holds a B.A. in Physics and a B.S. in Electrical Engineering from Cornell University and a master's degree in Electrical Engineering from Stanford University.

**EXPERIENCE**

10/1987 - present: Zeidman Consulting - founder and president
- Provides engineering hardware and software design services to companies.
- Provides engineering support and expert witnesses for high-tech litigation.

8/2007 - present: Software Analysis and Forensic Engineering Corporation - company founder and president
- Software tools for intellectual property litigation.
- Created patented CodeSuite® software including BitMatch®, CodeCLOC®, CodeCross®, CodeDiff®, CodeMatch®, and SourceDetective® for efficiently finding correlation between source code files of different programs.
- Developed CodeSuite-MP for running CodeSuite® on multiple cores of a multicore processor.
- Architected CodeGrid for running CodeSuite® on a supercomputer grid.

8/2020 - present: Good Beat Games - founder and president
- Online gaming company.
- Initially focusing on poker: Good Beat Poker.

12/2013 - present: Firtiva Corporation - founder and president
- Streaming media company.

1/2002 – 5/2023: Zeidman Technologies - founder and president
- Software tools for embedded software development.
- Created patented SynthOS® software that automatically synthesizes source code for a real time operating system.
- Created patented Molasses® virtualization software that enables a slow speed hardware emulator or prototype to be attached to a high-speed network to emulate network hardware in a live system.

1/2003 - 4/2008: Semizone.com - advisor
- Web-based training for engineers.
- Advisor on issues relating to e-learning content, development, presentation, and delivery.
- Instructor for various electrical engineering courses.

1/1999 - 12/2002: The Chalkboard Network - founder and president
- Web-based training for engineers and business professionals.
- Developed Depth Control®, a unique instructional design methodology for Web-based training.

1/1997 - 12/1997: Apple Computer - consultant

7/1995 - 9/1995
- Firmware development for a multimedia projection system.
- Firmware development for the Apple Studio Display, an advanced flat panel monitor.

7/1996 - 12/1996: Hitachi Computer Products (America) - consultant
- Helped define an architecture and functional specification for an ATM switch.

10/1995 - 6/1996: Cisco Systems - consultant

3/1995 - 10/1995

10/1994 - 1/1995
- Wrote Verilog behavioral models and developed a Verilog simulation environment for a 10baseT switch.
- Performed schematic capture, Verilog design, and simulation of an FDDI hub.
- Performed schematic capture, Verilog design, and simulation of an ATM router.

5/1997 - 6/1997: Quickturn Design Systems - consultant

3/1995 - 7/1995

1/1994 - 2/1994

5/1993 - 6/1993
- Designed custom memory boards for emulation of a supercomputer.

7/1993 - 3/1994: Adaptive Video - consultant
- Managed a team designing DSP-based medical imaging boards.

1/1993 - 3/1993: Wireless Access - consultant
- Supervised the design of an FPGA-based prototype for a telecommunications encoding and decoding scheme.

1/1992 - 4/1999: eVAULT Remote Backup Service - founder and president
- Invented the concept of remote backup.
- Set up a remote backup system with a central file server and communication lines including ISDN.
- Wrote remote backup software for DOS, Windows, and OS/2 including a GUI, a backup scheduler and file compression, encryption, and communication routines.

6/1991 - 9/1991: STEP Engineering - consultant
- Reviewed and optimized RISC hardware and software.

12/1990 - 8/1991: Ricoh Corporation - consultant
- Led a team that designed four RISC-based controllers for laser printers, scanners, faxes, and copiers.

9/1989 - 11/1990: DAVID Systems - consultant
- Designed network interface boards for 10BaseT, 10Base2, and FOIRL.
- Led an international team that tested an AMI encoding scheme and designed an ASIC for a digital phone set.

5/1993 - 8/1993: Ikos Systems - consultant

8/1992 - 2/1993

3/1988 - 8/1989
- Designed a high speed SBUS to MXIbus interface and a high-speed controller for a parallel processor.
- Architected, designed, and wrote diagnostic software for a RISC-based controller for a simulation accelerator.

10/1987 - 10/1988: Stanford University - consultant
- Led a team of graduate students under Professor Mike Flynn in the design and testing of a neural network memory.

1/1986 - 3/1988: Telestream Corporation - staff engineer
- Developed an architecture model for a telecom parallel processor system.
- Modeled, simulated, and tested a proprietary bus.
- Designed a telecom processing element ASIC.
- Designed a telecom system backplane.

9/1985 - 12/1985: American Supercomputers - staff engineer
- Designed a data cache and the register section logic for a CRAY compatible supercomputer.
- Assisted with the implementation of a behavioral simulator.

1/1985 - 8/1985: ROLM Corporation - staff engineer
- Simulated, debugged, and tested cache and memory control ASICs for a minicomputer.
- Microcoded the character string instructions.

4/1983 - 12/1984: Signetics Corporation - staff engineer
- Project leader for a CMOS DMA Interface chip (68431).
- Simulated a TTL VME bus controller chip (68172).
- Redesigned and simulated an oxide isolated ISL Enhanced Video Attribute Controller chip (2675T).
- Simulated a TTL Disk Phase Locked Loop chip (68459).
- Created a standard procedure for developing ASICs.

**LITIGATION CONSULTING**

11/2021 – 11/2024: Motorola Solutions, Inc. v. Hytera Communications Corporation Ltd., et al.
Law Firm: Steptoe LLP
Client: Hytera
Court: U.S. District Court, Northern District of Illinois, Eastern Division
Case: 1:17-cv-01973
- Copying of mobile radio software
- Reviewed source code
- Compared software code using CodeSuite
- Wrote expert reports
- Testified at deposition
- Testified at contempt hearing

11/2021 – 11/2024: USA v. Hytera Communications Corporation Ltd., et al.
Law Firm: Steptoe LLP
Client: Hytera
Court: U.S. District Court, Northern District of Illinois, Eastern Division
Case: 1:20-CR-00688

- Copying of mobile radio software
- Reviewed source code
- Compared software code using CodeSuite
- Wrote expert report

6/2022 – 4/2025: Nextpulse, LLC v. Life Fitness

Law Firm: GCA Law Partners
Client: Nextpulse
Court: U.S. District Court, Northern District Of Illinois, Eastern Division
Case: Case No. 1:22-CV-03239
- Alleged misappropriation of confidential software
- Reviewed source code
- Compared software code using CodeSuite

6/2022 – 11/2024: Nextpulse, LLC v. Brunswick Corporation

Law Firm: GCA Law Partners
Client: Nextpulse
Court: Superior Court of The State of California, County of San Francisco
Case: Case No. CGC-18-571065
- Alleged misappropriation of confidential software
- Reviewed source code
- Compared software code using CodeSuite
- Testified at deposition

4/2022 – 2/2023: Suzhou Angela Online Game Technology and Imperium Interactive Entertainment v. Snail Games USA and Wildcard Properties

Law Firms: Hughes Hubbard & Reed / Blue Peak Law Group and Quinn Emanuel Urquhart & Sullivan
Client: Court (neutral)
Court: U.S. District Court, Central District of California
Case: 2:21-cv-9552-CAS-SK and 2:22-cv-2009-CAS-SK
- Alleged copying of online game software
- Reviewed source code
- Compared software code using CodeSuite
- Wrote expert report
- Testified at deposition

3/2022 – 12/2022: Insuraprise, Inc. vs. Universal Fidelity Life Insurance Company, et al.

Law Firm: Icenogle & Boggins
Client: Universal Fidelity Life Insurance Company
Court: 459th Judicial District Court of Travis County, Texas
Cause: D-1-GN-18-003277
- Alleged trade secret theft of Medicare Supplemental Insurance customer management software
- Wrote expert report
- Testified at deposition

Testified at deposition
2/2022 – 8/2023: Karma Automotive v. Lordstown Motors Corp.

Law Firm: Fisher & Phillips / Seyfarth Shaw
Client: Karma Automotive
Court: U.S. District Court, Central District of California
Case: 8:20-cv-02104-JVS-DFM
- Alleged copying of automotive control software.
- Reviewed source code
- Compared software code using CodeSuite

- Wrote declarations and expert report
- Testified at deposition

2/2022 – 9/2022: Allscripts v. Andor Health

Law Firm: Barnes & Thornburg
Client: Allscripts
Court: U.S. District Court, District of Delaware
Case: 1:21-CV-00704-MAK G
- Alleged copying and reverse engineering of Electronic Health Records (EHR) applications
- Reviewed source code
- Compared software code using CodeSuite
- Wrote expert report
- Testified at deposition

12/2021 – 6/2022: Solas OLED v. Samsung Electronics

Law Firm: Russ August & Kabat
Client: Solas OLED
Court: U.S. District Court, Eastern District of Texas, Marshal Division
Case: 2:21-cv-00105-JRG
- Alleged patent infringement of capacitive touch screens
- Wrote expert report
- Testified at deposition

8/2021: Neodron Ltd. v. Cypress Semiconductor

Law Firm: Russ August & Kabat
Client: Neodron
Court: U.S. District Court, Western District of Texas
Case: 6:20-cv-523-ADA
- Alleged patent infringement of capacitive touch screens

7/2021 – 8/2021: Neodron Ltd. v. STMicroelectronics

Law Firm: Russ August & Kabat
Client: Neodron
Court: U.S. District Court, Western District of Texas
Case: 6:20-cv-560
- Alleged patent infringement of capacitive touch screens

2/2021 – 9/2022: AC Technologies and Via Vadis v. Amazon

Law Firm: DiNovo Price Ellwanger & Hardy
Client: AC Technologies and Via Vadis
Court: U.S. District Court, Western District of Texas
Case: 1:14-cv-813
- Alleged patent infringement of peer-to-peer BitTorrent file sharing protocol
- Wrote expert report
- Testified in deposition

12/2020 – 9/2021: Qualcomm v. Monterey Research

Law Firm: Desmarais
Client: Monterey Research
Court: Patent Trial and Appeal Board
Case: IPR2020-01493
- Alleged patent infringement of programmable devices.
- Wrote expert declaration
- Testified in deposition

<u>12/2020 - 9/2021: Advanced Micro Devices v. Monterey Research</u>

Law Firm: Desmarais
Client: Monterey Research
Court: Patent Trial and Appeal Board
Case: IPR2020-01315
- Alleged patent infringement of transistor output buffer circuit
- Wrote expert declaration
- Testified in deposition

<u>12/2020 - 9/2021: Advanced Micro Devices v. Monterey Research</u>

Law Firm: Desmarais
Client: Monterey Research
Court: Patent Trial and Appeal Board
Case: IPR2020-00989
- Alleged patent infringement of programmable devices
- Wrote expert declaration
- Testified in deposition

<u>8/2020 - present: ImageKeeper v. Wright National Flood Insurance Services</u>

Law Firm: Duane Morris
Client: Wright National Flood Insurance Services
Court: United States District Court, District of Nevada.
Case: 2:20-cv-01470-GMN-VCF
- Alleged trade secret theft of flood insurance claim adjuster software
- Wrote expert declarations
- Testified in deposition

<u>7/2020 – 9/2023: Wavell v. Zwerling, et al.</u>

Law Firm: Callahan & Blaine
Client: Wavell
Court: Judicial Arbitration & Mediation Services, Orange County, California
Case: 1200055354
- Alleged trade secret theft of financial analysis software
- Wrote expert declarations
- Testified in deposition

<u>6/2020 – 1/2021: In re: Tiktok, Inc.</u>

Law Firm: Freed Kanner London & Millen / Carlson Lynch
Client: Plaintiffs
Court: U.S. District Court, Northern District Of Illinois, Eastern Division
Case: 20-cv-4699
- Class action lawsuit about consumer privacy
- Computer source code review

<u>12/2019 – 6/2023: EcoFactor v. ecobee</u>

Law Firm: Russ August & Kabat
Client: EcoFactor
Court: U.S. District Court, Western District of Texas, Waco Division
Case: 6:20-cv-00078-ADA
- Alleged patent infringement of smart thermostats and smart HVAC systems
- Wrote expert report
- Testified in deposition
- Testified at trial

<u>12/2019 – 12/2021: EcoFactor v. ecobee</u>

Law Firm: Russ August & Kabat
Client: EcoFactor
Court: U.S. International Trade Commission
Case: 337-TA-1258
- Alleged patent infringement of smart thermostats, smart HVAC systems, smart HVAC control systems, and components thereof
- Wrote expert reports
- Testified at hearing

<u>9/2019 – 2/2024: HOV Services v. ASG Technologies Group</u>

Law Firm: Stokes Lawrence
Client: ASG Technologies Group
Court: U.S. District Court, Southern District of New York
Case: 1:18-cv-09780-PKC
- Alleged breach of contract involving enterprise information and IT system management solutions
- Compared software code using CodeSuite
- Wrote expert declaration
- Testified in deposition
- Testified at trial

<u>8/2019 – 4/2021: Knowmadics v. LDX</u>

Law Firm: SKS LAW / Lister-Beaupré
Client: LDX
Court: Ontario Superior Court of Justice, Canada
Case: 7-CV-74995
- Alleged copyright infringement of location monitoring and tracking software
- Compared software code using CodeSuite
- Wrote expert reports
- Testified in deposition

<u>7/2019 – 7/2021: Exegy and IP Reservoir v. Activ Financial</u>

Law Firm: Harness, Dickey & Pierce
Client: Exegy
Court: U.S. District Court, Northern District of Illinois
Case: ILND 1:19-cv-02858
- Alleged patent infringement of network devices for real-time financial market data
- Wrote three expert declarations for IPR
- Testified in three depositions for IPR

<u>7/2019 – 3/2021: Neodron v. Samsung, Microsoft, Amazon, Lenovo, Motorola, Dell, and HP</u>

Law Firm: Russ August & Kabat
Client: Neodron
Court: U.S. International Trade Commission
Case: Inv. No. 337-TA-1162
- Alleged patent infringement of capacitive touch screens
- Wrote expert reports
- Testified in two depositions

<u>6/2019 - 11/2019: iReviewNow & SecurTest v. Datamaxx Applied Technologies</u>

Law Firm: Ausley & McMullen,
Client: iReviewNow & SecurTest
Venue: American Arbitration Association
Case: 01-18-0004-6193

- Alleged breach of contract and trade secret theft of a system for verifying and authenticating background reports and consumer records
- Wrote a declaration and an expert report
- Testified at arbitration hearing

5/2019 – 5/2020: ECI Software Solutions. v. John Plyler Plumbing and Hardware, Olshan Lumber Company, Prosperity Computer Solutions, Greg Matatall, Wade Frazier, and Ed Baldridge

Law Firm: Lewis Brisbois Bisgaard & Smith
Client: Prosperity Computer Solutions
Court: U.S. District Court, Northern District of Texas
Case: 3:18-cv-02758-S

- Alleged copyright infringement and trade secret theft of enterprise resource planning software
- Wrote expert report
- Testified in deposition

10/2018 – 2/2020: Automotive Data Solutions v. Directed Electronics Canada

Law Firm: Trojan Law Offices
Client: Automotive Data Solutions
Court: U.S. District Court, Central District of California
Case: 2:18-cv-01560-GW-E

- Alleged copyright infringement of aftermarket automobile remote starter devices
- Alleged trade secret misappropriation of aftermarket automobile remote starter devices
- Compared software code using CodeSuite
- Wrote expert reports
- Testified in deposition

6/2018 - 3/2019: Sarine Technologies v. Diyora & Bhanderi, et al.

Client: neutral expert appointed by the court
Court: Commercial Court at Vadodara, Gujarat, India
Case: Commercial Trademark Suit No. 8 of 2017

- Alleged copyright infringement of diamond imaging software
- Compared code using CodeSuite
- Wrote an expert report
- Affirmed as an expert by the Supreme Court of India

4/2018 – 06/2020: Home Semiconductors v. Samsung Electronics

Law Firm: TechKnowledge Law Group
Client: Home Semiconductors
Court: United States District Court, District of Delaware
Case: Civil Action 13-2033-RGA

- Alleged patent infringement of memory hardware
- Performed research
- Prepared expert report

4/2018 - 5/2018: The State of Missouri v. Eric Greitens

Law Firm: St. Louis Circuit Attorney's Office
Client: The State of Missouri
Court: 22nd Circuit Court, Missouri
Case: Cause No. 1822-CR00642

- Alleged criminal privacy violation
- Researched, analyzed, and compared smartphone camera shutter sounds
- Researched smartphone mechanism for transmission of pictures
- Wrote expert reports
- Testified in deposition

<u>1/2018 - 9/2019: Video Gaming Technologies v. Castle Hill Studio, et al</u>

Law Firm: Saul Ewing Arnstein & Lehr
Client: Castle Hill Studios
Court: U.S. District Court, Northern District of Oklahoma
Case: 17-cv-454-GKF-JF
- Alleged trade secret misappropriation of Class II gaming software
- Compared software code using CodeSuite
- Wrote an expert report
- Testified in deposition

<u>12/2017 - 9/2018: U.S. Ex Rel Maria Uchytil v. Avanade, et al.</u>

Law Firm: Lowe Graham Jones PLLC
Client: Maria Uchytil
Court: U.S. District Court, Western District of Washington
Case: C12-2091-JCC
- Alleged fraudulent procurement of government contracts for computer software
- Compared software code using CodeSuite
- Wrote expert report
- Testified in deposition

<u>1/2017 – 6/2018: CamSoft Data Systems v. Southern Electronics Supply Company, et al.</u>

Law Firm: Melancon Rimes
Client: CamSoft Data Systems
Court: 19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana
Case: Docket No. 582,741
- Alleged trade secret misappropriation of wireless network configuration technology
- Wrote an expert report
- Testified in deposition

<u>12/2016 - 11/2018: Papst Licensing v. Apple, LG Electronics, ZTE Corporation, Samsung Electronics, Lenovo, Motorola Mobility, and Huawei Technologies</u>

Law Firm: DiNovo Price Ellwanger
Client: Papst Licensing
Court: U.S. District Court, Eastern District of Texas, Tyler Division
Case: Civil Action No. 6:15-cv-1095
- Alleged patent infringement of mobile phones
- Read patents
- Examined mobile phones
- Analyzed software source code
- Wrote expert reports
- Testified in 6 depositions
- Testified at trial

<u>9/2016 - 9/2017: CSS v. Christopher Herrington, Gene Yoho and Compiled Technologies</u>

Law Firm: Robinson & McElwee
Client: Christopher Herrington, Gene Yoho and Compiled Technologies
Court: U.S. District Court, Southern District of West Virginia, Charleston Division
Case: Civil Action 2:16-cv-01762
- Alleged copyright infringement of government document management software
- Alleged trade secret misappropriation of government document management software
- Compared software code using CodeSuite
- Wrote an expert report
- Testified in two depositions

7/2016 - 1/2017: Commonwealth of MA v. Figuereo, et al.

Law Firm: Committee for Public Counsel Services
Client: Figuereo, et al.
Court: Massachusetts District Court and Boston Municipal Court
Case: 1248CR1075
- Supervised a team of engineers analyzing and testing Draeger Alcotest breathalyzer hardware and firmware for accuracy, consistency, and reliability.

5/2016 - 2/2020: In re Papst Licensing GmbH & Co. KG Patent Litigation

Law Firm: Desmarais
Client: Papst Licensing GmbH & Co. KG
Court: U.S. District Court, District of Columbia
Case: Miscellaneous Action No. 07-493-RMC
- Alleged patent infringement of camera interface software
- Read patents and proposed a claim construction
- Wrote a declaration
- Testified in deposition
- Testified at Markman hearing

1/2016 - 6/2016: Verasonics v. Alpinion Medical Systems

Law Firm: Davis Wright Tremaine
Client: Verasonics
Venue: American Arbitration Association, International Centre for Dispute Resolution
Case: 01-15-0002-9484
- Alleged trade secret theft of software for an ultrasound research platform
- Compared software code using CodeSuite
- Wrote a declaration and an expert report
- Testified at arbitration hearing

12/2015 - 2/2017: ACI Worldwide v. MasterCard Technologies

Law Firms: Faegre Baker Daniels / Robins Kaplan
Client: ACI Worldwide
Venue: U.S. District Court, District of Nebraska
Case: 8:14cv-00031
- Alleged trade secret theft of financial transaction middleware
- Compared software code using CodeSuite
- Wrote declarations and expert reports
- Testified at depositions

10/2015 - 6/2017: Phoenix Technologies v. VMware

Law Firm: Cooley
Client: Phoenix Technologies
Venue: U.S. District Court, Northern District of California, Oakland Division
Case: 5:15-cv-01414
- Alleged copyright infringement of BIOS code
- Compared software code using CodeSuite
- Wrote two expert reports
- Testified at deposition
- Testified at trial

7/2015 - 5/2016: Oracle America v. Google

Law Firm: Orrick, Herrington & Sutcliffe
Client: Oracle America
Court: U.S. District Court, Northern District of California

Case: C 10-03561 WHA
- Software copyright infringement of Java API packages
- Wrote expert report
- Testified in deposition

2/2015 - present: Intellisoft v. Acer America

Law Firm: Balaban & Spielberger
Client: Intellisoft
Court: Superior Court of California, County of Santa Clara
Case: 1-14-CV-272381
- Alleged trade secret misappropriation of power management hardware and software
- Examined personal computer hardware and software
- Read patents
- Read industry specifications
- Wrote expert reports
- Testified twice at deposition

2/2015 - 1/2016: NNG v. Ava Enterprises

Law Firm: Lewis Roca Rothgerber Christie
Client: NNG, Kft
Court: U.S. District Court, Central District of California
Case: 2:2014-CV-00220
- Alleged copyright infringement of GPS navigation software
- Wrote expert report

10/2014 - 4/2018: ObjectiVision v. Visionsearch Pty Ltd and University of Sydney

Law Firms: K&L Gates / Marque Lawyers / Allens
Client: ObjectiVision
Court: Federal Court of Australia
Case: NSD 385 of 2014
- Alleged copyright infringement of software for a visual electrophysiology device
- Compared software code using CodeSuite
- Researched algorithms
- Wrote expert reports
- Collaborated in an expert conclave
- Testified in trial

10/2014 - 6/2016: AAMP of America v. Automotive Data Solutions

Law Firm: Trojan Law Offices
Client: Automotive Data Solutions
Court: U.S. District Court, Middle District of Florida, Tampa Division
Case: 8:13-cv-2019-T-35TGW
- Alleged patent infringement of aftermarket stereo interface devices
- Wrote expert reports
- Participated in inter partes review
- Testified in two depositions

11/2013 - 9/2014: United Services Automobile Association v. Mitek Systems

Law Firm: Wilson Sonsini Goodrich & Rosati / Scheper Kim & Harris
Client: Mitek Systems
Court: U.S. District Court, Western District of Texas, San Antonio Division
Case: SA-12-CA-0282-FB
- Alleged trade secret misappropriation of mobile banking and check imaging software
- Alleged patent infringement of mobile banking and check imaging software

- Analyzed software and examined specifications
- Wrote expert reports

6/2013 - 1/2014: Cellebrite Mobile Synchronization v. Micro Systemation

Law Firm: Pearl Cohen Zedek Latzer Baratz
Client: Cellebrite Mobile Synchronization
Court: U.S. District Court, Virginia Eastern District Court, Alexandria Division
Case: 1:13-cv-01014-TSE-TRJ
- Alleged copyright infringement and trade secret misappropriation of mobile device forensic software
- Compared software code using CodeSuite
- Wrote an expert report

4/2013 - 12/2015: Audionics System v. AAMP of Florida

Law Firm: Trojan Law Offices
Client: Audionics System
Court: U.S. District Court, Central District of California, Western Division
Case: 2:12-cv-10763-MMM-JEM
- Alleged patent infringement of aftermarket stereo interface devices
- Wrote expert reports
- Testified in two depositions

2/2013 - 5/2017: Metropolitan Health Corporate v. Neil Harvey Associates

Law Firm: Kritzinger & Co / Attorneys Zumpt
Client: Metropolitan Health Corporate
Venue: Western Cape High Court, Cape Town, South Africa
Case: 10264/2010
- Alleged copyright infringement of healthcare administration software
- Compared software code using CodeSuite
- Wrote expert reports

10/2012 - 12/2012: E-Tech USA v. 2lemetry

Law Firm: Reed Smith
Client: 2lemetry
Court: U.S. District Court, District of Colorado
Case: cv-03371-REB-KMT
- Alleged trade secret misappropriation of cloud platform software
- Compared software code using CodeSuite
- Wrote an expert report

8/2012 - 4/2015: Round Rock Research v. SanDisk

Law Firm: Desmarais
Client: Round Rock Research
Court: U.S. District Court, District of Delaware
Case: 12-569 (SLR)
- Alleged patent infringement of flash memory devices
- Analyzed hardware and firmware and examined specifications
- Wrote expert reports
- Testified twice in deposition
- Testified twice in court

8/2012 - 4/2015: SanDisk v. Round Rock Research

Law Firm: Desmarais
Client: Round Rock Research

Court: U.S. District Court, Northern District of California
Case: 1-cv-05243-RS
- Alleged patent infringement of flash memory devices
- Analyzed hardware and firmware and examined specifications
- Wrote expert reports
- Testified in deposition

7/2012 - 5/2013: Kenneth C. Henry v. Petrolink v. Digital Well File

Law Firms: Wright & Close; Martin, Disiere, Jefferson & Wisdom
Client: neutral expert
Court: District Court of Harris County, Texas, 133rd Judicial District
Case: 2010-08178
- Alleged copyright infringement of real-time decision-making software for oilfield data
- Alleged trade secret theft
- Compared software code using CodeSuite
- Wrote two expert reports

7/2012 - 6/2013: Elan Microelectronics v. Pixcir Microelectronics

Law Firm: Alston & Bird
Client: Elan Microelectronics
Court: U.S. District Court, District of Nevada
Case: 2:10-cv-00014-GMN-(PAL)
- Alleged patent infringement of capacitive touch controller hardware and software

1/2012 - 5/2014: Intellectual Ventures v. Altera, Microsemi, Lattice Semiconductor, and Xilinx

Law Firm: Desmarais
Client: Intellectual Ventures
Court: U.S. District Court, District of Delaware
Case: C.A. No. 10-1065-LPS
- Alleged patent infringement of FPGA and ASIC integrated circuits
- Examined schematics and Verilog code
- Wrote expert reports
- Testified at two depositions

1/2012 - 6/2014: ThinkOptics v. Nintendo of America, et al.

