# EXHIBIT 20

**REDACTED VERSION OF DOCUMENT FILED UNDER SEAL**

# FILED UNDER SEAL

**EXHIBIT 28**

**THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

| | |
|---|---|
| IN RE META PIXEL TAX FILING CASES | Master File No. 5:22-cv-07557-PCP (VKD) |
| This document relates to: | **EXPERT REPORT OF ROBERT ZEIDMAN** |
| All Actions | |

CONFIDENTIAL

**EXPERT REPORT OF ROBERT ZEIDMAN**

# Contents

I. Introduction ................................................................................................................. 1

II. Scope of Report ........................................................................................................... 1

III. Personal Experience and Background ......................................................................... 2

IV. Background Facts for Report ....................................................................................... 4

  A. Putative Class Definitions .......................................................................................... 4

  B. Statutes Relevant to Report ........................................................................................ 5

  C. Descriptions of Key Technologies and Concepts Relevant to Report ........................ 5

    i. Software Source Code ............................................................................................ 5

    ii. JavaScript .............................................................................................................. 6

    iii. Clients and Servers .............................................................................................. 6

    iv. Tags ...................................................................................................................... 7

    v. The Meta Pixel ...................................................................................................... 7

    vi. Meta Conversions API .......................................................................................... 7

V. Analysis ....................................................................................................................... 7

  A. Description of Event Data Produced by Meta ............................................................ 8

  B. How and When the Meta Pixel Collected and Transmitted Data to Meta .................. 9

    i. When the Meta Pixel Began Operating on the Tax Preparers' Websites ............... 10

    ii. How the Meta Pixel Operates on the Tax Preparers' Websites ............................. 10

    iii. How the Meta Pixel was Employed on the Tax Preparers' Websites .................... 11

  C. Analysis of the Specific Visitor Data Produced by Meta from the Tax Preparers' Websites that the Meta Pixel Collected and Transmitted to Meta ..................................................... 12

  D. Calculating Visits to the Tax Preparer Websites ...................................................... 14

VI. Conclusions ............................................................................................................... 16

Index of Exhibits ............................................................................................................. 18

I, Robert Zeidman, provide the following expert disclosures.

## I.    INTRODUCTION

1.    Based on my background and experience, I have been asked by counsel for the Plaintiffs in this action to provide my opinions and conclusions related to Meta's collection and transmission of visitor data from the websites of H&R Block and TaxAct (collectively the "Tax Preparers") through Meta's use of the Meta Pixel.

2.    For my work on this matter Zeidman Consulting is being compensated at a rate of $1,000.00 per hour.

3.    In reaching the opinions and conclusions discussed herein, I relied upon the materials listed in **Exhibit A**.

## II.    SCOPE OF REPORT

4.    This report seeks to address the following issues:

    a.    **How and When the Meta Pixel Collected and Transmitted Data to Meta**: This report details how the Meta Pixel and related technologies operate, and how and when the Meta Pixel collected and transmitted various types of data to Meta from the proposed class representatives ("Representatives")[1] and members of the proposed classes ("Classes," described further below) during the relevant class periods.

    b.    **Analysis of the Specific Visitor Data Produced by Meta that the Meta Pixel Collected from the Tax Preparers' Websites and Transmitted to Meta**: This report will identify and analyze the specific samples of visitor data from the Tax Preparers' websites that Meta produced to Plaintiffs from its repository of "Hive" data, including the extent to which this data reflects the

---

[1] Plaintiffs' Counsel has informed me that Plaintiffs intend to seek the appointment of the following plaintiffs as Class Representatives: Kayla Housman, Tiffany Bryant, Katrina Calderon, and Jane Doe (the "Representatives").

transmission of sensitive data, including "pen register" data,[2] from the Meta Pixel to Meta. The report will also explain the limitations of the data Meta produced during discovery while demonstrating that even the sample provided by Meta shows the Meta Pixel transmitting an enormous amount of tax information and other data to Meta from the Tax Preparers' websites. Moreover, the report will also propose ways in which the types of data produced by Meta could be used to determine the number of visits made to the Tax Preparers' websites during the relevant class periods.