Law Firm: Nix Patterson & Roach
Client: ThinkOptics
Court: U.S. District Court, Eastern District of Texas, Tyler Division
Case: 6:2011cv00454
- Alleged patent infringement of video game controller hardware
- Wrote expert reports
- Testified at two depositions

1/2012 - 9/2012: E-Micro Corporation v. Google, et al.

Law Firm: Nix Patterson & Roach
Client: E-Micro
Court: U.S. District Court, Eastern District Of Texas, Tyler Division
Case: 6:11-CV-465 (JDL)
- Alleged patent infringement of mobile commerce software

7/2011 - 12/2011: Facebook v. Power Ventures

Law Firm: Orrick, Herrington & Sutcliffe
Client: Facebook
Court: U.S. District Court, Northern District of California
Case: 5:08-cv-05780 JW (HRL)

- Alleged copyright infringement of social network software
- Alleged trademark infringement of social network software
- Alleged DMCA violation
- Alleged violation of the CAN-SPAM Act
- Alleged violation of the Computer Fraud and Abuse Act ("CFAA")
- Alleged violation of the California Comprehensive Computer Data Access and Fraud Act
- Alleged unfair competition
- Wrote expert report

<u>4/2011 - 4/2014: Motorola Mobility, Google v. Microsoft</u>

Law Firm: Sidley Austin
Client: Microsoft
Court: U.S. District Court, Southern District of Florida
Case: 1:10-cv-2406J-MORENO

- Alleged patent infringement of voicemail software
- Alleged patent infringement of graphics software
- Analyzed patents
- Examined source code
- Wrote expert reports
- Testified in deposition

<u>8/2010 - 3/2011: Cross Match Technologies v. Suprema and Mentalix</u>

Law Firm: Latham & Watkins
Client: Cross Match Technologies
Court: U.S. International Trade Commission
Investigation: 337-TA-720

- Alleged patent infringement of fingerprint scanning and imaging software
- Analyzed patents
- Examined source code
- Compared software code using CodeSuite
- Wrote an expert report
- Testified in deposition

<u>7/2010 - 4/2011: Xpoint Technologies v. Symantec</u>

Law Firm: Quinn Emanuel Urquhart & Sullivan
Client: Symantec
Court: U.S. District Court, District of Delaware
Investigation: 09-CV-0026 (SLR)

- Alleged patent infringement of backup software
- Analyzed patents
- Examined software
- Wrote an expert report

<u>4/2010 - 7/2012: Brocade v. A10 Networks</u>

Law Firms: Orrick, Herrington & Sutcliffe; McDermott, Will & Emery
Client: Brocade
Court: U.S. District Court, Northern District of California, San Jose Division
Case: C 10-03428 LHK (PSG)

- Alleged copying of software for network controllers
- Compared software code using CodeSuite
- Measured software development using CodeCLOC
- Wrote an expert report and several declarations
- Testified in deposition
- Testified at trial

3/2010 - 9/2010: Datamaxx v. Computer Products of Illinois

Law Firm: Ausley & McMullen
Client: Computer Products of Illinois
Court: U.S. District Court, Northern District Of Florida, Tallahassee Division
Case: 4:09cv435-RH/WCS
- Alleged copying of software to enable law enforcement
- Compared software code using CodeSuite
- Wrote a declaration and a rebuttal expert report
- Testified in deposition

2/2010 - 7/2010: SplitFish v. Bannco

Law Firm: Finnegan, Henderson, Farabow, Garrett & Dunner
Client: SplitFish
Court: U.S. District Court, Northern Easter District of Virginia, Alexandria Division
Case: l:10cv297
- Preliminary injunction against defendant granted
- Alleged copying of firmware for video game controllers
- Compared software code using CodeSuite
- Wrote two declarations

12/2009 - 7/2013: Robin Antonick v. Electronic Arts

Law Firm: Keker & Van Nest
Client: Electronic Arts
Court: U.S. District Court, Northern District of California
Case: 3:11-cv-01543-CRB (EDL)
- Contract dispute
- Examined source code and binary code
- Compared software code using CodeSuite
- Wrote expert reports
- Testified in deposition
- Testified in court

10/2009-11/2009: Sigma Six Technologies and Sigma Six Consulting. v. Nagarro and T-Systems Enterprise Services.

Law firm: Ropers, Majeski, Kohn & Bentley PC
Client: Nagarro
Court: U.S. District Court, Northern District of California
Case: C 08-05633 JW
- Alleged trade secret infringement case involving enterprise client user interface software

8/2009 - 11/2010: Zynga v. Green Patch

Law firm: Quinn Emanuel Urquhart & Sullivan
Client: Zynga
Court: U.S. District Court, Northern District of California
Case: CV-09-3636 SC (EMC)
- Alleged copyright infringement case involving web-based social networking game software
- Compared software code using CodeSuite
- Wrote two declarations and an expert report

8/2009 - 5/2012: De Lage Landen Operational Services v. Third Pillar Systems

Law Firm: Wilson Sonsini Goodrich & Rosati
Client: Third Pillar Systems
Court: U.S. District Court, Eastern District of Pennsylvania
Case: 09-cv-02439-HB

- Alleged trade secret misappropriation and contract dispute involving lending and leasing software
- Compared software code using CodeSuite
- Wrote an expert report and a rebuttal expert report
- Testified in deposition
- Testified at trial

2/2009 - 10/2009: Minden Schipper & Associates v. Cancercare Manitoba (Varian Medical Systems)

Client: Varian Medical Systems
Court: Queen's Bench, Winnipeg Centre, Canada
Case: CI 05-01-45377
- Alleged trade secret misappropriation and copying of oncology diagnosis expert system software.
- Compared software code using CodeSuite
- Wrote an expert report

11/2008 - 1/2010: Applied Materials v. Advanced Micro-Fabrication Equipment Co.

Law firm: Goodwin Procter
Client: Applied Materials
Court: U.S. District Court, Northern District Of California
Case: C07 05248 JW (PVT)
- Alleged copying of software for semiconductor manufacturing machines
- Compared software code using CodeSuite
- Wrote expert reports
- Testified in deposition

9/2008 - 9/2009: Abanco Investments v. GuestLogix

Law firm: Patterson, Thuente, Skaar & Christensen
Client: GuestLogix
Court: U.S. District Court, Northern District of Illinois
Case: 07 C 1071
- Alleged trade secret theft involving point-of-sale software
- Compared software code using CodeSuite
- Wrote an expert report

9/2008 - 3/2010: Personnel Department v. CareerBuilder

Law firm: Jones, Day, Reavis & Pogue
Client: CareerBuilder
Court: U.S. District Court, District of Vermont
Case: 2:08-cv-59-wks
- Alleged trade secret theft involving resume building software
- Compared software code using CodeSuite
- Wrote an expert report

9/2008 - 12/2008: Honeywell, Metrologic, OmniPlanar v. Datalogic

Law firm: Robins, Kaplan, Miller & Ciresi
Client: OmniPlanar
Court: U.S. District Court, District of New Jersey
Case: 1:2008cv05234
- Alleged copyright infringement and trade secret theft involving bar code scanner firmware
- Compared software code using CodeSuite

7/2008-10/2008: Facebook v. StudiVZ

Law firm: Orrick, Herrington & Sutcliffe
Client: Facebook
Court: U.S. District Court, Northern District of California

Case: 5:08-CV-03468 JF
- Alleged copyright infringement case involving web-based social networking software
- Compared software code using CodeSuite

4/2008 - 12/2010: Esbin & Alter v. Zappier, et al.

Law firm: Alter & Alter
Client: Esbin & Alter
Court: U.S. District Court, Southern District of New York
Case: 08 Civ. 313
- Contract dispute case involving billing and document management software
- Compared software code using CodeSuite
- Wrote two declaration and two expert reports

4/2008 - 12/2008: Piper Jaffray v. Vermilion Capital Management

Law firm: Patterson, Thuente, Skaar & Christensen
Client: Vermilion Capital Management
Court: Minnesota District Court, Fourth Judicial District, County of Hennepin
Case: 07-20203
- Alleged trade secret case involving stock market technical analysis software
- Compared software code using CodeSuite
- Wrote an expert report

4/2008 - 11/2008: Intelligraphics v. Marvell Semiconductor

Law firm: Sommers and Schwartz
Client: Intelligraphics
Court: U.S. District Court, Northern District Of California, San Francisco Division
Case: C-07-2499 JCS
- Contract dispute case involving WLAN firmware and drivers
- Compared software code using CodeSuite
- Wrote an expert report
- Testified at deposition

3/2008 - 8/2008: Optovue v. Carl Zeiss Meditec

Law firm: Nixon Peabody
Client: Carl Zeiss Meditec
Court: U.S. District Court, Northern District of California, Oakland Division
Case: C 07-03010 CW
- Alleged copyright/trade secret theft case involving optical coherence tomography software
- Compared software code using CodeSuite
- Wrote an expert report

2/2008 - 4/2008: Gemstar v. Digeo

Law firm: Ropes & Gray
Client: Gemstar
Court: U.S. District Court, Central District of California, Western Division
Case: CV-06-6519
- Alleged patent infringement case involving program guide displays
- Wrote an expert report

1/2008 - 4/2014: MSC Software v. Altair Engineering, et al.

Law firm: Dykema Gossett
Client: MSC Software
Court: U.S. District Court, Eastern District of Michigan, Southern Division
Case: 2:07-cv-12807
- Alleged trade secret theft case involving motion simulation software

- Compared software code using CodeSuite
- Wrote a declaration and an expert report
- Testified at a hearing
- Testified in deposition

<u>5/2007 - 12/2008: The MathWorks v. COMSOL</u>

Law firm: Jones, Day, Reavis & Pogue
Client: The MathWorks, Inc.
Court: U.S. District Court, Eastern District of Texas, Tyler Division
Case: 6:06-CV-335
- Alleged copyright infringement case involving mathematical modeling software
- Compared software code using CodeSuite

<u>5/2007 - 12/2008: The MathWorks v. COMSOL</u>

Law firm: Jones, Day, Reavis & Pogue
Client: The MathWorks, Inc.
Court: U.S. District Court, Eastern District of Texas, Tyler Division
Case: 6:06-CV-334
- Alleged patent infringement case involving mathematical modeling software

<u>5/2007 - 6/2007: Third Party Verification v. SignatureLink</u>

Law firm: Law Offices of Brian S. Steinberger
Client: Third Party Verification
Court: U.S. District Court, Middle District of Florida
Case: 6:06-cv-00415
- Alleged copyright infringement case involving web-based signature capture software
- Compared software code using CodeSuite
- Wrote an expert report

<u>4/2007 - 7/2008: Symantec v. Commissioner of Internal Revenue</u>

Law firm: Baker & McKenzie
Client: Symantec
Court: U.S. Tax Court
Case: 12075-06
- Software transfer pricing tax dispute
- Software comparison using CodeSuite and CLOC methodology
- Wrote an expert report
- Testified at trial

<u>4/2007 - 5/2007: Kernius & Frise v. International Electronics</u>

Law firm: Zito tlp
Client: Kernius & Frise
Case: 05-CV-1927
Court: U.S. District Court, District of Maryland
- Alleged patent infringement case involving modems and call waiting
- Wrote an expert report
- Testified in deposition

<u>2/2007 - 8/2008: Quantum Research Group (Atmel) v. Apple, Cypress, Fingerworks</u>

Law firm: Zito tlp, Sidley Austin
Client: Quantum Research Group (Atmel)
Court: U.S. District Court, District of Maryland
Case: 05-cv-03408-WMN
- Alleged patent infringement case involving capacitive sensing devices

- Assisted with claim construction
- Wrote an expert report
- Testified in deposition

8/2006 - 8/2007: AdTech RFID v. Adept Identification Technologies, et al.

Law firm: Wilson Sonsini Goodrich & Rosati
Client: Adept Identification Technologies
Court: Superior Court of Santa Clara County California
Case: 1:06-CV-057464

- Alleged trade secret theft case involving RFID software
- Compared software code using CodeSuite
- Wrote an expert report

6/2006 - 2/2007: Medinformatix v. AcerMed

Law firm: Timothy McGonigle
Client: MedInformatix
Arbitration: JAMS
Ref: 1220035252

- Alleged trade secret case involving electronic medical records software.
- Assisted with determination of trade secrets
- Compared software code using CodeSuite
- Wrote declarations
- Testified in deposition

5/2006 - 11/2006: Iconix v. NetPickle, et al.

Law firm: Orrick, Herrington & Sutcliffe
Client: NetPickle
Court: U.S. District Court, Northern District of California, Oakland Division
Case: 4:06-cv-02201

- Alleged copyright infringement case involving web-based presentation software
- Compared software code using CodeSuite
- Wrote a declaration
- Wrote an expert report
- Testified in deposition

4/2006 - 10/2006: Forgent v. Microsoft et al.

Law firm: Susman Godfrey
Client: Forgent
Court: U.S. District Court, Northern District of California, San Jose Division
Case: M:05-CV-01654

- Alleged patent infringement case involving JPEG encoding of pictures in files
- Reverse engineered video equipment

2/2006 - 5/2008: Rasterex Holdings v. Research in Motion

Law firm: Kilpatrick Stockton
Client: Rasterex Holdings
Court: Superior Court of Fulton County, State of Georgia
Case: 2003-cv-76785

- Alleged copyright infringement case involving mobile document translation and storage software
- Compared software code using CodeSuite
- Wrote an expert report
- Testified in deposition

2/2006 - 9/2006: Medinformatix v. Camtronics Medical Systems

Law firm: Timothy McGonigle
Client: MedInformatix
Court: U.S. District Court, Central District of California
Case: 2:05-cv-04829 SJO
- Alleged trade secret theft case involving electronic medical records software
- Assisted with determination of trade secrets
- Compared software code using CodeSuite
- Wrote declarations

8/2005 - 12/2007: Moneygram Payment Systems v. Enterprise Payment Solutions

Law firm: Michael Best & Friedrich
Client: Moneygram
Court: U.S. District Court, Eastern District of Tennessee
Case: 1:05-cv-00172
- Alleged copyright infringement case involving ACH financial software
- Compared software code using CodeSuite
- Wrote an expert report

8/2005 - 8/2006: Silvaco v. Specular

Law firm: Wilson Sonsini Goodrich & Rosati
Client: Specular
Court: Superior Court of Santa Clara County California
Case: 1:04-cv-031951
- Alleged trade secret case involving electronic design automation (EDA) software
- Compared software code using CodeSuite
- Wrote an expert report

7/2005-2/2008: ConnectU v. Facebook, et al.

Law firm: Orrick, Herrington & Sutcliffe
Client: Facebook
Court: U.S. District Court, District of Massachusetts
Case: 1:04-cv-11923
- Alleged copyright infringement case involving social network software
- Compared software code using CodeSuite

4/2005 - 3/2007: Merchant Transaction Systems, et al. v. Nelcela, et al.

Law firm: Lewis & Roca
Client: Merchant Transaction Systems/POST Integration/Ebocom
Court: U.S. District Court, District of Arizona
Case: 2:02-cv-01954
- Alleged copyright infringement involving credit card processing software
- Compared software code using CodeSuite
- Wrote an expert report
- Testified in deposition

4/2005: Brod v. Lev, et al.

Law firm: Wilson Sonsini Goodrich & Rosati
Client: Lev
Court: Superior Court of Santa Clara County California
Case: 1:03-cv-005813
- Alleged copyright infringement case involving Internet acceleration software
- Compared software code using CodeSuite

<u>3/2005 - 12/2005: American Video Graphics v. Electronic Arts, et al.</u>

Law firm: McKool Smith
Client: AVG
Court: U.S. District Court, Eastern District of Texas, Tyler Division
Case: 6:04-CV-398
- Alleged patent infringement case involving 3D graphics software algorithms
- Examined source code for over 50 video games
- Wrote claim charts for each video game

<u>3/2005 - 12/2005: American Video Graphics v. Sony Corporation of America, et al.</u>

Law firm: McKool Smith
Client: AVG
Court: U.S. District Court, Eastern District of Texas, Tyler Division
Case: 6:04cv399
- Alleged patent infringement case involving 3D graphics hardware algorithms
- Examined graphic chips

<u>8/2004 - 12/2007: Creative Science Systems v. Forex Capital Markets</u>

Law firm: Baker & McKenzie/Sommers and Schwartz
Client: Creative Science Systems
Court: U.S. District Court, Northern District of California
Case: 5:04-cv-03746
- Alleged copyright infringement involving web-based financial software
- Compared software code using CodeSuite
- Compared software object code
- Wrote a declaration and an expert report
- Testified in deposition

<u>8/2004 - 3/2005: XIOtech v. Compellent Technologies, et al.</u>

Law firm: Faegre & Benson
Client: Compellent
Court: Minnesota District Court, Fourth Judicial District, County of Hennepin
Case: 04-5065
- Alleged trade secret theft involving storage area network (SAN) software
- Compared software code using CodeSuite
- Compared features and researched prior art for storage area network (SAN) software
- Wrote an expert report

<u>8/2004 - 9/2004: OpenTable v. Smart Restaurant Solutions</u>

Law firm: Wilson Sonsini Goodrich & Rosati
Client: Smart Restaurant Solutions
Court: Superior Court of the State of California for the County of San Francisco
Case: CGC-03-424516
- Alleged copyright infringement involving restaurant management software
- Compared software code using CodeSuite
- Wrote an expert report

<u>7/2004 - 2/2005: Zoran and Oak Technology v. MediaTek, et al.</u>

Law firm: Wilson Sonsini Goodrich & Rosati /Hogan & Hartson
Client: MediaTek
Court: U.S. International Trade Commission
Investigation: 337-TA-506
- Alleged patent infringement involving CD-ROM/DVD controller hardware

- Examined VHDL for two CD-ROM/DVD controller chips to determine their architectures and implementations
- Wrote an expert report and created exhibits for trial
- Testified in deposition
- Testified at trial

<u>4/2004 - 11/2004: Agere Systems v. Intersil</u>

Law firm: Kirkland & Ellis
Client: Agere
Court: U.S. District Court, Eastern District of Pennsylvania
Case: 02-CV-08219, 02-CV-1544

- Alleged copyright infringement and contract dispute involving WLAN chips
- Compared firmware source code using CodeSuite
- Examined Verilog and VHDL source code
- Wrote an expert report and rebuttal to opposition expert report

<u>4/2003 - 5/2003: Alvis v. Hewlett-Packard</u>

Law firm: Drinker Biddle & Reath
Client: Hewlett Packard
Court: U.S. District Court, District Court of Jefferson County, Texas
Case: A-164,880

- Class action suit involving reliability of floppy disk drives and software patches
- Wrote an expert report
- Testified in deposition

<u>4/2003 - 5/2003: MediaTek Software Clean Room Development Project</u>

Law firm: MacPherson Kwok
Client: MediaTek

- Clean room code development
- Reviewed source code and compared different source code routines for similarities

<u>3/2003 - 5/2003: Research In Motion v. Good Technology</u>

Law firm: Jones, Day, Reavis & Pogue
Client: Research In Motion
Court: U.S. District Court, District of Delaware
Case: 02-556-JJF, 02-1286-JJF, 02-1338-JJF

- Alleged patent infringement case involving handheld wireless devices and supporting software
- Analyzed software code
- Assisted with deposition of opposing expert
- Wrote claim charts

<u>8/2001 - 9/2001: Intel v. VIA Technologies</u>

Law firm: Howrey Simon Arnold & White
Client: Intel
Court: U.S. District Court, Northern District of California
Case: C99-03062

- Alleged patent infringement case involving computer motherboards
- Examined computer motherboards for patent infringement

<u>7/2001 - 4/2003: Intel v. VIA Technologies</u>

Law firm: Dewey Ballantine/Brobeck, Phleger & Harrison
Client: Intel
Court: U.S. District Court, Western District of Texas
Case: A-01-CA-602-SS

- Alleged patent infringement cases involving CPUs and computer chipsets
- Assisted with claim construction
- Wrote test case software in assembly language
- Examined computer motherboards
- Analyzed Verilog code of CPUs
- Wrote several expert reports
- Wrote several claim charts

3/2001 - 3/2001: KRS Distributing v. Gatten Insurance

Law firm: Stone & Hiles
Client: Gatten Insurance
- Insurance claim
- Examined a fax machine to retrieve stored documents

7/1997 - 3/1999: Texas Instruments v. Hyundai Electronics Industries Co.

Law firm: Jones, Day, Reavis & Pogue
Client: Texas Instruments
Court: U.S. District Court, Eastern District of Texas
Case: 2:98-CV-00074
- Alleged patent infringement involving semiconductor wafer handling hardware, software, and communication protocols
- Reverse engineered hardware and software in order to determine infringement.
- Constructed exhibits
- Assisted with the writing of expert reports
- Assisted with the writing of claim charts

8/1996 - 12/1996: Texas Instruments v. Samsung Electronics, et al.

Law firm: Jones, Day, Reavis & Pogue
Client: Texas Instruments
Court: U.S. District Court, Eastern District of Texas
Case: 2:96-CV-00001, 2:96-CV-00002, 2:96-CV-00003
- Alleged patent infringement involving semiconductor wafer handling hardware, software, and communication protocols
- Reverse engineered hardware and software in order to determine infringement
- Constructed exhibits
- Assisted with the writing of expert reports
- Assisted with the writing of claim charts

2/1996 - 7/1996: Cirrus Logic v. Agarwal, et al.

Law firm: Morrison & Foerster
Client: Cirrus Logic
Court: Superior Court of Santa Clara County California
Case: CV 745373
- Alleged trade secret case involving semiconductors and LCD display technology
- Examined validity of trade secrets
- Reconstructed the history of an internal engineering project
- Researched prior art

**HONORS, AWARDS, AND DISTINCTIONS**

**Engineering and Science**

1. Fellow, Association of Cyber Forensics and Threat Investigators

2. 2018 CREST (Cupertino Recognizes Extra Steps Taken) Award, Innovator of the Year

3. Outstanding Engineer in a Specialized Field: For Pioneering Contributions to the Field of Forensic Software Analysis, IEEE Region 6 Central Area, 2015.

4. Outstanding Engineer in a Specialized Field: For Pioneering Contributions to the Field of Forensic Software Analysis, IEEE Santa Clara Valley Section, 2015.

5. Final Round, 2011 Jolt Awards, for the book The Software IP Detective's Handbook: Measurement, Comparison, and Infringement Detection.

6. Outstanding Engineer in a Specialized Field: For Innovative Contributions in the Area of Forensic Software Analysis, IEEE Santa Clara Valley Section, 2010.

7. Session's Best Paper Award, The11th World Multi-Conference on Systemics, Cybernetics and Informatics, 2007.

8. The Number 5 Programmable Logic "How To" article of 2006, Programmable Logic DesignLine newsletter.

9. Finalist, Design News magazine 2006 Golden MouseTrap Award: Design and Development Software Tools, for SynthOS.

10. Winner, Software Development magazine 2003 Jolt Reader's Choice Award for the book *Designing with FPGAs and CPLDs*.

11. Senior Member, ACM

12. Senior Member, IEEE

13. Top PLD/FPGA News and Feature Article for 2003, CMP Media

14. Winner, Wyle/EE Times American By Design Contest, 1994

15. Stanford Graduate Engineering Fellowship

16. Eta Kappa Nu (Electrical Engineering honor society)

17. Association for Educational Data Systems Honorable Mention

18. Bausch & Lomb Honorary Science Award

**Writing and Filmmaking**

1. Reader Views Silver Award Winner: Classical Societal Issues category, for the book *Election Hacks*.

2. PenCraft Book Award Winner: Non-Fiction: Gov/Politics category, Winter 2025, for the book *Election Hacks*.

3. Next Generation Indie Book Awards, Finalist: Current Events category, 2024, for the book *Election Hacks*.

4. PenCraft Book Award Winner: First Place for Fiction: Cultural category, 2022, for the novel *Animal Lab*.

5. American Book Award Winner: Science Fiction: Post-Apocalyptic category, 2022, for the novel *Animal Lab*.

6. Readers Favorite, Silver Medal: Fiction – Dystopia category, 2022, for the novel *Animal Lab*.

7. Florida Authors and Publishers Association's President's Book Awards, Bronze Medal: Adult Fiction – Fantasy category, 2022, for the novel *Animal Lab*.

8. Next Generation Indie Book Awards, Finalist: Current Events category, 2022, for the novel *Animal Lab*.

9. Book Excellence Award, Finalist: Suspense category, 2022, for the novel *Animal Lab*.

10. The BookFest Award, Second Place: Society, War & Political Collapse category, Spring 2022, for the novel *Animal Lab*.