## III.   PERSONAL EXPERIENCE AND BACKGROUND

5.   I am an engineer and the founder and president of Zeidman Consulting, which provides engineering consulting to high-tech companies. Among the types of services I provide are hardware and software design. My clients have included Fortune 500 computer and technology companies as well as smaller companies and startups. A copy of my resume is attached hereto as **Exhibit B**.

6.   I hold a master's degree from Stanford University in Electrical Engineering and two bachelor's degrees from Cornell University, one in Electrical Engineering and one in Physics. I have more than 40 years of experience in electrical engineering and more than 50 years of experience in software development.

7.   The software products I have developed include Internet-based training courses and web-based course administration software, an operating system synthesis tool, a source code comparison tool, a network emulation software bridge, a remote backup system, and an online gaming site. The hardware products I have developed include semiconductor integrated circuits and printed circuit boards for bus controllers, memory interfaces, network interfaces, a video

---

[2] Cal. Penal Code § 638.50 defines a "pen register" as a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." *See* **Exhibit C**.

attribute controller, a data cache and register logic for a supercomputer, a processor for a telecom parallel processor system, a neural network memory, and various controllers incorporating RISC processors and DSPs.

8. I have founded several companies including (a) Zeidman Consulting, a hardware and software development firm; (b) eVault, a remote backup company; (c) the Chalkboard Network, an e-learning company; (d) Zeidman Technologies, which develops software tools for enabling and improving hardware and software development; (e) Software Analysis and Forensic Engineering Corporation; which develops software forensic analysis tools; and (f) Good Beat Games, an online poker gaming site.

9. I have written a variety of papers, books, and presentations on computer hardware and software and other engineering subjects. I am the developer of the Universal Design Methodology, a process for efficiently developing reliable systems, about which I have written extensively. A list of my publications is included in my resume attached as **Exhibit B**.

10. I hold 29 patents in the areas of software analysis, software comparison, software synthesis, hardware emulation, hardware synthesis, hardware simulation, media broadcast and advertising, and online gaming. I wrote a textbook on software forensics entitled *The Software IP Detective's Handbook, Measurement, Comparison, and Infringement Detection*, which is recognized as the seminal book in the field. I have created a tool called CodeSuite® for assisting in the determination of whether one computer program has been copied from another computer program.

11. I have consulted on 291 matters involving intellectual property disputes including instances of alleged software copying, trade secret misappropriation, and patent infringement. My work in this capacity has included, among other things, reviewing and analyzing software source code, reviewing and analyzing patents, reverse engineering hardware and software, writing expert reports, and testifying in court. I have testified at deposition and at trial in a number of these cases. The specific cases can be found in my resume, attached as **Exhibit B**.

## IV.    BACKGROUND FACTS FOR REPORT

### A.    Putative Class Definitions

12.    Plaintiffs' counsel has informed me that Plaintiffs intend to seek to certify the following classes and class periods:

**The Nationwide Pen Register Classes (Cal. Penal Code § 638.51)**:

H&R Block.com: All individuals in the United States who visited the website H&R Block.com when Meta's Tracking Pixel was deployed on the website, from January 15, 2019 to June 30, 2023. This class seeks certification of claims under California Penal Code § 638.51. All Representatives seek to be the class representatives for this class.

TaxAct.com: All individuals in the United States who visited the website TaxAct.com from August 25, 2015 to June 30, 2023. This class seeks certification of claims under California Penal Code §§ 638.51. Plaintiff Katrina Calderon seeks to be the class representative for this class.

**The Nationwide Eavesdropping Classes (Cal. Penal Code §§ 632 and 635)**:

H&R Block.com: All individuals in the United States who visited the website H&R Block.com from January 15, 2019 to June 30, 2023. This class seeks certification of claims under California Penal Code §§ 632 and 635. All Representatives seek to be the class representatives for this class.