11. Wishing Shelf Independent Book Award, Adult Fiction 2022 Finalist, for the novel *Animal Lab*.

12. Firebird Book Award, Social/Political Change category, 2022, for the novel *Animal Lab*.

13. Literary Titan Book Award, Silver Award Winner, January 2022, for the novel *Animal Lab*.

14. Indies Today Awards, Semi-Finalist, Suspense/Thriller category, 2021, for the novel *Animal Lab*.

15. Southern California Book Festival, Honorable Mention, Wild Card category, 2022, for the novel *Animal Lab*.

16. Thriller of the Month, February 2014, for the novel *Horror Flick*.

17. Indie Excellence 2013 Winner, Humor category, for the novel *Good Intentions*.

18. Indie Excellence 2013 Finalist, Political Thriller category, for the novel *Good Intentions*.

19. Honorable Mention, 2013 San Francisco Book Festival, for the novel *Horror Flick*.

20. Pinnacle Book Achievement Award 2012 for the novel *Good Intentions*.

21. Semifinalist, November 2011 Amazon Studios Best Kids and Family Script Award, for the screenplay *The Amazing Adventure of Edward and Dr. Sprechtmachen*.

22. Semifinalist, October 2011 Amazon Studios Best Script Award, for the screenplay *The Amazing Adventure of Edward and Dr. Sprechtmachen*.

23. Semifinalist, September 2011 Amazon Studios Best Script Award, for the screenplay *The Amazing Adventure of Edward and Dr. Sprechtmachen*.

24. Semifinalist, August 2011 Amazon Studios Best Script Award, for the screenplay *The Amazing Adventure of Edward and Dr. Sprechtmachen*.

25. Semifinalist, July 2011 Amazon Studios Best Script Award, for the screenplay *The Amazing Adventure of Edward and Dr. Sprechtmachen*.

26. Semifinalist, June 2011 Amazon Studios Best Sci-Fi/Action Script Award, for the screenplay *The Amazing Adventure of Edward and Dr. Sprechtmachen*.

27. Semifinalist, June 2011 Amazon Studios Best Script Award, for the screenplay *The Amazing Adventure of Edward and Dr. Sprechtmachen*.

28. Semifinalist, 2004 Cinequest Screenwriting Competition, for the screenplay *The Amazing Adventure of Edward and Dr. Sprechtmachen*.

29. Second Place, 2002 Autumn Moon Productions Screenplay Awards, for the screenplay *Horror Flick*.

30. Third Place, 2002 Autumn Moon Productions Screenplay Awards, for the screenplay *The Amazing Adventure of Edward and Dr. Sprechtmachen*.

31. First Place, 2001 Focus on Writers Contest, for the screenplay *Horror Flick*.

32. Special Mention Winner, 2001 Screenwriting Showcase Awards, for the screenplay *Horror Flick*.

33. Honorary Mention, 2002 Autumn Moon Productions Screenplay Awards, for the screenplay *Sex and Violence*.

34. Finalist, 2001 Empyrion Screenplay Competition, for the screenplay *Sex and Violence*.

35. Finalist, 2001 New Century Writer Awards, for the screenplay *Horror Flick*.

36. Top Ten Finalist, 2001 Tennessee Screenwriting Association Competition, for the screenplay *The Amazing Adventure of Edward and Dr. Sprechtmachen*.

37. Top Finalist, BDR 2000 Productions New Millennium Screenplay 2001 Contest, for the screenplay *Horror Flick*.

38. Certificate of Merit, 2002 International Screenplay Competition, for the screenplay *Horror Flick*.

39. Certificate of Merit, 2002 International Screenplay Competition, for the screenplay *The Amazing Adventure of Edward and Dr. Sprechtmachen*.

40. Certificate of Merit, 2002 International Screenplay Competition, for the screenplay *Sex and Violence*.

41. Semifinalist, 2001 WordsFromHere Contest, for the screenplay *Horror Flick*.

42. Semifinalist, 2001 Venice Arts Screenwriting Competition, for the screenplay *Horror Flick*.

43. Semifinalist, 2001 National Screenwriting Competition, for the screenplay *Horror Flick*.

44. Semifinalist, 2001 National Screenwriting Competition, for the screenplay *Sex and Violence*.

45. Quarterfinalist, 2001 Fade In: Screenwriting Awards, for the screenplay *The Amazing Adventure of Edward and Dr. Sprechtmachen*.

46. Quarterfinalist, Texas Film Institute 2001 Screenplay Competition, for the screenplay *Horror Flick*.

47. Certificate of Merit, Writer's Digest 2000 National Self-Published Book Awards, for the novel *Horror Flick*.

48. Semifinalist, 2000 poetry.com North American Open Poetry Contest, for the poem *I Remember*.

49. Quarterfinalist, 1999 New Century Writer Awards, for the novel *Horror Flick*.

50. Quarterfinalist, 1999 New Century Writer Awards, for the screenplay *The Amazing Adventure of Edward and Dr. Sprechtmachen*.

51. Third Place, 1998 Magnum Opus Discovery Awards of the C.C.S. Entertainment Group and the Hollywood Film Festival, for the novel *Horror Flick*.

52. Quarterfinalist, 1998 Empire Screenplay Contest, for the screenplay *Sex and Violence*.

53. A reading of my screenplay *Sex and Violence* was performed by the Independent Media Artists Group (IMAGE), on August 15, 1998.

54. Vermont Studio Center scholarship to attend a one-month writing retreat, April 1998.

55. Semifinalist, 1997 Monterey County Film Contest, for the screenplay *Sex and Violence*.

56. First Place, 1993 Foster City Annual Writer's Contest, for unpublished short story *The Contest*.

57. Semifinalist, 1993 national Syndicated Fiction Project, for unpublished short story *The Contest*.

58. First Place, 1990 Foster City Annual Writer's Contest, for unpublished short story *The Lost and Found Virginity*.

59. 1989 Philadelphia International Film Festival showing of the short film *Writer's Block*, which I produced, wrote, directed, edited, and mixed.

60. First Place, 1988 Fremont Film Festival, for the short film *February 20, 1988*, which I produced, wrote, directed, edited, and mixed.

**Miscellaneous**

1. Policy Fellow, Nevada Policy.

2. Albert Nelson Marquis Lifetime Achievement 2018.

3. United Synagogue Award for Excellence

4. Biography in Who's Who in America

5.      University Unions Distinguished Service Award

6.      Phi Beta Kappa

7.      Ivy League Honor Society

8.      Alpha Lambda Delta honor society

9.      Dual Degree Program, Cornell University

10.     National Merit Scholarship

11.     Literary Society Foundation Award Gold Medal, Excellence in German

12.     Literary Society Foundation Award Bronze Medal, Excellence in German

13.     Rumsey Scholarship, Cornell Club of Philadelphia

14.     City of Philadelphia Scholarship

15.     School District of Philadelphia Scholarship

16.     Fourth Prize, Colonial Philadelphia Historical Society Essay Contest

17.     Founder, Delaware Valley Teen Mensa

## SPECIAL KNOWLEDGE AND SKILLS

- CodeSuite certified.
- Software source code analysis and synthesis
- Computer architectures: AMD 29000, CRAY XMP, Data General MV8000, IBM PC, IDT R4650, Intel 8051, Intel x86 family, Motorola 68000, 68HC11, 68HC08, 68HC05, TI TMS320Cxx, TMS340xx
- Networking protocols: ATM, Ethernet
- Buses: ADB, EISA I$^2$C, ISA, MXI, PCI, SBUS, VME
- Hardware programming languages: ABEL, AHDL, CUPL, PALASM, Verilog, VHDL
- Software programming languages: APL, BASIC, C, C++, Delphi, FOCAL, FORTRAN, Java, LISP, Pascal, Perl, PHP, PL/1, PowerBuilder, SQL, Visual BASIC, various assembly, machine languages
- Operating systems: AOS/VS, MSDOS, UNIX, VMS, Windows 3.1/NT/9x/2000/Me/XP/Vista/7/8/10/11
- Workstations: Apple Macintosh, Daisy, IBM PC, Hewlett Packard, SUN, VALID
- Electronic Design Automation (EDA)
- CAD tools: Concept, Futurenet, MAX+Plus II (Altera), MDE (LSI Logic), Mentor, Orcad, PROCapture, P-CAD, Schema, Viewlogic, XACT (Xilinx)
- Simulation accelerators: Mentor Graphics, Cadence Design Systems
- Hardware emulators: Mentor Graphics, Cadence Design Systems
- ASIC design
- FPGA and CPLD design: Actel, Altera, Lattice, Xilinx
- Miscellaneous design experience: Cache memory, telecommunications, data communications, digital signal processing (DSP), digital logic (CMOS, ECL, TTL), analog
- Patent infringement
- Trade secret theft
- Copyright infringement
- Plagiarism detection
- Solid state theory
- Information theory

## EDUCATION

Master of Science in Electrical Engineering, 1982, Stanford University

Bachelor of Science with distinction in Electrical Engineering, 1981, Cornell University
Bachelor of Arts cum laude in Physics and with distinction in all subjects, 1981, Cornell University
De Anza College Film Department, 1987 - 1990

**BOOKS**

1. Bob Zeidman, *The Software IP Detective's Handbook: Measurement, Comparison, and Infringement Detection*, Second edition, Swiss Creek Publications, Las Vegas, NV, 2025, 442pp.

2. Bob Zeidman, *Election Hacks*, Swiss Creek Publications, Las Vegas, NV, 2023, 280 pp.

3. Bob Zeidman, *Animal Lab*, Swiss Creek Publications, Las Vegas, NV, 2021, 128 pp.

4. Bob Zeidman, *Just Enough Electronics to Impress Your Friends and Colleagues*, Swiss Creek Publications, Cupertino, CA, 2013, 214pp.

5. Bob Zeidman, *The Software IP Detective's Handbook: Measurement, Comparison, and Infringement Detection*, First edition, Prentice-Hall, Upper Saddle River, NJ, 2011, 450pp.

6. Clive Maxfield, *FPGAs: World Class Designs*, Elsevier Inc., Burlington, MA, 2009, Chapter 1 (reprint).

7. Ashby, Baker, Ball, Crowe, Hayes-Gill, Hickman, Kester, Mancini, Grout, Pease, Tooley, Williams, Wilson, Zeidman, C*ircuit Design: Know It All*, Elsevier Inc., Burlington, MA, 2008, Chapters 27-29 (reprint).

8. R. C. Cofer, Clive Maxfield, Bob Zeidman, Richard Munden, Rick Gentile, *Newnes FPGAs: Ebook Collection*, Elsevier Science & Technology Books, Burlington, MA, 2008 (reprint).

9. Bob Zeidman, *Designing with FPGAs and CPLDs*, CMP Books, Lawrence, KS, 2002, 220pp.

10. Bob Zeidman, *Introduction to Verilog*, IEEE Press, Piscataway, NJ, 2000, 99pp.

11. Bob Zeidman, *Verilog Designer's Library*, Prentice-Hall, Upper Saddle River, NJ, 1999, 411pp.

12. Bob Zeidman, *Good Intentions*, Swiss Creek Publications, Cupertino, CA, 2012, 259pp.

13. Bob Zeidman, *Horror Flick*, Swiss Creek Publications, Cupertino, CA, 1999, 341pp.

14. Bob Zeidman, *The Amazing Adventure of Edward and Dr. Sprechtmachen*, Swiss Creek Publications, Cupertino, CA, 1998, 73pp.

**PAPERS AND PRESENTATIONS**

1. Zeidman, Bob, "It is Time for Standards in Software Forensics," *Texas Intellectual Property Law Journal*, Vol. 33. No. 3, 351-368, June 2025.

2. Zeidman, Bob, "The AI Misinformation Avalanche," *Legal Era Online*, https://www.legaleraonline.com/ai/the-ai-misinformation-avalanche-945354, March 18, 2025.

3. Zeidman, Bob, "A Gold Standard for Clean Room Development to Protect From Intellectual Property Infections" *International In-House Counsel Journal*, https://www.iicj.net/paper/1809, December 5, 2023.

4. Zeidman, Bob, "How I Won $5 Million From the MyPillow Guy and Saved Democracy" *Politico*, https://www.politico.com/news/magazine/2023/05/26/my-pillow-mike-lindell-investigation-00097903, May 26, 2023.

5. Zeidman, Bob, "Preventing an IP Infection: Clean Room Development Procedure" IPWatchdog, https://ipwatchdog.com/2023/04/29/preventing-an-ip-infection-clean-room-development-procedure/id=160187, April 29, 2023.

6. Zeidman, Bob, "Clean Room Development to Prevent the Spread of 'Infectious IP'" *IPWatchdog*, https://ipwatchdog.com/2023/04/22/clean-room-development-to-prevent-the-spread-of-infectious-ip/id=159864, April 24, 2023.

7.  Zeidman, Bob, "Can a Human Patent a Space Alien's Invention?" *IPWatchdog*, https://www.ipwatchdog.com/2022/09/17/can-human-patent-space-aliens-invention/id=151391, September 17, 2022.

8.  Zeidman, Bob, "The Supreme Court is Set to Hear a Copyright Case with Big Implications for U.S. Tech Innovation," *IPWatchdog*, https://www.ipwatchdog.com/2022/08/15/supreme-court-set-hear-copyright-case-big-implications-u-s-tech-innovation/id=150902, August 15, 2022.

9.  "Protecting Software Globally with U.S. Copyrights," Shelowitz Law Group, https://us02web.zoom.us/rec/share/SRDSdzdaFIAGq1-xJsh8Itc6ZZyuOiJrCWJCkZe7CDXy__6S-bszIIHDR-lmHONw.jemkTykKvKPx8C_Q (passcode: k2irg!LA), June 23, 2021.

10. Zeidman, Bob, "Clarifying the U.S. Approach to Copyright and Plagiarism," *IPWatchdog* (https://www.ipwatchdog.com/2019/08/06/clarifying-u-s-approach-copyright-plagiarism), August 6, 2019.

11. Zeidman, Bob, "The History of Digital Game Intellectual Property from Atari to Zynga," Vintage Computer Festival West, August 5, 2018.

12. Zeidman, Bob, "Oracle v. Google: Protecting Software Development, Not Destroying It," *IPWatchdog* (http://www.ipwatchdog.com/2018/07/15/oracle-v-google-protecting-software-development/id=99359), July 16, 2018.

13. Zeidman, Bob, "RPost Does Not Meet Any Definition of 'Patent Troll,'" *IPWatchdog*, (http://www.ipwatchdog.com/2017/12/05/rpost-not-patent-troll/id=90783), December 5, 2017.

14. Zeidman, Robert, et al., In The Supreme Court of the United States, Brief of a Group of Inventors, Entrepreneurs, and Small Business Owners as Amici Curiae in Support of Petitioner, RPost Communications Limited, RMail Limited, RPost International Limited And RPost Holdings Incorporated, Petitioners, V. GoDaddy.com LLC Respondent, No. 17-695, December 1, 2017.

15. Zeidman, Bob, "Was MS-DOS code copied from CP/M?" Vintage Computer Festival West, August 6, 2016.

16. Zeidman, Bob, "Facebook, Oculus, ZeniMax, and Nonliteral Copying of Code" *IPWatchdog* (http://www.ipwatchdog.com/2017/02/07/facebook-oculus-zenimax-nonliteral-copying-code), February 7, 2016.

17. Zeidman, Bob, "What If Someone Steals Your Code?" Better Software, Fall 2016.

18. Zeidman, Bob, "Source Code Comparison of DOS and CP/M," Journal of Computer and Communications (http://www.scirp.org/journal/PaperInformation.aspx?PaperID=71259), Vol.4 No.12, October 2016.

19. Zeidman, Bob, "Was DOS copied from CP/M?" *Embedded.com* (http://www.embedded.com/electronics-blogs/say-what-/4442498/Was-DOS-copied-from-CPM-), August 6, 2016.

20. Zeidman, Bob, "Software, Hard Case," *Legaltech News* (http://www.lawtechnews-digital.com/lawtechnews/august_2016?sub_id=4m2w4egdg99X&folio=30&pg=30#pg30), August 2016.

21. Zeidman, Bob and Gupta, Eashan, "Why Libertarians Should Support a Strong Patent System" *IP Frontline* (http://ipfrontline.com/2016/03/why-libertarians-should-support-a-strong-patent-system), March 15, 2016.

22. Zeidman, Bob, "Not Getting the Truth about the FBI, Apple, the San Bernardino Terrorists, and Hacking an iPhone" *IPWatchdog* (http://www.ipwatchdog.com/2016/02/22/youre-not-hearing-the-truth-about-the-fbi-apple-the-san-bernardino-terrorists-and-hacking-an-iphone), February 22, 2016.

23.  Zeidman, Bob, "Drawing Accurate Forensic Conclusions," *Digital Forensics*, Issue 26 (https://zeidmanconsulting.com/documents/Drawing%20Accurate%20Forensic%20Conclusions%20-%20Digital%20Forensics%20magazine%20-%20Feb%20%202016.pdf), February 2016.

24.  Zeidman, Bob and Gupta, Eashan, "Why Libertarians Should Support a Strong Patent System" *IPWatchdog* (http://www.ipwatchdog.com/2016/01/05/why-libertarians-should-support-a-strong-patent-system), January 5, 2016.

25.  Zeidman, Bob, "The Anti-Marcus Lemonis Principle for Succeeding In Business," RealClearMarkets (http://www.realclearmarkets.com/articles/2015/12/02/the_anti-marcus_lemonis_principle_for_succeeding_in_business_101899.html), December 2, 2015.

26.  Zeidman, Bob, "An Overview of Software Forensics," *IP Frontline* (http://ipfrontline.com/2015/10/an-overview-of-software-forensics), October 27, 2015.

27.  Zeidman, Bob, "RISC needs to make a comeback," *Embedded Computing Design*, (http://embedded-computing.com/guest-blogs/risc-needs-to-make-a-comeback), September 15, 2015.

28.  Zeidman, Bob, "Are wearables wearing thin?" *IT World*, (http://www.itworld.com/article/2979834/internet-of-things/are-wearables-wearing-thin.html), September 3, 2015.

29.  Zeidman, Bob, "An inventor's perspective on patent reform" *The Hill* (http://thehill.com/blogs/congress-blog/technology/250593-an-inventors-perspective-on-patent-reform), August 10, 2015.

30.  Zeidman, Bob, "How much does your thermostat know about you?" *IT World*, (http://www.itworld.com/article/2952744/internet-of-things/how-much-does-your-thermostat-know-about-you.html), July 30, 2015.

31.  Zeidman, Bob, "Living in a multi-processor world," *Embedded Computing Design*, (http://embedded-computing.com/guest-blogs/living-in-a-multi-processor-world), June 19, 2015.

32.  Zeidman, Bob, "Software Forensics: Qualifying Tools and Experts Who Use Them" *IPWatchdog* (http://www.ipwatchdog.com/2014/10/31/software-forensics-qualifying-tools-and-experts), October 31, 2014.

33.  Zeidman, Bob, "Software Forensics: Objectively Proving Infringement or Misappropriation" *IPWatchdog* (http://www.ipwatchdog.com/2014/10/27/software-forensics-objectively-proving-infringement-or-misappropriation), October 27, 2014.

34.  Zeidman, Bob, "Misunderstanding Plagues the Patent System" *Electronic Design* (http://electronicdesign.com/embedded/misunderstanding-plagues-patent-system), July 23, 2014.

35.  Zeidman, Bob, "Sloppy, Misleading Yale Paper Challenges University Patenting" *IPWatchdog* (http://www.ipwatchdog.com/2014/07/15/sloppy-misleading-yale-paper-challenges-university-patenting), July 15, 2014.

36.  Zeidman, Bob, "ASOS: A new software development paradigm for the Internet of Things" Embedded.com (http://www.embedded.com/design/operating-systems/4431826/NEW--ASOS--A-new-software-development-paradigm-for-the-Internet-of-Things---Part-1--Basic-building-blocks and http://www.embedded.com/design/operating-systems/4431775/2/ASOS--A-new-RTOS-paradigm-for-the-Internet-of-Things---Part-2--Building-a-project-file), June 30, 2014.

37.  Zeidman, Bob, "A Code Correlation Comparison of the DOS and CP/M Operating Systems" *Journal of Software Engineering and Applications* (http://www.scirp.org/journal/PaperInformation.aspx?PaperID=46362#.U4WDefldWCU), May 27, 2014.

38.  Zeidman, Bob, "The bogeymen destroying the patent system" *San Jose Mercury News* (http://www.mercurynews.com/opinion/ci_25579281/bob-zeidman-bogeymen-destroying-patent-system), April 17, 2014.

39.  Zeidman, Bob, "Fortune Magazine's Unusual Position on Non-Practicing Entities" *IPWatchdog* (http://www.ipwatchdog.com/2014/04/10/fortune-magazines-unusual-position-on-non-practicing-entities), April 10, 2014.

40.  Zeidman, Bob, "Did Bill Gates Steal the Heart of DOS?" *IEEE Spectrum* (http://spectrum.ieee.org/computing/software/did-bill-gates-steal-the-heart-of-dos), July 2012.

41.  Zeidman, Bob, "This one really takes the cake—and the schematics," (http://www.edn.com/electronics-blogs/tales-from-the-cube/4390916/This-one-really-takes-the-cake-and-the-schematics) EDN magazine, July 2012.

42.  Zeidman, Bob and Kovanis, Evan, "Round 2: Did Oracle Overlook the Smoking Gun in its Case against Google?" *IPWatchdog* (http://www.ipwatchdog.com/2012/07/11/round-2-did-oracle-overlook-the-smoking-gun-in-its-case-against-google), July 11, 2012.

43.  Kovanis, Evan and Zeidman, Bob, "Did Oracle Overlook the Smoking Gun in its Case against Google?" *IPWatchdog* (http://www.ipwatchdog.com/2012/06/26/did-oracle-overlook-the-smoking-gun-in-its-case-against-google), June 26, 2012.

44.  Melling, L. and Zeidman, B., "Comparing Android Applications to Find Copying," *Journal of Digital Forensics, Security and Law* (https://www.academia.edu/126753776/Comparing_Android_Applications_to_Find_Copying), Vol. 7, No. 1, 2012.

45.  Zeidman, Bob, "Program Identifiability: How easily can you spot your code?" *Embedded.com* (http://www.embedded.com/design/embedded/4374526/Program-Identifiability--How-easily-can-you-spot-your-code-), June 7, 2012.

46.  Zeidman, Bob, "Setting the Record Straight: Patent Trolls vs. Progress" *IPWatchdog* (http://www.ipwatchdog.com/2012/05/01/setting-the-record-straight-patent-trolls-vs-progress), May 1, 2012.

47.  Baer, N. and Zeidman, B., "Measuring Whitespace Pattern Sequences as an Indication of Plagiarism," *Journal of Software Engineering and Applications* (https://www.scirp.org/journal/paperinformation.aspx?paperid=18570), April 2012.

48.  Zeidman, Bob, "Will Congress Break the Internet?" *IPWatchdog* (http://www.ipwatchdog.com/2012/02/08/will-congress-break-the-internet), February 2, 2012.

49.  Zeidman, Bob, "The Case of the Arrogant Expert," *Intellectual Property Today* (https://zeidmanconsulting.com/documents/The%20Case%20of%20the%20Arrogant%20Expert.pdf), February 2012.

50.  Zeidman, Bob, "The Software IP Detective: Infringement Detection in a Nutshell," *IPWatchdog* (http://www.ipwatchdog.com/2011/11/20/the-software-ip-detective-infringement-detection-in-a-nutshell), November 20, 2011.

51.  Zeidman, Bob, "How Do I Infringe Thee? Let Me Count the Ways," *InformIT* (http://www.informit.com/articles/article.aspx?p=1750207&seqNum=3), Sep 21, 2011.

52.  Zeidman, Bob, "The history of digital game intellectual property from Atari to Zynga," The Museum of Art and Digital Entertainment, August 4, 2011.

53.  Shay, I., Baer, N., and Zeidman, R., "Measuring Whitespace Patterns in Computer Source Code as an Indication of Plagiarism," *Intellectual Property Today* (https://www.zeidmanconsulting.com/documents/Measuring%20Whitespace%20Patterns%20In%20Computer%20Source%20Code%20as%20an%20Indication%20of%20Copying.pdf), October 2010.

54. Zeidman, B., "Software v. Software," *IEEE Spectrum* (http://spectrum.ieee.org/computing/software/software-forensics-tools-enter-the-courtroom) October 2010.

55. Shay, I., Baer, N., and Zeidman, R., "Measuring Whitespace Patterns as an Indication of Plagiarism," ADFSL Conference on Digital Forensics, Security and Law (https://www.zeidmanconsulting.com/documents/Measuring%20Whitespace%20Patterns%20as%20an%20Indication%20of%20Plagiarism.pdf), May 20, 2010.

56. Hoehn, T. and Zeidman, R., "Measuring the Speedup of a Commercial Application on a Computer Grid," ISCA 22nd International Conference On Parallel And Distributed Computing And Communication Systems (http://www.safe-corp.com/documents/Measuring_Speedup_of_a_Commercial_Application_on_a_Computer_Grid.pdf), September 24, 2009.

57. Zeidman, R., "DUPE: The Depository of Universal Plagiarism Examples," 5th International Conference on IT Security Incident Management & IT Forensics (http://www.safe-corp.com/documents/DUPE.pdf), September 2009.

58. Baer, N. and Zeidman, B., "Measuring Changes in Software with CLOC," *Embedded.com* (https://www.embedded.com/measuring-changes-in-software-with-cloc), July 28, 2009.

59. Baer, N. and Zeidman, B., "Measuring Changes in Software IP," *Intellectual Property Today* (https://zeidmanconsulting.com/documents/Measuring%20Changes%20in%20Software%20IP.pdf), June 2009.

60. Baer, N. and Zeidman, B., "Measuring Software Evolution with Changing Lines of Code," 24th International Conference on Computers and Their Applications (CATA-2009) (https://zeidmanconsulting.com/documents/Measuring_Software_Evolution_with_Changing_Lines_of_Code.pdf), April 10, 2009.