TaxAct.com: All individuals in the United States who visited the website TaxAct.com from August 25, 2015 to June 30, 2023. This class seeks certification of claims under California Penal Code §§ 632, and 635. Plaintiff Katrina Calderon seeks to be the class representative for this class.

**The California Wiretapping Classes (Cal. Penal Code § 631(a) and 635)**:

H&R Block.com: All individuals in California who visited the website H&R Block.com from January 15, 2019 to June 30, 2023. This class seeks certification of claims under California Penal Code §§ 631(a) and 635. Plaintiffs Jane Doe and Katrina Calderon seek to be the class representative for this class.

TaxAct.com: All individuals in California who visited the website TaxAct.com from August 25, 2015 to June 30, 2023. This class seeks certification of claims under California Penal Code §§ 631(a) and 635. Plaintiff Katrina Calderon seeks to be the class representative for this class.

**The Nationwide UCL Public Injunctive Relief Classes (Cal. Bus. & Prof. Code § 17200)**:

H&R Block.com: All individuals in the United States who visited the website H&R Block.com from January 15, 2019 to June 30, 2023. This class seeks certification of claims under Cal. Bus. & Prof. Code § 17200. All Representatives seek to be the class representatives for this class.

TaxAct.com: All individuals in the United States who visited the website TaxAct.com from August 25, 2015 to June 30, 2023. This class seeks certification of claims under Cal. Bus. & Prof. Code § 17200. Plaintiff Katrina Calderon seeks to be the class representative for this class.

**B.     Statutes Relevant to Report**

13.     Plaintiffs' counsel has informed me that the Plaintiffs intend to seek the certification of class claims alleging violations of the statutes enumerated in **Exhibit C**.

**C.     Descriptions of Key Technologies and Concepts Relevant to Report**

14.     This section describes the key technologies and concepts relevant to this report.

   ***i.     Software Source Code***

15.     Computer programs can be written using complex instructions that look like English. For example, the instruction `if revenue > expenses then profit = revenue-expenses` tells the computer that if revenue is greater than expenses then calculate profit by subtracting expenses from revenue. Similarly, the statement `printf("Hello world!")` tells the computer to print the words "Hello world!" to the computer screen. These high-level, English-like instructions are called "source code." Computer programs are made up of many lines of source code, and the process of writing these lines of code is called programming. Eventually these lines of source code are turned into instructions that a computer understands, consisting of sequences of electronic ones and zeroes. The process of turning human-readable source code into a file containing computer instructions is called "compiling" and is performed by a special computer program called a "compiler."

CONFIDENTIAL                                                                                    5

### ii.    *JavaScript*

16.    JavaScript is a scripting language that is executed most commonly on the client-side in modern web browsers. Typically, the purpose of JavaScript is to enhance the user interfaces of websites and make web page content dynamic, so that displayed web content varies based on user interaction and other input. JavaScript shares syntax similarities with Java, but they are two distinct programming languages and differ in both syntax and standard libraries. Java and JavaScript are also used for significantly different purposes and in significantly different environments. JavaScript needs to run inside another application, such as an Internet Browser, and is not well suited for building large, complex, fast applications.

### iii.    *Clients and Servers*

17.    The Internet is a global network of millions of interconnected computers throughout the world. An intranet is an internal network of interconnected computers within an organization that is isolated from the Internet and only accessible by members of the organization. A "browser" is a computer program used for displaying text, images, and sound over the Internet or an intranet. Much of the information on the Internet and on an intranet is stored in, and accessed through, "web pages" which can be accessed through a computer connected to a network. "Websites" are locations on the Internet and/or on an intranet that contain collections of web pages.