61. Zeidman, B., "Detecting and Proving Software Theft and Infringement," SDForum: Emerging Tech SIG, December 10, 2008.

62. Zeidman, B., "Find Your Copy-Cats With SCC," *Software Test & Performance* (https://xndev.com/articles/stp-2008-10.pdf), October 2008, pp 18-23.

63. Zeidman, B., "Software Intellectual Property," invited guest lecture, NALSAR University of Law, Hyderabad, India, October 27, 2008.

64. Zeidman, B., "Detecting Stolen Code," EDAC Anti-Piracy Committee, June 12, 2008.

65. Zeidman, R., "Multidimensional Correlation of Software Source Code," The Third International Workshop on Systematic Approaches to Digital Forensic Engineering (https://ieeexplore.ieee.org/document/4545376), May 22, 2008.

66. Zeidman, B., "Getting Better Search Results," *Dr. Dobb's Journal* (http://www.drdobbs.com/architecture-and-design/getting-better-search-results/207401584) May 2008, pp 44-48.

67. Zeidman, B. and Baer, N., "What, Exactly, Is Software Trade Secret Theft?" (https://zeidmanconsulting.com/documents/What,%20Exactly,%20is%20Software%20Trade%20Secret%20Theft.pdf) *Intellectual Property Today*, March 2008.

68. Berger, A., Hill, M., and Zeidman, B., "Software and RTOS synthesis: The next step in software development?" *Programmable Logic Design Line* (http://www.eetimes.com/design/programmable-logic/4015158/Software-and-RTOS-synthesis-The-next-step-in-software-development-), February 27, 2008.

69. Zeidman, R., "Iterative Filtering of Retrieved Information to Increase Relevance," *Journal of Systemics, Cybernetics and Informatics*, Vol. 5 No. 6, 2007, pp 91-96 (reprint).

70. Hoehn, T. and Zeidman, B., "Grid-Enabling Resource Intensive Applications," (http://www.drdobbs.com/parallel/grid-enabling-resource-intensive-applica/202401080) *Dr. Dobb's Journal*, November 2007, pp 22-28.

71. Zeidman, R., "Iterative Filtering of Retrieved Information to Increase Relevance," The 11th World Multi-Conference on Systemics, Cybernetics and Informatics (https://zeidmanconsulting.com/documents/Iterative_Filtering.pdf), July 11, 2007.

72. Zeidman, B., "Who Stole My Software?" High Technology Crime Investigation Association, May 10, 2007.

73. Zeidman, B., "How to choose an RTOS for your FPGA and ASIC designs," *Programmable Logic Design Line* (http://www.eetimes.com/design/programmable-logic/4015109/How-to-choose-an-RTOS-for-your-FPGA-and-ASIC-designs), May 10, 2007.

74. Zeidman, B., "Sharing Videos With Invisible Commercials," The Thirty Third Asilomar Microcomputer Workshop, April 18, 2007.

75. Zeidman, B., "Real Time Operating Systems for Systems on a Chip," IEEE Consultants Network of Silicon Valley, April 17, 2007.

76. Zeidman, B., "What, Exactly, Is Software Plagiarism?" *Intellectual Property Today* (https://zeidmanconsulting.com/documents/What,%20Exactly,%20Is%20Software%20Plagiarism.pdf), February 2007.

77. Zeidman, B., "Software Synthesis for Embedded Systems," Silicon Valley Code Camp, October 8, 2006.

78. Zeidman, B., "Who Stole My Code," Silicon Valley Code Camp, October 8, 2006.

79. Zeidman, B., "Software Source Code Correlation," 5th IEEE/ACIS International Conference on Computer and Information Science (https://ieeexplore.ieee.org/document/1652022), July 12, 2006.

80. Zeidman, B., "The Death of the Structured ASIC," *Programmable Logic Design Line* (http://chipdesignmag.com/display.php?articleId=386), April 18, 2006.

81. Zeidman, B., "All about FPGAs," *Programmable Logic Design Line* (http://www.design-reuse.com/articles/12884/all-about-fpgas.html), March 22, 2006.

82. Zeidman, B., "The pluses and minuses of being a consultant," IEEE Gold, Santa Clara Valley Chapter, February 9, 2006.

83. Zeidman, B., "Using software synthesis for multiprocessor OS and software development," *Embedded.com* (http://www.embedded.com/design/prototyping-and-development/4006506/Using-software-synthesis-for-multiprocessor-OS-and-software-development), January 6, 2006.

84. Zeidman, B., "Implementing Integrated Hardware/Software Projects With High Level Languages and Tools," Boston Section of the IEEE, December 1, 2005.

85. Zeidman, B., "Back to the basics: Programmable Systems on a Chip," *Embedded.com* (http://www.eetimes.com/design/programmable-logic/4014776/Introduction-to-Programmable-Systems-on-a-Chip), July 27, 2005.

86. Zeidman, B., "Who Stole My Code?" The Thirty First Asilomar Microcomputer Workshop, April 21, 2005.

87. Zeidman, B., "Software Synthesis for OS-Independent Coding," *Dr. Dobb's Journal* (http://www.drdobbs.com/architecture-and-design/software-synthesis-for-os-independent-co/184406036) April 2005, pp 58-63.

88. Zeidman, B., "RTOS Synthesis for Embedded Systems," Server Blade Summit, March 24, 2005.

89. Zeidman, B., "RTOS Synthesis to Reduce Power Consumption," DesignCon 2005, February 1, 2005.

90. Zeidman, B., "Software synthesis for embedded systems," *Embedded Systems Programming* (http://www.embedded.com/design/prototyping-and-development/4006439/Software-synthesis-for-embedded-systems) February 2005, pp 36-43.

91. Zeidman, B., "Testing a Network Device Prototype in a Live Network," *Annual Review of Communications* Volume 4, 2004, p.803 (reprint).

92. Zeidman, B., "Roll Your Own Real-Time OS," *BladeLetter*, Q3 2004, p. 8.

93. Zeidman, B., "Detecting Source-Code Plagiarism," *Dr. Dobb's Journal* (http://www.drdobbs.com/architecture-and-design/detecting-source-code-plagiarism/184405734) July 2004, pp 55-60.

94. Zeidman, B., "Software Synthesis for Embedded Systems," The Thirtieth Asilomar Microcomputer Workshop, April 27, 2004.

95. Zeidman, B., "Smart Pills: The Royal Treatment," *IP Law & Business*, March 2004.

96. Zeidman, B., "Emulating/Prototyping a Network Device in a Live Network," DesignCon 2004, February 3, 2004.

97. Zeidman, B., "Software synthesis is productive for system design," *EE Times* (http://www.eetimes.com/document.asp?doc_id=1148219), January 12, 2004.

98. Zeidman, B., "Guidelines for Effective E-Learning," *Chief Learning Officer* (https://www.chieflearningofficer.com/2003/12/01/guidelines-for-effective-e-learning) December, 2003, pp. 24-31.

99. Zeidman, B., "Universal Design Methodology," *Embedded Systems Programming* (http://www.embedded.com/electronics-blogs/beginner-s-corner/4024888/The-universal-design-methodology) December, 2003, pp 55-56.

100. Zeidman, B., "Test Your Next Hardware Design—in a Live Network," *Communication Systems Design* (https://www.academia.edu/1576191/Test_Your_Next_Hardware_Design-in_a_Live_Network) October 2003, p.18.

101. Zeidman, B., "Platform FPGAs to Prevail," *Embedded Systems Programming* (http://business.highbeam.com/136935/article-1G1-109898412/platform-fpgas-prevail-before-long-platform-fpgas-containing) November, 2003, pp.28-31.

102. Zeidman, B., "The Universal Design Methodology -- taking hardware from conception through production," *EDN* (http://www.edn.com/design/integrated-circuit-design/4345988/The-Universal-Design-Methodology-taking-hardware-from-conception-through-production) December 26, 2002, p53.

103. Zeidman, B., "FPGAs vs. ASICs for Networking," Network Processor Conference West, October 2002, 11pp.

104. Zeidman, B., "How to Start A Consulting Business," *Embedded Systems Programming* (http://www.embedded.com/design/real-world-applications/4402268/How-to-Start-a-Consulting-Business-) December 2000, pp161-163.

105. Zeidman, B., "An Introduction to Remote Backup," *Disaster Recovery Journal*, Vol. 9 No. 2 (http://www.drj.com/drj-world-archives/data-processing-recovery/an-introduction-to-remote-backup.html) April/May/June 1996, p48.

106. Zeidman, B., "Testing System Memory Quickly and Efficiently," Design SuperCon 96 conference, February 1, 1996, 14pp.

107. Zeidman, B., "Remote Backup - Transmitting Critical Data Over Phone Lines for Offsite Storage," JAMCON '95 Communications Conference, August 20, 1995, pp97-99.

108. Zeidman, B., "Testing Memory Quickly," *Embedded Systems Programming*, Aug 1995, pp68-75

109. Zeidman, B., "Read-Ahead Logic: An Alternative to Cache," Design SuperCon 95 conference, March 1, 1995, 6pp.

110. Zeidman, B., "How to Make Money as a Consultant," *Income Opportunities*, Dec 1993, pp48-62

111. Zeidman, B., "Interleaving DRAMs for Faster Access," *ASIC & EDA*, November 1993, pp24-34.

112. Zeidman, B., "Starting Up Your Engineering Consulting Business," *High Technology Careers*, April/May 1993, p24.

113. Zeidman, B., "New Film Software for Independent Producers," *CUE*, September 1992, pp6-7.

114. Hafeman, D. and Zeidman, B., "Memory Architectures Compound RISC's Gains," *Electronic Design*, July 11, 1991, pp71-82.

115. Flynn, M. J., Zeidman, R. and Lochner, E., "Sparse Distributed Memory Prototype: Address Module Hardware Guide," Stanford University Computer Systems Laboratory CSL-TR-88-373, December 1988 72pp.

116. Flynn, M. J., Kanerva, P., Ahanin, B., Bhadkamkar, N., Flaherty, P., Hickey, P., Lochner, E., Webber, K., and Zeidman, R., "Sparse Distributed Memory Prototype: Principles of Operation," Stanford University Computer Systems Laboratory CSL-TR-88-338, December 1988 96pp.

## PATENTS

Named inventor on following patents and patent applications:

1. Zeidman, Robert M., "Visual tool for developing real time task management code," U.S. Patent 6,934,947.

2. Zeidman, Robert M., "Method for connecting a hardware emulator to a network," U.S. Patent 7,050,962.

3. Zeidman, Robert M., Hafeman, Daniel R., Barr, Michael, "Method and apparatus for synthesizing a hardware system from a software description," U.S. Patent 7,210,116.

4. Zeidman, Robert M., "Apparatus and method for connecting hardware to a circuit simulation," U.S. Patent 7,266,490, RE 42,227.

5. Zeidman, Robert M., "Software tool for detecting plagiarism in computer source code," U.S. Patent 7,503,035.

6. Zeidman, Robert M., Hafeman, Daniel R., Barr, Michael, "Method and apparatus for synthesizing a hardware system from a software description," U.S. Patent 7,620,928.

7. Zeidman, Robert M., Hafeman, Daniel R., "Method and apparatus for emulating a hardware/software system using a computer," U.S. Patent 7,647,583.

8. Zeidman, Robert M., "Detecting plagiarism in computer source code," U.S. Patent 7,823,127.

9. Zeidman, Robert M., "Apparatus and method for connecting hardware to a circuit simulation," U.S. Patent 7,835,897.

10. Zeidman, Robert M., "Software tool for synthesizing a real-time operating system," U.S. Patent 7,882,488.

11. Zeidman, Robert M. and Snider, Gregory, "Using readily available driver and application source code with a synthesized operating system," U.S. Patent 7,900,187.

12. Zeidman, Robert M., Hafeman, Daniel R., Barr, Michael, "Method and apparatus for synthesizing a hardware system from a software description," U.S. Patent 7,945,879.

13. Zeidman, Robert M., "System and method for connecting a logic circuit simulation to a network," U.S. Patent 8,160,863.

14. Zeidman, Robert M. "Use of hardware peripheral devices with software simulations," U.S. Patent 8,195,442

15. Zeidman, Robert M., "Detecting copied computer source code by examining computer object code," U.S. Patent US 8,255,885.

16. Zeidman, Robert M., "Software tool for detecting plagiarism in computer source code," U.S. Patent 8,261,237.

17. Zeidman, Robert M., "Method for advertisers to sponsor broadcasts without commercials," U.S. Patent 8,316,390.

18. Zeidman, Robert M., "Conveying Data From A Hardware Device To A Circuit Simulation," U.S. Patent 8,380,481.

19. Zeidman, Robert, "Software for filtering the results of a software source code comparison," U.S. Patent 8,495,586.

20. Zeidman, Robert M., "Detecting plagiarism in computer source code," U.S. Patent 9,003,366.

21. Zeidman, Robert, and Hoehn, Timothy, "Searching the Internet for common elements in a document in order to detect plagiarism," U.S. Patent 9,043,375.

22. Mylroie, Steve and Zeidman, Robert M., "Detecting plagiarism in computer markup language files," US Patent 9,053,296.

23. Zeidman, Robert M., "Method for advertisers to sponsor broadcasts without commercials," US Patent 10,116,999.

24. Zeidman, Robert M., "Method and Apparatus for Remote Game Play with Real-Time Commentary," US Patent 11,369,887.

25. Zeidman, Robert M., "Method and Apparatus for Remote Game Play with Real-Time Commentary," US Patent 11,413,545.

26. Zeidman, Robert M. and Zeidman, Carrie L., "Pool Lap Counter," US Patent 11,511,177.

27. Zeidman, Robert M., "Method and Apparatus for Remote Game Play with Real-Time Commentary," US Patent 11,684,860.

28. Zeidman, Robert M., "Method and Apparatus for Remote Game Play with Real-Time Commentary," US Patent 11,684,859.

29. Zeidman, Robert M.,  Zeidman, Carrie L., Caldwell, John, "Pool Lap Counter," China National Intellectual Property Administration utility model 23134921.

30. Zeidman, Robert M.,  Zeidman, Carrie L., Caldwell, John, "Pool Lap Counter," USPTO application number 18/120,899 (pending).

**TRAINING/TEACHING EXPERIENCE**

Presented seminars and courses on the following topics:

- A Crash Course in Verilog
- All About Patents
- Analysis of Software Copyright Infringement Cases
- Artificial Intelligence, Intellectual Property, and Star Trek
- ASIC Design
- All About Electronics
- Choosing an OS for your IoT device
- CPLD Design
- Creating a Multitasking System at the Push of a Button Using SynthOS
- Detecting Software IP Theft
- Detecting Software Copying

- Electrical Engineering for non-EEs
- Finding and Utilizing Technical Consultants for IP Litigation
- FPGA Design
- FPGAs vs. ASICs for Networking
- The History of Digital Hardware Design
- How to Patent Your Invention
- How to Start a Consulting Business
- Introduction to Programmable Systems on a Chip
- Investigating Technology Theft
- IP Litigation from the Perspective of an Inventor/Expert Witness
- Measuring Software Changes with the CLOC Method
- Memory Architectures
- Patent Litigation Tips
- Patents in Star Trek
- Patents in the Future
- Programmable Systems on a Chip (SOCs)
- Protecting Your Intellectual Property
- Proving the Facts: A Fireside Chat with Bob Zeidman on Winning the My Pillow CEO's Challenge
- Push-Button Creation of an Optimized Application Specific OS
- Real-Time Operating Systems for SOCs
- Software Copyright Infringement Allegations - Inside the Forensic Analysis
- Software Forensics and Voting Machines
- Software Intellectual Property
- Software Synthesis
- Software Synthesis for Embedded Systems
- Starting a Consulting Business
- Technical Consultants for IP Litigation
- Testing Memory
- The Desperate Need for Standards of IP Infringement Detection Tools and Methods in Litigation
- The Real and Unreal Threats of Artificial Intelligence
- Understanding Innovation
- Understanding Software IP and Detecting IP Theft
- Universal Design Methodology
- Verilog and HDLs
- What I Did Right And What I Screwed Up - Lessons From A Parallel Entrepreneur
- You Invented It, Now Protect It!

At the following places:

- 56-Year Mission Las Vegas (Star Trek convention)
- Association of Computing Machinery, Bay Area
- Cogswell College
- College of San Mateo
- Cornell Entrepreneur Network
- Design Automation Conference
- DesignCon
- Digital Forensic Research Workshop
- Eastcon
- Easy Paths to Silicon Design
- Electronic Discovery Reference Model (EDRM)
- Embedded Systems Conference

  - Boston
  - Chicago

- Europe
- India
- London
- Minneapolis
- Silicon Valley
- Embedded TechCon
- Forensic Expert Witness Association National Conference
- Gigabit Ethernet Conference
- High-Level Electronic System Design Conference
- High Technology Crime Investigation Association
- International Conference on Cryptologic History
- Institute of Electrical and Electronics Engineers
- IoT Evolution Expo
- LancerHacks
- Maker Faire
- Microsoft Store, Stanford Shopping Center
- Midwest IP Institute
- NALSAR University of Law
- Network Processors Conference West
- Northcon
- Opportunity X
- Palo Alto Area Bar Association
- PCB Design East
- PCB Design West
- San Jose State University
- San Francisco State University
- Semizone.com
- Server Blade Summit
- Silicon Valley Code Camp
- Southcon
- Stanford University
- STLV
- Union College Academy for Lifelong Learning
- Vintage Computer Festival
- Westcon
- World Intellectual Property Technical Forum
- World IP Forum

# EXHIBIT C

# Exhibit C – Relevant Legal Statutes

## Cal. Penal Code § 638.51

(a) Except as provided in subdivision (b), a person may not install or use a pen register or a trap and trace device without first obtaining a court order pursuant to Section 638.52 or 638.53.

(b) A provider of electronic or wire communication service may use a pen register or a trap and trace device for any of the following purposes:

> (1) To operate, maintain, and test a wire or electronic communication service.

> (2) To protect the rights or property of the provider.

> (3) To protect users of the service from abuse of service or unlawful use of service.

> (4) To record the fact that a wire or electronic communication was initiated or completed to protect the provider, another provider furnishing service toward the completion of the wire communication, or a user of that service, from fraudulent, unlawful, or abusive use of service.

> (5) If the consent of the user of that service has been obtained.

(c) A violation of this section is punishable by a fine not exceeding two thousand five hundred dollars ($2,500), or by imprisonment in the county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170, or by both that fine and imprisonment.

(d) A good faith reliance on an order issued pursuant to Section 638.52, or an authorization made pursuant to Section 638.53, is a complete defense to a civil or criminal action brought under this section or under this chapter.

## Cal. Penal Code. § 638.50(b)

For purposes of this chapter, the following terms have the following meanings:

(a) "Wire communication" and "electronic communication" have the meanings set forth in subdivision (a) of Section 629.51.

(b) "Pen register" means a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication. "Pen register" does not include a device or process used by a provider or customer of a wire or electronic communication service for billing, or recording as an incident to billing, for communications services provided by such provider, or a device or process used by a provider or customer of a wire communication service for cost accounting or other similar purposes in the ordinary course of its business.

(c) "Trap and trace device" means a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication.

(d) "Prohibited violation" has the same meaning as that term is defined in Section 629.51.

## Cal. Penal Code § 631(a)

a) Any person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500), or by imprisonment in the county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170, or by both a fine and imprisonment in the county jail or pursuant to subdivision (h) of Section 1170. If the person has previously been convicted of a violation of this section or Section 632, 632.5, 632.6, 632.7, or 636, the offense is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in the county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170, or by both that fine and imprisonment.

(b) This section shall not apply to any of the following:

(1) Any public utility, or telephone company, engaged in the business of providing communications services and facilities, or to the officers, employees or agents thereof, where the acts otherwise prohibited herein are for the purpose of construction, maintenance, conduct or operation of the services and facilities of the public utility or telephone company.

(2) The use of any instrument, equipment, facility, or service furnished and used pursuant to the tariffs of a public utility.

(3) Any telephonic communication system used for communication exclusively within a state, county, city and county, or city correctional facility.

(c) For purposes of this section, "telephone company" is defined in paragraph (3) of subdivision (c) of Section 638.

(d) Except as proof in an action or prosecution for violation of this section, no evidence obtained in violation of this section shall be admissible in any judicial, administrative, legislative, or other proceeding.

## Cal. Penal Code § 632

(a) A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500) per violation, or imprisonment in a county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment. If the person has previously been convicted of a violation of this section or Section 631, 632.5, 632.6, 632.7, or 636, the person shall be punished by a fine not exceeding ten thousand dollars ($10,000) per violation, by imprisonment in a county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment.

(b) For the purposes of this section, "person" means an individual, business association, partnership, corporation, limited liability company, or other legal entity, and an individual acting or purporting to act for or on behalf of any government or subdivision thereof, whether federal, state, or local, but excludes an individual known by all parties to a confidential communication to be overhearing or recording the communication.

(c) For the purposes of this section, "confidential communication" means any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, executive, or administrative proceeding open to the public, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded.

(d) Except as proof in an action or prosecution for violation of this section, evidence obtained as a result of eavesdropping upon or recording a confidential communication in violation of this section is not admissible in any judicial, administrative, legislative, or other proceeding.

(e) This section does not apply (1) to any public utility engaged in the business of providing communications services and facilities, or to the officers, employees, or agents thereof, if the acts otherwise prohibited by this section are for the purpose of construction, maintenance, conduct, or operation of the services and facilities of the public utility, (2) to the use of any instrument, equipment, facility, or service furnished and used pursuant to the tariffs of a public utility, or (3) to any telephonic communication system used for communication exclusively within a state, county, city and county, or city correctional facility.

(f) This section does not apply to the use of hearing aids and similar devices, by persons afflicted with impaired hearing, for the purpose of overcoming the impairment to permit the hearing of sounds ordinarily audible to the human ear.

**Cal. Penal Code § 635**

(a) Every person who manufactures, assembles, sells, offers for sale, advertises for sale, possesses, transports, imports, or furnishes to another any device which is primarily or exclusively designed or intended for eavesdropping upon the communication of another, or any device which is primarily or exclusively designed or intended for the unauthorized interception or reception of communications between cellular radio telephones or between a cellular radio telephone and a landline telephone in violation of Section 632.5, or communications between cordless telephones or between a cordless telephone and a landline telephone in violation of Section 632.6, shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500), by imprisonment in the county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment. If the person has previously been convicted of a violation of this section, the person shall be punished by a fine not exceeding ten thousand dollars ($10,000), by imprisonment in the county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment.

(b) This section does not apply to either of the following:

    (1) An act otherwise prohibited by this section when performed by any of the following:

        (A) A communication utility or an officer, employee or agent thereof for the purpose of construction, maintenance, conduct, or operation of, or otherwise incident to the use of, the services or facilities of the utility.

        (B) A state, county, or municipal law enforcement agency or an agency of the federal government.

        (C) A person engaged in selling devices specified in subdivision (a) for use by, or resale to, agencies of a foreign government under terms approved by the federal government, communication utilities, state, county, or municipal law enforcement agencies, or agencies of the federal government.

    (2) Possession by a subscriber to communication utility service of a device specified in subdivision (a) furnished by the utility pursuant to its tariffs.

# EXHIBIT D

∞ Meta                                                                                     ☰

Meta Business Help Center

# Best practices for Meta Pixel setup

5,760 views

You can use these best practices during and after Meta Pixel setup to check that you successfully installed your pixel and events.

## During Meta Pixel setup

- **Check that your pixel base code is accurate.** If you installed the pixel using code on your website, make sure everything between the <script> and </script> tags exactly matches your pixel base code. If you installed the pixel using a tag manager, then you won't see the code on the actual web page so you'll have to troubleshoot within your tag manager.

- **Check that you added the event code in the correct place.** Here's an example of what your website code might look like with the add to cart event installed:



1. Your website's original code.

2. Your pixel base code.

3. Your standard event code.

- **Make sure your standard events are spelled correctly in code.** Events are case sensitive, so if you accidentally add fbq('track', 'viewcontent'); to one of your web pages instead of the correct standard event code fbq('track', 'ViewContent'); you'll see an event called **viewcontent** show up as a custom event in Meta Events Manager.

## After Meta Pixel setup

- **Use the Conversions API in addition to the Meta Pixel, and share the same events using both tools.** We call this a redundant event setup. For example, if you share the purchase, initiate checkout and contact events using the pixel, share those same web events from your server using the Conversions API. Redundant setups are useful because the Conversions API allows you to share website events that the pixel may fail to capture due to network connectivity issues or page loading errors. Learn how to check if you're sharing redundant web events.

- **Use the test events tool** to check that you set up your standard or custom events correctly. If you see any unusual activity, you can also use the Test Events tool to debug your events.

- **Check the Diagnostics tab in Events Manager** to find and resolve problems related to your event setup. You'll also see recommendations to improve your event setup if we detect a problem.

- **If you can't access the ad account with the pixel you want to test, download the Meta Pixel helper.** A pop-up tells you what Pixel and events were found on the page, and if they loaded successfully. If the page view event (which is automatically included as part of your pixel base code) loads on every web page, and each standard event loads successfully (only on the pages you added them to), then you can start using your pixel.

- **Go to a web page where you've installed the entire pixel base code, including the page view event.** The page view event is automatically included as part of your pixel base code. If your pixel is working correctly, it will send the page view event back to Meta. The page view event will show up on your pixel's page in Events Manager. Your pixel's status will also be set to **Active**.

If you've successfully set up your pixel, you're ready to use the pixel for advertising.