18.    A "server" is a computer on a network (such as an intranet or the Internet) that is dedicated to a particular purpose, stores information, and serves that information to one or more client computers over the network. For example, a "web server" performs all work necessary for hosting the website, stores all files related to the website, and serves the web pages to client computers on the network. Server software refers to software running on the server computer that "serves up" information to a client computer. When someone uses their browser to access Facebook, for example, the Facebook computer is the server.

19.    A "client" is a computer that makes an information request to a server, which fulfills the request. Client software refers to software running on the client computer that makes requests

CONFIDENTIAL                                                                                          6

for information from a server computer. When someone uses their Microsoft Edge browser to access Facebook, for example, the visitor's computer is the client and the browser is the client software.

### iv.    *Tags*

20.    A tag is JavaScript code that captures visitor interactions on a website and transmits that information to third party servers. In this way, tags "track" visitors. The scripts can be managed directly on the website or they can be managed by a tag manager on a third-party website such as Google Tag Manager. The advantage of using a third-party tag manager is that the website administrator does not need to modify the tag code on the website each time the company decides to track new information about its customers, which may require a code change to every webpage on the site. Instead the website administrator needs to simply supply new tags to the tag manager, effectively updating the entire website and all of its pages to track new information about visitors.

### v.    **The Meta Pixel**

21.    As explained in greater detail below, in Section V.B, the Meta Pixel is a specific type of tag used by Meta to transmit visitor information to Meta.

### vi.    **Meta Conversions API**

22.    The Meta Conversions API is a tracking tool developed by Meta to supplement its ability to collect visitor data from websites in addition to visitor data collected by the Meta Pixel. *See* **Exhibit D** (PIXEL_TAX000000230-32) at 1. Meta's Conversions API allows Meta to collect visitor data "that the [Meta Pixel] may fail to capture due to network connectivity issues or page loading errors." *See* **Exhibit D** at 1.

## V.    ANALYSIS

23.    In this section I describe the analysis that leads to my conclusions. First, I describe some of the key data I relied upon in forming my opinions.

CONFIDENTIAL                                                                7

### A.    Description of Event Data Produced by Meta

24.    In this litigation, Meta produced a sample of event data from what it calls its "Hive" database (the "Event Data Sample"), which I have reviewed. The Event Data Sample consists of five tables of data, with data from the 26th day of the month from varying months (depending on the table) between April 2022 and April 2023.

25.    For the purposes of this report, I focused mainly on the `offsite_signals` table, which includes data from the 26th day of the month between July 26, 2022 and April 26, 2023. Internal Meta documents have described Meta's `offsite_signals` database as "the source of truth for event [data] analysis." **Exhibit E** (PIXEL_TAX000000131-7) at 3.

26.    Meta also produced event data for three of the four Representatives, Tiffany Bryant, Katrina Calderon, and Jane Doe ("Representative Data," collectively with the Event Data Sample, the "Data").

27.    The Data produced by Meta includes tables with over 50 distinct data fields related to events from websites, including from H&R Block's and TaxAct's. Many of these fields originate from data collected and transmitted via the Meta Pixel.

28.    This Data includes "pen-register" information about the webpages members of the classes visited, the date and time they were on the website, their operating system information, browser information, device type information, IP address, and geolocation data.

29.    The Data includes fields clearly marked as "city," "country," and ███████████ **Exhibit F** at 6, 21 (Ex. 148 to 30(b)(6) deposition), which, like other "pen register" data, is transmitted to Meta each time a person visits a website employing the Meta Pixel.[3] *See* **Exhibit G** at 1 (current version of https://developers.facebook.com/docs/meta-pixel explaining the Meta Pixel can collect, among other things, "[a]nything that is generally present in HTTP headers, a standard web protocol sent between any browser request and any server on the internet. This

---

[3] As described above, the relevant class period for classes related to visitors to the H&R Block website is from January 15, 2019 to June 30, 2023. The relevant class period for classes of visitors to the TaxAct website is from August 25, 2015 to June 30, 2023.

information may include data like IP addresses, information about the web browser, page location, document, referrer and person using the website."). Meta also produced a data dictionary which provides that the fields "city" and "country" represent the city and country "where the pixel is fired (inferred from geo IP location)." **Exhibit H** (PIXEL_TAX000058898-905) at 1-2.