**Note:** You can use one pixel across your whole website, including multiple pages of your website. However, there may be a need to use two pixels on one website. For example, if two different agencies run ads for your business, they may each need to set up a separate pixel on your website. Learn more about using multiple pixels on Meta for Developers.

---

Was this information helpful?                                                            🔗  ⬆

☑ Yes  ☐ No

More in this section: EVENTS





PIXEL_TAX000000232

# EXHIBIT E

# EXHIBIT F

# EXHIBIT G

Docs    Meta Pixel

On This Page

# Meta Pixel

The Meta Pixel is a snippet of JavaScript code that allows you to track visitor activity on your website. It works by loading a small library of functions which you can use whenever a site visitor takes an action (called an **event**) that you want to track (called a **conversion**). Tracked conversions appear in the Ads Manager where they can be used to measure the effectiveness of your ads, to define custom audiences for ad targeting, for Advantage+ catalog ads campaigns, and to analyze that effectiveness of your website's conversion funnels.

The Meta Pixel can collect the following data:

- **Http Headers** – Anything that is generally present in HTTP headers, a standard web protocol sent between any browser request and any server on the internet. This information may include data like IP addresses, information about the web browser, page location, document, referrer and person using the website.
- **Pixel-specific Data** – Includes Pixel ID and the Facebook Cookie.
- **Button Click Data** – Includes any buttons clicked by site visitors, the labels of those buttons and any pages visited as a result of the button clicks.
- **Optional Values** – Developers and marketers can optionally choose to send additional information about the visit through Custom Data events. Example custom data events are conversion value, page type and more.
- **Form Field Names** – Includes website field names like `email`, `address`, `quantity`, etc., for when you purchase a product or service. We don't capture field values unless you include them as part of Advanced Matching or optional values.

# Documentation Contents

## Get Started

A short tutorial on adding the Pixel base code to your webpages.

## Guides

Use case based guides to help you perform specific actions.

## Reference

Product specifications and endpoint references.

## Support

Solutions to common problems, troubleshooting tips, and tools.

# Learn more

- Track User activity in a mobile app using Facebook App Events
- Apple's iOS 14 Requirements for Meta Pixel

**Meta Pixel**

Get Started

Guides

Support

Reference

# EXHIBIT H

# EXHIBIT 26

# FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT I

HIGHLY CONFIDENTIAL

Page 1

1             UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF CALIFORNIA
3                 SAN JOSE DIVISION
4                    ---oOo---
5
6

   IN RE META PIXEL TAX

7                              No. Master File No.

   FILING CASES                3:22-cv-07557-PCP

8

   This document relates
9   to:  All actions
   _____/
10
11
12

               HIGHLY CONFIDENTIAL
13
        VIDEOTAPED DEPOSITION OF AMLESH JAYAKUMAR
14
            30(b)(6) Meta Platforms, Inc.
15
                 July 14, 2025
16
17
18
19
20
21
22
        Taken before EARLY K. LANGLEY, RMR, B.A. (PBK)
23
                 CSR No. 3537
24
              Job No. NE 7464368
25

HIGHLY CONFIDENTIAL

Page 2

1                          I N D E X

2

3                                                    PAGE

4

    AMLESH JAYAKUMAR                                   9

5

6    EXAMINATION BY MR. SMITH                          9

7    EXAMINATION BY MS. HAUSKNECHT                   211

8    EXAMINATION BY MR. SMITH                        213

9

10

11

12      INSTRUCTIONS TO WITNESS/REQUESTS TO MARK TRANSCRIPT

13

                               Page:Line

14

    Instructions not to answer

15

    Instructions not to answer

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

```
 1                    E X H I B I T S

 2

 3   EXHIBIT NO.                                        PAGE

 4

 5   Exhibit 140    Plaintiffs' Fourth Amended Notice    14
                    of 30(b)(6) Deposition of
 6                  Defendant Meta Platforms, Inc.

 7

     Exhibit 141    Declaration of Tobias Wooldridge     20
 8                  in Support of Defendant Meta
                    Platforms, Inc.'s Opposition to
 9                  Plaintiffs' Motion for
                    Preliminary Injunction
10

11   Exhibit 142    "About Personally Identifiable       37
                    Information (Contact
12                  Information)" PIXEL_TAX000052510

13

14   Exhibit 143    Defendant Meta Platforms, Inc.'s     47
                    Amended Responses and Objections
                    to Plaintiffs' First Set of
15                  Requests for Admission

16

     Exhibit 144    Defendant Meta Platforms, Inc.'s     47
17                  Responses and Objections to
                    Plaintiffs' First Set of Requests
18                  for Admission

19

     Exhibit 145    9/22/2022 Email, J. Singhal to T.    82
20                  Wooldridge, PIXEL_TAX000059137

21

     Exhibit 146    Document titled                      90
22                  ███████████_inc._archive_
                    2022-7-26_1.csv,
23                  PIXEL_TAX000036169, Excerpted
                    Rows 2540 and 6700" Highly
24                  Confidential AEO

25
```

HIGHLY CONFIDENTIAL

Page 4

1    Exhibit 147    "PIXEL_TAX000003583" Highly         104
                    Confidential AEO
2

3    Exhibit 148    PIXEL_TAX000003585 (Excerpted:      104
                    Rab Jane Doe, Rows 1, 121-124)
4                   Highly Confidential AEO
5
     Exhibit 149    PIXEL_TAX000034451, Tab "Logs"      150
6                   Highly Confidential AEO
7
     Exhibit 150    5/18/2018 Internal message,         155
8                   PIXEL_TAX000022472
9
     Exhibit 151    12/19/2022 Internal message, T.     163
10                  Wooldrige to M. Patel,
                    PIXEL_TAX000023047
11
12   Exhibit 152    3/1/2022 Internal message, A.       168
                    Anand to others,
13                  PIXEL_TAX000004297
14
     Exhibit 153    12/1/2022 TaxSlayer letter to       174
15                  Meta Platforms, TS_NDCal_000158
16
     Exhibit 154    April 15 internal message           180
17                  ██████████████████████████
                    ██████████████████ ,
18                  PIXEL_TAX000052702
19
     Exhibit 155    April 9 internal memo, ██████        ██
██                  ████████████████████████████
                    ████████████████████████████:
21                  PIXEL_TAX000052649
22
     Exhibit 156    11/15/22 messages, V. Norland to    193
23                  M. Nelson, PIXEL_TAX000023123
24
25

HIGHLY CONFIDENTIAL

Page 5

1  **Exhibit 157     The Markup article. Tax Filing         200**
                     **Websites Haven Been Sending**
2                    **Users' Financial Information to**
                     **Facebook"**
3

4  **Exhibit 158     Document titled "ABP Privacy          203**
                     **Infra, Long Range Investments**
5                    **[A/C  Priv]" not Bates-stamped**
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

HIGHLY CONFIDENTIAL

                                                      Page 6

 1              DEPOSITION OF AMLESH JAYAKUMAR

 2

 3          BE IT REMEMBERED, that pursuant to Notice, and

 4     on July 14, 2025, commencing at the hour of 10:09 a.m.,

 5     in the offices of Gibson Dunn & Crutcher, One

 6     Embarcadero Center, 26th Floor, San Francisco,

 7     California, before me, EARLY LANGLEY, a Certified

 8     Shorthand Reporter, State of California, personally

 9     appeared AMLESH JAYAKUMAR, produced as a witness in

10     said action, and being by me first duly sworn, was

11     thereupon examined as a witness in said cause.

12                          ---oOo---

13     APPEARANCES:

14

15     For the Plaintiffs:

16             SMITH KRIVOSHEY, P.C.

17             BY: JOEL D. SMITH, ESQ.

18             867 Boylston Street, 5th Floor

19             Boston, MA 02216

20             617-377-7404

21             Joel@skclassactions.com

22

23

24

25

HIGHLY CONFIDENTIAL

```
                                    Page 7

1    For the Defendant Meta Platforms, Inc.:

2

3           GIBSON, DUNN & CRUTCHER

4           BY: NATALIE J.  HAUSKNECHT, ESQ.

5           One Embarcadero Center

6           San Francisco, CA 94111

7           Nhausknecht@gibsondunn.com

8

9           - and -

10

11          GIBSON, DUNN & CRUTCHER

12          BY: ASHLEY ROGERS, ESQ.

13          2001 Ross Avenue

14          Dallas, TX 75201

15          (214) 698-3100

16          Arogers@gibsondunn.com

17

18

19   Also present:

20          Peter Yaroschuk, Videographer

21          Veronica Nauts, Meta Platforms, Inc.

22

23

24

25
```

HIGHLY CONFIDENTIAL

```
                                            Page 8

  1                    --oOo--

  2              P R O C E E D I N G S

  3                    --oOo--

  4         THE VIDEOGRAPHER:  Good morning.  We are

  5  going on the record at 10:09 a.m. on July 14,

  6  2025.  Please note that the microphones are

  7  sensitive and may pick up whispering and private

  8  conversations.  Please mute your phones at this

  9  time.

 10         Audio and video recording will continue

 11  to take place unless all parties agree -- all

 12  parties agree to go off the record.  This is

 13  Media Number 1 of the video recorded deposition

 14  of Amlesh Jayakumar, taken by counsel for

 15  plaintiff, in the matter of In Re Meta Pixel Tax

 16  Filing Cases, filed in the United States District

 17  Court, Northern District of California Case

 18  Number 5:22-cv-07557-PCP (VKD).

 19         The location of this deposition is 1

 20  Embarcadero Center, Suite 2600, San Francisco,

 21  California.

 22         My name is Peter Yaroschuk representing

 23  Veritext.  I'm the videographer.  I'm not related

 24  to any party in this action, nor am I financially

 25  interested in the outcome.  If there are any
```

HIGHLY CONFIDENTIAL

Page 171

1      Q.  Is it the case that notwithstanding

2   Meta's general filtering systems, ███████████

   ███████████████████████████████████████████

4          MS. HAUSKNECHT:  Objection.  Scope.

5          THE WITNESS:  The filtering systems I

6   described in my earlier responses, the ones that

7   ████████████████████████████████████████

   ███████████████████████████████████████████████

   ██████████████████████████████████████████

   ████████████████████████████████████

   █████████████████████████████████████████████

   ███████████████████████████████████████████████

   ████████████████████████████████████████

   ██████████████████████████████████████████

   █████████████████████

16  BY MR. SMITH:

17      Q.  How long does Meta typically keep Event

18  Data receives from websites?

19          MS. HAUSKNECHT:  Objection.  Vague.

20          THE WITNESS:  Meta generally has sort of

21  retention policies that govern the storage of the

22  different kinds of data within HIVE tables.

23          For Event Data, it received from the Meta

24  Pixel by Meta, it depends on the data itself, but

25  the primarily -- the primary tables where the

HIGHLY CONFIDENTIAL

Page 172

1    Event Data is stored typically retains the data

2    for about 90 days.

3    BY MR. SMITH:

4        Q.  Okay.  And other HIVE tables, do they

5    retain the data, or at least some of the data,

6    for a longer period or a shorter period or a

7    combination of both?

8            MS. HAUSKNECHT:  Objection.  Scope.

9    Vague.

10            THE WITNESS:  And to clarify, by other

11    "HIVE tables," are you referring to tables other

12    than what I described as being the primary

13    tables --

14    BY MR. SMITH:

15        Q.  Uh-huh.

16        A.  -- that were in the scope of this?

17            MS. HAUSKNECHT:  Objection.  Scope.

18    Vague.

19            THE WITNESS:  Event Data that may be

20    stored in tables, other than the primary tables,

21    would be duplicative of the data that is in the

22    primary tables.

23            So that the data would not be stored for

24    a longer period of time or novel -- different

25    data would not be stored elsewhere from the

HIGHLY CONFIDENTIAL

Page 215

1

2

A C K N O W L E D G E M E N T

3

4

5              I, AMLESH JAYAKUMAR, certify

6         that I have read the transcript of my

7         testimony taken under oath on July 14,

8         2025, and that the transcript is a

9         true, complete and correct record of

10        what was asked, answered and said

11        during this deposition, and that the

12        answers on the record as given by me

13        are true and correct.

14

15                    _____

16                          AMLESH JAYAKUMAR

17

18    Signed and subscribed to

19    before me, this      day

20    of                 , 20 .

21    _____

22    Notary Public

23

24

25

HIGHLY CONFIDENTIAL

Page 216

1                    SIGNATURE OF DEPONENT

2

3          I, the undersigned, AMLESH JAYAKUMAR, do

4    hereby certify that I have read the foregoing

5    deposition and find it to be a true and accurate

6    transcription of my testimony, with the following

7    corrections, if any:

8

9    PAGE      LINE                        CHANGE

10   _____     _____

11   _____     _____

12   _____     _____

13   _____     _____

14   _____     _____

15   _____     _____

16   _____     _____

17   _____     _____

18   _____     _____

19   _____     _____

20   _____     _____

21   _____     _____

22   _____     _____

23   _____     _____

24   _____

25               AMLESH JAYAKUMAR,    Date

HIGHLY CONFIDENTIAL

Page 217

1  STATE OF CALIFORNIA

2

3  REPORTER'S CERTIFICATE

4

5          I, EARLY LANGLEY, a Shorthand Reporter,

6  State of California, do hereby certify:

7          That AMLESH JAYAKUMAR, in the foregoing

8  deposition named, was present and by me sworn as

9  a witness in the above-entitled action at the

10  time and place therein specified;

11          That said deposition was taken before me

12  at said time and place, and was taken down in

13  shorthand by me, a Certified Shorthand Reporter

14  of the State of California, and was thereafter

15  transcribed into typewriting, and that the

16  foregoing transcript constitutes a full, true and

17  correct report of said deposition and of the

18  proceedings that took place;

19          That before completion of the

20  proceedings, review of the transcript was not

21  requested.

22          IN WITNESS WHEREOF, I have hereunder

subscribed my hand this July 17, 2025.

23

24

          EARLY LANGLEY, CSR NO. 3537

25          State of California

# EXHIBIT J

1  GIBSON, DUNN & CRUTCHER LLP          COOLEY LLP
   LAUREN R. GOLDMAN (*pro hac vice*)    MICHAEL G. RHODES (SBN 116127)
2  lgoldman@gibsondunn.com               rhodesmg@cooley.com
   200 Park Avenue                       KYLE C. WONG (SBN 224021)
3  New York, NY 10166                    kwong@cooley.com
   Telephone:    (212) 351-4000          CAMERON J. CLARK (SBN 313039)
4  Facsimile:    (212) 351-4035          cclark@cooley.com
                                         CAROLINE A. LEBEL (SBN 340067)
5  ELIZABETH K. MCCLOSKEY (SBN 268184)   clebel@cooley.com
   emccloskey@gibsondunn.com             3 Embarcadero Center, 20th Floor
6  ABIGAIL A. BARRERA (SBN 301746)       San Francisco, CA 94111-4004
   abarrera@gibsondunn.com               Telephone: (415) 693-2000
7  555 Mission Street, Suite 3000        Facsimile: (415) 693-2222
   San Francisco, CA 94105
8  Telephone:    (415) 393-8200
   Facsimile:    (415) 393-8306
9
   TRENTON J. VAN OSS (*pro hac vice*)
10 tvanoss@gibsondunn.com
   1050 Connecticut Avenue, N.W.
11 Washington, DC 20036-5306
   Telephone:    (202) 955-8500
12 Facsimile:    (202) 467-0539

13 *Attorneys for Defendant Meta Platforms, Inc.*
   *(formerly known as Facebook, Inc.)*
14

15                   UNITED STATES DISTRICT COURT

16                 NORTHERN DISTRICT OF CALIFORNIA

17                      SAN FRANCISCO DIVISION

18

19 IN RE META PIXEL HEALTHCARE           Case No. 3:22-cv-3580-WHO
   LITIGATION
20                                        PUTATIVE CLASS ACTION

21 _____       **DECLARATION OF TOBIAS**
                                          **WOOLDRIDGE IN SUPPORT OF**
22                                        **DEFENDANT META PLATFORMS, INC.'S**
                                          **OPPOSITION TO PLAINTIFFS' MOTION**
23 This Document Relates To:              **FOR PRELIMINARY INJUNCTION**

24 Case No. 3:22-cv-3580-WHO (Doe)        *[Declaration of Abigail Barrera and [Proposed]*
                                          *Order filed concurrently herewith]*
25
                                          Action Filed: June 17, 2022
26
                                          Honorable Judge William H. Orrick
27

28

Gibson, Dunn &
Crutcher LLP

DECLARATION OF TOBIAS WOOLDRIDGE IN SUPPORT OF DEFENDANT META PLATFORMS, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION – CASE NO. 3:22-CV-3580-WHO

I, Tobias Wooldridge, hereby declare and state:

1.     I am a software engineer at Meta.   I offer this declaration in support of Meta's Opposition to Plaintiff's Motion for Preliminary Injunction.  The following facts are based on my own personal knowledge, unless otherwise indicated, and, if called and sworn as a witness, I could and would testify competently to them.

**My Background And Work At Meta**

2.     I have worked at Meta as a software engineer since February 2015.  I am a senior engineer on the Signals team, which bears primary responsibility for maintaining and updating the Meta Pixel code.  My team is also responsible for maintaining and implementing Meta's systems that detect and filter potentially sensitive data being sent by third-party developers to Meta via the Meta Pixel, among other Business Tools.  I have worked on the Signals team since April 2017.

**Meta Prohibits Developers From Sending Health Information Through Its Pixel Tool**

3.     Meta's Pixel is a free, publicly available piece of code that third-party website developers can choose to install and use on their websites to measure certain actions taken on their own websites.   Meta's Pixel is available to and used by website developers across industries.   Other companies offer their own pixel tools.

4.     Specifically, when someone takes an action a developer chooses to track on their website (like subscribing to email updates), the Meta Pixel is triggered and sends Meta certain data, called an "Event."  Meta attempts to match the Events it receives to Meta users (Meta cannot match non-Meta users).  The developer can then create "Custom Audiences" based on Events and can target ads on Facebook, Instagram, and publishers within Meta's Audience Network to Meta users who have taken certain actions on their own website.  Meta can also provide the developer with de-identified, aggregated reporting that helps the developer better understand the impact of its ads by measuring what happens when people see them.  The identity of matched Meta users is never revealed to the developer or to any advertiser.

5.     Meta does not want or permit developers to transmit sensitive information, including health information, to it through the Pixel tool.  Meta takes numerous measures to prevent the transmission and receipt of that information.

Gibson, Dunn &
Crutcher LLP

1

DECLARATION OF TOBIAS WOOLDRIDGE IN SUPPORT OF DEFENDANT META PLATFORMS, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION – CASE NO. 3:22-CV-3580-WHO

6. First, Meta requires all developers to agree to its Business Tools Terms before they can obtain a Pixel ID and utilize Meta Pixel code in a website. The Business Tools Terms expressly prohibit developers from sending Meta health or otherwise sensitive information (including any information defined as sensitive under applicable law) and require developers to warrant that they have the legal right to share any information they choose to share with Meta. Developers must also accept Meta's Commercial Terms before using Meta for a business purpose, which similarly prohibit sending Meta health or otherwise sensitive information.

7. Second, during the Meta Pixel ID creation process—a necessary step to install and use the Meta Pixel—Meta reminds developers not to send Meta sensitive user data, linking to the Business Tools Terms and to Meta's Business Help Center content about restricted data ("About Restricted Meta Business Tools Data"). Attached as **Exhibit 1** is a true and correct copy of the article entitled "About Restricted Meta Business Tools Data," downloaded from the Meta Business Help Center on October 13, 2022. Meta has published several additional Business Help Center articles that explain and give examples of the kinds of information (including health information) that developers should not send to Meta, provide steps developers can take to avoid sending such information, and describe how to address instances in which sensitive information may have been sent.

8. Third, in addition to requiring developers to agree not to send Meta any information they do not have the legal right to share, Meta developed and implemented a filtering mechanism to screen out potentially sensitive data it detects. Meta developed the filter to detect data sent through the Pixel (as well as other Business Tools) that it categorizes as potentially sensitive data, including health data, and the filter prevents that detected data from being ingested into Meta's ads ranking and optimization systems. ████████████████████████

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████

9. When Meta's systems detect and filter out data they categorize as potentially sensitive, Meta sends notifications to the developer (1) via email and (2) in two locations in Meta's developer

Gibson, Dunn & Crutcher LLP

dashboard, Events Manager. These notifications inform the developer that Meta detected and blocked data that may not comply with Meta's terms; confirm that the removal may affect ad performance; and provide details about the affected data, including the URL where the events occurred, the location (but not the contents) of the potentially violating information, steps the developer can take to address the issue, and an email address to contact with questions.

**Meta Users Consent To Meta's Use Of Pixel Data And Can Control And Disconnect Their Off-Facebook Activity**

10.     Meta discloses to users that it receives data from third parties, including data sent via the Pixel tool, and provides several ways for its users to review and control Meta's use of that data. The Data Policy, to which all users of Meta services must agree, explains that Meta may receive information about users' activities off the Meta services, including from developers that use the Meta Business Tools, including the Meta Pixel. The Data Policy also discloses how Meta uses such data, including by providing measurement, analytics, and other business services. Meta users also must agree to the Terms of Service and Cookies Policy, which disclose that their personal data can be used to provide targeted ads.

11.     Meta also enables its users to review a summary of information Meta has received about their activity from third parties, including through the Pixel, and to disconnect that data from their account. Specifically, using the Off-Facebook Activity tool, which is linked to in the Data Policy and accessible via other entry points, Meta users can control or disconnect the off-Facebook activity that has been associated with their Facebook account, subject to some exceptions for security and safety needs. Meta users can disconnect historical third-party activity data from their account using the "Clear previous history" option. They can also "turn off" storage of future connections between their Facebook account and their activities off Facebook using the "Disconnect Future Activity" option. Meta users can make this choice for all third-party websites or on a website-by-website basis.

12.     In addition, Meta provides other privacy tools and resources to users of the Meta services that allow them to control how data shared by third parties can be used to show them relevant ads. Specifically, the "Data About Your Activity From Partners" tool within Meta's "Ad Settings" allows users to opt out of receiving personalized advertisements based on their activity on third-party

Gibson, Dunn &
Crutcher LLP

3

DECLARATION OF TOBIAS WOOLDRIDGE IN SUPPORT OF DEFENDANT META PLATFORMS, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION – CASE NO. 3:22-CV-3580-WHO

1    websites, apps, or offline, among other things.

2        13.     Additional tools Meta provides to its users, which enable them to control

3    advertisements they receive, include the following:

4        • **Hide ad**:  Users can hide individual advertisements appearing in their News Feed.

5        • **Report ad**:  Users can report advertisements in their News Feed if they consider them

6          to be inappropriate—for example, due to containing spam, false news, or being

7          misleading or sexually inappropriate.

8        • **Hide advertiser**:  Users can hide all advertisements from a specific developer altogether

9          via their Ad Preferences.

10       • **Limit ad topics**:  Users can limit advertisements about topics such as alcohol, parenting,

11         pets, social issues, and elections or politics, and advertisers cannot target the user based

12         on an interest in that topic.

13   I declare under penalty of perjury that the foregoing is true and correct, and that I executed this

14   Declaration on October ___, 2022, in _____.
         17                    Adelaide, South Australia

15

16                                                          Tobias Wooldridge
                                                     _____
17                                                       Tobias Wooldridge

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF TOBIAS WOOLDRIDGE IN SUPPORT OF DEFENDANT META PLATFORMS, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION – CASE NO. 3:22-CV-3580-WHO

# Exhibit 1

DocuSign Envelope ID: 29007459-7BD9-44AA-9953-6791AB4B96E5

**At Meta, we have policies around the kinds of information businesses can share with us. We don't want websites or apps sending us sensitive information about people.**

Business Tools Data is data sent from advertisers to Meta in connection with advertising, matching, measurement and analytics, including through the use of Business Tools, Social Plugins, Login, and certain APIs. Meta's Business Tools Terms outline the type of data that advertisers should not send to Meta via any of the Meta Business Tools.

Specifically, advertisers should not share Business Tools Data with Meta that they know or reasonably should know is either from or about children under the age of 13, or includes health or financial information, or other categories of sensitive information. This includes any information defined as sensitive under applicable laws, regulations and applicable industry guidelines.

Advertisers may use the Meta Business Tools to send to Meta information that personally identifies individuals (referred to as Contact Information), such as names, email addresses, and phone numbers, to help Meta match the data advertisers share with Meta user accounts. However, such Contact Information must be hashed in a manner specified by Meta before transmission, when using a Meta image Pixel or other Meta Business Tools. Visit Meta for Developers for hashing instructions.

Use the Learn More section below for further guidance on certain types of sensitive Business Tools Data prohibited under Meta's Business Tools Terms.

If you receive a notification that you're violating Meta's Business Tools data policies, learn how to troubleshoot the issue.