30.   My understanding is that neither the Event Data Sample nor the Representative Data is coextensive with all event data that Meta may have collected through its use of the Meta Pixel from the Representatives or from members of the proposed classes. As explained by Meta's 30(b)(6) deponent, "the primary tables where the Event Data is stored typically retains the data for about 90 days." **Exhibit I** (excerpts of transcript of 30(b)(6) deposition) at 171:23-172:2.

**B.   How and When the Meta Pixel Collected and Transmitted Data to Meta**

31.   The Meta Pixel is a JavaScript tracking tool that Meta offers website operators so they can embed it in their webpages to measure visitor interactions and transmit those interactions to Meta for its use in its advertising and analytics systems. *See* **Exhibit G** at 1. When a webpage containing the Meta Pixel is loaded in a visitor's browser, or when a trigger event occurs (such as clicking a button, submitting a form, or completing a purchase), the Meta Pixel sends data about the event to Meta's servers. *See* **Exhibit J** (Declaration of Tobias Wooldridge in Support of Defendant Meta Platforms, Inc.'s Opposition to Plaintiffs' Motion for Preliminary Injunction in Case No. 3:22-cv-3580-WHO) at ¶ 4. This data can include standard data (such as the event name, page URL, and timestamp), optional custom data configured by the site operator, and data that can be used for matching the site visitor to a Meta user based on the user's Meta profiles (on Facebook, Instagram, and others). *See* **Exhibit J** at ¶ 4.

32.   The Meta Pixel can operate in conjunction with Meta's Conversions API, which sends similar event data directly from the website operator's servers to Meta's servers rather than from the visitor's browser. For both the Meta Pixel and Meta's Conversions API, data is transmitted over the Internet to Meta-controlled endpoints.

CONFIDENTIAL                                                                          9

### i.    *When the Meta Pixel Began Operating on the Tax Preparers' Websites*

33.    According to Meta's Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories ("Supplemental Interrogatory Responses"), Meta received its first transmission of data from the Meta Pixel operating on the TaxAct website on August 15, 2015, and from the H&R Block Website on January 15, 2019. *See* **Exhibit K** at 2. Meta's Supplemental Interrogatory Responses further state that the Meta Pixel was still operating on the websites on March 30, 2025 when the responses were drafted. *See* **Exhibit K** at 2.

34.    I    have    used    the    Meta    Pixel    Helper,    *see*    **Exhibit    L** (https://chromewebstore.google.com/detail/meta-pixel-helper/fdgfkebogiimcoedlicjlajpkdmockpc?pli=1), a third-party browser extension, to determine whether the Meta Pixel was still operating on the Tax Preparers' websites as of August 15, 2025. The Meta Pixel Helper detects and reports active Meta Pixel IDs and fired events in real time when a site is loaded. Using this tool, I confirmed that the Meta Pixel was still active and firing on www.hrblock.com and www.taxact.com as of that date.

### ii.    *How the Meta Pixel Operates on the Tax Preparers' Websites*

35.    The Meta Pixel is a tracking tag created and maintained by Meta that is embedded in the Tax Preparers' websites. It records visitor interactions and transmits event data to Meta's servers for advertising, analytics, and measurement purpose.

36.    The Meta Pixel is used by Meta to cause information about website visitors' "events" to be sent to Meta, which also allows the website operators to track customer information and interactions with the websites. There are three types of "events" that the Meta Pixel can collect and transmit to Meta:

- **Standard events** are website visitor actions that Meta has defined with specific functions and that website developers can track by employing one of several predefined Meta Pixel functions that are provided by Meta. Standard events are predefined visitor actions that correspond to common visitor activities, such as searching for, viewing or purchasing a product. Standard events that can be tracked include `AddToCart`, `Purchase`, and `CompleteRegistration`.