## Learn more

# EXHIBIT K

GIBSON, DUNN & CRUTCHER LLP
LAUREN R. GOLDMAN (admitted *pro hac vice*)
lgoldman@gibsondunn.com
DARCY C. HARRIS (admitted *pro hac vice*)
dharris@gibsondunn.com
200 Park Avenue
New York, NY 10166
Telephone:    (212) 351-4000
Facsimile:    (212) 351-4035

ELIZABETH K. MCCLOSKEY, SBN 268184
emccloskey@gibsondunn.com
ABIGAIL A. BARRERA, SBN 301746
abarrera@gibsondunn.com
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone:    (415) 393-8200
Facsimile:    (415) 393-8306

*Attorneys for Defendant Meta Platforms, Inc.*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE META PIXEL TAX FILING CASES | MASTER FILE NO. 3:22-cv-07557-PCP |
| | **DEFENDANT META PLATFORMS, INC.'S FIRST SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES** |
| This Document Relates To: | |
| All Actions | |

**PROPOUNDING PARTY:  PLAINTIFFS**

**RESPONDING PARTY:    META PLATFORMS, INC.**

**SET NUMBER:    ONE**

Gibson, Dunn &
Crutcher LLP

DEFENDANT META PLATFORMS, INC.'S FIRST SUPPLEMENTAL RESPONSES AND OBJECTIONS
TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
CASE NO. 3:22-CV-07557-SI

1  Defendant Meta Platforms, Inc. ("Meta"), by and through its undersigned attorneys, and

2  pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure ("Federal Rules"), and the Civil

3  Local Rules of the U.S. District Court for the Northern District of California ("Local Rules"), hereby

4  provides the following supplemental responses and objections to Interrogatory No. 6 from plaintiffs'

5  First Set of Interrogatories to Defendant Meta Platforms, Inc. (each, an "Interrogatory," and, together,

6  the "Interrogatories"), dated July 11, 2023. Meta provides these supplemental responses subject to and

7  without waiving the responses and objections contained in its initial response dated August 10, 2023.

8  Meta likewise provides these supplemental responses subject to the Preliminary Statement, General

9  Objections, Objections to Definitions, Objections to Instructions, and Objections to Time Period set

10 forth in its initial response dated August 10, 2023, and incorporates them by reference as if asserted

11 herein.

12 **INTERROGATORIES**

13 **INTERROGATORY NO. 6:**

14  State the period(s) of time when each SUBJECT WEBSITE transmitted event data or other data

15 to Meta via the Meta Pixel, Conversions API, and SDK.

16 **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6**:

17 **(CONFIDENTIAL):**

18  Meta restates and incorporates its Preliminary Statement, General Objections, Objections to

19 Definitions, and Objections to Time Period, as though fully set forth in this Response. Meta further

20 objects to this Interrogatory on the following additional grounds:

21  (A)  Meta objects to this Interrogatory as being overbroad and unduly burdensome, including

22 because it is unlimited as to time.

23  (B)  Meta objects to this Interrogatory as overbroad and unduly burdensome, including

24 because it seeks information that is irrelevant to the claims in, or defenses to, this action and is

25 disproportionate to the needs of the case. For example, the Interrogatory seeks information related to

26 any transmission by a "SUBJECT WEBSITE" of "event data or other data to Meta via the Meta Pixel,

27 Conversions API, and SDK," irrespective of whether such data is relevant to the subject matter of this

28

1

Gibson, Dunn &
Crutcher LLP

DEFENDANT META PLATFORMS, INC.'S FIRST SUPPLEMENTAL RESPONSES AND OBJECTIONS TO
PLAINTIFFS' FIRST SET OF INTERROGATORIES
CASE NO. 3:22-CV-07557-SI

litigation.

Subject to and without waiving the foregoing objections, and subject to the ongoing nature of discovery in this action, Meta responds as follows:  The first and last dates on which Meta received a transmission of data via the Meta Pixel or the Conversions API from each of the corresponding SUBJECT WEBSITES based on the Pixel IDs plaintiffs have provided to Meta is as follows as of March 30, 2025:

|  | Meta Pixel First Fired Date | Meta Pixel Last Fired Date | Conversions API First Fired Date | Conversions API Last Fired Date |
|---|---|---|---|---|
| **TaxAct** (Pixel ID: 1445099202415763) | August 25, 2015 | March 30, 2025 | November 10, 2020 | November 28, 2022 |
| **TaxSlayer** (Pixel ID: 535920746746256) | December 12, 2017 | March 30, 2025 | March 5, 2021 | March 30, 2025 |
| **H&R Block** (Pixel ID: 288696891835309) | January 15, 2019 | March 30, 2025 | June 16, 2021 | March 30, 2025 |

Meta reserves its right to supplement its objections and responses to this Interrogatory.

DATED:  April 11, 2025

GIBSON, DUNN & CRUTCHER LLP

By: _____/s/ Lauren Goldman_____
            Lauren Goldman

*Attorneys for Defendant Meta Platforms, Inc.*

2

Gibson, Dunn &
Crutcher LLP

1

**VERIFICATION**

2      I, Carrol Xia, a data scientist at Meta Platforms, Inc. ("Meta"), am authorized to make this

3   Verification on behalf of Meta.  I have read Meta's foregoing First Set of Supplemental Responses and

4   Objections to Plaintiffs' First Set of Interrogatories.  The responses were prepared by Meta's counsel

5   with assistance from Meta's employees.  My understanding is that these responses and information are

6   based on records and information currently available.  To the extent I do not have personal knowledge,

7   I have relied on others to gather the information.  Subject to the foregoing, in accordance with 28 U.S.C.

8   § 1746, I declare under penalty of perjury under the laws of the United States that the factual

9   information provided in the foregoing First Set of Supplemental Responses and Objections to

10  Plaintiffs' First Set of Interrogatories are true and correct based upon a reasonable inquiry at this time

11  made by Meta.

12

13  Executed on April 11, 2025

14  Signed by:

15  *Gwen Xia*
    A705EDF159D44F1...

16

17

18

19

20

21

22

23

24

25

26

27

28

3

Gibson, Dunn &
Crutcher LLP

# EXHIBIT L


chrome web store

🔍 Search extensions and themes

Discover    **Extensions**    Themes



## Meta Pixel Helper

🏅 Featured    4.1 ★ (1.2K ratings)    ⮌ Share          Add to Chro

Extension     Developer Tools     3,000,000 users



## Overview

The Meta Pixel Helper is a troubleshooting tool that helps you validate your pixel implementation.

The Facebook Pixel Helper works in the background to look for conversion or Facebook pixels and provide realtime feedback on the implementation. A small number will appear on the Facebook Pixel Helper icon to indicate number of pixel events. When clicked, a panel will e to show a detailed overview of the page's pixels, including warnings, errors and successes. Learn more about using Facebook pixels here: https://developers.facebook.com/docs/marketing-api/facebook-pixel

## 4.1 out of 5 ★★★★☆

1.2K ratings  •  Learn more about results and reviews.

See all reviews

## Details

| | | | |
|---|---|---|---|
| **Version** | **Offered by** | **Developer** | **Trader** |
| 3.0.7 | Meta | Meta Platforms, INC. | This developer has identified |
| | | 1 Meta Way Menlo Park, CA | itself as a trader per the |
| **Updated** | **Size** | 94025 US | definition from the European |
| February 29, 2024 | 74.78KiB | | Union and committed to only |
| | | ✉ Email ⌄ | |

 chrome web store

Discover    **Extensions**    Themes

🔍

196337864

---

## Privacy

⊘  The developer has disclosed that it will not collect or use your data.

This developer declares that your data is

- Not being sold to third parties, outside of the approved use cases
- Not being used or transferred for purposes that are unrelated to the item's core functionality
- Not being used or transferred to determine creditworthiness or for lending purposes

---

## Support

For help with questions, suggestions, or problems, visit the developer's support site

---

## Related



**Tag Assistant**
3.9 ★ (1.3K) ⓘ
The Tag Assistant extension works with Tag Assistant to hel...



**TikTok Pixel Helper**
2.4 ★ (120) ⓘ
The TikTok Pixel Helper is a plug-in that monitors whether...



**MY AD FINDER**
4.8 ★ (2.7K) ⓘ
MY AD FINDER allows you to collect, save & hunt trending a...



**Adminer Analytics**
3.1 ★ (19) ⓘ
Inteligência de dados para avaliação de lojas e produtos.

‹

---

About Chrome Web Store  ·  Developer Dashboard  ·  Privacy Policy  ·  Terms of Service  ·  Help

# EXHIBIT M

GIBSON, DUNN & CRUTCHER LLP
LAUREN GOLDMAN (*pro hac vice*)
LGoldman@gibsondunn.com
DARCY C. HARRIS (*pro hac vice*)
DHarris@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:    (212) 351-4000
Facsimile:    (212) 351-4035

ELIZABETH MCCLOSKEY, SBN 268184
EMccloskey@gibsondunn.com
ABIGAIL A. BARRERA, SBN 301746
ABarrera@gibsondunn.com
One Embarcadero Center
San Francisco, CA 9411
Telephone:    (415) 393-8200
Facsimile:    (415) 393-8306

*Attorneys for Defendant Meta Platforms, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE META PIXEL TAX FILING CASES<br><br>This document relates to: All Actions | Case No. 5:22-cv-07557-PCP (VKD)<br><br>**DEFENDANT META PLATFORMS, INC.'S AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION** |

**PROPOUNDING PARTY:**    Plaintiffs

**RESPONDING PARTY:**    Meta Platforms, Inc.

**SET NO.:**    One

Gibbon, Dunn & Crutcher LLP

DEFENDANT META PLATFORMS, INC.'S AMENDED RESPONSES AND OBJECTIONS TO
PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION
CASE NO. 5:22-CV-07557-PCP (VKD)

1    Defendant Meta Platforms, Inc. ("Meta"), by and through the undersigned attorneys, and

2    pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure and the Local Rules of the

3    United States District Court for the Northern District of California ("Local Rules"), hereby amends

4    its Responses and Objections to Plaintiffs' First Set of Requests for Admission (the "Requests") as

5    follows.

6    Meta provides this Amended Response subject to and without waiving the responses and

7    objections contained in its initial responses dated February 23, 2024 ("Initial Response"). Meta

8    likewise provides this Amended Response subject to the Preliminary Statement and General

9    Objections in its Initial Response and incorporates them by reference as if asserted herein.

10    **RESPONSES AND OBJECTIONS TO REQUESTS FOR ADMISSION**

11    **REQUEST FOR ADMISSION NO. 13**

12    Admit that the Meta Pixel collected information from the TaxAct website that included "full

13    names, email, country, state, city, zip codes, phone numbers, gender, date of birth, first names of

14    dependents, buttons that were clicked, names of text-entry forms that the taxpayer navigated to (both

15    of which could indicate, for example, whether taxpayers were eligible for certain deductions or

16    exemptions), web browser used, year of the return, and website referral, if any." *See* THE REPORT,

17    at page 11.

18    **AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 13**

19    Meta incorporates by reference the Preliminary Statement and General Objections set forth

20    above. Meta further objects to this Request as vague and ambiguous, including in the use of the

21    following undefined terms and phrases: "collected," "information," "the TaxAct website," and

22    "website referral." Meta further objects to this Request to the extent it quotes a statement in a

23    document that Meta did not prepare, and relays information allegedly provided by a third party over

24    whom Meta has no control. Meta further objects to this Request because Meta cannot confirm that

25    the quotation in the Request accurately represents what the cited third party communicated to the

26    author(s) of THE REPORT. *See* THE REPORT, at page 11 n.75. Meta also objects to this Request

27    as vague, ambiguous, unduly burdensome, and disproportionate to the needs of this case to the extent

28    the Request fails to specify a particular period of time. Meta further objects to this Request to the

Gibson, Dunn &
Crutcher LLP

extent it suggests the Pixel, rather than TaxAct, determined what information to send to Meta via the Pixel. Meta further objects to the Request to the extent it calls for information no longer within Meta's possession, custody, or control.

Subject to and without waiving its objections, and based on a reasonable investigation of the information available as of the date of these responses, Meta responds as follows: Meta admits that it received from the TaxAct website via the Pixel, among other things, "SubscribedButtonClick" event data, "PageView" event data, and other event data with parameters, among others, bearing the labels "name," "raw_event_name," "event_name," "itemlist_product_names," "og:site_name," "cy_email," "ly_email," "email," "state_revenue," "zip," "phone," "age_range," "num_of_dependents," "numChildButtons," "button_text," "buttonFeatures," "buttonText," "return_year," "further_referred_document_link," "referred_document_link," "innerText," "tax_form," "formFeatures," and "client_user_agent." Meta directs plaintiffs to its productions of event data for additional information that may be relevant to this Request. Except as otherwise admitted, the information Meta knows or can readily obtain is insufficient to enable it to admit or deny this Request. Meta continues to investigate information within its possession, custody, or control that would enable it to admit or deny this Request, and Meta reserves the right to supplement or amend its response. Meta is willing to meet and confer to discuss the basis for its response.


Dated: May 20, 2025                          GIBSON, DUNN & CRUTCHER LLP


                                             By:  _____ /s/ Lauren Goldman _____

                                             *Attorneys for Defendant Meta Platforms, Inc.*

3

# EXHIBIT N

1  GIBSON, DUNN & CRUTCHER LLP          COOLEY LLP
   LAUREN GOLDMAN (*pro hac vice*)      MICHAEL G. RHODES, SBN 116127
2  LGoldman@gibsondunn.com              Rhodesmg@cooley.com
   DARCY C. HARRIS (*pro hac vice*)     KYLE C. WONG, SBN 224021
3  DHarris@gibsondunn.com               KWong@cooley.com
   200 Park Avenue                      CAROLINE A. LEBEL, SBN 340067
4  New York, NY 10166-0193              CLebel@cooley.com
   Telephone:   (212) 351-4000          3 Embarcadero Center, 20th Floor
5  Facsimile:   (212) 351-4035          San Francisco, CA 94111-4004
                                        Telephone: (415) 693-2000
6  ELIZABETH MCCLOSKEY, SBN 268184      Facsimile: (415) 693-2222
   EMccloskey@gibsondunn.com
7  ABIGAIL A. BARRERA, SBN 301746
   ABarrera@gibsondunn.com
8  One Embarcadero Center
   San Francisco, CA 9411
9  Telephone:   (415) 393-8200
   Facsimile:   (415) 393-8306
10
11 ANDREW M KASABIAN, SBN 313210
   AKasabian@gibsondunn.com
12 333 South Grand Avenue
   Los Angeles, CA 90071
13 Telephone:   (213) 229-7311
   Facsimile:   (213 229-6311

14 *Attorneys for Defendant Meta Platforms, Inc.*

15

16                    UNITED STATES DISTRICT COURT

17                   NORTHERN DISTRICT OF CALIFORNIA

18                          SAN JOSE DIVISION

19

20  IN RE META PIXEL TAX FILING CASES          Master File No. 5:22-cv-07557-PCP (VKD)

21  This document relates to: All Actions       **DEFENDANT META PLATFORMS, INC.'S**
                                                **RESPONSES AND OBJECTIONS TO**
22                                              **PLAINTIFFS' FIRST SET OF REQUESTS**
                                                **FOR ADMISSION**
23

24  **PROPOUNDING PARTY:**      Plaintiffs

25  **RESPONDING PARTY:**       Meta Platforms, Inc.

26  **SET NO.:**                One (Requests No. 1-36)

27

28

---
Gibson, Dunn &
Crutcher LLP

DEFENDANT META PLATFORMS, INC.'S RESPONSES AND OBJECTIONS TO
PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION
CASE NO. 5:22-CV-07557-PCP (VKD)

1    Defendant Meta Platforms, Inc. ("Meta"), by and through the undersigned attorneys, and

2 pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure and the Local Rules of the

3 United States District Court for the Northern District of California ("Local Rules"), hereby objects

4 and responds as follows to Plaintiffs' First Set of Requests for Admission (the "Requests").  Subject

5 to and without waiving any of the objections set forth below, Meta is willing to meet and confer with

6 Plaintiffs regarding these Responses and Objections.

7                                   **PRELIMINARY STATEMENT**

8        1.       Meta's responses to the Requests are made to the best of its current knowledge,

9 information, belief, and understanding of the Requests.  Meta's factual and legal investigation of this

10 matter is ongoing.  Further, the parties have not engaged in any meet and confer discussions

11 regarding the Requests, many of which are vague, overbroad, or otherwise objectionable.  Meta

12 reserves the right to supplement or amend any responses in accordance with any agreement between

13 the parties or should future investigation indicate that such supplementation or amendment is

14 necessary.

15       2.       Meta's responses to the Requests are made solely for the purpose of and in relation to

16 the above-captioned action.  Each response is given subject to all appropriate objections (including,

17 but not limited to, objections concerning privilege, competency, relevance, materiality, propriety, and

18 admissibility).  All objections are reserved and may be interposed at any time.

19       3.       Meta's responses include only information that is within Meta's possession, custody,

20 or control.

21       4.       Meta incorporates by reference each and every general objection set forth below into

22 each and every specific response.  From time to time, a specific response may repeat a general

23 objection for emphasis or some other reason.  The failure to include any general objection in any

24 specific response shall not be interpreted as a waiver of any general objection to that response.

25       5.       Nothing contained in these Responses and Objections or provided in response to the

26 Requests consists of, or should be construed as, an admission relating to the accuracy, relevance,

27 existence, or nonexistence of any alleged facts or information referenced in any Request.

28

Gibson, Dunn &
Crutcher LLP

## **GENERAL OBJECTIONS**

The following General Objections apply to each and every Request and are incorporated by reference into each and every specific response as if fully set forth in each such response.

1.      Meta generally objects to each Request on the grounds and to the extent that it purports to impose obligations beyond those imposed or authorized by the Federal Rules of Civil Procedure, the Federal Rules of Evidence, the Local Rules, the Court's standing orders, any other applicable federal or state law, and any agreements between the parties.  Meta will construe and respond to the Requests in accordance with the requirements of the Federal Rules of Civil Procedure and other applicable rules or laws.

2.      Meta generally objects to each Request to the extent it relates to a fact or contention that is irrelevant to the claims in, or defenses to, this action, including any request relating to any time period outside that which is relevant to the claims or defenses asserted in this action.

3.      Meta generally objects to each Request to the extent the Request is vague, ambiguous, unreasonably cumulative, or duplicative.

4.      Meta generally objects to each Request to the extent that it seeks information outside of Meta's possession, custody, or control.

5.      Meta generally objects to each Request to the extent that it relies upon THE REPORT. THE REPORT was not prepared or maintained by Meta and Meta had no involvement with or input in the drafting of THE REPORT.  Citations to THE REPORT throughout the Requests are often vague and ambiguous.  The Requests cite to passages of THE REPORT that reference sources  to which Meta does not have access and that often do not appear to be relevant to any party's claim or defense.  To the extent that plaintiffs assert that sources cited in THE REPORT are incorporated by reference into the Requests based on the Requests vague and ambiguous citations to passages of THE REPORT that reference sources, for all cited sources that are not within Meta's possession, custody, or control and to which Meta does not have access, Meta is not able to assess those sources and does not have the ability to confirm or understand the content of any such source or the underlying factual circumstances referenced in any such source.

Gibson, Dunn &
Crutcher LLP

6.     Meta generally objects to each Request on the grounds and to the extent it purports to request the identification and disclosure of any information or documents relating to or prepared in anticipation of litigation, relating to or prepared in connection with any internal investigation conducted at the direction of counsel, that constitute attorney work product, that reveal privileged attorney-client communications, that are covered under the common-interest privilege and/or joint-defense privilege, or that are otherwise protected or immune from disclosure under any applicable privilege(s), law(s), or rule(s).  Meta hereby asserts all such applicable privileges and protections and excludes privileged and protected information from its responses to each Request.  *See generally* Fed. R. Evid. 502; Cal. Evid. Code § 954.

## RESPONSES AND OBJECTIONS TO REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 1**

Admit that the Meta Pixel is a piece of code that is placed within the overall code of a website. *See* THE REPORT, at page 6.

**RESPONSE TO REQUEST FOR ADMISSION NO. 1**

Meta incorporates by reference the Preliminary Statement and General Objections set forth above.  Meta further objects to this Request as vague and ambiguous, including in the use of the following undefined phrases: "piece of code," "placed," and "within the overall code of a website." Meta also objects to this Request as overly broad and unduly burdensome to the extent it seeks information pertaining to any website's "overall" code.  Meta further objects to the Request to the extent it seeks information that does not pertain to H&R Block, TaxAct, TaxSlayer, or the other "online tax preparation websites" that are alleged to be the subject matter of the Consolidated Class Action Complaint (Dkt. 71 ¶¶ 2, 4 ,65-68) and is thus not relevant to the claims or defenses in this case.

Subject to and without waiving the foregoing objections, and based on a reasonable investigation of the information available as of the date of these Responses, Meta responds as follows:  Meta admits that the Meta Pixel is a publicly available piece of JavaScript code that third-party developers may embed in their website, subject to Meta's Business Tools Terms.  *See* Meta

Gibson, Dunn &
Crutcher LLP

Business Tools Terms, https://m.facebook.com/legal/businesstech. Except as otherwise admitted, Meta denies this Request.

**REQUEST FOR ADMISSION NO. 2**

Admit that, once placed on a website, the Meta Pixel downloads more code from Meta that gathers information about website visitors and their activity on the website. *See* THE REPORT, at page 6.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2**

Meta incorporates by reference the Preliminary Statement and General Objections set forth above.  Meta objects to this Request as vague and ambiguous, and overly broad and unduly burdensome, including in the use of the following undefined terms and phrases: "downloads," "more code," "gathers information," "website visitors," and "activity," rendering the Request unintelligible. Meta further objects to this Request to the extent it seeks information that is not relevant to the claims or defenses in this case.

Subject to and without waiving its objections, and based on a reasonable investigation of the information available as of the date of these responses, Meta responds as follows:  Meta denies this Request.

**REQUEST FOR ADMISSION NO. 3**

Admit that the Meta Pixel collects this user data to enable advertisers to track user behavior and shopping patterns, measure the performance of ad campaigns, and build an audience base for future ad targeting. *See* THE REPORT, at page 6.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3**

Meta incorporates by reference the Preliminary Statement and General Objections set forth above.  Meta objects to this Request as vague and ambiguous, including in the use of the following undefined terms and phrases: "collects," "this user data," "enable," "track," "user behavior," "shopping patterns," "measure," "performance," "ad campaigns," "build an audience," and "future ad targeting," rendering this Request unintelligible.  Meta further objects to this Request to the extent it seeks information that is not relevant to the issues in this case.

Subject to and without waiving its objections, and based on a reasonable investigation of the information available as of the date of these responses, Meta responds as follows:  Meta admits that it publicly discloses that a developer may choose to embed and configure the Meta Pixel on a website to "log when someone takes an action on [the developer's] website," which "allows [the developer] to measure the effectiveness of [their] advertising by understanding the actions people take on [their] website." *See* Meta Business Help Center, *About Meta Pixel*, https://www.facebook.com/business/help/742478679120153?id= 1205376682832142.  Except as otherwise admitted, Meta denies this Request.

**REQUEST FOR ADMISSION NO. 4**

Admit that Meta retains the data its Pixel collects on third-party websites and can use this data for its own advertising purposes. *See* THE REPORT, at page 6.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4**

Meta incorporates by reference the Preliminary Statement and General Objections set forth above.  Meta further objects to this Request as vague and ambiguous, including in the use of the following undefined terms and phrases: "retains," "collects," "use," and "its own advertising purposes."  Meta further objects to this Request as compound.  Meta further objects to this Request to the extent it seeks information that is not relevant to the claims or defenses in this case.

Subject to and without waiving its objections, and based on a reasonable investigation of the information available as of the date of these responses, Meta responds as follows:  This Request is impermissibly compound and Meta is not required to respond to the Request as written.

**REQUEST FOR ADMISSION NO. 5**

Admit that Meta recommends that third-party developers add the Pixel "between the opening and closing <head> tags on every page where [they] will be tracking website visitor actions," in order to "reduce[] the chances of browsers or third-party code blocking the Pixel's execution" and to "increase[] the chance that [website] visitors are tracked before they leave [the] page." *See* THE REPORT, at page 7.

Gibson, Dunn &
Crutcher LLP

**RESPONSE TO REQUEST FOR ADMISSION NO. 5**

Meta incorporates by reference the Preliminary Statement and General Objections set forth above.  Meta further objects to this Request as vague and ambiguous, including in the use of the following undefined phrase: "add the Pixel."   Meta objects to the Request to the extent it mischaracterizes the content from which it purportedly quotes; the underlying document is publicly accessible and speaks for itself.  Meta further objects to this Request to the extent it seeks information that is not relevant to the issues in this case.

Subject to and without waiving its objections, and based on a reasonable investigation of the information available as of the date of these responses, Meta responds as follows:  Meta admits that the publicly available webpage titled "Get Started" under the "Meta for Developers" website states that: "To install the Pixel, we highly recommend that you add its base code between the opening and closing <head> tags on every page where you will be tracking website visitor actions.  Most developers add it to their website's persistent header, so it can be used on all pages.  Placing the code within your <head> tags reduces the chances of browsers or third-party code blocking the Pixel's execution.  It also executes the code sooner, increasing the chance that your visitors are tracked before they leave your page." *See* Meta for Developers, *Get Started*, https://developers.facebook.com/docs/meta-pixel/get-started/.  Except  as otherwise admitted, Meta denies this Request.

**REQUEST FOR ADMISSION NO. 6**

Admit that Meta delivers a "c_user cookie" to a user when the user logs into Facebook (Meta) for the first time or from a new device. *See* THE REPORT, at page 7.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6**

Meta incorporates by reference the Preliminary Statement and General Objections set forth above.  Meta further objects to this Request as vague and ambiguous, including in the use of the following undefined terms and phrases: "delivers," "to a user," "for the first time," and "logs into Facebook (Meta)."  Meta further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome to the extent it seeks information that is not relevant to the claims or defenses in this case, including to the extent the Request appears to rely on information related to a company

7

Gibson, Dunn &
Crutcher LLP

(Google) and a product (Google Analytics) that have no relevance to the claims or defenses in this case and over which Meta has absolutely no control, insofar as the Request quotes a passage in THE REPORT that provides as its source material a series of website links to articles regarding Google Analytics, a wholly irrelevant technology that has no bearing on the claims or defenses in this case.