- **Custom events** are visitor actions that website operators define and can track by calling the Meta Pixel's built-in custom event method (`fbq('trackCustom', ...)`), which is part of the Pixel library provided by Meta. Custom events allow tracking of actions or details not covered by Meta's predefined standard events. For example, a website may want to track which customers used specific coupons during a purchase or identify a specific product purchased. In the context of the Tax Preparers' websites, examples of custom events include `EFile-Print`, `Download`, and `FormSubmission`.

- **Automatic Events** are visitor actions that are tracked automatically without needing the tags to call any specific functions. For example, each time the Meta Pixel loads, it automatically tracks a "PageView" standard event that records the URL of the page visited. No specific code is needed on the webpage to record these events. Automatic events include `PageView`, `ScrollDepth`, `Microdata`, and `SubscribeButtonclick`.

37.    The Meta Pixel captures and transmits:

- The **event type** (e.g., `Purchase`, `InitiateCheckout`).

- **Metadata** about the event (e.g., transaction value, page URL, financial interactions).

- **Device & browser details** (e.g., IP address, user agent, referrer URL).

- **App-specific data** (e.g. screen views, in-app purchases, app version).

- **Visitor identifiers** for cross-platform tracking (e.g., email, phone number, Meta ID).

- **Custom data** parameters defined by the website operator (e.g., tax return status, coupon codes, selected product type).

### iii.    *How the Meta Pixel was Employed on the Tax Preparers' Websites*

38.    Both TaxAct and H&R Block implemented the Meta Pixel on their websites, enabling immediate client-side tracking of visitor interactions as the visitor navigated the site. TaxAct deployed the Meta Pixel through Google Tag Manager, while H&R Block deployed the Meta Pixel through Adobe Dynamic Tag Manager/Adobe Launch and Magic Pixel.

39.    Tag management systems give website operators greater flexibility and control over tracking by allowing them to add, modify, or remove scripts without altering the site's underlying code. Because the tracking code is injected dynamically when the page loads, it is less visible in the website's static source code, reducing the likelihood of detection by casual visitors. Common tag management systems include the ones used by the Tax Preparers.

CONFIDENTIAL                                                                                                11

40.    During the relevant class periods the Meta Pixel operated in a largely uniform manner on the Tax Preparers' websites with respect to the basic mechanics of collecting and transmitting visitor data to Meta.

**C.    Analysis of the Specific Visitor Data Produced by Meta from the Tax Preparers' Websites that the Meta Pixel Collected and Transmitted to Meta**

41.    I reviewed the Data produced by Meta for the purpose of analyzing what event data was transmitted to and received by Meta from the Tax Preparers' websites.

42.    As an initial matter, and as discussed above, the Data produced by Meta was limited because it only included a small sample of possible event data from the relevant class periods. Meta also regularly deleted event data within 90 days. *See* **Exhibit I** at 171:23-172:2. Despite all of this I was able to review a considerable sample of event data for members of the classes and the Representatives.

43.    I have reviewed the Event Data Sample, particularly from the `offsite_signals` spreadsheet. By reviewing the number of unique (encrypted) IP addresses and associated zip codes, I have determined that there are numerous (and more than 40) people who visited the HRB and TaxAct websites, both nationally and in California, during the relevant class periods. For H&R Block, the period was from January 15, 2019 to June 30, 2023. For TaxAct, the period was from August 25, 2015 to June 30, 2023.

44.    For example, the Representative Data produced by Meta reflects that the Meta Pixel transmitted to Meta the facts that Plaintiff Jane Doe, on April 2, 2022, visited H&R Block's website using a Chrome desktop browser with device operating system Windows NT, while she was in Turlock, California, and searched for information about claiming boyfriends on taxes. *See* **Exhibit F** at 1-3, 5-6, 21 (bottom row of each page).