Subject to and without waiving its objections, and based on a reasonable investigation of the information available as of the date of these responses, Meta responds as follows:  Meta admits that it publicly discloses via its Cookies Policy that, among other things, Meta "may place cookies on your computer or device and receive information stored in cookies when you use or visit:  The Meta Products; Products provided by other members of the Meta Companies; and Websites and apps provided by other companies that use the Meta Products, including companies that incorporate Meta technologies into their websites and apps. . . . For example:  We use cookies [including the c_user cookie] to keep you logged in as you navigate between Facebook Pages.  Cookies also help us remember your browser so you don't have to keep logging in to Facebook and so you can more easily log in to Facebook via third-party apps and websites. . . . In addition, your browser or device may offer settings that allow you to choose whether browser cookies are set and to delete them.  These controls vary by browser, and manufacturers may change both the settings they make available and how they work at any time."  *See* Meta Privacy Center, *Cookies Policy*, https://www.facebook.com/privacy/policies/cookies.  Except as otherwise admitted, Meta denies this Request.

**REQUEST FOR ADMISSION NO. 7**

Admit that Meta's "c_user cookie" has a lifespan of 365 days, which refreshes each time the user interacts with Meta. *See* THE REPORT, at page 7.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7**

Meta incorporates by reference the Preliminary Statement and General Objections set forth above.  Meta further objects to this Request as vague and ambiguous, including in the use of the following undefined terms: "refreshes," and "interacts."  Meta further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome to the extent it seeks information that is not relevant to the claims or defenses in this case, including to the extent the Request appears to rely on

information related to a company (Google) and a product (Google Analytics) that have no relevance to the claims or defenses in this case and over which Meta has absolutely no control, insofar as the Request quotes a passage in THE REPORT that provides as its source material a series of website links to articles regarding Google Analytics, a wholly irrelevant technology that has no bearing on the claims or defenses in this case.

Subject to and without waiving its objections, and based on a reasonable investigation of the information available as of the date of these responses, Meta responds as follows:  Meta admits that its publicly available Cookies Policy states that the c_user cookie has a lifespan of 365 days. https://www.facebook.com/privacy/policies/cookies.  Except as otherwise admitted, Meta denies this Request.

**REQUEST FOR ADMISSION NO. 8**

Admit that the Meta Pixel collects information from a user's website activity and matches it to the user's unique "c_user cookie." *See* THE REPORT, at page 7.

**RESPONSE TO REQUEST FOR ADMISSION NO. 8**

Meta incorporates by reference the Preliminary Statement and General Objections set forth above.  Meta further objects to this Request as vague and ambiguous, including in the use of the following undefined terms and phrases: "collects," "information," "website activity," and "unique." Meta further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome to the extent it seeks information that is not relevant to the claims or defenses in this case, including to the extent the Request appears to rely on information related to a company (Google) and a product (Google Analytics) that have no relevance to the claims or defenses in this case and over which Meta has absolutely no control, insofar as the Request quotes a passage in THE REPORT that provides as its source material a series of website links to articles regarding Google Analytics, a wholly irrelevant technology that has no bearing on the claims or defenses in this case.

Subject to and without waiving its objections, and based on a reasonable investigation of the information available as of the date of these responses, Meta responds as follows:  Meta denies this Request.

Gibson, Dunn &
Crutcher LLP

1    **REQUEST FOR ADMISSION NO. 9**

2        Admit that Meta uses the "c_user cookie," along with its other cookies, to record and organize

3    a user's activities and communications across websites, attribute that activity to individual users, and

4    create a "dossier" on each user. *See* THE REPORT, at page 7.

5    **RESPONSE TO REQUEST FOR ADMISSION NO. 9**

6        Meta incorporates by reference the Preliminary Statement and General Objections set forth

7    above.  Meta further objects to this Request as vague and ambiguous, including in the use of the

8    following undefined terms and phrases: "along with its other cookies," "record," "organize,"

9    "activities and communications across websites," "attribute that activity," and "create a 'dossier,'"

10   rendering this Request unintelligible.  Meta further objects to this Request as vague, ambiguous,

11   overly broad, and unduly burdensome to the extent it seeks information that is not relevant to the

12   claims or defenses in this case, including to the extent the Request appears to rely on information

13   related to a company (Google) and a product (Google Analytics) that have no relevance to the claims

14   or defenses in this case and over which Meta has absolutely no control, insofar as the Request quotes

15   a passage in THE REPORT that provides as its source material a series of website links to articles

16   regarding Google Analytics, a wholly irrelevant technology that has no bearing on the claims or

17   defenses in this case.

18       Subject to and without waiving its objections, and based on a reasonable investigation of the

19   information available as of the date of these responses, Meta responds as follows:  Meta denies this

20   Request.

21   **REQUEST FOR ADMISSION NO. 10**

22       Admit that TaxSlayer began using the Meta Pixel on its website in February 2018. *See* THE

23   REPORT, at page 10.

24   **RESPONSE TO REQUEST FOR ADMISSION NO. 10**

25       Meta incorporates by reference the Preliminary Statement and General Objections set forth

26   above.  Meta further objects to this Request as vague and ambiguous, including in the use of the

27   following undefined term and phrase: "using" and "on its website."  Meta further objects that this

28   Request seeks an admission regarding the actions of a third party over whom Meta has no control and

10

information solely within the possession of a third party over whom Meta has no control.  Meta further objects to this Request to the extent it calls for discovery that is better sought through another mechanism, including the duplicative Plaintiffs' Interrogatory No. 6, dated July 11, 2023, that plaintiffs also served.

Subject to and without waiving its objections, and based on a reasonable investigation of the information available as of the date of these responses, including the Pixel ID that plaintiffs have indicated is a Pixel ID associated with TaxSlayer, Meta responds as follows:  Meta denies this Request.

**REQUEST FOR ADMISSION NO. 11**

Admit that H&R Block has been using the Meta Pixel for "at least a couple of years.". *See* THE REPORT, at page 11.

**RESPONSE TO REQUEST FOR ADMISSION NO. 11**

Meta incorporates by reference the Preliminary Statement and General Objections set forth above.  Meta further objects to this Request as vague and ambiguous, including in the use of the following undefined terms and phrases: "using" and "at least a couple of years."  Meta further objects that this Request seeks an admission regarding the actions of a third party over whom Meta has no control and information solely within the possession of a third party over whom Meta has no control.  Meta further objects to this Request to the extent it calls for discovery that is better sought through another mechanism, including the duplicative Plaintiffs' Interrogatory No. 6, dated July 11, 2023, that plaintiffs also served.

Subject to and without waiving its objections, and based on a reasonable investigation of the information available as of the date of these responses, Meta responds as follows:  Meta admits that it first received a transmission from Pixel ID 288696891835309, which plaintiffs have indicated is a Pixel ID associated with H&R Block, on January 15, 2019.  Except as otherwise admitted, Meta denies this Request.

**REQUEST FOR ADMISSION NO. 12**

Admit that TaxAct began using the Meta Pixel on its website in 2018. *See* THE REPORT, at page 11.

1  **RESPONSE TO REQUEST FOR ADMISSION NO. 12**

2      Meta incorporates by reference the Preliminary Statement and General Objections set forth

3  above. Meta further objects to this Request as vague and ambiguous, including in the use of the

4  following undefined terms and phrases: "using" and "on its website." Meta further objects that this

5  Request seeks an admission regarding the actions of a third party over whom Meta has no control and

6  information solely within the possession of a third party over whom Meta has no control. Meta

7  further objects to this Request to the extent it calls for discovery that is better sought through another

8  mechanism, including the duplicative Plaintiffs' Interrogatory No. 6, dated July 11, 2023, that

9  plaintiffs also served.

10      Subject to and without waiving its objections, and based on a reasonable investigation of the

11  information available as of the date of these responses, including the Pixel ID that plaintiffs have

12  indicated is a Pixel ID associated with TaxAct, Meta responds as follows: Meta denies this Request.

13  **REQUEST FOR ADMISSION NO. 13**

14      Admit that the Meta Pixel collected information from the TaxAct website that included "full

15  names, email, country, state, city, zip codes, phone numbers, gender, date of birth, first names of

16  dependents, buttons that were clicked, names of text-entry forms that the taxpayer navigated to (both

17  of which could indicate, for example, whether taxpayers were eligible for certain deductions or

18  exemptions), web browser used, year of the return, and website referral, if any." *See* THE REPORT,

19  at page 11.

20  **RESPONSE TO REQUEST FOR ADMISSION NO. 13**

21      Meta incorporates by reference the Preliminary Statement and General Objections set forth

22  above. Meta further objects to this Request as vague and ambiguous, including in the use of the

23  following undefined terms and phrases: "collected," "information," "the TaxAct website," and

24  "website referral." Meta further objects to this Request to the extent it quotes a statement in a

25  document that Meta did not prepare, and relays information allegedly provided by a third party over

26  whom Meta has no control. Meta further objects to this Request because Meta cannot confirm that

27  the quotation in the Request accurately represents what the cited third party communicated to the

28  author(s) of THE REPORT. *See* THE REPORT, at page 11 n.75. Meta also objects to this Request

12

Gibson, Dunn &
Crutcher LLP

as vague, ambiguous, unduly burdensome, and disproportionate to the needs of this case to the extent the Request fails to specify a particular period of time.  Meta further objects to this Request to the extent it suggests the Pixel, rather than TaxAct, determined what information to send to Meta via the Pixel.  Meta further objects to the Request to the extent it calls for information no longer within Meta's possession, custody, or control.

Subject to and without waiving its objections, and based on a reasonable investigation of the information available as of the date of these responses, Meta responds as follows:  Meta admits that it received from the TaxAct website via the Pixel, among other things, "SubscribedButtonClick" event data, and "PageView" event data with parameters, among others, bearing the labels "name," "raw_event_name," "event_name," "itemlist_product_name," "og:site_name," "cy_email," "ly_email," "email," "state_revenue," "zip," "phone," "age_range," "num_of_dependents," "numChildButtons," "button_text," "buttonFeatures," "buttonText," "return_year," "further_referred_document_link," "referred_document_link," "innerText," "tax_form," "formFeatures," and "client_user_agent."  Meta directs plaintiffs to its forthcoming production(s) of event data for additional information that may be relevant to this Request.  Except as otherwise admitted, the information Meta knows or can readily obtain is insufficient to enable it to admit or deny this Request.  Meta continues to investigate information within its possession, custody, or control that would enable it to admit or deny this Request, and Meta reserves the right to supplement or amend its response.  Meta is willing to meet and confer to discuss the basis for its response.

## REQUEST FOR ADMISSION NO. 14

Admit that Meta "collected indicators for whether a given taxpayer was head of household, married filing jointly, had certain assets, investment income, charitable contributions, mortgage interests, standard deductions, Schedule Cs, and student loan interest" from the TaxAct website through another Meta "business tool that leverages Facebook's computing services." *See* THE REPORT, at page 11.

## RESPONSE TO REQUEST FOR ADMISSION NO. 14

Meta incorporates by reference the Preliminary Statement and General Objections set forth above.  Meta further objects to this Request as vague and ambiguous, including in the use of the

following undefined terms and phrases: "collected," "indicators," "leverages," "computing services," "the TaxAct website," and "another Meta business tool," rendering this Request improper and unintelligible.  Meta further objects to this Request to the extent it quotes a statement in a document that Meta did not prepare, and relays information allegedly provided by a third party over whom Meta has no control.  Meta further objects to this Request to the extent Meta cannot confirm that the quotation in the Request accurately represents what the cited third party communicated to the author(s) of THE REPORT.  Meta also objects to this Request as vague, ambiguous, unduly burdensome, and disproportionate to the needs of this case to the extent the Request fails to specify a particular period of time.  Meta further objects to this Request to the extent it suggests the Meta, rather than TaxAct, determined what information to send to Meta via a "Meta business tool."

Subject to and without waiving its objections, and based on a reasonable investigation of the information available as of the date of these responses, Meta responds as follows:  Meta can neither admit nor deny the matters set forth in this Request because the information Meta knows or can readily obtain is insufficient to enable it to admit or deny this Request.

**REQUEST FOR ADMISSION NO. 15**

Admit that TaxAct shared taxpayers' number of dependents, number of W2s, AGI (rounded to the nearest thousand), and federal tax owed, and refund amount (each one rounded to the nearest hundred)" with Meta. *See* THE REPORT, at page 11–12.

**RESPONSE TO REQUEST FOR ADMISSION NO. 15**

Meta incorporates by reference the Preliminary Statement and General Objections set forth above.  Meta further objects to the Request as impermissibly vague and unintelligible to the extent it purports to quote from a source but omits an introductory quotation mark.  Meta further objects to this Request as vague and ambiguous, including in the use of the following undefined terms and phrases: "shared," "taxpayers," "AGI," "number of dependents," "federal tax owed," and "refund amount."  Meta further objects to this Request as unduly burdensome and disproportionate to the needs of this case to the extent the Request pertains to business tools other than the Meta Pixel, SDK, and CAPI.  Meta further objects to this Request to the extent it quotes a statement in a document that Meta did not prepare, and relays information allegedly provided by a third party over whom Meta has

14

1    no control.  Meta further objects to this Request to the extent it cannot confirm that the quotation in

2    the Request accurately represents what the cited third party communicated to the author(s) of THE

3    REPORT.  Meta further objects to this Request as vague, ambiguous, unduly burdensome, and

4    disproportionate to the needs of this case to the extent the Request fails to specify a particular period

5    of time.

6         Subject to and without waiving its objections, and based on a reasonable investigation of the

7    information available as of the date of these responses, Meta responds as follows:  Meta admits that it

8    received from the TaxAct website via the Pixel, among other things, parameters bearing the labels

9    "num_of_dependents," "numChildButtons," "w2," "agi," "federal_owe_amount," and

10   "federal_refund_amount."  Meta directs plaintiffs to its forthcoming production(s) of event data for

11   additional information that may be relevant to this Request.  Except as otherwise admitted, the

12   information Meta knows or can readily obtain is insufficient to enable it to admit or deny this

13   Request.  Meta continues to investigate information within its possession, custody, or control that

14   would enable it to admit or deny this Request, and Meta reserves the right to supplement or amend its

15   response.  Meta is willing to meet and confer to discuss the basis for its response.

16   **REQUEST FOR ADMISSION NO. 16**

17        Admit that the Meta Pixel's default settings allowed it to collect page title information from

18   H&R Block's online tax filing service, including page titles that relayed information about the

19   customer and his or her tax situation, such as "the first name of the taxpayer and aggregate amounts

20   relating to HSA contributions, scholarships, and education expenses." *See* THE REPORT, at page 12.

21   **RESPONSE TO REQUEST FOR ADMISSION NO. 16**

22        Meta incorporates by reference the Preliminary Statement and General Objections set forth

23   above.  Meta further objects to this Request as vague and ambiguous, including in the use of the

24   following undefined terms and phrases: "allowed," "collect page title information," "H&R Block's

25   online tax filing service," "relayed information," "tax situation," and "aggregate amounts relating to

26   HSA contributions, scholarships, and education expenses."  Meta further objects to this Request to

27   the extent it quotes a statement in a document that Meta did not prepare, and relays information

28   allegedly provided by a third party over whom Meta has no control.  Meta further objects to this

15

Gibson, Dunn &
Crutcher LLP

DEFENDANT META PLATFORMS, INC.'S RESPONSES AND OBJECTIONS TO
PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION
CASE NO. 5:22-CV-07557-PCP (VDK)

Request to the extent Meta cannot confirm that the quotation in the Request accurately represents what the cited third party communicated to the author(s) of THE REPORT.  Meta further objects that this Request seeks an admission regarding the actions of a third party over whom Meta has no control and information solely within the possession of a third party over whom Meta has no control.  Meta further objects to this Request as vague, ambiguous, unduly burdensome, and disproportionate to the needs of this case to the extent the Request fails to specify a particular period of time.

Subject to and without waiving its objections, and based on a reasonable investigation of the information available as of the date of these responses, Meta responds as follows:  Meta admits that it received from the H&R Block website via the Pixel, among other things, a parameter titled "passed_document_link" that contained webpage URL data.  Except as otherwise admitted, the information Meta knows or can readily obtain is insufficient to enable it to admit or deny this Request.  Meta continues to investigate information within its possession, custody, or control that would enable it to admit or deny this Request, and Meta reserves the right to supplement or amend its response.  Meta is willing to meet and confer to discuss the basis for its response.

**REQUEST FOR ADMISSION NO. 17**

Admit that the Meta Pixel transmitted information on both H&R Block's and TaxSlayer's page headers, which included "information on whether taxpayers had visited pages for many broad categories, such as dependents, certain types of income (such as rental income or capital gains), and certain tax credits or deductions." *See* THE REPORT, at page 12.

**RESPONSE TO REQUEST FOR ADMISSION NO. 17**

Meta incorporates by reference the Preliminary Statement and General Objections set forth above.  Meta further objects to this Request as vague and ambiguous, including in the use of the following undefined terms and phrases: "transmitted information on," "page headers," "many broad categories," "certain types of income" and "certain tax credits or deductions."   Meta further objects to this Request to the extent it quotes a statement in a document that Meta did not prepare, and relays information allegedly provided by a third party over whom Meta has no control.  Meta further objects to this Request to the extent Meta cannot confirm that the quotation in the Request accurately represents what the cited third party communicated to the author(s) of THE REPORT.  Meta further

16

Gibson, Dunn &
Crutcher LLP

1  objects to this Request as vague, ambiguous, unduly burdensome, and disproportionate to the needs

2  of this case to the extent the Request fails to specify a particular period of time.  Meta further objects

3  to this Request to the extent it incorrectly and misleadingly indicates the quotation in the Request

4  pertains to both H&R Block and TaxSlayer, when the quoted content appears only in relation to H&R

5  Block in THE REPORT.  *See* THE REPORT, at page 12.

6          Subject to and without waiving its objections, and based on a reasonable investigation of the

7  information available as of the date of these responses, Meta responds as follows:  Meta admits that it

8  received from the H&R Block website via the Pixel, among other things, "PageView" event data and

9  "Universal_HRBlock" event data with a parameter titled "passed_document_link,"  and the

10  "passed_document_link" parameter contained URL data for webpages for many broad categories.

11  Meta further admits that it received from the TaxAct website via the Pixel, among other things,

12  "PageView" event data with a parameter titled "passed_document_link," and the

13  "passed_document_link" parameter contained URL data for webpages for many broad categories.

14  Meta directs plaintiffs to its forthcoming production(s) of event data for additional information that

15  may be relevant to this Request.  Except as otherwise admitted, the information Meta knows or can

16  readily obtain is insufficient to enable it to admit or deny this Request.  Meta continues to investigate

17  information within its possession, custody, or control that would enable it to admit or deny this

18  Request, and Meta reserves the right to supplement or amend its response.  Meta is willing to meet

19  and confer to discuss the basis for its response.

20  **REQUEST FOR ADMISSION NO. 18**

21          Admit that the Meta collected information from TaxSlayer users, including "name, email,

22  phone number, city, state, and zip code on certain pages." *See* THE REPORT, at page 12.

23  **RESPONSE TO REQUEST FOR ADMISSION NO. 18**

24          Meta incorporates by reference the Preliminary Statement and General Objections set forth

25  above.  Meta further objects to this Request as vague and ambiguous, including in the use of the

26  following undefined phrases: "collected information" and "on certain pages."  Meta further objects to

27  the Request's reference to "the Meta" as vague and ambiguous, and therefore interprets the phrase to

28  refer to Meta.  Meta further objects to this Request as overly broad, unduly burdensome, and

17

Gibson, Dunn &
Crutcher LLP

1   disproportionate to the needs of this case to the extent it does not limit its scope to the claims and

2   defenses in this case, seeks information that is more easily obtainable through other means,

3   particularly with respect to information reportedly provided by TaxSlayer to congressional staffers,

4   and/or fails to specify a particular period of time.

5       Subject to and without waiving its objections, and based on a reasonable investigation of the

6   information available as of the date of these responses, Meta responds as follows:  Meta denies this

7   Request.

8   **REQUEST FOR ADMISSION NO. 19**

9       Admit that Meta employees told congressional staff that Meta "match[es] email addresses

10  collected through the Pixel with email addresses that Facebook has on file." *See* THE REPORT, at

11  page 14.

12  **RESPONSE TO REQUEST FOR ADMISSION NO. 19**

13      Meta incorporates by reference the Preliminary Statement and General Objections set forth

14  above.  Meta further objects to this Request as vague and ambiguous, including in the use of the

15  following undefined terms and phrases: "match[es]," "collected," and "on file."  Meta further objects

16  to this Request as unduly burdensome and disproportionate to the needs of this case to the extent it

17  seeks information outside the relevant time period or seeks information unrelated to the tax entities at

18  issue in this litigation.

19      Subject to and without waiving the foregoing objections, and based on a reasonable

20  investigation of the information available as of the date of these Responses, Meta responds as

21  follows:  Third-party developers—not Meta—choose whether and how to configure the Meta Pixel

22  and what data to send to Meta via the Pixel.  Meta admits that it publicly discloses: "You may use the

23  Meta Business Tools to send Meta customer information parameters, which are a set of user

24  identifiers, such as names and emails, that you share alongside your event information.  Customer

25  information parameters can help Meta match events with user accounts on Meta technologies, which

26  can help you measure the effectiveness of your advertising and deliver your ads to people who are

27  likely to find them relevant.  Some customer information parameters must be hashed prior to

28  transmission to Meta, as required by the Meta Business Tools Terms and set forth in Meta's

18

Gibson, Dunn &
Crutcher LLP

DEFENDANT META PLATFORMS, INC.'S RESPONSES AND OBJECTIONS TO
PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION
CASE NO. 5:22-CV-07557-PCP (VDK)

1   developer documentation." *See* Meta's Business Help Center, *About Customer Information*

2   *Parameters*, https://www.facebook.com/business/help/876665706470981?

3   id=188852726110565. Except as otherwise admitted, the information Meta knows or can readily

4   obtain is insufficient to enable it to admit or deny this Request.

5   **REQUEST FOR ADMISSION NO. 20**

6          Admit that the Meta Pixel has a feature called Automatic Configuration ("AutoConfig") by

7   default. *See* THE REPORT, at page 15.

8   **RESPONSE TO REQUEST FOR ADMISSION NO. 20**

9          Meta incorporates by reference the Preliminary Statement and General Objections set forth

10  above. Meta objects to this Request as vague and ambiguous, including in the use of the following

11  undefined terms and phrases: "feature," and "by default." Meta further objects to the request to the

12  extent it seeks information outside the scope of the relevant time period.

13         Subject to and without waiving its objections, and based on a reasonable investigation of the

14  information available as of the date of these responses, Meta responds as follows: Meta admits that it

15  publicly discloses that "autoConfig" is a setting in the Meta Pixel code that developers may disable

16  when configuring the Meta Pixel, as explained in Meta's publicly available online guides regarding

17  the Meta Pixel. *See* Meta for Developers, *Automatic Configuration*,

18  https://developers.facebook.com/docs/meta-pixel/advanced/#automatic-configuration.

19  **REQUEST FOR ADMISSION NO. 21**

20         Admit that the Meta Pixel's AutoConfig setting enables Meta to read certain webpage

21  metadata. *See* THE REPORT, at page 15.

22  **RESPONSE TO REQUEST FOR ADMISSION NO. 21**

23         Meta incorporates by reference the Preliminary Statement and General Objections set forth

24  above. Meta further objects to this Request as vague and ambiguous, including in the use of the

25  following undefined terms and phrase: "enables," "read," and "certain webpage metadata." Meta

26  objects to this Request on the grounds that it is impermissibly vague. *See James v. Maguire*

27  *Correctional Facility*, 2012 WL 3939343, at *4 (N.D. Cal. Sept. 10, 2012) ("Because admissions are

28  designed to limit factual issues in a case, the requesting party bears the burden of setting forth its

Gibson, Dunn &
Crutcher LLP

requests simply [and] directly, not vaguely or ambiguously."). Meta further objects to this Request to the extent that the Request is based on a statement in a document that Meta did not prepare and to which Meta does not have access, and relays information allegedly provided by a third party over whom Meta has no control. Meta further objects to this Request to the extent Meta cannot confirm that the text of the Request accurately represents what the cited third party communicated to the author(s) of THE REPORT.

Subject to and without waiving its objections, and based on a reasonable investigation of the information available as of the date of these responses, Meta responds as follows: This Request is impermissibly vague and Meta is not required to respond. To the extent Meta is required to respond, Meta denies this Request.

**REQUEST FOR ADMISSION NO. 22**

Admit that the Meta Pixel's AutoConfig setting enables another feature called Automatic Advanced Matching. *See* THE REPORT, at page 16.

**RESPONSE TO REQUEST FOR ADMISSION NO. 22**

Meta incorporates by reference the Preliminary Statement and General Objections set forth above. Meta further objects to this Request as vague and ambiguous, including in the use of the following undefined terms and phrases: "AutoConfig setting," "enables," and "another feature." Meta further objects to this Request as vague, ambiguous, unduly burdensome and disproportionate to the needs of this case to the extent the Request fails to specify a particular period of time. Meta further objects to this Request to the extent it seeks information that does not pertain to H&R Block, TaxAct, TaxSlayer, or the other "online tax preparation websites" that are alleged to be the subject matter of the Consolidated Class Action Complaint (Dkt. 71 ¶¶ 2, 4 ,65-68) and is thus not relevant to the claims or defenses in this case. Meta further objects to this Request to the extent that the Request is based on a statement in a document that Meta did not prepare and to which Meta does not have access, and relays information allegedly provided by a third party over whom Meta has no control. Meta further objects to this Request to the extent Meta cannot confirm that the text of the Request accurately represents what the cited third party communicated to the author(s) of THE REPORT.