45.    In another example, the Representative Data produced by Meta reflects that the Meta Pixel transmitted to Meta the facts that Plaintiff Katrina Calderon, on November 14, 2021, visited H&R Block's website using a mobile phone with an iOS operating system (i.e., an Apple iPhone), when she was in Salinas, California, and visited H&R Block's home page.

46.    As Meta confirmed in this litigation, in response to a request for admission that the Meta Pixel collected information from the TaxAct website that included numerous types of data, Meta:

admit[ted] that it received from the TaxAct website via the Pixel, among other things, "SubscribedButtonClick" event data, "PageView" event data, and other event data with parameters, among others, bearing the labels "name," "raw_event_name," "event_name," "itemlist_product_names," "og:site_name," "cy_email," "ly_email," "email," "state_revenue," "zip," "phone," "age_range," "num_of_dependents," "numChildButtons," "button_text," "buttonFeatures," "buttonText," "return_year," ██████████████████████████████████ "innerText," "tax_form," "formFeatures," and "client_user_agent."

**Exhibit M** at 3 (Meta's Amended Responses and Objections to Plaintiffs' First Set of Request for Admission).

47.    Meta further admitted that it "received from the TaxAct website via the Pixel, among other things, parameters bearing the labels 'num_of_dependents,' 'numChildButtons,' 'w2,' 'agi,' 'federal_owe_amount,' and "federal_refund_amount." **Exhibit N** at 15 (Meta's Responses and Objections to Plaintiffs' First Set of Request for Admission).

48.    The Event Data Sample produced by Meta also reveals specific tax concerns that members of the classes researched when visiting both Tax Preparers' website. For example, the Event Data Sample table `ads_pixel_traffic` table for data from May 26, 2022, reflects that the following URLs were visited:

- https://www.hrblock.com/taxcenter/income/investments/how-to-figure-capital-gains-tax/
- https://blog.taxact.com/debt-you-cant-lose-in-bankruptcy/

49.    The Event Data Sample from July 26, 2022, similarly shows, among other things, a specific class member's age range (35-44), return year (2020), agi ($55,000), federal revenue ($0), federal amount owed ($0), federal refund amount ($7,400), number of dependents (2),

standard deductions (1), state revenue ($0), and tax form used (1040):

{"age_range":"35-44","f1099misc":"0","ad_tracking":"0","promo":"taspcl4usmilitary,","source_code":"1901200000","start_vintage":"yr3","customer_type":"consumer","return_year":"2020","start_edition":"deluxe","current_edition":"deluxe","start_product_id":"20CRDLXFEDFEDOL","current_product_id":"20CRDLXFEDFEDOL","start_actual_price":"24.95","start_default_price":"24.95","agi":"55000","app_step":"iv_uspaper_printfedreturn","audit_revenue":"0.00","charitable_contribution":"0","complete_vintage":"new","federal_revenue":"0.00","federal_owe_amount":"0","federal_refund_amount":"7400","filing_status":"married_filing_jointly","investments":"1","modules_submitted":"fed","num_of_dependents":"2","payment_type":"ccard","rpt_revenue":"0.00","schedule_c":"0","schedule_c_ez":"undefined","software_revenue":"0.00","standard_deduction":"1","state_revenue":"0.00","svc_revenue":"undefined","tax_form":"1040","total_revenue":"0.00","w2":"1","_filteredParams":"{\"unwantedParams\":[\"mortgage_interest\",\"student_loan_interest\"],\"sensitiveParams\":[]}"}

**Exhibit O** (Exhibit 146 to 30(b)(6) deposition) at 3, 16.

50.    There are thousands of rows of data like this for other members of the classes in the limited Event Data Sample produced by Meta.