Gibson, Dunn &
Crutcher LLP

Subject to and without waiving its objections, and based on a reasonable investigation of the information available as of the date of these responses, Meta responds as follows:  Meta admits that a publicly available page within Meta's "Business Help Center" titled "About advanced matching for web" states that to "set up automatic advanced matching," a developer can "toggle it on in Meta Events Manager."  However, for developers whose businesses are "categorized as being in a "restricted vertical," for example, "industries such as banking, lending, financial services, insurance, pharmaceuticals and health," those developers may be "unable to use automatic advanced matching." Businesses in restricted verticals have to "set up advanced matching manually instead."   Except as otherwise admitted, Meta denies this Request.

**REQUEST FOR ADMISSION NO. 23**

Admit that the Meta Pixel's Automatic Advanced Matching feature allowed the Pixel to transmit sensitive taxpayer information to Meta, including "name, email, phone number, city, state, and zip code," along with "web page titles" that revealed "information about types of tax forms that taxpayers . . . visited." *See* THE REPORT, at page 16.

**RESPONSE TO REQUEST FOR ADMISSION NO. 23**

Meta incorporates by reference the Preliminary Statement and General Objections set forth above.  Meta further objects to this Request as vague and ambiguous, including in the use of the following undefined terms and phrases: "sensitive," "taxpayer information," "feature," "allowed," "web page titles," and "tax forms . . . visited."  Meta further objects to this Request to the extent "sensitive taxpayer information" constitutes a legal issue in dispute in this action and calls for an "admission of a conclusion of law." *Jones v. Nutiva, Inc.*, 2016 WL 5900722, at *1 (N.D. Cal. Oct. 11, 2016).  Meta further objects to this Request as vague, ambiguous, unduly burdensome, and disproportionate to the needs of this case to the extent the Request fails to specify a particular period of time.  Meta further objects to this Request to the extent that the Request is based on a statement in a document that Meta did not prepare and to which Meta does not have access and a meeting at which Meta was not present, and relays information allegedly provided by a third party over whom Meta has no control.  Meta further objects to this Request to the extent Meta cannot confirm that the text of

Gibson, Dunn &
Crutcher LLP

1  the Request accurately represents what the cited third party communicated to the author(s) of THE
2  REPORT.

3      Subject to and without waiving its objections, and based on a reasonable investigation of the
4  information available as of the date of these responses, Meta responds as follows:  Meta denies this
5  Request.

6  **REQUEST FOR ADMISSION NO. 24**

7      Admit that TaxSlayer's account representative at Meta "specifically recommended" using the
8  Automatic Advanced Matching feature. *See* THE REPORT, at page 16.

9  **RESPONSE TO REQUEST FOR ADMISSION NO. 24**

10     Meta incorporates by reference the Preliminary Statement and General Objections set forth
11 above.  Meta further objects to this Request as vague and ambiguous, including in the use of the
12 following undefined terms and phrases: "TaxSlayer's account representative at Meta," and "feature."
13 Meta objects to the Request as unduly burdensome and disproportionate to the needs of this case to
14 the extent its scope is not limited to any particular period of time.  Meta further objects to this
15 Request to the extent that the Request is based on a statement in a document that Meta did not
16 prepare and to which Meta does not have access, and relays information allegedly provided by a third
17 party over whom Meta has no control.  Meta further objects to this Request to the extent Meta cannot
18 confirm that the text of the Request accurately represents what the cited third party communicated to
19 the author(s) of THE REPORT.  Meta further objects to this Request to the extent Meta cannot
20 confirm that the text of the Request accurately reflects any information that may have been conveyed
21 to TaxSlayer by a Meta employee or contractor or otherwise.

22     Subject to and without waiving its objections, and based on a reasonable investigation of the
23 information available as of the date of these responses, Meta responds as follows:  The information
24 Meta knows or can readily obtain is insufficient to enable it to admit or deny this Request.  Meta's
25 factual investigation of this matter is ongoing, and Meta reserves the right to supplement or amend

26

27

28

1   this response should future investigation indicate that such supplementation or amendment is

2   necessary.

3   **REQUEST FOR ADMISSION NO. 25**

4       Admit that, after TaxSlayer contacted Meta for "full disclosure on the information that may

5   have been collected by Meta through the Meta Pixel," Meta "did not provide any detail on the

6   information that was actually collected." *See* THE REPORT, at page 17.

7   **RESPONSE TO REQUEST FOR ADMISSION NO. 25**

8       Meta incorporates by reference the Preliminary Statement and General Objections set forth

9   above.  Meta further objects to this Request on the grounds that it is overly broad and unduly

10  burdensome to the extent it fails to specify with any particularity the purported communication at

11  issue.  Meta objects to this Request as vague and ambiguous, including in the use of the following

12  undefined terms and phrases: "contacted," "information," "collected," "any detail," "actually

13  collected," and "full disclosure."  Meta objects to this Request on the grounds that it is impermissibly

14  vague.  *See James v. Maguire Correctional Facility*, 2012 WL 3939343, at *4 (N.D. Cal. Sept. 10,

15  2012) ("Because admissions are designed to limit factual issues in a case, the requesting party bears

16  the burden of setting forth its requests simply [and] directly, not vaguely or ambiguously.").  Meta

17  further objects to this Request to the extent that the Request is based on a statement in a document

18  that Meta did not prepare and to which Meta does not have access, and relays information allegedly

19  provided by a third party over whom Meta has no control.  Meta further objects to this Request to the

20  extent Meta cannot confirm that the text of the Request accurately represents what the cited third

21  party communicated to the author(s) of THE REPORT.

22      Subject to and without waiving its objections, and based on a reasonable investigation of the

23  information available as of the date of these responses, Meta responds as follows:  The information

24  Meta knows or can readily obtain is insufficient to enable it to admit or deny this Request.  Meta's

25  factual investigation of this matter is ongoing, and Meta reserves the right to supplement or amend

26  this response should future investigation indicate that such supplementation or amendment is

27  necessary.

28

Gibson, Dunn &
Crutcher LLP

DEFENDANT META PLATFORMS, INC.'S RESPONSES AND OBJECTIONS TO
PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION
CASE NO. 5:22-CV-07557-PCP (VDK)

1    **REQUEST FOR ADMISSION NO. 26**

2          Admit that Meta never responded to TaxSlayer's letter asking for specifics regarding whether

3    Meta deleted the data it collected from the tax website. *See* THE REPORT, at page 17.

4    **RESPONSE TO REQUEST FOR ADMISSION NO. 26**

5          Meta incorporates by reference the Preliminary Statement and General Objections set forth

6    above.  Meta further objects to this Request on the grounds that it is overly broad and unduly

7    burdensome to the extent it fails to specify with any particularity the purported communication at

8    issue.  Meta further objects to this Request as vague and ambiguous, including in the use of the

9    following undefined terms and phrases: "deleted," and "collected."  Meta further objects to the

10   Request as vague, ambiguous, unduly burdensome, and disproportionate to the needs of this case to

11   the extent the Request fails to specify a particular period of time.  Meta further objects to this Request

12   to the extent that the Request is based on a meeting that Meta did not attend, and relays information

13   allegedly provided by a third party over whom Meta has no control.  Meta further objects to this

14   Request to the extent Meta cannot confirm that the text of the Request accurately represents what the

15   cited third party communicated to the author(s) of THE REPORT.  Meta objects to this Request on

16   the grounds that it is impermissibly vague.  *See James v. Maguire Correctional Facility*, 2012 WL

17   3939343, at *4 (N.D. Cal. Sept. 10, 2012) ("Because admissions are designed to limit factual issues

18   in a case, the requesting party bears the burden of setting forth its requests simply [and] directly, not

19   vaguely or ambiguously.").

20          Subject to and without waiving its objections, and based on a reasonable investigation of the

21   information available as of the date of these responses, Meta responds as follows:  This Request is

22   impermissibly vague and Meta is not required to respond.  To the extent Meta is required to respond,

23   the information Meta knows or can readily obtain is insufficient to enable it to admit or deny this

24   Request.  Meta's factual investigation of this matter is ongoing, and Meta reserves the right to

25   supplement or amend this response should future investigation indicate that such supplementation or

26   amendment is necessary.

27

28

24

**REQUEST FOR ADMISSION NO. 27**

Admit that Meta told congressional staff that the company "do[es] not want or permit developers to transmit sensitive information of any kind—including personal financial information." *See* THE REPORT, at page 18.

**RESPONSE TO REQUEST FOR ADMISSION NO. 27**

Meta incorporates by reference the Preliminary Statement and General Objections set forth above. Meta objects to this Request as vague and ambiguous, including in the use of the following undefined terms and phrases: "congressional staff," and "told."

Subject to and without waiving its objections, and based on a reasonable investigation of the information available as of the date of these Responses, Meta responds as follows: Meta admits that in a letter addressed to Senator Elizabeth Warren, dated January 12, 2023, Meta stated that it "do[es] not want or permit developers to transmit sensitive information of any kind—including personal financial information."

**REQUEST FOR ADMISSION NO. 28**

Admit that Meta told congressional staff that its Facebook Business Tools Terms require developers to "(1) warrant that they have 'all of the necessary rights and permissions and a lawful basis . . .' to disclose the information they are sending to Meta; [and] (2) refrain from sending Meta any 'sensitive information,' specifically including financial information." *See* THE REPORT, at page 18.

**RESPONSE TO REQUEST FOR ADMISSION NO. 28**

Meta incorporates by reference the Preliminary Statement and General Objections set forth above. Meta objects to this Request as vague and ambiguous, including in the use of the following undefined terms and phrases: "congressional staff," and "told."

Subject to and without waiving its objections, and based on a reasonable investigation of the information available as of the date of these responses, Meta responds as follows: Meta admits that in a letter addressed to Senator Elizabeth Warren, dated January 12, 2023, Meta stated that its Business Tools Terms require developers to, among other things, "(1) warrant that they have 'all of the necessary rights and permissions and a lawful basis . . .' to disclose the information they are

Gibson, Dunn &
Crutcher LLP

1  sending to Meta; [and] (2) refrain from sending Meta any 'sensitive information,' specifically

2  including financial information."

3  **REQUEST FOR ADMISSION NO. 29**

4      Admit that Meta told congressional staff that its Commercial Terms "expressly provide that

5  developers may not send to Meta 'information that . . . includes health, financial, biometrics, or other

6  categories of similarly sensitive information.'" *See* THE REPORT, at page 18.

7  **RESPONSE TO REQUEST FOR ADMISSION NO. 29**

8      Meta incorporates by reference the Preliminary Statement and General Objections set forth

9  above.  Meta objects to this Request as vague and ambiguous, including in the use of the following

10  undefined terms and phrases: "congressional staff," and "told."

11      Subject to and without waiving its objections, and based on a reasonable investigation of the

12  information available as of the date of these responses, Meta responds as follows:  Meta admits that

13  in a letter addressed to Senator Elizabeth Warren, dated January 12, 2023, Meta stated that its

14  "Commercial Terms expressly provide that developers may not send to Meta 'information that . . .

15  includes health, financial, biometrics, or other categories of similarly sensitive information (including

16  any information defined as sensitive under applicable law); except in cases where . . . you are sending

17  financial information for the express purpose of effecting a financial transaction either with us or as

18  enabled by a Meta Product.'"

19  **REQUEST FOR ADMISSION NO. 30**

20      Admit that Meta allows third-party developers to access Pixel code "without reading or

21  understanding any guidance or signing any kind of separate acknowledgement" of the Facebook

22  Business Tools Terms or Meta's Commercial Terms. *See* THE REPORT, at page 18–19.

23  **RESPONSE TO REQUEST FOR ADMISSION NO. 30**

24      Meta incorporates by reference the Preliminary Statement and General Objections set forth

25  above.  Meta further objects to this Request as vague and ambiguous, including in the use of the

26  following undefined terms and phrases: "allows," "any kind of," and "access Pixel code." Meta

27  objects to the Request as unduly burdensome and disproportionate to the needs of this case to the

28  extent its scope is not limited to any particular period of time.

Subject to and without waiving its objections, and based on a reasonable investigation of the information available as of the date of these responses, Meta responds as follows:  Meta denies this Request.

**REQUEST FOR ADMISSION NO. 31**

Admit that Meta states it filters Pixel data to remove "sensitive financial information," "sensitive health information,' and "personally identifiable information (contact information)" before the data "can be stored and used in [its] advertising systems." *See* THE REPORT, at page 15.

**RESPONSE TO REQUEST FOR ADMISSION NO. 31**

Meta incorporates by reference the Preliminary Statement and General Objections set forth above.  Meta further objects to this Request as vague and ambiguous, including in the use of the following undefined terms and phrases: "filters," "Pixel data," "remove," "data," and "stored and used."  Meta objects to the Request as vague, ambiguous, unduly burdensome, and disproportionate to the needs of this case to the extent the Request fails to specify a particular period of time.  Meta further objects to the Request to the extent that  the Request mischaracterizes the content of THE REPORT.

Subject to and without waiving its objections, and based on a reasonable investigation of the information available as of the date of these Responses, Meta responds as follows:  Meta denies this Request.

**REQUEST FOR ADMISSION NO. 32**

Admit that Meta does not specifically list tax-specific information in its examples of "sensitive" information that trigger its signal filtering mechanism. *See* THE REPORT, at page 19.

**RESPONSE TO REQUEST FOR ADMISSION NO. 32**

Meta incorporates by reference the Preliminary Statement and General Objections set forth above.  Meta objects to the Request as vague, ambiguous, unduly burdensome, and disproportionate to the needs of this case to the extent the Request fails to specify a particular period of time.  Meta

Gibson, Dunn &
Crutcher LLP

1   further objects to this Request as vague and ambiguous, including in the use of the following

2   undefined terms and phrases: "tax-specific information," and "signal filtering mechanism."

3         Subject to and without waiving its objections, and based on a reasonable investigation of the

4   information available as of the date of these responses, Meta responds as follows:  Meta denies this

5   Request.

6   **REQUEST FOR ADMISSION NO. 33**

7         Admit that Meta told Congressional staff that whenever the signal filtering mechanism was

8   triggered, the tax prep companies would receive a notification via email and through the Facebook

9   Business Manager; conversely, if no notification was received, no data was filtered. *See* THE

10  REPORT, at page 19.

11  **RESPONSE TO REQUEST FOR ADMISSION NO. 33**

12        Meta incorporates by reference the Preliminary Statement and General Objections set forth

13  above.  Meta further objects to this Request as vague and ambiguous, including in the use of the

14  following undefined terms and phrases: "signal filtering mechanism," "the tax prep companies,"

15  "data," and "filtered."

16        Subject to and without waiving its objections, and based on a reasonable investigation of the

17  information available as of the date of these responses, Meta responds as follows:  Meta admits that it

18  publicly discloses that: "You may be notified, for example, through email, in Meta Events Manager,

19  or in Meta Ads Manager, if Meta's systems detect and remove potentially prohibited information in

20  the data you're sharing.  Detailed information can be found in the diagnostics tab in Events

21  Manager.  If you receive such a notification, you should follow the instructions, review the data

22  you're sharing, and take all necessary actions to avoid sending Meta prohibited data in the

23  future.  You should review all the types of information you send, which may include standard events,

24  URL parameters, custom event names and custom data, and ensure you are not sending prohibited

25  information from anywhere in your website or app."  *See* Meta Business Help Center, *About*

26  *Prohibited Information*,

27  https://www.facebook.com/business/help/361948878201809?id=188852726110565&checkpoint_src

28

Gibson, Dunn &
Crutcher LLP

1   =any.  Except as otherwise admitted, the information Meta knows or can readily obtain is insufficient

2   to enable it to admit or deny this Request.

3   **REQUEST FOR ADMISSION NO. 34**

4       Admit that Meta did not provide copies of any signal-filtering notifications when asked by

5   Congressional staff. *See* THE REPORT, at page 20.

6   **RESPONSE TO REQUEST FOR ADMISSION NO. 34**

7       Meta incorporates by reference the Preliminary Statement and General Objections set forth

8   above.  Meta further objects to this Request as vague and ambiguous, including in the use of the

9   following undefined terms and phrases: "signal-filtering notifications."  Meta objects to this Request

10  as overly broad and unduly burdensome to the extent it seeks information that is not relevant to the

11  claims or defenses in this case.

12      Subject to and without waiving its objections, and based on a reasonable investigation of the

13  information available as of the date of these Responses, Meta responds as follows:  This Request

14  seeks information irrelevant to the claims or defenses in this case and as such Meta is not required to

15  respond.

16  **REQUEST FOR ADMISSION NO. 35**

17      Admit that Meta privacy engineers have stated that the company "do[es] not have an adequate

18  level of control and explainability over how our systems use data, and thus we can't confidently make

19  controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'"

20  *See* THE REPORT, at page 20.

21  **RESPONSE TO REQUEST FOR ADMISSION NO. 35**

22      Meta incorporates by reference the Preliminary Statement and General Objections set forth

23  above.  Meta further objects to this Request as vague and ambiguous, including in the use of the

24  following undefined terms and phrases: "privacy engineers," and "the company."  Meta further

25  objects to the Request to the extent it seeks information that is not relevant to the claims or defenses

26  in this case.

27      Subject to and without waiving its objections, and based on a reasonable investigation of the

28  information available as of the date of these responses, Meta responds as follows:  This Request seeks

Gibson, Dunn &
Crutcher LLP

information irrelevant to the claims or defenses in this case and as such Meta is not required to respond.

**REQUEST FOR ADMISSION NO. 36**

Admit that the document attached as Exhibit A is a true and correct copy of an original document generated by a Meta employee.

**RESPONSE TO REQUEST FOR ADMISSION NO. 36**

Meta incorporates by reference the Preliminary Statement and General Objections set forth above.  Meta further objects to this Request as vague and ambiguous, including in the use of the following undefined terms and phrases: "an original document," and "generated."

Subject to and without waiving its objections, and based on a reasonable investigation of the information available as of the date of these responses, Meta responds as follows:  Meta denies this Request.

Dated: February 23, 2024                GIBSON, DUNN & CRUTCHER LLP


By:  _____*/s/ Lauren Goldman*_____

*Attorneys for Defendant Meta Platforms, Inc.*

# EXHIBIT O

# EXHIBIT P

# EXHIBIT Q

# EXHIBIT 9

# FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT R

**Get started**   **Advertise**   **Learn**   **Support**   🔍  🔔     Start Now

Business Help Center                    → **Get support**

# About automatic events

The Meta Pixel receives information about the actions, or events, that take place on your website. Automatic events are actions that your pixel receives from your website that don't require you to add any additional code. Your pixel receives these actions through visitor activity and by using information about your web page to understand context associated with these actions better.

If you haven't used events before, with automatic events you can:

- Create an ad using the sales, leads, or engagement objectives. Choose a conversion location (such as website or app), and choose a specific conversion event (like a purchase) and see your return on advertising.

  Create custom audiences based on actions people take on your website, like adding an item to their cart or making a purchase.

- Create a lookalike audience to find new people similar to your best customers to reach with your Meta ads.

You can see your metrics for events received when you go to Events Manager, click the ⛗ **Data sources** tab, select your pixel, and click the **Overview** tab. **Total events** can include automatic events and any events you have manually added to your website or created using another platform, such as a partner integration.

Automatic events are de-duplicated from any other events you have manually set up. We recommend keeping automatic events on for better Meta advertising optimization.

∞ Meta    **Get started**    **Advertise**    **Learn**    **Support**    🔍  🔔  👤    Start Now

Business Help Center                                        (→) **Get support**

## Was this information helpful? *

○ Yes

○ No

More in this section: Events

## Basics

**About Meta Pixel**

**About standard and custom website events**

**About automatic events**

**About partner integrations**

**About the event setup tool for web**

## Create

## Manage

## Results

## Specifications

## Troubleshoot

∞ Meta        **Get started**    Advertise    Learn    Support        🔍    🔔    👤    Start Now

**Business Help Center**                                                        ⊙ **Get support**

⌐ Help chosen for you

Fix a disabled ad account due to failed payment issues on Meta        →

Business Help Center

---

Troubleshoot a disabled or restricted account        →

Business Help Center

---

About advertising restrictions        →

Business Help Center

---

About Meta Business Support Home        →

Business Help Center

---

⊕

| Email |

| Enter a country name... |

∞ Meta    **Get started**    **Advertise**    **Learn**    **Support**            Start Now

**Business Help Center**    → **Get support**

receive the latest updates from
Meta for Business, including news,
events and product updates.

Subscribe

© 2025 Meta

About    Developers    Careers    Privacy    Cookies    Terms    Help Center

English (US)    English (UK)    Español    Português (Brasil)    Français (France)    Español (España)

More languages ›

# EXHIBIT S





∞ Meta     **Get started**     **Advertise**     **Learn**     **Support**

**Business Help Center**

 **Get support**

# About standard and custom website events

Meta uses event data to show ads to people likely to be interested. Website events are actions people take on your website, such as making a purchase or adding an item to their cart.

When people interact with your business, tools like the Conversions API and Meta Pixel help you share these events. This sharing improves your Meta ads by reaching a relevant audience, personalizing ad experiences, and optimizing ad campaigns for better outcomes.

here are two categories of events you can share: standard and custom.

**Standard events**: These are actions with predefined names that Meta recognizes and supports across ad products. You can set up standard events using the event setup tool, a partner integration, your pixel code, or Conversions API code. Sharing standard events helps optimize for conversions and build audiences. Learn more about standard website events.

- **Custom events**: These are actions not covered by standard events. You can assign a unique name to represent the action. Set up custom events using your pixel code or Conversions API code. Sharing custom events helps optimize for conversions and build audiences. When you send a new custom event, review it in Meta Events Manager to ensure it originates from your business and complies with Meta Business Tools Terms. Learn more about reviewing custom events in Events Manager.

∞ Meta   **Get started**   Advertise   Learn   Support       Start Now

**Business Help Center**      **Get support**

When people interact with your business, tools like the Conversions API and Meta Pixel help you share these events. This sharing improves your Meta ads by reaching a relevant audience, personalizing ad experiences, and optimizing ad campaigns for better outcomes.

There are two categories of events you can share: standard and custom.

- **Standard events**: These are actions with predefined names that Meta recognizes and supports across ad products. You can set up standard events using the event setup tool, a partner integration, your pixel code, or Conversions API code. Sharing standard events helps optimize for conversions and build audiences. Learn more about standard website events.

- **Custom events**: These are actions not covered by standard events. You can assign a unique name to represent the action. Set up custom events using your pixel code or Conversions API code. Sharing custom events helps optimize for conversions and build audiences. When you send a new custom event, review it in Meta Events Manager to ensure it originates from your business and complies with Meta Business Tools Terms. Learn more about reviewing custom events in Events Manager.

## Example of website code with events

Here's how your website code appears with standard or custom events installed:

∞ Meta    **Get started**    Advertise    Learn    Support    🔍    🔔    👤    Start Now

Business Help Center    ⊕ Get support



1.   Original website code.

2.   Meta Pixel code.

3.   Standard or custom event code. An example is the "add to cart" event, a standard event. Learn more about how to set up standard and custom events in your website's code.

Integrate events on pages significant to your business to understand your customers' journey. Setting up events along their path, such as from product page views to purchases, helps measure and optimize ads for meaningful conversions. Once events are set up, learn to understand your events in Events Manager.

## Best practices

∞ Meta      **Get started**      Advertise      Learn      Support      🔍      🔔

Business Help Center                              (→)  **Get support**

information about people. This includes data defined as sensitive under applicable laws, regulations, or industry guidelines, or otherwise not allowed under Meta terms and policies. Sharing such information violates the Meta Business Tools Terms. Learn more about prohibited information.

## Learn more

- Specifications for Meta Pixel standard events

- Best practices for Meta Pixel standard event setup

- About custom conversions for web

---

**Was this information helpful?** *

🔗      ⬆

◯  Yes

◯  No

More in this section: Events

---

## Basics

**About Meta Pixel**

**About standard and custom**

## Manage

---

## Results

---

## Specifications

∞ Meta       **Get started**      **Advertise**      **Learn**      **Support**       🔍   🔔   [avatar]      Start Now

**Business Help Center**                                   → **Get support**

**About the event**

## Create

## Set Up Events

## Custom Conversions

⤴ Help chosen for you

Fix a disabled ad account due to
failed payment issues on Meta          →
Business Help Center

Troubleshoot a disabled or
restricted account                     →
Business Help Center

About advertising restrictions         →
Business Help Center

About Meta Business Support
Home                                   →
Business Help Center

  

∞ Meta    **Get started**    **Advertise**    **Learn**    **Support**    Start Now

**Business Help Center**    (→) **Get support**

# Get the latest updates from Meta for Business.

Provide your email address to receive the latest updates from Meta for Business, including news, events and product updates.

Email

Enter a country name...

By submitting this form, you agree to receive marketing related electronic communications from Meta, including news, events, updates and promotional emails. You may withdraw your consent and unsubscribe from these at any time, for example, by clicking the unsubscribe link included on our emails. For more information about how Meta handles your data please read our Data Policy.

Subscribe

## Meta Technologies ⌄

## Tools ⌄

## Goals ⌄

∞ Meta    **Get started**    Advertise    Learn    Support    🔍 🔔 👤    Start Now

**Business Help Center**    ⊕ **Get support**

---

Inspiration    ⌄

---

Skills and Training    ⌄

---

Guides and Resources    ⌄

---

Business Help Center    ⌄

---

© 2025 Meta

---

About    Developers    Careers    Privacy    Cookies    Terms    Help Center

---

English (US)    English (UK)    Español    Português (Brasil)    Français (France)    Español (España)

More languages ›