**D.    Calculating Visits to the Tax Preparer Websites**

51.    The types of data produced by Meta could be used to determine the number of visits made to the Tax Preparers' websites during the relevant class periods. I have been asked how to calculate these numbers using Meta's Hive data. In my view, a reasonable measure of a "visit" to a website (including the Tax Preparers' websites) would be each time someone (a) goes to the website and either simply remains for a time on the initial web page or performs some operations such as entering information into the website, and then (b) leaves the website by navigating to a different website, closing the browsing session or timing out. If this visitor comes back to the website again at a later time, that would be considered a second visit. I call the count of these visits

a "Visitation Count."

52.    In providing the following method for deriving the Visitation Count from the Data, I am using the following proxies that should be accurate based on my knowledge of the fields in the Data and on the information disclosed by Meta.

53.    In the below Table 1, I identify the definitions that Meta provided for relevant fields in the Event Data Sample from the `offsite_signals` database. *See* **Exhibit P** (PIXEL_TAX000034479-506) at 1-2. I am relying on these definitions and also my observations of the data in the fields.

| Field | Description |
| --- | --- |
| `connection_method` | Connection method through which this event was received (e.g. browser, server, merged). Called event_src or signals connection method elsewhere |
| ███████████ | ████████████████████████████████████████ |
| `session_id` | The ID of the user session. |

**Table 1. Meta Hive field definitions provided by Meta**

54.    With the relevant fields of the Data identified, in order to determine the number of visits to each Tax Preparer website, each entry in the database first needs to be filtered to identify whether it is related to H&R Block's or TaxAct's website. The field ████████████ contains the Pixel IDs for each Tax Preparer website identified by Meta. *See* **Exhibit K** at 2 (TaxAct Pixel ID is ███████████ H&R Block Pixel ID is █████████████ By filtering the ████████████ field by these two identifiers, one can differentiate between event data from the two Tax Preparer websites.

55.    Next, the field `connection_method` should be limited to only "BROWSER" or "SERVER" in order to limit the data set to events triggered by the Meta Pixel or Meta Conversions API. *See* **Exhibit P** at 1; *see also* **Exhibit Q** (PIXEL_ TAX000059048-53) at 3.

56.    Finally, the field `session_id` gives a unique ID for each "user session." **Exhibit P** at 2. Put another way, each unique session ID represents a unique visit to the Tax Preparer websites. Counting each unique session ID, when filtered to identify which Tax Preparer website

was visited and when omitting any blank or "null" `session_id` fields, will provide an accurate Visitation Count for each website.

## VI.    CONCLUSIONS

57.    In this report, I describe how I reviewed the data supplied by Meta in its "Hive." I conclude the following about the data that Meta collected and how it collected it.

1) **How and When the Meta Pixel Collected and Transmitted Data to Meta**: This report details how the Meta Pixel and related technologies operate. As described in this report, I determined that the Meta Pixel collected and transmitted various types of data to Meta from the Representatives and other members of the Classes during the relevant class periods from the Tax Preparers' websites, and did so in a largely uniform matter on each website during the relevant class periods.

2) **Analysis of the Specific Visitor Data Produced by Meta from the Tax Preparers' Websites that the Meta Pixel Collected and Transmitted to Meta**: In this report, I analyzed samples of visitor data from the Tax Preparers' websites that Meta produced to Plaintiffs from its repository of "Hive" data. I determined that the data included "pen register" data that was transmitted from each visitor to the Tax Preparers' website to Meta, as well as other data reflecting visitors' tax information and other financial concerns. While Meta only produced a limited data sample, I nonetheless found there was an enormous amount of tax information and other data transmitted to Meta from the Tax Preparers' websites. In addition, I proposed how the types of data produced by Meta can be used to determine the number of visits to each Tax Preparers' websites during the relevant class periods.

58.    It is my understanding that discovery in this case is ongoing. Accordingly, I reserve the right to supplement or amend my opinions in light of any additional evidence, testimony, or information that may be provided to me after the date of this report. I also reserve the right to

CONFIDENTIAL                                                                          16

supplement or amend my opinions in response to any expert reports served by any other party in the lawsuit.

Dated: August 18, 2025

_____

Robert Zeidman

CONFIDENTIAL

17